ACCEPTED
01-15-00571-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
9/24/2015 9:45:33 PM
CHRISTOPHER PRINE
CLERK

**N0. 01-15-00571-CV**

IN THE COURT OF APPEALS

FOR THE FIRST DISTRICT

OF TEXAS AT HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

9/24/2015 9:45:33 PM

CHRISTOPHER A. PRINE
Clerk

**IN THE INTEREST OF A.G. AND F.G., CHILDREN**

**S.F., APPELLANT**
**vs.**
**DEPARTMENT OF FAMILY AND**
**PROTECTIVE SERVICES, APPELLEE**

ON APPEAL FROM
THE 313TH DISTRICT COURT OF
HARRIS COUNTY, TEXAS
TRIAL COURT CAUSE NO. 2013-06904J

**ORIGINAL APPELLANT'S BRIEF**

DONALD M. CRANE
DONALD M. CRANE (SBN 05005900)
Attorney at Law
810 South Mason Road, #350
Katy, Texas 77450
Telephone: (281) 392-6611
Facsimile: (281) 392-5383
donmcrane@gmail.com
ATTORNEY FOR APPELLANT, S.F.

**NO ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

**Respondent/Appellant:**
**S.F., Mother**

**Trial Counsel:**
Juliane (Juli) Crow
P.O. Box 10152
Houston, Texas 77026

**Appellate Counsel:**
Donald M. Crane
810 South Mason Road, Suite 350
Katy, Texas 77450

**Petitioner/Appellee:**
**Department of**
**Family and Protective**
**Services**

**Trial Counsel:**
Jamie Rawlinson
Assistant County Attorney
1019 Congress Avenue, 15th Floor
Houston, Texas 77002-1700

**Appellate Counsel:**
Sandra D. Hachem
Senior Assistant County Attorney
2525 Murworth, Suite 300
Houston, Texas 77054-1603

**Interested Party:**
**A.G. and F.G., Children**

**Ad Litem:**
John R. Millard
1 Sugar Crk. Ctr. Blvd., Ste. 925
Sugar Land, Texas 77478

**Interested Party:**
**R.F., Father**

**Trial Counsel:**
Dana Rahman
1415 S. Voss Road #110-398
Houston, Texas 77057

1

**Interested Party:**  
**B.L., Alleged Father**

**Trial Counsel:**  
Dana Rahman  
1415 S. Voss Road #110-398  
Houston, Texas 77057

**Interested Party:**  
**Unknown Father**

**Trial Counsel:**  
Mitchel Ryan Nelson  
111 W. 15th St.  
Houston, Texas 77008-4220

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL                          1

TABLE OF CONTENTS                                        3

INDEX OF AUTHORITIES (Cases)                             5

INDEX OF AUTHORITIES (Statutes and Rules)               7

NO ORAL ARGUMENT REQUESTED                               8

RECORD REFERENCES                                        8

PARTY/PARTICIPANT REFERENCES                             9

STATEMENT OF THE CASE                                    10

ISSUES PRESENTED                                         11

APPELLANT'S BRIEF                                        12

STATEMENT OF FACTS                                       14

ARGUMENTS AND AUTHORITIES                                21

    A.    Standard of Review          21

    B.    Best Interest               23

SUMMARY OF ARGUMENT                                      26

    I.    ISSUE PRESENTED NO. ONE      26

    A. Argument                                        26

    B. Authorities                                     26

    C. Analysis                                        27

II.     ISSUE PRESENTED NO. TWO     29

     A. Argument     29

     B. Authorities     29

     C. Analysis     30

CONCLUSION AND PRAYER     32

CERTIFICATE OF COMPLIANCE     33

CERTIFICATE OF SERVICE     34

# INDEX OF AUTHORITIES

| **CASES** | **PAGE** |
|---|---|
| *City of Keller v. Wilson,* 168 s.w.3D 802 (Tex. 2005) | 22 |
| *Holick v. Smith, 685 S.W.2D 18* (Tex. 1985) | 21, 29 |
| *Holley v. Adams,* 544 S.W.2d 367 (Tex. 1976) | 24, 29 |
| *In re A.A.A.,* 265 S.W.3d 507, 516 (Tex. App. – Houston [14th Dist.] 2008, pet. denied) | 25, 30 |
| *In re A.I.G.,* 135 S.W.3d 687, 692 (Tex. App. – San Antonio 2003, no pet.) | 24, 29 |
| *In re C.H.,* 89 S.W.3d 17 (Tex. 2002) | 22, 23 |
| *In re C.L.C.*, 119 S.W.3d 382 (Tex. App. – Tyler 2003, no pet.) | 27 |
| *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App. – Fort Worth 2000, pet. denied) | 23, 27 |
| *In re E.C.R., 402 S.W.3d 239 (Tex. 2013)* | 25 |
| *In re J.F.C.,* 96 S.W.3d 256 (Tex. 2002) | 21, 22 |
| *In re J.J.*, 911 S.W.2d 437, 440 (Tex. App. – Texarkana, 1995) | 27 |
| *In re L.C.*, 145 S.W.3d 790, 795-796 (Tex. App. – Texarkana 2004, no pet.) | 26 |

# INDEX OF AUTHORITIES, cont.

*In re N.R.*, 101 S.W.3d 771, 776 (Tex. App., 2003)                    27

*In re S.R.L.,* 243 S.W.3d 232     [Tex. App. – Houston          23
   (14th Dist.) 2007, no pet.]

*In the Interest of E.S.S.*, 131 S.W.2d 632                    22
   (Tex. App.-Fort Worth     2004, no pet.)

*Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App. – Houston     26
   [1st Dist.] 2010, pet. denied)

*Tex. Dep't of Human Services v. Boyd,* 727 S.W.2d 531          26, 27
   (Tex. 1987)

*Santosky v. Kramer*, 455 U.S. 745 (1982)                     21

*Stanley v. Illinois,* 405 U.S. 645 (1972)                    21, 29

*Yonko v. Dept. of Family & Protective Servs.*                 23
   196 S.W.3d 236 [Tex. App. -Houston (1st Dist.) 2006]

**<u>STATUTES AND RULES</u>**                                    **<u>PAGE</u>**

TEX. FAM. CODE ANN. § 101.007                                     27
(Vernon Supp. 2002)

TEX. FAM. CODE ANN. § 161.001(1)                                  28
(Vernon Supp. 2002)

TEX. FAM. CODE ANN. § 161.001(1)(D)                               31
(Vernon Supp. 2002)

TEX. FAM. CODE ANN. § 161.001(2)                                  33
(Vernon Supp. 2002)

Appellant, S.F., does not request oral argument.

**RECORD REFERENCES**

**TRANSCRIPT**

The pleading record <u>consists</u> of the Transcript (Clerk's Record). The Transcript is referenced to herein as [CR_____] followed by a page and line reference.

Both the Transcript and the Statement of Facts (Reporter's Record) may contain copies of the Exhibits and, if so, will be referenced accordingly.

**STATEMENT OF FACTS**

The Statement of Facts (Reporter's Record) consists of three (3) volumes (including Exhibits) prepared by Ms. Elizabeth Cordova, CSR, Texas CSR 9039, Deputy Court Reporter, 313th District Court, 8531 Triola Lane, Houston, Texas 77036, (281) 865-2723, and is referred to herein as [RR Vol._____, p.____, l.____].

Ms. Cordova's Reporter's Record, Volume 1 of 3, is entitled "Master," and references the 2nd day of June 2015.

Ms. Cordova's Reporter's Record, Volume 2 of 3, is entitled "Trial," and references the 2nd day of June 2015.

Ms. Cordova's Reporter's Record, Volume 3 of 3, is entitled "Exhibits," and references the 2nd day of June 2015.

## PARTY/PARTICIPANT REFERENCES

Appellant, S.F., may be referred to as: "Appellant," "S.F.," "respondent mother," "mother," or "daughter."

Further, Appellee refers to Department of Family and Protective Services and may be referred to as: "Petitioner," "DFPS," "CPS," or the "Agency."

"A.G. and F.G." refers to the children and may be referred to as: "A.G." or "F.G."

"T.E." and "godmother" refers to the godmother of the children.

**TO THE HONORABLE JUSTICES OF THE FIRST COURT OF APPEALS:**

Appellant, S.F., (also referred to as "mother"), respectfully submits her original brief in the above styled and numbered appeal.

## STATEMENT OF THE CASE

On December 18, 2013, the Texas Department of Family and Protective Services ("DFPS") filed its *Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship* ("the Original Petition") wherein it requested, inter alia., to be named the temporary managing conservator of A.G., a female child born on August 15, 2001 and F.G., a female child born December 26, 2011. **CR pp. 4-35**.

The case was tried before the Honorable Stephen Newhouse on June 2, 2015. **RR Vol. 2, p. 1, l. 20-23**. The Court entered judgment in favor of DFPS and terminated the parent-child relationship between Appellant and her children, A.G. and F.G. **RR Vol. 2, p. 36, l. 20-24**. Appellant's rights were terminated pursuant to Texas Family Code Section 161.001(1)(D), (E), (L), and (O). **RR Vol. 2, p. 36, l. 22-24; CR pp. 160-170**.

On June 29, 2015, Appellant filed her notice of appeal. **CR pp. 174-175**. Appellant seeks reversal of the judgment entered June 25, 2015.

10

## ISSUES PRESENTED

**Issue Presented No. One:** The evidence was legally and factually insufficient to support the termination of Appellant's parental rights under Texas Family Code Section 161.001(1)(D)

**Issue Presented No. Two:** The evidence was legally and factually insufficient to support the termination of Appellant's parental rights under Texas Family Code Section 161.001(2)

IN THE COURT OF APPEALS

FOR THE FIRST DISTRICT

OF TEXAS AT HOUSTON, TEXAS

**IN THE INTEREST OF A.G. and F.G., CHILDREN**

**S.F., APPELLANT**
**vs.**
**DEPARTMENT OF FAMILY AND**
**PROTECTIVE SERVICES, APPELLEE**

ON APPEAL FROM
THE 313TH DISTRICT COURT OF
HARRIS COUNTY, TEXAS
TRIAL COURT CAUSE NO. 2014-06904J

**APPELLANT'S BRIEF**

TO THE HONORABLE JUSTICES OF THE FIRST COURT OF APPEALS:

COMES NOW DONALD M. CRANE ("Appellate Counsel"), appointed

Attorney Ad litem on appeal for Appellant, S.F., Respondent Mother, and

respectfully submits this Appellant's Brief.

Appellant, S.F., may be referred to as: "Appellant," "S.F.," "respondent mother," "mother," or "daughter."

Further, Appellee refers to Department of Family and Protective Services and may be referred to as: "Petitioner," "DFPS," "CPS," or the "Agency."

"A.G. and F.G." refers to the children and may be referred to as: "A.G." or "F.G."

"T.E." and "godmother" refers to the godmother of the children.

## STATEMENT OF FACTS

On November 15, 2013, DFPS received a referral alleging the neglectful supervision of F.G. **CR pp. 96**. The referral alleged that law enforcement was dispatched to S.F.'s home for "a welfare concern." **CR pp. 96**. It further alleged that a neighbor stated she watched F.G. "wander around the courtyard of the apartment complex" for a few hours alone. **CR pp. 96**. When law enforcement arrived to the apartment complex, F.G. was with the neighbor. **CR pp. 96**. The referral stated that F.G. is "often left unsupervised a lot." **CR pp. 96**. It further stated that S.F. was "across the street at a bar listening to a band" and "intoxicated." **CR pp. 96**. Lastly, the referral stated that S.F. was "arrested for child endangerment." **CR pp. 96**.

On November 19, 2013, Alexaundra Duncan, investigative caseworker, interviewed A.G., F.G. and their godmother, T.E. **CR pp. 97-98**. A.G. stated S.F. would "frequently leave her home alone." **CR pp. 97**. At the time of the incident, A.G. stated S.F. left her alone to watch F.G., while S.F. and some friends went to the bar to "participate in karaoke." **CR pp. 98**. A.G. "left her sister outside in the courtyard" while A.G. "went upstairs to use the restroom." **CR pp. 98**. T.E. stated S.F. asked her to be the godmother of her children "and has since formed a

14

relationship with the children." **CR pp. 98**. T.E. also stated she would be able to serve a parental child safety placement. **CR pp. 98**.

On November 20, 2013, Ms. Duncan interviewed S.F. **CR pp. 98**. S.F. stated her neighbor "set her up" and that the neighbor wants her children "because the children are extremely beautiful." **CR pp. 98**. S.F. further denied using drugs or drinking alcohol. **CR pp. 98**.

On November 21, 2013, Ms. Duncan interviewed Ms. Pam Ham, the apartment manager. Ms. Ham stated that S.F. is behind on rent and "is going to be evicted from her apartment." **CR pp. 99**. Ms. Ham also stated that S.F.'s electricity was "always off due to nonpayment." **CR pp. 99**.

On December 1, 2013, S.F. informed Ms. Duncan "she had checked her self into Bayshore Medical Center." **CR pp. 100**. A few days later, Ms. Duncan spoke with Dr. Arianne Rumley, who informed her that S.F. was being discharged to the Bay Area Homeless Shelter, diagnosed with depression, and tested positive for marijuana. **CR pp. 100**.

On December 6, 2013, Ms. Duncan requested S.F. to take a drug test and S.F. stated "she had smoked marijuana a few days before she had gotten arrested,"

15

so "she would probably test positive." **CR pp. 100**. A few weeks later, S.F. informed Ms. Duncan that "she is bi-polar and is not currently taking medication." **CR pp. 100**. S.F. also stated that "she does not have a place to live due to her being evicted from her apartment." **CR pp. 100**.

## TRIAL

On June 2, 2015 the following testified at trial: Ms. Tina Marsh, DFPS supervisor and T.E., godmother of A.G. and F.G. S.F. was not present for trial. **RR Vol. 2, p. 5, l. 9-10**.

## Tina Marsh

Ms. Marsh testified she has been supervising this case "since the very beginning when the kids came into custody." **RR Vol. 2, p. 10, l. 16-19**. She further testified the children are with their godmother. **RR Vol. 2, p. 10, l. 20-21**.

Ms. Marsh testified S.F. completed a psychosocial evaluation and a substance abuse assessment. **RR Vol. 2, p. 11, l. 4-9**. Ms. Marsh also testified S.F. "was supposed to follow the recommendations of the evaluations that she

16

completed and she failed to do that." **RR Vol. 2, p. 11, l. 24-25 – p. 12, l. 1**.[1] Ms. Marsh further testified S.F. was going into inpatient treatment the day before trial and that she had been trying to get into the hospital for over a year but she had not been able to get in. **RR Vol. 2, p. 12, l. 15-25**.

Ms. Marsh testified S.F. is not working. **RR Vol. 2, p. 13, l. 21**. Ms. Marsh further testified she has not provided any support for the children. **RR Vol. 2, p. 27, l. 13-15**. Ms. Marsh testified S.F. has communicated infrequently with the Agency. **RR Vol. 2, p. 14, l. 1**.[2] Ms. Marsh also testified S.F. was convicted of endangering a child. **RR Vol. 2, p. 14, l. 15-17**. She further testified that S.F. "has not done anything" to alleviate the concerns that caused her to inadequately supervise F.G. **RR Vol. 2, p. 14, l. 22-25**.

---

[1] Ms. Marsh further testified, "The psychosocial recommended her to have a full-blown psychological evaluation as well as the parenting classes, complete individual counseling, the substance abuse treatment, and she never did follow up with any of that." **RR Vol. 2, p. 12, l. 1-5**. She also testified, "The substance assessment recommended her for outpatient treatment; she never followed through with that. She was supposed to complete a parenting class. She was supposed to maintain stable housing, stable income, submit to random drug testing; she's not doing any of that, she hasn't done that." **RR Vol. 2, p. 12, l. 5-11**.

[2] Ms. Marsh further testified, "She'll call every so often but since the children have been placed with the current caregiver, she's not really contacted us." She also testified, "The other issue with mom is that she has a mental health diagnosis that she's refused to get treated for. She's diagnosed with bi-polar and I believe schizophrenia. She refused to see a psychiatrist, that was also part of the recommendation on the psychosocial evaluation that she completed." **RR Vol. 2, p. 14, l. 1-11**.

Ms. Marsh testified that S.F. admitted to leaving F.G. in the care of A.G. and that "she was not present when her 1-year-old was roaming around." **RR Vol. 2, p. 15, l. 13-21**. Ms. Marsh further testified the Agency is asking the Court to terminate the parental rights of S.F. **RR Vol. 2, p. 16, l. 15-18**.

Ms. Marsh testified A.G. is bonded to S.F. **RR Vol. 2, p. 22, l. 16-17**. She further testified it is not A.G.'s desire to have her mother's rights terminated. **RR Vol. 2, p. 22, l. 20-22**. Ms. Marsh testified that A.G. does not want to be adopted. **RR Vol. 2, p. 22, l. 23-25**.[3] Ms. Marsh also testified the children are in a kinship placement that would like to adopt, but the issue is that currently the Godmother is married and has to settle that relationship in divorce before she can be approved for an adoption. **RR Vol. 2, p. 26, l. 7-12**.

**T.E.**

T.E. testified the children have been in her care for almost six months. **RR Vol. 2, p. 28, l. 14-20**. T.E. testified S.F. would come visit "like two, three weeks

---

[3] Ms. Marsh testified that S.F. provided a list of relatives or close family friends to serve a placement for the children, but none of the names were considered suitable placements. **RR Vol. 2, p. 25, l. 2-11**.

at a time, and then she would slack off. And then she would come back one day, one day of the month and then slack off, but she would come visit them. **RR Vol. 2, p. 29, l. 1-5**. T.E. further testified S.F. supported her with $250 worth of food stamps "once a month." **RR Vol. 2, p. 29, l. 6-12**.[4]

T.E. testified that when S.F. came over to visit she did not appear to be healthy. **RR Vol. 2, p. 31, l. 5-7**.[5] T.E. also testified S.F. was high when she came to her house. **RR Vol. 2, p. 31, l. 11-13**.[6]

T.E. testified she has been separated from her husband for over twenty years. **RR Vol. 2, p. 32, l. 23-25**.[7] She further testified she is willing to take care of the children. **RR Vol. 2, p. 33, l. 12-14**. T.E. also testified she works for "All the Little Things Count," where she is a program specialist for the mentally retarded. **RR Vol. 2, p. 33, l. 19-25 – p. 34, l. 1-5**.

**Closing Arguments:**

DFPS requested that mother's parental rights be terminated for both

---

[4] T.E. further testified S.F. was inconsistent in providing her with food stamp money. **RR Vol. 2, p. 29, l. 13-25**.

[5] T.E. further testified S.F. "was down. She was real tired looking. She was real skinny." **RR Vol. 2, p. 31, l. 8-10**.

[6] She further testified, as to how she knew she was high, "I could tell from her eyes." She also testified that S.F.'s speech was slurred and her eyes were glassy and red. **RR Vol. 2, p. 31, l. 14-20**.

[7] She also testified that her boyfriend, Phillip, was present with her in court. **RR Vol. 2, p. 32, l. 16-22**.

children under 161.001(1)(D), (E),(L), (N), and (O). **RR Vol. 2, p. 35, l. 4-23**.

Ms. Crow, Attorney for S.F., made no argument. **RR Vol. 2, p. 36, l. 13**.

Mr. Millard, Attorney for A.G. and F.G., commented that A.G. "has expressed that she does not want her mother's rights to be terminated. So, on her behalf I request that you not terminate her mother's rights." **RR Vol. 2, p. 36, l. 15-19**.

## Court's Findings

The Court decided that the Agency met its burden by clear and convincing evidence for both children. **RR Vol. 2, p. 36, l. 20-21**.

## Court's Ruling:

The Court ruled that the mother's parental rights were terminated for both children pursuant to Texas Family Code Section 161.001.1(D), (E), (L), and (O). **RR Vol. 2, p. 36, l. 22-24**.

# ARGUMENTS AND AUTHORITIES

### A. Standard of Review

A parent's natural right to the "companionship, care, custody and management" of his or her children is fundamental and of constitutional dimension. *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397 (1982); *see Stanley v. Illinois,* 405 U.S. 645, 651 (1972); *see Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985). It is an interest that is far more precious than any property right. *Santosky*, 455 U.S. at 758-59. Because the termination of parental rights involves fundamental constitutional rights, the burden of proof at trial in parental termination cases is by clear and convincing evidence. Texas Family Code Section 161.001; *In re J.F.C.,* 96 S.W.3d 256, 263 (Tex. 2002). Under Section 161.001, a court may order the termination of the parent-child relationship if the court finds by clear and convincing evidence that (1) one or more acts enumerated in Section 161.001 (1) was committed and (2) termination is in the best interest of the child. "Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Texas Family Code Section 101.007; *J.F.C.* 96 S.W.3d at 266.

Termination may not be based solely on the best interest of the child, but both elements must be established. *In the Interest of E.S.S.*, 131 S.W.2d 632 (Tex. App.-Fort Worth 2004, no pet.). In cases involving termination of parental rights, there is a strong presumption that the best interest of the child is served by keeping custody in the natural parents. *In the Interest of K.C.M.*, 4 S.W.3d 392, 399 (Tex. App-Houston [1st Dist.] 1999, pet denied, overruled on other grounds; In re *C.H.,* 89 S.W.3d 17 (Tex. 2002).

In determining legal sufficiency this Court must review all the evidence in light most favorable to the finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.,* 96 S.W.3d at 266. To give proper deference to the fact finder's conclusions, this Court must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.* This Court must disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible. *Id.* In conducting a legal sufficiency review in a parental termination case this Court must consider all of the evidence, not only that which favor the verdict. *See City of Keller v. Wilson,* 168 S.W.3d 802, 817 (Tex. 2005).

In determining a factual sufficiency point, the higher burden of proof in

termination cases also alters the appellate standard of review. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* In reviewing the factual sufficiency of the evidence, this Court must consider and weigh all evidence, including that favorable to the appellant as well as that favorable to the finding. *In the Interest of D.T.,* 34 S.W.3d 625, 631 (Tex. App.-Fort Worth 2000, pet. denied).

**B. Best Interest**

Although the best interest of the child is often infused with the statutory grounds for termination under Texas Family Code Section 161.001(1), the best interest determination must have a firm basis in facts standing apart from the offending behavior. *In re S.R.L.,* 243 S.W.3d 232, 235 (Tex. App. - Houston [14th Dist.] 2007, no pet.).

Texas law places a high evidentiary standard on the State in order to overcome the presumption that children should remain with their parents. *Yonko v. Dept. of Family & Protective Servs.*, 196 S.W.3d 236 (Tex. App. -Houston [1st Dist.] 2006).

The determination of a child's best interest does not require proof of any

unique set of factors, nor does it limit the proof to any specific factors. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). In reviewing the sufficiency of the evidence to support a best-interest finding, courts may consider (1) the desires of the child, (2) the present and future physical and emotional needs of the child, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the persons seeking custody in promoting the best interest of the child, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by the individuals or agency seeking custody, (7) the stability of the home or proposed placement, (8) acts or omissions of the parent, which may indicate the existing parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *Id*. at 371-72. Although there is a strong presumption that it is in the child's best interest to allow the natural parent to retain custody, when confronted with evidence to the contrary, that presumption disappears. *In re A.I.G.,* 135 S.W.3d 687, 692 (Tex. App. – San Antonio 2003, no pet.) Also, "abuse or neglect of the child" necessarily includes the risks or threats of the environment in which the child is placed including the harm suffered or the danger faced by other

children under the parent's care. *In re E.C.R.,* 402 S.W.3d 239 (Tex. 2013).

Evidence proving one or more of the statutory grounds for termination may be

probative in determining that termination is in the best interest of the child. *In re*

*A.A.A.,* 265 S.W.3d 507, 516 (Tex. App. – Houston [14th Dist.] 2008, pet. denied).

# SUMMARY OF ARGUMENT

**Issue Presented No. One:** **The evidence was legally and factually insufficient to support the termination of Appellant's parental rights under Texas Family Code Section 161.001(1)(D)**

## A. Argument

Appellant argues that the evidence is legally and factually insufficient to establish (D) termination grounds.

## B. Authorities

In order to prove termination under subsection (D), the Agency must clearly and convincingly show that the Mother "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(1)(D) (Vernon Supp. 2002). Subsection (D) requires a showing that the environment in which the child was placed posed a danger to the child's physical or emotional health, and it permits termination based on a single act or omission by the parent. *In re L.C.*, 145 S.W.3d 790, 795-796 (Tex. App. – Texarkana 2004, no pet.); *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App. – Houston [1st Dist.] 2010, pet. denied).

"Endanger" means "to expose to loss or injury; to jeopardize." *Tex. Dep't*

*of Human Services v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987). Endanger also means more than a threat of metaphysical injury or the possible ill effects of less-than-ideal family environment. *Boyd*, 727 S.W.2d at 533. Parental conduct does not have to be directed at the child nor does the child actually need to suffer from injury, rather it is sufficient that the child's well-being be jeopardized or exposed to loss or injury. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d 437, 440 (Tex. App. – Texarkana, 1995).

Notably, the concern of this provision is the child's living environment. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App. – Fort Worth 2000, pet. denied); *see also In re C.L.C.*, 119 S.W.3d 382 (Tex. App. – Tyler 2003, no pet.). There must be a connection between the living conditions and the actual emotional or physical injury to the child. *In re C.L.C.*, 119 S.W.3d at 392. However it is not necessary for the parent to have certain knowledge that the actual injury is occurring, but it is sufficient that the parent was aware of the potential danger. *In re N.R.*, 101 S.W.3d 771, 776 (Tex. App., 2003).

## C. Analysis

The evidence brought by the Agency was legally and factually insufficient.

The Agency did not show that the children's living environment would endanger the physical or emotional well-being of A.G. and F.G. The Agency provided testimony only from the DFPS supervisor and the godmother. In regards to the living environment of the children, the DFPS supervisor, Ms. Marsh, provided minimal testimony of the children's living environment. **RR Vol. 2, p. 15, l. 7-21**. The exhibits introduced by DFPS also provide minimal information in record that refers to the children's living environment and the exhibit information contains only allegations. **RR Vol. 3, p. 76-91**. Therefore, the evidence provided by the Agency was legally and factually sufficient and does not establish the (D) termination ground.

**Issue Presented No. Two:** **The evidence was legally and factually insufficient to support the termination of Appellant's parental rights under Texas Family Code Section 161.001(2)**

**A. Argument**

Appellant argues that the evidence is legally and factually insufficient to support the trial court's finding that it was in her children's best interest for her parental rights to A.G. and F.G. to be terminated.

**B. Authorities**

The termination of parental rights involves fundamental constitutional rights. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). The natural rights that exist between parents and their children are of constitutional dimension. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). The determination of a child's best interest does not require proof of any unique set of factors, nor does it limit the proof to any specific factors. *See Holley v. Adams,* 544 S.W.2d 367, 371-72 (Tex. 1976). Although there is a strong presumption that it is in the child's best interest to allow the natural parent to retain custody, when confronted with evidence to the contrary, that presumption disappears. *In re A.I.G.,* 135 S.W.3d 687, 692 (Tex. App. – San Antonio 2003, no pet.) Evidence proving one or more of the statutory grounds for termination may be probative in

determining that termination is in the best interest of the child. *In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App. – Houston [14th Dist.] 2008, pet. denied).

**C. Analysis**

There are multiple factors introduced into evidence to disprove the trial court's determination. The most distinct evidence presented was the desires of A.G. According to the testimony, the Court heard multiple statements that A.G. did not desire for her mother's parental rights to be terminated. Ms. Marsh testified that A.G. is bonded to S.F. **RR Vol. 2, p. 22, l. 16-17**. She also testified that it is not A.G.'s desire to have her mother's rights terminated. **RR Vol. 2, p. 22, l. 20-22**. Ms. Marsh further testified that A.G. does not want to be adopted. **RR Vol. 2, p. 22, l. 23-25**. During closing arguments, Mr. Millard also made similar remarks regarding A.G.'s desires. Mr. Millard stated, A.G. "has expressed that she does not want her mother's rights to be terminated. So, on her behalf I request that you not terminate her mother's rights." **RR Vol. 2, p. 36, l. 15-19**.

Lastly, the children are placed in an environment that is inconsistent and detrimental to their well-being. The testimony shows that T.E.'s questionable lifestyle and unstable home environment may present future emotional and

physical dangers to the children. T.E. further testified she has been separated from her husband for over twenty years. **RR Vol. 2, p. 32, l. 23-25**. This raises concerns about T.E.'s character (as to her multiple relationships) which could significantly impact the lives of these children. For example, why has T.E. not divorced this person after twenty years? And, will her husband come back into T.E.'s life?

T.E. also testified that her boyfriend was present with her in court. **RR Vol. 2, p. 32, l. 16-22**. Although there is insufficient inquiry regarding T.E.'s multiple relationships (however speculative such inquiry may be), it remains unsettling that T.E. may be too distracted to care for two young children.

Therefore, the evidence could not be clearer, for it is both legally and factually insufficient to support the trial court's finding that it was in her children's best interest for her parental rights to A.G. and F.G. to be terminated because of A.G.'s outspoken desires and T.E.'s multiple relationships with other men.

## CONCLUSION AND PRAYER

Appellant prays that this Honorable Court of Appeals reverse the judgment terminating her parental rights to A.G. and F.G. and remand this case to the trial court for the sole purpose of conducting an evidentiary hearing on the issue of conservatorship.

Appellant prays for general relief.

Respectfully submitted,

**/s/ Donald M. Crane**
Donald M. Crane
TBA 05005900
Attorney at Law
810 South Mason Road, #350
Katy, Texas 77450
Telephone: (281) 392-6611
Facsimile: (281) 392-5383
donmcrane@gmail.com

ATTORNEY ON APPEAL FOR
S.F.

32

## CERTIFICATE OF COMPLIANCE

I hereby certify that the word count of this document is 5,228 words.

**/s/ Donald M. Crane**
Donald M. Crane

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 24, 2015, that a true and correct copy of the foregoing Original Appellant's Brief, was served in accordance with the TRAP to Ms. Sandra Hachem, Sr. Assistant Harris County Attorney, counsel for DFPS by electronically delivery through prodoc efiling and E-mail, and on Dana Rahman, Attorney for Fathers, R.F. & B.L., through hand-delivery or fax, and on John Millard, Attorney Ad litem, through hand-delivery or fax, and on Mitchel Ryan Nelson, Attorney for Unknown Father through hand-delivery or fax and Appellant through hand-delivery or First Class U. S. Post.

Ms. Sandra D. Hachem,
Senior Assistant County Attorney
Attorney for Appellee,
Department of Family and Protective Services
2525 Murworth, Suite 300
Houston, Texas 77054
Sandra.Hachem@cao.hctx.net
(713) 578-3995 fax

Ms. Dana Rahman                                    Via hand-delivery only
Attorney for Fathers, R.F. & B.L.
1415 S. Voss Road #110-398
Houston, Texas 77057
(832) 218-1911 fax

Mr. John R. Millard                                Via hand-delivery only
Attorney Ad litem
1 Sugar Crk. Ctr. Blvd., Ste. 925
Sugarland, Texas 77478
(888) 501-0680 fax

Mr. Mitchel Ryan Nelson                    Via hand-delivery only
Attorney for Unknown
111 W. 15th St.
Houston, Texas 77008-4220
(713) 869-9912 fax


Ms. S.F., Appellant
832 White Boulevard, #104
McComb, MS 39648




**/s/ Donald M. Crane**
Donald M. Crane

# City of Keller v. Wilson, 168 S.W.3d 802 (Tex. 2005)

**Page 802**

**168 S.W.3d 802 (Tex. 2005)**
**The CITY OF KELLER, Petitioner,**
**v.**
**John W. WILSON, Grace S. Wilson,**
**Johnny L. Wilson and Nancy A. Wilson, Respondents.**
**No. 02-1012.**
**Supreme Court of Texas**
**June 10, 2005**

Argued Oct. 19, 2004.

Rehearing Denied Sept. 2, 2005.

On Petition for Review from the Court of Appeals for the Second District of Texas.

---

**Page 803**

[Copyrighted Material Omitted]

---

**Page 804**

[Copyrighted Material Omitted]

---

**Page 805**

[Copyrighted Material Omitted]

---

**Page 806**

[Copyrighted Material Omitted]

---

**Page 807**

Dabney D. Bassel, Larry Bracken, Law Snakard & Gambill, P.C., Fort Worth, Douglas H. Conner III, L. Stanton Lowry, Boyle & Lowry, L.L.P., Irving, for petitioner.

James B. Barlow, Barlow & Garsek, Fort Worth, Robert L. Russell Bush, Bush & Morrison, Arlington, David R. Casey, Hurst, for respondents.

Jay Doegey, Assistant City Attorney for the City of Corpus Christi, Texas, Corpus Christi, Theodore P. Gorski Jr., Office of the City Attorney for City of Fort Worth, Mark G. Daniel, Evans Gandy Daniel & Moore, Fritz Quast, Taylor Olson Adkins Sralla & Elam, LLP, Fort Worth, Monte Akers, Texas Municipal League, Austin, Michael A. Bucek, Senior

Assistant City Attorney, Irving, Robert F. Brown, Brown & Hofmeister, L.L.P., Richardson, Bruce S. Powers, Assistant County Attorney, Michael A. Stafford, Harris County Attorney, Houston, for Amicus Curiae.

BRISTER, Justice & JEFFERSON, Chief Justice, HECHT, WAINWRIGHT, and GREEN, Justice joined, and in which Justice O'NEILL and Justice MEDINA joined as to Parts I through IV.

**OPINION**

BRISTER, Justice.

Must an appellate court reviewing a verdict for legal sufficiency start by considering all the evidence or only part? Over the years, we have stated both as the proper scope of review. While some see the standards as opposing, we disagree; like a glass that is half-full or half-empty, both arrive at the same point regardless of where they start.

But both standards must be properly applied. Rules and reason sometimes compel that evidence must be credited or discarded whether it supports a verdict or contradicts it. Under either scope of review, appellate courts must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. As we find the evidence here meets neither standard, we reverse.

## I. Factual and Procedural History

The City of Keller is one of several fast-growing communities on the outskirts of

**Page 808**

Fort Worth.[1] As part of that growth, the City approved plans for two new subdivisions, Estates of Oak Run and Rancho Serena, including plans for storm water drainage.

The Wilsons own property southeast of the new subdivisions, with a tract owned by Z.T. Sebastian lying between. Before development, surface water flowed generally north to south from the land where the subdivisions were built, across the Sebastian and Wilson properties, and into the Little Bear Creek Watershed.

In 1991, the City adopted a Master Drainage Plan providing for drainage easements across both the Sebastian and Wilson properties, and thence into Little Bear Creek. The City's codes require developers to comply with the Master Plan, to provide drainage for a 100-year rain event, and to avoid increasing the volume or velocity of water discharged upon downhill properties.

The developers of Oak Run and Rancho Serena submitted plans to the City indicating they would buy a drainage easement and build a ditch forty-five feet wide and more than two hundred yards long across the Sebastian property, and deed both to the City upon completion.[2] The plans also included detention basins on the subdivision properties, but omitted any drainage easement or ditch across the Wilsons' property. The City's director of public works approved the developers' plans, and the City accepted the works on completion.

In accordance with the Master Plan, the City built a box culvert south of the Wilsons' property. But as the developers' drainage ditch ended at the Wilsons' north property line, there was no link between the two. The Wilsons alleged and the jury found this omission increased flooding on the Wilsons' property, ruining eight acres of farmland the jury valued at almost $300,000.

To recover damages for inverse condemnation, the Wilsons had to prove the City intentionally took or damaged their property for public use, or was substantially certain that would be the result.[3] They do not allege the City intentionally flooded their land, but do allege it approved revised plans that it knew were substantially certain to have that effect.

The City contends no evidence supports the jury's finding of an intentional taking. It presented evidence that engineers for the developers, for the City, and for an outside firm the City retained all certified that the revised drainage plan complied with the City's codes and regulations— including the ban against increasing downstream runoff. Thus, the City asserts it had no reason to be substantially certain the opposite would occur, until it did.

A divided court of appeals rejected this contention.[4] In its legal sufficiency review, the court refused to consider the various engineers' certifications because "we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary."[5] The City challenges

this omission as applying the wrong scope of review.

We have on many occasions stated the scope of review precisely as the court of appeals says (the "exclusive" standard).[6] But we have also stated that a reviewing court must consider *"all* of the evidence" in the light favorable to the verdict (the "inclusive" standard).[7] Sometimes we have mentioned neither reviewing all evidence nor disregarding some part of it.[8] Finally, we have sometimes expressly mentioned both.[9]

Although this Court has used both the exclusive and the inclusive standards interchangeably over the years, commentators say the two are different.[10] Because this

important issue is dispositive here, we address it in some detail, and reserve for another day the City's arguments that a governmental entity cannot be liable for approving a developer's plans, or accepting rather than constructing the works at issue.

### II. Contrary Evidence That Cannot Be Disregarded

The question presented here is not a new one. More than 40 years ago, then Justice Calvert[11] addressed the standards for reviewing legal and factual sufficiency in the most-cited law review article in Texas legal history.[12] Frustrated that despite this Court's efforts to explain those standards "a growing number of recent decisions indicate a continuing misunderstanding," [13] the author summarized and attempted to clarify Texas law up to 1960.[14] The article's impact remains substantial today, having been cited more than 100 times by Texas courts in the last five years.

According to the article:

"No evidence" points must, and may only, be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.[15]

We have quoted a similar formulation on many occasions.[16]

Notably, Justice Calvert then proceeded to put the question before us in the proper context:

It is in deciding "no evidence" points in situation (c) that the courts follow the further rule of viewing the evidence in its most favorable light in support of the finding of the vital fact, considering only the evidence and the inferences which support the finding and rejecting the evidence and the inferences which are contrary to the finding.[17]

Clearly, the traditional rule in Texas has never been that appellate courts must reject contrary evidence in every no-evidence review. Instead, the traditional scope of review does not disregard contrary evidence if there is no favorable evidence

(situation (a) above), or if contrary evidence renders supporting evidence incompetent (situation (b) above) or conclusively establishes the opposite (situation (d) above).

As the following examples show, this has remained the rule since. We do not presume to categorize all circumstances in which contrary evidence must be considered in a legal sufficiency review. Evidence can be disregarded whenever reasonable jurors could do so,[18]an inquiry that is necessarily fact-specific. But it is important that when courts use the exclusive standard and disregard contrary evidence, they must recognize certain exceptions to it.

### A. Contextual Evidence

In Justice Calvert's first situation—a complete absence of evidence of a vital fact—it is generally irrelevant whether a reviewing court considers contrary evidence.[19]If supporting evidence is absent, opposing evidence cannot change that result. But in a number of cases, the lack of supporting evidence may not appear until all the evidence is reviewed in context.

For example, publications alleged to be defamatory must be viewed as a whole—including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself.[20]A court reviewing legal sufficiency cannot disregard parts of a publication, considering only false statements to support a plaintiff's verdict or only true ones to support a defense verdict.[21]

Similarly, reviewing courts must construe contracts as a whole; we do not consider only the parts favoring one party and disregard the remainder, as that would render the latter meaningless.[22]Even writings executed at different times must be considered together if they pertain to the same transaction.[23]

It is not just writings that reviewing courts must consider in context. For example, in reviewing intentional infliction of emotional distress claims for legal sufficiency, "we consider the context and the relationship between the parties."[24]Acts that might constitute outrageous conduct when dealing with a hearing-impaired consumer[25]may be legally insufficient between

business parties.[26]In our no-evidence reviews of successful claims, we have invariably reviewed not just evidence showing the conduct was outrageous, but also evidence showing that, in context, it was not.[27]

More generally, evidence cannot be taken out of context in a way that makes it seem to support a verdict when in fact it never did.[28]If a witness's statement "I did not do that" is contrary to the jury's verdict, a reviewing court may need to disregard the whole statement, but cannot rewrite it by disregarding the middle word alone.

Thus, if evidence may be legally sufficient in one context but insufficient in another, the context cannot be disregarded even if that means rendering judgment contrary to the jury's verdict. Either "evidence contrary to the verdict" must be defined to exclude material contextual evidence, or it must be an exception to the general rule.

### B. Competency Evidence

It has long been the rule in Texas that incompetent evidence is legally insufficient to support a judgment, even if admitted without objection.[29]Thus, evidence showing it to be incompetent cannot be disregarded, even if the

result is contrary to the verdict. If the rule were otherwise, incompetent evidence would *always* be legally sufficient, because the evidence showing it to be incompetent could never be considered.

Thus, for example, if an eyewitness's location renders a clear view of an accident "physically impossible," it is no evidence of what occurred, even if the eyewitness thinks otherwise.[30]Similarly, an employee's testimony that he was in the course and scope of his employment is legally insufficient to support a verdict against his employer if the evidence shows that legal conclusion to be incompetent.[31]

This exception frequently applies to expert testimony. When expert testimony is required, lay evidence supporting liability is legally insufficient.[32]In

such cases, a no-evidence review cannot disregard contrary evidence showing the witness was unqualified to give an opinion.[33]And if an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded.[34]

After we adopted gate-keeping standards for expert testimony,[35]evidence that failed to meet reliability standards was rendered not only inadmissible but incompetent as well.[36]Thus, an appellate court conducting a no-evidence review cannot consider only an expert's bare opinion, but must also consider contrary evidence showing it has no scientific basis.[37]Similarly, review of an expert's damage estimates cannot disregard the expert's admission on cross-examination that none can be verified.[38]

Thus, evidence that might be "some evidence" when considered in isolation is nevertheless rendered "no evidence" when contrary evidence shows it to be incompetent. Again, such evidence cannot be disregarded; it must be an exception either to the exclusive standard of review or to the definition of contrary evidence.

### C. Circumstantial Equal Evidence

As noted above, Justice Calvert believed the exclusive standard applied only when a no-evidence challenge asserted the evidence was no more than a scintilla.[39]But he went on to note a "variation" that required contrary inferences to be considered when the equal-inference rule applied.[40]

In claims or defenses supported only by meager circumstantial evidence, the evidence does not rise above a scintilla (and thus is legally insufficient) if jurors would have to guess whether a vital fact exists.[41]"When the circumstances are equally consistent with either of two facts, neither fact may be inferred."[42]In such cases, we must "view each piece of circumstantial

evidence, not in isolation, but in light of all the known circumstances."[43]

Justice Calvert argued there was "no necessity for the variation" because drawing an inference based on meager evidence was unreasonable whether or not the reviewing court considered the opposing inferences.[44]Nevertheless, he recognized that "[t]he opposing inference is present and it does no harm to note its presence." [45]

In subsequent cases this Court has continued to note rather than disregard the presence of equal but opposite inferences, often because lower courts have overlooked them. Thus, for example, one might infer from cart tracks in spilled macaroni salad that it had been on the floor a long time, but one might also infer the opposite—that a sloppy shopper recently did both.[46]Similarly, when injury or death occurs without eyewitnesses and only meager circumstantial evidence suggests what happened, we cannot disregard other meager evidence of equally likely causes.[47]

Thus, when the circumstantial evidence of a vital fact is meager, a reviewing court must consider not just favorable but all the circumstantial evidence, and competing inferences as well.

### D. Conclusive Evidence

Next, Justice Calvert noted that Texas courts conducting a no-evidence review traditionally do not disregard contrary evidence that conclusively establishes the opposite of a vital fact.[48] He argued that this is to some extent not a "true" no-evidence claim, as proponents may have to show not only that no evidence supports the verdict but that the opposite was proved as a matter of law.[49] There are several types of conclusive evidence. First, an appellate court conducting a legal sufficiency review cannot "disregard undisputed evidence that allows of only one logical inference."[50] By definition, such evidence can be viewed in only one light, and reasonable jurors can reach only one conclusion from it. Jurors are not free to reach a verdict contrary to such evidence;[51] indeed, uncontroverted issues

need not be submitted to a jury at all.[52]

Reviewing legal sufficiency in such cases encompasses a general no-evidence review, because if some evidence supports the verdict then the contrary evidence was not "undisputed." But the review does not stop there; the evidence must also have only one logical inference. Undisputed evidence that reasonable jurors could disbelieve has two: (1) it is true, or (2) it is not.

Most often, undisputed contrary evidence becomes conclusive (and thus cannot be disregarded) when it concerns physical facts that cannot be denied. Thus, no evidence supports an impaired-access claim if it is undisputed that access remains along 90 percent of a tract's frontage.[53] Evidence that a buyer believed a product had been repaired is conclusively negated by an accompanying letter to the contrary.[54] And an insured's liability has not been determined by an "actual trial" if the insured did not appear, present evidence, or challenge anything presented by his opponent.[55]

Undisputed contrary evidence may also become conclusive when a party admits it is true. Thus, a claimant's admission that he was aware of a dangerous premises condition is conclusive evidence he needed no warning about it.[56] Similarly, an ex-employee's admission that she obtained other employment may prove conclusively that she did not detrimentally rely on a defendant's promise to re-hire her.[57] And jurors may not find that an indictment was based on a defendant's misleading report when the district attorney admits it was his own mistake.[58]

It is impossible to define precisely when undisputed evidence becomes conclusive. For example, an injured employee's return to work may prove conclusively that an injury was not total,[59] or it may not.[60] Circumstances in which a body is found may conclusively establish suicide,[61] or allow

jurors to infer otherwise.[62] Evidence is conclusive only if reasonable people could not differ in their conclusions,[63] a matter that depends on the facts of each case.

There is another category of conclusive evidence, in which the evidence *is* disputed. Undisputed evidence and conclusive evidence are not the same—undisputed evidence may or may not be conclusive, and conclusive evidence may or may not be undisputed.

Thus, for example, in *Murdock v. Murdock,* we found no evidence to support a verdict establishing the defendant's paternity when blood tests conclusively proved he was not the child's father.[64] The evidence was directly disputed—the child's mother testified she had conjugal relations with no one else during the relevant time.[65] Nevertheless, we held there was no evidence to support the paternity verdict because of conclusive evidence to the contrary.[66]

Similarly, in *Texas & New Orleans Railroad Co. v. Compton,* we found no evidence that a railroad's negligence caused an automobile to slam into the sixtieth car of a slow-moving train.[67]Again, the evidence was hotly disputed—while railroad witnesses testified that warning signs were in place at the crossing, the car's driver and a passenger testified they saw nothing, and would have been able to stop if they had.[68]Nevertheless, we held there was no evidence to support the claim because, if the driver could not see the side of a train before he hit it, he could not have seen a crossing sign either.[69]

Of course, there are few instances in which disputed evidence is conclusive, and many instances in which undisputed evidence is not. As our sister court has noted, testimony by a paid informant is legally sufficient to support a conviction, even if "[t]wenty nuns testify that the defendant was with them at the time, far from the scene of the crime . . . [and] [t]wenty more nuns testify that they saw the informant commit the crime." [70]But a more famous clerical hypothetical by Judge Learned Hand shows the opposite limit:

If, however, it were proved by twenty bishops that either party, when he used the words [in a contract], intended something else than the usual meaning which the law imposes upon them, he would still be held.... [71]

While jurors may generally believe either sinners or saints, their discretion is limited when it is proved beyond question that an "eyewitness" was actually far away in prison or totally blind on the day of the crime.

Proper legal-sufficiency review prevents reviewing courts from substituting

---

**Page 817**

their opinions on credibility for those of the jurors, but proper review also prevents jurors from substituting their opinions for undisputed truth. When evidence contrary to a verdict is conclusive, it cannot be disregarded.

### E. Clear-and-Convincing Evidence

Since the time of Justice Calvert's article, new claims and burdens of proof have arisen that require additions to the four types of no-evidence review Justice Calvert considered exhaustive. Beginning with the United States Supreme Court's opinion in *Jackson v. Virginia,* appellate courts have recognized that, while "one slender bit of evidence" may be all a reviewing court needs to affirm a verdict based on the preponderance of the evidence, a higher burden of proof requires a higher standard of review.[72]As we recently stated, the standard for legal sufficiency works in tandem with the standard of review—"whenever the standard of proof at trial is elevated, the standard of appellate review must likewise be elevated." [73]If the rule were otherwise, legally sufficient evidence to support a preponderance-of-the-evidence verdict would satisfy the higher burdens as well, thus rendering their differences meaningless.[74]

Accordingly, we have held that a legal sufficiency review must consider *all* the evidence (not just that favoring the verdict) in reviewing cases of parental termination,[75]defamation,[76]and punitive damages.[77]In such cases, again, evidence contrary to a verdict cannot be disregarded.

### F. Consciousness Evidence

Further, we have had to particularize legal-sufficiency review in cases involving what a party knew or why it took a certain course, as they are not amenable to review under the exclusive standard.

Long before gross negligence had to meet a clear-and-convincing burden, we recognized in *Burk Royalty Co. v. Walls* that no-evidence review of such findings had to include "all of the surrounding facts, circumstances, and conditions, not just individual elements or facts."[78]As then Chief Justice Greenhill noted in concurring, speeding and running a red light may not be legally sufficient evidence of gross negligence if one's wife and daughter are bleeding to death in the back seat.[79]Reviewing courts assessing evidence of conscious indifference cannot disregard part of what a party was conscious of.[80]

For the same reasons, the exclusive standard of review has proven problematic in insurance bad-faith cases. Liability in

such cases requires proof that the insurer denied coverage after it became reasonably clear.[81] But that standard will always be met if reviewing courts must disregard any evidence that coverage was unclear.[82] Subsequent cases show that reviewing courts are in fact looking at *all* the evidence to determine whether coverage was reasonably clear.[83]

This problem arises in other contexts as well. In discrimination cases, discharged employees will never have to prove that the reason given for termination was a pretext if no-evidence review must disregard that reason.[84] Government officials will never be entitled to immunity if we consider only evidence suggesting they should have acted differently.[85] And limitations will never run under the discovery rule if reviewing courts must disregard all evidence that claimants knew of their claims.[86]

This is not to say a reviewing court may credit a losing party's explanations or excuses if jurors could disregard them. For example, while an insurer's reliance on an expert report may foreclose bad faith recovery,[87] it will not do so if the insurer had some reason to doubt the report.[88] But a reviewing court cannot review whether jurors could reasonably disregard a losing party's explanations or excuses without considering what they were.

### III. Contrary Evidence That Must Be Disregarded

As trials normally focus on issues that jurors could decide either way, reviewing

courts must disregard evidence contrary to the verdict far more often than they must consider it. Just as no-evidence review that starts by disregarding contrary evidence often must end up considering considerably more, no-evidence review that begins by considering all the evidence must usually end up considering considerably less.

Again, we do not presume to categorize all circumstances in which contrary evidence must be disregarded; a few examples serve to demonstrate that even under the inclusive standard, viewing all the evidence in a light favorable to the verdict often requires that much of it be disregarded.

A. Credibility Evidence

Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony.[89] They may choose to believe one witness and disbelieve another.[90] Reviewing courts cannot impose their own opinions to the contrary.[91]

Most credibility questions are implicit rather than explicit in a jury's verdict. Thus, reviewing courts must assume jurors decided all of them in favor of the verdict if reasonable human beings could do so. Courts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it.[92]

For example, viewing the evidence in the light favorable to the verdict means that if both parties in a traffic accident testify they had the green light, an appellate court must presume the prevailing party did and the losing party did not. If the parties to an oral contract testify to conflicting terms, a reviewing court must presume the terms were those asserted by the winner. When all the evidence is viewed in the light most favorable to the jury verdict, some of it must be completely discounted. Though not disregarded at the outset, the end result is the same.

This has always been our practice in cases using the inclusive scope of review. Thus, we have concluded that a bailee sold cotton without the bailor's consent, despite the former's denials, because the jury verdict favored the

latter.[93]And we have affirmed a gross negligence verdict based on testimony that the defendant's speed was 80 miles per hour, without mentioning his own testimony to a speed half that.[94]

Nor is it necessary to have testimony from both parties before jurors

may disbelieve either. Jurors may disregard even uncontradicted and unimpeached testimony from disinterested witnesses.[95]Thus, an architect's uncontradicted testimony that he relied on a 20-year warranty was not binding on jurors when the bid specifications he prepared included only much shorter warranties.[96]Nor was an insured's uncontradicted testimony about lost furnishings binding on jurors when the fire scene contained several indications of arson but few of burnt furniture.[97]Even uncontroverted expert testimony does not bind jurors unless the subject matter is one for experts alone.[98]

Of course, "[t]he jury's decisions regarding credibility must be reasonable." [99]Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted.[100]And as noted above, they are not free to believe testimony that is conclusively negated by undisputed facts. But whenever reasonable jurors could decide what testimony to discard, a reviewing court must assume they did so in favor of their verdict, and disregard it in the course of legal sufficiency review.

### B. Conflicting Evidence

It is the province of the jury to resolve conflicts in the evidence.[101]Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume that jurors resolved all conflicts in accordance with that verdict.[102]

Again, this has always been the case even in those cases using the inclusive scope of review. For example, in such cases we have sometimes detailed only the evidence that supported a jury's fraud finding.[103]We have affirmed a bad-faith verdict for legal sufficiency despite "significant evidence" that the insurer acted in

good faith.[104]We have found some evidence of lost profits, even though income tax returns showed the contrary.[105]And we have affirmed a jury's negligence finding despite a defendant's evidence asserting it could not have prevented the accident.[106]

In none of these cases did we state that the scope of review required us to disregard evidence contrary to the verdict; instead, we started by considering the entire record in each. But in each case we either discounted or never mentioned conflicting evidence contrary to the verdict because viewing the evidence in the light favorable to the verdict required us to do so.

Of course, it is not always clear whether evidence is conflicting. Evidence is not conflicting just because the parties cannot agree to it. For example, evidence that a hospital controlled a doctor's rotation and patient assignments raises no material conflict with evidence that a different entity controlled the details of medical treatment, as only the latter is material in a malpractice case.[107]Similarly, evidence showing the terms of one loan does not conflict with undisputed evidence that the parties never reached an agreement regarding the terms of another.[108]

But in every circumstance in which reasonable jurors could resolve conflicting evidence either way, reviewing courts must presume they did so in favor of the prevailing party, and disregard the conflicting evidence in their legal sufficiency review.

### C. Conflicting Inferences

Even if evidence is undisputed, it is the province of the jury to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess. Thus, in product liability cases jurors may find evidence of a defect from subsequent modifications, even if there were plenty of other reasons for the changes.[109]Even if a defendant admits approaching an intersection from the wrong way on a one-way street, jurors may infer the plaintiff failed to keep a proper lookout, as that is one possible inference from the accident itself.[110]Similarly, jurors may infer that relatives tore down posters of a missing child to assist the child's father, even though another inference was that the signs simply embarrassed them.[111]

Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences in their legal sufficiency review.

### IV. Reconciling the Standards

Having noted the dual lines of authority stating the scope of no-evidence review, and the proper application and exceptions to each, we turn to the question of which one is correct. For the reasons

discussed below, we believe the answer is both.

### A. Goals: The Standards Must Be The Same

Whether a court begins by reviewing all the evidence or disregarding part in a legal-sufficiency review, there can be no disagreement about where that review should end. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so.[112]A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement.[113]

Similarly, there is no disagreement about how a reviewing court should view evidence in the process of that review. Whether a reviewing court starts with all or only part of the record, the court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it.[114]But if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it.[115]

Given these premises, it is no coincidence that the two standards should reach the same result—indeed they *must.* Any scope of appellate review smaller than what reasonable jurors could believe will reverse some verdicts that are perfectly reasonable; any scope of review larger than what reasonable jurors could believe will affirm some verdicts that are not.

Further, the two must coincide if this Court is to perform its constitutional duties. Although factual sufficiency has been the sole domain of the intermediate appellate courts in Texas since 1891, our jurisdiction has always included legal sufficiency, as that is a question of law, not of fact.[116]Construing either standard to require us to do less would be just as unconstitutional as construing either to allow us to do more.

This is not to say judges and lawyers will always agree whether evidence is

legally sufficient. As discussed more fully below, reasonable people may disagree about what reasonable jurors could or must believe. But once those boundaries are settled, *any* standard of review must coincide with those boundaries—affirming jury verdicts based on evidence within them and reversing jury verdicts based on evidence that is not. Any standard that does otherwise is improperly applied.

### B. Other Motions: The Standards Must Be The Same

Just as the scope of no-evidence review must coincide with its goals, the scope of review should not depend upon the motion in which it is asserted. Judgment without or against a jury verdict is proper at any course of the proceedings only when the law does not allow reasonable jurors to decide otherwise. Accordingly, the test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review.

Our statements of the standard for reviewing a directed verdict present the same mixed bag found with general no-evidence review. We have most often used the exclusive standard, stating that courts reviewing directed verdicts must consider only evidence supporting the non-movant's case and disregard all contrary evidence.[117]But we have also stated that reviewing courts should use the inclusive standard, considering all the evidence in a light contrary to the directed verdict.[118]And we have sometimes stated both, requiring reviewing courts to consider all the evidence in a light contrary to the directed verdict and then to disregard all conflicting evidence that supports it.[119]

By contrast, cases concerning judgments non obstante verdicto most often utilize the inclusive scope of review. Beginning with the 1931 amendment authorizing trial judges to grant them,[120]we have generally reviewed such orders by considering all the evidence in a light favorable to the

**Page 824**

verdict that was set aside.[121]In later years we have sometimes adopted the exclusive standard,[122]but our opinions doing so usually cite to general no-evidence cases in which no judgment n.o.v. was involved.[123]

The one exception in which both standards do not expressly appear is in the scope of review for summary judgments. Here, there is only one standard—a reviewing court must examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion.[124]Reviewing courts do *not* disregard the evidence supporting the motion;

**Page 825**

if they did, all summary judgments would be reversed.

In practice, however, a different scope of review applies when a summary judgment motion is filed without supporting evidence.[125]In such cases, evidence supporting the motion is effectively disregarded because there is none; under the rule, it is not allowed. Thus, although a reviewing court must consider all the summary judgment evidence on file, in some cases that review will effectively be restricted to the evidence contrary to the motion.

The standards for taking any case from the jury should be the same, no matter what motion is used. If only one standard were proper, we would not expect both to appear in cases reviewing directed verdicts, judgments notwithstanding the verdict, and summary judgments. But both do.

### C. Federal Courts: The Standards Are The Same

The federal courts have had a similar split of authority between the inclusive and exclusive standards for scope of review. But no longer—the United States Supreme Court recently concluded in *Reeves v. Sanderson Plumbing Products, Inc.* that the two tests are the same.[126]

Under Rule 50 of the federal rules of procedure, a court should render judgment as a matter of law when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." [127]In deciding whether all or only part of the evidence should be considered, the Supreme Court stated:

The Courts of Appeals have articulated differing formulations as to what evidence a court is to consider in ruling on a Rule 50 motion. Some decisions have stated that review is limited to that evidence favorable to the nonmoving party, while most have held that review extends to the entire record, drawing all reasonable inferences in favor of the nonmovant.

On closer examination, this conflict seems more semantic than real. Those decisions holding that review under Rule 50 should be limited to evidence favorable to the nonmovant appear to have their genesis in *Wilkerson v. McCarthy* [128]. In *Wilkerson,* we stated that "in passing upon whether there is sufficient evidence to submit an issue to the jury we need look only to the evidence and reasonable inferences which tend to support the case of the nonmoving party. [129]But subsequent decisions have clarified that this passage was referring to the evidence to which the trial court should *give credence,* not the evidence that the court should *review.* In the analogous context of summary judgment under Rule 56, we have stated that the court must review the record "taken as a whole." And the standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, such that "the inquiry under each is the same." It therefore follows that, in entertaining a motion for judgment as a

---

**Page 826**

matter of law, the court should review all of the evidence in the record.[130]

We address the Supreme Court's conclusion as to the most appropriate standard below; the relevant point here is its conclusion that differences between the inclusive and exclusive standards are more semantic than real.

### D. Objections: The Standards Are Not The Same

While we have used the two standards for the scope of review interchangeably for many years in many different contexts, several arguments suggest they are not the same.

First, the courts of appeals often use the two standards in illustrations of the difference between legal and factual sufficiency, with the exclusive standard tied to the former and the inclusive standard to the latter:

When [reviewing] legal sufficiency, we consider *only* the evidence and inferences that tend to support the award of damages and disregard all evidence and inferences to the contrary. . . . When we review factual sufficiency, we consider and weigh *all* of the evidence and will set aside the verdict only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust.[131]

But there have always been exceptions to this distinction.[132]As demonstrated in Parts II and III above, it is generally true that the *result* of legal-sufficiency review is to disregard contrary evidence, but there are exceptions when a reviewing court cannot. It is not surprising that in drawing the general distinction between legal and factual sufficiency, courts have not complicated that distinction by listing the several exceptions in which the scope of review— though not the standard of review—may overlap.

Second, it has been argued that the exclusive standard "is an important prophylactic" against invasion of the jury's province, as appellate judges are less likely to consider contrary evidence when they should not if the exclusive standard is used.[133]But if that is true, the opposite should also be the case—appellate courts are less likely to consider contrary evidence *when they must* (as shown in Part II) if the exclusive standard is used. No matter which standard is used, appellate courts must take care not to consider or disregard too little or too much.

---

**Page 827**

Conversely, several factors appear to favor application of the inclusive standard. First, when we have said "we must look only at that evidence which tends to support the judgment," [134]we could not have been speaking literally; no glasses filter evidence, and judges cannot abandon such judgments to law clerks or litigants. It is often hard to say whether evidence does or does not support a verdict—the same facts may support different conclusions,[135]or

may support one part of a verdict but not another.[136]Nor can evidence supporting a verdict be identified by which party offered it—parties depend on admissions and cross-examination during their opponent's case, and minimize damaging evidence by presenting it during their own. As a practical matter, a court cannot begin to say what evidence supports a verdict without reviewing it all.

Second, an appellate court that begins by disregarding one party's evidence may strike many citizens as extending something less than justice for all. Concerns about open government and open courts suggest an appellate process that considers all the evidence, though deferring to the jury's verdict. While there is some dispute whether Lady Justice should wear a blindfold,[137]the metaphor was surely never intended to suggest that justice disregards the facts.

In sum, the exclusive standard is helpful in recognizing the distinctive roles of judge and jury, intermediate and supreme court. By contrast, the inclusive standard is helpful in recognizing what courts actually do, and must be seen to do. Both are important; we should avoid choosing between them if we can.

### E. Conclusion: The Standards Are The Same

As both the inclusive and exclusive standards for the scope of legal-sufficiency review have a long history in Texas, as both have been used in other contexts to review matter-of-law motions, as the federal courts have decided the differences between the two are more semantic than real, and as both—properly applied—must arrive at the same result, we see no compelling reason to choose among them.

The key qualifier, of course, is "properly applied." The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.

While judges and lawyers often disagree about legal sufficiency in particular cases,

---

the disagreements are almost always about what evidence jurors can or must credit and what inferences they can or must make. It is inevitable in human affairs that reasonable people sometimes disagree; thus, it is also inevitable that they will sometimes disagree about what reasonable people can disagree about. This is not a new problem; Justice Calvert noted it almost fifty years ago:

The rule as generally stated is that if reasonable minds cannot differ from the conclusion that the evidence lacks probative force it will be held to be the legal equivalent of no evidence. The application of the rule can lead to strange results. It is theoretically possible, and sometimes not far from actual fact, that five members of the Supreme Court will conclude that the evidence supporting a finding of a vital fact has no probative force, and in reaching the conclusion through application of the rule will thus hold, in effect, that the trial judge who overruled a motion for instructed verdict, the twelve jurors who found the existence of the vital fact, the three justices of the Court of Civil Appeals who overruled a "no evidence" point of error and four dissenting justices of the Supreme Court are not men [138]of "reasonable minds." [139]

It is not hubris that occasionally requires an appellate court to find a jury verdict has no reasonable evidentiary basis. As Justice Frankfurter stated long ago:

Only an incompetent or a wilful judge would take a case from the jury when the issue should be left to the jury. But since questions of negligence are questions of degree, often very nice differences of degree, judges of competence and conscience have in the past, and will in the future, disagree whether proof in a case is sufficient to demand submission to the jury. The fact that [one] thinks there was enough to leave the case to the jury does not indicate that the other [is] unmindful of the jury's function. The easy but timid way out for a trial judge is to leave all cases

tried to a jury for jury determination, but in so doing he fails in his duty to take a case from the jury when the evidence would not warrant a verdict by it. A timid judge, like a biased judge, is intrinsically a lawless judge.[140]

### V. Application to the Facts

**It** remains to apply the scope of review to the facts presented.

A majority of the court of appeals affirmed the verdict for the Wilsons, finding legally sufficient evidence that the City knew increased flooding on the Wilsons' property was substantially certain to occur.[141] The majority pointed to the following proof. First, the Wilsons' expert testified that the revised plan was certain to

create flooding.[142] Second, as the City admittedly knew that development would increase runoff and the Sebastian ditch would channel it toward the Wilsons, so it knew "with absolute certainty" that flooding would be the result.[143] Third, the City "did not explain" why the Master Plan required a drainage ditch across the Wilsons' property but the revised plan did not, thus allowing jurors to infer that the City knew this omission would cause flooding.[144]

Of course, the City *did explain* why it approved the new plan—because three sets of engineers said the omitted ditch was unnecessary—but the court felt compelled by the scope of review to disregard that evidence.

For several of the reasons stated earlier, we believe the court of appeals did not properly apply the scope of review. The critical question in this case was the City's state of mind—the Wilsons had to prove the City *knew* (not should have known) that flooding was substantially certain. A reviewing court cannot evaluate what the City knew by disregarding most of what it was told.

Moreover, when a case involves scientific or technical issues requiring expert advice (as this one does), jurors cannot disregard a party's reliance on experts hired for that very purpose without some evidence supplying a reasonable basis for doing so.[145] Here, it was uncontroverted that three sets of engineers certified that the revised plans met the City's codes and regulations—and thus would not increase downstream flooding. The same firm that drew up the original Master Plan certified the revised one; unless the City had some reason to know the first certification was true and the second one was false (of which there was no evidence), there was only one logical inference jurors could draw.

None of the evidence cited by the court of appeals showed the City knew more than it was told by the engineers. The Wilsons' expert testified that flooding was (in his opinion) inevitable, but not that *the City* knew it was inevitable. The Wilsons' expert gave no opinion on the latter point.

Second, ending a ditch at a neighbor's property line may be evidence that a defendant was substantially certain of the result in some cases, but not in the context of this one. City witnesses admitted knowing development would increase runoff at the head of this drainage system, but not flooding at its foot. Calculating the effect of detention ponds and absorption in a grassy drainage ditch forty-five feet wide and over two hundred yards long required hydrological formulas, computer models, and mathematical calculations. The omission of the ditch across the Wilsons' property obviously raised concerns that the City investigated, but was no evidence that the City knew the advice it received in response was wrong.

The Wilsons also point to a letter Sebastian's attorney wrote the City demanding indemnity in case the new ditch flooded the Wilsons. But attorneys must protect a client from potential liability whether it is

real or imagined—and justly so. In the letter, the attorney never purports to be an expert in hydrology, or cite the opinions of anyone who was. This letter may have required the City to investigate, but again is no evidence it knew the advice it received was wrong.[146]

Our concurring colleagues believe reasonable jurors could nevertheless disregard what all the engineers certified because the City had a financial incentive to believe them rather than pay the Wilsons. Of course, defendants have a financial incentive to avoid paying damages in every case; if that incentive alone is some evidence of liability, then plaintiffs create enough evidence to go to the jury every time they file suit.

But more important, this ignores what the Wilsons had to prove—not that the City *might* have disbelieved the engineers' reports, but that it *did*. This requires evidence of "objective indicia of intent" showing the City knew identifiable harm was occurring or substantially certain to result.[147] Jurors' doubts about the engineers' reports or the City's motives could not supply them with objective indicia that the City knew flooding would occur. Constitutional concerns about the roles of judge and jury do not allow either to make such evidence up.

We agree with the court of appeals that the Wilsons presented some evidence that the City damaged their property, and that in drawing up and approving drainage plans it was acting for a public purpose. The missing piece in the evidence here is proof that the City knew the plans it approved were substantially certain to increase flooding on the Wilsons' properties. While the City certainly knew that fact after the flooding started, the Wilsons never pleaded or submitted to the jury any takings theory other than the City's initial approval.

Crediting all favorable evidence that reasonable jurors could believe and disregarding all contrary evidence except that which they could not ignore, we hold there was no evidence the City's approval of the revised drainage plan was an intentional taking.

Accordingly, we reverse the court of appeals' judgment against the City under article I, section 17 of the Texas Constitution. Because the court of appeals declined to address the jury's alternate verdict for the Wilsons on a claim under the Texas Water Code, we remand the case to that court to determine that issue.

Justice O'NEILL filed a concurring opinion in which Justice MEDINA joined.

Justice JOHNSON did not participate in the decision.

Justice O'NEILL, joined by Justice MEDINA, concurring.

The Court does an excellent job of explaining the appropriate scope of no-evidence review: the reviewing court "must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." 168 S.W.3d at 807. I agree with this standard and join Parts I through IV of the Court's opinion. But I cannot join Part V, because the Court misapplies the standard that it so carefully

articulates by crediting evidence the jury could reasonably disregard.

The City of Keller's Master Drainage Plan required it in part to condemn a 2.8-acre drainage easement on the Wilson property for construction of an earthen channel forty-five feet wide and five feet deep that would funnel water from the adjoining Sebastian property over the Wilson property into the Little Bear Creek Watershed. The City chose not to proceed with this portion of the plan, though, claiming reliance on engineers' assurances that the developers' installation of retention ponds on neighboring land could prevent flooding. The drainage channel that was actually built ended at the edge of the Sebastian property and funneled water directly onto the Wilsons' land, destroying eight acres of farmland worth almost $300,000. The Court holds that the jury was required to believe the City's testimony that it relied on the engineers' assurances and thus did not know flooding was substantially certain to occur, stating that when a case requires expert testimony "jurors cannot disregard a party's reliance on experts

hired for that very purpose without some evidence supplying a reasonable basis for doing so." 168 S.W.3d at 829. Even if this were an appropriate review standard—which it hasn't been until today—I believe the jury had a reasonable basis upon which to disregard the City's professed reliance; the City had a financial incentive to disclaim knowledge of the flooding, and the Wilsons presented some evidence that the City had independent knowledge flooding was substantially certain to occur. In my view, the jury was the proper body to weigh the witnesses' credibility and resolve these disputed fact issues. I nevertheless agree that the City cannot be liable for a taking in this case because I believe that a city's mere act of approving a private development plan cannot constitute a taking for public use. Accordingly, I concur in the Court's judgment but not its reasoning.

I

Questions of intent are generally proved only by circumstantial evidence; as the court of appeals in this case aptly noted, "defendants will rarely admit knowing to a substantial certainty that given results would follow from their actions," and therefore the jury must be "free to discredit defendants' protestations that no harm was intended and to draw inferences necessary to establish intent." 86 S.W.3d 693, 704. I agree with the Court that the jury's ability to disbelieve the City's protestations is not itself "evidence of liability." 168 S.W.3d at 830. Instead, the jury's ability to weigh the witnesses' credibility means that the City's testimony did not conclusively establish its lack of liability. Because liability is not conclusively negated, we must examine the record to see if there is legally sufficient evidence from which the jury could infer that the City knew flooding was substantially certain to occur. I would hold that the evidence of intent that was presented in this case allowed the jury to draw such an inference.

At trial, the Wilsons presented evidence that the City had independent sources of knowledge that flooding was substantially certain to occur. First, they demonstrated that the developers' plan itself was flawed. Rather than incorporate a drainage ditch running across the Wilson property, as the City's Master Plan required, the developers' plan ended the drainage ditch abruptly at the edge of the Wilson property. The Wilsons' expert testified that the plan's implementation would necessarily "increase the volume and flow of water across the Wilson property from the rate of fifty-five cubic feet per second to ninety-three cubic feet per second." 86 S.W.3d at 703.

---

**Page 832**

Second, the City was aware that water flowed across the Wilson property before the development commenced, and, as the court of appeals pointed out, the City's Director of Public Works admitted that the City knew the development would increase the water's flow and velocity; specifically, he testified that "the City knew the upstream water would be absorbed less and would flow faster due to the removal of trees and vegetation from the developments and from the forty-five-foot-wide earthen channel" that ended at the Wilson property's edge. *Id.* at 705. Finally, there was evidence that the City received a letter warning that the developers' plan would subject the Wilson property to flooding.

While I believe there is some evidence that the City knew flooding was substantially certain to occur, there is also some evidence that it did not. City officials testified that they relied on the representations of engineers who assured them retention ponds could substitute for a drainage easement and the Wilson property would not be damaged. If the jury accepted this evidence as true, I agree that the intent element would be negated, which would preclude the City's takings liability. But I do not agree that the jury was bound to accept the City's testimony as true. The Court itself notes that jurors "may choose to believe one witness and disbelieve another," and that "[c]ourts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it." 168 S.W.3d at 819. This statement mirrors our prior jurisprudence, which has long provided that a jury "has several alternatives available when presented with conflicting evidence" because it "may believe one witness and disbelieve others," "may resolve inconsistencies in the testimony of any witness," and "may accept lay testimony over that of experts." *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986) (citations omitted).

As the Court itself states, jurors are required to credit undisputed testimony only when it is "clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." 168 S.W.3d at 820. The City's testimony does not meet this standard. The City Manager did testify that the City "would not have approved the developments unless [it was] assured that the developments did not increase the velocity of water or the flow of water" onto the neighboring property. 86 S.W.3d at 706. But the Wilsons disputed

whether the City's protestations were credible, pointing out that the City had a powerful incentive to profess a lack of knowledge through reliance on the engineers' assurances because it would then avoid the considerable expense of compensating the Wilsons for the property that would otherwise have been condemned under the Master Drainage Plan. *See id.* at 705.

Moreover, the Court's conclusion that juries cannot disregard a party's reliance on expert opinions is not consistent with our jurisprudence. The Court cites two cases for this proposition, but neither supports the Court's analysis; instead, both cases support the conclusion that the jury, as the finder of fact, should appropriately resolve factual disputes regarding a party's reliance on hired experts. *Provident Am. Ins. Co. v. Castañeda,* 988 S.W.2d 189, 194-95 (Tex.1998); *State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 448-50 (Tex.1997).

In *Castañeda,* a bad-faith insurance case, there was no question that the insurer had relied on an expert's assurances and thus no dispute about whether the

jury could have disregarded that evidence. *Castañeda,* 988 S.W.2d at 194-95. In that case, we performed a traditional legal sufficiency analysis and concluded there was no evidence that the defendant acted in bad faith. *Id.* at 194. We did state that reliance on an expert's opinion will not preclude a finding of bad faith if the expert's opinion was "unreliable and the insurer knew or should have known that to be the case." *Id.* However, we did not hold that the jury must credit a party's testimony that it relied on an expert.

We reiterated this point in *Nicolau,* another bad-faith insurance case. There, the Court noted "we have never held that the mere fact that an insurer relies upon an expert's report to deny a claim automatically forecloses bad faith recovery as a matter of law," and again concluded that purported "reliance upon an expert's report, standing alone, will not necessarily shield" the defendant from liability. *Nicolau,* 951 S.W.2d at 448. The Court conceded that "[w]ere we the trier of fact in this case, we may well have concluded that [the insurer] did not act in bad faith," but concluded that the "determination is not ours to make" because "the Constitution allocates that task to the jury and prohibits us from reweighing the evidence." *Id,* at 450 (citing Tex. Const. art. I, § 15, art. V, §§ 6, 10).

The same is true in this case. The jury was not required to believe that the City did not know flooding was substantially certain to occur because it relied on assurances to the contrary; as a reviewing Court, we should "assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it." 168 S.W.3d at 819. Such credibility determinations are uniquely suited and constitutionally committed to the fact finder. *See* Tex. Const, art. I, § 15, art. V, § 6; *see also Nicolau,* 951 S.W.2d at 450.

II

Although I disagree with the Court's conclusion that the jury was required to credit the City's testimony, I agree with its judgment in the City's favor because, in my view, the City's mere approval of the private development plans did not result in a taking for public use, as the constitutional standard requires for a compensable taking. Tex. Const. art. I, § 17. The City did not appropriate or even regulate the use of the Wilsons' land, nor did it design the drainage plan for the proposed subdivisions. Instead, the City merely approved subdivision plans designed by private developers, and that design included inadequate drainage capabilities. The City argues, and I agree, that its mere approval of private plans did not transfer responsibility for the content of those plans from the developers to the City. Municipalities review subdivision plats "to ensure that subdivisions are safely constructed and to promote the orderly development of the community." *City of Round Rock v. Smith,* 687 S.W.2d 300, 302 (Tex.1985); *see* Tex. Loc. Gov't Code § 212.002. Such a review is intended to protect the city's residents; it is not intended to transfer responsibility for a flawed subdivision design from the developers to the municipality. *See, e.g., City of Round Rock,* 687 S.W.2d at 302; *see also Cootey v. Sun Inv., Inc.,* 68 Haw. 480, 718 P.2d 1086, 1091 (1986) (holding that "[t]he permit process by which the County approves or disapproves the development of a proposed subdivision reflects an effort by government to require the developer to meet his responsibilities under the subdivision rules, regulations, and laws," and that "the primary responsibility of providing an adequate and safe development rests with . . . the developer, and not with the County").

Because the primary responsibility for a development's design rests with the developer,

and because the plat-approval process does not transfer such responsibility to the municipality, mere plat approval cannot be a basis upon which to predicate takings liability. We have held that, to be liable for a taking, a governmental entity must "perform certain acts in the exercise of its lawful authority . . . which resulted in the taking or damaging of plaintiffs' property, and which acts were the *proximate cause* of the taking or damaging of such property." *State v. Hale,* 136 Tex. 29, 146 S.W.2d 731, 736 (1941) (emphasis added). In this case, flooding resulted from the developers' defective drainage design, not from the City's approval of the plat; thus, the City's approval was not the proximate cause of the damage to the Wilson property.

Other courts, faced with similar facts, have also concluded that a governmental entity cannot be liable for a taking when its only action is to approve a private development plan. *See Phillips v. King County,* 136 Wash.2d 946, 968 P.2d 871, 879 (1998); *see also Pepper v. J.J. Welcome Constr. Co.,* 73 Wash.App. 523, 871 P.2d 601, 606 (1994). In *Phillips,* the Washington Supreme Court observed that there is no public aspect to a private development and concluded that "[i]f the county or city were liable for the negligence of a private developer, based on approval under existing regulations, then the municipalities, and ultimately the taxpayers, would become the guarantors or insurers for the actions of private developers whose development damages neighboring properties." *Phillips,* 968 P.2d at 878. The court in *Pepper* similarly examined an inverse condemnation claim based upon a county's approval of private developments with defective drainage plans; it, too, concluded that the county's approval did not cause the resultant flooding and did not result in an unconstitutional taking. *Pepper,* 871 P.2d at 606. The court noted that the flooding was "not the result of the County appropriating or regulating their use of the land," and held that "[t]he fact that a county regulates development and requires compliance with road and drainage restrictions does not transform a private development into a public project." *Id.* The court concluded that because "land use regulation of [the plaintiffs'] property did not cause the damages, no inverse condemnation was involved." *Id.* I am persuaded by the reasoning of the courts in *Phillips* and *Pepper,* and would similarly conclude that the City's plat approval in this case did not amount to an unconstitutional taking as a matter of law.

The court of appeals in this case advanced an alternative reason for affirming the trial court's judgment, suggesting that even if the City could not be liable for merely approving a subdivision plat, it could nevertheless be held liable for failing to condemn a drainage easement across the Wilson property. 86 S.W.3d at 707. The court of appeals stated that "the City chose not to condemn any of the Wilson property," but instead "allow[ed] the water flowing from the Sebastian easement to discharge, uncontrolled, across the Wilson property." *Id.* As noted above, however, it was the developers' plan—not the City's actions—that allowed the water to flood the Wilson property. Because the City's action did not cause the flooding, I disagree that the City's failure to condemn an easement is relevant to takings liability. If the City were responsible for the flooding but chose not to condemn the property, it might be subject to inverse-condemnation liability. *See Tarrant County Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 554 (Tex.2004) ("When the government takes private property without first paying for it, the owner may recover damages for inverse condemnation."). However, if a governmental entity's actions are not the

"proximate cause of the taking or damaging" of the property, then the entity cannot be liable for a taking. *Hale,* 146 S.W.2d at 736. Accordingly, the entity need not condemn property merely because a private entity is causing damage. This rule does not leave owners of flooded property without a remedy; when a private development floods neighboring land, the owner of the damaged property will ordinarily have recourse against the private parties causing the damage. *See* Tex. Water Code § 11.086(a), (b) (providing that "[n]o person may divert or impound the natural flow of surface waters in this state ... in a manner that damages the property of another by the overflow of the water diverted or impounded" and that "[a] person whose property is injured by an overflow of water caused by an unlawful diversion or impounding has remedies at law and in equity and may recover damages occasioned by the overflow"). Because the developers' design of the plat— not the City's approval—caused the flooding damage in this case, I would hold that the City cannot be held liable for an unconstitutional taking under Article I, Section 17 of the Texas Constitution.

## III

Because I believe the Court fails to give due regard to the jury's right to make credibility determinations, I cannot join Part V of the Court's opinion. But because I conclude that the City's mere act of approving a private development plan did not cause the Wilson property to be "taken, damaged or destroyed for or applied to public use," Tex. Const, art. I, § 17, I agree that the City cannot be held liable for a taking in this case. Accordingly, I concur in the Court's judgment.

---------

Notes:

[1] The City of Fort Worth asserts in an amicus brief that in 2001 alone it approved 325 subdivision plats creating 5,857 residential lots within its extraterritorial jurisdiction, which of course excludes surrounding communities.

[2] Evidence at trial and briefs by amici indicate that cities normally acquire title to these easements to ensure they are properly mowed and maintained after the developers' departure.

[3] Tex. Const, art. I, § 17; *City of Dallas v. Jennings,* 142 S.W.3d 310, 313-14 (Tex.2004).

[4] 86S.W.3d693, 715, 717.

[5] *Id.* at 700.

[6] *See, e.g., Wal-Mart Stores, Inc. v. Canchola,* 121 S.W.3d 735, 739 (Tex.2003) (per curiam); *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex. 2001); *City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 69 (Tex.2000); *Wal-Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 936 (Tex. 1998); *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex. 1996); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex. 1995); *Browning-Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex. 1993); *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex. 1992); *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex. 1992); *Havner v. E-Z Mart Stores, Inc.,* 825 S.W.2d 456, 458 (Tex.1992); *Lewelling v. Lewelling,* 796 S.W.2d 164, 166 (Tex. 1990); *Burkard v. ASCO Co.,* 779 S.W.2d 805, 806 (Tex. 1989) (per curiam); *Brown v. Edwards Transfer Co.,* 764 S.W.2d 220, 223 (Tex. 1988); *City of Gladewater v. Pike,* 727 S.W.2d 514, 518 (Tex.1987); *King v. Bauer,* 688 S.W.2d 845, 846 (Tex. 1985); *Tomlinson v. Jones,* 677 S.W.2d 490, 492 (Tex. 1984); *Glover v. Tex. Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex. 1981) (per curiam); *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex. 1976); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965); *Wininger v. Ft. Worth & D.C. Ry. Co.,* 105 Tex. 56, 143 S.W. 1150, 1152 (1912).

[7] *See, e.g., St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519 (Tex.2002) (plurality op.); *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285-86 (Tex. 1998); *State Farm Lloyds Ins. Co. v. Maldonado,* 963 S.W.2d 38, 40 (Tex. 1998); *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex. 1998); *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex. 1997); *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex. 1983); *Burk Royalty v. Walls,* 616 S.W.2d 911, 922 (Tex. 1981); *Harbin v. Seale,* 461 S.W.2d 591, 592 (Tex. 1970); *De Winne v. Allen,* 154 Tex. 316, 277 S.W.2d 95, 97 (1955); *Hall v. Med. Bldg. of Houston,* 151 Tex. 425, 251 S.W.2d 497, 498(1952).

[8] *Tarrant Reg'l Water Dist.* v. *Gragg,* 151 S.W.3d 546, 552 (Tex.2004); *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684 (Tex.2004); *Lozano v. Lozano,* 52 S.W.3d 141, 144 (Tex.2001) (per curiam); *La.-Pac. Corp. v. Andrade,* 19 S.W.3d 245, 247 (Tex. 1999); *Latham v. Castillo,* 972 S.W.2d 66, 68 (Tex. 1998); *Brown v. Bank of Galveston, Nat'l Ass'n,* 963 S.W.2d 511, 513 (Tex. 1998).

[9] *See, e.g., Coastal Transp. Co.* v. *Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234 (Tex. 2004); *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex. 1994) (per curiam); *compare Biggers v. Cont'l Bus Sys., Inc.,* 157 Tex. 351, 303 S.W.2d 359, 363 (1957) ("We may consider *only* that evidence, if any, which, viewed in its most favorable light, supports the jury findings, and we must disregard all evidence which would lead to a contrary result.") (emphasis added), *with Biggers v. Cont'l Bus Sys., Inc.,* 157 Tex. 351, 298 S.W.2d 79, 81 (1956) ("[T]he duty of this Court [is] to examine and consider *all* of the evidence bearing on the controlling issues, and having done so to decide whether there is evidence of probative value to support the answers made by the jury to the issues.") (quotation omitted) (emphasis added), *and Cartwright v. Canode,* 106 Tex. 502, 171 S.W. 696, 698 (1914) ("[W]e must reject all evidence favorable to the plaintiffs in error, and consider only the facts and circumstances which tend to sustain the verdict.... In considering this question, we must take into account all of the facts and circumstances attending the transaction.").

[10]*See, e.g.,* W. Wendell Hall, *Standards of Review in Texas,* 34 ST. MARY'S L.J. 1, 159-62 (2002); William V. Dorsaneo, III, *Judges, Juries, & Reviewing Courts,* 53 SMU L.R. 1497, 1498, 1507-11 (2000); Phil Hardberger, *Juries Under Siege,* 30 St. Mary's L.J. 1, 40-41 (1998). *But see* William Powers, Jr., *Judge & Jury in the Texas Supreme Court,* 75 Tex. L.Rev. 1699, 1699-1700, 1704-19 (1997) (concluding the Court is not changing the no-evidence standard of review but is moving away from broad definitions of duty and toward particularized definitions of duty).

[11]Robert W. Calvert was an associate justice of this Court from 1950 to 1960, and Chief Justice from 1961 to 1972.

[12]Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error,* 38 Tex. L.Rev. 361 (1960).

[13]*Id. at 361.*

[14]"Most of what has been said here is repetitious of what has been said before in the cited cases and articles. The purpose of the writer here has been to try to bring former writings on the subject into compact form and under somewhat closer analysis." *Id.* at 371.

[15]*Id.* at 362-63.

[16]*See, e.g., King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003); *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex.2003) (per curiam); *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex. 1998); *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 409 (Tex. 1998); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex. 1997); *Anderson v. City of Seven Points,* 806 S.W.2d 791, 795 n. 3 (Tex. 1991); *Cecil v. Smith,* 804 S.W.2d 509, 510 n. 2 (Tex. 1991); *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex. 1990).

[17]Calvert, *supra* note 12, at 364.

[18]*See In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002); *Uniroyal,* 977 S.W.2d at 340; *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.,* 644 S.W.2d 443, 446 (Tex. 1982).

[19]Calvert, *supra* note 12, at 364 ("If there is an absolute absence of evidence of a vital fact ... an appellate court has no occasion to concern itself with an abstract rule such as how minds of reasonable men might view the situation.").

[20]*New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 158-59 (Tex.2004); *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114 (Tex.2000); *Guisti v. Galveston Tribune,* 105 Tex. 497, 150 S.W. 874, 877-78 (1912).

[21]*Bentley v. Bunton,* 94 S.W.3d 561, 581 (Tex.2002) (considering remarks in context of series of talk-show programs); *Turner,* 38 S.W.3d at 115 (holding defamation includes story in which details are right but gist is wrong).

[22]*Shell Oil Co. v. Khan,* 138 S.W.3d 288, 292 (Tex.2004).

[23]*DeWitt County Elec. Co-op., Inc. v. Parks,* 1 S.W.3d96, 102 (Tex. 1999).

[24]*Tiller v. McLure,* 121 S.W.3d 709, 714 (Tex. 2003) (per curiam); *see also Tex. Farm Bureau Mut. Ins. Cos. v. Sears,* 84 S.W.3d 604, 610-11 (Tex.2002); *GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 612 (Tex. 1999).

[25]*See George Grubbs Enters., Inc. v. Bien,* 881 S.W.2d 843, 852-53 (Tex.App.-Fort Worth 1994) (holding that efforts to pressure deaf-mute consumer to buy car were legally sufficient evidence of intentional infliction), *rev'd on other grounds,* 900 S.W.2d 337, 338 (Tex. 1995).

[26]*See Tiller,* 121 S.W.3d at 714 (holding efforts to pressure widow of contracting party to complete project were legally insufficient evidence of intentional infliction).

[27]*See, e.g., id.* at 713-14 (discussing contrary evidence showing defendant's reasonable concerns about timeliness of plaintiff's work); *Sears,* 84 S.W.3d at 612 (discussing contrary evidence that defendant believed claimant was involved in suspicious dealings).

[28] *Bostrom Seating, Inc.* v. *Crane Carrier Co.,* 140 S.W.3d 681, 684, 685 (Tex.2004) (holding no evidence supported defect as comments from deposition "were read out of context").

[29] *Coastal Transp. Co.* v. *Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 232 n. 1 (Tex. 2004) (citing *Henry v. Phillips,* 105 Tex. 459, 151 S.W. 533, 538 (1912)). This rule was changed for hearsay evidence in 1983. *See* Tex.R. Evid. 802 ("Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay.").

[30] *Tex. & P. Ry. Co. v. Ball,* 96 Tex. 622, 75 S.W. 4, 6 (1903).

[31] *Minyard Food Stores, Inc.* v. *Goodman,* 80 S.W.3d 573, 579 (Tex.2002) (holding defamation was not in course and scope of employment as duties required employee to cooperate in investigation but not to lie); *Robertson Tank Lines, Inc.* v. *Van Cleave,* 468 S.W.2d 354, 360 (Tex.1971) (holding truck driver was not in course of employment during social visit to his father).

[32] *Bowles v. Bourdon,* 148 Tex. 1,219 S.W.2d 779, 782-83 (1949) (affirming directed verdict against malpractice claim as inadequate expert testimony from doctor of same school or practice as defendant rendered proof legally insufficient).

[33] *See Leitch* v. *Hornsby,* 935 S.W.2d 114, 119 (Tex. 1996).

[34] *See Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499-500 (Tex. 1995) (holding opinion that spray caused frostbite was legally insufficient as it assumed absence of redness when plaintiff admitted the contrary); *Roark* v. *Allen,* 633 S.W.2d 804, 809 (Tex. 1982) (holding opinion that physician should have warned of possible skull fracture was legally insufficient as it assumed physician was aware of fracture when there was no proof he was).

[35] *See E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex. 1995) (adopting reasoning of *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

[36] *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 714, 720 (Tex. 1997).

[37] *Id.* at 711, 724-30.

[38] *Kerr-McGee Corp. v. Helton,* 133 S.W.3d 245, 254-57 (Tex.2004).

[39] Calvert, *supra* note 12, at 364.

[40] *Id.* at 364-65.

[41] *Ford Motor Co.* v. *Ridgway,* 135 S.W.3d 598, 601 (Tex.2004) (holding evidence that truck caught fire unaccompanied by proof identifying any defect did not exceed a scintilla, as jurors would have to guess cause); *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 729 (Tex.2003) (per curiam); *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 392 (Tex. 1997); *W. Tel. Corp. v. McCann,* 128 Tex. 582, 99 S.W.2d 895, 900 (Tex. 1937); Calvert, *supra* note 12, at 365.

[42] *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.,* 819 S.W.2d 801, 805 (Tex.1991); *see also Litton Indus. Prods., Inc.* v. *Gammage,* 668 S.W.2d 319, 324 (Tex. 1984) (citing *Tex. Sling Co. v. Emanuel,* 431 S.W.2d 538, 541 (Tex. 1968)).

[43] *Lozano,* 52 S.W.3d at 167.

[44] Calvert, *supra* note 12, at 365.

[45] *Id.*

[46] *Wal-Mart Stores, Inc.* v. *Gonzalez,* 968 S.W.2d 934, 938 (Tex. 1998).

[47] *See Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 729 (Tex.2003) (per curiam); *McCann,* 99 S.W.2d at 900.

[48]Calvert, *supra* note 12, at 363-64. But other commentators disagree. *See* Powers, *supra* note 10, at 1703-10. We have held that a "conclusively and as a matter of law" point may be asserted under a "no evidence" point. *O'Neil* v. *Mack Trucks, Inc.,* 542 S.W.2d 112, 113 (Tex. 1976). And the cases in this section note that conclusive proof is often asserted by parties that do *not* carry the burden of proof. *See also Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001) (per curiam) (court must first examine record for evidence supporting verdict, ignoring all evidence to the contrary; if there is no such evidence, the court then examines the entire record to see if the contrary finding is established as a matter of law).

[49]Calvert, *supra* note 12, at 363-64. *But see, e.g., Cecil v. Smith,* 804 S.W.2d 509, 510 n. 2 (Tex. 1991) ("Cecil's points that (1) there was no evidence to support the findings and (2) the contrary of each finding was established as a matter of law will hereinafter collectively be referred to as her "no evidence" points.").

[50]*St. Joseph Hosp.* v. *Wolff,* 94 S.W.3d 513, 519-20 (Tex.2002) (plurality op.) (quoting *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 51 n. 1 (Tex. 1997)).

[51]*Tex. & N.O.R Co.* v. *Burden,* 146 Tex. 109, 203 S.W.2d 522, 528, 530 (1947); *see also Prudential Ins. Co. of Am. v. Krayer,* 366 S.W.2d 779, 783 (Tex. 1963) (finding evidence of suicide undisputed after disregarding disputed portion of facts).

[52]*Sullivan v. Barnett,* 471 S.W.2d 39, 44 (Tex. 1971); *Wright v. Vernon Compress Co.,* 156 Tex. 474, 296 S.W.2d 517, 523 (1956) ("[T]he trial court is required to submit only controverted issues. No jury finding is necessary to establish undisputed facts."); *Clark v. Nat'l Life & Accident Ins. Co.,* 145 Tex. 575, 200 S.W.2d 820, 822 (1947) ("Uncontroverted questions of fact need not be and should not be submitted to the jury for its determination."); *S. Underwriters v. Wheeler,* 132 Tex. 350, 123 S.W.2d 340, 341 (Tex.1939).

[53]*County of Bexar v. Santikos,* 144 S.W.3d 455, 460-61 (Tex.2004).

[54]*PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 97-98 (Tex. 2004).

[55]*State Farm Lloyds Ins. Co.* v. *Maldonado,* 963 S.W.2d 38, 40 (Tex. 1998).

[56]*Wal-Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 709-10 (Tex.2003) (per curiam).

[57]*See Johnson & Johnson Med., Inc. v. Sanchez,* 924 S.W.2d 925, 930 (Tex. 1996).

[58]*King v. Graham,* 126 S.W.3d 75, 78-79 (Tex.2003) (per curiam) (holding no evidence supported malicious prosecution claim as district attorney admitted prosecution was due to item he overlooked rather than any false statements by defendants).

[59]*Travelers Ins. Co. v. Seabolt,* 361 S.W.2d 204, 206 (Tex. 1962) (return to regular job in which use of hand was required conclusively established claimant did not suffer total loss of use).

[60]*Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309-10 (Tex.1986) (return to work did not conclusively establish injury was not total as claimant could not do regular work and employer voluntarily accommodated her with lesser duties).

[61]*See, e.g., Prudential Ins. Co. of Am. v. Krayer,* 366 S.W.2d 779, 783 (Tex. 1963).

[62]*See Republic Nat'l Life Ins. Co. v. Heyward,* 536 S.W.2d 549, 552 (Tex. 1976).

[63]*Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 340 (Tex. 1998); *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.,* 644 S.W.2d 443, 446 (Tex. 1982).

[64]811 S.W.2d 557, 560 (Tex. 1991).

[65]*Id.* at 558.

[66]*Id.* at 560. In defense of jurors, it should be noted that the trier-of-fact in *Murdock* was a judge.

[67] 135 Tex. 7, 136 S.W.2d 1113, 1115 (1940).

[68] *Id.*

[69] *Id.*

[70] *Clewis v. State,* 922 S.W.2d 126, 133 n. 12 (Tex.Crim.App.1996) (en banc) (citation omitted).

[71] *Hotchkiss* v. *Nat'l City Bank,* 200 F. 287, 293 (S.D.N.Y.1911).

[72] 443 U.S. 307, 320 n. 14, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

[73] *Southwestern Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 627 (Tex.2004).

[74] Our sister court reviews the legal sufficiency of criminal convictions by considering *"all evidence* which the jury was permitted, whether rightly or wrongly, to consider" in the light most favorable to the prosecution. *Moff v. State,* 131 S.W.3d 485, 488 (Tex.Crim.App. 2004); *see also Vodochodsky v. State,* 158 S.W.3d 502, 509 (Tex.Crim.App. 2004).

[75] *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002).

[76] *Bentley v. Bunton,* 94 S.W.3d 561, 596 (Tex.2002); *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 120 (Tex.2000).

[77] *Garza,* 164 S.W.3d at 627.

[78] 616 S.W.2d 911, 922 (Tex.1981).

[79] *Id.* at 926 (Greenhill, C.J., concurring).

[80] *See Coastal Transp. Co.* v. *Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234-35 (Tex. 2004).

[81] *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 55-56 (Tex. 1997).

[82] *See id.* at 51 (noting same problem with previous test whether insurer had reasonable basis for denying claim).

[83] *See Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.,* 77 S.W.3d 253, 262-63 (Tex.2002) (finding no evidence of bad faith based in part on defendant's correspondence showing misunderstanding regarding settlement terms); *State Farm Fire & Cas. Co. v. Simmons,* 963 S.W.2d 42, 45 (Tex. 1998)(affirming bad-faith verdict after noting that insurer gave contradictory reasons for not interviewing potential arsonists); *Minn. Life Ins. Co. v. Vasquez,* 133 S.W.3d 320, 330 (Tex.App.-Corpus Christi 2004, pet. filed) (finding some evidence of bad faith because, though insurer showed hospital stymied its efforts to obtain records, insurer failed to seek same information from other sources); *Allstate Tex. Lloyds v. Mason,* 123 S.W.3d 690, 704-06 (Tex.App.-Fort Worth 2003, no pet.) (reversing bad-faith verdict for legal insufficiency because insurer reasonably relied on expert report); *Allison v. Fire Ins. Exch.,* 98 S.W.3d 227, 249-50 (Tex.App.-Austin 2002, pet. granted, judgm't vacated w.r.m.) (affirming bad-faith verdict after reviewing insurer's reasons for delay and insured's responsive evidence); *Oram v. State Farm Lloyds,* 977 S.W.2d 163, 167 (Tex.App.-Austin 1998, no pet.) (reversing bad-faith verdict for legal insufficiency because insurer's interpretation of exclusion was reasonable though incorrect).

[84] *Wal-Mart Stores, Inc. v. Canchola,* 121 S.W.3d 735, 740 (Tex.2003) (per curiam) (noting liability may be established by proof of discrimination plus proof employer's reason was pretext); *Cont'l Coffee Prods. Co.* v. *Cazarez,* 937 S.W.2d 444, 452 (Tex. 1996) (same).

[85] *See, e.g., Univ. of Houston v. Clark,* 38 S.W.3d 578, 583 (Tex.2000) (noting good-faith test considers *all* circumstances on which official acted).

[86] *See, e.g., PPG Indus., Inc.* v. *JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 94 (Tex.2004) (holding no evidence supported jury verdict applying discovery rule based on contrary evidence that claimant's predecessor knew 3,000 windows had failed).

[87]*See, e.g., Provident Am. Ins. Co. v. Castaneda,* 988 S.W.2d 189, 194-95 (Tex. 1998) (finding no evidence insurer denied claim in bad faith due to conflicting medical evidence).

[88]*See, e.g., State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 448 (Tex. 1997) (holding some evidence showed expert report was pretext and thus denial of claim had no reasonable basis).

[89]*Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003); *Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 28 (Tex. 1993); *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex. 1986); *Edrington v. Kiger,* 4 Tex. 89, 93(1849).

[90]*McGalliard,* 722 S.W.2d at 697; *Silcott v. Oglesby,* 721 S.W.2d 290, 293 (Tex. 1986); *Ford v. Panhandle & Santa Fe Ry. Co.,* 151 Tex. 538, 252 S.W.2d 561, 563 (1952) (holding it was up to jurors "to resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses"); *Houston, E. & W.T. Ry. Co. v. Runnels,* 92 Tex. 305, 47 S.W. 971, 972 (1898).

[91]*Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 120 (Tex.2000).

[92]*Runnels,* 47 S.W. at 972.

[93]*Cochran v. Wool Growers Cent. Storage Co.,* 140 Tex. 184, 166 S.W.2d 904, 907 (1942) (noting the Court "read the entire statement of facts").

[94]*Harbin v. Seale,* 461 S.W.2d 591, 594 (Tex. 1970); *compare Harbin v. Seale,* 454 S.W.2d 271, 272 (Tex.Civ.App.-Dallas 1970) (reporting defendant's testimony that he was traveling only 40 miles per hour), *rev'd,* 461 S.W.2d 591 (Tex.1970).

[95]*MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 653-54 (Tex. 1999) (holding evidence allowed jurors to disbelieve defendant's experts' testimony even though plaintiff's expert's testimony was shown to be in error); *Runnels,* 47 S.W. at 972; *Cheatham* v. *Riddle,* 12 Tex. 112, 118 (1845).

[96]*PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 100 (Tex. 2004).

[97]*Anchor Cas. Co.* v. *Bowers,* 393 S.W.2d 168, 169-70 (Tex. 1965).

[98]*Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 338 (Tex. 1998); *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex. 1986).

[99]*Bentley v. Bunton,* 94 S.W.3d 561, 599 (Tex.2002).

[100]*See* TexR. Civ. P. 166a(c); *Wal-Mart Stores, Inc. v. Reece,* 81 S.W.3d 812, 817 (Tex. 2002) (finding no evidence that store knew of puddle based in part on uncontradicted testimony by only employee in the area); *In re Doe 4,* 19 S.W.3d 322, 325 (Tex.2000); *WFAA-TV, Inc.* v. *McLemore,* 978 S.W.2d 568, 574 (Tex. 1998) (holding reporter's detailed explanation of foundation of report established lack of malice as matter of law).

[101]*See, e.g., Dresser Indus., Inc. v. Lee,* 880 S.W.2d 750, 754 (Tex. 1993); *Lyons* v. *Millers Cas. Ins. Co.,* 866 S.W.2d 597, 601 (Tex. 1993); *Biggers v. Cont'l Bus Sys., Inc.,* 157 Tex. 351, 303 S.W.2d 359, 365 (1957); *Howard Oil Co. v. Davis,* 76 Tex. 630, 13 S.W. 665, 667 (1890) (holding reviewing court must uphold jury verdict despite strong evidence to the contrary if evidence is conflicting).

[102]*See, e.g., Gen. Motors Corp. v. Sanchez,* 997 S.W.2d 584, 592 (Tex. 1999); *Caller-Times Publ'g Co. v. Triad Communications, Inc.,* 826 S.W.2d 576, 580 (Tex. 1992); *Bendalin* v. *Delgado,* 406 S.W.2d 897, 899 (Tex. 1966).

[103]*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48-49 (Tex. 1998).

[104]*Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 286 (*Tex. 1998).

[105]*White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262-63 (Tex. 1983).

[106] *Hall v. Med. Bldg. of Houston,* 151 Tex. 425, 251 S.W.2d 497, 502 (1952).

[107] *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 542-43 (Tex.2002) (plurality op.).

[108] *T.O. Stanley Boot Co.* v. *Bank of El Paso,* 847 S.W.2d 218, 221 (Tex. 1992).

[109] *Uniroyal Goodrich Tire Co.* v. *Martinez,* 977 S.W.2d 328, 341-42 (Tex. 1998).

[110] *De Winne* v. *Allen,* 154 Tex. 316, 277 S.W.2d95, 98-99(1955).

[111] *Lozano* v. *Lozano,* 52 S.W.3d 141, 144 (Tex.2001) (per curiam); *id.* at 162-63 (Hecht, J., concurring and dissenting).

[112] *See Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 552 (Tex.2004); *Coastal Transp. Co.* v. *Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234 (Tex.2004); *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004); *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 922 (Tex. 1998); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex. 1995); *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex. 1994); *Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex. 1992); *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex. 1983); *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 297 (Tex. 1983) (per curiam).

[113] *See* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" & "Insufficient Evidence,"* 69 Tex. L.R. 515, 517-20 (1991).

[114] *Gragg,* 151 S.W.3d at 552; *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519 (Tex.2002) (plurality op.); *Southwestern Bell Mobile Sys., Inc. v. Franco,* 971 S.W.2d 52, 54 (Tex.1998) (per curiam); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998); *Havner,* 953 S.W.2d at 711; *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 75 (Tex.1997) (Hecht, J., concurring); *Preferred Heating & Air Conditioning Co. v. Shelby,* 778 S.W.2d 67, 68 (Tex. 1989) (per curiam); *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex. 1981); *Harbin v. Seale,* 461 S.W.2d 591, 592 (Tex. 1970); *W. Tel. Corp. v. McCann,* 128 Tex. 582, 99 S.W.2d 895, 898 (Tex.1937).

[115] *See St. Joseph Hosp.,* 94 S.W.3d at 519-20 (Tex.2002) (plurality op.); *Giles,* 950 S.W.2d at 51 n. 1 (citing *Wininger v. Ft. Worth & D.C. Ry. Co.,* 105 Tex. 56, 143 S.W. 1150, 1152 (1912) and *Tex. & N.O. Ry. Co. v. Rooks,* 293 S.W. 554, 556-57 (Tex.Comm'n.App.1927)).

[116] *Southwestern Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 620 (Tex.2004) (citing *Choate v. San Antonio & A.P. Ry.,* 91 Tex. 406, 44 S.W. 69, 69 (1898); *Muhle v. N.Y., T. & M. Ry.,* 86 Tex. 459, 25 S.W. 607, 608 (1894)).

[117] *Coastal Transp. Co. v. Crown Cent. Petroleum Corp., 136 S.W.3d 227, 234 (Tex.2004); Qantel Bus. Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 303 (Tex.1988); *Hart v. Van Zandt,* 399 S.W.2d 791, 793 (Tex. 1965); *Triangle Motors v. Richmond,* 152 Tex. 354, 258 S.W.2d 60, 61 (1953); *Ford v. Panhandle & Santa Fe Ry. Co.,* 151 Tex. 538, 252 S.W.2d 561, 562 (1952); *Anglin v. Cisco Mortgage Loan Co.,* 135 Tex. 188, 141 S.W.2d 935, 938 (1940).

[118] *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684 (Tex.2004); *S.V. v. R.V.,* 933 S.W.2d 1, 8 (Tex. 1996); *Colvin v. Red Steel Co.,* 682 S.W.2d 243, 245 (Tex. 1984); *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex. 1983); *Seideneck v. Cal Bayreuther Assocs.,* 451 S.W.2d 752, 753 (Tex. 1970); *Dunagan v. Bushey,* 152 Tex. 630, 263 S.W.2d 148, 153 (1953); *FitzGerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 258 (1951); *Kelly v. McKay,* 149 Tex. 343, 233 S.W.2d 121, 122 (1950); *White v. White,* 141 Tex. 328, 172 S.W.2d 295, 296 (1943); *McAfee v. Travis Gas Corp.,* 137 Tex. 314, 153 S.W.2d 442, 445 (1941); *Wellington Oil Co. v. Maffi,* 136 Tex. 201, 150 S.W.2d 60, 61 (1941); *Chicago, R.I. & G. Ry. Co.* v. *Carter,* 261 S.W. 135, 135 (Tex.Com.App.1924, judgm't adopted); *Charles v. El Paso Elec. Ry. Co.,* 254 S.W. 1094, 1094-95 (Tex.Com.App.1923, holding approved, judgm't adopted).

[119] *Szczepanik v. First S. Trust Co., 883 S.W.2d 648, 649 (*Tex. 1994) (per curiam); *Vance v. My Apartment Steak House of San Antonio, Inc.,* 677 S.W.2d 480, 483 (Tex. 1984); *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 295 (Tex. 1983); *Jones v. Tarrant Util. Co.,* 638 S.W.2d 862, 865 (Tex.1982); *Collora* v. *Navarro,* 574 S.W.2d 65, 68 (Tex. 1978); *Henderson v. Travelers Ins. Co.,* 544 S.W.2d 649, 650 (Tex. 1976); *Jones v. Nafco Oil & Gas, Inc.,* 380 S.W.2d 570, 574 (Tex. 1964).

[120] Act of April 25, 1931, 42d Leg., R.S., ch. 77, § 1, 1931 Tex. Gen. Laws 119; *Myers v. Crenshaw,* 134 Tex. 500, 137 S.W.2d 7, 13 (Tex. 1940); *Hines v. Parks,* 128 Tex. 289, 96 S.W.2d 970, 971 (Tex. 1936). *Cf Deal v. Craven,* 277 S.W. 1046, 1047 (Tex.Com.App.1925, judgm't adopted) ("It has long been settled in this state that the judgment must follow the verdict, and that the courts are without power to enter a judgment notwithstanding a verdict upon a material issue.").

[121]*Brown* v. *Bank of Galveston, Nat'l Ass'n,* 963 S.W.2d 511, 513 (Tex. 1998) ("[W]e consider the evidence in the light most favorable to the verdict and reasonable inferences that tend to support it."); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 931 (Tex. 1983) ("In acting on the motion [for judgment notwithstanding the verdict], *all* testimony must be viewed in a light most favorable to the party against whom the motion is sought, and every reasonable intendment deducible from the evidence is to be indulged in that party's favor.") (emphasis added); *Dowling v. NADW Mktg., Inc.,* 631 S.W.2d 726, 728 (Tex.1982) (same); *Douglass v. Panama, Inc.,* 504 S.W.2d 776, 777 (Tex. 1974) (same); *Leyva v. Pacheco,* 163 Tex. 638, 358 S.W.2d 547, 550 (1962) (same); *Houston Fire & Cas. Ins. Co. v. Walker,* 152 Tex. 503, 260 S.W.2d 600, 603-04 (1953) (affirming trial court's implied disregard of one jury answer based on "consideration of the transcript as a whole"); *Burt v. Lochausen,* 151 Tex. 289, 249 S.W.2d 194, 199 (1952) ("[W]e must consider *all the testimony in the record* from the standpoint most favorable to the plaintiff.") (emphasis added); *Neyland v. Brown,* 141 Tex. 253, 170 S.W.2d 207, 211 (Tex. 1943) (considering judgment non obstante veredicto "in the light of the record as a whole"); *Le Master v. Fort Worth Transit Co.,* 138 Tex. 512, 160 S.W.2d 224, 225 (1942) ("[W]e must view LeMaster's testimony, *as well as all other testimony in the record,* from a standpoint most favorable to him.") (emphasis added); *McAfee v. Travis Gas Corp.,* 137 Tex. 314, 153 S.W.2d 442, 445 (1941) ("[W]e must regard the evidence contained in this record in its most favorable light for McAfee . . . because of the instructed verdict and judgment non obstante veredicto."); *see also Ballantyne v. Champion Builders, Inc.,* 144 S.W.3d 417, 424-29 (Tex.2004) (upholding judgment non obstante veredicto based on conclusive evidence contrary to verdict).

[122]*See Tiller v. McLure,* 121 S.W.3d 709, 713 (Tex.2003) (per curiam); *Wal-Mart Stores, Inc.* v. *Miller,* 102 S.W.3d 706, 709 (Tex.2003) (per curiam); *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex. 1990); *Best v. Ryan Auto Group, Inc.,* 786 S.W.2d 670, 671 (Tex. 1990) (per curiam); *Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309 (Tex. 1986); *Tomlinson v. Jones,* 677 S.W.2d 490, 492 (Tex. 1984); *Williams v. Bennett,* 610 S.W.2d 144, 145 (Tex.1980); *Freeman v. Tex. Comp. Ins. Co.,* 603 S.W.2d 186, 191 (Tex. 1980); *Dodd v. Tex. Farm Prods. Co.,* 576 S.W.2d 812, 814-15 (Tex.1979); *Campbell v. Northwestern Nat'l Life Ins. Co.,* 573 S.W.2d 496, 497 (Tex. 1978); *Miller v. Bock Laundry Mach. Co.,* 568 S.W.2d 648, 650 (Tex.1977); *Sobel v. Jenkins,* 477 S.W.2d 863, 865 (Tex. 1972); *C. & R. Transp., Inc. v. Campbell,* 406 S.W.2d 191, 193 (Tex.1966).

[123]*See Tiller,* 121 S.W.3d at 713 (citing *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001)); *Miller,* 102 S.W.3d at 709 (same); *Best,* 786 S.W.2d at 671 (citing *King v. Bauer,* 688 S.W.2d 845, 846 (Tex. 1985)); *Tomlinson,* 677 S.W.2d at 492 (citing *Glover v. Tex. Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex. 1981)); *Campbell,* 573 S.W.2d at 497 (citing *Martinez v. Delta Brands, Inc.,* 515 S.W.2d 263, 265 (Tex. 1974)); *Campbell,* 406 S.W.2d at 193 (citing *Cartwright v. Canode,* 106 Tex. 502, 171 S.W. 696, 697-98 (1914)).

[124]*IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex. 2004); *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215-16 (Tex.2003); *Wal-Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d 502, 506 (Tex.2002); *Gonzalez* v. *Mission Am. Ins. Co.,* 795 S.W.2d 734, 736 (Tex. 1990); *Bayouth v. Lion Oil Co.,* 671 S.W.2d 867, 868 (Tex. 1984).

[125]*See* Tex. R. Civ. P. 166a(i).

[126]530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

[127]Fed.R.Civ.P. 50(a)(1).

[128]336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497 (1949).

[129]*Id.* at 57, 69 S.Ct. 413.

[130]*Reeves,* 530 U.S. at 149-50, 120 S.Ct. 2097 (citations omitted).

[131]*Carter* v. *Steverson & Co.,* 106 S.W.3d 161, 166 (Tex.App.-Houston [1st Dist] 2003, pet. denied) (emphasis added) (citation omitted); *accord Long v. Long,* 144 S.W.3d 64, 67 (Tex. App.-El Paso 2004, no pet.); *Gore v. Scotland Golf, Inc.,* 136 S.W.3d 26, 29 (Tex.App.-San Antonio 2003, pet. denied); *Exxon Corp. v. Breezevale Ltd.,* 82 S.W.3d 429, 438 (Tex.App.-Dallas 2002, pet. denied); *N. Am. Van Lines, Inc. v. Emmons,* 50 S.W.3d 103, 113 n. 3 (Tex.App.-Beaumont 2001, pet. denied); *Molina v. Moore,* 33 S.W.3d 323, 329 (Tex.App.-Amarillo 2000, no pet.); *Wal-Mart Stores, Inc. v. Itz,* 21 S.W.3d 456, 470 n. 3 (Tex.App.-Austin 2000, pet. denied); *see also In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951) (per curiam) (holding court of appeals erred in failing to distinguish between legal and factual sufficiency review by not weighing all the evidence when conducting the latter).

[132]*Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex. 1981) (noting that review of gross negligence finding by considering all the evidence appeared to but did not conflict with traditional no-evidence test).

[133]Dorsaneo, *supra* note 10, at 1503; *see also* Hardberger, *supra* note 10, at 17 (arguing exclusive standard is "designed to afford high deference to jury verdicts").

[134]*State v. Biggar,* 873 S.W.2d 11, 13 (Tex. 1994).

[135]*See, e.g., CMH Homes, Inc. v. Daenen,* 15 S.W.3d 97, 102 (Tex.2000) (noting plaintiff argued defendant's frequent inspections of stairs showed knowledge of inherent danger, while court held it showed the opposite as inspections found nothing); *State Farm Fire & Cas. Co. v. Simmons,* 963 S.W.2d 42, 45 (Tex. 1998) (affirming bad-faith verdict after noting insurer's reasons for denial were contradictory).

[136]*See, e.g., Wal-Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 327 (Tex. 1993) (noting evidence of single previous minor stumble supported negligence finding but not gross negligence).

[137]*See* Judith Resnik, *Managerial Judges,* 96 Harv. L.R. 374, 382-83 (1982) (noting that images of justice appeared blindfolded only within the last four hundred years).

[138]Justice Calvert's use of the masculine in 1960 may perhaps be forgiven, for although Hattie Hennenberg, Hortense Ward, and Ruth Brazzil served temporarily on this Court in 1925, and Sarah T. Hughes was appointed as a state district judge ten years later, it was not until 1954 that the Texas Constitution was amended to allow women to serve as jurors, and not until 1973 that Mary Lou Robinson became the first women to serve as a state appellate judge. See James T. "Jim" Worthen, *The Organizational & Structural Development of Intermediate Appellate Courts in Texas,* 46 S. Tex. L.Rev. 33, 75 (2004); Robert L. Dabney, Jr. *We Were There,* Houston B.J. Nov.-Dec.1999, at 42, 44.

[139]Calvert, *supra* note 12, at 364.

[140]*Wilkerson* v. *McCarthy,* 336 U.S. 53, 65, 69 S.Ct. 413, 93 L.Ed. 497 (1949) (Frankfurter, J., concurring).

[141]86 S.W.3d 693, 709.

[142]*Id.* at 703, 705.

[143]*Id.* at 705.

[144]*Id.* at 704-05.

[145]*Provident Am. Ins. Co.* v. *Castañeda,* 988 S.W.2d 189, 194-95 (Tex.1998); *see also State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 448 (Tex. 1997) (holding reliance on expert report did not foreclose bad-faith claim because claimant "presented evidence from which a fact-finder could logically infer that Haag's reports were not objectively prepared, that State Farm was aware of Haag's lack of objectivity, and that State Farm's reliance on the reports was merely pretextual.").

[146]*Cf. Nissan Motor Co. Ltd. v. Armstrong,* 145 S.W.3d 131, 140 (Tex.2004) (holding complaint letters may require manufacturer to investigate, but are not evidence complaints are true).

[147]*Tarrant Reg'l Water Dist.* v. *Gragg,* 151 S.W.3d 546, 555 (Tex.2004) (emphasis added).

**685 S.W.2d 18 (Tex. 1985)**
**Mable Jo David HOLICK, Petitioner,**
**v.**
**Danny Eugene SMITH Et ux., Respondents.**
**Nos. C-3261, C-3262 [*].**
**Supreme Court of Texas.**
**February 6, 1985**

Rehearing Denied March 13, 1985.

---

Thomas T. Tatum, Whitehouse, for petitioner.

Bain, Files, Allen & Caldwell, Jerry Bain, Tyler, for respondents.

SPEARS, Justice.

This case involves the involuntary termination of the parent-child relationship between Mable Jo Holick and two of her children. Mr. and Mrs. Danny Eugene Smith brought suit for termination and for adoption of the two Holick children. After a non-jury trial, the court ordered termination of the parent-child relationship and granted the adoption. The court of appeals, in an unpublished opinion, affirmed. We reverse the judgments of the courts below.

In early March 1982, Ms. Holick left the children with the Smith family. Ms. Holick had been unable to financially support herself or the children. Although she was able to keep them clothed and fed, they sometimes had no place to sleep but the car. The children were behind on their immunizations and had head lice when Ms. Holick's niece, Mrs. Smith, offered to take care of them until Mrs. Holick could get on her feet.

After leaving the children with the Smiths, Ms. Holick went to Dallas with her youngest child to live with her boyfriend. There, she obtained employment as a waitress. She sent no money to the Smiths, nor did they expect her to send money for the children's support. She did not visit or write the children for over six months, although she did call and talk to them once during that period.

The Smiths have two children of their own, are very active in the church, and are able to financially support the children. The social worker's report concludes that the Smiths are excellent role models, express love for the children, and appear to want to adopt them.

The issue presented on appeal is whether the Texas Family Code authorizes termination under these circumstances. We are

---

called upon to construe section 15.02 of the Family Code, which provides in part:

A petition requesting termination of the parent-child relationship with respect to a parent who is not the petitioner may be granted if the court finds that:

(1) the parent has:

(A) voluntarily left the child alone or in the possession of another not the parent and expressed an intent not to return; or

(B) voluntarily left the child alone or in the possession of another not the parent without expressing an intent to return, without providing for the adequate support of the child, and remained away for a period of at least three months; or

(C) voluntarily left the child alone or in the possession of another without providing adequate support of the child and remained away for a period of at least six months; or

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; or

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; or

(F) failed to support the child in accordance with his ability during a period of one year ending within six months of the date of the filing of the petition;

* * *

* * *

and in addition, the court further finds that termination is in the best interest of the child.

Tex.Fam.Code Ann. § 15.02 (Vernon Supp.1984).

The trial court terminated the parent-child relationship based on subsection (1)(C). There are five requirements for termination under subsection (1)(C):

(1) voluntarily left the child,

(2) alone or in the possession of another,

(3) without providing adequate support of the child,

(4) remained away for at least six months, and

(5) termination is in the best interest of the child.

It is undisputed that Ms. Holick voluntarily placed the children in the possession of the Smiths and that she remained away for at least six months, even though she had expressed an intent to return for the children. It is undisputed that Ms. Holick made no support payments but was not expected to by the Smiths, and she did not contest the trial court's finding that the termination and adoption would be in the best interest of the children. She contends, however, that she was not required to actually support the children, but only make arrangements for their adequate support.

The natural right existing between parents and their children is of constitutional dimensions. *In re G.M.,* 596 S.W.2d 846, 846 (Tex.1980); *Wiley v. Spratlan,* 543 S.W.2d 349, 352 (Tex.1976). Indeed, "involuntary termination of parental rights involves fundamental constitutional rights." *In re G.M.,* 596 S.W.2d at 846. This natural parental right has been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." See *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1976). A termination decree is complete, final, irrevocable and divests for all time that natural right as well as all legal rights, privileges, duties and powers with respect to each other except for the child's right to inherit. Wiley, 543 S.W.2d at 352; Tex.Fam.Code Ann. §

15.07 (Vernon 1975). Moreover, the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights. *Santosky v. Kramer,* 455 U.S. 745, 747, 102 S.Ct. 1388, 1391, 71 L.Ed.2d 599 (1980); *Richardson v. Green,* 677 S.W.2d 497, 500 (Tex.1984). Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent. See Cawley

---

v. Allums, 518 S.W.2d 790, 792 (Tex.1975); *Heard v. Bauman,* 443 S.W.2d 715, 719 (Tex.1969).

The Smiths seek a construction of subsection (1)(C) that would require Ms. Holick to have personally sent them "adequate support" for the children; however, they never expected such support. The Smiths took the children because Ms. Holick could not adequately support them. The Smiths, nevertheless, argue that the legislature intended to require parents to personally "provide adequate support" under (1)(C) because (1)(B) contains the language "provide for the adequate support." In *Brokenleg v. Butts,* 559 S.W.2d 853 (Tex.Civ.App.--El Paso 1977, writ ref'd n.r.e.) cert. denied 442 U.S. 946, 99 S.Ct. 2894, 61 L.Ed.2d 318 (1979) the court construed subsection (1)(B), the three-month provision. The court held that subsection (1)(B) requires the parent to make arrangements for the adequate support of the child rather than personally send support.

We believe that subsection (1)(C) is capable of two interpretations. "Provide" is defined to mean "to furnish; supply" or "to fit out with means to an end." Webster's New International Dictionary (2nd ed. 1960). Thus, subsection (1)(C) is susceptible to an interpretation which would merely require that the parent make arrangements for adequate support rather than personally support the child.

The Smiths would have us adopt an interpretation which would allow the termination based on whether the parent is acutely indigent, not whether the parent intended to abandon the child nor whether the parent's conduct endangers the physical or emotional wellbeing of the child. Under such an interpretation a parent's rights could be terminated if he placed his child with another who promised to provide support, even though he expressed an intent to return as soon as he could get back on his feet. His rights could be terminated even if he sent every dime he could spare for that child's support, if what he sent were not enough to be termed "adequate." With the view that termination is such a drastic and grave measure that involuntary termination statutes are strictly construed in favor of the parent, we decline to adopt such an interpretation.

We hold that under § 15.02(1)(C) Ms. Holick was required to make arrangements for the adequate support rather than personally support the children. Termination was not authorized under these facts. Accordingly, we reverse the judgments of the courts below and render judgment that the termination is denied and the adoption is set aside.

Dissenting opinion by WALLACE, J., in which McGEE and KILGARLIN, JJ., join.

WALLACE, Justice, dissenting.

I respectfully dissent. The majority opinion clearly misconstrues both the obvious intent and the plain meaning of Tex.Fam.Code Ann. § 15.02 (Vernon Supp.1984). It is a rule of statutory construction that every word of a statute is presumed to have a specific purpose. Likewise, every word excluded from a statute must be presumed to have been excluded for a particular reason. *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535 (Tex.1981).

We must presume the Legislature intended that termination of the parent-child relationship may be granted when: (1) the parent leaves the child with one not a parent ... without expressing an intent to return without providing for the adequate support of the child and remains away three months; or, (2) the parent leaves the child with a parent, or another ... without providing adequate support of the child and remains away for at least six months. Tex.Fam.Code Ann. § 15.02(1)(B) and § 15.02(1)(C). The crucial words expressly adopted in the first instance are, "without expressing an intention to return" and "without providing for" the adequate support of the child; whereas, in the latter situation the language is "without providing adequate support."

In comparing § 15.02(1)(A), (B) and (C), it will be noted that there is no time delay before suit is required if a parent leaves and expresses an intent not to return. Three months absence is required before termination where the child is left with someone other than a parent and no provision for support is made. The time period expands to six months even if the child is left with the other parent and no support is provided. The Tex.Fam.Code coordinates a progression of conduct with lengthened delays. The omission of "for" from § 15.02(1)(C) was logically intended.

These provisions do not authorize termination only in the case of the acutely indigent. Termination of the parent-child relationship is authorized in any situation where the parents meet the legislative requirements for termination through poverty, neglect, abuse or any other condition falling within these sections.

Denying termination in this instance ignores those situations where the best interest of the child is served by termination of the parent-child relationship. In this case, the trial court found that the best interest of the child would be served by the stable, loving environment of the Smiths. This finding was not contested by Ms. Holick. While it is true that the parent-child bond is very strong, it is not true that all parents provide for the best interest of their children.

A common thread running through the Tex.Fam.Code is protection of the "best interest of the child." The express language of the provisions regarding termination of the parent-child relationship should be followed when the trial court finds that to do so would be in the best interest of the child.

Accordingly, I would affirm the judgments of the courts below and render judgment that the termination and adoption be granted.

McGEE and KILGARLIN, JJ., join in this dissenting opinion.

---------

Notes:

[*] These are direct companion cases

January 21, 1976

**NANCI ADAMS HOLLEY, APPELLANT**
**V.**
**DAVID E. ADAMS, APPELLEE**

From the District Court of Travis County, 98th Judicial District

COUNSEL

For Appellant: Stephen M. Orr - Austin, TX

For Appellee: Rogan B. Giles - Austin, TX

Author: Shannon

This appeal concerns the termination of a parent-child relationship. Tex. Family Code Ann. ? 15.02 (1974).

Appellee, David E. Adams, filed suit in the district court of Travis County seeking a termination of the parent - child relationship between his son, David Christopher Adams, and appellant, Nanci Holley, the mother of the child and formerly appellee's wife. After trial to the court, judgment was entered terminating the parent-child relationship between the boy and appellant. We will affirm that judgment.

Appellee alleged that he and appellant had been married and that during their marriage a son, David Christopher, was born to them in February of 1966. Appellee and appellant were divorced by the district court of Travis County in 1969. By the terms of the divorce decree, appellee was awarded custody of the boy. Appellant was not ordered to pay child support. Appellee pleaded further that termination of the parent-child relationship between appellant and her son would be in the best interests of the child. As grounds for termination, appellee alleged that appellant had failed to support the child in accordance with her ability during a period of one year ending within six months of the date of the filing of the suit, and that appellant had "emotionally and actually abandoned the child."

After judgment and upon request, the court filed findings of fact and conclusions of law. The findings of fact are summarized as follows. Appellee and appellant lived together as husband and wife until the spring of 1968 when appellant moved out. Afterward appellant filed a suit for divorce against appellee, and during the pendency of the divorce, appellant voluntarily delivered physical custody of David Christopher to appellee. At that time the child was about three years of age. Appellant did not contest the judgment awarding custody of the boy to his father. From the time appellant delivered the child to appellee in early 1969, through the date of appellee's marriage to his present wife in late 1970, appellee provided all of the shelter, clothing, food, health care, entertainment, training, education, love, and affection for the child. Following appellee's present marriage, he and his wife have acted as father and mother to the child.

Shortly after the divorce was entered, appellant was committed by her mother to the Austin State Hospital for observation and treatment. She was released from the hospital after a weekend stay. After her release she departed Austin in the company of three men with whom she made her way from Texas to the State of Washington.

Appellant married Randie Shreve in Seattle on March 14, 1970, by whom she bore a child in August of 1970. Appellant divorced Shreve in June of 1973. Appellant married her present husband, Ricky Holley, in March of 1974.

Before her marriage to Shreve appellant worked as a telephone solicitor to support herself, receiving the minimum wage. In 1972, appellant obtained employment at the University of Washington as a program advisor. At the time of trial appellant still held that position. After her divorce from Shreve, appellant filed proceedings in voluntary bankruptcy. She was discharged from her debts by the bankruptcy court in September of 1973. When appellant began her employment with the University she received $500.00 each month. In January, 1975, her salary had increased to $693.00 monthly. Though appellant's present husband is a full time student, he receives $366.00 each month from the United States government and earns about $60.00 each month as a tutor.

Since August, 1969, appellant has returned to Austin three times. Appellant's mother, as well as her son, lives in Austin. On each of the three trips to Austin, appellant has visited with her son.

Since appellant moved from Austin, she has sent a total of about $100.00 to David Christopher. Occasionally, she sent clothing and toys. At least one of the packages was returned to appellant unopened. Appellee did not refuse to accept any money tendered by appellant for support of the child. Appellee, however, did not accept a check for twenty dollars sent by appellant as a birthday present to the child during the pendency of the litigation. Appellant testified that she occasionally wrote to the child, directly, and indirectly through her mother. Appellee and his present wife denied that they refused to read to the child any letters which reached them.

David Christopher has enjoyed good health, and has a happy relationship with appellee and his step-mother. He has exhibited no behavior problems. He has attended school regularly and has made good grades.

The court found as a fact that appellant had not supported the child in keeping with her ability during a period of one year prior to filing of the petition for termination.

The district court concluded, among other things, that though appellant was not ordered to pay child support by the terms of the divorce judgment, she had a continuing duty by virtue of Tex. Family Code Ann. ? 4.02 (1974) to provide support for her son. The court concluded further that appellant failed to support the child in accordance with her ability during a period of one year ending within six months of the date of filing of the petition for termination within the meaning of Tex. Family Code Ann. ? 15.02(1)(E) (1974), and that such failure was not excusable under the circumstances within the meaning of Tex. Family Code Ann. ? 15.02(1)(E) (1974). The court was also of the opinion that appellant, by her conduct and virtual abandonment of the child for a period of nearly six years, had engaged in conduct which endangered the

emotional well-being of the child within the meaning of Tex. Family Code Ann. ? 15.02(1)(D) (1974). Finally, the court concluded that termination of the parent-child relationship between appellant and the child was in the best interest of the child within the meaning of Tex. Family Code Ann. ? 15.02(2) (1974).

Appellant attacks the dispositive findings of fact and conclusions of law of the district court by many points of error. We will not attempt to discuss the points in their order of appearance in appellant's brief.

Contrary to appellant's claim, the trial court concluded correctly that appellant had a continuing duty to provide support for her child even though she was not ordered to do so by the terms of the divorce decree. Each spouse has the duty to support his or her minor children. Tex. Family Code Ann. ? 4.02 (1974). See Curton v. Gordon, 510 S.W.2d 682 (Tex. Civ. App. 1974, writ ref'd n.r.e.).

Texas Family Code Ann. ? 15.02 (1974) empowers the court to grant a petition terminating the parent-child relationship of a non-requesting parent upon the finding that:

"(1) the parent has:

"(D) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; or

"(E) failed to support the child in accordance with his ability during a period of one year ending within six months of the date of the filing of the petition;

"(I)… and

"(2) termination is in the best interest of the child." (Emphasis supplied)

With respect to his suit for termination of appellant's parental rights under ? 15.02 appellee had the burden of demonstrating facts in compliance with (1)(D) or (1)(E) and (2) that termination was in the best interest of the child. See White v. Chamberlain, 525 S.W.2d 273 (Tex. Civ. App. 1975, no writ). As written previously, the district court was of the opinion that appellee discharged his burden in proving compliance with (1)(D) and (1)(E) and (2).

Appellant by three points of error maintains that the fact finding that she did not support her child in keeping with her ability during a period of one year prior to the filing of the petition for termination was supported by no evidence or, alternatively, that the finding was so contrary to the great weight and preponderance of the evidence so as to be manifestly unjust. We will overrule those points of error.

The petition for termination was filed on July 26, 1974. One year prior to that date appellant earned in excess of $500.00 each month. By January of 1975, she earned $693.00 monthly. It is true that she filed voluntary bankruptcy proceedings in June of 1973, but she was discharged from her debts by the bankruptcy court in September, 1973. In nearly six years appellant sent no more than $100.00 in support of her son.

Though the testimony was conflicting, the trial court concluded that appellee did not refuse to accept any money tendered by appellant in support of the child. Appellant did testify that she had a policy of group health insurance presumably obtained in connection with her employment at the University, and that as a member of her family the child, David Christopher, was covered by the terms of that policy. Though appellant did send occasional packages of clothes and toys to the child, occasional gifts are not sufficient to satisfy the requirements of ? 15.02(1)(E). See Curton v. Gordon, supra.

As we are of the opinion that the court's finding with respect to ? 15.02(1)(E) is sound, it is not necessary to consider appellant's points of error attacking the court's finding concerning ? 15.02(1)(D).

As she must, appellant attacks the determination by the trial court that the best interest of the minor child was served by the termination of her parental rights. Prior to their divorce appellant delivered the child to appellee. Appellant then embarked upon a rootless trek to the western states with three male companions. She obtained employment in Seattle, and married twice more. During all of those years she saw her son only three times. She did send him a little money, a few clothes, and a few toys. We agree with the district court that from the time appellant deposited David Christopher with appellee, it was appellee who provided all of the shelter, clothing, food, care, training, love, and affection for the child. After appellee remarried, he and his present wife have acted as father and mother to the child.

Under the record, we are of the opinion that the trial court correctly concluded that it was in the best interest of the child that appellant's parental rights be terminated.

The judgment is affirmed.

# In re A.A.A., 265 S.W.3d 507 (Tex.App.-Houston [1 Dist.] 2008)

265 S.W.3d 507 (Tex.App.-Houston [1 Dist.] 2008)
In the Interest of A.A.A.
No. 01-07-00160-CV.
Court of Appeals of Texas, First District, Houston.
June 26, 2008

Rehearing Overruled Aug. 19, 2008.

---

[Copyrighted Material Omitted]

---

William B. Connolly, William B. Connolly & Associates, Houston, TX, for Appellant.

Sandra D. Hachem, Senior Assistant County Attorney, Houston, TX, for Appellee.

Panel consists of Justices TAFT, HANKS, and HIGLEY.

**OPINION**

GEORGE C. HANKS, JR., Justice.

We withdraw our opinion and judgment issued January 24, 2008 and issue this one in its stead. We grant the Texas Department of Family and Protective Services's (" DFPS" ) motion for rehearing.

In this accelerated appeal, Shde Aza Hurst challenges the trial court's decree terminating her parental rights to her minor child, A.A.A., and naming DFPS as A.A.A.'s sole managing conservator. In five issues, Hurst argues that the evidence is legally and factually insufficient to support the trial court's findings under Section 161.001. TEX. FAM.CODE ANN. § 161.001 (Vernon Supp.2007). In her sixth issue, Hurst asserts that, if we reverse the trial court's termination of her parental rights, we should also reverse the trial court's appointment of DFPS as sole managing conservator. We affirm.

---

Paul Alexander, whose parental rights were also terminated in the decree, filed a notice of appeal, but did not file a brief or a motion to extend time to file a brief, and he has not reasonably explained his failure to file a brief. Accordingly, we dismiss Alexander's appeal for want of prosecution. *See* TEX.R.APP. P. 38.8(a)(1).

## Background

A.A.A. was born April 13, 2005. During the summer of 2005, her mother, Shde Hurst, was living in Louisiana with her boyfriend, Paul Alexander. Alexander claims that he is A.A.A.'s father, although DNA test

results were not available at trial. In September 2005, Hurst ended her relationship with Alexander, after living with him for six months, and she and A.A.A. moved to a Houston shelter. After arriving at the shelter, Hurst worked at McDonald's for about one month and also began attending night school.

On January 24, 2006, Hurst left eight-month-old A.A.A. at the shelter and went to Wal-Mart. While at Wal-Mart, Hurst was arrested for shoplifting and spent two days in a Harris County jail. Hurst claims that she was shoplifting cough medicine because A.A.A. was sick. On January 25, when Hurst did not return to the shelter, DFPS received a referral of neglectful supervision of A.A.A. The next of kin was supposed to have picked up A.A.A. on January 24, but never arrived. When DFPS called the contacts on Hurst's emergency list, the first contact indicated that she could not care for the child, and the second contact had a disconnected number. A.A.A. was then taken into DFPS care. On January 26, DFPS filed a petition for protection of a child, conservatorship, and termination of the parent-child relationship, and the trial court issued a temporary order naming DFPS as A.A.A.'s temporary sole managing conservator. DFPS initially placed A.A.A. in foster care, but in May 2006, A.A.A. was moved to Hurst's relative. This relative has expressed an interest in adopting A.A.A.

Hurst was released from county jail on January 25 at 5:55 p.m. She testified that, by the time she was released, DFPS had already had possession of A.A.A. for one day. She also stated that DFPS told her that A.A.A. would not be returned until she completed the required process. After being released, Hurst moved to another shelter in Pasadena, Texas, for a few weeks and then moved in with a friend in Houston until sometime in June. Hurst claimed that she worked at McDonald's during this period, although A.A.A.'s guardian ad litem testified that Hurst told her she had been working at the McDonald's for about three weeks as of June 1.

In June, Hurst moved back to Louisiana where she moved back and forth between Alexander and her sick mother, whom she assisted. Hurst stated that, once back in Louisiana, she babysat two children, ages seven and nine, for around seven months and was making about $300 every two weeks. A.A.A. remained in Texas with Hurst's relative. At the time of trial, Hurst testified that she was currently living with Alexander at an apartment in Lake Charles, where she planned on staying and where she has arranged for daycare for A.A.A. She also stated that she was working at a gas station making $7.25 an hour.

A family service plan was implemented, outlining the services Hurst was to complete in order to be reunited with A.A.A. Hurst signed this plan on March 9, and, on March 23, the trial court ordered Hurst to comply with the plan. Brandi Sewell-Hall, the appointed caseworker on A.A.A.'s case from January 2006 until December 2006, testified that, during her time on the case,

---

DFPS tried to help Hurst to complete her services but Hurst failed to complete any of the services except for a psychological evaluation. Hall also stated that, during the year she was the assigned caseworker, Hurst only visited A.A.A. two times, even though she could have visited twice a month while A.A.A. was in foster care, and more often once Hurst's relative had custody of A.A.A. Hurst testified that she left a message on Hall's answering machine indicating that she was moving to Louisiana. Hall, however, stated that she does not remember such a message.

Elizabeth Bolling, the assigned caseworker from January 19, 2007 until the time of trial, testified that Hurst had only seen A.A.A. once during that time. Bolling stated that it is in A.A.A.'s best interest to remain with Hurst's relative. A.A.A.'s guardian ad litem testified that A.A.A. had bonded with Hurst's relative and was thriving in her current environment.

Hurst testified that her failure to comply with the family service plan was due to transportation problems and the unavailability of parenting classes, although she testified at trial that she made a choice not to catch the bus to attend the parenting classes. She also testified that she completed the parenting classes days before trial and just needed to pick up the certificate.

Hurst testified that she visited A.A.A. six times before she moved back to Louisiana. She also stated that she called A.A.A. every day after she moved to Louisiana. Hurst claimed that she did not visit A.A.A. more frequently because she believed she could only visit A.A.A. at the DFPS office. Bolling confirmed that Hurst had stated that she believed all visits with A.A.A. were to be at the DFPS office. While Hurst admitted that she did not provide financial support for A.A.A. after she was taken into DFPS care, Hurst testified that she brought clothing and shoes to the DFPS office approximately six times.

DFPS petitioned to have Hurst's parental rights terminated on January 26, 2006. Permanency hearings occurred on July 27 and November 14, 2006, and on February 6, 2007. A bench trial occurred on DFPS's parental-termination suit on February 6, 2007, and, on February 27, the trial court signed a judgment terminating Hurst's and Alexander's parent-child relationship with A.A.A. and appointing DFPS as A.A.A.'s sole managing conservator.

### Sufficiency

In issues one through five, Hurst challenges the trial court's termination of her parental rights because the evidence is legally and factually insufficient to support the trial court's finding that she engaged in conduct set out as grounds for termination pursuant to Texas Family Code subsections 161.001(1)(E), (F), (N), and (O) and the trial court's finding that termination was in the best interest of the child pursuant to subsection 161.001(2).

### Standard of Review

Because parental-rights termination " is complete, final, irrevocable, and divests for all time that natural right ...[,] the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985) (citing *Santosky v. Kramer,* 455 U.S. 745, 747, 102 S.Ct. 1388, 1391, 71 L.Ed.2d 599 (1982); *Richardson v. Green,* 677 S.W.2d 497, 500 (Tex.1984)). " ' Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE. ANN. § 101.007 (Vernon

---

**Page 512**

2002). This heightened burden of proof results in a heightened standard of review.

When determining legal sufficiency, we review " all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002). To give appropriate deference to the factfinder's conclusions, we must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* This does not mean that we must disregard all evidence that does not support the finding. *Id.* Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* Therefore, in conducting a legal-sufficiency review in a parental-termination case, we must consider all of the evidence, not only that which favors the verdict. *See City of Keller v. Wilson,* 168 S.W.3d 802, 817 (Tex.2005).

In determining factual sufficiency under the clear and convincing burden, we must consider whether the evidence is sufficient to produce in the mind of the factfinder a firm belief or conviction as to the truth of the allegation sought to be established. *In re C.H.,* 89 S.W.3d 17, 26 (Tex.2002). We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *J.F.C.,* 96 S.W.3d at 266. " If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

The natural rights that exist between parents and their children are of constitutional dimension. *Holick,* 685 S.W.2d at 20. Therefore, termination proceedings should be strictly scrutinized, and the involuntary termination statutes should be strictly construed in favor of the parent. *Id.* at 20-21. However, "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.,* 89 S.W.3d at 26.

For parental rights to be involuntarily terminated, it must be found by clear and convincing evidence that the parent engaged in conduct set out in subsection 161.001(1) and that termination would be in the child's best interest pursuant to subsection 161.001(2). TEX. FAM.CODE ANN. § 161.001 (Vernon Supp.2007).

### Failure to Comply with Court Order

In her fourth issue, Hurst asserts that the evidence is legally and factually insufficient to support the trial court's finding that Hurst engaged in conduct pursuant to subsection 161.001(1)( *O* ). To terminate parental rights based on subsection 161.001(1)( *O* ), a trial court must find by clear and convincing evidence that the parent

failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 [1] for the abuse or neglect of the child.

TEX. FAM.CODE ANN. § 161.001(1)( *O* ) (Vernon Supp.2007).

Hurst does not dispute that A.A.A. was in DFPS custody for at least nine months or that she did not comply with all the requirements of her family service plan. Instead, she argues that DFPS did not meet its burden of proof under subsection 161.001(1)( *O* ) because A.A.A. was not removed from Hurst as a result of abuse or neglect, but solely because she had been arrested and was unable to return to A.A.A. at the shelter.[2]

DFPS counters by asserting that the Legislature did not intend to require a finding of abuse or neglect of the child under subsection 161.001(1)( *O* ). Instead, according to DFPS, this language merely clarifies that removal under this subsection is proper if the child was removed for *any* reason under Chapter 262. DFPS also argues that the Texas Supreme Court has shown that proof of abuse or neglect is not required for a finding pursuant to subsection 161.001(1)( *O* ).

Because this appeal requires us to interpret a section of the Texas Family Code, we restate the basic principles of statutory construction. Interpreting statutes is a legal matter, subject to de novo review. *Bragg v. Edwards Aquifer Auth.,* 71 S.W.3d 729, 734 (Tex.2002). A trial court has no discretion when evaluating a question of law. *See Huie v. DeShazo,* 922 S.W.2d 920, 927 (Tex.1996); *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

The overriding goal of statutory interpretation is to determine the Legislature's intent. *Cont'l Cas. Co. v. Downs,* 81 S.W.3d 803, 805 (Tex.2002). In order to ascertain legislative intent, we first look to the plain and common meaning of the words used by the Legislature. TEX. GOV'T CODE ANN. § 311.011 (Vernon 2005); *Argonaut Ins. Co. v. Baker,* 87 S.W.3d 526, 529 (Tex.2002). It is a well-settled rule of statutory construction that every word of a statute must be presumed to have been used for a purpose. *In re Bell,* 91 S.W.3d 784, 790 (Tex.2002). To ascertain legislative intent, however, we must look to the statute as a whole and not to its isolated provisions. *Morrison v. Chan,* 699 S.W.2d 205, 208 (Tex.1985); *Tex. Dep't of Banking v. Mount Olivet Cemetery Ass'n,* 27 S.W.3d 276, 283 (Tex.App.-Austin 2000, pet. denied). In ascertaining legislative

intent, we do not confine our review to isolated statutory words, phrases, or clauses, but we instead examine the entire act. *Meritor Auto., Inc. v. Ruan Leasing Co.,* 44 S.W.3d 86, 90 (Tex.2001).

In this case, we are called upon to interpret the meaning of " removal from the parent under Chapter 262 for abuse or neglect of the child." DFPS contends that this phrase merely clarifies that removal under subsection 161.001(1)( *O* ) is proper if the child was removed for *any* reason under Chapter 262. However, we must presume that the phrase " abuse or neglect of the child" was used by the Legislature for a reason. *See Bell,* 91 S.W.3d at 790.

DFPS also asserts that the supreme court has addressed the issue of whether " abuse or neglect" are requirements of subsection 161.001(1)( *O* ). In *J.F.C.,* the supreme court determined:

The evidence establishes as a matter of law that the parents failed to comply with the court's orders specifying the actions the parents had to take for the DPRS to return the children to the parents. The record also conclusively establishes that the children were removed from their parents under Chapter 262 of the Family Code, and it is undisputed that they were in the DPRS's custody for more than nine months after their removal. Accordingly, the parental conduct described in subsection 161.001(1)( *O* ) of the Family Code was established as a matter of law.

96 S.W.3d at 278-79 (Tex.2002). Thus, in holding that subsection 161.001(1)( *O* ) was conclusively established, the supreme court's analysis did not include whether the child at issue was removed for abuse or neglect. DFPS contends that, by not mentioning that the child was removed for abuse or neglect, the supreme court eliminated abuse or neglect as a required element of subsection 161.001(1)( *O* ). We disagree.

We first note that the specific question of whether a child must be removed under Chapter 262 for that child's own abuse or neglect was not brought before the court in *J.F.C.* Instead, the court was asked to address the constitutionality of the broad-form jury charge on parental termination used by the trial court. *Id.* at 277. The supreme court did not reach this issue, however, because it held that the evidence established parental conduct pursuant to subsection 161.001(1)( *O* ) as a matter of law. *Id.*

The Texas Supreme Court has not reviewed a termination based on subsection 161.001(1)( *O* ) since *J.F.C.* Among the courts of appeals, most have not looked to *J.F.C.* when reviewing a subsection 161.001(1)( *O* ) termination, but have acted similarly by not analyzing whether the child at issue was removed under Chapter 262 for abuse or neglect. However, several decisions have treated a finding of abuse or neglect of the child to be a required element.

*In re S.A.P.,* from the Waco Court of Appeals, specifically pointed out that " abuse or neglect of the child" was required under subsection 161.001(1)( *O* ), and, because testimony showed that the child was not removed for abuse or neglect, but because of the risk caused by the parents' prior history, held that there was no evidence to support the jury's finding. 169 S.W.3d 685, 705-06 (Tex.App.-Waco 2005, no pet.). The Tyler Court of Appeals has consistently recognized " abuse or neglect of the child" as an element of subsection 161.001(1)( *O* ). *See In re K.H.,* No. 12-05-00077-CV, 2006 WL 3211299, at *5 (Tex.App.-Tyler Nov. 8, 2006, no pet.); *In re M.B.,* No. 12-04-00350-CV, 2005 WL 3201071, at *4 (Tex.App.-Tyler Nov. 30, 2005, no pet.);

*In re A.C.,* No. 12-04- 00264-CV, 2005 WL 2404108, at *4 (Tex.App.-Tyler Sept. 30, 2005, no pet.). Additionally, a decision from the Amarillo Court of Appeals actually designated " the child's removal from the parent was a result of abuse or neglect of the child" as the third element of subsection 161.001(1)( *O* ) and

went on to conclude that the child at issue was removed because of her parents' neglect. *In re M.B.,* No. 07-04-0334-CV, 2004 WL 2867544, at *2 (Tex.App.-Amarillo Dec. 14, 2004, no pet.).

Because the supreme court did not expressly hold that " removal under Chapter 262 for abuse or neglect of the child" is *not* an element of subsection 161.001(1)( *O* ), we must adhere to the unambiguous language of the statute. Thus, in our sufficiency review of the trial court's finding that Hurst engaged in conduct pursuant to subsection 161.001(1)( *O* ), we must consider whether DFPS proved by clear and convincing evidence that A.A.A. was removed under Chapter 262 for Hurst's abuse or neglect.

In determining whether the evidence is sufficient to support the trial court's finding that A.A.A. was removed because of Hurst's abuse or neglect, and because " abuse" and " neglect" are not defined in subsection 161.001(1)( *O* ), it is helpful to review how " abuse or neglect of the child" has been addressed as a prong of subsection 161.001(1)( *O* ). In *In re M.B.,* the court held that the Department's affidavit established that the child was removed as a result of neglect. 2004 WL 2867544, at *2. The affidavit stated that the Department had received a report from the hospital treating the child, which informed them that the parents could not be located and had not left any contact information. *Id.* As of the date of removal, the parents had not visited the child in the hospital in nearly one month. *Id.* In *In re A.C.,* a Department affidavit stated that a report was initially received alleging neglectful supervision. 2005 WL 2404108, at *4. After investigating, the Department decided that there was " reason to believe" the allegations. *Id.* A Department specialist found that, after the allegation, the parents placed the children with a relative to avoid foster care. *Id.* After caring for the children for four months, the relative brought the children to the Department, because she could not care for them and was not receiving support from their parents. *Id.* The specialist believed emergency removal was necessary due to alleged drug use and lack of appropriate housing. The court held that this evidence established the parents' neglect. *Id.* In *In re K.H.,* the court held that evidence that the " case was initiated because of domestic violence ... and physical neglect of both children" established that removal occurred due to parental neglect. 2006 WL 3211299, at *5. Removal based on neglect was also held to be established where a Department affidavit noted that the child tested positive for drugs at birth and the parents were " engaged in ongoing drug possession and use in violation of a previous service plan." *In re M.B.,* 2005 WL 3201071, at *4. However, in *In re S.A.P.,* the court held that the abuse or neglect prong was not satisfied because a Department caseworker specifically testified that the child was not removed for the abuse or neglect of the parents, but because of a risk caused by the parent's prior history. 169 S.W.3d at 705-06. We conclude that these opinions show that whether a child was removed for abuse or neglect should be determined on a case-by-case basis.

Here, DFPS argues that the fact that Hurst left A.A.A. in the shelter while she went to commit a crime is sufficient to establish neglect. We disagree. DFPS did not offer sufficient evidence of the circumstances surrounding this event to

establish neglect. Specifically, DFPS provided no evidence that Hurst knew or reasonably should have known that her child would not be taken care of when she left her at the shelter. Similarly, DFPS failed to present evidence with whom, and with what instructions, the child was left at the shelter. To the contrary, there is evidence that Hurst had provided emergency contact information with the shelter, even though this contact information ultimately proved useless.

Nevertheless, we conclude that the evidence is sufficient to support the trial court's finding that A.A.A. was removed for Hurst's neglect. DFPS did present evidence to the trial court that, once Hurst was released from police custody, she did not make any effort to find out A.A.A.'s location or condition or to leave a way to reach her with either DFPS or the shelter. Attached to DFPS's original petition for temporary managing conservatorship of A.A.A. is an affidavit, signed on January 26, 2006, stating that Hurst was released from county jail on January 25, 2006 at 5:55 p.m., but had not yet returned to the shelter or made any attempt to contact relatives, and her whereabouts were unknown at that time. Moreover, the affidavit states that A.A.A. " was placed into protective custody because her mother could not be located and there were no other [DFPS] approved alternate placement options available." On January 26, the trial court found that A.A.A. was initially removed from Hurst pursuant to Section 262.104, which allows for emergency

removal without a court order. TEX. FAM.CODE. ANN. § 262.104 (Vernon Supp.2007). The trial court also issued a temporary order naming DFPS as A.A.A.'s temporary sole managing conservator, finding, in part, that " there is a continuing danger to the physical health or safety of the child if returned to the parent." In viewing all the evidence in the light most favorable to the finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that A.A.A. was removed under Chapter 262 for Hurst's neglect. Additionally, because the evidence surrounding Hurst's lack of effort to locate her child following her release from custody is undisputed, we hold that the evidence is factually sufficient to support the trial court's finding.

We overrule Hurst's fourth issue. Therefore, we need not address Hurst's first through third issues challenging the trial court's other subsection 161.001(1) findings, but we must also determine whether the evidence was sufficient to support the trial court's finding that termination was in A.A.A.'s best interest.

**Best Interest of the Child**

In her fifth issue, Hurst challenges the legal and factual sufficiency of the trial court's finding that termination was in A.A.A.'s best interest pursuant to subsection 161.001(2). TEX. FAM.CODE. ANN. § 161.001(2).

A strong presumption exists that a child's best interests are served by maintaining the parent-child relationship. *In re L.M.,* 104 S.W.3d 642, 647 (Tex.App.-Houston [1st Dist.] 2003, no pet.). The same evidence of acts or omissions used to establish grounds for termination under subsection 161.001(1) may be probative in determining the best interests of the child. *Id.* Some of the factors that an appellate court may consider in ascertaining the best interest of a child include the list set forth in *Holley v. Adams.,* 544 S.W.2d 367, 371-72 (Tex.1976). Those factors include the following:

(1) the desires of the child;
(2) the emotional and physical needs of the child now and in the future;

(3) the emotional and physical danger to the child now and in the future;
(4) the parental abilities of the individuals seeking custody;
(5) the programs available to assist these individuals to promote the best interest of the child;
(6) the plans for the child by these individuals or by the agency seeking custody;
(7) the stability of the home or proposed placement;
(8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and
(9) any excuse for the acts or omissions of the parent.

*Id.; see also Adams v. Tex. Dept. of Family & Protective Servs.,* 236 S.W.3d 271, 280-81 (Tex.App.-Houston [1st Dist.] 2007, no pet.). These factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to parental termination. *In re C.H.,* 89 S.W.3d 17, 27 (Tex.2002). Termination of the parent-child relationship is not justified where the evidence shows merely that a parent's failure to provide a more desirable degree of care and support of the child is due solely to misfortune or the lack of intelligence or training, and not to indifference or malice. *Clark v. Dearen,* 715 S.W.2d 364, 367 (Tex.App.-Houston [1st Dist.] 1986, no writ).

We begin by considering the desires of the child and the suitability of any proposed placement. At the time of trial, A.A.A. was too young to express with whom she desired to live. Nevertheless, A.A.A.'s guardian ad litem noted in her report that, during the most recent visit between Hurst and A.A.A., there was limited interaction because A.A.A. does not know her mother. She recommended that A.A.A. remain in her current placement, because she has bonded with Hurst's relative and her children and appears to be thriving. Further, while the record does not expressly state that DFPS plans on placing A.A.A. with Hurst's relative, Hall testified that Hurst's relative has expressed an interest in adopting A.A.A.

We next examine A.A.A.'s emotional and physical considerations now and in the future. DFPS did not present any evidence showing how Hurst posed a physical or emotional danger to A.A.A. Both caseworkers testified that A.A.A. has no special needs. There is no evidence that Hurst had a drug or alcohol problem. Hurst also testified that there was no domestic violence problems between her and Alexander.

Nevertheless, the goal of establishing a stable, permanent home for a child is a compelling state interest. *In re C.E.K.*, 214 S.W.3d 492, 498 (Tex.App.-Dallas 2006, no pet.). We recognize that Hurst testified that she is currently living and plans on staying with Alexander in a Lake Charles apartment, where she has day care arranged for A.A.A. She also explained that her name was on the apartment's lease, even when she was not living there, because she planned on returning to Louisiana. Alexander expressed that he is going to stay at the apartment and is ready to provide shelter and food for A.A.A.

However, despite Hurst's and Alexander's testimony that they are ready to provide for A.A.A., there is also evidence weighing against Hurst's ability to provide a stable, permanent home. Since A.A.A.'s removal, Hurst has lived at several locations around Houston and in Louisiana and has changed jobs several times. Her rationale for initially leaving Louisiana and moving with A.A.A. to the Houston shelter was she " wanted to do things on her own."

When asked why she moved back to Louisiana while A.A.A. remained in Texas, Hurst answered, " Because that's home. I was going home." She explained that, once back in Louisiana, she lived back and forth between Alexander and her sick mother, whom she assisted.

Hurst also testified that she worked continuously from February 2006 until the time of trial. She stated that she worked at McDonald's from February 2006 until June 2006. However, the guardian ad litem testified that, on June 1, 2006, Hurst told her that she had been working at McDonald's for only three weeks. Once back in Louisiana, Hurst testified that she babysat two children for seven months, making $300 every two weeks. At trial, Hurst expressed that she was currently working early evenings at a gas station making $7.25 an hour. Hurst's frequent moves and job changes weigh against her ability to provide a stable, permanent home for A.A.A.

Finally, we look at Hurst's acts and omissions that indicate that the parent-child relationship is improper, keeping in mind any excuses she has for her behavior. The events precipitating DFPS's taking custody of A.A.A. began with Hurst's arrest for shoplifting. Hurst admitted that shoplifting is wrong, but testified that this was the first time she had been arrested and claimed that she shoplifted cough medicine for A.A.A., who was sick. While Hurst offered several explanations for why she did not attend required parenting classes and claimed that she left several messages with Hall indicating that she was moving back to Louisiana, it is undisputed that she failed to complete the services outlined in her court-ordered family service plan. Furthermore, Hurst made at most six out of a possible 24 visits with A.A.A., and, after she returned to Louisiana in June 2006, she did not see A.A.A. again until January 2007. Even though she could have visited A.A.A. more often once she was in her relative's care, Hurst claimed that she was told she could only visit at the DFPS office. However, when asked why she did not make the remaining 18 visits, which would have been at the DFPS office, she replied, " I don't know." Hurst stated that the primary reason she went six months without visiting A.A.A. was her lack of transportation, but noted that she called A.A.A. everyday. Hall agreed that Hurst had complained about transportation problems during most of their conversations. Finally, Hurst testified that she brought A.A.A. clothing and shoes during their visits, but admitted that she has provided no financial assistance for her daughter's maintenance.

In light of all the evidence, the trial court could have formed a firm belief or conviction that termination of Hurst's parental rights was in A.A.A.'s best interest. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of Hurst's parental rights was in the best interest of A.A.A.

We overrule Hurst's fifth issue.

**Sole Managing Conservator**

Having affirmed the termination of Hurst's parental rights, we now turn to Hurst's sixth issue, which asks whether the appointment of DFPS as sole managing conservator should be reversed. However, because Hurst asks us to consider this issue only if we conclude that the trial court erred in terminating her parental rights, we need not address it.

**Conclusion**

We affirm the trial court's judgment.

---------

Notes:

[1] Chapter 262 is entitled " Procedures in Suit by Governmental Entity to Protect Health and Safety of Child." TEX. FAM.CODE ANN. § 262 (Vernon Supp.2007). Subchapter B of Chapter 262 provides the reasons and procedures necessary for a governmental entity to take possession of a child. *See generally id.* § § 262.101-.114 (Vernon 2002 & Supp.2007).

[2] On rehearing, DFPS asserts that Hurst's statement of points regarding subsection 161.001(1)( *O* ) is insufficient to preserve her complaint that the evidence is legally and factually insufficient to support the trial court's finding that A.A.A. was removed for abuse or neglect. *See* TEX. FAM.CODE ANN. § 263.405(b), (i) (Vernon Supp.2007) (requiring a party to file with the trial court a statement of the point or points he wishes to appeal before an appellate court may consider the issue). Hurst's points regarding subsection 161.001(1)( *O* ) are as follows:

19. The evidence is legally insufficient to support a finding that the Respondent did not participate in court ordered services under the Texas Family code, section § 161.001( *O* ).
20. The evidence is factually insufficient to support a finding that the Respondent did not participate in court ordered services under the Texas Family code, section § 161.001( *O* ).
While these points do not expressly challenge the sufficiency of the evidence supporting that A.A.A. was removed for abuse or neglect, they were sufficient to put the trial court on notice that Hurst was challenging the legal and factual sufficiency of its termination of her parental rights pursuant to subsection 161.001(1)( *O* ). Accordingly, we consider Hurst's issue regarding subsection 161.001(1)( *O* ).

# In re A.I.G., 135 S.W.3d 687 (Tex.App.—San Antonio 2003)

**135 S.W.3d 687 (Tex.App.—San Antonio 2003)**
**In the Interest of A.I.G. and J.A.M., children.**
**No. 04-02-00849-CV.**
**Court of Appeals of Texas, Fourth District, San Antonio.**
**March 31, 2003.**

[Copyrighted Material Omitted]

Grace G. Kunde, Knobles & Klingemann, Inc., Seguin, for appellant.

Lana S. Shadwick, Houston, William Old, Austin, for appellee.

Elizabeth C. Jandt, Jandt & Jandt, Seguin, for ad litem.

Sitting: CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice, SANDEE BRYAN MARION, Justice.

## OPINION

Opinion by: CATHERINE STONE, Justice.

This is an accelerated appeal from an order terminating Appellant Michelle Garza's parental rights to her two children, A.I.G. and J.A.M. The Texas Department of Protective and Regulatory Services ("TDPRS") sued to involuntarily terminate the parental rights of Garza and George Martinez, J.A.M.'s father. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

According to Garza and Martinez, who were present the afternoon J.A.M. was rushed to the hospital, when Martinez returned home from work, he and Garza immediately started to argue. They argued for about thirty minutes before Garza left for work. J.A.M. was fussy, but Martinez prepared a bottle after Garza left. Martinez claimed that when J.A.M.'s crying grew louder, he placed her in the baby bouncer. He said he shook the bouncer hard, she continued crying, and he went to the kitchen to get her bottle. He claims

that when he returned from the kitchen, J.A.M. was seizing. As he picked her up, she had a bowel movement and stopped breathing. Martinez ran outside to call Garza, who was walking to work. Garza returned to the apartment, and the couple performed CPR on J.A.M. An ambulance responded to their call and transported J.A.M. to the hospital.

CT scans revealed that J.A.M. had multiple hemorrhages in her brain and eyes and had suffered a stroke. The effects of this abuse are catastrophic. J.A.M. now has cerebral palsy. Her bones will continue to grow, but her muscles will not due to lack of use. Her muscles will tighten to the point where they can actually pull the bones out of their sockets. She will never be able to walk, talk, see clearly, potty-train, or

understand her surroundings. She will be in constant pain and suffer seizures for the rest of her unnaturally shortened life. [1]

TDPRS alleged that J.A.M. suffered abuse at the hands of both of her parents and presented evidence that J.A.M. suffered from Shaken Baby Syndrome. After a bench trial, the trial court found clear and convincing evidence that Garza and Martinez engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children. The court also found clear and convincing evidence that termination of Garza and Martinez's parent-child relationship was in the best interests of both A.I.G. and J.A.M. The court therefore granted TDPRS' request to terminate the parental rights of Garza and Martinez. The trial court also terminated the parental rights of Isaac Antunez, A.I.G.'s father, based on his executed waiver of interest. Garza alone appeals the termination order.

## SUFFICIENCY CHALLENGES TO ENDANGERMENT FINDINGS

In proceedings to terminate the parent-child relationship under section 161.001 of the Texas Family Code, the State must establish one or more acts or omissions enumerated under subsection (1), and must additionally prove that termination of the parent-child relationship is in the best interest of the child. *See* TEX. FAM.CODE ANN. § 161.001 (Vernon 2002). Because termination of parental rights is such a drastic remedy involving fundamental constitutional rights, both the grounds for involuntary termination and the best interest of the child must be proved by clear and convincing evidence. *See In the Interest of C.H.,* 89 S.W.3d 17, 25 (Tex.2002). Clear and convincing evidence is defined as the degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be proved. *See id.*

Garza claims error on three grounds. First, she contends that TDPRS presented legally and factually insufficient evidence to support a finding by clear and convincing evidence that she endangered the well-being of her children or knowingly placed them with persons who endangered their well-being. In cases such as the instant case where no findings of fact are filed, the judgment of the trial court must be affirmed if it can be upheld on any legal theory that finds support in the evidence. *In the Interest of W.E.R.,* 669 S.W.2d 716, 717 (Tex.1984).

"The distinction between legal and factual sufficiency when the burden of proof is clear and convincing evidence may be a fine one in some cases, but there is a distinction in how the evidence is reviewed."

---

**Page 691**

*In the Interest of J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002). When reviewing for legal sufficiency, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id.* "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.*

In a factual sufficiency review, we determine whether the factfinder could reasonably form a firm belief or conviction based on the evidence about the truth of the State's allegations. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

As evidence that Garza endangered the children, TDPRS presented the testimony of Maureen Watson, a detective with the Seguin police department, who testified that Garza admitted to shaking J.A.M. Garza's sworn statement that she shook J.A.M. "about five times" was admitted at trial. Although Garza testified that she felt coerced into making the statement and denied ever shaking J.A.M., Garza's mother, Aida

Trevino, testified that she had seen Garza shake A.I.G. Trevino also testified that she witnessed both Garza and Martinez being "rough" with the children. TDPRS also introduced evidence that Garza suffered from depression, received prescription medicine to treat her depression, and had better anger management skills when she took that medicine. However, Garza testified that she stopped taking the medicine after only a few months, and that her temper became worse at that time.

As evidence that Garza knowingly placed the children with persons whose conduct endangered them, TDPRS presented the testimony of Jared Speights, an investigative caseworker with Child Protective Services. Speights testified that Garza knew Martinez was rough with the children before the day J.A.M. was taken to the hospital. Speights also testified that Garza knew Martinez was bipolar and had stopped taking the medicine prescribed for his mental illness. TDPRS also introduced a second sworn statement made by Garza, stating that she did not trust Martinez with the children because he was short-tempered and impatient. Additionally, Garza herself testified that Martinez was rough with A.I.G. and would scream at her without reason. Garza also testified that although she and Martinez would push, hit, slap, and scream at each other, and even though she knew Martinez was suicidal, she left the children with Martinez. While on the stand, Garza stated that she accepted responsibility for leaving J.A.M. with Martinez, a man she knew to be violent and aggressive.

Martinez's sworn admission that he shook J.A.M. was introduced at trial. J.A.M.'s pediatric neurosurgeon testified that injuries were inflicted on J.A.M. over the course of at least two weeks. TDPRS argued that if Garza herself did not inflict the injuries on J.A.M., Garza should have been able to recognize the signs that her daughter was being abused. This argument is supported by the testimony of J.A.M.'s neurosurgeon that a baby who was shaken like this would likely be listless, pale, lethargic, and would vomit more than normal. Garza testified that she noticed that J.A.M. was limp, pale, and unable to keep her food down in the week before she was taken to the hospital.

---

**Page 692**

Garza contends that legally and factually insufficient evidence was presented to find that the children were continuously endangered prior to removal, or that the children would be endangered if they were returned to her. Garza also argues that there is no evidence or insufficient evidence to establish that her conduct physically or emotionally harmed the children or that she knowingly placed them in a dangerous environment on the day J.A.M. was rushed to the hospital. She argues that because she attended counseling and parenting classes which included discussions on anger management, and because her last counselor testified that she was making positive progress, the court had legally and factually insufficient evidence to find by clear and convincing evidence that she endangered her children or knowingly placed them with persons who endangered them.

A child is endangered when they are jeopardized or exposed to loss or injury. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987). Endangerment can be proven through actions and omissions. *See In the Interest of D.T.*, 34 S.W.3d 625, 634 (Tex.App.-Fort Worth 2000, pet. denied). Domestic violence and a propensity for violence may be considered as evidence of endangerment. *See In the Interest of B.J.B.*, 546 S.W.2d 674, 677 (Tex.App.-Texarkana 1977, writ ref'd n.r.e.). Additionally, a parent's mental state may be considered in this analysis if that mental state allows the parent to engage in conduct which endangers the physical or emotional well-being of the child. *In the Interest of C.D.*, 664 S.W.2d 851, 853 (Tex.App.-Fort Worth 1984, no writ). The record supports a finding that both Garza and Martinez shook J.A.M. The record also indicates that both Garza and Martinez suffered from diagnosed but untreated mental diseases and that they were prone to physical outbursts when placed under stress or angered. After considering the entire record and arguments of the parties, we hold that there is legally and factually sufficient evidence to support a finding by clear and convincing evidence that Garza engaged in conduct or knowingly placed her children with persons who engaged in conduct which endangered the physical or emotional well-being of A.I.G. and J.A.M. Garza's first issue is overruled.

### SUFFICIENCY CHALLENGES TO BEST INTEREST FINDINGS

In her second issue, Garza claims that TDPRS failed to overcome the presumption that allowing the natural parent to retain custody is in the children's best interests. Although a strong presumption exists that a child's best interest is served by keeping them with their natural parents, that presumption disappears when confronted with evidence to the contrary. *See In the Interest of H.C.,* 942 S.W.2d 661, 667 (Tex.App.-San Antonio 1997, no writ). In determining a child's best interest, courts have considered a number of factors, including: 1) the desires of the child; 2) the emotional and physical needs of the child now and in the future; 3) the emotional and physical danger to the child now and in the future; 4) the parental abilities of the individuals seeking custody; 5) the programs available to assist these individuals to promote the best interest of the child; 6) the plans for the child by these individuals or by the agency seeking custody; 7) the stability of the home or proposed placement; 8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and 9) any excuse for the acts or omissions of the parent. *Holley v. Adams,* 544 S.W.2d 367, 371-72 (Tex.1976). We need not decide each of these factors against a parent to find that termination is in the child's best

interest. *See Phillips v. Tex. Dep't of Protective & Regulatory Servs.,* 25 S.W.3d 348, 355 (Tex.App.-Austin 2000, no pet.).

In deciding A.I.G. and J.A.M.'s best interests, the trial court could have considered the following: (1) the present and future emotional and physical needs of the children; (2) the present and future physical and emotional danger to the children; (3) Garza's parental inabilities; (4) Garza's unwillingness to accept and complete counseling services; (5) Garza's unwillingness and inability to effect positive changes within a reasonable time; and (6) stability of the proposed home for A.I.G. and J.A.M. Evidence supporting termination of Garza's parental rights on grounds of endangerment is also probative of the best interests of the children. *See C.H.,* 89 S.W.3d at 28.

Through each of its witnesses, TDPRS presented evidence that Garza has been unable to meet the physical and emotional needs of her children. Garza's mother testified that both children have lived with her for the vast majority of their young lives because Garza has been unable or unwilling to assume responsibility for them. She testified that Garza was unaware of the needs of the children, and would seldom change A.I.G.'s diaper, even as a toddler. She testified that Garza complained about having to take care of the children and that after a particularly stressful day, Garza threatened to kill Martinez and J.A.M.

Alyssa Halbert, a caseworker for Child Protective Services, testified that Garza failed to complete the anger management classes required by her family service plan, and that Garza's participation in therapy had been sporadic. Halbert testified that Garza could not provide a stable home, and that inability would adversely affect the children. Halbert also expressed concern for the safety of the children due to Garza's inability to control her impulses and cope with anger. Christina Marbach, a licensed professional counselor who met with Garza, also testified that Garza's attendance at counseling sessions ordered by Child Protective Services was sporadic, her absences were unexplained, and her progress was hindered by inconsistent attendance. Marbach testified that although Garza was becoming more insightful in recognizing her depressive symptoms and the triggers for her anger, Garza refused to see the psychiatrist Marbach recommended to prescribe medicine to treat Garza's depression.

The counselors Garza has seen testified that she is not ready to take on the role of a full-time parent to her children. Parenting J.A.M. will present particular challenges because she will never learn to potty-train or ask for food or water. She will require 24 hour-a-day care for the remainder of her life. Trevino has been caring for both children full-time since the State intervened on their behalf. Both Halbert and Trevino testified that Trevino provided and would continue to provide a stable home for A.I.G. and J.A.M. The numerous incidents of neglect and dangerous conditions evinced in the record sufficiently establish a pattern of obvious harm to the children's emotional and physical well-being. Therefore, after reviewing the factors applicable to this case and considering the entire record and arguments of the parties on appeal, we hold that TDPRS and the attorney and guardian ad litem presented legally and factually sufficient evidence to support a finding by clear and convincing evidence that termination of Garza's parental rights is in the best interests of A.I.G. and J.A.M. Garza's second issue is overruled.

**GARZA'S REQUEST FOR ABATEMENT**

Finally, Garza argues the appeal should be abated because the trial court's order did not contain specific positive findings. The order stated that the

**Page 694**

trial court found clear and convincing evidence that Garza "engaged in conduct *or* knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children." (emphasis added). She claims the court's failure to identify the conduct upon which it relied in terminating her parental rights prevents her from knowing the exact grounds on which the trial court based its order, and thereby prevents her from controverting its findings. TDPRS responds, and the attorney and guardian ad litem agrees, that abatement to the trial court requiring it to recite factual findings would be improper.

We agree with TDPRS and the attorney and guardian ad litem that the appeal should not be abated. The Texas Rules of Civil Procedure provide that findings of fact are to be separately filed and not recited in a judgment. *See* TEX.R. CIV. P. 299a. It would have been improper for the trial court to describe the facts supporting its judgment in the body of the judgment itself. *See R.S. v. B.J.J.,* 883 S.W.2d 711, 715-16 (Tex.App.-Dallas 1994, no writ). Furthermore, the trial court's judgment tracked the language of the Family Code provision dealing with endangerment of a child's well-being. *See* TEX. FAM.CODE ANN. § 161.001(1)(E) (Vernon 2002). After entering the endangerment finding based on clear and convincing evidence, the trial court entered a finding based on clear and convincing evidence that termination of Garza's parental relationship was in the best interests of A.I.G. and J.A.M. This is all the Family Code requires the State to prove, and all the trial court is required to find. Therefore, Garza's argument that this court should abate the appeal and order the trial court to make factual findings is without merit. *Cf. Tex. Dep't of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990) (recognizing in analogous jury trial that jury properly answered the broad-form question of whether the parent-child relationship should be terminated and specific grounds on which jury relied in answering the termination questions were insignificant).

With the understanding that the trial court would have erred had it made factual findings in its judgment, we turn to Garza's failure to file a notice of past due findings of fact and conclusions of law. *See* TEX.R. CIV. P. 297. When the trial court failed to respond to Garza's timely request for findings of fact and conclusions of law, Garza did not file a notice of past due findings of fact and conclusions of law. No findings of fact or conclusions of law were ever filed. If a party does not file a notice of past due findings of fact and conclusions of law when required, it is as if no initial request was made and the complaint about the trial court's failure to file findings and conclusions is waived. *See Am. Realty Trust, Inc. v. JDN Real Estate-McKinney, L.P.,* 74 S.W.3d 527, 530 (Tex.App.-Dallas 2002, pet. denied). Therefore, Garza's complaint that the trial court should have made positive findings has been waived. Garza's final issue is overruled. The judgment of the trial court is affirmed.

---------

Notes:

[1] Martinez was convicted of causing J.A.M.'s injuries. However, the record also shows that Martinez and Garza each made statements accusing the other of shaking J.A.M., and that both Garza and Martinez admitted to shaking J.A.M. themselves.

---------

89 S.W.3d 17

89 S.W.3d 17 (Tex. 2002)

45 Tex.Sup.Ct.J. 1000

In the interest of C.H., a minor child.

No. 00-0552.

Supreme Court of Texas

July 3, 2002

Argued April 11, 2001.

Rehearing Denied Sept. 26, 2002.

89 S.W.3d 18

Charles G. Childress, Austin, Duke Hooten, Boerne, Sarah Regina Guidry, Houston, Texas Dept. of Protective & Regulatory Services, Jose R. Rodriguez, Michael J. Alvarez, El Paso County Attorneys, El Paso, John Cornyn, Attorney General of the State of Texas, Philip A. Lionberger, Office of the Attorney General of Texas, Julie Caruthers Parsley, Office of the Solicitor General of Texas, Austin, for Petitioner.

John Terence Garcia, Thomas E. Stanton, The Law Firm of James Kirby Read, El Paso, James W. Paulsen, Houston, for Respondent.

Justice JEFFERSON delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice ENOCH, Justice OWEN, Justice BAKER, Justice O'NEILL, and Justice RODRIGUEZ join.

We are asked to decide the appropriate appellate standard to review the factual sufficiency of the evidence in parental termination cases, in which the burden of proof at trial is by clear and convincing evidence. We granted review to resolve the conflict among the courts of appeals about whether the traditional factual sufficiency standard is adequate to review the findings in a termination proceeding, and if not, what the appropriate standard should be. We hold that termination findings must be upheld against a factual sufficiency challenge if the evidence is such that a reasonable jury could form a firm belief or

conviction that grounds exist for termination under Texas Family Code sections 161.001 and 161.206(a). When reversing on insufficiency grounds, the reviewing court must detail the evidence relevant to the issue of parental termination and clearly state why the evidence is insufficient to support a termination finding by clear and convincing evidence. Because the court of appeals did not correctly apply this standard, we reverse its judgment and remand to that court for further proceedings.

I

The Texas Department of Protective and Regulatory Services filed an action to terminate the parent-child relationship between the parents, Susan H. and Robert G., and the minor child, C.H., under the procedures provided in Texas Family Code Chapter 161. The trial court's charge asked the jury to make any affirmative findings about termination on clear and convincing evidence. The jury found that the parents had engaged in conduct warranting termination and that terminating the rights of both parents would be in the best interest of the child. The trial court rendered judgment in accordance with the verdict.

On appeal, the parents challenged the jury's findings on both legal and factual sufficiency grounds. The court of appeals rejected the parents' legal sufficiency challenges. In its factual sufficiency review, the court of appeals first noted that the clear-and-convincing burden of proof is intermediate between reasonable doubt and preponderance-of-the-evidence. 25 S.W.3d 38, 47. The court of appeals applied what it termed a higher standard of factual sufficiency review:

In reviewing factual sufficiency challenges in termination cases, again where the burden of proof at trial is by clear and convincing evidence, we apply a higher standard of factual sufficiency review. After considering all of the evidence, we must determine not whether the trier of fact could reasonably conclude that the existence of a fact is more probable than not, as in cases where the burden of proof is by a preponderance of the evidence, but whether the trier of fact [ ] could reasonably conclude that the existence of the fact is highly probable. Under this standard, we must consider whether the evidence was sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. A challenge to the factual sufficiency of the evidence will only be sustained if the jury could not have reasonably found the facts to be established by clear and convincing evidence.

25 S.W.3d at 47-48 (citations omitted). The court held that the evidence was factually sufficient to support the jury's findings that both parents had endangered and abandoned the child. Id. at 52, 55-56. The court also concluded that there was some evidence to support the jury's findings that parental termination was in the best interest of the child. Id. at 53-54, 57. However, focusing primarily on the lack

of evidence about C.H.'s needs and prospects beyond foster care, the court of appeals concluded that the record did not adequately support the conclusion that it was "highly probable" that termination of the parents' rights would be in the child's best interest. Id. at 57.

II

We review the record and the court of appeals' analysis with respect to Robert only, because Susan relinquished her parental rights and is not a party to this appeal. The trial court instructed the jury to determine if there was clear and convincing evidence:

89 S.W.3d 20

(A) that Robert [G] engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child,; or,

(B) that Robert [G] voluntarily and with knowledge of the pregnancy, abandoned the mother of the child beginning at a time during the pregnancy with the child and continuing through birth, failed to provide adequate support or medical care for the mother during the period of abandonment before the birth of the child, and remained apart from the child or failed to support the child since the birth.

See TEX. FAM.CODE § 161.001(1)(E), (H). We will recount the evidence the jury heard relevant to this charge.

When Susan began living with Robert, she was eighteen years old and had a history of drug abuse. She had run away from home at age fifteen and had given birth to a daughter at age sixteen. Robert was thirty-six years old at the time and married to Bertha, a woman with whom he had fathered a son. He had an extensive criminal record, including convictions for drug offenses, theft, and assault. Robert sold drugs for a living and was an addict. In 1996, while living together, Susan told Robert she was pregnant with C.H. At about the same time, Susan relinquished parental rights to her daughter and consented to her daughter's adoption.

Susan was pregnant with C.H. when both she and Robert were arrested in 1996 for possession of cocaine and heroin. After her release, Susan voluntarily entered a drug-treatment program, but left the drug-treatment center in a matter of days. Shortly after his release, Robert was again arrested on other

drug charges. Robert was sentenced to ten years' imprisonment, a sentence he was serving at the time of trial.

Susan was incarcerated for the last five months of her pregnancy with C.H. She was released on probation ten days after his birth. Susan and C.H. resided in her mother's home for a few months, then they moved into an apartment with Susan's new boyfriend, Michael Russey. Following his drug conviction, Robert had minimal contact with either Susan or their son.

In March 1997, about a month after Susan and C.H. moved in with Michael Russey, Russey flagged down a passing police car, reported that he had a physical confrontation with Susan and that narcotics were being used in his apartment. When the officers entered the apartment, they found Susan in the bedroom with another man whom she knew only as "C.C." Two other couples were also in the apartment. C.H. was asleep in a playpen. The police found a spoon containing cocaine residue, matches, a plastic baggie, and empty balloons associated with heroin use near the child's bed. Other drug paraphernalia littered the bedroom and bathroom. Witnesses testified that the apartment was filthy, with mounds of clothes strewn about, grease spattered on the walls, and broken windows throughout the unit.

Susan testified that she and Russey had been smoking crack cocaine that night and had a violent argument. The police arrested Susan and charged her with cocaine possession. Emergency worker David Abogado from the Texas Department of Protective and Regulatory Services took custody of C.H. Since that time, C.H. has remained in a foster family's care.

Robert testified about his extensive criminal history at the termination hearing. Over the course of five years, he had been arrested for theft, possession of narcotics,

89 S.W.3d 21

aggravated assault of a police officer, and repeated violations of probation. Robert conceded that he continued his criminal activities even after he learned of Susan's pregnancy. He acknowledged that, as a result of his criminal proclivities, he was unable to be present for the child's birth or formative years. Robert testified that after he and Bertha divorced, he did not provide child support to or know the whereabouts of his fourteen-year-old son.

Robert had seen C.H. only twice since his birth, once when Susan visited Robert in the county jail and once when Robert visited Susan in her mother's home. Robert had never lived with C.H., did not contact the Department about C.H., and never paid child support nor arranged medical care for Susan or

C.H. Robert testified that the only time he attempted to provide financial support for C.H. was when he gave money to an acquaintance, who purportedly promised to deliver it to Susan. Robert claimed that the friend absconded with the money. Robert testified he was currently unable to provide financial support to C.H.

Evidence contrary to the verdict was comprised primarily of Robert's testimony. Robert testified that he loved C.H. and wished to remain his parent. Robert and Susan both stated that Robert encouraged Susan to obtain medical treatment while she was pregnant with C.H. Robert also testified that he intended to seek employment when released from prison so that he could provide for C.H. Finally, Robert testified that he was auditing classes on chemical dependency while incarcerated.

Dr. Richard Park conducted a psycho-social evaluation on Robert in March 1997. Dr. Park recommended that Robert's parental rights be terminated. He testified that, while Robert was "likeable," his ten-year prison sentence would impede his ability to be a parent to C.H. Dr. Park noted Robert's illicit livelihood, his criminal record, and his refusal to take personal responsibility for his criminal background. Dr. Park also noted that Robert had abandoned his only other son.

The Department visited C.H.'s foster family on a monthly basis. Dr. Park and Court Appointed Special Advocate (CASA) volunteers observed that C.H. was developing normally and that he was an emotionally stable, happy boy. The Department initiated proceedings to terminate Susan's and Robert's parental rights so that C.H. could be placed with adoptive parents. On a broad-form submission, the jury found that Susan's and Robert's parent-child relationships with C.H. should be terminated, and the trial court rendered judgment accordingly. Both Susan and Robert appealed.

III

The court of appeals determined that there was legally sufficient evidence that both Susan and Robert engaged in specific conduct under Texas Family Code section 161.001(1) warranting termination, and that termination would be in C.H.'s best interest. See TEX. FAM.CODE § 161.001(2). The court of appeals also concluded the evidence was factually sufficient to support the finding that the parents had engaged in section 161.001(1) conduct. With respect to Robert in particular, the court found that "the series of arrests on drug offenses from April 1996 until November 1996, with full knowledge of [Susan's] pregnancy and possible consequences of his course of conduct, implies that [Robert] had a conscious disregard and indifference to his parental responsibilities." 25 S.W.3d at 55. The court concluded that Robert had "abnegated all personal responsibility for [Susan], thus consigning her fate, and their unborn son's, to chance or other people." Id. at 56.

The court next addressed the sufficiency of the evidence to support the jury's finding that termination was in C.H.'s best interest. While purporting to analyze that issue in a light most favorable to the jury's finding, the actual analysis left critical facts unstated and faulted the Department for not producing specific evidence about who would care for the child in the event Robert's parental rights were terminated. The court of appeals concluded:

[T]he nature of his criminal record, at least what is in the record, establishes little. It does not appear to show that he is an abusive or violent person, nor does it appear that he has psychological problems, apart from his drug addiction, that potentially puts his son at risk. The Department suggests that [Robert G.]'s imprisonment conclusively establishes a potential adverse psychological impact on C.H., but there is no evidence as to the significance of impact on an infant as opposed to an older child. There is no evidence, expert, medical, or otherwise, about C.H.'s present and future emotional and physical needs in the time periods relevant to this case.

As we decided in the case of [Susan H.], we must conclude that the record before us does not contain clear and convincing evidence that termination of the parent-child relationship is in C.H.'s interest. The record does not adequately support the conclusion that it is highly probable that termination of [Robert G.]'s parental rights was in the best interest of C.H.

25 S.W.3d at 57.

IV

The Department, relying on Meadows v. Green, 524 S.W.2d 509 (Tex.1975) (per curiam), contends that the court of appeals erred in applying "heightened appellate review" because Texas jurisprudence recognizes only two levels of appellate evidentiary review--legal sufficiency and factual sufficiency. But Meadows has limited application in termination proceedings. In Meadows, we sought to reconcile decades of confusing and contradictory decisions using a clear-and-convincing standard, or some similarly-worded standard, in a variety of contexts. Those standards had been applied to issues as diverse as resulting trusts, probate, and parol evidence. See Grasty v. Wood, 230 S.W.2d 568, 572 (Tex.Civ.App.-Galveston 1950, writ ref'd n.r.e.); Simpson v. Neely, 221 S.W.2d 303, 312-13 (Tex.Civ.App.-Waco 1949, writ ref'd); Farr v. Moreland, 197 S.W.2d 386, 388 (Tex.Civ.App.-Texarkana 1946, no writ). See generally Vance, The Clear and Convincing Evidence Standard in Texas: A Critique, 49 BAYLOR L.REV. 391. (1991). We held that civil cases should be subjected to only two appellate standards of review, legal and factual sufficiency. Meadows, 524 S.W.2d at 510. But Meadows predates application of a clear-and-convincing burden of proof as a constitutionally-mandated standard at trial.

In Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1978), rev'g, 557 S.W.2d 511 (Tex.1977), the United States Supreme Court concluded that due process demands clear and convincing

proof before the state may involuntarily confine a person in a mental institution. The Supreme Court instructed:

The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusion for a particular type of adjudication."

Id. at 423, 99 S.Ct. 1804 (quoting In re Winship, 397 U.S. 358, 370, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)

89 S.W.3d 23

(Harlan, J., concurring)).

On remand, we adopted the clear-and-convincing burden of proof and defined it as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." State v. Addington, 588 S.W.2d 569, 570 (Tex.1979). The following year, we extended the clear-and-convincing standard to termination proceedings because we determined that the constitutional interests at stake are no less compelling than the liberty interest in an involuntary commitment proceeding. In re G.M., 596 S.W.2d 846, 847 (Tex.1980). Citing Addington, we held that "[t]ermination is a drastic remedy and is of such weight and gravity that due process requires the state to justify termination of the parent-child relationship by proof more substantial than a preponderance of the evidence." Id.

The Texas Legislature has now codified the clear-and-convincing standard in Family Code § 161.001(1), (2), which provides: a "court may order termination of the parent-child relationship if the court finds by clear and convincing evidence" that the parent has engaged in certain listed conduct and "termination is in the best interest of the child." After this Court decided In re G.M., the United States Supreme Court held that "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." Santosky v. Kramer, 455 U.S. 745, 747-48, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

V

While G.M. and Santosky established that the burden of proof in termination proceedings is clear and convincing evidence, neither decision indicated how appellate courts are to review findings based on that burden of proof. Our courts of appeals have wrestled with the standard for reviewing the factual

sufficiency of findings that must be supported by clear and convincing evidence. See In re K.R., 22 S.W.3d 85, 90 (Tex.App.-Houston [14th Dist.] 2000) (acknowledging the courts of appeals' disagreement about the proper standard of appellate review of an involuntary termination of parental rights), rev'd on other grounds, 63 S.W.3d 796 (Tex.2001), cert. denied, --- U.S. ----, 122 S.Ct. 2624, 153 L.Ed.2d 806 (2002).

Relying on authority from other jurisdictions, the Fifth Court of Appeals was the first to require an intermediate standard of appellate review. See Neiswander v. Bailey, 645 S.W.2d 835 (Tex.App.-Dallas 1982, no writ) (citing Beeler v. American Trust Co., 24 Cal.2d 1, 147 P.2d 583, 600 (1944) and Comment, Evidence: Clear and Convincing Proof: Appellate Review, 32 CALIF. L.REV. 74 (1944)). The court reasoned that, because the standard of proof was an intermediate one, the standard of appellate review should likewise be an intermediate one. Neiswander, 645 S.W.2d at 835. The resulting appellate standard of review required the court of appeals to determine whether the trier of fact could reasonably conclude that the fact's existence is highly probable. Id. at 836.

Other courts of appeals have disagreed about whether termination proceedings require a third level of appellate review in addition to legal and factual sufficiency. The Fourth, Eighth, Ninth, and Tenth Courts of Appeals state that they employ a heightened level of appellate review. See In re J.M.T., 39 S.W.3d 234 (Tex.App.-Waco 1999, no pet.); In re K.C., Jr., 23 S.W.3d 604 (Tex.App.-Beaumont 2000, no pet.); In re B.R., 950 S.W.2d 113 (Tex.App.-El Paso, 1997, no writ)

89 S.W.3d 24

; In re H.C., 942 S.W.2d 661 (Tex.App.-San Antonio 1997, no writ). In B.R., for example, the court reasoned that it made sense to reject a third intermediate appellate standard of review when there were only two standards of proof allowed at trial in Texas. 950 S.W.2d at 118. But because this Court had subsequently required a third standard of clear-and-convincing proof at trial for involuntary termination of parental rights, the court in B.R. thought it appropriate for appellate courts to also employ a third standard of review. See id. (determining it incongruous to require trial courts to require an enhanced burden of proof while appellate courts applied the same appellate review accorded to preponderance-of-the-evidence issues).

This intermediate standard of appellate review has been described in slightly different ways by the various courts of appeals. Several courts have concluded the requirement that the existence of the fact be "highly probable" is merely another way of requiring that the existence of the fact be "clear and convincing." See Spangler v. Texas Dep't of Protective & Regulatory Servs., 962 S.W.2d 253, 257 (Tex.App.-Waco 1998, no pet.); In re B.R., 950 S.W.2d at 119 n. 5; In re L.R.M., 763 S.W.2d 64, 66 (Tex.App.-Fort Worth 1989, no writ); Neiswander, 645 S.W.2d at 835-36.

The Eighth Court of Appeals has examined factual sufficiency questions to determine if "the evidence was sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegations sought to be established." In re B.R., 950 S.W.2d at 119. This meant sustaining the insufficient-evidence point of error only "if the fact finder could not have reasonably found the fact was established by clear and convincing evidence." Id. (quoting Mezick v. State, 920 S.W.2d 427, 430 (Tex.App.-Houston [1st Dist.] 1996, no writ)). The Ninth Court of Appeals has held that to withstand a factual sufficiency challenge in parental termination cases, "the evidence must permit a rational trier of fact to hold a firm belief or conviction as to the truth of the allegations sought to be established." In re K.C., Jr., 23 S.W.3d at 605. The Tenth Court of Appeals declared that it will sustain a factual insufficiency challenge "when: (1) the evidence is factually insufficient to support a finding by clear and convincing evidence; or (2) a finding is so contrary to the weight of contradicting evidence that no trier of fact could reasonably find the evidence to be clear and convincing." In re A.M.C., 2 S.W.3d 707, 711 (Tex.App.-Waco 1999, no pet.); see also Spangler, 962 S.W.2d at 257. The Fourth Court of Appeals reviewed a jury's findings based on clear and convincing evidence to determine whether sufficient evidence was presented to "produce in the mind of a rational factfinder a firm belief or conviction as to the truth of the allegations sought to be established." In re H.C., 942 S.W.2d 661, 663-64 (Tex.App.-San Antonio 1997, no writ).

Some courts of appeals that initially applied an intermediate standard of appellate review have more recently retreated to the traditional standard of appellate review for factual sufficiency challenges. See In re J.N.R., 982 S.W.2d 137, 143 & n. 5 (Tex.App.-Houston [1st Dist.] 1998, no writ) (expressly overruling former opinions); In re J.J., 911 S.W.2d 437, 439-40 & n. 1 (Tex.App.-Texarkana 1995, writ denied); In re W.S., 899 S.W.2d 772, 776 (Tex.App.-Fort Worth 1995, no writ); In re A.D.E., 880 S.W.2d 241, 245 (Tex.App.-Corpus Christi 1994, no writ); D.O. v. Texas Dep't of Human Servs., 851 S.W.2d 351, 353 (Tex.App.-Austin 1993, no writ). These courts have maintained the traditional appellate standard of review in factual sufficiency challenges even when a heightened

89 S.W.3d 25

standard of proof was required at trial, holding that a court should sustain a factual sufficiency challenge only if the court concludes that the finding is "so weak or ... so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." In re J.N.R., 982 S.W.2d 137, 143 (Tex.App.-Houston [1st Dist.] 1998, no pet.); see also In re B.S.T., 977 S.W.2d 481, 483 (Tex.App.-Houston [14th Dist.] 1998, no pet.); In re J.J., 911 S.W.2d at 439; In re J.F., 888 S.W.2d 140, 141 (Tex.App.-Tyler 1994, no writ); D.O., 851 S.W.2d at 353.

VI

The Department argues that the courts of appeals' various formulations of a heightened standard blur the distinction between legal and factual sufficiency review. Robert responds that federal constitutional concerns mandate a higher appellate standard. [1] We conclude that the burden of proof at trial necessarily affects appellate review of the evidence. Under traditional factual sufficiency standards, a court determines if a finding is so against the great weight and preponderance of the evidence that it is manifestly unjust, shocks the conscience, or clearly demonstrates bias. Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex.1986). But that standard is inadequate when evidence is more than a preponderance (more likely than not) but is not clear and convincing. As a matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance. See In re W.C., 56 S.W.3d 863, 868 (Tex.Civ.App.-Houston [14th Dist.] 2001, no pet.); In re K.R., 22 S.W.3d at 96-97 (Wittig, J., concurring).

We hold that the appellate standard for reviewing termination findings is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations. That standard best comports with the Supreme Court's holding in Santosky, with the definition of clear and convincing evidence we first adopted in Addington, and with the Legislature's definition in the Family Code. See Santosky v. Kramer, 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (holding that the clear-and-convincing standard "adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process."); Addington, 588 S.W.2d at 570 (holding that clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."); TEX. FAM.CODE § 101.007 (" 'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.").

89 S.W.3d 26

A standard that focuses on whether a reasonable jury could form a firm conviction or belief retains the deference an appellate court must have for the factfinder's role.

Accordingly, we disapprove of holdings that termination findings should be upheld if those findings are not against the great weight and preponderance of the evidence. See, e.g., In re King, 15 S.W.3d 272, 276 (Tex.App.-Texarkana 2000, pet. denied); In re K.C.M., 4 S.W.3d 392, 395 (Tex.App.-Houston [1st Dist.] 1999, pet. denied); In re J.N.R., 982 S.W.2d at 143; In re B.S.T., 977 S.W.2d 481, 484 n. 4 (Tex.App.-Houston [14th Dist.] 1998, no pet.); In re D.L.N., 958 S.W.2d 934, 940 (Tex.App.-Waco 1997, pet. denied); Spurlock v. Texas Dep't of Protective & Regulatory Servs., 904 S.W.2d 152, 155 (Tex.App.-Austin 1995, writ denied).

There have been other opinions that, while attempting to account for the clear and convincing burden of proof, nevertheless stated standards that diverge perceptibly from the standard we announce today. We are not persuaded that these standards would necessarily have produced a different disposition had those courts reviewed the evidence under today's standard, because the opinions reflect that the courts undertook an exacting review of the entire record with a healthy regard for the constitutional interests at stake. Despite differences in articulated standards, the courts have often employed similar analyses in reaching their decisions. See In re Leal, v. Department of Protective & Regulatory Servs., 25 S.W.3d 315, 318-21 (Tex.App.-Austin 2000, no pet.). But in the interest of uniform decision-making, we reject any articulation of the standard that varies from the standard we announce today. Accordingly, we reject standards that retain the traditional factual sufficiency standard while attempting to accommodate the clear-and-convincing burden of proof. See, e.g., In re W.C., 56 S.W.3d at 868 n. 3; Leal, 25 S.W.3d at 321.

We also disapprove of the test Neiswander announced, that a court of appeals must determine whether a reasonable trier of fact could conclude that the existence of a disputed fact is "highly probable." See, e.g., In re A.R.R., 61 S.W.3d 691, 697 (Tex.App.-Fort Worth 2001, pet. denied); In re B.B., 971 S.W.2d 160, 164 (Tex.App.-Beaumont 1998, pet. denied); In re B.R., 950 S.W.2d 113, 119 (Tex.App.-El Paso 1997, no writ); Neiswander, 645 S.W.2d at 836. Because some could argue that evidence that makes the existence of a fact "highly probable" is not necessarily the same as evidence that produces a firm conviction in the existence of the fact, we reject the "highly probable" formulation. Cf. In re L.R.M., 763 S.W.2d 64, 66 (Tex.App.-Fort Worth, 1989, no writ)(stating that "highly probable" inquiry needlessly complicates the standard of review).

VII

We emphasize that, as appellate courts apply the standard we announce today, they must maintain the respective constitutional roles of juries and appellate courts. An appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt. See Santosky, 455 U.S. at 767-69, 102 S.Ct. 1388 (holding that "beyond reasonable doubt" standard not required in termination cases). While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.

89 S.W.3d 27

While the court of appeals recited the "highly probable" standard that we disavow, we do not view the recitation of an erroneous standard as harmful error in and of itself. The Department argues, however, that the court of appeals' application of the standard failed to give due deference to the jury's

fact-finding function. We agree. The court of appeals properly stated that appellate courts should not reverse the judgment unless the jury could not reasonably have formed a firm conviction or belief that terminating Robert's parental rights was in C.H.'s best interest. However, the court did not properly adhere to that standard in reviewing the evidence. The court of appeals relied on some considerations this Court has said may be pertinent when deciding "best interest." Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976). But we have never held that these considerations are exhaustive, or that all such considerations must be proved as a condition precedent to parental termination. The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child. Other cases, however, will present more complex facts in which paltry evidence relevant to each consideration mentioned in Holley would not suffice to uphold the jury's finding that termination is required.

In this case, the court of appeals based its insufficiency holding on five areas in which it concluded the evidence was lacking:

(1) the foster parents did not testify that they intended to adopt C.H., from which the court of appeals "necessarily infers that [the foster parents] were not considering or intending to adopt C.H.";

(2) there is no evidence about the emotional effect on C.H. were he to remain with the foster parents until he was either reunited with his mother, placed with a qualifying relative, or adopted;

(3) there is no evidence about the child's need for continuity of care and for timely integration into a stable and permanent home, taking into account the differences in development and the concept of time to children of different ages;

(4) there is no evidence to establish that the emotional and physical needs of the child, now and in the future, would be met by termination of the parent-child relationship; and

(5) there is no evidence about allegations that C.H. is experiencing developmental and health problems (sickle cell anemia) that would affect his adoptability. [2]

But the court did not fully account for the evidence that supported the jury's verdict--particularly evidence bearing upon Robert's historical deficiencies in parenting and current criminal proclivities. The court found "some footing" for the jury's termination finding in "the uncertainty of

[Robert's] ability to seek reunification" with C.H. In the main, however, the court reached its conclusion by disregarding evidence that the jury presumably considered clear and convincing.

For example, undisputed evidence established not only that Robert is unable to care for the child from prison, but that he has also exhibited a pattern of conduct that is inimical to the very idea of child-rearing. He failed to arrange medical care for Susan during her pregnancy with C.H.; he provided no emotional or financial assistance to C.H. after his birth; he had an "extensive criminal history involving drugs and assaults" which continued unabated after C.H.'s birth; and he had no concrete plan to provide emotional or physical care for C.H. The court of appeals held that the evidence was clear and convincing that Robert had endangered C.H.'s physical and emotional well-being, abandoned Susan during her pregnancy, failed to provide support or medical care for her and C.H., remained apart from them, and failed to support C.H. after his birth. 25 S.W.3d at 55-56. But, the opinion does not suggest that any of this evidence would be relevant to a determination of the child's best interest. While it is true that proof of acts or omissions under section 161.001(1) does not relieve the petitioner from proving the best interest of the child, the same evidence may be probative of both issues. Holley, 544 S.W.2d at 370; Wiley v. Spratlan, 543 S.W.2d 349, 351 (Tex.1976).

Moreover, the court's opinion gave no weight to the fact Robert had seen C.H. only twice and had done nothing to foster a parent-child relationship with C.H. The opinion also fails to account for Robert's testimony that he was unaware of the whereabouts of his fourteen-year-old son from his prior marriage and did not support him in any way. Robert's past performance as a parent--apart from his criminal history--could certainly have a bearing on his fitness to provide for C.H., yet the court of appeals did not mention Robert's prior history of child neglect as a factor bearing upon the jury's finding that termination would be in C.H.'s best interest.

Regarding the court of appeals' conclusion that the foster family's failure to testify "necessarily infers that they were not considering or intending to adopt C.H.," we note that the Family Code provides that a court may appoint the Department as a child's managing conservator upon termination. TEX. FAM.CODE § 161.207. Evidence about placement plans and adoption are, of course, relevant to best interest. However, the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor; otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located. Instead, the inquiry is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's best interest--even if the agency is unable to identify with precision the child's future home environment.

We do not have jurisdiction to conduct a factual sufficiency review, but we may ensure that the courts of appeals adhere to the proper legal standard of review. See Jaffe Aircraft Corp. v. Carr, 867 S.W.2d 27, 29 (Tex.1993) (stating that although this Court has no jurisdiction to determine the factual sufficiency of evidence, we may determine whether intermediate appellate courts properly follow applicable legal standards). Because the court of appeals disregarded much of the evidence supporting the finding that termination would be in C.H.'s best interest, and

89 S.W.3d 29.

failed to clearly explain why it concluded a reasonable jury could not form a firm conviction or belief from all the evidence that termination would be in C.H.'s best interest, the court of appeals has erred. Accordingly, we reverse the court of appeals' judgment and remand to that court to consider Robert G.'s factual sufficiency point under the standard announced today.

Justice HECHT filed a concurring opinion.

Justice HANKINSON concurred in the judgment only.

Justice HECHT, concurring.

I join fully in the Court's opinion and add only this brief note.

Respondent argues that appellate review of the evidence for terminating the parental relationship must not only be conducted in light of the requirement of proof by clear and convincing evidence but must also be de novo--that is, with very limited deference to the finder of fact--as the United States Constitution requires in defamation cases [1] and for punitive damages awards. [2] Absent a definitive word from the United States Supreme Court on whether the Constitution requires this independent appellate review, [3] it might become necessary for this Court to address the issue. We have not done so here because it may make no difference; whether the evidence is sufficient to support the judgment in this case may not turn on what deference is paid the jury's findings. We should have the court of appeals' analysis of the evidence in light of the burden of proof before we take on the difficult constitutional issue.

Also, after reading the evidence set out in our opinion one might wonder why the State, far from failing to meet its burden of proof, should not be held to have established conclusively grounds for terminating Robert G.'s parental relationship with C.H. The State has not made this argument.

---------

Notes:

[1] In Bose Corp. v. Consumers Union of the United States, Inc., 466 U.S. 485, 510-11, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) the United States Supreme Court held that, in First Amendment cases, a finding of "actual malice" must be supported by clear and convincing proof to satisfy due process. The Court adopted a standard of appellate review that required "judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice'." Although the Supreme Court in Santosky has also required that parental termination be proved, at a minimum, by clear and convincing evidence, the Court did not articulate a standard for appellate review. Because we decide this case today on non-constitutional grounds, we express no opinion whether the Bose standard applies in a proceeding to terminate the parent-child relationship.

[2] Aside from referring to C.H.'s sickle cell anemia, this conclusion is inconsistent with the court's earlier rejection of those allegations:

... C.H. does not suffer from in utero exposure to drugs. The record shows that C.H. was born full-term and released from the hospital four days after birth. Every witness called by the Department who had observed C.H. following his removal, from mere days following to mere days before trial, stated that C.H.'s development was normal and appropriate. He was by all accounts a normal, well-developed, and happy baby.

25 S.W.3d at 50.

[1] Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 685-686, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); Bose Corp. v. Consumers Union, 466 U.S. 485, 510-511, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

[2] Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 436, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001).

[3] See Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

---------

In re C.H., 89 S.W.3d 17, 45 Tex.Sup.Ct.J. 1000 (Tex. 2002)

119 S.W.3d 382 (Tex.App.—Tyler 2003), 12-02-00348, In re C.L.C.

Page 382

**119 S.W.3d 382 (Tex.App.—Tyler 2003)**

**In the Interest of C.L.C. and C.R.D., Minor Children.**

**No. 12-02-00348-CV.**

**Court of Appeals of Texas, Twelfth District, Tyler**

**August 27, 2003.**

Page 383

[Copyrighted Material Omitted]

Page 384

[Copyrighted Material Omitted]

Page 385

[Copyrighted Material Omitted]

Page 386

[Copyrighted Material Omitted]

Page 387

Douglas Scott Williams, Murchison, for appellant.

Donna R. Bennett, Dist. Atty's Office, Henderson County, Athens, for appellee.

Lee Ann Millender, for real party in interest.

Panel consisted of WORTHEN, C.J., GRIFFITH, J. and DeVASTO, J.

 **OPINION**

JAMES T. WORTHEN, Chief Justice.

Jimmy Crawford ("Crawford") appeals the termination of his parental rights.

Page 388

Crawford presents three issues on appeal. We affirm.

 *BACKGROUND*

Crawford and Melanie Dawn Dickinson ("Dickinson") are the parents of two boys, C.L.C. and C.R.D. On the morning of October 9, 2001, John Floyd ("Floyd"), Precinct Four Constable in Henderson County, Texas, received a call regarding C.L.C. The child was sick, but the school had no contact information for the parents. The school requested that Floyd go to C.L.C.'s house and ask his parents to pick up the child. Floyd arrived at Crawford's residence about 8:40 a.m. He observed that the yard was a "mess" with garbage bags torn open in the yard, a mattress standing up against the side of the family's mobile home, abandoned vehicles, and a pickup with burned trash in it along with metal and glass garbage that would not burn. When Floyd left his vehicle, he noticed the television was extremely loud. After knocking and beating on the door produced no response, Floyd discovered the door was unlocked. As he opened the door, Floyd immediately noticed a chemical smell. Inside, there was something like a haze, and Floyd was concerned that it was a health hazard to enter the house.

Floyd found Crawford lying on a couch right inside the door with a spray can containing carburetor cleaner under his arm. Floyd identified the smell as carburetor cleaner fumes. Crawford was unresponsive until Floyd shook him and yelled at him. When Floyd explained to Crawford the

purpose of his visit, Crawford stated that he knew C.L.C. was sick and that they had all been sick. Floyd told Crawford that someone needed to pick up the child. Crawford told Floyd to "go tell her to go get him," pointing to the opposite end of the trailer. Floyd believed Crawford was referring to Dickinson, but he refused Crawford's request because the house was in such a mess that Floyd did not want to walk through it. Floyd asked Crawford to get Dickinson. After calling Dickinson's name and receiving no response, Crawford agreed to pick up C.L.C. from school. Although he did not conduct a field sobriety test, Floyd assessed Crawford and determined that he was capable of driving. Crawford went to the school and picked up C.L.C. Floyd followed him and stated that Crawford's driving was "okay."

After Crawford left the school, Floyd met with C.L.C.'s teacher and the school nurse. Together, they concluded that Child Protective Services should be contacted regarding C.L.C.'s home situation. An investigator for the Texas Department of Protective and Regulatory Services (the "Department"), Katherine Diesch ("Diesch"), received the report alleging inhalant abuse in C.L.C.'s family, abuse of drugs including methamphetamines and alcohol, incidents of violence, and a dirty home. Based on the report, Diesch accompanied Floyd and Eric Ward ("Ward"), a Henderson County Health and Sanitation Officer, to Crawford's home. When they arrived at the home, Crawford was sitting on the tailgate of his pickup truck in the yard. According to Floyd, Crawford did not appear to be intoxicated or a danger to himself or others. Floyd located C.L.C. in the living room of the residence watching television, but no one else was in the house. However, the carburetor cleaner spray can was sitting on the floor by the couch within access of the child.

Floyd observed that the house was worse than he realized that morning. Paper plates with half-eaten food were in the living room, the sink was full of dishes and "nasty" water, and so many paper plates and dishes were stacked on the stove that

Page 389

Floyd was unable to determine if the stove was electric or gas. In Floyd's opinion, the house was very unsanitary and unsafe for small children. Ward issued Crawford a warning citation for conditions outside the house.

Diesch stated that the yard was an "absolute mess" and loud music emanated from the property. She confirmed Floyd's description of the premises and did not believe the yard was in any condition for young children to play in. She approached Crawford, but he immediately became "out of control," questioning her purpose there. Diesch was unable to conduct an interview. Moreover, Diesch stated that Crawford came toward her in such a way that she was afraid of him, and felt he was attempting to intimidate and threaten her. Diesch stated that Crawford was unclean and smelled of urine. Crawford did not allow Diesch to go in the house or take photographs.

Later, Shirley McCarty ("McCarty"), Dickinson's aunt, arrived in a car with Dickinson and C.R.D. Diesch stated that Dickinson was "totally insensible" and passed out in the back seat of the vehicle. When Dickinson woke up, she was incoherent and unable to carry on a conversation. The situation became chaotic because Crawford and Dickinson began arguing, screaming, and yelling at one another. At that point, Diesch agreed to meet McCarty, Dickinson, and the two children at her office. At Diesch's office, Dickinson was still incomprehensible. Diesch attempted to implement

a safety plan in which Dickinson would leave Crawford and unsupervised visitation between the children and Crawford would be prohibited. However, Dickinson would not agree to leave. McCarty took the children to her home while Dickinson left the office.

The following morning, McCarty called Diesch, sounding "frantic and upset." McCarty had just received a call from Dickinson who stated that she and Crawford were coming to get the children. McCarty was afraid of Crawford and agreed to take the children to Diesch's office. That day, October 10, 2001, the children were taken into the Department's custody and placed in a foster home because Diesch did not believe the children were safe with their parents. Later the same day, Crawford and Dickinson went to the Department's office. Diesch was in her office after hours and heard a commotion. As she looked out her office door, she saw Dickinson's face in the window of the security door and concluded that someone else was there as well. Dickinson stated that she needed to talk and denied that Crawford was with her. Then, Diesch heard the other security door being pulled out of the wall, frame and all, and saw Crawford running past her window. Crawford was arrested for retaliation later that night.

On October 11, 2001, the Department filed a petition for protection of a child, for conservatorship, and for termination of Crawford and Dickinson's parental rights. An affidavit by Diesch attached to the petition contained details of the Department's history with the family. Additionally, the affidavit included allegations of drug and alcohol abuse by both parents, possible "sniffing" by Crawford from a spray can of carburetor cleaner, the mental illness of Dickinson, unsanitary home conditions, incidents of domestic violence between the parents, and retaliation against a Department worker.[1] On October

Page 390

1 and 2, 2002, the termination proceeding was tried before the court.

On November 4, 2002, the trial court found, by clear and convincing evidence, that Crawford knowingly placed or knowingly allowed his children to remain in conditions or surroundings which endangered their physical or emotional well-being, and engaged in conduct or knowingly placed his children with persons who engaged in conduct which endangered their physical or emotional well-being. Further, the trial court found that termination was in the best interests of the children.[2] This appeal followed.

### *TERMINATION OF PARENTAL RIGHTS*

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood,* 17 S.W.3d 750, 759 (Tex.App.-Austin 2000), *pet. denied per curiam,* 53 S.W.3d 684 (Tex.2001); *In re J.J.,* 911 S.W.2d 437, 439 (Tex.App.-Texarkana 1995, writ denied). A termination decree is "complete, final, irrevocable [and] divests for all time the parent and child of all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit." *Wiley v. Spratlan,* 543 S.W.2d 349, 352 (Tex.1976); *In re Shaw,* 966 S.W.2d 174, 179 (Tex.App.-El Paso 1998, no pet.) Thus, breaking the bonds between a parent and child "can never be justified without the most solid and substantial reasons." *Wiley,* 543 S.W.2d at 352. Because a termination action permanently sunders those bonds, the proceedings must be strictly scrutinized. *Id.; In re Shaw,* 966 S.W.2d at 179. However, parental rights are not absolute, and it is vital that the emotional and physical interests of the child not be sacrificed at the expense of preserving that

right. *In re C.H.,* 89 S.W.3d 17, 26 (Tex.2002).

Section 161.001 of the Family Code permits a court to order termination of parental rights if two elements are established. TEX. FAM.CODE ANN. § 161.001 (Vernon 2002); *In re J.M.T.,* 39 S.W.3d 234, 237 (Tex.App.-Waco 1999, no pet.), *disapproved on other grounds,* 96 S.W.3d 256, 267 & n. 39 (Tex.2002). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. TEX. FAM.CODE ANN. § 161.001(1) (Vernon 2002); *Green v. Texas Dep't of Protective & Regulatory Servs.,* 25 S.W.3d 213, 219 (Tex.App.-El Paso 2000, no pet.); *In re J.M.T.,* 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM.CODE ANN. § 161.001(2) (Vernon 2002); *In re J.M.T.,* 39 S.W.3d at 237. Additionally, both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM.CODE ANN. § 161.001; *Wiley,* 543 S.W.2d at 351; *In re J.M.T.,* 39 S.W.3d at 237.

Due process requires a petitioner to justify termination by clear and convincing evidence because termination is such a drastic remedy. *In re J.M.T.,* 39 S.W.3d at 237. The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM.CODE ANN. § 161.001; *In re J.J.,* 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (Vernon 2002). There is a strong presumption that the best interest of the child is served by preserving the parent-child relationship. *Wiley,* 543 S.W.2d at 352;
Page 391
*In re J.M.T.,* 39 S.W.3d at 240. Thus, the burden of proof is on the person seeking to deprive the parent of their parental rights. *In re J.M.T.,* 39 S.W.3d at 240.

## STANDARD OF REVIEW

When confronted by both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981); *In re M.D.S.,* 1 S.W.3d 190, 197 (Tex.App.-Amarillo 1999, no pet.). Because termination findings must be based on clear and convincing evidence, the standard of review is not the same on appeal as a finding based upon a preponderance of the evidence. *In re J.F.C.,* 96 S.W.3d 256, 264 (Tex.2002). Therefore, in reviewing the legal sufficiency of the evidence to support termination findings, an appellate court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id.* at 266. In order that proper deference is shown to the fact finder's role, an appellate court must presume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id.* However, a reviewing court is not required to ignore all evidence not supporting the finding because that might bias a clear and convincing analysis. *Id.* A judgment in favor of the parent is generally required if there is legally insufficient evidence. *Id.*

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or

conviction about the truth of the petitioner's allegations. *In re C.H.,* 89 S.W.3d at 25. In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id.* at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.,* 96 S.W.3d at 266. If the disputed evidence is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* An appellate court should specify its reasons for concluding that a reasonable trier of fact could not have attributed disputed evidence in favor of the finding. *Id.* at 266-67.

This standard retains the deference an appellate court must have for the fact finder's role. *In re C.H.,* 89 S.W.3d at 26. Additionally, the trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom,* 965 S.W.2d 575, 580 (Tex.App.-Houston [1st Dist.] 1997, pet. denied). Thus, our review must not be so rigorous that only fact findings established beyond a reasonable doubt could withstand review. *In re C.H.,* 89 S.W.3d at 26. Further, a trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards applied in reviewing evidence supporting a jury's finding. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994); *In re V.R.W.,* 41 S.W.3d 183, 190 (Tex.App.-Houston [14th Dist.] 2001, no pet.), *disapproved on other grounds,* 96 S.W.3d 256, 267 & n. 39 (Tex.2002).

Page 392

## *TERMINATION UNDER SECTION 161.001(1)(D)*

Crawford contends that the evidence is legally and factually insufficient to support a finding that he knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being. Crawford argues that there is no competent evidence that the children were living in squalor, that termination was recommended without having seen the inside of the residence, and that other testimony shows the living conditions are now appropriate. Further, there is no evidence connecting the living conditions with any resulting danger to the children's emotional or physical well-being. The Department contends that the evidence shows that Crawford's residence was filthy and unsanitary, that there was domestic violence in the home, that there was drug abuse in the home, that Crawford knew Dickinson had a mental illness and posed a threat to the children, and that Crawford's history of criminal behavior created a high risk that he would be incarcerated in the future.

### *Applicable Law*

Section 161.001(1)(D)of the Texas Family Code states that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. TEX. FAM.CODE ANN. § 161.001(1)(D) (Vernon 2002). This provision addresses the child's surroundings and environment, rather than parental conduct. *In re N.R.,* 101 S.W.3d 771, 775-76 (Tex.App.-Texarkana 2003, no pet. h.); *In re R.D.,* 955 S.W.2d 364, 367-68 (Tex.App.-San Antonio 1997, pet. denied); *Ybarra v. Texas Dep't of Human Svcs.,* 869 S.W.2d 574, 577 (Tex.App.-Corpus Christi 1993, no writ).

"Endanger" means to expose to loss or injury or to jeopardize. *Texas Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987); *In re D.M.,* 58 S.W.3d 801, 811 (Tex.App.-Fort Worth 2001, no pet.). Endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment. *Boyd,* 727 S.W.2d at 533; *In re D.M.,* 58 S.W.3d at 811. Nonetheless, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd,* 727 S.W.2d at 533; *In re J.J.,* 911 S.W.2d at 440. Rather, it is sufficient that the child's well-being be jeopardized or exposed to loss or injury. *In re J.J.,* 911 S.W.2d at 440.

The Department must show that the child's living conditions pose a real threat of injury or harm. *In re N.R.,* 101 S.W.3d at 776; *Ybarra,* 869 S.W.2d at 577. Further, there must be a connection between the conditions and the resulting danger to the child's emotional or physical well-being. *Ybarra,* 869 S.W.2d at 577-78. However, it is not necessary for the parent to have certain knowledge that an actual injury is occurring. *In re N.R.,* 101 S.W.3d at 776. It is sufficient that the parent was aware of the potential for danger to the child in such environment and disregarded that risk. *Id.* The relevant time frame to determine whether there is clear and convincing evidence of endangerment is before the child was removed. *Ybarra,* 869 S.W.2d at 577.

Unsanitary conditions can qualify as surroundings that endanger a child. *Leal v. Texas Dep't of Protective and Regulatory Svcs.,* 25 S.W.3d 315, 325 (Tex.App.-Austin 2000, no pet.), *disapproved on other grounds,* 96 S.W.3d 256, 267 & n. 39 (Tex.2002). Moreover, abusive

Page 393

or violent conduct by a parent or other resident of a child's home can produce an environment that endangers the physical or emotional well-being of a child. *D.O. v. Texas Dep't of Human Svcs.,* 851 S.W.2d 351, 354 (Tex.App.-Austin 1993, no writ), *disapproved on other grounds,* 96 S.W.3d 256, 267 & n. 39 (Tex.2002); *In re B.R.,* 822 S.W.2d 103, 106 (Tex.App.-Tyler 1991, writ denied). We have previously concluded that it is illogical to reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child, or with whom a child is compelled to associate on a regular basis in his home, are not inherently a part of the "conditions and surroundings" of that place or home. *In re B.R.,* 822 S.W.2d at 106. This statute is designed to protect a child from precisely such an environment. *Id.* Further, an environment which routinely subjects a child to the probability that he will be left alone because his parents are once again jailed endangers both the physical and emotional well-being of a child. *In re S.D.,* 980 S.W.2d 758, 763 (Tex.App.-San Antonio 1998, pet. denied). Conduct that results in such a disability, and that subjects a child to a life of uncertainty and instability, endangers the child's physical or emotional well-being. *Id.*

*Analysis*

Floyd and Diesch testified about Crawford's behavior, the condition of Crawford's premises, and their knowledge of the events that transpired between October 9 and October 11, 2001 as set forth above. Further, the record reflects that at the time of trial, Crawford was incarcerated in the Henderson County jail for the retaliation incident and would soon enter a drug treatment program.

Crawford lived with Dickinson for about eleven years and knew that she has been diagnosed

with a mental illness. However, he testified that he believed Dickinson was capable of being a responsible parent. In a 1997 proceeding, a court returned C.L.C. to Crawford's custody with orders that Dickinson be allowed supervised visitation only. At that time, Crawford agreed Dickinson posed a threat to C.L.C. Nonetheless, Dickinson was living with Crawford when he regained custody of C.L.C. Moreover, Crawford testified that a "homemaker" came to the house approximately six to nine months prior to this case and dismissed them from the Department as "no problems," after which Dickinson was allowed to live with the children. Crawford contends that he allowed Dickinson unsupervised contact with C.L.C. after the "homemaker's" visit and the Department's dismissal of their case.[3] Crawford had a second child with Dickinson in 2000.

Crawford admitted that he and Dickinson have trouble dealing with stressful situations. He also admitted that Dickinson is "not totally right without her medication," and that she has abused a prescription drug. Crawford was also concerned about Dickinson using that prescription drug and "it happening with the children." Further, he admitted there is a slim possibility that he might move back in with her after he is released.

Regarding alleged drug abuse, Crawford testified that he had inhaled chemicals to get high but never when the children lived with him, while the children were in his custody, or while they were in his presence. Later, however, he admitted that he "huffed" when the children were in his custody, and admitted that he had a drug problem. Crawford stated that inhaling

Page 394

"eases all the stress," but causes him to do "undesirable things," and admitted that inhaling affects his ability to reason and make decisions. Crawford denied admitting to a caseworker that he was "huffing" carburetor cleaner on the day Floyd came to his house and denied testifying similarly at a revocation hearing in 2002. He also denied using other illegal drugs for years and denied testing positive for marijuana in May of 2001.

Crawford admitted he consumed alcohol while the children were in his custody but denied being a big drinker until the children were removed. After being arrested several times for public intoxication, he voluntarily checked himself into a drug treatment center. Upon release, Crawford voluntarily turned himself in to police regarding a probation violation based on the public intoxication arrests. Crawford then requested entry into a drug treatment facility in order to have a relationship with his children. Further, Crawford testified that he wanted some help.

Crawford agreed that his relationship with Dickinson has, at times, been volatile. He has slapped Dickinson a time or two, but never hit her. Further, he stated that the children were never present during their fights. During their relationship, he was arrested based on Dickinson's statements but those charges were later dismissed. Crawford denied that he committed a list of alleged incidents of domestic violence against Dickinson. Crawford also denied an incident at a liquor store with Dickinson. Although he remembered Dickinson got a restraining order against him, he stated the underlying factual allegations were false. In her investigation, Diesch spoke with C.L.C. who confirmed a report of an incident in which Crawford was shooting a weapon at the burn barrel from the roof of the home while Dickinson and C.L.C. were lying on the ground in the yard. Crawford denied the incident occurred. Further, C.L.C. stated that his parents would sometimes leave him and his brother alone.

Dickinson admitted being diagnosed as bipolar and being committed to Terrell State Hospital for mental illness. She denied abusing prescription drugs. Dickinson testified that Crawford physically abused and hit her in the past, but denied that she told a caseworker that he drank and was violent. Dickinson either denied or did not recall numerous alleged incidents of domestic violence perpetrated against her by Crawford. Dickinson denied that any assault occurred while the children were living with her or in front of the children. Although she stated that their arguments became physical sometimes, she denied that she had ever hit Crawford or that he had shot at her. Dickinson denied any intention of moving in with Crawford when he is released.

Denise Killgore ("Killgore"), the family's case worker with Child Protective Services in Henderson County, met Crawford in the Henderson County jail on October 15, 2001. Killgore discussed a family service plan with Crawford on that date. Later, Crawford told her he had a "huffing" problem and wanted help. Killgore believed Crawford tested positive for marijuana in 2001. According to Killgore, Crawford denied "everything" on his criminal history record. Crawford admitted to Killgore that the children had witnessed domestic violence between him and Dickinson and that he "huffed" while in possession of the children. Crawford was also aware that Dickinson had a problem with prescription drugs. Killgore stated that Crawford was worried about her "driving like that." However, Crawford stated that Dickinson never drove with the children "like that," intimating that she never drove the children while abusing a prescription drug.

Page 395

According to Killgore, there was "zero progress" by the parents as well as episodes of violence.

John Bell ("Bell"), a deputy with the Henderson County Sheriff's Department, testified regarding a dispatch he received in September 2001. The call was about a fight in front of a liquor store between a man and a woman that might involve a knife. When he responded, Bell spoke to Crawford and Dickinson at a nearby gas station and observed that Crawford had blood on his face and chest. Bell was aware that Crawford has been arrested twice for domestic violence. Further, Bell responded to domestic violence calls at Crawford's residence approximately six or seven times since 1995. He also witnessed physical injuries on both parents. The only time a child was present was in 1995, and he confirmed that there had been actual domestic violence on that call. According to Bell, it was rare for him to talk to Crawford when he was not intoxicated.

Based on the home situation, domestic violence, and drug abuse, Diesch believes Crawford placed the children in conditions or surroundings which endangered their physical or emotional well-being. However, Diesch admitted that she was not happy with Crawford and that she took this case personally. Diesch admitted that, other than the incident at her office, she never witnessed any violence nor had she witnessed any drug abuse. Further, her opinion regarding the conditions of the home were based only on the condition of the yard outside.

Killgore testified that Crawford knowingly placed the children in conditions or surroundings that endangered them. Killgore cited several factors for her opinion including the domestic violence, Crawford's huffing and being under the influence of alcohol and drugs while in front of the children, and repeated Department involvement. Killgore admitted that the inside and outside of the house are now appropriate. In her opinion, witnessing domestic violence is emotionally damaging for children. However, Killgore also admitted that there is no evidence the children were

physically injured or emotionally damaged by Crawford. The children have never seen a psychologist or psychiatrist to determine if their emotional well-being had been affected. Vicki Sussen ("Sussen"), an employee of CASA, believes the evidence shows that the children had been knowingly and willingly left in danger.

Viewing the evidence in the light most favorable to the finding, a reasonable fact finder could have concluded that Crawford was under the influence of drugs while the children were in his custody, that the house and yard were both unsanitary and unsafe, that Crawford committed domestic violence, and that he left the children with their mentally ill mother whom he acknowledged posed a danger to them. Therefore, we conclude that the evidence, viewed in the light most favorable to the finding, is sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that Crawford knowingly placed or knowingly allowed his children to remain in conditions or surroundings which endangered their physical or emotional well-being.

Although there is conflicting testimony regarding the present condition of the home, the lack of psychological evidence that the children were damaged, and that domestic violence occurred in the presence of the children, the trial court could have resolved this conflict in favor of its finding. The trial court could have disbelieved Crawford's testimony that the house was not dirty, that the children never witnessed domestic violence, that Dickinson was not a danger to the children, and that

Page 396

the children were not damaged by their environment and surroundings. Further, the trial court could have found that Crawford's drug abuse, violence, and repeated arrests were conditions that endangered the children's physical or emotional well-being. Although there is some disputed evidence, we find that this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that Crawford knowingly placed or knowingly allowed his children to remain in conditions or surroundings which endangered their physical or emotional well-being. Accordingly, Crawford's first issue is overruled.

### TERMINATION UNDER SECTION 161.001(1)(E)

Crawford contends that the evidence is legally and factually insufficient to support a finding that he engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. Crawford argues that his housing situation was stable, that he was not frequently incarcerated, that there is no evidence he left the children with improper parties, that he substantially complied with the Department's service plan, that he never used illegal drugs in the presence of his children, and that there is no evidence that the children were physically or emotionally harmed by him. The Department contends that Crawford is incapable of providing a stable, secure, and safe home, that he had engaged in domestic violence with Dickinson while the children were living in the home, that he used drugs while in possession of his children, that he exposed the children to Dickinson who was mentally ill and abused prescription drugs, and that he engaged in dangerous activity involving firearms.

### Applicable Law

Section 161.001(1)(E) of the Texas Family Code states that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. TEX. FAM.CODE ANN. § 161.001(1)(E) (Vernon 2002). The specific danger to the child's well-being need not be established as an independent proposition, but may instead be inferred from parental misconduct. *Boyd,* 727 S.W.2d at 533; *In re J.J.,* 911 S.W.2d at 440. Further, scienter is not required for an appellant's own acts under section 161.001(1)(E), although it is required when a parent places his child with others who engage in endangering acts. *In re U.P.,* 105 S.W.3d 222, 236 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re N.K.,* 99 S.W.3d 295, 301 n. 9 (Tex.App.-Texarkana 2003, no pet.); *In re M.D.S.,* 1 S.W.3d at 200.

As previously discussed, "endanger" means to expose to loss or injury or to jeopardize. *Boyd,* 727 S.W.2d at 533; *In re D.M.,* 58 S.W.3d at 811. It is not necessary that the conduct be directed at the child or that the child actually suffers injury; rather, it is sufficient that the child's well-being be jeopardized or exposed to loss or injury. *Boyd,* 727 S.W.2d at 533; *In re J.J.,* 911 S.W.2d at 440. Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.,* 100 S.W.3d 658, 662 (Tex.App.-Dallas 2003, pet. filed); *In re D.M.,* 58 S.W.3d at 811. It is inconsequential that the parental conduct occurred before the

Page 397

child's birth. *In re U.P.,* 105 S.W.3d at 229; *In re D.M.,* 58 S.W.3d at 812. Instead, courts look to what the parent did both before and after the child's birth to determine whether termination is necessary. *In re D.M.,* 58 S.W.3d at 812. Further, termination under subsection (E) must be based on more than a single act or omission. *In re D.M.,* 58 S.W.3d at 812; *In re D.T.,* 34 S.W.3d 625, 634 (Tex.App.-Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well-being is required. *In re D.M.,* 58 S.W.3d at 812; *In re D.T.,* 34 S.W.3d at 634.

Imprisonment is a factor to be considered by the trial court on the issue of endangerment. *Boyd,* 727 S.W.2d at 533; *In re M.D.S.,* 1 S.W.3d at 199. Mere imprisonment, standing alone, will not constitute engaging in conduct which endangers the emotional or physical well-being of a child. *Boyd,* 727 S.W.2d at 533; *In re D.M.,* 58 S.W.3d at 812; *In re M.D.S.,* 1 S.W.3d at 199. A parent's voluntary, willful, and conscious engagement in conduct that he knows may result in imprisonment is also insufficient to support termination of parental rights. *In re D.T.,* 34 S.W.3d at 636. If the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding under section 161.001(1)(E) is supportable. *Boyd,* 727 S.W.2d at 534; *In re D.M.,* 58 S.W.3d at 812; *In re M.D.S.,* 1 S.W.3d at 199.

### Analysis

In addition to the evidence previously discussed, Dr. Timothy James Furlong ("Furlong"), a staff psychiatrist at the Andrews Center, testified that he attempted to perform a psychological

evaluation on Dickinson through a clinical interview in 1996. However, she was not fully cooperative and was experiencing psychotic symptoms. Furlong stated that there was evidence Dickinson had a psychotic mental illness, but he was unable to make a definitive diagnosis. In 1999, Dickinson began to see Furlong. He prescribed medications and, in April of 2002, Furlong requested Dickinson be committed to Terrell State Hospital because of allegations that she was suicidal, misusing prescription drugs, and abusing carburetor cleaner as an inhalant. Dickinson did not recall reporting to a Department caseworker that Crawford threw her on the ground, sat on her, and kicked her in the stomach after she told him she might be pregnant. Moreover, she stated that she had never seen Crawford physically abuse or hit the children.

Amy Michelle Young ("Young"), the children's caseworker for Child Protective Services in Henderson County, testified regarding a visit on March 5, 2002 with Crawford, Dickinson, and the children at a McDonald's restaurant. Dickinson was driven to the visit by Albert Pritchett ("Pritchett"). Crawford was not walking straight and his speech was slurred, and Young believed Crawford was intoxicated for the visit. C.L.C. seemed scared and uncomfortable when Crawford showed him a deep wound on his hand. When Young asked Crawford to lower his voice, he jumped up, slammed his hands on the table, and stated that he was not happy. He called the Department staff "liars," said "you people have got my kids," and cursed loudly in the restaurant with the children present. In response, C.L.C. backed away, went to a table in the corner, placed his fingers in his ears, and rocked back and forth. Young was concerned for her own safety as well as the children's safety. She stated that the situation was unmanageable. Due to Crawford's behavior,

Page 398

Young terminated the visit. In the parking lot, Crawford got into the passenger seat of the car occupied by Pritchett and began beating Pritchett with his fist. Young testified that the children witnessed Crawford's actions.

Regarding the visit at McDonald's, Crawford admitted he had a confrontation with Pritchett. Crawford denied that his children witnessed his fight with Pritchett or that he was screaming, yelling, and cursing at the Department's employees inside the restaurant. Crawford denied beating Pritchett in the face.

On March 6, 2002, after the incident at the McDonald's restaurant, the Department changed its goal for the children to termination of parental rights. Diesch believes Crawford engaged in conduct which endangered his children's physical and emotional well-being based on his violence and drug abuse. Sussen recommended termination of Crawford and Dickinson's parental rights based on the evidence at trial, the parents' history since 1995, and the fact that the parents knew the consequences of their actions.

According to Killgore, Crawford engaged in activities or conduct which endangered the children's physical or emotional well-being. Her opinion was based on all Department reports, Killgore's own observations of Crawford's and Dickinson's individual behavior and their interactions with one another, what both parents told her, and Crawford's repeated arrests. Moreover, Killgore stated that Crawford admitted the children had witnessed domestic violence between him and Dickinson, that he had been high in front of the children, and that he and

Dickinson "huffed" together after the children were removed. In her opinion, witnessing domestic violence is emotionally damaging for children. Further, by placing the children with their mother, Crawford engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children.

Viewing the evidence in the light most favorable to the finding, a reasonable fact finder could have concluded that Crawford left the children with Dickinson who was mentally ill and a danger to the children, that Crawford abused drugs while the children were in his custody, that Crawford perpetrated numerous instances of domestic violence against Dickinson, that Crawford had repeated arrests, and that Crawford was violent toward others in the presence of the children. Therefore, we conclude that the evidence, viewed in the light most favorable to the finding, is sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that Crawford engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being.

Although there is conflicting testimony regarding Dickinson's stability and whether the children witnessed the domestic violence or Crawford's drug abuse, the trial court could have resolved this conflict in favor of its finding. The trial court could have disbelieved Crawford's testimony that Dickinson was not a danger to the children, that the children never witnessed the domestic violence, and that the children were never present when Crawford was under the influence of drugs. Although there is some disputed evidence, we find that this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that Crawford engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being.

Page 399

Accordingly, Crawford's second issue is overruled.

## BEST INTEREST OF THE CHILD

We now turn to the trial court's finding that termination is in the best interest of the child.

### Applicable Law

In determining the best interest of the child, a number of factors have been considered including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams,* 544 S.W.2d 367, 371-72 (Tex.1976).

This list is not exhaustive, but simply indicates considerations which have been or could be pertinent. *Id.* However, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.,* 58 S.W.3d at 814. The *Holley* test focuses on the best interest of the child, not the parent's best interest. *Dupree v. Texas Dep't of Protective & Regulatory Servs.,* 907 S.W.2d 81, 86 (Tex.App.-Dallas 1995, no writ). While incarceration is a

factor in determining the best interest of a child, it is not dispositive. *In re C.T.E.,* 95 S.W.3d 462, 466 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). In determining the weight of this factor, the court should consider the expected length of an appellant's imprisonment and whether it can be inferred from an appellant's criminal conduct that he has endangered the safety of the child. *Id.*

### Analysis

In addition to the evidence previously described, there was testimony regarding the programs available to assist Crawford. Crawford recalled that the family service plan listed a group of requirements to be met. He understood that noncompliance would affect his ability to have a relationship with his children in the future. Although he told the Department that he would do anything to get his children back and that he loved his children, he did not attend counseling as often as ordered and did not attend parenting classes because he claimed the class was full. He attended Alcoholics Anonymous only about twenty times and admitted that he "didn't get near done what [he] was supposed to get done done."

Crawford was required to attend Alcoholics Anonymous as part of his family service plan. Killgore believed that he attended some meetings while in rehab before going to jail. Both parents attended one meeting with a therapist who recommended visitation for everyone's benefit. Further, he did get a drug assessment while in jail but did not follow the recommendation. Crawford's drug test while in jail was clean. Moreover, Crawford and Dickinson informed Killgore that they did not have any problems and they did not want to seek counseling, attend parenting classes, or go to drug treatment. From the date of her first meeting with Crawford until the time of trial, Killgore described Crawford's compliance with his service plan as "generally noncompliant."

There was additional testimony regarding the parental abilities of Crawford. Killgore admitted that Crawford acted appropriately toward his children on the occasions she was present. He interacted

Page 400

better with C.L.C., got very emotional, smiled a lot, and asked the children questions about how their life was going. He seemed to miss the children and to love them. Further, she believes that C.L.C. loves Crawford. Dickinson stated that Crawford loves his children. Young admitted that Crawford acted appropriately at other visits she supervised, although she stated that there did not appear to be a bond between children and parents. Floyd admitted that the children did not appear dirty when he observed them.

There was also additional testimony regarding the acts or omissions of Crawford which indicate that the existing parent-child relationship was not a proper one, that the home was not stable, and that the children are in emotional and physical danger now and in the future. Dr. Paul Andrews ("Andrews"), a clinical psychologist, performed a psychological evaluation on Crawford in October of 2001. Based on the tests, interview, and other information, Crawford was diagnosed with adult antisocial behavior. Andrews opined that Crawford was probably depressed and had a personality disorder marked by histrionic narcissistic and antisocial personality disorders. He also recommended a substance abuse assessment. In Andrews's opinion, Crawford's diagnosis is incongruent with good parenting practices because of the self-centeredness and lack of regard for others commonly manifested with these personality disorders.

Killgore received a telephone call on February 5, 2002 from Dickinson who sounded very upset. She stated that Crawford had beaten her when she informed him that she might be pregnant. According to Dickinson, Crawford knocked her down, kicked her, sat on her stomach, and was drunk during the attack. Killgore recommended termination of Crawford's parental rights. Diesch stated that Crawford's parental rights should be terminated. Young believes that Crawford's parental rights should be terminated because she does not believe he is in a state to be an appropriate parent. Sussen believes it is in the best interest of the children that Crawford's rights be terminated.

Viewing the evidence in the light most favorable to the finding, a reasonable fact finder could have concluded that Crawford was under the influence of drugs while the children were in his custody, that the home was unstable, that Crawford's compliance with the family service plan was negligible, that Dickinson was mentally ill and a danger to the children, that Crawford perpetrated numerous instances of domestic violence against Dickinson, that Crawford was repeatedly arrested, and that Crawford was violent toward others in the presence of the children. Therefore, we conclude that the evidence, viewed in the light most favorable to the finding, is sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that terminating Crawford's parental rights is in the best interest of the children.

Although there is conflicting testimony regarding the relationship between Crawford and his children, Dickinson's stability, and whether the children witnessed the domestic violence or Crawford's drug abuse, the trial court could have resolved this conflict in favor of its finding. The court could have disbelieved Crawford and Dickinson when they testified that the children never witnessed the domestic violence, that Crawford was never under the influence of drugs in the presence of the children, and that Dickinson was a capable parent. Although there is some disputed evidence, we find that this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm

Page 401

belief or conviction that terminating Crawford's parental rights is in the best interest of the children. Accordingly, Crawford's third issue is overruled.

## CONCLUSION

Based upon our review of the record, we conclude that the trial court did not err in finding that Crawford knowingly placed or knowingly allowed his children to remain in conditions or surroundings which endangered their physical or emotional well-being, and engaged in conduct or knowingly placed his children with persons who engaged in conduct which endangered their physical or emotional well-being. Further, the trial court did not err by finding that terminating Crawford's parental rights is in the best interest of C.LC. and C.R.D. Therefore, the **judgment** of the trial court is **affirmed.**

---------

Notes:

[1] The record contains a catalog of incidents of alleged domestic violence that, for the most part, are denied by both Crawford and Dickinson. For the sake of brevity, we recite a reduced number of the allegations of domestic violence.

[2] The court also terminated Dickinson's parental rights. She does not appeal.

[3] Counsel for Dickinson requested the judge take judicial notice that an order was signed in June of 1998 dismissing the 1997 case involving Crawford, Dickinson, and C.L.C.

---------

58 S.W.3d 801 (Tex.App.-Fort Worth 2001)

IN THE INTEREST OF D.M., B.W., AND J.C.W.

No. 2-00-176-CV

Court of Appeals of Texas, Fort Worth

October 4, 2001

From the 323rd District Court of Tarrant County

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

Panel F: LIVINGSTON, DAUPHINOT, and GARDNER, JJ.

OPINION

GARDNER, JUSTICE

Appellant W.M. appeals the trial court's judgment terminating her parental rights to her children, D.M., B.W., and J.C.W. In three issues, she contends there is legally and factually insufficient evidence to support the judgment of termination. We conclude the evidence is both legally and factually sufficient to support the judgment rendered and affirm the trial court's judgment.

Page 806

Background Facts

Appellant is the mother of three children: D.M., who was born in 1988; B.W., who was born in 1994; and J.C.W., who was born in 1996. The Texas Department of Protective and Regulatory Services (TDPRS) first took possession of all three children in September 1997, when Appellant was arrested for hot checks and traffic tickets. The children were eventually returned to her in the summer and fall of 1998, with the TDPRS maintaining managing conservatorship of the children. On January 28, 1999, the TDPRS gave back managing conservatorship of the children to Appellant.

A few days later, Appellant was again arrested. Although the record is unclear, it appears Appellant was arrested for either having a fake ID or outstanding traffic tickets. The children were again removed by the TDPRS and placed in foster care. On February 3, 1999, the TDPRS filed its original petition seeking termination of Appellant's parental rights and was appointed as the children's temporary managing conservator.

After Appellant was released from jail, she contacted the TDPRS, and a service plan was implemented. The TDPRS began to seek a concurrent plan of family reunification and termination.

However, Appellant was again incarcerated in December 1999, and yet again in January 2000, for prostitution. The TDPRS decided to proceed with terminating Appellant's parental rights.

Termination proceedings began on March 1, 2000,1 with the jury deciding that Appellant's parental rights to all three children should be terminated. The trial court adopted the jury's findings and entered a judgment terminating Appellant's parental rights.2

Termination of Parental Rights

Parents' rights to "the companionship, care, custody and management" of their children are constitutional interests "far more precious than any property right." Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982). In a termination case, the State seeks not merely to limit those rights but to end them finally and irrevocably to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. See TEX. FAM. CODE ANN. § 161.206(b) (Vernon 1996); Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by "clear and convincing evidence." TEX. FAM. CODE ANN. § 161.206(a). This burden is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Id. § 101.007; Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 31 (Tex. 1994). This is an intermediate standard that falls between the preponderance burden of ordinary civil proceedings and the reasonable doubt burden of criminal proceedings. State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979).

Page 807

The clear and convincing standard of proof creates a higher burden to fulfill because of the severity and permanency of the termination of the parent-child relationship. In re J.N.R., 982 S.W.2d 137, 141 (Tex. App. Houston [1st Dist.] 1998, no pet.). Termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent. Holick, 685 S.W.2d at 20-21; In re A.V., 849 S.W.2d 393, 400 (Tex. App. Fort Worth 1993, no writ).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(1), (2) (Vernon Supp. 2001); Richardson v. Green, 677 S.W.2d 497, 499 (Tex. 1984). Proof of one does not relieve the petitioner from establishing the other. Holley v. Adams, 544 S.W.2d 367, 370 (Tex. 1976).

Jury's Findings

In this case, the jury found: (1) Appellant knowingly placed or knowingly allowed D.M., B.W., and J.C.W. to remain in conditions or surroundings that endangered their emotional or physical well-being; (2) Appellant engaged in conduct or knowingly placed D.M., B.W., and J.C.W. with persons who engaged in conduct that endangered their emotional or physical well-being; and (3) termination of the parent-child relationship between Appellant and D.M., B.W., and J.C.W. would be in the children's best interests. Appellant contends the evidence is both legally and factually insufficient to support any of the statutory grounds for termination found by the jury.

Standard of Review

When presented with legal and factual sufficiency challenges, the reviewing court first reviews the legal sufficiency of the evidence. Glover v. Tex. Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex. 1981). In determining a "no-evidence" point, we consider all the evidence and inferences in the light most favorable to the party in whose favor the judgment has been rendered, and indulge every reasonable inference from the evidence in that party's favor. Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998) (op. on reh'g); Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997), cert. denied, 523 U.S. 1119 (1998); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). A no evidence point will only be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence, or (d) the evidence conclusively establishes the opposite of a vital fact. Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S. 1040 (1999) (citing Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex. L. Rev. 361, 362-63 (1960)). If there is more than a scintilla of evidence to support the judgment, the party's claim is sufficient as a matter of law. Cont'l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of a vital fact. Orozco v. Sander, 824 S.W.2d 555, 556 (Tex. 1992).

Page 808

An assertion that the evidence is "factually insufficient" to support a finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965). In determining a factual sufficiency point, we have previously concluded that the higher burden of proof in termination cases does not alter the appellate standard of review for factual sufficiency of the evidence. See In re D.T., 34 S.W.3d 625, 630 (Tex. App. Fort Worth 2000, pet. denied) (op. on reh'g); Faram v.

Gervitz-Faram, 895 S.W.2d 839, 843 (Tex. App. Fort Worth 1995, no writ) (both cases rejecting the "intermediate standard of appellate review" in cases involving the "clear and convincing" burden of proof). Rather, the higher burden of proof merely changes the weight of the evidence necessary to support a finding or verdict. In re D.T., 34 S.W.3d at 632. When reviewing a finding made by clear and convincing evidence, we determine whether the evidence is sufficient to make the existence of the fact highly probable, not whether the evidence supporting the finding is sufficient to make the existence of the fact more probable than not, as in ordinary civil cases. That is, we must consider whether the evidence is sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. Id. We will sustain a factual insufficiency point only if the evidence is so weak or the evidence to the contrary is so overwhelming that the fact finder could not have reasonably concluded there was a high probability that the endangering conduct or conditions occurred or that termination was in the children's best interest. Id. We are required to consider all of the evidence in the case in making this determination. Id. at 630.

The Evidence

Appellant admitted she had a drug problem and had been using cocaine on and off since before D.M.'s birth. She began using crack cocaine in 1986, and used it while she was pregnant with B.W., but quit using it when she found out she was pregnant with J.C.W. She admitted using crack cocaine as recently as February 1999, which is when she claimed she stopped using the drug. Appellant also had a history of arrests for prostitution, bad checks, failure to ID, and multiple traffic tickets.

From 1993 to approximately May 1997, Appellant lived with J.C. Williams, B.W.'s biological father. He was a drug dealer and drug user who supplied her with drugs and was often abusive towards her. Appellant left Williams and moved to a shelter, where she lived from approximately September 1997 to May 1998. Appellant also worked at the shelter, doing odd jobs.

The TDPRS first received a referral on Appellant in September 1997, when she was arrested at the shelter for hot checks and traffic tickets. Appellant gave the TDPRS the name of her sister and a friend who might be willing to look after the children while she was in jail. She also informed them that B.W. had been recently treated for asthma and had medication he needed to take. The children had no clothes or belongings with them, and she provided no medication for B.W. The children were hungry, dirty, and lice infested. When the sister and friend were unable to take the children, they were taken into custody and placed in foster care. However, at that time, the children were of average height and weight and were not malnourished or dehydrated. They did not have any developmental delays, were on track with their education, and D.M. was receiving As and Bs in school. The caseworker testified she

Page 809

would not have taken the children into custody had Appellant not been arrested.

Appellant spent approximately one month in jail. Upon her release, she contacted the TDPRS. A service plan was developed, requiring Appellant to attend parenting classes, LAMs classes,3 drug prevention classes, and submit to drug testing. Appellant showed interest in starting her classes and got a job. She attended LAMs classes and parenting classes that were provided to her at the shelter. The TDPRS explained that a counselor from one of the children's schools offered to provide Appellant with classes at the shelter because of Appellant's transportation problems. Appellant also attended some drug prevention classes and tested drug-free during this time. Additionally, she made most, if not all, of her weekly visits with the children. These visits went well. Appellant enjoyed the visits and brought the children toys and clothes. When she was informed D.M. had been acting out and having problems in her foster home, Appellant talked to D.M. and asked her to do better and stay out of trouble. As of March 1998, Appellant was making substantial progress on her service plan.

B.W. and J.C.W. were returned to Appellant in July 1998, but the TDPRS maintained managing conservatorship of the children. At that time, she was living in Azle with a friend, Michael Buttrill. It was known that Buttrill had a criminal history, several DWIs, and raised fighting chickens. After the children were returned, the TDPRS received two additional referrals. Upon investigation, they found no bruises on the children, no signs of physical abuse, and no evidence of neglectful supervision. In fact, the children appeared to be adjusting and doing well. However, there was evidence of constant drinking and fighting, with the police being called on one occasion. The TDPRS informed Appellant she needed to get the children out of that environment.

In September 1998, with the TDPRS' assistance, Appellant obtained an apartment through HUD. D.M. was returned to Appellant in October 1998, with the TDPRS still maintaining managing conservatorship of the children. The TDPRS continued to monitor Appellant and the children because referrals were constantly coming in. They learned Appellant was leaving the children on weekends with a friend named Dawn Bolin and people from the shelter while Appellant went to Azle to visit with friends. The TDPRS explained to Appellant this was not what the department wanted for the children, or what she should want for her children. Appellant signed a child safety evaluation and plan in which she agreed she would no longer leave the children in Bolin's care.4

On January 28, 1999, the TDPRS agreed to give Appellant managing conservatorship of her children again. Approximately two days later, Appellant was again arrested for either possessing a fake ID or for outstanding traffic tickets. The TDPRS was informed Appellant was in jail and the children were either unattended or were being cared for by people the children were not supposed to be with. The caseworker went to Appellant's apartment and found the children in Bolin's care. The apartment

smelled of "urine and feces and dirt, sweat," was cluttered, the carpet was filthy, J.C.W.'s diaper looked as though it

hadn't been changed in quite a while and he had a rash on both sides of his leg. The children were immediately removed and placed back in foster care. The TDPRS then filed its petition to terminate Appellant's parental rights.

About this same time, the TDPRS also received a referral from D.M.'s school regarding concerns about D.M. not attending school, her exhaustion at school from going to chicken fights with her mother on the weekends, scratches on her body, and head lice. A caseworker discussed these concerns with Appellant.

When Appellant was released from jail in March 1999, she again contacted the TDPRS. Service plans were again implemented. These plans required Appellant to maintain housing and employment, attend parenting classes, submit to random drug urinalysis tests, and have a psychological evaluation.

Appellant maintained her HUD apartment and made most of her visits with her children. However, she lost the apartment in September 1999 because she did not have her children. The caseworker who had the case until March 1999 testified she made monthly visits to the apartment, had major concerns, and would instruct Appellant she had to clean it up. The caseworker who took over in April 1999 testified she visited the apartment on two occasions. On the first visit it was considered clean. The second visit occurred when the children were removed in February 1999 and revealed unsanitary conditions. After losing the apartment, Appellant again lived either with friends, Williams, or in shelters.

Appellant also obtained employment at two different jobs from April to May 1999 and from July to November 1999. Appellant claimed she lost her job in November because of her counseling sessions and classes. Appellant also testified she worked at other temporary jobs.

Between April and November 1999, Appellant submitted to the psychological evaluation and one urinalysis, which was inconclusive. She agreed to take additional tests, but these tests were never requested or scheduled by the TDPRS. However, she later failed to successfully complete a court ordered urinalysis or to show up for a retest.

Appellant did not attend any of the parenting classes that were set up for her after her February 1999 release from jail. She claimed to have transportation problems and scheduling conflicts with her job during this time. She did attend the TDPRS' permanency planning team (PPT) meetings except the last one.5

It was in October 1999 that the TDPRS finally determined Appellant had a severe drug abuse problem. It amended her service plan to require Appellant to attend individual counseling and community addiction treatment service program classes ("CATS classes").

At the October PPT meeting, Appellant still expressed a desire and willingness to comply with the service plan and have her children returned to her. Appellant attended three out of approximately thirteen individual therapy sessions and three out of approximately thirty-two CATS classes. She reported she was having either transportation problems, scheduling conflicts with her job, or the sessions were scheduled too early in the morning. Appellant was also incarcerated during the time she was to be attending some of these sessions and classes, having been arrested for prostitution in December 1999 and again in

Page 811

January 2000. The record does not disclose how long Appellant stayed in jail for the December offense. However, she spent thirty days in jail for the January offense and was released on February 28, 2000.

The TDPRS decided to terminate Appellant's parental rights at the January or February 2000 PPT meeting based upon her failure to comply with her service plans and the children's need for permanency. A TDPRS caseworker testified that, between October 1999 and the last PPT, Appellant's involvement had "waned." "She was unable to come to visits as much. She did not participate in services and was not doing the types of things that we had hoped that she would do. And that is why at that -- at the last PPT we decided to go this route and made this recommendation."

At trial, the counselor who had worked with Appellant in the therapy sessions testified about a residential treatment program she thought would benefit Appellant and her drug abuse problem. This structured program places participants and their children in on-site apartment type settings. Participants have very limited freedom, attend parenting classes throughout the day, obtain vocational training, and eventually graduate into outside group classes. Day care is provided for the children. Upon completion, participants are assisted in getting housing and continue their involvement with the program. The entire program lasts approximately three years. The counselor stated Appellant was the exact type of client this program was geared towards and that the program might improve Appellant's ability to work in an outpatient setting.

Appellant testified that she felt she could benefit from such a program because of the stability it offered. The TDPRS supervising caseworker also testified that, if Appellant were able to participate in a residential treatment program such as this, it was possible her children could be returned to her sometime in the future, and that their relationship could continue to be nurtured and helped along with the TDPRS' assistance.

Legal and Factual Sufficiency of the Evidence

Endangerment Through Course of Conduct

We first address Appellant's complaints that the evidence is both legally and factually insufficient to support the jury's finding that she engaged in conduct or knowingly placed D.M., B.W., and J.C.W. with persons who engaged in conduct that endangered their physical or emotional well-being. See Tex. Fam. Code Ann. § 161.001(1)(E).

Subsection E requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. Id.; In re B.S.T., 977 S.W.2d 481, 484 (Tex. App. Houston [1st Dist.] 1998, no pet.). The parent's endangering acts need not have been directed at the child, or have caused an actual injury or threat of injury to the child; instead, this element may be satisfied by showing the parent in question engaged in a course of conduct that endangered the child's physical or emotional well-being. In re R.D., 955 S.W.2d 364, 368 (Tex. App. San Antonio 1997, pet. denied).

"Endanger" under subsection E means to expose to loss or injury, to jeopardize. Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). The term means more than a threat of "metaphysical injury," but it is not necessary that the conduct be directed at the child or that the child actually suffer injury. Id. Nevertheless, there must be evidence

Page 812

of endangerment to the child's physical or emotional well-being as the direct result of the parent's conduct. In re R.D., 955 S.W.2d at 368; Dupree v. Tex. Dep't of Protective & Regulatory Servs., 907 S.W.2d 81, 83-84 (Tex. App. Dallas 1995, no writ).

It is inconsequential that the parental conduct considered in a termination proceeding occurred before the child's birth. Rather, courts look to what the parent did both before and after the child's birth to determine whether termination is necessary. Avery v. State, 963 S.W.2d 550, 553 (Tex. App. Houston [1st Dist.] 1997, no writ).

Additionally, termination under subsection E must be based on more than a single act or omission; a voluntary, deliberate, and conscious "course of conduct" by the parent is required. In re D.T., 34 S.W.3d at 634; In re K.M.M., 993 S.W.2d 225, 228 (Tex. App. Eastland 1999, no pet.); In re J.N.R., 982 S.W.2d 137, 142 (Tex. App. Houston [1st Dist.] 1998, no pet.). Imprisonment, standing alone, does not constitute "engaging in conduct which endangers the emotional or physical well-being of the child." However, it is a fact properly considered on the issue of endangerment. Boyd, 727 S.W.2d at 533-34; In re D.T., 34 S.W.3d 635-36; In re B.S.T., 977 S.W.2d at 485. The State need not show incarceration was a result of a course of conduct endangering the child; it need only show incarceration was part of a course of conduct endangering the child. Thus, if the evidence, including imprisonment, proves a course of conduct that has the effect of endangering the child, the requirement of subsection E is met. Boyd, 727 S.W.2d at 533-34.

The TDPRS points to Appellant's housing instability and frequent incarcerations as evidence of conduct that endangered the children's emotional or physical well being. The TDPRS also points to Appellant's leaving the children in Bolin's care, a person whom the TDPRS and Appellant had agreed was an unsafe and inappropriate person to watch over the children, as evidence of endangering conduct. While there was conflicting evidence as to whether Appellant knowingly left her children in Bolin's care, the jury could conclude from the evidence that Appellant's instability, including her arrests and incarcerations, affected her ability to ensure that her children were properly taken care of and remained out of Bolin's care, as required by her service plan.

The TDPRS further contends that Appellant's failure to comply with her service plans in several other respects constitutes evidence of conduct that endangered the children's emotional and physical well being. The primary evidence it relies upon is the fact that Appellant's "participation waned" between the October 1999 service plan and the January or February 2000 decision to terminate. It is undisputed Appellant attended only a few of the required counseling sessions and CATS classes and that she did not attend any parenting classes. Following her third and last counseling session on November 30, the evidence shows Appellant was arrested for prostitution and incarcerated.

Prior to this time, the evidence shows Appellant promptly contacted the TDPRS after she was released from jail on both occasions, that she participated in her service plans, and that she made such progress in 1998 that her children were returned to her. The record also shows that despite Appellant's poverty, transportation problems, and drug problem, she did participate, to some degree, in her service plans between the time the children were removed in February 1999 and the time the TDPRS made its decision to terminate. She was employed during some of this

time; she maintained the apartment for a year, losing it only because she did not have her children; she made most of her weekly visits with the children; she submitted to one urinalysis and a psychological evaluation; and she began her counseling sessions and CATS classes. These are difficult milestones considering Appellant's situation.

However, by Appellant's own admission, she has a drug problem. She has used cocaine and crack cocaine on and off for many years, including during her pregnancies with B.W. and J.C.W., and she admitted to using crack cocaine as recently as February 1999. After February 1999, Appellant took one urinalysis, which was inconclusive. She agreed to take additional tests. However, none were requested or scheduled because the State was not providing funding and Appellant was having to pay for her own tests and did not have the money. In January 2000, Appellant submitted to a court-ordered urinalysis, but she failed to successfully complete the test, and she failed to show up for the retest. Although there is no direct evidence of Appellant's continued drug use between the time her children were removed in February 1999 and termination, Appellant's counselor testified Appellant's behavior of missing appointments and minimizing her drug use was indicative that Appellant was still using drugs. Additionally, Appellant's failure to complete the court-ordered urinalysis is some evidence from which the jury could reasonably infer she was avoiding testing because she was still using drugs.

There is also evidence from which the jury could reasonably infer that Appellant's addiction had an adverse effect on the lives of her and her children and endangered their emotional and physical well-being. While Appellant failed to pay her traffic fines, which resulted in her arrest and incarceration on at least two occasions, Appellant obviously found a means to obtain money to purchase drugs. She resorted to prostitution, which resulted in her arrest and incarceration on at least two other occasions. At the time of her arrests for prostitution, Appellant knew she was in jeopardy of losing her children. There is also evidence that these were not isolated incidents, but a continuation of past conduct occurring at a time when Appellant admitted she used drugs. And, as we have already noted, Appellant's frequent incarcerations affected her ability to properly care for her children and comply with her service plans.

We conclude that, viewing the evidence most favorably to the jury's verdict, there is legally sufficient evidence of a voluntary, deliberate, and conscious course of conduct by Appellant from which the jury could reasonably conclude there was a high probability that her conduct endangered the children's emotional or physical well-being. Viewing all the evidence in the record in a neutral light, both that favoring termination and that favoring maintaining Appellant's parental rights, we conclude there is also factually sufficient evidence that Appellant engaged in conduct that endangered the children's physical and emotional well-being. Accordingly, we overrule Appellant's second issue.

Because we have concluded there is both legally and factually sufficient evidence to support the jury's findings under subsection E, we need not address Appellant's first issue regarding the sufficiency of the evidence under subsection D; only one finding alleged under section 161.001(1) is necessary to a judgment of termination. In re S.F., 32 S.W.3d 318, 320 (Tex. App. San Antonio 2000, no pet.); see also Tex. R. App. P. 47.1. However, in order to uphold the judgment of termination, we must also examine the

Page 814

sufficiency of the evidence to support the jury's finding that termination is in the children's best interest. See In re J.O.C., 47 S.W.3d 108, 114 (Tex. App. Waco 2001, no pet.).

Best Interest Of The Children

In order to uphold the jury's termination finding, there must also be evidence that termination is in the children's best interest. There is a strong presumption that the best interest of a child is served by keeping custody in the natural parent. In re K.C.M., 4 S.W.3d 392, 393-95 (Tex. App. Houston [1st Dist.] 1999, pet. denied); Ziegler v. Tarrant County Child Welfare Unit, 680 S.W.2d 674, 676 (Tex. App. Fort Worth 1984, writ ref'd n.r.e.). The fact finder may consider a number of factors in determining the best interest of the child, including: the desires of the child, the present and future physical and emotional needs of the child, the present and future emotional and physical danger to the child, the parental abilities of the person seeking custody, programs available to assist those persons in promoting the best interest of the child, plans for the child by those individuals or by the agency seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. Holley, 544 S.W.2d at 371-72.

"Best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. Id. Quite often, the best interest of the child is infused with the statutory offensive behavior. While there are instances where the offending behavior will demand termination of parental rights, there are also those cases where the best interest determination must have a firm basis in facts standing apart from the offending behavior. Although such behavior may reasonably suggest that a child would be better off with a new family, the best interest standard does not permit termination merely because a child might be better off living elsewhere. Termination should not be used to merely reallocate children to better and more prosperous parents. See In re C.H., 25 S.W.3d 38, 52-53 (Tex. App. El Paso 2000, pet. granted).

The TDPRS points primarily to Appellant's history of drug use and instability as evidence supporting the jury's best interest findings. While Appellant's history, admissions, and conduct relating to drug abuse, and her inability to maintain a lifestyle free from arrests and incarcerations support the jury's endangerment finding, this evidence is also relevant to a best interest determination. Additionally, we review the evidence under each of the Holley factors.

Desires of the Children

At the time of trial in this case, D.M. was 12 years old, B.W. was 5, and J.C.W. was 3 years old. While the two younger children were not able to express their wishes, it is undisputed Appellant and D.M. had a strong bond and that D.M. wanted to be returned to her mother. The guardian ad litem testified that, regardless of whether Appellant's parental rights were terminated, she believed D.M. would "always have contact with [her mother]" and "have that relationship maintained", and that it was "idiotic for any of us to think that [D.M.'s] not going to have conversations with [her mom] or contact with [her]." She also believed D.M. would resist adoption because "she still thinks she deserves to be with her mom."

B.W. also had a close bond with his mother and asked to go home with her at the end of most visits. Additionally, B.W. had a strong bond with D.M. and wanted to be with her. After family visits, he

Page 815

exhibited negative behaviors "exemplify[ing] his separation anxiety."

There was evidence that D.M. and B.W. were not close to J.C.W. The evidence also showed that B.W. and J.C.W. were becoming closer, with J.C.W. wanting to be with his older brother. During visits, the family appeared to interact well together. The evidence shows Appellant made most of her weekly visits with her children, that the visits went well, and that both the children and Appellant enjoyed their visits together.

Parental Abilities

The children's guardian ad litem testified she believed Appellant did not really understand what a good parent needs to be in order to raise children that are going to be productive citizens one day. She

believed it was in the children's best interest to have Appellant's parental rights terminated because they "deserve stability and stable parents."

Contrary evidence showed all children were developmentally on track; they did not have any special or extensive needs to address; Appellant provided them with food, clothing, and attended to their medical needs; D.M. was very bright and did very well in school; and, when D.M. acted out and was having problems in foster care, Appellant talked to her and asked her to do better and stay out of trouble. Appellant also testified she talked to D.M. about school and helped her with her homework, she played and watched television with B.W., and she read to J.C.W. before bedtime.

The guardian ad litem testified she visited D.M.'s school, had a good visit with the principal, and left her business cards at the school for each of D.M.'s teachers with instructions for them to call her regarding D.M. "being abnormal . . . having any strange behaviors or outbursts in class, . . . [or] something that was unusual for a student to show that she might be having trouble." The TDPRS did not present evidence of any responses to the ad litem's instructions.

Appellant's counselor, although expressing some concerns about Appellant's ability to parent, testified she did not have enough time with Appellant to determine her actual ability to parent her children.

Current and Future Needs and Dangers to the Children

With regard to the children's present and future physical and emotional needs or endangerment, the TDPRS again points generally to the children's need for permanency and Appellant's inability to provide a stable and safe home and lifestyle for herself and the children. The TDPRS also argues that D.M. will need some counseling as a result of her being sexually molested while in foster care to support its conclusion that returning D.M. to Appellant would not be in D.M.'s best interest.

To Appellant's credit, it was she who first discovered information, during one of her weekly visits with the children, about D.M.'s encounter while in foster care, which led the TDPRS to discover that D.M. had been sexually molested by another foster child. There is no direct evidence Appellant would be unable to meet D.M.'s added emotional needs, although there is evidence showing Appellant did not always meet all of her children's needs. First, there is evidence Appellant did not have appropriate care for the children during her periods of incarceration. D.M. also testified the children did not get enough attention from their mother before they first went into foster care because of her mother's drug problem. However, D.M. further testified that Appellant did provide them with a place to live and food and made D.M. feel safe. Since they were returned to Appellant, however, D.M. stated

drugs were not a problem, Appellant was always at home with them, and no "bad things" happened.

TDPRS caseworkers also testified that no special services were set up for any of the children. Under the TDPRS' "level-of-care system," which is based on a 1 to 6 scale with 6 being the most needy, the children were designated a level 1, meaning they had no extensive needs.

Acts/Omissions Indicating Parent-Child Relationship is not Proper

As for acts indicating the parent-child relationship between Appellant and her children is not proper, there is evidence Appellant allowed D.M. to take on a parenting role. One caseworker testified she did not believe Appellant understood that this type of relationship was inappropriate. Another caseworker testified that she spoke to Appellant about her concerns that D.M. took on a supervisory role of her younger brothers. Sometimes she saw improvement and sometimes not.

Plans for the Children

Regarding future plans for the children, the TDPRS stated its goal was adoption, focusing on the children's need for stability and permanency. The TDPRS generally believed the children were adoptable and could be adopted together. The TDPRS admitted that the children are not currently in adoptive placement, but are living apart in two different foster homes. There is no evidence of any adoption prospects for these three children, separately or together.

The evidence also showed the children are not of the same race, D.M. and B.W. being racially mixed, which the TDPRS admitted would impact their potential for placement to some degree. The TDPRS also admitted the age of a child impacts adoption; the older the child, the fewer opportunities for adoption. D.M. was 12 years old at the time of trial, B.W. was 5, and J.C.W. almost 3. There was also evidence D.M. was expelled from school on five occasions while in foster care, that she was not ready for adoption, that she would resist adoption, and that she would need some type of therapeutic intervention to better prepare her for adoption.

Appellant admitted she had no job and no place to live at the time of trial, and she was not ready for the children to be returned to her. She had applied for one or two jobs at the time of trial. She

also knew the children were okay with their foster families. Appellant admitted stability was a problem and that she had difficulty managing because of her living and transportation problems. However, she loved her children and did not want her parental rights terminated.

Available Programs

Appellant's counselor also did not recommend returning the children to Appellant, but would like to see Appellant do further work on a service plan and participate in some residential treatment, which might improve her ability to work in an outpatient setting. She had worked with TDPRS clients for approximately eight years, and testified that some clients were asked to participate in a residential treatment program with intensive outpatient followup. She testified about a specific residential drug treatment program that might benefit Appellant and through which she might be able to have her children returned to her, providing both stability and safety for the children. When asked about the residential treatment facility, Appellant testified she believed, from what she had heard, it would definitely provide her with more stability, which is something that had been difficult for her. Appellant's counselor also testified that Appellant willingly participated in the three counseling

Page 817

sessions she attended, although she did not show up for the fourth appointment.

A TDPRS caseworker testified Appellant had been given several opportunities since 1997 to improve her lifestyle and, more often than not, would start engaging in the services provided and then stop, with the end result being Appellant never fulfilled any of the services she was asked to fulfill. Another caseworker testified that based on Appellant's previous experiences with the TDPRS, she would not expect Appellant to be successful even if given continued services.

We hold that the foregoing evidence, coupled with Appellant's history of drug abuse, her admissions and conduct relating to recent drug use, and her inability to maintain a lifestyle free from arrests and incarcerations, is some evidence that termination would be in the children's best interest. While this evidence overlaps the proof required to establish endangerment by her course of conduct, it also provides legally sufficient evidence to support the finding that termination is in the children's best interest.

In considering the factual sufficiency of the evidence to support the jury's findings, this court must set aside the findings and grant a new trial if an answer of the jury to a material issue is so contrary to the overwhelming weight of clear and convincing evidence as to be clearly wrong or manifestly

unjust. However, we may not substitute our opinion for that of the jury merely because we might have reached a different fact conclusion. See Thompson v. Wooten, 650 S.W.2d 499, 501 (Tex. App. Houston [14th Dist.] 1983, writ ref'd n.r.e.). The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. Eris v. Phares, 39 S.W.3d 708, 713 (Tex. App. Houston [1st Dist.] 2001, pet. denied). While the evidence presents a close case, after reviewing all of the evidence presented and mindful of the fact that we may not reweigh that evidence or reassess the credibility of the witnesses, we cannot conclude that, under all of the evidence in the record in this case, the jury's finding that termination of Appellant's parental rights is in the children's best interest is not manifestly wrong and unjust. We hold that the totality of the evidence in light of the Holley factors and other relevant factors is factually sufficient to establish by clear and convincing evidence that termination is in the children's best interest. We overrule Appellant's third issue.


Conclusion


Having determined the evidence is both legally and factually sufficient to support the jury's findings under sections 161.001(1)(E) and 161.001(2), we affirm the trial court's judgment.


Dauphinot, J. filed a concurring opinion.


--------------


NOTES:


1. Because the suit was set for dismissal on February 7, 2000, the trial court extended the final dismissal date to August 5, 2000.


2. D.M.'s biological father is deceased. B.W.'s and J.C.W.'s biological fathers had not established any right to or interest in the children and did not appear at the termination hearing. The trial court also terminated their parental rights to B.W. and J.C.W.


3. The TDPRS described a LAMs class as one where parents meet to learn to maintain their families and receive instruction indirectly related to parenting.

4. Bolin apparently suffered from major mental health problems, and her own children were in TDPRS custody.

5. It also appears Appellant attended all but one court proceeding, although it is not clear whether this information was presented to the jury.

---------------

Dauphinot, Justice, concurring.

Because the law requires that we affirm the jury's verdict if the evidence to support it is legally sufficient and sufficient to make the existence of the facts found by the jury highly probable,1 I have no alternative but to concur in the majority's holding.

As the majority points out, a parent's right to the companionship of his or her children is far more precious than any property right. That companionship is as precious, in my opinion, as the right to liberty or to life itself. Equally important, I believe, is the right and the necessity of brothers and sisters to have each other's

Page 818

companionship and support. Yet, unlike non-criminal deprivation of liberty provisions, such as involuntary mental illness commitment proceedings, there is no requirement that termination of the parent-child relationship be the least draconian alternative that adequately protects the child's welfare or that the bonds between siblings be preserved.2

The record before us reflects poor parenting and drug addiction. However, the record also reflects:

1. A close bond between Appellant and D.M., who is now nearly fourteen years old.

2. A close bond among the children, who were separated when TDPRS assumed custody.

3. No evidence of any adoption prospects for the children after termination, either separately or together.

4. Separation anxiety suffered by B.W., who is now almost eight years old, when he was not allowed to go home with his mother at the end of family visits.

5. D.M.'s sexual abuse, which occurred while she was in foster care.

6. A loving bond between Appellant and her children.

7. The availability of a three-year residential treatment program that preserves the family unit and promotes the development of parenting skills.

Additionally, the record reflects that D.M. will likely not be adopted and that B.W.'s racially mixed parentage will adversely impact his potential for placement. If not adopted, the children must remain in foster care. This is true although TDPRS's stated goal for the children focused on their need for stability and permanency.

This court is limited to determining whether the evidence supports the jury's findings under the law as it now stands. Only the legislature has the authority to enact laws that would require the petitioner to prove that termination is not only in the best interest of the children but also that termination is the least draconian alternative available under the specific circumstances presented.

Because the law permits me no alternative, I concur in the majority's opinion.

---------------

NOTES:

1. See In re D.T., 34 S.W.3d 625, 630-31 (Tex. App. Fort Worth 2000, pet. denied).

2. See Tex. Health & Safety Code Ann. § 574.036(d) (Vernon Supp. 2001) (requiring that court-ordered mental health services be provided "in the least restrictive appropriate setting available"); Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2001).

---------------

In the Interest of D.M, 58 S.W.3d 801 (Tex.App.-Fort Worth, 2001)

# In re D.T., 34 S.W.3d 625 (Tex.App. —Fort Worth 2000)

**34 S.W.3d 625 (Tex.App. —Fort Worth 2000)**
**In the Interest of D.T., A Child.**
**No. 2-99-101-CV.**
**Court of Appeals of Texas, Second District, Fort Worth**
**November 16, 2000**

Rehearing Overruled Jan. 25, 2001.

---

[Copyrighted Material Omitted]

---

Mike Berger, Fort Worth, for appellant.

Tim Curry, Crim. Dist. Atty., Charles M. Mallin, Chief Appellate Division, Helena F. Faulkner, Asst. Dist. Atty., Fort Worth, for appellee.

DAY and GARDNER, JJ.; JOHN HILL, J. (Retired, Sitting by Assignment).

## OPINION ON REHEARING

ANNE GARDNER, Justice.

The State, on behalf of Texas Department of Protective and Regulatory Services (TDPRS), has filed a combined motion for rehearing and motion for rehearing en banc asserting complaints regarding our original decision. We withdraw our opinion and judgment issued June 8, 2000, and substitute the following

---

in their place. We overrule the motion for rehearing.

## INTRODUCTION

Appellant L.J.T., a twenty-eight year old mother, [1] appeals from the trial court's judgment terminating her parental rights to her son, D.T. She raises two points, contending there is legally or factually insufficient evidence to support the judgment of termination. We reverse and render in part and reverse and remand in part.

## BACKGROUND

Appellant became pregnant with D.T. in 1996, while living in Montana with D.T.'s father, D.B. [2] She left Montana on November 12, 1996, because D.B. had struck her with a bicycle rack the night before and because she wanted to avoid serving a jail term for a bad check charge. She moved to Oklahoma and had no further contact with D.B.

Appellant lived in Oklahoma from November 1996 until September 1997. D.T. was born in Oklahoma City on August 12, 1997. Subsequently, Appellant moved to Texas, got a job, and arranged for a babysitter to care for D.T. On February 10, 1998, Appellant was arrested by the Hurst Police Department on warrants for bad checks written in Texas and Montana. After she was arrested, she made arrangements for the babysitter to continue caring for D.T. for several more days. D.T. was then six months old.

Because she had no family locally, Appellant requested that TDPRS contact the child's paternal grandparents for possible placement. [3] D.T. was placed in emergency foster care on February 12, 1998.

Jennifer Cook of TDPRS was assigned the case on February 12, 1998. She went to the Hurst jail and met with Appellant for approximately thirty to forty-five minutes. Cook notified Appellant of the emergency placement of D.T. and told her about proceedings being initiated by TDPRS to terminate the parent-child relationship between Appellant and D.T.

Cook saw D.T. on the date she was assigned, and the child appeared to be healthy and well-nourished. At that time, she had no reason to believe that D.T. was abused or neglected. In Cook's words, D.T. "was clean, he looked very healthy. He was real healthy, happy, smiling." Cook felt the reason an emergency removal was necessary was because Appellant could not make bond and there were no available relatives with whom to place D.T. Had Appellant been able to make bond, Cook said Appellant would have been in a position to make arrangements on her own to take care of her son.

On March 5, 1998, Cook called Appellant and spoke with her about relinquishing her parental rights. Appellant told Cook that she thought she would be in jail for over twelve months. Cook explained that in every case in which she "feels" a jail term may exceed twelve months, she is instructed to look at relinquishment from "day one." Nevertheless, Cook testified that there was a two-track approach to the case, in which the caseworkers were pursuing both reunification and termination. The case was transferred sometime in March 1998 to Noelle Preston, a caseworker at TDPRS, for the making of a service plan.

On March 12, 1998, Preston developed a family service plan with a long-range goal of family reunification and mailed it to Appellant. The service plan required Appellant

---

to attend parenting classes and counseling, obtain psychological testing, and participate in parole stipulations when applicable.

On March 20, 1998, Appellant wrote Preston and advised her that she had tried to telephone Preston; she asked how D.T. was doing. On six more occasions between June and December 1998, Appellant wrote Preston, asking how D.T. was doing, asking for pictures of him, and requesting visits with D.T. while she was incarcerated. In an October 6 letter, she advised Preston that she did not want D.T. placed for adoption, that she wanted her son, and that she wanted his paternal grandparents to take care of him while she was incarcerated. Appellant advised Preston that she had completed parenting classes and was currently in counseling. It is undisputed that visits between Appellant and her son were denied, based solely on TDPRS "policy": Appellant had been transferred out of the region where her son had been placed and such visits are deemed not to be in the child's best interest.

On June 3, 1998, Preston sent Appellant a letter stating in relevant part:

I have not heard from you for quite some time now. I need for you to call me ... or send me a letter by June 9, 1998, so we can discuss your service plan. I am reviewing your last plan, dated 3/12/98, since there will be a review court hearing scheduled in July and your plan must be updated for the hearing. You will receive notice of the hearing in a few weeks.
If I do not hear from you by June 9th I will complete your service plan without your participation and mail you a copy. However, your participation is crucial, therefore, we really need to talk.
I am changing the permanency goal from "family reunification" to "adoption." We can talk more about that when you call or write.

Preston confirmed that TDPRS would not have taken the child but for the fact that Appellant was incarcerated. Preston also admitted that Appellant did everything she could while in jail to comply with the service plan. Appellant was scheduled to be released in August 1999, but Preston testified that she believed Appellant's parental rights should be terminated because she had engaged in criminal conduct that resulted in her separation from D.T. by her imprisonment, thereby endangering D.T.'s well-being.

The termination hearing was held on January 21, 1999. Judgment was rendered terminating Appellant's parental rights, as well as those of D.B. and Appellant's former husband as putative father. The trial court signed a corrected decree on April 23, 1999, and filed findings of fact and conclusions of law.

## TERMINATION OF PARENTAL RIGHTS

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX.FAM.CODE ANN. § 161.001(1), (2) (Vernon Supp.2000); *Richardson v. Green,* 677 S.W.2d 497, 499 (Tex.1984). Proof of one does not relieve the petitioner from establishing the other. *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex.1976). It must be emphasized that the child's best interest is not the sole goal of involuntary termination proceedings. The supreme court has made clear that termination "may not be based solely upon what the trial court determines to be the best interest of the child." Id. (emphasis added).

Parents' rights to "the companionship, care, custody and management" of their children are protected to the degree that they are of "federal constitutional dimensions." *Santosky v. Kramer,* 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982) (holding that the parent-child relationship is "far more precious than any property right"). In a termination case,

---

**Page 630**

the State seeks not merely to limit those rights but to end them finally and irrevocably--to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX.FAM.CODE ANN. § 161.206(b) (Vernon 1996); *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985).

It is because termination of parental rights is such a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by a heightened burden of proof of "clear and convincing evidence." *In re G.M.,* 596 S.W.2d 846, 847 (Tex.1980); See also TEX.FAM.CODE ANN. § 161.206(a). This burden is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX.FAM.CODE ANN. § 101.007 (Vernon 1996); *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 31 (Tex.1994). This is an intermediate standard that falls between the preponderance burden of ordinary civil proceedings and the reasonable doubt burden of criminal proceedings. *State v. Addington,* 588 S.W.2d 569, 570 (Tex.1979).

The clear and convincing standard of proof creates a higher burden to fulfill because of the severity and permanency of the termination of the parent and child relationship. *In re J.N.R.,* 982 S.W.2d 137, 141 (Tex.App.--Houston [1st Dist.] 1998, no pet.). This court is duty bound to strictly scrutinize termination proceedings and must strictly construe involuntary termination statutes in favor of the parent. Holick, 685 S.W.2d at 20-21; *In re A.V.,* 849 S.W.2d 393, 400 (Tex.App.--Fort Worth 1993, no writ).

## STANDARD OF REVIEW

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex.1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994).

When presented with legal and factual sufficiency challenges, the reviewing court first reviews the legal sufficiency of the evidence. *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981) (per curiam). In determining a "no-evidence" point, we are to consider all of the evidence in the light most favorable to the party in whose favor the judgment has been rendered, and to indulge every reasonable inference from the evidence in that party's favor. Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex.1998) (op. on reh'g); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997), cert. denied, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

An assertion that the evidence is "factually insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406 (Tex.), cert. denied, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

We have previously held that the higher burden of proof in termination cases does not alter the appellate standard of review for factual sufficiency of the evidence. *In re W.S.,* 899 S.W.2d 772, 776 (Tex.App.--Fort Worth, 1995, no writ); *Faram v. Gervitz-Faram,* 895 S.W.2d 839, 843 (Tex.App.--Fort Worth, 1995, no writ). A number of our sister courts have likewise continued to apply the traditional

standard of review for factual sufficiency where the burden in the trial court is clear and convincing evidence. [4] We note that other courts have espoused what they describe as an intermediate standard of appellate review of factual sufficiency of the evidence in such cases. [5]

In In re L.R.M., this court recognized that, just as the clear and convincing standard of proof in the trial court is an "intermediate" standard of proof falling between the preponderance of evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings, the standard of review for clear and convincing evidence is an "intermediate" standard necessary to protect the fundamental constitutional rights of the parent in termination proceedings. 763 S.W.2d 64, 67 (Tex.App.--Fort Worth 1989, no writ). However, we further observed that, in applying the intermediate standard of review, "[o]ther principles of law relating to sufficiency of evidence are still applicable even when the intermediate standard is used." Id.

Those other principles include the well-settled rule that, in reviewing the factual sufficiency of evidence, we must consider and weigh all of the evidence just as the trial court did, including that favorable to the appellant as well as that favorable to the verdict or findings of the court. Ortiz, 917 S.W.2d at 772 (holding court of appeals must "weigh all of the evidence in the record"); *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986) (noting that court of appeals must examine entire record and review all of the evidence); *In re King's Estate,* 150 Tex. at 664-65, 244 S.W.2d at 661 (pointing out that fact jurisdiction under article V, section 6 of the Texas Constitution requires exercise of our "peculiar" powers to consider and weigh all of the evidence).

The reviewing court does not "indulge inferences or confine its view to evidence favoring one side of the case. Rather, it looks at all of the evidence and then makes a predominately intuitive judgement." William Powers & Jack Ratliff, Another Look at "No Evidence" and "Insufficient Evidence" 69 TEX.L.REV. 515, 525 (1991). The courts of appeals "must, up to a point, follow the same mental processes as a jury does." St. John Garwood, The Question of Insufficient Evidence on Appeal, 30 TEX.L.REV. 803, 811 (1952).

We recognize that we are not a fact finder and that we cannot substitute our judgment for that of the jury merely because the evidence would support a different result. Maritime Overseas, 971 S.W.2d at 406. We can only "unfind" facts. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex.1986) (quoting Garwood, 30 TEX.L.REV. at 813-14). Further, we may set aside a verdict or finding only if the evidence is so weak or the verdict or findings are so contrary to the overwhelming weight of the evidence as to be manifestly unjust. Ortiz, 917 S.W.2d at 772; Pool, 715 S.W.2d at 634.

Applying these principles in reviewing factual sufficiency of the evidence

where a "clear and convincing" burden of proof is required, the standard of review actually does not change, regardless of the terminology used to describe it. [6] Rather, the higher burden of proof merely changes the weight of the evidence necessary to support a finding or verdict. Review of factual sufficiency of the evidence under a clear and convincing standard requires us to determine whether the evidence is sufficient to make the existence of the fact highly probable, not whether the evidence supporting the finding is sufficient to make the existence of the fact more probable than not, as in ordinary civil cases. That is, we must consider whether the evidence is sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. *In re B.R.,* 950 S.W.2d 113, 119 (Tex.App.--El Paso 1997, no writ); Faram, 895 S.W.2d at 843. Accordingly, to prevail on an assertion that the evidence supporting termination of parental rights is factually insufficient, the appellant must show that the evidence is so weak or the evidence to the contrary is so overwhelming that the trier of fact could not have reasonably concluded that there was a high probability that the conduct or endangerment of the child occurred or that termination was in the best interest of the child.

## TRIAL COURT'S FINDINGS

The trial court found, specifically, that Appellant had arrest warrants in five states based on her criminal conduct prior to the birth of D.T.; that Appellant knew her criminal conduct was wrong and could result in her incarceration and inability to parent her child; that Appellant again engaged in criminal conduct after D.T.'s birth and was incarcerated; and that Appellant's conduct and subsequent incarceration endangered the physical and emotional well-being of D.T.

The trial court made the following findings based on the statutory requirements of section 161.001: Appellant knowingly placed D.T. and allowed him to remain in conditions and surroundings that endangered his physical and emotional well-being; Appellant engaged in conduct and knowingly placed D.T. with persons who engaged in conduct that endangered his physical and emotional well-being; Appellant constructively abandoned D.T., who had been in the temporary managing conservatorship of TDPRS for not less than six months, and (a) TDPRS made reasonable efforts to return D.T. to Appellant, (b) Appellant did not regularly visit or maintain significant contact with D.T., and (c) Appellant has demonstrated an inability to provide D.T. with a safe environment; and termination of Appellant's parental rights is in D.T.'s best interest. [7]

## LEGAL SUFFICIENCY OF THE EVIDENCE

### I. Environment

We first address whether the evidence is legally sufficient to support the finding that Appellant knowingly placed and knowingly allowed D.T. to remain in conditions or surroundings that endangered his physical or emotional well-being. TEX.FAM.CODE ANN. § 161.001(1)(D). Under section 161.001(1)(D), the environment of the child must be examined to determine if that is a source of endangerment to the child. Id.; *In re B.S.T.,* 977 S.W.2d at 484. There is no evidence regarding D.T.'s home environment prior to Appellant's arrest. There is no indication that

the babysitter's residence was a dangerous environment.

In In re W.S., we held that involuntary termination under former section 15.02(a)(1)(D) of the Texas Family Code [8] may be established by conduct of the parent as well as by physical conditions in the home. 899 S.W.2d at 776. The State now urges that, under our holding in that case, the conduct and incarceration of Appellant somehow suffices to establish a basis for termination under section 161.001(D). W.S. involved a child continually subjected to sexual abuse by the stepfather in the home, with no effort by the mother to stop the abuse even though she was aware of its occurrence. On that evidence, we held that an endangering "environment" may be produced by conduct of the parent in the home. Id.

This case bears no likeness to W.S. When Appellant was arrested, she asked that TDPRS be contacted to ensure that D.T. was cared for while she was in jail. There was no indication at the time D.T. was placed in foster care that he had been abused or neglected; he appeared clean, happy, and healthy. [9] Cook admitted that, if Appellant had made bond, she would have been able to continue caring for her son. We determine that there is no evidence that Appellant knowingly placed or allowed the child to remain in conditions that endangered his physical or emotional well-being.

## II. Constructive Abandonment

We next address whether the evidence was legally sufficient to support the finding that Appellant constructively abandoned D.T. TEX.FAM.CODE ANN. § 161.001(1)(N). The elements of constructive abandonment are: (1) the child has been in the permanent or temporary managing conservatorship of TDPRS for not less than six months; (2) the department has made reasonable efforts to return the child to the parent; (3) the parent has not regularly visited or maintained significant contact with the child; and (4) the parent has demonstrated an inability to provide the child with a safe environment. Id. If there is no evidence of one or more of these elements, then the finding of constructive abandonment fails.

The first element is not disputed, and the second is inapplicable because Appellant was incarcerated. Therefore, we will focus on the third and fourth elements. There is no evidence to establish the third element of constructive abandonment. To the contrary, Appellant made numerous written requests asking for visitation while she was in jail. Appellant testified that Preston told her that she was going to visit her in Polk County, but when Appellant asked her to bring D.T., Preston stated that the judge would not allow it. Preston confirmed that visitations were denied based on the policy of TDPRS. The record does not support the trial court's finding that Appellant did not attempt to visit regularly or maintain significant contact with the child.

Turning to the last element, nothing in the record other than her incarceration indicates that Appellant has demonstrated an inability to provide D.T. with a safe environment. It has long been settled that imprisonment, standing alone, does not constitute "abandonment" of a child for purposes of termination of parental rights. *In re S.D.H.,* 591 S.W.2d 637, 638 (Tex.Civ.App.--Eastland 1979, no writ) (holding imprisonment does not constitute "abandonment," nor is it conduct "endangering" a child); H.W.J. v. State Dep't of Public Welfare, 543 S.W.2d 9, 11 (Tex.Civ.App.--Texarkana 1976, no writ)

---

**Page 634**

(same); *Hutson v. Haggard,* 475 S.W.2d 330, 333 (Tex.Civ.App.--Beaumont 1971, no writ) (holding imprisonment is not "abandonment"). Texas Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987) (holding imprisonment alone is not conduct "endangering a child").

Considering the evidence in light of the proper standard for "no-evidence" review, and mindful that incarceration alone is not sufficient to constitute abandonment of a child, we hold there is no evidence to support two of the required elements of constructive abandonment.

## III. Course of Conduct

We next address the legal sufficiency of the evidence to support the trial court's finding that Appellant engaged in conduct or knowingly placed D.T. with persons who engaged in conduct that endangered his physical or emotional well-being. TEX.FAM.CODE ANN. § 161.001(1)(E). Section 161.001(1)(E) requires us to look at the parent's conduct alone, including actions or omissions or failures to act. Id.; *In re B.S.T.,* 977 S.W.2d at 484.

"Endanger" under section 161.001(1)(E) means to expose to loss or injury, to jeopardize. Boyd, 727 S.W.2d at 533. The term means more than a threat of "metaphysical injury," but it is not necessary that the conduct be directed at the child or that the child actually suffer injury. Id. Nevertheless, there must be evidence of endangerment to the child's physical or emotional well-being as the direct result of the parent's conduct. *In re R.D.,* 955 S.W.2d 364, 366 (Tex.App.--San Antonio 1997, pet. denied); Dupree v. Texas Dep't of Protective & Regulatory Servs., 907 S.W.2d 81, 83-84 (Tex.App.--Dallas 1995, no writ).

Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious "course of conduct" by the parent is required. *In re K.M.M.,* 993 S.W.2d 225, 228 (Tex.App.--Eastland 1999, no pet.); *In re J.N.R.,* 982 S.W.2d at 142. There is evidence that Appellant had prior convictions and outstanding arrest warrants based on criminal conduct of writing bad checks before D.T.'s birth. Appellant had previously lived in various states outside of Texas. Appellant admitted that, while living in Utah several years before moving to Texas, she had received probation for two bad check cases, one felony and one misdemeanor. Appellant also acknowledged that she jumped bond when she fled from Montana in 1996 prior to D.T.'s birth, partly to avoid serving time in jail. Child protective services became involved, and the two children she had at that time were placed with her mother. [10] Appellant testified she had outstanding warrants from the state of Montana as the result of the revocation of her bond and as a result of the bad check charge pending there.

The evidence to support the trial court's specific finding that Appellant had arrest warrants in five different states consisted of testimony from caseworker Preston that Appellant had told her she had "holds" on her from two other states, Idaho and Oklahoma, in addition to the Montana charges and the convictions in Utah. Appellant testified at the hearing that she was given that information by "Polk County," but some of those "cases" were several years old and she had no information that those states were looking for her or had "holds" on her. She was to

be released in August 1999 from her current sentence unless one of those states took her on her release date. Caseworker Cook testified only that TDPRS had been "given information regarding her criminal history and [was] concern[ed] that [Appellant] had several warrants out in several different states and her jail term might go beyond the twelfth month." Preston testified Appellant's course of criminal conduct resulted in her imprisonment, thereby endangering D.T.'s physical and emotional well-being by causing Appellant to be separated from him. The argument of TDPRS, apparently accepted by the trial court, is that Appellant knew she was engaging in conduct that could result in her imprisonment and separation from D.T. and, accordingly, by actively writing bad checks, she engaged in a voluntary, deliberate, and conscious course of conduct that endangered D.T. We reject this argument, as it would effectively nullify the longstanding rule against terminating the parental relationship based solely on imprisonment. Boyd, 727 S.W.2d at 533.

In Boyd, the evidence showed that the father had been convicted of two burglaries, was imprisoned when the child was born, lived with the mother and child for six months, and was in prison again at the time of the hearing. Id. at 533. The Supreme Court of Texas held "endanger" means more than a threat of metaphysical injury or the possibility of ill effects, and endangerment does not require that the misconduct of the parent be directed at the child or that the child actually suffer injury. Id. Rather, the court concluded, "endanger" means "to expose to loss or injury," and "imprisonment is certainly a factor to be considered ... on the issue of endangerment." Id.

The court acknowledged that Texas cases have held that mere imprisonment, standing alone, will not constitute engaging in conduct that endangers the emotional or physical well-being of the child, but noted that the courts have "parted company" on the effect of the parents' imprisonment. Id. The court then held, without elaboration, "[i]f the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding under Section 15.02(1)(E) is supportable." Id. at 534 (quoting *Wray v. Lenderman,* 640 S.W.2d 68, 71 (Tex.App.--Tyler 1982)).

In the court of appeals in Boyd, the Department of Human Services had made the identical argument asserted in our case: "endangerment" as contemplated by the statute may be inferred from imprisonment, alone, when such imprisonment is the result of a voluntary, deliberate and conscious course of conduct by the prisoner. *Boyd v. Texas Dep't of Human Servs.,* 715 S.W.2d 711, 717 (Tex.App.--Austin 1986), rev'd, 727 S.W.2d 531 (Tex.1987). The Austin court of appeals expressly rejected that argument, describing it as "fundamentally without meaning." Id. That court pointed out:

By definition, almost all crimes for which imprisonment may be assessed require a culpable mental state that is voluntary, deliberate and conscious.... [I]nstead of "qualifying" the primary rule, that imprisonment and criminal conduct are not, in and of themselves, grounds for the termination of parental rights, the rule for which the Department contends would devour or render meaningless such primary rule....

Id. at 716.

In reversing, the supreme court disapproved the court of appeals' holding that endangerment may not be inferred from conduct of a parent and must be proved by independent evidence. The supreme court also said that imprisonment is a "factor" to consider with other evidence. The supreme court did not say that endangerment may be inferred from any and all criminal conduct just because that conduct results in imprisonment.

Notably, in reversing the court of appeals' decision in Boyd, the supreme court

---

did not mention the court of appeals' rejection of the Department's argument. [11] We do not read the supreme court's decision in Boyd as requiring us to accept TDPRS's argument that, merely because a parent voluntarily, willfully, and consciously engages in conduct that she knows may result in imprisonment, such conduct and resulting imprisonment are sufficient to support termination of her parental rights. We believe more is required to meet the stringent conditions that are necessary to terminate parental rights.

While an easily administered test such as that proposed by TDPRS may serve the State's interest in conserving time and administrative resources, such a test creates a danger that termination of parental rights could become an additional punishment automatically imposed along with imprisonment for almost any crime. Steven Fleischer, Termination of Parental Rights: An Additional Sentence for Incarcerated Parents, 29 SETON HALL L.REV. 312, 313-16, 339-40 (1998).

On the other hand, the supreme court has not articulated how and to what extent imprisonment should be considered as a "factor" in termination cases. Since Boyd, one court has suggested that imprisonment is a factor in termination only if it is the result of or coupled with a course of conduct that, itself, causes endangerment to the physical or emotional well-being of the child. Dupree, 907 S.W.2d at 84. Another court has stated that if imprisonment is based upon "a certain type of voluntary, deliberate and conscious course of conduct," only then may imprisonment be considered conduct that "endangers" the child under section 161.001(1)(D) or (E). In re K.M.M., 993 S.W.2d at 228.

In the cases we have found involving termination of parental rights of imprisoned parents, endangerment to a child could easily have been inferred from the underlying conduct of the parent. E.g., In re M.D.S., 1 S.W.3d 190, 198-99 (Tex.App.--Amarillo 1999, no pet.) (affirming termination of parental rights of father serving sentence for burglary based on negotiated plea with dismissal of indictment for aggravated sexual assault of another child and history of multiple sexual encounters with children); In re K.M.M., 993 S.W.2d at 228 (finding evidence of "endangerment" sufficient where father was incarcerated before child's birth for sexual assault of fifteen-month old child, had three previous juvenile adjudications for aggravated sexual assault of children, and was still incarcerated at time of trial); Spangler, 962 S.W.2d at 260 (upholding termination of parental rights of father who was serving sentence for "retaliation" against TDPRS worker, who was frequently in jail, and abused mother in presence of children); In re J.J., 911 S.W.2d at 440 (affirming termination of parental rights of father who was frequently jailed, used crack cocaine, and abused wife in presence of children); Trevino v. Texas Dep't of Protective & Regulatory Servs., 893 S.W.2d 243, 247-48 (Tex.App.--Austin 1995, no writ) (affirming termination of parental rights of father who frequently used drugs and was imprisoned for causing death of another child); In re A.K.S., 736 S.W.2d 145, 146 (Tex.App.--Beaumont 1987, no writ) (affirming termination of parental rights of father serving sentence for rape, who also compulsively exhibited genitals to women). Termination based on conduct resulting in imprisonment has also been upheld in one case involving a series of arrests and imprisonments along with additional criminal conduct by the parent with knowledge that his rights to the child were in jeopardy. In re J.N.R., 982 S.W.2d at 144.

There is no evidence here that Appellant's misconduct in writing bad checks was of a type from which endangerment could be inferred. Nevertheless, evidence

---

of conduct before a child is born, as well as evidence as to how a parent has treated another child or spouse is relevant regarding whether a course of conduct under section 161.001(1)(E) has been established. *E.g., In re D.L.N.,* 958 S.W.2d 934, 939 (Tex.App.--Waco 1997, pet. denied); see also Dupree, 907 S.W.2d at 84; Trevino, 893 S.W.2d at 248. We hold that the evidence of Appellant's past course of misconduct, including the evidence that she left her other two children in foster care in Montana when she jumped bail, together with her subsequent offense in Texas and incarceration, viewed in a light most favorable to the judgment, is some evidence of a course of conduct of endangerment under section 161.001(1)(E).

**FACTUAL SUFFICIENCY OF THE EVIDENCE**

To determine whether the evidence is factually insufficient, we consider and detail all the evidence relevant to the trial court's finding under section 161.001(1)(E). See Pool, 715 S.W.2d at 635. Specifically, the issue is whether all of the evidence, including the evidence of Appellant's imprisonment, is factually sufficient to establish that she endangered D.T. physically or emotionally.

**I. Evidence Supporting the Finding**

In reviewing the legal sufficiency of the evidence, we have previously reviewed and detailed the evidence supporting the finding of endangerment as the result of Appellant's course of conduct. Briefly summarizing: Appellant (1) fled the State of Montana while pregnant to avoid imprisonment for writing a hot check, leaving her other children who were later placed with her mother; (2) wrote one or more bad checks in Texas after D.T. was born, resulting in her imprisonment for approximately eighteen months; and (3) engaged in similar criminal conduct in other states prior to D.T.'s birth.

Neither Cook nor Preston verified with the Texas Department of Corrections Appellant's scheduled release date or her criminal status with the other states. Preston amended the service plan based on a telephone conversation she had in June 1998 with authorities in Livingston in which she was told that Appellant would be in jail two years and would then be bench warranted to other states. On cross-examination, Preston conceded that information was incorrect.

Appellant testified that she knew her conduct was wrong and that she could possibly go to jail but that she did not know her ability to parent D.T. could be affected. In In re J.N.R., a biological father learned of his child while in prison, made monthly inquiries regarding the child until his release despite the filing of the termination suit, and thereafter became an active parent in the child's life with regularly scheduled visits and participation in a family service plan. 982 S.W.2d at 139. The plan required him to secure a job and a place to stay, which he did, and also required him to stay out of jail and participate in his parole tasks, which he did not do. Within a few months, his participation in parenting classes became very inconsistent. He also failed to show up for drug tests, and within a period of one month, he was arrested on three separate occasions for disorderly conduct, passing counterfeit bills, and resisting arrest. At the time of the termination hearing, he was in jail awaiting trial on still another charge of passing counterfeit bills. Affirming a judgment terminating his parental rights, the court of appeals relied upon evidence that the father had continued to engage in the criminal activity that resulted in his incarceration even after knowing his parental rights were in jeopardy. Id. at 143. In contrast to the record in In re J.N.R., there is no evidence here that Appellant knew her conduct would result in long-term imprisonment that would affect her ability to parent D.T. or that would have the effect of endangering D.T.'s physical or emotional well-being. What remains is the evidence that Appellant fled Montana, leaving her other children

who were placed in foster care. However, the record is silent as to any factual details regarding whether she, herself, initiated the placement for their protection or whether she simply abandoned them when she fled.

**II. Evidence Contrary to Finding**

Along with evidence supporting the trial court's finding of endangerment, we review the evidence contrary to its finding. Pool, 715 S.W.2d at 635. In caseworker Cook's words, when she saw D.T. on the date she was assigned to the case, he "was clean, he looked very healthy. He was real healthy, happy, smiling." There was no indication that

D.T. had been abused or neglected. Indeed, the documentation by Preston after D.T.'s emergency placement reflects not only that D.T. was "on target developmentally for his age" and appeared to be "a healthy child" but also that Appellant was able to meet D.T.'s "basic material needs prior to incarceration."

Cook's testimony that an emergency removal was only necessary because Appellant could not make bond is particularly significant. Preston agreed with this opinion by testifying that TDPRS would not have taken the child except for the fact that Appellant was incarcerated. It was undisputed that Appellant would be eligible for release within nine months of the time of the hearing in January 1999. The only testimony regarding the State of Montana charges was Appellant's testimony that she was told she would be credited for the time served in Texas and it was her understanding she would not have to do additional time.

Absent specific guidance from the supreme court on the troublesome issue of termination of an imprisoned parent's rights, we believe that, in considering all of the evidence, we should look not only at incarceration as a "factor" but also at the expected length of the sentence and whether the underlying conduct is of a type, in and of itself, from which endangerment of the child may be inferred. In this regard, the current statutory scheme for involuntary termination of parental rights in Texas is instructive. As amended in 1997, the family code now includes imprisonment for two years or more as a separate ground for termination (along with a finding of best interest). TEX.FAM.CODE ANN. § 161.001(1)(Q) (providing for termination based on knowing commission of criminal offense resulting in confinement for two years or more from date petition for termination is filed). TDPRS did not plead that section as a basis for termination in this case, nor would it have been applicable, based on the evidence of Appellant's release date.

Because the Legislature specified a minimum period of imprisonment of two years from the date of filing the petition, it is reasonable to assume that the Legislature intended that imprisonment for less than that length of time would be insufficient, standing alone, to support involuntary termination. Because the State does not dispute that Appellant's length of confinement in Texas was for less than that amount of time, and it is speculative as to what confinement, if any, she might ever serve under pending charges from other states, we believe it is consistent with the statutory scheme to hold that TDPRS was required to show either a course of underlying conduct leading to her imprisonment, or in addition to the imprisonment, a course of conduct that was, itself, of an endangering nature to the child.

That our decision is consistent with the Texas statutory scheme regarding the effect of criminal conduct and imprisonment is further supported by the detailed list of crimes under section 161.001(1)(L), which are deemed to constitute a sufficient basis for termination, each of which is of an endangering nature and each of which must also be found to have caused the "death or serious injury" of a child. TEX.FAM.CODE ANN. § 161.001(1)(L). Writing bad checks is not included in the list.

---

**Page 639**

The manner in which the issue has been handled by statute and by courts in other states is also instructive. E.g., ARIZ.REV.STAT.ANN § 8-533 (West 1989 & Supp.1997) (permitting termination for conviction of felony of such nature to prove "unfitness"); IND.CODE ANN. § 31-35-5-4 (West Supp.1997) (allowing termination if conviction is for certain type of crime, including murder and rape); *In re L.A.S.,* 134 N.J. 127, 631 A.2d 928, 935-36 (1993) (holding nature of underlying crime and length of sentence are relevant factors, among others, in termination case involving incarcerated parent); *In re Christina P.,* 175 Cal.App.3d 115, 220 Cal.Rptr. 525, 535 (1985) (holding certain crimes may sufficiently show "depravity" of parent to warrant termination); see generally Parent's Involuntary Confinement, Or Failure To Care For Child As Result Thereof, As Evincing Neglect, Unfitness, Or The Like In Dependency Or Divestiture Proceeding, 79 A.L.R.3d 417, 417 (1977) (focusing on the consequential inability to care for one's children due to confinement).

It is undisputed that this is Appellant's first jail sentence, and it is for a relatively short time, running concurrently with the time she would receive for the Montana charges. The evidence amounts only to "possibilities" as to Appellant's future incarceration on other unspecified charges in other states. The underlying criminal conduct of writing hot checks, in and of itself, is not a type of conduct from which physical or emotional endangerment of a child may be inferred, nor is there any evidence of unrelated conduct of Appellant specifically toward D.T. that might be so characterized.

To the contrary, all the evidence indicates that D.T. was well-cared for by Appellant prior to her arrest, that he was bonding with Appellant, that he slept with her at night and was with her most of the time except when she was at work, and that he was generally a healthy, happy baby. It is also undisputed that Appellant has fulfilled each of the tasks assigned to her by the family service plan to the best of her ability and that her inability to visit with D.T. is solely due to the TDPRS policy.

The concurring justice asserts that this type of evidence is relevant only on the issue of best interest of the child. We have found no comparable case in which parental rights have been terminated in the context of an imprisoned parent. However, in other cases, judgments terminating parental rights based on endangerment have been reversed on similar evidence, without reaching the issue of best interest. In Clay v. Texas Department of Human Resources, the mother contacted the Department for help because she was being abused by her husband and the children were not safe in his presence. 748 S.W.2d 598, 599-600 (Tex.App.--Waco 1988, no writ). The children were placed in the temporary custody of TDHR at the mother's request. The mother paid all child support and attended almost all counseling sessions as ordered and visited with the children as allowed, but she had twenty-five different jobs and a number of different addresses during the three years after TDHR was granted temporary custody. In reversing the judgment terminating her parental rights, the reviewing court found there was no evidence the mother engaged in conduct that endangered the children. Id. at 600. The court noted that the mother posed no danger to her children and that she was "guilty of nothing more than suffering from some of life's misfortunes. She did not work at one place nor live at one place long enough to satisfy the TDHR." Id.

In Doria v. Texas Department of Human Resources, the evidence was that the mother left the children alone in a house with no running water, electricity, or heat and that a boyfriend abused her and possibly abused one child. 747 S.W.2d 953, 958-59 (Tex.App.--Corpus Christi 1988, no writ). The mother was unable to comply with the family service plan by attending

---

**Page 640**

all counseling and parenting classes, obtaining adequate housing or visiting the children regularly. A TDHR worker was of the opinion that the children removed from the mother's home should not be returned because they no longer related to the mother and it was "not fair" to them. Id. at 957.

In reversing on the basis of factual insufficiency of the evidence of endangerment, the court of appeals noted that the house had been repaired, that the mother had attended a large number of the required classes and visits considering her low intelligence and poverty, that an abusive boyfriend was no longer allowed in the house, that the great weight of the evidence showed the mother was striving to conform to the service plan, and that she loved her children and was sincerely concerned about getting them back. Id. at 958-59; see also Ybarra v. Texas Dep't of Human Servs., 869 S.W.2d 574, 578 (Tex.App.--Corpus Christi 1993, no writ) (finding factual insufficiency of evidence to support termination based on mother's failure to comply with DHS directions and goals).

Although the parents were not incarcerated in those cases, we believe that the relationship of the parent and child, as well as efforts to improve or enhance parenting skills, are relevant in determining whether a parent's conduct results in "endangerment" of the child under section 161.001(1)(E), even where the parent is incarcerated. TEX.FAM.CODE ANN. § 161.001(1)(E); see also Steven Fleischer, 29 SETON HALL L.REV. at 314-15.

Like the mother in Clay, Appellant contacted TDPRS to ensure D.T.'s safety. Like the mothers in both Clay and Doria, she complied as fully as possible with the goals and objectives required by TDPRS in order to facilitate reunification with her son. TDPRS conceded Appellant complied in all possible respects with the service plan, wrote letters to Preston inquiring about D.T., and requested photographs and visits. Appellant acknowledged her criminal past was wrong. She has taken actions to correct her behavior, loves her son, and has taken advantage of classes and counseling sessions at the T.D.C. in compliance with the service plan to ensure that she lives a clean lifestyle. Despite repeated efforts by Appellant to contact Cook and Preston by telephone and in writing, TDPRS abandoned its reunification goal because Appellant was still incarcerated, placement with D.T.'s grandparents was not possible, and only eight months remained for the court to render a final order of termination or to dismiss the suit. [12] TEX.FAM.CODE ANN. § 263.401(a).

Regarding the evidence that Appellant left her other two children in Montana when she jumped bond, Appellant testified that she could not support her two other children financially and that she left Montana in part to escape D.T.'s abusive father. After Appellant left D.T.'s abusive father, D.T. was born, and she got a job in Texas and found a babysitter for him. When she was arrested in Texas, she made arrangements for the babysitter to continue caring for D.T. and then contacted TDPRS and asked it, herself, to assist in temporary placement.

On this record, we find that there is more than a scintilla of evidence of endangerment, but that the evidence is factually insufficient to establish by clear and convincing evidence that Appellant pursued a course of conduct that endangered the physical or emotional well-being of D.T.

**BEST INTEREST OF THE CHILD**

Appellant's brief also attacks the legal and factual sufficiency of evidence to support the trial court's finding that termination is in the best interest of D.T. Judicial inquiry as to the best interest of the child is deferred pending determination

---

that the petitioner has sufficiently established one or more of the acts or omissions enumerated in subdivision (1) of the statute. *In re S.D.H.,* 591 S.W.2d at 638.

There is a strong presumption that the best interest of a child is served by keeping custody in the natural parent. *In re K.C.M.,* 4 S.W.3d 392, 393-95 (Tex.App.--Houston [1st Dist.] 1999, pet. denied); *Ziegler v. Tarrant County Child Welfare Unit,* 680 S.W.2d 674, 676 (Tex.App.--Fort Worth 1984, writ ref'd n.r.e.). The fact-finder must consider a number of factors in determining the best interest of the child, including the desires of the child, the present and future physical and emotional needs of the child, the present and future emotional and physical danger to the child, the parental abilities of the person seeking custody, programs available to assist those persons in promoting the best interest of the child, plans for the child by those individuals or by the agency seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. Holley, 544 S.W.2d at 371-72.

D.T. is only eighteen months old and obviously unable to communicate his wishes. As to his emotional and physical needs, the evidence affirmatively established that those needs were adequately met by Appellant in the past, as shown by the evidence that D.T. was developmentally and intellectually on-target, has no special needs, and was happy and healthy when placed in custody of the TDPRS. Caseworker Preston acknowledged D.T.'s past home environment could be considered safe. There is no evidence whatsoever as to any actual emotional or physical danger to D.T. in the past. It is undisputed that D.T. is not currently endangered and his emotional and physical needs are being met in foster care. No evidence, direct or indirect, was offered by TDPRS regarding D.T.'s future emotional or physical needs or endangerment to him in the future. Caseworker Preston testified that, in her opinion, it is in the best interest of D.T. for the parent-child relationship with Appellant to be terminated because of Appellant's current separation from him while she is incarcerated and because "[s]he hasn't shown she can provide a safe, stable home for him." Aside from the fact that her statement would improperly reverse the burden of proof, Preston was not looking toward the future when Appellant would be released. She admitted, "We're not even looking to August. We're dealing with right now."

There was no evidence that Appellant currently lacked parenting ability. It was undisputed that Appellant had taken advantage of and had completed the psychological testing and counseling offered to her. There was no evidence of availability of child care assistance or counseling in the future to assist her with D.T., nor was any evidence offered as to financial entitlement programs available. As to plans for the future, Appellant testified that her mother has asked her to come back to Alabama after her release date. Appellant wants to finish school, and her mother said she will help her. TDPRS's plans for D.T. were not stated. Although Preston testified that the current foster parents would be willing to adopt, there was no testimony from the foster parents.

There was no evidence of abuse, neglect, or any other indication of an inappropriate parent-child relationship between Appellant and D.T. As to "excuse," Appellant candidly offered none, but testified she realized her conduct

was wrong and has taken advantage of everything offered by the Texas Department of Corrections to make sure she does not go back.

The evidence of Appellant's past course of conduct of writing bad checks apparently spans several years. This evidence, when considered with her conduct of jumping bond and leaving her other children in Montana, meets only one of the factors enumerated in Holley: evidence of her acts and omissions. While the evidence of

---

**Page 642**

this factor overlaps the proof required to establish the statutory ground of endangerment by her conduct, this evidence is nevertheless some evidence, more than a scintilla, to support termination.

Viewing the evidence in the light most favorable to the judgment, there is legally sufficient evidence that the best interest of D.T. would be served by termination of Appellant's parental rights. However, based upon a review of the totality of the evidence as detailed above in light of the Holley factors, including evidence contrary to the trial court's findings, we hold that the evidence is so weak as to be factually insufficient to establish by clear and convincing evidence that the best interest of D.T. will be served by terminating Appellant's parental rights.

## CONCLUSION

Having determined the evidence is legally insufficient to support the findings under section 161.001(1)(D) and (N), we sustain Appellant's first point as to those findings. When we sustain a "no-evidence" point, it is our duty to render judgment for the appellant because that is the judgment the trial court should have rendered. TEX.R.APP.P. 43.3; *Vista Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176, 176 (Tex.1986) (quoting National Life & Accident Ins. Co. v. Blagg, 438 S.W.2d 905, 909 (Tex.1969)). Therefore, we reverse the trial court's judgment under section 161.001(1)(D) and (N) and render judgment for Appellant on these grounds.

Having determined the evidence is factually insufficient to support the findings under section 161.001(1)(E) and (2), we are of the opinion that the judgment terminating Appellant's parental rights is manifestly unjust. We sustain Appellant's points as to the applicable findings. We reverse the trial court's judgment on the grounds of section 161.001(1)(E) and (2) and remand that portion of the cause for a new trial. B.J. Valve & Fitting Co. v. Elliott Valve Repair Co., 679 S.W.2d 1, 1 (Tex.1984).

JOHN HILL, J. (Retired), filed a concurring opinion.

JOHN HILL, Justice, concurring (Retired).

I concur in the result only because, while I agree with the majority that the evidence is factually insufficient to support the trial court's finding that termination of Appellant's parental rights is in the best interest of the child, I disagree with the majority's conclusion that the evidence is factually insufficient to support the trial court's finding that Appellant engaged in conduct that endangered the physical and emotional well-being of the child.

The majority agrees that the evidence is legally sufficient to support the finding that Appellant engaged in conduct that endangered the physical and emotional well-being of D.T., but finds that the evidence is factually insufficient to support the finding. As I understand the evidence, Appellant, prior to the birth of D.T., fled the State of Montana in order to avoid prosecution for bad checks and to escape an abusive husband. In doing so, she left behind two children who ultimately ended up in the care of her mother. When asked by a child investigator for the Texas Department of Protective and Regulatory Services (TDPRS) why she had not contacted the children, she testified that it was because they were better off in foster care. She testified that there is an outstanding warrant out for her arrest in Montana as a result of bail revocation. She also acknowledged that there is a pending charge in that state for bad checks.

Appellant was arrested in February 1998, shortly after D.T.'s birth in August 1997. In January 1999, at the time of the trial of this termination proceeding, Appellant was in state jail following her conviction for a state jail felony in Texas. She was expecting to be released in August 1999. She acknowledged having been convicted

of a felony involving bad checks in Utah. She said that some of her out-of-state cases might be four or five years old. Appellant testified that she had been told that there might be arrest warrants out for her in five different states. She indicated that those arrest warrants were based upon her conduct, that she knew there would be a possibility of her going to jail, that if she went to jail she would not be able to parent her child, and that she engaged in a continuing course of conduct of writing bad checks or engaging in an activity that might get her arrested.

In holding the evidence is factually insufficient to support the trial court's finding that Appellant engaged in conduct endangering the physical and emotional well-being of D.T., the majority relies upon testimony indicating that D.T. was in good health and had not been abused, that Appellant was taking good care of D.T. before her arrest and was doing the best she could while incarcerated to indicate her interest in D.T., that the only reason for emergency removal of D.T. when Appellant was initially arrested was because she could not make bail, that the Appellant contacted the TDPRS after she was arrested to ensure D.T.'s safety, that she complied as fully as possible with the goals and objectives required of her by the Department, and that her conviction was not for a crime from which, in and of itself, physical or emotional harm to the child might be inferred.

The majority relies in part upon a law review article from the SETON HALL LAW REVIEW, authored by Steven Fleischer. In that article, Fleischer states that, while the psychological effects of parental incarceration on children vary greatly from child to child, parental incarceration can have a pronounced negative effect on a child and may temporarily or permanently affect the child's development and future relationships. Steven Fleischer, Termination of Parental Rights: An Additional Sentence for Incarcerated Parents, 29 SETON HALL L.REV. 312, 321 (1998). It is undisputed that Appellant engaged in a pattern of criminal conduct over a lengthy period of time that ultimately resulted in imprisonment for over a year and a half. It appears that there is a reasonable possibility of more incarceration to come. Therefore, it is my opinion that the evidence is undisputed that Appellant engaged in conduct that endangered the physical and emotional well-being of her child.

The remaining issue is whether termination of the parent-child relationship is in D.T.'s best interest. I believe all the evidence the majority relies upon in holding that the evidence is factually insufficient to support the trial court's finding on the endangerment issue is relevant to the best interest issue. However, the evidence does not contradict the undisputed testimony that shows Appellant engaged in conduct that endangered the physical and emotional well-being of D.T. Evidence that D.T. did not actually suffer injury is not inconsistent with the finding. *Texas Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987). Evidence that Appellant is a loving mother who cares about her child is not inconsistent with the finding because loving mothers can, and Appellant did, engage in conduct that endangers the child. The potential harm to D.T. comes from her course of conduct and the resulting imprisonment. While the nature of a course of conduct, in and of itself, may sometimes support termination, the fact that the conduct, in and of itself, does not pose such a danger does not keep the conduct from posing a danger when coupled with the imprisonment that results from such conduct. Because the evidence relied upon by the majority does not contradict the undisputed evidence the majority found to be legally sufficient to support the trial court's finding on the endangerment issue, I believe the majority is in error in holding the evidence factually insufficient to support the finding on endangerment.

---------

Notes:

[1] Appellant is sometimes referred to in the record by her married name, L.J.P.

[2] D.B., the biological father of D.T., is sometimes referred to in the reporter's record as D.V. In the clerk's record, he is identified as D.B.

[3] A home study was later performed on the paternal grandparents, and as a result, placement with them was denied.

[4] E.g., In re J.N.R., 982 S.W.2d 137, 142-43 (Tex.App.--Houston [1st Dist.] 1998, no pet.); In re B.S.T., 977 S.W.2d 481, 484, n. 4 (Tex.App.--Houston [14th Dist.] 1998, no pet.); In re J.J. & K.J., 911 S.W.2d 437, 439-40 (Tex.App.--Texarkana 1995, writ denied); Spurlock v. Texas Dep't of Protective & Regulatory Servs., 904 S.W.2d 152, 155-56 (Tex.App.-Austin 1995, writ denied); In re A.D.E., 880 S.W.2d 241, 245 (Tex.App.--Corpus Christi 1994, no writ); D.O. v. TDHS, 851 S.W.2d 351, 353 (Tex.App.--Austin 1993, no writ).

[5] E.g., In re B.R., 950 S.W.2d 113, 117-18 (Tex.App.--El Paso 1997, no pet.); Spangler v. Texas Dep't of Protective & Regulatory Servs., 962 S.W.2d 253, 257 (Tex.App.--Waco 1998, no pet.); In re H.C., 942 S.W.2d 661, 663-64 (Tex.App.--San Antonio, 1997, no pet.); In re L.S., 748 S.W.2d 571, 572-73 (Tex.App.--Amarillo 1988, no writ); Neiswander v. Bailey, 645 S.W.2d 835, 835-36 (Tex.App.--Dallas 1982, no writ); see generally Bill Vance, The Clear and Convincing Evidence Standard in Texas: A Critique, 48 BAYLOR L.REV. 391 (1996) (discussing why an additional standard of review should be developed for appellate review of findings of fact made under the clear and convincing evidence standard).

[6] Clear and convincing proof has not been required by the supreme court except where that heightened degree of proof has been mandated by constitutional or statutory requirements. Huckabee v. Time Warner Entm't Co., 19 S.W.3d 413, 423 (Tex.2000). Clear and convincing evidence is required both by due process and by statute in involuntary termination cases. In re G.M., 596 S.W.2d at 847; TEX.FAM.CODE ANN. § 161.206(a).

[7] In effect, the trial court found that Appellant committed acts prohibited under section 161.001(1)(D), (E), and (N) and that termination was in D.T.'s best interest. TEX.FAM.CODE ANN. § 161.001(1)(D), (E), (N), (2).

[8] Act of May 27, 1993, 73rd Leg., R.S., ch. 597, § 1, 1993 Tex.Gen.Laws 2254, 2254 (repealed 1995) (current version at TEX.FAM.CODE ANN. § 161.001(1)(D)).

[9] The fact that D.T. was placed in foster care when Appellant was arrested is not, standing alone, evidence of endangerment. G.M. v. Texas Dep't of Human Res., 717 S.W.2d 185, 188 (Tex.App.--Austin 1986, no writ) (holding that leaving child in care of licensed foster parents did not "endanger" child's emotional or physical well-being).

[10] When Appellant was sixteen, she gave birth to a daughter and placed her for adoption. Later, Appellant married and had other children, one of whom, a twin with a heart defect, died at the age of three months from sudden infant death syndrome while Appellant was at work. Appellant was suspicious of his death because her former husband with whom she was then living had shaken the baby before and had blamed their pet cat for bruises she had once found on the baby. Although the State mentions this evidence, it does not rely on it as evidence of a conscious course of conduct that endangered D.T.

[11] The supreme court did not adopt the sentence in Wray that stated if the imprisonment "displays a voluntary, deliberate and conscious course of conduct, it qualifies as conduct which endangers the emotional well-being of the child." Wray, 640 S.W.2d at 71.

[12] If an extension of the trial court's jurisdiction under section 263.401(b) had been requested and granted, the final hearing could have been held nearer to the time of Appellant's scheduled release. TEX.FAM.CODE ANN. § 263.401(b)(Vernon Supp.2000).

---------

402 S.W.3d 239 (Tex. 2013)

56 Tex.Sup.Ct. J. 666

In the Interest of E.C.R., child.

No. 12-0744.

Supreme Court of Texas.

June 14, 2013

Argued April 23, 2013.

Crow, Juliane Phillips, Attorney at Law, Houston, TX, for Other interested party Guardian Ad Litem.

402 S.W.3d 240

Sandra D. Hachem, Vincent Reed Ryan Jr., Houston, TX, for Petitioner Department of Family & Protective Services.

William M. Thursland, Houston, TX, for Respondent R., M.

OPINION

JEFFERSON, Chief Justice

We require the State to overcome significant burdens before removing a child from his parent. These impediments are essential to protect the parent's fundamental liberty interest in the companionship, care, custody, and management of her children.[1] But " [j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.,* 89 S.W.3d 17, 26 (Tex.2002).[2]

The Family Code allows a court to terminate a parent's rights to her child if the child has been in the State's custody for at least nine months, and the

State proves, by clear and convincing evidence, that the parent failed to comply with a court order that specified what she had to do to get her child back. TEX. FAM.CODE § 161.001(1)( *O* ). The provision applies, however, only if the child was removed from the parent under Family Code Chapter 262 for " abuse or neglect of the child." *Id.* We must decide whether abuse or neglect includes placing the child's physical health or safety at substantial risk, as outlined below. Because we conclude that it does, and because the parent's abuse or neglect of another child is relevant to that determination, we reverse in part the court of appeals' judgment and remand the case to that court.

## I. Background

After M.R. was seen punching and dragging her four-year-old daughter, Y. C., by her ponytail down the street, a witness called the authorities. M.R.'s eight-month-old son, E.C.R., was not present during this incident. The police found that Y.C. had fresh bruising on her face, dried blood inside her nose, cuts on her forehead and lips, and multiple scrapes. The police arrested M.R., who denied causing the injuries but later pleaded guilty to bodily injury to a child, a third-degree felony. The Department of Family and Protective Services received a referral of physical abuse of Y.C., who was sent to live with her father. After its investigation, the Department placed E.C.R., whose paternity was undetermined, with foster parents.

The Department took possession of E.C.R. under Family Code section 262.104, which authorizes possession without a court order if circumstances would lead a person of ordinary prudence and caution to believe that the child faced " an immediate danger to [his] physical health or safety." TEX. FAM.CODE § 262.104. The next day, the Department filed a petition seeking conservatorship of E.C.R. and termination of M.R.'s parental rights. The petition was supported by a six-page affidavit recounting the circumstances necessitating

E.C.R.'s removal. The affidavit described the allegations of physical abuse of Y.C. and also noted that M.R. had a prior CPS case involving physical abuse of an older son, who was in the permanent managing conservatorship of foster parents. M.R. told caseworker Cyntera Donatto that she had twice attempted suicide while spending three days in jail for the incident involving Y.C. After being released from jail, M.R. slept on the streets and left E.C.R. with her boyfriend at his home. M.R. told Donatto that the boyfriend physically abused her and was not stable. A criminal background check revealed that he had been arrested seven times over the past decade for theft, burglary, driving with an invalid license, and evading arrest. The day after she met with M.R., Donatto learned that M.R. had again been incarcerated.

Donatto observed E.C.R. and noted that, unlike Y.C., there were no evident signs that E.C.R. had been physically abused. He appeared clean, healthy, and developmentally on target. But his mother's history of abusing her other children, her fragile mental state, and her criminal case and incarceration persuaded Donatto that E.C.R. should not be left in M.R.'s care. Because E.C.R.'s paternity was unknown, the Department sought to be named his temporary managing conservator.

That day, the trial court found that E.C.R. had been removed pursuant to section 262.104 and that he faced a continuing danger to his physical health or safety if returned to M.R. The trial court also found that the nature of the emergency and the continuing danger to E.C.R.'s welfare made his return to M.R. impossible or unreasonable. The court set the matter for a full adversary hearing within fourteen days.

After that hearing the trial court found sufficient evidence to satisfy a person of ordinary prudence and caution that:

(1) there was a danger to the physical health or safety of the child which was caused by an act or failure to act of the person entitled to possession and for the child to remain in the home is contrary to the welfare of the child; (2) the urgent need for protection required the immediate removal of the child and

makes efforts to eliminate or prevent the child's removal impossible or unreasonable; and (3) notwithstanding reasonable efforts to eliminate the need for the child's removal and enable the child to return home, there is a substantial risk of a continuing danger if the child is returned home.

The court appointed the Department temporary managing conservator and ordered M.R. to comply with the service plan. *See* TEX. FAM.CODE §§ 263.101–.106. The court warned M.R. that her failure to do so could result in the termination of her parental rights. *See id.* §§ 161.001(1)( *O* ), 263.106.

At a subsequent status hearing, the trial court signed additional temporary orders setting the conditions for E.C.R.'s return to M.R. M.R. had to complete a psychiatric examination and follow all recommendations; complete a psychological examination and follow all recommendations; participate in counseling, including individual, group, or family therapy sessions; complete parenting classes; complete random drug tests; remain drug free; refrain from engaging in criminal activity; maintain stable housing; maintain stable employment; successfully complete domestic violence and anger management classes; and complete all services outlined in the Family Service Plan. The court found that M.R. reviewed and understood the service plan and was advised that unless she was willing

402 S.W.3d 242

and able to provide E.C.R. with a safe environment within the time specified in the plan, her parental rights could be terminated.

Almost a year later, the trial court held a termination hearing. M.R. gave limited testimony. She admitted being served with citation and receiving deferred adjudication for causing injury to a child, but she denied ever telling the caseworker that E.C.R. was not living in a safe environment. She provided the names of two men who might be E.C.R.'s father. She admitted having a prior CPS case that went to final orders, and that she no longer had custody of that child.

The Department representative testified that E.C.R. was removed because of the risk of physical abuse based on M.R.'s abuse of Y.C. The representative also stated that M.R. had completed some of the court-ordered requirements, but she had not satisfied the " big" ones. She failed to undergo a psychiatric evaluation or participate in psychotherapy. The Department also presented evidence that M.R. did not obtain employment, a violation of both the Family Service Plan and the conditions of her community supervision, and she had not lived in a home for six months.

The trial court terminated M.R.'s rights under subsection O of Family Code section 161.001(1), finding that such termination was in E.C.R.'s best interest. M.R. appealed, challenging the sufficiency of the evidence supporting termination under that subsection and the best interest finding. As to the former, her argument was straightforward. She did not dispute her failure to comply with the provisions of a court order that specifically established the actions necessary for E.C.R. to be returned to her and that E.C.R. had been in the Department's conservatorship for more than nine months. Instead, she argued that termination under subsection O was improper because E.C.R. was removed because of *risk* of abuse based on her conduct toward his sibling, but not for actual abuse or neglect.

The court of appeals agreed, holding that M.R.'s abuse of Y.C. was not evidence that M.R. abused or neglected E.C.R. 390 S.W.3d 22, 27. Instead, " [f]or a trial court to terminate parental rights under section 161.001(1)( *O* ), it must find that the child who is the subject of the suit was removed as a result of the abuse or neglect of that specific child." *Id.* The court noted that " the Family Service Plan and [the caseworker's] testimony both show that [the Department] became involved as a result of M.R.'s abuse of E.C.R.'s sibling, a factor that the court could not consider in reaching a finding under section 161.001(1)( *O* )." *Id.* at 28. The court reversed the portion of the trial court's judgment terminating M.R.'s parental rights and rendered judgment denying the Department's termination petition.[3] *Id.* at 30. A divided court voted against en banc reconsideration. *Id.* (Keyes, J., dissenting).

We granted the petition for review. 2013 Tex. LEXIS 112 (Feb. 15, 2013).

**402 S.W.3d 243**

**II. The Department proved grounds for termination under subsection 161.001(1)( *O* ) as a matter of law.**

Family Code section 161.001(1) identifies multiple grounds for involuntarily terminating parental rights. Subsection O authorizes termination if the court finds, by clear and convincing evidence, that a parent has:

failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.
TEX. FAM.CODE § 161.001(1)( *O* ).

We last considered subsection O in *In re J.F.C.,* 96 S.W.3d 256, 277 (Tex.2002), an appeal of a judgment terminating the parents' right to their three children. In that case, the Department received a referral alleging that the father had sexually abused two of the children, but the ensuing investigation revealed no evidence of abuse. *In re J.F.C.,* 57 S.W.3d 66, 68 (Tex.App.–Waco 2001), *rev'd,* 96 S.W.3d 256 (Tex.2002). A year later, the Department received information that the parents " had drug problems, were physically abusive to one another, and may have been physically abusing the children." *Id.* The Department investigated and found bruises on one of the children, as well as corroboration of drug use in the home. *Id.* The Department did not remove the children, because it concluded they were not in immediate danger. *Id.* In weekly home visits over the next seven months, the Department found no evidence of abuse. *Id.* The Department learned, however, that the parents were not participating in their required counseling and continued to have conflicts

among themselves. *Id.* Subsequently, the Department received a report that the mother had handled one of the children roughly; the Department confirmed that the child (the same one who had bruises previously) had marks and scratches on his body. *Id.* The Department found that the parents' emotional health was deteriorating, and the children were not attending daycare. *Id.* The parents continued to fight and faced substantial marital problems and financial hardships. *Id.* The Department removed the children from the home and sued for temporary conservatorship. *Id.* The trial court approved a Family Service Plan outlining the requirements the parents had to satisfy to avoid termination of their rights. *Id.* at 68–69. Primarily because the parents failed to comply with the Plan, the Department amended its petition to seek termination. *Id.* at 69.

The trial court terminated the parents' rights. *Id.* at 70. A divided court of appeals reversed after determining that the charge permitted the jury to find that the parents' rights should be terminated without finding that termination would be in the children's best interest. *J.F.C.,* 96 S.W.3d at 260. In this Court, the parents argued, among other things, that the charge failed to require that the same ten jurors agree on the specific grounds for termination. *Id.* at 277. Because the question included more than one course of parental conduct justifying termination, they argued that their rights may have been terminated even though fewer than ten jurors agreed on the basis for termination. *Id.*

We held that even assuming the submission was improper, any error was harmless, because the Department had conclusively proved that the parents rights should be terminated under subsection O:

402 S.W.3d 244

It is undisputed that both parents failed to comply with numerous, material provisions of court orders that specifically required their compliance to avoid restriction or termination of their parental rights.
....

The evidence establishes as a matter of law that the parents failed to comply with the court's orders specifying the actions the parents had to take for the [Department] to return the children to the parents. The record also conclusively establishes that the children were removed from their parents under Chapter 262 of the Family Code, and it is undisputed that they were in the [Department's] custody for more than nine months after their removal. Accordingly, the parental conduct described in subsection 161.001(1)( *O* ) of the Family Code was established as a matter of law. Any error in failing to submit a specific instruction on juror agreement regarding parental conduct was thus harmless.

*Id.* at 277–79. We reversed the court of appeals' judgment and rendered judgment terminating the parents' rights. *Id.*at 285.

At least one appellate court has interpreted subsection O in a similar fashion, holding that termination was warranted upon proof of " immediate danger to the physical health or safety of the child" — the emergency removal standard under chapter 262. *In re M.L.J.,* No. 02–07–0178–CV, 2008 WL 1932076, at *5, 2008 Tex.App. LEXIS 3218, at *14–15 (Tex.App.–Fort Worth May 1, 2008, pet. denied) (mem.op.); *see also* TEX. FAM.CODE §§ 262.101–.102, .104(a)(1)–(2). In *M.L.J.,* the parents argued— as M.R. does here— that subsection O was inapplicable because their child was not removed for actual abuse or neglect, but only because of the risk of abuse or neglect. The court of appeals rejected this contention. *See M.L.J.,* 2008 WL 1932076, at *5–6, 2008 Tex.App. LEXIS 3218, at *14–18. The Department's investigator testified that the child was removed from the parents, who were both intellectually disabled, not just because of the parents' " lack of skills" but also because they refused to seek help caring for their child. *Id.* at *5–6, 2008 Tex.App. LEXIS 3218, at *16. A psychologist corroborated his testimony, stating that the mother had reported that the father had once punched her and once shook one of the children. *Id.* at *6, 2008 Tex.App. LEXIS 3218, at *17. The psychologist also noted that the mother had difficulty accepting that she needed help caring for her children, and that a small child faced a high degree of risk if left in the parents' care. *Id.* at *6, 2008 Tex.App. LEXIS 3218, at *17–18.

The court of appeals held that the investigator's testimony " ' would lead a person of ordinary prudence and caution to believe that there is an immediate danger to the physical health or safety of [the child].' " *Id.* at *6, 2008 Tex.App. LEXIS 3218, at *18 (quoting TEX. FAM.CODE § 262.104(a)(1)–(2)). The court concluded that the evidence supported termination under subsection O. *Id.; see also In re D.R.J.,* 395 S.W.3d 316, 324 (Tex.App.–Fort Worth Feb. 7, 2013, no pet.) (Gardner, J., concurring) (" This court has previously held that evidence was sufficient to establish removal for ' abuse or neglect' based upon a CPS investigator's personal knowledge of facts that would lead a person of ordinary prudence to believe that there is ' an immediate danger to the physical health or safety of the child' as required for removal without a court order under family code section 262.104(a)(1), (2)." ) (citing *In re M.L.J.* ).

Conversely, other courts have held that removal due to risk of abuse or neglect

402 S.W.3d 245

does not satisfy O's requirements. *See, e.g., In re C.B.,* 376 S.W.3d 244, 252 (Tex.App.–Amarillo 2012, no pet.);*Mann v. Dep't of Family and Protective Servs.,* No. 01–08–01004–CV, 2009 WL 2961396, at *7–8, 2009 Tex.App. LEXIS 7326, at *20–21 (Tex.App.–Houston [1st Dist.] Sept. 17, 2009, no pet.) (mem.op.); *In re S.A.P.,* 169 S.W.3d 685, 706–07 (Tex.App.–Waco 2005, no pet.) (holding that father's rights could not be terminated under subsection O because child was removed due only to risk of abuse based on parents' prior history).

In *C.B.,* the court of appeals considered a case involving a mother who " admitted to recent and chronic methamphetamine use" and who was involved in, and exposed C.B. to, an abusive relationship with her boyfriend, also a methamphetamine user who kept the drug in a bedside cabinet in their shared home. *C.B.,* 376 S.W.3d at 251. The boyfriend had threatened the mother's life and repeatedly abused her in C.B.'s presence. *Id.* at 251–52. Nonetheless, the

court held that termination under subsection O was not proper because although " [t]he affidavit portrays a volatile home environment and behavior by the mother and her paramour capable of resulting in abuse or neglect of a two-year-old child, ... § 161.001(1)( *O* ) requires actual occurrence of abuse or neglect to justify termination of parental rights." *Id.* at 252. Even applying the definitions of abuse and neglect in a related chapter, the court concluded that subsection O's standard had not been satisfied. *Id.* at 250. " Abuse" under chapter 261 includes a parent's current use of a controlled substance,[4] yet the court found no evidence that the mother's methamphetamine use caused physical, mental, or emotional harm to C.B., a statutory requirement. *Id.* Nor had C.B. been the victim of neglect: " [A] pattern of violence directed toward the mother by her paramour would carry some risk that a two-year-old child in the home may suffer harm, but this record does not support a conclusion that C.B. was subjected to ' a substantial risk of immediate harm.' " *Id.* (quoting TEX. FAM.CODE § 261.001(4)(B)(i)). The court held that the trial court's temporary orders were not relevant, because while they justified initial and continued removal of C.B., they contained " no findings that C.B. was actually abused or neglected." *Id.* at 250-51.

In *Mann,* the Department removed a days-old baby from his mother due to a risk of physical abuse, based on the mother's abuse of a sibling. *Mann,* 2009 WL 2961396, at *1, 2009 Tex.App. LEXIS 7326, at *1-2. The mother failed to complete the necessary court-ordered services, and the trial court terminated her rights under subsection O. *Id.* at *1-4, 2009 Tex.App. LEXIS 7326, at *3-11. The court of appeals reversed, holding that there was no evidence that the child had actually been abused or neglected. *Id.* at *6, 2009 Tex.App. LEXIS 7326, at *16-17. Risk was not enough; the mother's abusive conduct toward a sibling " do[es] not provide evidence that [the mother] abused or neglected [the removed child]." *Id.* at *7, 2009 Tex.App. LEXIS 7326, at *20. Thus, the court held that the evidence was legally insufficient to support termination under subsection O. *Id.* at *7-8, 2008 Tex.App. LEXIS 3218, at *20-21.

In this case, the same court of appeals applied *Mann* to reach the same conclusion. 390 S.W.3d at 27 (holding that " M.R.'s abuse of Y.C. cannot be considered evidence that M.R. abused or neglected E.C.R. under section 161.001(1)( *O* )" ). The court disregarded the trial court's temporary orders finding " ' danger to [E.C.R.'s] physical health or safety' " and " ' a substantial

402 S.W.3d 246

risk of a continuing danger if the child is returned home,' " because they were based on the risk of abuse, rather than " specific allegations of neglect or abuse" of E.C.R. *Id.* at 27–29.

We agree that subsection O requires proof of abuse or neglect,[5] but we disagree that those terms can never be read to include risk. We consider their use and meaning in context of the Family Code removal provisions and the Legislature's definitions of " abuse" and " neglect" in related chapters.

The preceding chapter, titled " Investigation of Report of Child Abuse or Neglect," requires that " abuse" and " neglect" be reported to the authorities, and the failure to do so carries criminal penalties. TEX. FAM.CODE §§ 261.101(a), .103(a), .109. The terms are defined broadly and nonexclusively,[6] but only " [i]n this chapter." *Id.* § 261.001, (1), (4). Both definitions give examples of abusive or neglectful conduct, and both definitions explicitly include risk: abuse includes not just actual physical injury, but a " genuine threat of substantial harm from physical injury" ; neglect includes placing a child in or failing to remove a child from a situation that requires actions or judgment beyond his capabilities and that results in " a substantial risk of immediate harm to the child" or a situation in which the child would be exposed to " a substantial risk of sexual conduct harmful to the child." *Id.* § 261.001(1)(C), (4)(B)(i), (4)(B)(iv). Both definitions also include language that permits the consideration of harm to another child in determining whether abuse or neglect has occurred. *See, e.g., id.* § 261.001(1)(C) (" genuine threat of

substantial harm" ), (4)(B)(v) (" neglect" includes exposing a child to situations in which another child faces certain sexual crimes, like abuse and trafficking).

Once the Department receives a report of abuse or neglect, it must promptly and thoroughly investigate. *Id.* § 261.301(a). If the Department believes that the child's immediate removal is necessary to avoid

402 S.W.3d 247

further abuse or neglect, it must file a petition or take other action under chapter 262 for the child's temporary care and protection. *Id.* § 261.302(d).

Chapter 262, titled " Procedures in Suit by Governmental Entity to Protect Health and Safety of Child," details the circumstances under which a governmental entity may file a suit affecting the parent–child relationship or take possession of a child without a court order. *Id.* § 262.001(a). The statute provides that " [i]n determining the reasonable efforts that are required to be made with respect to preventing or eliminating the need to remove a child from the child's home or to make it possible to return a child to the child's home, the child's health and safety is the paramount concern." *Id.* § 262.001(b). The Department, a law enforcement officer, or a juvenile probation officer may take possession of a child without a temporary restraining order if the child faces an immediate danger to his physical health or safety; has been a victim of sexual abuse; is in the possession of someone who is using a controlled substance, if it poses an immediate danger to the child's physical health or safety; or is in the possession of someone who has permitted him to remain on premises used for methamphetamine manufacture. *Id.* § 262.104(a)–(b). If the Department petitions for possession of a child without prior notice and a hearing, it must submit an affidavit stating, among other things, " facts sufficient to satisfy a person of ordinary prudence and caution" that the child faces an immediate danger to his health or safety, or that the child has been a victim of neglect or sexual abuse, and that continuation in the home would be contrary to the

child's welfare. *Id.* § 262.101. The trial court may issue a temporary restraining order only if it finds that one of those conditions has been satisfied.

Within fourteen days after the Department has taken possession of the child, the trial court must hold a full adversary hearing. *Id.* § 262.201(a). Following the hearing, the trial court must order the child returned to his parent unless the court finds sufficient evidence to satisfy a person of ordinary prudence and caution that: there was a danger to the child's physical health or safety that was caused by an act or failure to act of the person entitled to possession, and for the child to remain in the home is contrary to his welfare; the urgent need for protection required the immediate removal of the child and reasonable efforts, consistent with the circumstances and providing for the child's safety, were made to eliminate or prevent the child's removal; and reasonable efforts have been made to enable the child to return home, but there is a substantial risk of a continuing danger if the child is returned home. *Id.* § 262.201(b). Continued removal is warranted only if the child faces a continuing danger to his physical health or safety. *Id.* § 262.201(b)–(c).

The standard used repeatedly throughout chapter 262 is " danger to the physical health or safety of the child." That phrase is also centered on risk, rather than just a history of actual abuse or neglect: the Legislature has defined it to include " exposure of the child to loss or injury that jeopardizes the physical health or safety of the child without regard to whether there has been an actual prior injury to the child." *Id.* § 101.009; *see also id.* § 101.001(a) (" Definitions in this subchapter apply to this title." ). In determining whether the child faces a continuing danger to his physical health or safety, at each stage of the proceedings the court may consider whether the child's household includes a person who has: " (1) abused or neglected another child in a manner that caused serious injury to or the death of the

other child; or (2) sexually abused another child." *Id.* §§ 262.102(b) (temporary restraining order), 262.107(b) (initial hearing), 262.201(d) (full adversary hearing).

Although chapter 261's " abuse" and " neglect" definitions do not govern in chapter 262, they surely inform the terms' meanings. *See, e.g., Brown v. Darden,* 121 Tex. 495, 50 S.W.2d 261, 263 (1932) (" Whenever a legislature has used a word in a statute in one sense and with one meaning, and subsequently uses the same word in legislating on the same subject−matter, it will be understood as using it in the same sense, unless there be something in the context or the nature of things to indicate that it intended a different meaning thereby." ). So while subsection O requires removal under chapter 262 for abuse or neglect, those words are used broadly. Consistent with chapter 262's removal standards, " abuse or neglect of the child" necessarily includes the risks or threats of the environment in which the child is placed. Part of that calculus includes the harm suffered or the danger faced by other children under the parent's care. If a parent has neglected, sexually abused, or otherwise endangered her child's physical health or safety, such that initial and continued removal are appropriate, the child has been " remov[ed] from the parent under Chapter 262 for the abuse or neglect of the child." *See* TEX. FAM.CODE §§ 161.001(1)( *O* ), 262.101, .102, .104, .107, .201. [7]

Here, the Department's evidence in support of removal included an affidavit showing that the department received a referral of physical abuse of Y.C. A witness had seen M.R. punching Y.C. and dragging her by her hair. Y.C. had sustained injuries. M.R. denied the abuse, but she was arrested and charged with intentional bodily injury to a child. She had been involved in a prior CPS case involving physical abuse of her older son, who was in the foster parents' permanent conservatorship. She left E.C.R. with her boyfriend, who was not E.C.R.'s father, had an extensive criminal history, and had physically abused her. She was incarcerated and unable to care for E.C.R. This affidavit, even if not evidence for all purposes, shows what the trial court relied on in determining whether removal was justified. That court found sufficient evidence to satisfy a person of ordinary prudence and caution that E.C.R. faced an immediate danger

to his physical health or safety, that the urgent need to protect him required his immediate removal, and that he faced a substantial risk of a continuing danger if he were returned home— findings unchallenged by M.R.[8] This evidence

402 S.W.3d 249

and these findings establish that E.C.R. was removed from M.R. under chapter 262 for abuse or neglect. *See, e.g., In re J.S.G.,* No. 14-08-00754-CV, 2009 WL 1311986, at *6-7, 2009 Tex.App. LEXIS 3224, at *18-20 (Tex.App.-Houston [14th Dist.] May 7, 2009, no pet.) (mem.op.) (relying on caseworker's affidavit in support of the Department's removal request, as well as trial court's temporary orders concluding that the children faced a danger to their physical health or safety and a substantial risk of a continuing danger if returned home, to conclude that the evidence established that the children were removed " as a result of neglect specific to them by" the mother); *see also D.F. v. Tex. Dep't of Family & Protective Servs.,* 393 S.W.3d 821, 830–31 (Tex.App.-El Paso 2012, no pet.) (noting that trial court's finding of immediate danger to child's physical health or safety or that they were neglected or abused supported finding of neglect); *In re S.N.,* 287 S.W.3d 183, 190 (Tex.App.-Houston [14th Dist.] 2009, no pet.) (holding that affidavit, family service plan, and temporary orders showing danger to physical health or safety and " ' substantial risk of continuing danger' " supported finding that children were removed under chapter 262 for neglect); *In re A.A.A.,* 265 S.W.3d 507, 516 (Tex.App.-Houston [1st Dist.] 2008, pet. denied) (considering affidavit in support of removal and trial court's temporary orders finding " ' continuing danger to the physical health or safety of the child if returned to the parent' " as evidence that child was removed because of neglect).

M.R. does not dispute that she " failed to comply with numerous, material provisions of court orders that specifically required ... compliance to avoid restriction or termination of parental rights." *J.F.C.,* 96 S.W.3d at 277. As in *J.F.C.,* the record conclusively establishes that E.C.R. was removed from M.R. under Chapter 262 of the Family Code for abuse or neglect, and it is undisputed that he was in the Department's custody for more than nine months

after his removal. The parental conduct described in subsection 161.001(1)( *O* ) of the Family Code was thus established as a matter of law.

### III. A reasonable factfinder could have formed a firm belief or conviction that termination was in E.C.R.'s best interest.

M.R. also challenges the sufficiency of the evidence supporting the best interest finding. In reviewing this finding, we consider, among other evidence, the *Holley* [9] factors. *In re E.N.C.,* 384 S.W.3d 796, 807 (Tex.2012). Many of the reasons supporting termination under subsection O also support the trial court's best interest finding.*See In re C.H.,* 89 S.W.3d 17, 28 (Tex.2002) (holding that same evidence may be probative of both section 161.001(1) grounds and best interest). M.R. pleaded guilty to causing injury to a child, a third

402 S.W.3d 250

degree felony. She twice attempted suicide while incarcerated on that charge, and there was evidence that she was mentally unstable. She no longer has custody of any of her four children. Her oldest was taken into Department custody several years earlier after a referral of physical abuse, and the trial court terminated her parental rights. E.C.R. lives in the same foster home with M.R.'s youngest child, a baby who was born after E.C.R. was taken into custody. M.R. has a history of homelessness, and at the time of the hearing, she had not lived in a home for six months. She has not been employed at any time since E.C.R. was taken into custody, jeopardizing her parental rights and violating the conditions of her community supervision. Although she told the child advocate she was unable to work due to pregnancy, she was unable to provide documentation substantiating that claim, nor did she explain her inability to work at all during the fourteen months the case was pending. When E.C.R. came into care, he was behind on his immunizations. He has done " very well" in foster care, and his foster parents are meeting his physical and emotional needs. The Department's long term goal for E.C.R. is unrelated adoption,

although there was no evidence that his foster family would, or would not, adopt him. *C.H.,* 89 S.W.3d at 28 (" Evidence about placement plans and adoption are, of course, relevant to best interest." ). But " the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor." *Id.* Rather, we examine the entire record to decide best interest, " even if the agency is unable to identify with precision the child's future home environment." *Id.* We conclude that there is evidence from which a fact-finder could have formed a firm belief or conviction that termination of M.R.'s parental rights was in E.C.R.'s best interest.

M.R. also challenged the factual sufficiency of the evidence supporting the best interest finding, a question that the court of appeals must decide. *See* TEX. CONST. art. V, § 6(a). We remand to that court for consideration of the issue.

## IV. Conclusion

We reverse in part the court of appeals' judgment and remand to that court for further proceedings. TEX.R.APP. P. 60.2(d).

—————————

Notes:

[1] *Lassiter v. Dep't of Soc. Servs.,* 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); *see In re E.R.,* 385 S.W.3d 552, 563 (Tex.2012) (" Parental rights are ' far more precious than any property right,' and when the State initiates a termination proceeding, ' it seeks not merely to infringe that fundamental liberty interest, but to end it.' " ) (quoting *Santosky v. Kramer,* 455 U.S. 745, 758–59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)); *see also Holick v. Smith,* 685 S.W.2d 18, 21 (Tex.1985) (noting that " involuntary termination statutes are strictly construed in favor of the parent" ).

[2] *See also* TEX. FAM.CODE § 153.001(a)(2) (" The public policy of this state is to ... provide a safe, stable, and nonviolent environment for the child." ).

[3] The court of appeals refused to consider the Department's cross-points asserting alternative bases for termination. 390 S.W.3d at 29–30 (holding that " a parental rights termination order can be upheld only on grounds both pleaded by [the Department] and found by the trial court" ) (quoting *Vasquez v. Texas Dep't of Protective & Regulatory Servs.,* 190 S.W.3d 189, 194 (Tex.App.– Houston [1st Dist.] 2005, pet. denied)). *But see id.* at 47 (Keyes, J., dissenting) (stating that " predicate acts under section 161.001(1) raised by [the Department] and supported by the evidence, but not expressly found by the trial court" should be considered by appellate court). The Department contends this was error. Because we hold that the Department conclusively proved grounds for termination under subsection O, we do not reach this issue.

[4] *See* TEX. FAM.CODE § 261.001(1)(I).

[5] *See, e.g., In re A.A.A.,* 265 S.W.3d 507, 515 (Tex.App.–Houston [1st Dist.] 2008, pet. denied) (holding that subsection O requires proof of abuse or neglect, which should be determined on a case-by-case basis); *see also D.F. v. Tex. Dep't of Family & Protective Servs.,* 393 S.W.3d 821, 828 (Tex.App.–El Paso 2012, no pet.) (concluding that subsection O requires proof of abuse or neglect); *In re M.N.,* No. 11-10-00129-CV, 2011 WL 917837, at *3, 2011 Tex.App. LEXIS 1924, at *9 (Tex.App.–Eastland Mar. 17, 2011, no pet.)(mem.op.) (same); *In re S.N.,* 287 S.W.3d 183, 190 (Tex.App.–Houston [14th Dist.] 2009, no pet.) (same); *In re M.L.J.,* No. 2-07-178-CV, 2008 WL 1932076, at *5, 2008 Tex.App. LEXIS 3218, at *14 (Tex.App.–Fort Worth May 1, 2008, pet denied) (mem.op.) (same); *In re S.A.P.,* 169 S.W.3d 685, 705–06 (Tex.App.–Waco 2005, no pet.) (same); *In re M.B.,* No. 07-04-0334-CV, 2004 WL 2867544, at *2, 2004 Tex.App. LEXIS 11209, at *7 (Tex.App.–Amarillo Dec. 14, 2004, no pet.) (mem.op.) (same).

[6] *See* TEX. GOV'T CODE § 311.005(13) (" ' Includes' and ' including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the

terms does not create a presumption that components not expressed are excluded." ); *Tex. West Oaks Hosp., LP v. Williams,* 371 S.W.3d 171, 179 (Tex.2012) (holding that Legislature's use of the term " including" meant that statutory definition was nonexclusive); *see also Samantar v. Yousuf,* 560 U.S. 305,130 S.Ct. 2278, 2287, 176 L.Ed.2d 1047 (2010) (observing that " use of the word ' include' can signal that the list that follows is meant to be illustrative rather than exhaustive" ) (citing 2A N. SINGER & J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 47.7, p. 305) (7th ed.2007) (" [T]he word ' includes' is usually a term of enlargement, and not of limitation" (some internal quotation marks omitted)); *Fed. Land Bank v. Bismarck Lumber Co.,* 314 U.S. 95, 99–100, 62 S.Ct. 1, 86 L.Ed. 65 (1941) (holding that " the term ' including' is not one of all–embracing definition, but connotes simply an illustrative application of the general principle" ).

[7] *Cf.* TEX. FAM.CODE § 161.001(1)(E) (authorizing termination if parent engages in conduct that " endangers the physical or emotional well–being of *the child* " ) (emphasis added); *In re J.O.A.,* 283 S.W.3d 336, 345 (Tex.2009) (holding that " the endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage" ); *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987) (holding that conduct that " ' endangers ... the child' " did not require that actions " be directed at the child or that the child actually suffers injury" ) (quoting former TEX. FAM.CODE § 15.02(1)(E)).

[8] *See, e.g., Dancy v. Daggett,* 815 S.W.2d 548, 549 (Tex.1991) (holding that mandamus relief was appropriate because trial court's temporary orders were not subject to interlocutory appeal); *In re Steed,* No. 03–08–00235–CV, 2008 WL 2132014, at *1, 2008 Tex.App. LEXIS 3652, at *2 n. 3 (Tex.App.–Austin May 22, 2008, orig. proceeding) (" Because temporary orders in a suit affecting a parent–child relationship are not subject to interlocutory appeal under the family code, mandamus review is appropriate." ), *mand. denied,* 255 S.W.3d 613, 615 (Tex.2008, orig. proceeding) (" [W]e are not inclined to disturb the court of appeals' decision." ). *But see* TEX. FAM.CODE § 262.112(b) (" In any proceeding in which an expedited hearing is held under Subsection (a), the

department, parent, guardian, or other party to the proceeding is entitled to an expedited appeal on a ruling by a court that the child *may not* be removed from the child's home." ) (emphasis added).

[9] *See Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976). These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and(9) any excuse for the parent's acts or omissions. *Id.*

_____

# In re J.F.C., 46 Tex. Sup. Ct. J. 328, 96 S.W.3d 256 (Tex. 2002)

**Page 256**

**96 S.W.3d 256 (Tex. 2002)**
**46 Tex. Sup. Ct. J. 328**
**In the Interest of J.F.C., A.B.C., and M.B.C., Minor Children.**
**No. 01-0571.**
**Supreme Court of Texas**
**December 31, 2002**

Argued Sept. 4, 2002.

Rehearing Denied March 6, 2003.

---

**Page 257**

[Copyrighted Material Omitted]

---

**Page 258**

[Copyrighted Material Omitted]

---

**Page 259**

Idolina Garcia, Office of the Attorney General of Texas, Julie Caruthers Parsley, Office of the Solicitor General of Texas, Jeffrey S. Boyd, Office of the Attorney General, John Cornyn, Attorney General of the State of Texas, Howard G. Baldwin, First Assistant Attorney General, Austin, James Wiley, Assistant Criminal district Attorney, Amy Innmon Forrester and Thomas C. West, Waco, for Petitioners.

Nita C. Fanning, Kathryn J. Gilliam, Waco, L. T." Butch" Bradt, Houston, and Joseph M. Layman, Waco, for Respondent.

Justice OWEN delivered the opinion of the Court in which Chief Justice PHILLIPS, Justice HECHT, Justice JEFFERSON, and Justice SMITH joined.

After a jury trial, the trial court in this case rendered a judgment terminating the rights of both the mother and father to three of their children. A divided court of appeals reversed and remanded, holding that omission of an instruction that termination must be in the children's best interest from material parts of the jury charge was fundamental error that could be raised for the first time on appeal, and that the error probably caused rendition of an improper judgment. [1] We hold that:

1) although the trial court's charge was erroneous because it omitted the children's best interest as a prerequisite for termination in material parts of the charge, Texas Rule of Civil Procedure 279 requires us to supply the omitted finding in support of the judgment because there is either an express or deemed finding by the trial court that termination is in the children's best interest;

2) the concept of "fundamental error" cannot be used to circumvent the application of Rule 279 of our rules of procedure;

3) applying Rule 279 does not violate the due process clause of the United States Constitution or due course of law provision of the Texas Constitution;

4) because parental conduct on which termination could be based was conclusively established, we do not reach whether the trial court erred in failing to instruct the jury that the same ten jurors must agree that at least one statutorily described course of parental conduct occurred and that termination is in the best interest of the children; and

5) assuming, without deciding, that a judgment could be set aside in a parental

---

**Page 260**

termination case based on ineffective assistance of a parent's counsel, assistance of counsel in this case was not ineffective.

The factual sufficiency issues raised by the parents in the court of appeals pertain to a ground of termination that is unnecessary to the trial court's judgment. The remaining issues raised by the parents do not require reversal of the trial court's judgment terminating the parents' rights. Accordingly, we reverse the court of appeals' judgment and render judgment that the parent-child relationships are terminated.

I

Because we consider the record in this case in some detail later in this opinion, we include here only minimal facts and the procedural history. The three children who are the subject of this proceeding were removed from their parents' home by the Texas Department of Protective and Regulatory Services (DPRS) in October 1997. At that time, the children's respective ages were four years, two years, and seven months.

The children were initially removed without a court order. [2] The next day, the trial court held an emergency removal hearing and appointed the DPRS temporary managing conservator of the children. [3] Five days later, the court held an adversary hearing, continued the removal, and issued temporary orders appointing the DPRS temporary managing conservator. [4]

The trial court thereafter entered various orders directing the parents to perform specific acts to avoid restriction or termination of their parental rights. After working with the family for six months following the children's removal, the DPRS amended its petition in the trial court to seek termination of both parents' rights. A jury trial was held in February 1999, and the trial court rendered judgment in March 1999 terminating the parent-child relationship between each parent and the three children who had been removed from the home seventeen months earlier, in October 1997. A fourth child had been born in January 1999 shortly before trial. That child was removed from the parents at birth but was not the subject of any of the proceedings in this case.

The parents appealed, and the court of appeals, with one justice dissenting, reversed the trial court's judgment and remanded the case for a new trial. The court of appeals concluded that the charge permitted the jury to find that the parents' respective rights should be terminated without finding that termination would be in the children's best interest. Although the parents had not objected to the charge on this basis, the court of appeals held that the omission went to a "core issue" in a termination case, and that failing to review the unpreserved error on appeal would violate "Fourteenth Amendment procedural due process" requirements under the United States Constitution. [5] The parents had also complained for the first time on appeal that it was error in a parental termination case to use broad-form submission because less than ten jurors could rely on one basis for termination while other jurors could rely on another basis. [6] The parents contended that there must be a separate finding with regard to each

---

**Page 261**

element necessary for termination. [7] The court of appeals rejected these arguments, concluding that broad-form submission was permissible. [8] The dissent would have affirmed the trial court's judgment on the basis that there was either an express or implied finding that termination of parental rights was in the children's best interest. [9]

## II

We first consider the jury charge's submission of the best interest of the children. There is no indication in the record that the trial court or any counsel in the case was under any misapprehension that there are two prerequisites for termination of parental rights under section 161.001 of the Texas Family Code. Section 161.001 sets forth nineteen different courses of parental conduct, any one of which may satisfy the first prerequisite for termination. The second prerequisite under section 161.001 is that termination must be in the child's best interest. However, the written charge to the jury in this case omitted the children's best interest as an element in three material parts of the charge, perhaps because of a typographical error. The submission of the termination issues was as follows:

With regards to [**THE MOTHER**], for the parent-child relationship to be terminated in this case, it must be proved by clear and convincing evidence that she has done at least one of the following:

1) Engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

OR

2) Failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for abuse or neglect of the child.

With regards to [**THE FATHER**], for the parent-child relationship to be terminated in this case, it must be proved by clear and convincing evidence that he has done at least one of the following:

· Knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children;

OR

· Failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for abuse or neglect of the child. For the parent-child relationship to be terminated in this case, it must also be proved by clear and convincing evidence that termination of the parent-child relationship would be in the best interest of the children.

Some factors to consider in determining the best interest of the child are:

1. the desires of the child,

---

**Page 262**

2. the emotional and physical needs of the child now and in the future,

3. any emotional and physical danger to the child now and in the future,

4. the parenting ability of the individuals seeking custody,

5. the programs available to assist those individuals to promote the best interest of the child,

6. the plans for the child by those individuals or by the agency seeking custody,

7. the stability of the home or proposed placement,

8. the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and

9. any excuse for the acts or omissions of the parent.

QUESTION 1:
Should the parent-child relationship between [**THE MOTHER**] and [**J.F.C.**] be terminated?
Answer "Yes" or "No."
Answer:

[similar questions as to the other two children]

QUESTION 4:
Should the parent-child relationship between [**THE FATHER**] and [**J.F.C.**] be terminated?
Answer "Yes" or "No."
Answer:

[similar questions as to the other two children]

The charge would have accurately instructed the jury regarding the children's best interest if a hard return had been inserted in the instruction regarding the father just before the words "For the parent-child relationship to be terminated...." But as can be seen, the written instruction regarding the father's parental rights mentioned the best interest of the children only in connection with one of the two alternative descriptions of parental conduct. The jury was free to conclude that if the father had endangered the children, his rights could be terminated without any consideration of the children's best interest. Because of the way the written charge was structured, the factors the jury was to consider in determining the best interest of the children were referable only to whether the father had failed to comply with a court order establishing the actions necessary for return of the children.

The written instruction to the jury regarding the mother's parental rights omitted any reference to the best interest of the children. The jury was instructed that her rights could be terminated if there was clear and convincing evidence that she either engaged in conduct that endangered the children or failed to comply with a court order establishing the actions necessary for the return of her children.

Accordingly, the charge in this case omitted a statutorily prescribed element for parental termination. There was no objection to this omission.

**A**

Rule 279 of the Texas Rules of Civil Procedure prescribes the consequences for failing to object to the omission of an element of a ground of recovery. The current version of Rule 279, like its predecessor, embodies long-standing case law that when some but not all elements of a claim or cause of action are submitted to and found by a jury, and there is no request or objection with regard to the missing element, a trial court may expressly make a finding on the omitted element or, if it does not, the omitted element is deemed found by the court in a manner supporting the judgment if the deemed

finding is supported by some evidence. [10] Rule 279 thus directs courts how to proceed when an element of a "ground of recovery or defense" is omitted from a jury charge. [11]

In this case, the trial court's judgment contains an express finding that termination is in the best interest of the children. It recites that

the Court having reviewed the said verdict of the Jury and the pleadings and the evidence herein is of the opinion that the Petitioners are entitled to the judgment of termination with regard to the children in whose interest this suit is brought, and that such judgment is in the best interest of the children in whose interest this suit is brought.

There is no indication in the record that this finding was made at the request of either party, or after notice and hearing before rendition of judgment, as Rule 279 contemplates. [12] However, there was no objection to the inclusion of this finding in the judgment.

But irrespective of whether that written finding satisfies Rule 279 regarding an express finding, the "omitted element or elements shall be deemed found by the court in such manner as to support the judgment" [13] if there is evidence to support such a finding. [14] Because the judgment terminated parental rights, we must determine whether there is evidence to support a deemed finding that termination is in the children's best interest.

Due process requires the application of the clear and convincing evidence standard of proof in parental termination cases. [15] This Court has looked to the United States Supreme Court in articulating what the "clear and convincing evidence" standard means. [16] And, following

this Court's decision in *In re G.M.,* 596 S.W.2d 846 (1980) the Legislature amended the Texas Family Code to change the burden of proof in termination cases from a preponderance of the evidence to clear and convincing evidence. [17] The Family Code defines clear and convincing evidence in the same manner that this Court has defined that burden of proof: " 'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." [18]

### B

We have never considered how to apply the overlay of the clear and convincing evidence burden of proof onto our legal sufficiency, also known as our "no evidence," standard of review in cases other than defamation cases. [19] However, just recently, in a parental termination case, this Court was called upon to determine how the clear and convincing evidence standard must be applied in a factual sufficiency review. [20] We held in *In re C.H.,* 89 S.W.3d 17 (2002) "that the appellate standard for reviewing termination findings is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." [21] We expressly "reject[ed] standards that retain the traditional factual sufficiency standard while attempting to accommodate the clear-and-convincing burden of proof." [22] We concluded that "the burden of proof at trial necessarily affects appellate review of the evidence." [23] We explained:

Under traditional factual sufficiency standards, a court determines if a finding is so against the great weight and preponderance of the evidence that it is manifestly unjust, shocks the conscience, or clearly demonstrates bias. But that standard is inadequate when evidence is more than a preponderance (more likely than not) but is not clear and convincing. As a matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance. [24]

The same logic dictates the conclusion that our traditional legal sufficiency standard,

which upholds a finding supported by "[a]nything more than a scintilla of evidence," [25] is inadequate when the United States Constitution requires proof by clear and convincing evidence. Requiring only "[a]nything more than" a mere scintilla of evidence does not equate to clear and convincing evidence.

We find support for this conclusion, by analogy, in the United States Supreme Court's decision in Jackson v. Virginia. [26] In the criminal, habeas corpus context, the Supreme Court held in Jackson that the "no evidence" test it had previously articulated in Thompson v. Louisville [27] was "simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt" because " '[a] mere modicum of evidence may satisfy a 'no evidence' standard.' " [28] The Court defined a "mere modicum" of evidence to include "[a]ny evidence that is relevant--that has any tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence." [29] The Court concluded that "it could not seriously be argued that such a 'modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt." [30] The Court explained further:

Application of the Thompson [no evidence] standard to assess the validity of a criminal conviction after Winship could lead to absurdly unjust results. Our cases have indicated that failure to instruct a jury on the necessity of proof of guilt beyond a reasonable doubt can never be harmless error. Thus, a defendant whose guilt was actually proved by overwhelming evidence would be denied due process if the jury was instructed that he could be found guilty on a mere preponderance of the evidence. Yet a defendant against whom there was but one slender bit of evidence would not be denied due process so long as the jury has been properly instructed on the prosecution's burden of proof beyond a reasonable doubt. Such results would be wholly faithless to the constitutional rationale of Winship. [31]

The availability of habeas review has since been limited by the United States Supreme Court, but a majority of the Court has not modified the Jackson standard of review when the merits of a habeas petition are reached. [32]

The reasoning in Jackson reinforces our conclusion that to apply our traditional no evidence standard of review in a parental termination case would not afford the protections inherent in the clear and convincing standard of proof. As the example in Jackson highlights, a parent's rights could be terminated based on "but one slender bit of evidence" as long as the jury was properly instructed on the clear and convincing evidence burden of proof. Our legal sufficiency review, therefore, must

**Page 266**

take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof.

The distinction between legal and factual sufficiency when the burden of proof is clear and convincing evidence may be a fine one in some cases, but there is a distinction in how the evidence is reviewed. In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. [33] Rendition of judgment in favor of the parent would generally be required if there is legally insufficient evidence. [34]

In a factual sufficiency review, as we explained in In re C.H., a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. [35] We also explained in that opinion that the inquiry must be "whether the evidence is such that a factfinder could reasonably form a firm belief

or conviction about the truth of the State's allegations." [36] A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. [37] A court of appeals should

detail in its opinion why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding.

A number of our courts of appeals held, prior to our decision in In re C.H., [38] that a legal sufficiency review in a case in which the burden of proof is clear and convincing evidence is the same as in a case in which the burden of proof is a preponderance of the evidence. [39] We disapprove of those decisions' articulation of the standard of review on appeal. At least five courts of appeals' decisions have concluded that a heightened standard of review applies when the burden of proof is clear and convincing evidence, [40] but the standards they articulated differ in varying degrees from our holdings in In re C.H. [41] and in this case today.

We note that the parents have not argued that the United States Constitution requires appellate courts to conduct a de novo review in parental termination cases like the de novo review that the United States Supreme Court has held is required in defamation cases [42] and for punitive damage awards. [43] The parents' only constitutional

challenge regarding the best interest of the children is that violations of due process under the federal Constitution and of the due course of law provision in our state Constitution have occurred because there is no specific finding answered by the jury that termination is in the children's best interest. We consider this argument is section II.D. below. In the absence of any contention that the federal constitution requires a de novo review of the evidence, we leave open, as we did in In re C.H., whether the United States Constitution requires the type of review set forth by the United States Supreme Court in Harte-Hanks [44] and Bose, [45] and if so, whether the standards we have set forth above would comport with the de novo review required by those decisions.

Finally, we note that our decision in Garza v. Maverick Market, Inc. [46] is distinguishable. Garza concerned a wrongful death claim by an illegitimate child. This Court reaffirmed its prior holding in Brown v. Edwards Transfer Co. [47] that "[i]f paternity is questioned in a wrongful death action, the alleged child would have to prove by clear and convincing evidence that he is a filial descendant of the deceased." [48] Our Court had adopted the clear and convincing evidence standard in such cases to maintain consistency with the Legislature's choice of the clear and convincing evidence standard in connection with other legitimacy issues under the Probate Code and the Family Code. [49] The United States Supreme Court had not mandated a clear and convincing evidence burden of proof. Accordingly, this Court, not the federal constitution, imposed a clear and convincing burden of proof in Garza. The Court's statements in Garza that if there is "some evidence," the case must go to the jury, that "we 'consider all of the evidence in the light most favorable to the plaintiff, disregarding all contrary evidence and inferences,' " and that "[t]he question of whether the evidence clearly and convincingly prove[s paternity is] a question for the jury to determine," [50] do not control when, as here, we are considering a constitutionally mandated clear and convincing evidence burden of proof.

We turn to evidence in this case of whether termination is in the children's best interest.

C

In applying the standards set forth above, we consider the evidence that supports a deemed finding regarding best interest and the undisputed evidence. We do not consider evidence that a factfinder reasonably could have disbelieved.

Child Protective Services (CPS) began monitoring the parents and offering services on a continuing basis in March 1997. At that time, there were three children. J.F.C. was four years old, A.B.C. was two and one-half years old, and M.B.C. had just been born. The family lived on the campus of the Texas State Technical College.

The incident that gave rise to CPS's continual monitoring of this family was a report that the parents "had serious drug problems" and that they were physically abusive to one another. An investigator went to the home to meet with the parents

---

and examine the children. After initially refusing to permit the investigator to see the three children, the parents ultimately allowed the investigator to examine the oldest child and the infant. The investigator did not see any indication of abuse or neglect of these two children and noted that J.F.C. seemed happy. However, the parents told the investigator that two-and one-half-year-old A.B.C. was with a babysitter and was therefore unavailable for examination. The CPS investigator went to the babysitter's home, but she denied having seen the child that day. CPS then contacted the Texas State Technical College police, who accompanied the CPS investigator back to the family's home. It was only then that the parents produced A.B.C., and the investigator learned that the mother had hit A.B.C., leaving dark bruises surrounding the outside of the child's eye.

In an interview shortly after CPS discovered that A.B.C. had been abused, the father told a CPS counselor that his wife (the children's mother) was "very physically violent" and physically attacked him. He also said he was concerned for the safety of his children because their mother brought other men home and had sexual relations with them. There were also other people living in the home whom the father said he did not trust. Both parents admitted that during one of their many arguments, the mother had chipped or knocked out one of the father's teeth.

During April 1997, the parents also admitted to being under the influence of illegal drugs while watching the children, and CPS learned that the mother had tested positive for cocaine and methamphetamines shortly after M.B.C.'s birth a month earlier in March 1997. When asked about their drug use at trial, both parents said that they used cocaine while the children were at home and in their care. The mother further admitted to using cocaine within two weeks after giving birth to M.B.C., but she then testified that her children were safe in her care when she was using cocaine because the drug made her "more aware of [her] surroundings" and that they weren't endangered "even a little bit" when both parents were "high on drugs." The father in turn testified that God made cocaine available to him in times of grief and pain and that he was always able to supervise the children in a very caring manner even when he was under the influence of narcotics.

Although CPS knew of the drug use and some of the family violence as early as April 1997, it concluded that removal of the children was not justified because they were not in immediate danger. CPS instead implemented a Child Safety Evaluation and Plan in April 1997. The mother submitted to a psychological exam in compliance with this plan, and based on the results, CPS concluded that she was not "an immediate threat of harm to the children." Because the father refused to submit to a psychological exam, CPS referred the case to what it called "family preservation" in July 1997. The next month, the father did submit to a psychological exam, and based on the results of his and the mother's exam, family preservation recommended counseling.

A Family Service Plan was established in August 1997, five months after the initial instance of child abuse in March of that year. The plan established tasks for each parent, including drug assessments, individual counseling, and marriage counseling. The mother attended three of four scheduled sessions, but the father attended only one before the children were removed in October 1997.

Between April and early October of that year, CPS found no further indication of physical abuse of the children during home

---

visits. However, there was evidence of continued and escalating hostility between the parents from April of 1997 until October 22, 1997, when the children were removed from the home. CPS case workers witnessed arguments and hostility and met with each parent separately during home visits in order to be able to communicate with them. Because of the continual arguing between the parents, CPS recommended day care for the children, to which the parents agreed. Day care commenced the first week of October, but a few days later, another incident of physical abuse of A.B.C. occurred. The parents had arrived to pick up A.B.C. at day care, and the child began what the mother described as a "temper tantrum." A heated argument between the parents ensued, and the mother grabbed A.B.C. by the throat and face and shoved him into a car seat. A.B.C. later told a case worker that this hurt his neck, and an investigator subsequently found a mark on A.B.C.'s forehead and fingernail scratches on his neck. The children's attendance at day care thereafter was sporadic because the parents would not take them, even after CPS offered to provide transportation.

There was testimony at trial from Texas State Technical College police officers about domestic disturbances. Their records indicate that they responded to fourteen reports of violence at the family's home. The mother testified that the police came to their home between ten and fifteen times because she and her husband (the father of the children) were "extremely angry and arguing." Some of the visits by the campus police occurred before the DPRS removed the children and while the children were in the home. One of the officers testified that he had been to the home to respond to domestic disturbances and had seen three children. He always checked the children, and there were no signs of physical harm. He described the parents as "venomous" towards one another, and testified that the children definitely heard their fighting. The officer urged the mother many times to seek counseling, identifying several on- and off-campus sources, and at least once offered "any type of assistance [to the father] to overcome any problems."

On two other occasions, in August and October 1997, just before the children were removed, campus police officers went to the home because of domestic violence disturbances. On both occasions, the parents were upset, arguing loudly, and could not communicate with one another. The children were not at home during the latter incident. About a year and a half earlier, in 1996, campus police had given the mother and two of the children a ride home because the father had left them "on foot." (M.B.C. had not yet been born.)

The day the children were removed from the home (twelve days after the car seat incident), the father called the CPS case worker. The father was "very irate" and was "shouting ... that ... he wasn't going to be responsible for the children" and that he was "getting out of there." While the father was on the phone, the case worker heard an argument between the parents that was escalating. When the phone abruptly went dead, the case worker immediately went to the home. When he arrived, the father had left. The mother was very agitated and highly emotional. She complained about A.B.C., who was almost three years old at this point, saying that he "yelled and screamed all the time," that he "threw fits," that "[n]obody could control him or calm him down," and that she "just didn't know what she was going to do." The case worker took the children to day care, found the father, and brought both parents to his office. The parents did not calm down. CPS concluded that it would be unsafe for the children to go

**Page 271**

home to the parents in that state and asked the parents if there were relatives who could take the children. The mother gave them the name of one person, who declined to provide care for the children. Neither parent could offer any other names. The children remained with CPS that day, and the parents went home. CPS attempted to contact the parents for several days thereafter without success to arrange a visit with the children.

At this point, the DPRS petitioned the trial court to be appointed as temporary managing conservator of the children. The trial court ultimately entered a series of orders setting forth specific actions that each parent was to take. The orders advised the parents that if they did not comply, their children might not be returned and their parental rights could be terminated. The parents both testified at trial that they understood what the orders required and the consequences of noncompliance. The parents also testified that they did not comply with many provisions of family preservation plans CPS had implemented prior to removal of the children. As detailed in section III below, the parents consciously failed to comply with material provisions of the trial court's orders. Each parent was ordered to pay child support in the amount of $100 per month, not for each child, but for all three. The mother testified that although she could financially afford it, she deliberately chose not to pay child support because she believed that she

should not have to. The father gave similar testimony. Both parents refused to attend any parenting classes or to attend individual counseling sessions. The father testified that he continued to use illegal drugs. The mother became pregnant with the couple's fourth child, and although ordered by the trial court to obtain prenatal care, she did not do so for the first six months of her pregnancy.

After the children were removed from the home, violence between the parents continued. Seven days after the children were removed, a Texas State Technical College Police officer was again called to the home after a female's screams had been heard. When the responding officer approached the home, the father would not allow him to enter and insisted that the mother was not there. The father was "violent, screaming, yelling, cussing, belligerent, [and] uncooperative." The officer called the father on the phone, and the father continued to insist that the mother was not at home. It was only after the Waco SWAT team arrived that an agreement was reached by phone with the father. He and the mother then appeared at a picture window to show the officers that had gathered at the scene that the mother was not physically harmed.

On another occasion, campus police responded when the father had locked the mother out of the home during an argument even though she was stark naked. She broke a window with her hand and arm to gain re-entry and was cut and bleeding.

Campus police officers also responded to a call eight months after the children were removed when the father struck an eight-year-old neighbor. The police ultimately termed it an accidental striking, even though the father had threatened to hit the child right before he accidentally hit her. The father was, however, arrested on this occasion for evading detention. The record does not provide details of all fourteen responses by campus police to the home, but an officer described the father as "angry and explosive" and the mother as "[a]ngry, belligerent, nervous, [and] argumentative" in his dealings with them.

There was considerable expert testimony at trial that related to the children's

---

**Page 272**

best interest. One expert testified that the physical violence and verbal confrontations in the home had a negative emotional impact on the children. A.B.C. told this licensed counselor that he had seen his parents hit one another and that his father had hit him with a baseball bat. A.B.C.'s play consisted of male characters hitting female and child characters. One CPS worker observed visits between the parents and the children after their removal. She said these visits tended to be "chaotic" and that the children's behavior deteriorated after each visit. And there was testimony that the children displayed no distress at being separated from their parents.

A psychologist with over thirty years experience also evaluated both parents. In addition to taking the history of each parent, a battery of formal tests was conducted. This expert concluded that the mother had "manic tendencies, tendencies toward cycles of explosive behavior followed by periods of calm." He did "not see any real potential for change. I'd have to say her potential is extremely limited." When asked if the mother "is a fit parent or could she be," this expert said, "[t]here are too many concerns about aggression and violence and hostility as well as documented things in the history that are giant red flags in regard to parenting, and I would have to say, no, she doesn't have that capacity." There was extensive, detailed testimony about the mother's responses to various questions and standardized tests that directly related to violence. She also revealed that at some time in the recent past, she had hit a 22-month-old child when she was babysitting.

This same expert testified that during the psychological testing of the father, the father reported an "extensive drug history," including the use of LSD, amphetamines, cocaine, and marijuana. The expert also testified that psychological testing and medical history indicated that the father suffered from a bipolar disorder and that an unmedicated individual with bipolar disorder who was using "street drugs" was "extremely dangerous." The doctor testified that he recommended that the father see a psychiatrist who could prescribe medication, but he testified that he believed the father would not comply in taking the medication because he, like other individuals with bipolar disorder, prefers the excitement of the unmedicated state. The expert concluded that the father was "a very troubled individual," and the expert was "most concerned about the potential for violence, especially since there were so

many areas where family conflict was noted." The expert further testified that the father's responses to items on a standardized test that related to sexual deviance raised concerns about parenting potential.

There was undisputed evidence that does not support a finding that termination was in the children's best interest. About a year after the children were removed from the home, the parents moved to Austin. The mother found work there. The parents' landlord in Austin testified that their home was a "safe environment." The obstetrician who attended the birth of their fourth child described the parents as "an appropriate, courteous, and loving couple." There was also evidence that after this termination case was set for trial, the parents made attempts to comply with some parts of the trial court's order. But in spite of this evidence, a factfinder could reasonably form a firm belief or conviction that termination was in the children's best interest.

**D**

The parents have asserted that the omission of the children's best interest

---

from the jury charge violated the due process clause of the United States Constitution [51] and the due course of law provision of the Texas Constitution. [52] That argument was not preserved in the trial court. But assuming, without deciding, that this complaint could be raised for the first time on appeal, the argument has no merit. Applying Rule 279 to deem a finding in support of a judgment in a parental termination case does not violate the due process clause of the United States Constitution or the due course of law provision of the Texas Constitution.

The United States Supreme Court has held in Santosky v. Kramer that "[w]hen the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." [53] In the termination context, due process "turns on a balancing of … 'three distinct factors.' " [54] Those factors are: "the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure." [55]

In a parental termination case, the private interest affected is the right of a parent to raise his or her child, which is undeniably "an interest far more precious than any property right." [56] The Supreme Court has correctly observed that "[w]hen a State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." [57] The Supreme Court has thus termed the private interest in a parental termination case "a commanding one." [58]

The second factor identified by the Supreme Court in Santosky is "the risk of error created by the State's chosen procedure." [59] On balance, the risk of error caused by Rule 279 is not substantial. Rule 279 deems a finding on an element of a claim only after a full trial on the merits. Rule 279 does not deem an omitted finding in support of the judgment if the parent has objected to the omission or requested a proper submission. And, more importantly, an omitted finding may be supplied by an express finding of the trial court or a deemed finding only if that finding is supported by evidence. In a parental termination case, that evidence must be clear and convincing. A parent may raise legal and factual sufficiency challenges even after the verdict is rendered, and an appellate court will review those challenges on appeal, including the challenges to the legal and factual sufficiency of the evidence supporting the omitted finding. On appeal, the courts also consider whether the evidence was clear and convincing. [60]

In this case, the parents' motion for new trial asserted that the evidence was factually insufficient to support a finding that the parents had endangered the children or had failed to comply with court orders specifying the actions they were to take in order to have their children returned.

---

There was an opportunity to challenge the legal and factual sufficiency of the evidence regarding the best interest of the children, but the parents did not avail themselves of that opportunity in the trial court. Nor have they challenged legal or factual sufficiency regarding the best interest of the children in the court of appeals or this Court.

The third due process factor identified in Santosky is the governmental interest supporting use of the challenged procedure. [61] The government has a substantial interest in preventing retrial of a case when 1) some but not all elements of a termination action have been submitted to and found by a jury based on clear and convincing evidence or have been established as a matter of law, 2) the trial court renders judgment on the jury's verdict, and 3) there is clear and convincing evidence to support a finding of the missing element. Parents and children also have an interest in resolving termination proceedings as expeditiously as reasonably possible. A retrial results in prolonged uncertainty and disruption in the lives of the parents and children who are involved. The government has a legitimate interest in encouraging a parent to object in the trial court if a statutorily prescribed element of a termination action has been omitted from the court's charge rather than challenging the omission for the first time on appeal. A trial court can easily cure an omission in its charge to the jury if that omission is called to its attention before the case is submitted.

For these reasons, Rule 279 does not deprive the parents of due process or due course of law.

E

The dissenting opinions would resolve this case by analyzing whether an omission of an element of a claim in a jury charge is fundamental error. JUSTICE SCHNEIDER'S dissenting opinion urges the Court to do so in order to provide "guidance for practitioners and lower courts." [62] But the importance of an issue asserted by a party cannot justify ignoring applicable rules of procedure that bind this Court.

Rule 279 requires a reviewing court to supply an omitted finding in support of the trial court's judgment where, as here, there was no objection to the omission in the trial court, and some (in this case clear and convincing) evidence supports the omitted finding. This Court must apply the rules of civil procedure unless a constitutional provision or statute requires us to do otherwise. JUSTICE HANKINSON'S dissent incorrectly asserts that we are considering unpreserved error. Appellate courts should not reverse a trial court's judgment in violation of Rule 279 any more than appellate courts should reverse a trial court's judgment for error that was harmless. Rule 279 applies just as Texas Rule of Appellate Procedure 44.1 applies.

JUSTICE HANKINSON'S dissenting opinion seems to reason that since it concludes that the error in omitting an element of a claim was fundamental error, the charge should be reviewed as if an objection had been made. But this reasoning is circular since the fact that no objection was made is precisely why Rule 279 applies. Because of the operation of Rule 279, we have a very narrow question before us regarding "fundamental error." That question is whether the notion of "fundamental error" can be used to circumvent the operation of Rule 279 when a party fails to object to the

---

**Page 275**

omission of an element of a claim against that party. We answer that question "no." Assuming, without deciding, that the formulation of fundamental error in JUSTICE HANKINSON'S dissenting opinion is correct, deeming an omitted finding in support of a judgment in a parental termination case when that finding is supported by clear and convincing evidence does not adversely affect any "fundamental public policy" found in the Texas Constitution or statutes. [63] Giving full effect to Rule 279 simply means that a court, rather than a jury, has supplied a finding that is supported by clear and convincing evidence on one of the elements of parental termination. Neither the Texas Constitution nor any statute prohibits a bench trial of one or more issues in a termination case when there has been no objection by the parent.

To put this in perspective, suppose that a parent had requested a jury trial, but then failed to object when the trial court conducted a bench trial instead of empaneling a jury, entered findings of fact and conclusions of law, and rendered judgment terminating the parent-child relationship. Would we say that the parent could argue for the first

time on appeal that his or her right to a jury trial had been denied because this was fundamental error? The answer to that question is "no."

JUSTICE HANKINSON'S dissenting opinion concludes that the error in the charge was harmless because "the focus" of the trial was the children's best interest. [64] JUSTICE HANKINSON'S dissent seems to be saying that in spite of what the jury was told in writing by the trial court's charge, the omission of the children's best interest in three of four material parts of the charge was cured because there was so much evidence and argument from counsel about the children's best interest, the jury must (somehow) have understood that it could not find that the parent-child relationships should be terminated unless it concluded that termination was in the children's best interest.

While we agree that there was legally sufficient clear and convincing evidence that termination was in the children's best interest, most of the evidence relevant to the best interest of the children was also relevant to the grounds for termination based on the parents' conduct set forth in the charge. The jury was not told that it had to reach separate, distinct conclusions not only that there were grounds for termination based on the parents' conduct, but also that termination would be in the children's best interest. The jury was specifically instructed that the best interest of the children must be found in connection with only one of the four grounds for terminating based on parental conduct.

F

The record before us does not require a remand to the court of appeals for a factual sufficiency review of the deemed finding that termination was in the children's best interest. In the absence of a challenge to the factual sufficiency of the evidence, appellate courts must deem an omitted finding in support of a judgment if there is some evidence [65] (in this case clear and convincing evidence) to support the

---

**Page 276**

omitted finding and the other requirements of Rule 279 have been met.

Rule 279 permits a trial court to make an express finding on an omitted element if there is "factually sufficient evidence to support a finding." [66] If the trial court does not make an express finding, "such omitted element or elements shall be deemed found by the court in such manner as to support the judgment." [67] Rule 279 applies to deemed findings in a jury trial and is a parallel to Rule 299, which applies to deemed findings in a bench trial. Rule 299 provides: "where one or more elements thereof have been found by the trial court, omitted unrequested elements, where supported by evidence, will be supplied by presumption in support of the judgment." [68] The history of the rules that require deemed findings in both jury and bench trials do not indicate that there is to be any difference in the application of these rules in requiring a court to deem a finding. [69] It is only when there has been a factual sufficiency challenge that is preserved in the trial court that a deemed finding must be reviewed for factual sufficiency on appeal. [70]

The parents in this case have not contended in the trial court, the court of appeals, or this Court that the evidence is factually insufficient to support a finding that termination is in the children's best interest. Accordingly, we need not address whether factual sufficiency of evidence may be raised for the first time on appeal in a parental termination case. [71] The inquiry in this appeal is limited to whether there is legally sufficient evidence to support the trial court's express or deemed finding that termination is in the best interest of the children. The trial court's deemed finding that termination is in the best interest of the children is supported by legally sufficient clear and convincing evidence.

---

**Page 277**

III

The parents have an additional complaint about the jury charge. There are two predicates to parental termination under section 161.001 of the Texas Family Code. The first is that one or more courses of parental conduct must be established. The second is that termination must be in the best interest of the children. The gravamen of the parents' complaint is that the charge does not require the same ten jurors to agree that a parent engaged in at least one particular course of conduct described by section 161.001(1) and that termination is in the children's best interest. The charge only requires that ten jurors agree that the parent-child relationships should be terminated. [72] They thus contend that this broad-form submission did not satisfy federal due process requirements.

This constitutional challenge was not raised in the trial court. However, even assuming, without deciding, that 1) this argument could be raised for the first time on appeal, and 2) the charge erred in this regard, we do not reach the constitutional challenge because the evidence conclusively establishes that each parent engaged in a course of conduct described by subsection 161.001(1) of the Family Code. Therefore, the alleged error did not cause the rendition of an improper judgment or prevent the parents "from properly presenting the case to the court of appeals." [73]

Paragraph (O) of subsection 161.001(1) provides that one basis for establishing the parental conduct prong required for termination of parental rights is that a parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the [DPRS] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child." The State relied on subsection (O) as one of two alternate grounds of parental conduct that could support termination.

It is undisputed that both parents failed to comply with numerous, material provisions of court orders that specifically required their compliance to avoid restriction or termination of their parental rights. During the sixteen-month period between the time the DPRS removed the children and the time of trial, the trial court entered four separate orders. [74] Each order specifically advised the parents that failure to provide a safe environment within a reasonable time could result in restriction or termination of their parental duties and rights or the children not being returned to them. Each order directed each parent to perform specific acts. The mother testified that they knew they had to comply with the orders to obtain the return of the children. But both the mother and the father admitted that they had consciously decided not to comply with many of the requirements imposed by the orders.

There are some provisions of the orders with which the parents partially complied and others for which they offered an excuse for their noncompliance. But even

**Page 278**

giving full credit to their excuses and partial compliance, there were a number of material provisions of the orders with which the parents completely and undisputably failed to comply. Among other things, each of the four orders required the parents to (1) pay $100.00 per month in child support for the children while they were in DPRS custody; [75] (2) obtain an individual psychiatric evaluation; [76] (3) participate and make progress in parenting classes; (4) voluntarily submit to random urinalysis testing; and (5) participate and make progress in anger control classes. While the four orders were in effect, the parents never paid a single dollar of child support even though they admitted they were capable of doing so; never attended a single anger control class; and never attended a single parenting class.

Similarly, at the time of trial, the parents had yet to obtain an individual psychiatric evaluation. At one point, the mother scheduled a psychiatric evaluation and went to the appointment but refused to participate without her husband being present during the examination. Shortly before trial, the parents made appointments to obtain evaluations during the week after the scheduled trial. But, again, even giving full credit to their last minute efforts to comply, it is undisputed that they were not in compliance at the time of trial and had not complied with that portion of the trial court's orders.

With regard to the urinalysis requirement, the DPRS made no requests for urinalysis under the second order, but the parents admitted and other evidence shows that they refused requests to submit to urinalysis during the time the first order was in effect. And, although they took one requested urinalysis test under the third order, they took

only two of the six urinalysis tests requested under the December 15, 1998 order, which were requested in the few weeks before trial.

As noted above, the orders set forth requirements with which the parents partially complied. Prior to April 1998, the mother attended six of thirteen scheduled individual counseling sessions, and the father attended five of eleven. But because the parents missed so many appointments, the therapist expelled them from the program. The orders required the parents to maintain appropriate housing free from abuse, neglect, and safety hazards. As discussed above in section II.C., family violence in the home continued after the removal of the children. And, in June 1998, the parents were evicted from the Texas State Technical College campus. In August or September 1998, about five or six months before trial, the parents moved to Austin. There is some evidence that they had a clean, safe home there. But these sporadic incidents of partial compliance do not alter the undisputed fact that the parents violated many material provisions of the trial court's orders.

The evidence establishes as a matter of law that the parents failed to comply with the court's orders specifying the actions the parents had to take for the DPRS to return the children to the parents. The record also conclusively establishes that

the children were removed from their parents under Chapter 262 of the Family Code, and it is undisputed that they were in the DPRS's custody for more than nine months after their removal. Accordingly, the parental conduct described in subsection 161.001(1)(O) of the Family Code was established as a matter of law. Any error in failing to submit a specific instruction on juror agreement regarding parental conduct was thus harmless.

### IV

The parents additionally contend that their counsel's failure to object to error in the charge and other alleged mistakes during trial rendered his assistance ineffective and that they are entitled to a new trial on that basis. The parents argue that the Sixth Amendment to the United States Constitution entitles a parent to effective assistance of counsel when termination of parental rights is sought. They assert that termination is no less a punishment than imprisonment or even capital punishment.

Several Texas courts of appeals have considered whether the Sixth Amendment or other federal constitutional provisions mandate effective assistance of counsel in termination cases, and they have reached differing conclusions. A number of courts of appeals have concluded that the federal constitution does not grant that right. [77] At least one court of appeals has indicated that it does, [78] although other statements in its opinion indicate that it concluded that the right flows from section 107.013 of the Texas Family Code that requires appointment of counsel in limited circumstances. [79] Another court of appeals has recognized a right to effective counsel because of both section 107.013 and that court's "procedural due process concerns." [80] At least four decisions in other states recognize a right to effective assistance of counsel in termination cases, two of those basing the right on a statute requiring appointment of counsel, one finding that the right emanates from the due process clause of the Fourteenth Amendment, and the fourth apparently basing its conclusion on the Sixth Amendment. [81]

We believe that it is prudent to defer the resolution of whether a parent in a termination case may seek a new trial based on ineffective assistance of counsel because in this case, even applying the stringent test set forth by the United States Supreme Court for use in criminal cases, assistance of counsel was not ineffective.

In Strickland v. Washington, the United States Supreme Court examined at length the considerations in determining whether counsel in a capital or other criminal case was ineffective. [82] The Supreme Court's observations were extensive. The Supreme Court said at the outset of Strickland that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process

that the trial cannot be relied on as having produced a just result." [83] The Court then said there were two components in a criminal case in determining whether assistance of counsel was so defective to require reversal:

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. [84]

With regard to the first component, the Supreme Court said:

· "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." [85]

· "The purpose [of the Sixth Amendment's effective assistance of counsel guarantee] is simply to ensure that criminal defendants receive a fair trial." [86]

· "Judicial scrutiny of counsel's performance must be highly deferential." [87]

· "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." [88]

· "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered

---

**Page 281**

sound trial strategy.' " [89]

· "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." [90]

· "The court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." [91]

The Supreme Court then said with regard to the second component that even if an error by counsel were professionally unreasonable, that "does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." [92] Elaborating, the Court said:

· "Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." [93]

· "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." [94]

· "On the other hand, we believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." [95]

· "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [96]

· "A court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law." [97]

· "A verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." [98]

· "Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." [99]

We reiterate that we leave open the question of whether a claim of ineffective assistance of counsel may be asserted as a basis for reversing a judgment in a parental termination case. Even were we to recognize such a claim, the question of whether our harmless error rule must be discarded in such cases is another significant question that would have to be broached.

But even measuring the parents' complaints about their counsel against

---

**Page 282**

Strickland's standards, assistance of counsel was not ineffective in this case. Although the parents' complaints about their counsel are numerous, they are not well-founded. First, the parents cite the failure of their counsel to object to the omission of the children's best interest in material parts of the charge to the jury. Had there been an objection, then no finding would be deemed under Rule 279. [100] However, in light of the entire record, the parents have not "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " [101]

Counsel for the parents demonstrated in voir dire of the jury that he knew that the parents' rights could not be terminated, regardless of whether the conduct of the parents would otherwise permit termination, unless termination was found by the jury to be in the best interest of the children. He stated:

Now, folks, everyone keeps talking about we are here for a termination of parental rights. Not necessarily true. If the jury votes and says, "We believe that termination of parental rights is in the best interest of the children," then parental rights are terminated, and no longer will these people ever have the opportunity to be parents with their children. If the jury says, "No, it is not in the best interest of these children to have parental rights terminated," that doesn't say that the kids--that my folks go out this afternoon and pick up the kids and go home. What that would say is we all keep working together to try to resolve the situation. Okay? So this isn't like a criminal case where it's guilty or not guilty and you can never be tried again because I've been found innocent. This isn't like a car wreck where my client gets up and says, "We either recover the money or we don't recover the money." In this case it is not that kind of finality. In this case the jury can say, "Wait a minute. I don't believe that these folks had a fair chance to do it," and all you've got to do is say, "No, it's not in the children's best interest to terminate parental rights," and what that says is, "Children's Protective Services, you've got to work with them. We all have to work together." Okay? If you say, "Yes, termination is in the best interest," that's it, it's over. Okay?

Then again, in his opening statement, counsel for the parents stated to the jury:

We're here because the State of Texas is asking this jury to rubber stamp what they did and say, "Looks good to us. Take the kids." We're here because we're saying, ladies and gentlemen, this jury needs to come back and say, "No, it's not in those children's best interest. Do not terminate parental rights," and what that will say, what that will do is then the State of Texas will have to honestly work with [the parents], and that's what we're asking. Thank you.

Subsequently, during the objections to the charge, counsel for the parents demonstrated his ability to compare the language of the charge to the verbatim requirements of the Family Code. Counsel objected to the definition of "clear and convincing evidence" in the charge because it omitted three words that the statutory definition contained. Counsel then affirmatively stated to the court that he had no further objections to the charge. Notably, when it came time for closing arguments, counsel for the parents said nothing about the best interest of the children.

---

**Page 283**

Based on this record, the parents did not overcome the presumption that their counsel's decision regarding the charge error was based on strategy. There is precedent in criminal cases for raising jury charge error for the first time on appeal. [102] There is also precedent for raising some types of charge error for the first time on appeal in juvenile cases. [103] Counsel may have made the strategic decision not to object and to attempt to raise charge error for the first time on appeal in the event the jury returned an adverse verdict. The diligence exhibited by counsel in other aspects of the trial and what appear to be other tactical decisions, as discussed below, also indicate that counsel for the parents may well have made a strategic decision not to object to the omission of the children's best interest in material aspects of the charge.

The parents contend that their counsel's failure to object to the broad-form submission of the termination issues also constituted ineffective assistance of counsel. In light of this Court's decision in Texas Department of Human Services v. E.B., [104] which specifically approved broad-form submission in a termination case, it cannot be said that counsel's failure to object was, "in light of all the circumstances, ... outside the wide range of professionally competent assistance." [105] While it would certainly have been within the bounds of professional competency to raise an issue in the trial court so that counsel could ultimately implore this Court to reconsider E.B., it is not outside the bounds of competency to follow a decision of this Court.

The parents also contend that counsel's failure to request an instruction not to consider the parents' religious beliefs constituted ineffective assistance of counsel. There was considerable testimony during the trial about the parents' religious beliefs. At one juncture, the father testified that his conduct toward his children should be judged by God, not by a court. At another, the father testified that it was God who made cocaine available to the parents. Instead of requesting a jury instruction, counsel for the parents cross-examined the DPRS witnesses about the relevancy of the parents' religious beliefs and made arguments to the jury that the parents' religious beliefs were irrelevant to the termination inquiry. Even were it assumed that the trial court should have given an instruction to the jury had counsel so requested, it cannot be said that counsel's decision to address the parents' religious beliefs through argument was anything other than a reasonable exercise of trial strategy.

The parents contend that their counsel should have objected to questions

---

**Page 284**

they were asked during trial about their sexual conduct with third parties and alleged "sexual deviations." However, their counsel did object, many times, to questions of this nature. The fact that he did not object to each and every question is again within the realm of reasonable trial strategy in light of the record in this case.

At trial, the DPRS called expert witnesses with backgrounds in psychology and social work. The parents contend that their counsel provided ineffective assistance because he did not challenge the reliability of all psychological expert testimony on the ground that there is no scientific basis for predicting future behavior or evaluating individuals. Counsel for the parents did object to the qualifications of one witness, but not to the scientific reliability of this testimony in particular or the underpinnings of psychology in general. Psychological experts routinely testify in parental termination cases. It was not unreasonable for counsel to fail to take on the reliability of all psychological testimony in this case. More importantly, there is no basis in this record for concluding that had the trial court conducted a hearing on reliability, the evidence would have been shown to be unreliable.

The parents argue that their counsel treated the Family Service Plans developed by CPS as a court order. However, the record reflects that only one Family Service Plan was referenced by a court order in setting forth the

tasks that the parents were to perform, and that plan was filed with the court. The other three orders that were in evidence and at issue at trial contained directives to the parents in the orders themselves, wholly apart from any Family Service Plan.

The parents did not receive ineffective assistance of counsel.

**V**

None of the remaining issues raised by the parents require reversal. The parents asserted in their motion for new trial and in the court of appeals that there was factually insufficient evidence to support any finding by the jury that either parent had endangered the children. Because the evidence conclusively established other parental conduct described in section 161.001(1) of the Family Code, and there is an express or implied finding by the trial court, supported by clear and convincing evidence, that termination is in the children's best interest, it is immaterial whether an alternate submission regarding parental conduct was supported by factually sufficient evidence.

The parents equate parental termination for failure to comply with the court's orders to criminal contempt. They first argue that criminal contempt requires proof beyond a reasonable doubt. As discussed above, the United States Supreme Court held in Santosky that the federal constitution requires a clear and convincing evidence standard of proof in parental termination cases, but not proof beyond a reasonable doubt. [106]

The parents' second contention is that they have been punished with termination of their rights for failing to comply with the trial court's orders delineating what they must do to have their children returned. This punishment amounts to contempt, they argue, and violates the statutory limits on punishment of contempt to six months in jail or a $500 fine. The Legislature has specifically provided in subsection 161.001(1)(O) that failure to comply with court orders like those issued in this case is grounds for termination. That statute, not the contempt statutes, controls.

**Page 285**

The parents contend that the trial court erred in admitting evidence that either the father or the mother brought other men home to have sexual relations with the mother while the father watched. Evidence of other alleged sexual activities was also admitted. However, there was unchallenged testimony from an expert witness that the father "endorse[d]" many of the of items on the Minnesota Multiphasic Personality Inventory test that relate to sexual deviance. This expert concluded, without objection, that the father's responses to this standardized test raised concerns about his parenting potential. It cannot be said, based on the record as a whole, that the trial court abused its discretion in admitting the challenged evidence.

Finally, the parents contend that one witness, Jasmine Khan, gave an expert opinion when she was not qualified to do so. Counsel for the parents objected on this basis. But even if this witness's qualifications were not demonstrated, her testimony was cumulative of other witnesses.

In sum, any errors committed by the trial court did not require reversal.

\* \* \* \* \*

For the foregoing reasons, we reverse the judgment of the court of appeals and render judgment terminating the parent-child relationships between each of the children, J.F.C., A.B.C., and M.B.C., and their mother and father.

Justice O'NEILL concurred in the judgment only.

Justice HANKINSON filed a dissenting opinion, in which Justice ENOCH joined.

Justice SCHNEIDER filed a dissenting opinion.

Justice HANKINSON dissenting, joined by Justice ENOCH.

The Court states the issue in this case as "whether there is legally sufficient evidence to support the trial court's express or deemed finding that termination is in the best interest of the children." This statement of the issue will come as a surprise to the parties and the court of appeals, as no one has raised, briefed, or addressed this issue at any stage of these proceedings. In this parental-rights-termination case the State asked us to decide whether due process requires a court of appeals to review alleged errors in the charge when the parents did not object to those errors at trial. Instead of answering that question, the Court explains the consequences of the parents' failure to object to the first alleged charge error (omission of a statutory element required for termination) under Texas Rule of Civil Procedure 279. But those consequences are not at issue, and rule 279 does not answer the actual question presented of whether, in light of the constitutional interests at stake, our law requires an appellate court to consider the parents' complaints as if they did object to the charge, even though they admit they did not. The Court does not even attempt to explain how it can review the parents' second unpreserved claim of charge error (concerning broad-form submission), instead simply concluding that the error, if any, was harmless. Refusing to answer the question presented does a disservice to our courts of appeals by failing to resolve the conflict among them as to whether they may review unpreserved error in termination cases; a disservice to our established jurisprudence, which permits us to review only preserved complaints unless a recognized exception exists; and most importantly, a disservice to the parents and children who are entitled to consistent and efficient appellate review that fairly adjudicates their

**Page 286**

complaints in these time-sensitive and compelling cases.

I therefore dissent and write separately to explain how I would resolve the actual issue presented in this case. Because I conclude that Texas' common-law doctrine of fundamental error permits us to review the alleged charge errors, I would hold that Texas procedures for reviewing unpreserved charge error in parental-rights-termination cases do not violate due process. Having considered the alleged errors, however, I disagree with the court of appeals that the omission in the jury charge was harmful, and I would therefore remand this cause to the court of appeals for it to consider the remaining issues it did not yet address.

The Court relies on rule 279 to affirm the trial court's termination judgment. But rule 279 does not tell us whether charge error in a parental-rights-termination case can be reviewed for the first time on appeal. The purpose of rule 279 is to "salvage" a trial court's judgment when a party failed to object to an omitted element of a ground of recovery in a jury charge. See 4 MCDONALD & CARLSON, TEXAS CIVIL PRACTICE § 22:58, at 500-01 (2d ed.2001). Under rule 279, the court may deem the finding in support of the judgment if there is "some evidence" to support the finding. See *Ramos v. Frito-Lay, Inc.*, 784 S.W.2d 667, 668 (Tex.1990); *Cielo Dorado Dev., Inc. v. Certainteed Corp.*, 744 S.W.2d 10, 11 (Tex.1988). By marshaling the evidence to support a deemed finding against the parents under rule 279, the Court essentially conducts a harmful-error analysis of the charge error. But this approach is circular. The Court determines that applying rule 279 to deem a finding in support of the judgment does not violate due process because it concludes there was no harmful error. But had the error been harmful, the Court could not apply rule 279, and the parents would be left where they started: asking an appellate court to review unpreserved charge error. The Court should address the issue raised in the petition that we granted, and decide whether our law on preservation of error mandates appellate review of the parents' unpreserved complaints.

The Court's opinion describes how the jury charge in this case failed to track the statutorily required language found in Texas Family Code § 161.001. On appeal, the Coxes argued that the jury charge was erroneous because: (1) it failed to instruct the jury that they must find termination to be in the best interest of the children; and (2) the broad-form questions and disjunctive instructions violated their due process rights under the Fourteenth Amendment of the United States Constitution and Article 1, Sections 3 and 10 of the Texas Constitution. The Coxes acknowledged that they had not preserved these complaints in the trial court. However, they argued that the constitutional dimension of the liberty interests at stake and the quasi-criminal nature of a parental-rights-termination action warranted appellate review of the alleged jury-charge errors.

The court of appeals agreed. Specifically, the court of appeals held that Fourteenth Amendment procedural due process requires review of "core issues" in the jury charge in an involuntary parental-rights-termination case. 57 S.W.3d at 72. The court defined those "core issues" as "(1) the predicate grounds for termination, and (2) whether

termination is in the best interest of the child." Id. at 72 n. 5. After reviewing the jury charge in this case, the court concluded that the use of the broad-form question and disjunctive instruction in the jury charge was proper, having been explicitly approved by this Court in Texas Department of Human Services v. E.B., 802 S.W.2d 647 (Tex.1990)

**Page 287**

. 57 S.W.3d at 73. The court also concluded, however, that the omission of the "best interest" instruction as to Tawnya and the placement of the "best interest" instruction as to Paige constituted harmful error, because of the "potential" that the jury could have terminated both parents' rights "without finding that termination was in the best interest of the children." Id. at 74, 75. The court remanded the case to the trial court for a new trial without reviewing the Coxes' other complaints on appeal. Id. at 75. In its petition for review, the Department contends that the court of appeals erred by reviewing the unpreserved jury-charge error.

In effect, the court of appeals held that our state procedural rules violate due process in parental-rights-termination cases because they prohibit review when error is not preserved in the context of "core issues." See id. at 72-73. The analytical starting point for determining whether our procedures violate the Constitution is our law on error preservation for appellate review. As a general rule, no error may be reviewed on appeal that was not raised before the trial court. TEX.R.APP. P. 33.1. Nevertheless, like most other jurisdictions, our civil jurisprudence is well settled that appellate courts may consider unpreserved error that is "fundamental." See *McCauley v. Consol. Underwriters,* 157 Tex. 475, 304 S.W.2d 265, 266 (1957); *Ramsey v. Dunlop,* 146 Tex. 196, 205 S.W.2d 979, 982 (1947); see also 6 MCDONALD & CARLSON, TEXAS CIVIL PRACTICE § 47:4, at 1201-02 (2d ed.1998) (recognizing fundamental error as an exception to the general rule of preservation); W. James Kronzer, Laying the Foundation for Appellate Review, in APPELLATE PROCEDURE IN TEXAS (State Bar of Texas, 2d ed.1979), § 9.2, at 204-06 (same); Allen Wood, The Bill of Exceptions as Basis for Review, in id. § 11.5, at 248-49 (same). While most jurisdictions recognize some type of fundamental error, they do not define it uniformly. [1] Black's

**Page 288**

Law Dictionary defines the essence of fundamental error as that which is "so obvious and prejudicial that an appellate court should address it despite the parties' failure to raise a proper objection." BLACK'S LAW DICTIONARY 563 (7th ed.1999) (defining also "plain error" and "error apparent of record"). Our own application of fundamental error review has changed throughout the years. Consequently, an analysis of its evolution in our jurisprudence is useful to understanding how and when we should apply it.

We first recognized fundamental error as a principle firmly rooted in the common law. In *Jones v. Black,* 1 Tex. 527 (1846), this Court observed that as a general rule, "the record being silent as to any judicial action either sought or had upon the issues of law, they will be considered as waived, and will not be made the subject of revision here." Id. at 529. Nevertheless, this Court held that " 'if the foundation of the action has manifestly failed, we can not, without shocking the common sense of justice, allow a recovery to stand.' " Id. at 530 (quoting Palmer v. Lorillard, 16 Johnson 343, [348], 1819 WL 1790 (N.Y. 1819)); see also *Siese v. Malsch,* 54 Tex. 355, 357 (1881) (objections that go to merits and foundation of action will be considered though unassigned as error); *Rankert v.*

*Page* 289

Clow, 16 Tex. 9, 13 (1856) (same); *Salinas v. Wright,* 11 Tex. 572, 577 (1854) (same); *Wetmore v. Woodhouse,* 10 Tex. 33, 34 (1853) (same).

Although these early cases considered fundamental error to be a principle of common law, our Legislature had already codified its own version of fundamental-error review. In 1846, the Legislature enacted a statute that provided for supreme court review of "error in law either assigned or apparent on the face of the record." Act approved May 12, 1846, 1st Leg., § 24, 1846 Tex. Gen. Laws 249, 256-57, reprinted in 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1838-1846, at 1555, 1562-63 (Austin, Gammel Book Co. 1898). But in 1850, the Legislature enacted a statute providing that "[t]he appellant or plaintiff in error, shall in all cases file with the clerk of the court below, an assignment of errors, distinctly specifying the grounds on which he relies ... and all errors not so distinctly specified,

shall be considered by the Supreme Court as waived." Act approved Feb. 11, 1850, 3rd Leg., R.S., ch. 139, § 9, 1850 Tex. Gen. Laws 171, 173-74, reprinted in 3 GAMMEL, LAWS OF TEXAS 1847-1854, at 609, 611-12 (1898). Both statutes were made applicable to the courts of civil appeals when those courts were organized. See Act approved Apr. 13, 1892, 22nd Leg., 1st C.S., ch. 15, §§ 24, 25, 1892 Tex. Gen. Laws 25, 29, reprinted in 10 GAMMEL, LAWS OF TEXAS 1891-1897, at 389, 393 (1898). Although by its terms, the 1850 statute appeared to repeal the 1846 statute, our courts continued to consider fundamental error without acknowledging any effect of the 1850 statute. See Ramsey, 205 S.W.2d at 982. But see *Oar v. Davis,* 105 Tex. 479, 151 S.W. 794, 796 (1912) (holding that the statutes could be harmonized).

In one of the first cases to construe the 1846 statute, *Wilson v. Johnson,* 94 Tex. 272, 60 S.W. 242 (1900), this Court stated that "it is difficult to tell what is meant by this language; but we incline to think it intended to signify a prominent error, either fundamental in character, or one determining a question upon which the very right of the case depends." Id. at 243; see also *Houston Oil Co. of Tex. v. Kimball,* 103 Tex. 94, 122 S.W. 533, 537 (1909) ("Perhaps the best expression is that it must be a fundamental error, such error as being readily seen lies at the base and foundation of the proceeding and affects the judgment necessarily."). Thus, " 'fundamental error' is not a statutory term, but is one coined by the courts in interpreting our [statutes]." Texas & Pac. Ry. Co. v. Lilly, 118 Tex. 644, 23 S.W.2d 697, 698 (1930).

Our decisions from the pre-rules era disclose two policies that informed the application of fundamental-error review. First, as a matter of efficiency and economy, appellate courts were not required to examine the record in order to ascertain whether there was a basis for claiming error. See Wilson, 60 S.W. at 243 ("The purpose of assignments of error is to point out the errors complained of, and not to leave the appellate court to grope through the record to ascertain whether error has been committed or not."); see also Ford & Damon v. Flewellen, 276 S.W. 903, 903-04 (Tex.Com.App.1925, judgm't adopted) ("Any other rule ... would place an almost unbearable burden upon our appellate courts."). Thus, appellate courts considered unpreserved error only when the complaint could be seen on the face of the "record"--defined as "those proceedings which lie at the foundation of the court's power to render the judgment," such as the pleadings, the charge, the verdict, and the judgment itself. Texas & Pac. Ry. Co., 23 S.W.2d at 699; see *Yardley v. Houston Oil Co. of Tex.,* 288 S.W. 861, 868 (Tex.Civ.App.-Beaumont 1926, writ dism'd) ("[I]n considering fundamental error, the

---

**Page 290**

Court of Civil Appeals can only read the pleadings of the parties, the charge of the court, the verdict of the jury, and the judgment of the court...."). If determining whether there was error required examining the statement of facts, the courts would not consider it "fundamental." See, e.g., Yardley, 288 S.W. at 868 (trial court's allegedly erroneous construction of deed was not "fundamental" because it would require reviewing the evidence). Second, appellate courts only reviewed unpreserved error when there was "a good and sufficient ground for the court to interfere to prevent injustice being done to one of the parties." Houston Oil Co., 122 S.W. at 537; see also *Hollingsworth v. Holshousen,* 17 Tex. 41, 47-48 (1856) (citing the court's practice to review an erroneous jury charge when there is reason to believe it influenced the verdict to the prejudice of a party); Jones, 1 Tex. at 530 (rejecting a challenge to improper venue as merely a "dilatory" challenge and not a foundational objection).

In 1941, both statutes were repealed by the act vesting the Supreme Court with rulemaking authority. TEX.REV.CIV. STAT. ANN. art. 1731a, §§ 1, 2 (Vernon 1948); see *City of Santa Anna v. Leach,* 173 S.W.2d 193, 197-98 (Tex.Civ.App.-Eastland 1943, writ ref'd w.o.m.). We effectively "re-enacted" the 1850 statute in the form of Texas Rule of Civil Procedure 374, which required that any errors had to be presented in the court below or would be waived. For the few years immediately following the promulgation of the 1941 rules, a few courts of civil appeals held that they could no longer review fundamental error. See *Brown v. O'Meara,* 193 S.W.2d 715, 721 (Tex.Civ.App.-Galveston 1946, writ ref'd n.r.e.); Leach, 173 S.W.2d at 198.

In *Ramsey v. Dunlop,* 146 Tex. 196, 205 S.W.2d 979, 980 (Tex.1947), however, we held that the courts of civil appeals retained the authority to consider fundamental error, notwithstanding the apparent repeal of the statute and the enactment of rule 374. Ramsey involved an election for county commissioner. The candidate who received the fewest number of votes sued the winner on the grounds that the winner was not a resident of the precinct and therefore ineligible to hold office. The parties agreed that the only issues before the trial court were their respective residencies, the location of the precinct lines, and the validity of an order changing those precinct lines. The court of

civil appeals, however, reversed the judgment on the ground that Texas Revised Civil Statute article 3032 permitted only the candidate who received the greatest number of votes cast to receive the certificate of election. See id. at 980-81. That issue was neither preserved in the trial court nor assigned as error in the briefs. See id. at 980.

The court of appeals certified to this Court the question of whether it erred in determining a cause on a point not assigned as error. See id. We held that the court of appeals did not err, because fundamental-error review applied. Id. at 983-84. Citing eighty-nine years of Texas courts reviewing fundamental error, even "in the face of a statute which declared that all [unpreserved] errors ... should be considered as waived," this Court asked, "must we now hold that our courts of civil appeals have no authority to consider such errors because Art. 1837 has again been repealed by the substantial reenactment of Art. 1844 in the form of Rule 374, T.R.C.P.? As to errors that are truly fundamental, we think the answer must be No." Id. at 982-83.

While recognizing that fundamental-error review survived the promulgation of the Rules of Civil Procedure, we acknowledged that the doctrine could not be the

Page 291

same as the one codified in the 1846 statute. Declining to create an "all-inclusive" definition of the term, we held that, for purposes of the Ramsey election dispute, "an error which directly and adversely affects the interest of the public generally, as that interest is declared in the statutes or Constitution of this state, is a fundamental error." Id. at 983. We further determined that the alleged trial error would adversely affect the "fundamental public policy" found in the Texas Constitution and statutes that no one can be declared elected to public office unless he or she receives a majority or plurality of legal votes cast. Id.

Ten years later, in *McCauley v. Consolidated Underwriters,* 157 Tex. 475, 304 S.W.2d 265, 266 (Tex.1957), we reaffirmed the survival of the fundamental-error review doctrine, and held that it also applied in our Court. In McCauley, the trial court had set aside and vacated a default judgment. The court of civil appeals affirmed the order, despite the fact that it was a nonappealable interlocutory order. *McCauley v. Consolidated Underwriters,* 301 S.W.2d 181, 185 (Tex.Civ.App.-Beaumont 1957), rev'd, 157 Tex. 475, 304 S.W.2d 265 (Tex.1957). In its response to the plaintiff's writ of error to this Court, the defendant did not raise the jurisdictional defect in the court of appeals. Nevertheless, we held that fundamental error applied, reaffirming the definition from Ramsey. 304 S.W.2d at 265. We expanded on the definition, holding that "[w]hen the record affirmatively and conclusively shows that the court rendering the judgment was without jurisdiction of the subject matter, the error will also be regarded as fundamental." Id. at 266. Accordingly, we held that this Court had the power to reverse the court of appeals' judgment, and we dismissed the appeal on the unassigned jurisdictional error. Id.

Ramsey and McCauley were watershed decisions, establishing that fundamental-error review is not barred by our procedural rules. In the forty years since those decisions, Texas courts have consistently recognized and reaffirmed the existence of the fundamental-error doctrine. Because there is no statute defining the principle, we tend to agree with the commentator who noted that "[t]here is no single satisfactory definition of the phrase, nor can one easily analyze the cases for prognostic purposes." Kronzer, supra, § 9.2, at 205. In reviewing our caselaw, however, we are able to distill two types of error that our courts have consistently recognized are subject to fundamental-error review.

First, and most commonly, we apply fundamental-error review when a jurisdictional defect exists in the case. See, e.g., *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 445-46 (Tex.1993) (holding that standing is a jurisdictional issue that can be raised for the first time on appeal); *New York Underwriters Ins. Co. v. Sanchez,* 799 S.W.2d 677, 678 (Tex.1990) (holding that lack of appellate jurisdiction is fundamental error); McCauley, 304 S.W.2d at 265-66 (applying fundamental-error review because intermediate court lacked jurisdiction). With "jurisdictional-based" fundamental-error review, an appellate court may reverse the judgment of the court below for error--without conducting a review for harm--even if the error is not preserved. See *Baker v. Hansen,* 679 S.W.2d 480, 481 (Tex.1984).

Second, we apply fundamental-error review when an important public interest or public policy is at stake. See, e.g., Ramsey, 205 S.W.2d at 983. "Public-interest-based" fundamental error differs from jurisdiction-based

fundamental error in both a procedural and substantive way: As a procedural matter, public-interest-based fundamental-error review does not mandate

automatic reversal. Instead, after an appellate court determines that it will consider the unpreserved error, the court conducts the next two steps of appellate review and determines whether an error in fact occurred, and whether the error is harmful. See W. Wendell Hall, Standards of Review in Civil Appeals, 24 ST. MARY'S L.J. 1045, 1056 (1993); see, e.g., *In re C.O.S.,* 988 S.W.2d 760, 767 (Tex.1999) (concluding that failure to give statutory admonishments, while fundamental error, was not harmful error requiring reversal); *State v. Santana,* 444 S.W.2d 614, 615 (Tex.1969) (holding that jury charge in juvenile case warranted fundamental-error review and analyzing whether charge violated due process), vacated on other grounds, 397 U.S. 596, 90 S.Ct. 1350, 25 L.Ed.2d 594, on remand, 457 S.W.2d 275 (Tex.1970).

Substantively, public-interest-based fundamental error is rare, implicated only when our most significant state public interests are at stake. The meaning of the "public interest" that is adversely affected must be extremely circumscribed, or the exception would swallow the rule. Thus, it cannot be enough to allege that an error violates a party's constitutional rights. See Texas Dep't of Protective & Regulatory Servs. v. Sherry, 46 S.W.3d 857, 861 (Tex.2001) (holding that constitutional claim that paternity suit should not be barred by statute of limitations is waived by failing to raise the issue before the trial court) (citing *Dreyer v. Greene,* 871 S.W.2d 697, 698 (Tex.1993)). In Ramsey, we characterized the type of public interest that must be at stake as one "declared in the statutes or Constitution of this state." Ramsey, 205 S.W.2d at 983. However, we carefully declined to create an "all-inclusive" definition of a public interest that requires fundamental-error review. Id. Subsequent cases have identified statements of public interest based on our constitution and reflected in our caselaw. See, e.g., Santana, 444 S.W.2d at 615 (citing "the constitutional importance of this case to the public generally"); *Woodard v. Texas Dep't of Human Res.,* 573 S.W.2d 596, 597 (Tex.Civ.App.-Amarillo 1978, writ rev'd n.r.e.) (citing Texas Supreme Court precedent for the proposition "that the interest of the public is affected when the custody of a child is at issue").

Since Ramsey, our courts have categorically recognized only one other type of public interest so significant that fundamental-error review applies--the state's interest in the rights and welfare of minors. In particular, our courts have recognized fundamental-error review in the following cases: the failure to give statutory admonishments in a juvenile delinquency proceeding, see *In re C.O.S.,* 988 S.W.2d at 767; a jury charge submitting "preponderance of the evidence" as the burden of proof in a juvenile delinquency case, see Santana, 444 S.W.2d at 615; a jury charge based on an invalid theory of liability in a juvenile delinquency case, see *R.A.M. v. State,* 599 S.W.2d 841, 846 (Tex.Civ.App.-San Antonio 1980, no writ); the submission of "preponderance of the evidence" as the burden of proof in a parental-rights-termination case, see Woodard, 573 S.W.2d at 597; and an omission in a jury charge in a divorce case that deprived a minor child of the right to support, see *Rey v. Rey,* 487 S.W.2d 245, 248 (Tex.Civ.App.-El Paso 1972, no writ).

But not all cases involving children trigger fundamental-error review. In one case involving a minor, we rejected fundamental-error review because the error affected only the immediate private litigants and did not impact a matter of more general public concern. See *Newman v. King,* 433 S.W.2d 420, 422 (Tex.1968) (failure to appoint a guardian ad litem for a minor plaintiff in a change-of-name proceeding

action does not warrant fundamental-error review because only the rights of the particular minor and litigants are affected). Our courts of appeals have reached the same result in other cases. See *Wristen v. Kosel,* 742 S.W.2d 868, 870-71 (Tex.App.-Eastland 1987, writ denied) (no fundamental-error review in a custody case between two fit parents in which "[n]either parent's parental rights have been terminated"); *Ingram v. Ingram,* 249 S.W.2d 86, 88 (Tex.Civ.App.-Galveston 1952, no writ) (no fundamental-error review in a divorce case in which "the result of the suit can be of consequence to the litigants involved alone and … no broad question of public interest is involved").

Having reviewed our case law in this area, we are left with two guiding principles for determining whether fundamental-error review should apply to a matter of public interest: (1) the error complained of must implicate a significant public interest or policy of the state, articulated by our statutes, constitution, or caselaw; and (2) the nature of the error must be such that it impacts a truly general public interest, and not solely that of private litigants. To guide our determination in difficult cases, we should apply fundamental-error review to further its underlying policy of promoting judicial economy while avoiding manifest injustice.

With these principles in mind, I would turn to the errors alleged in this case to determine whether the fundamental-error doctrine applies. First, the Coxes allege that the trial court erroneously failed to instruct the jury that it must find termination of the Coxes' rights to be in the best interest of the child. The Coxes admit that they did not object at trial to the errors that they raised on appeal. Because charge error does not implicate the essential jurisdiction of the trial court to act, we should not review the error unless we determine that the public-interest basis for fundamental-error review applies. Applying the principles identified above, I would conclude that this charge error warrants fundamental-error review.

Our first inquiry should be whether the error affects a significant public interest, articulated in our statutes, constitution, or caselaw. See Ramsey, 205 S.W.2d at 983. In the statute governing suits affecting the parent-child relationship, our Legislature has declared that "[t]he public policy of this state is to ... assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child." TEX. FAM.CODE § 153.001(a). The statute further provides that "[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." Id. § 153.002. And in the Family Code subchapter governing the termination of parent-child relationships, the Legislature has emphasized repeatedly that the "best interest of the child" is the state's foremost priority in determining the welfare of children. See TEX. FAM.CODE §§ 161.001(2) (court must find by clear and convincing evidence that termination is in the best interest of the child), .003(a)(5) (court may order termination based on inability to care for a child if it is in the child's best interest), .004(a)(4) (court may order termination based on a subsequent petition if it is in the child's best interest), .005(a) (court may order termination when parent is petitioner if in the best interest of the child), .007(3) (court may order termination if pregnancy results from parent's criminal act and if in the best interest of the child), .204 (court may order termination based on affidavit of waiver of interest if it is in the best interest of the child); see also §§ 107.001(b) (court must appoint guardian ad litem to represent best interest of

---

**Page 294**

the child in a termination suit brought by the government); 153.433 (court shall order access to a grandchild by a grandparent if in the best interest of the child). Here, the charge omits the instruction that the jury must consider the "best interest of the children." Thus, the charge directly affects a statutorily defined public interest.

Further, the charge error directly affects the public policies stated in our caselaw. We presume as a matter of public policy that the best interest of a child is usually served by maintaining the parent-child relationship. See *In re G.M.,* 596 S.W.2d 846, 847 (Tex.1980); *Wiley v. Spratlan,* 543 S.W.2d 349, 352 (Tex.1976). Here, the State's effort to involuntarily terminate the Coxes' rights affects the public interest in maintaining the parent-child relationship. In addition, we employ a higher standard of proof in parental-termination cases than we do in ordinary civil cases, reflecting the particular importance of ensuring a correct judgment in these cases. *In re G.M.,* 596 S.W.2d at 847 (citing *Addington v. State,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)); see also TEX. FAM.CODE § 161.001 (codifying In re G.M. by establishing "clear and convincing evidence" as the burden of proof). In this case, the charge omits a required finding for termination and therefore directly and adversely impacts the public interest in reaching a correct judgment.

Having determined that the error alleged here affects a significant public interest, we should look to see whether the error impacts the public generally, and not just the immediate litigants. See Newman, 433 S.W.2d at 422. I would hold that an involuntary termination suit impacts the public generally. Parents have primary responsibility for the " 'custody, care and nurture' " of their children. *In re G.M.,* 596 S.W.2d at 846 (quoting *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). The State has a right and duty to look after the welfare of the children within its borders. See *Wicks v. Cox,* 146 Tex. 489, 208 S.W.2d 876, 878 (1948). Consequently, when the State acts to terminate a parent's rights, the State assumes the responsibility for the

children's welfare. The State's responsibility for the support of children is "obviously a matter of public interest" that "transcends the interest of the parties" to the immediate action. Rey, 487 S.W.2d at 248; cf. Wristen, 742 S.W.2d at 870-71 (public interest not affected by the issue of which parent is appointed as managing conservator when both parents are able to take care of the child). The charge in this case allowed the trial court to terminate Tawnya Cox's and Paige Cox's parental rights without specifically instructing the jury that it must first find termination to be in the best interest of each child. Accordingly, the jury charge in this case had a potentially adverse impact on the Cox children's best interest, which is a matter of public interest in a case that affects the public generally.

Concluding that the jury charge error alleged here is subject to fundamental-error review does not undermine the general policy of judicial economy that underlies our rule for preservation of trial error. In *Pirtle v. Gregory,* 629 S.W.2d 919 (Tex.1982), we explained that one rationale for requiring preservation is to avoid surprise to the opponent on appeal. Id. at 920. Here, the State had the burden of proving all the statutory elements of termination. TEX. FAM.CODE § 161.001. The State can hardly say that it was "surprised" to find that the jury charge did not contain the elements that the statute clearly requires it to prove. Moreover, if the error likely caused an improper verdict, the State's interest would be furthered by appellate review, because the State's overriding concern

---

**Page 295**

is the children's best interest, not the termination of parental rights.

Accordingly, I would hold that our courts may review unpreserved jury-charge error relating to the required statutory findings in a parental-rights-termination case under our common-law doctrine of fundamental-error review. As a result of this holding, I would conclude that Texas procedures for reviewing unpreserved charge error in parental-rights-termination cases do not violate due process.

Having determined that the complaint in this case can be reviewed, our appellate procedure next requires that we determine whether the jury charge was error. See Hall, supra, at 1056; see, e.g., *In re C.O.S.,* 988 S.W.2d at 767. Here, the proposed charge did not properly state the essential elements for terminating parental rights. Family Code § 161.001 provides that a court can involuntarily terminate a parent's rights only after the court has found by clear and convincing evidence both that: (1) the parent has committed one or more of the enumerated predicate acts or omissions; and (2) termination is in the best interest of the child. See TEX. FAM.CODE § 161.001; see also COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES (FAMILY) PJC 218.1 (2000). As to Tawnya, the proposed charge completely omitted the instruction that the jury find termination to be in the best interest of the child. As to Paige, the proposed charge included the "best interest" instruction only in conjunction with the alternative ground for termination that he had failed to comply with a court-ordered plan. Because a parental-rights-termination lawsuit is founded in statute, the jury charge should track the language of the statute. See *Spencer v. Eagle Star Ins. Co. of Am.,* 876 S.W.2d 154, 157 (Tex.1994). I therefore agree with the court of appeals that because the "charge fails to require all the findings that, under the Family Code, are necessary to terminate parental rights," the charge was error. 57 S.W.3d at 74.

Having determined that the parents' complaint can be reviewed on appeal, and that the trial court erred, I would review next the court of appeals' determination that the error was harmful. See Hall, supra, at 1056; see, e.g., *In re C.O.S.,* 988 S.W.2d at 767. The court of appeals stated that the jury "could very well" have terminated Tawnya's rights and "may very well" have terminated Paige's rights without finding that termination was in the children's best interest. 57 S.W.3d at 74-75. But whether the jury may have improperly terminated the Coxes' parental rights because the charge omitted a statutory element is relevant only to whether there was error in the first instance. The Coxes must still show that the error probably caused rendition of an improper verdict. See TEX.R.APP. P. 44.1(a). The court of appeals summarily stated that the evidence for terminating Tawnya's rights was "not highly persuasive," but it did not discuss that evidence. 57 S.W.3d at 74. And, with respect to Paige, the court of appeals said that the potential for the jury to terminate without finding termination in the children's best interest was increased because there was "less support" in the evidence for the ground that Paige had failed to comply with a court-ordered plan. Id. at 75. But the court of appeals never explained how it reached its conclusion as to either parent that the error probably caused rendition of an improper judgment. We must review the "pleadings of the parties, the evidence presented at trial, and the charge in its entirety" to determine whether the charge in this case probably resulted in an improper judgment. *Island Recreational Dev. v. Republic of Tex. Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986); see

*Reinhart v. Young,* 906 S.W.2d 471, 473 (Tex.1995).

The Department's evidence overwhelmingly focused on and supported the conclusion that termination was in the best interest of these children. In particular, Tawnya Cox testified that she and her husband used cocaine while the children were at home, and that she believed her children were safe because cocaine made her more aware of her surroundings. The Coxes testified to arguing violently with each other. In one of those arguments, she knocked several teeth out of his mouth, and during another argument, he locked her out of the house while she was naked. Dr. Shinder, a psychologist whose office evaluated the Coxes, opined that neither could be fit parents due to their "aggression and violence and hostility" and drug use. Jasmine Khan, a licensed professional counselor, testified about the Cox children's extreme, abnormal behavior when they were first removed from their parents' household. Most significantly, she described hostile, aggressive, and violent play by A.B.C. Khan also said that A.B.C. told her he witnessed violence and was a victim of violence in the Cox home. Other Child Protective Services workers reiterated this testimony. Khan also testified that after several months in foster care, the children improved tremendously, and did not display any distress being away from their parents. She testified that the Coxes were unwilling and unmotivated to make productive changes to address the issues placing their children at risk. A police officer described numerous times that he had to investigate domestic-disturbance calls at the Cox household, and described the confrontations as "pretty violent" such that he had concern for the children. A conservatorship worker from Child Protective Services testified that she observed visits between the Coxes and their children. She stated that the visits tended to be "chaotic," and the children's behavior deteriorated after each visit with their parents. The conservatorship worker also described the Coxes' hostility and anger toward each other. Notably, the testimony of Dr. Shinder, Khan, the police officer, and the conservatorship worker all culminated with their opinions that termination of the Coxes' parental rights and adoption would be in the Cox children's best interest. And other witnesses who worked on the Cox case, including a Child Protective Services supervisor and Court Appointed Special Advocate, similarly testified that termination would be in the Cox children's best interest.

The Coxes provided little evidence to contradict the evidence discussed above. However, their case likewise focused significantly on evidence relevant to whether termination was in the children's best interest. For example, the Coxes attempted to explain their efforts--after a trial date was set on the Department's termination petition--to comply with the Family Service Plan and to show their ability to provide the children a loving home. A year after the trial court initially ordered compliance with the Family Service Plan, in the fall of 1988, the Coxes moved to Austin from Waco. The jury heard testimony about a letter the Coxes' attorney wrote to Child Protective Services in Austin, stating that the Coxes wanted to "derail the termination" by working with the Department. Also, Paige Cox testified that he called Child Protective Services in Austin once they moved in an effort to start compliance with the Family Service Plan. The Coxes also presented evidence about the changes in their lives and relationship since moving to Austin to demonstrate that termination would not be in the children's best interest. Tawnya testified about her finding work in Austin. She said that Paige had

become more open and communicative, and she described the environment in Austin as "wonderful." The Coxes' obstetrician for the birth of their fourth child--who is not the subject of this suit--described the Coxes as "an appropriate, courteous, and loving couple." And the Coxes' landlord and roommate in Austin testified that their home was a "safe environment." Thus, much of the evidence adduced at trial was probative toward the issue of whether termination was in the children's best interest.

Moreover, the rest of the trial proceedings put this evidence in perspective, centering the jury's attention on the best interest of the children. The Department's pleadings specifically alleged as to each individual parent that "termination of the parent-child relationship [between the parent and each child] is in the best interest of the children, as required by Section 161.001 of the Texas Family Code." The attorneys for all parties repeatedly emphasized throughout the voir dire, examination of the witnesses, opening statements, and closing argument that the jury's focus should be on the children's best interest. (In its opinion, the Court quotes two of the relevant portions of the opening argument and voir dire record in which the Coxes' counsel reiterates that the jury's determination will regard the children's best interest. 96 S.W.3d at 261.) Finally, the jury charge listed factors to be

considered in determining the children's best interest, and many of these factors related to the evidence discussed above.

In light of the totality of the circumstances and the consistent and paramount emphasis upon the children's best interest at trial, I would conclude that the failure to submit the "best interest" instruction was not reasonably calculated and did not probably cause the rendition of an improper verdict. See TEX.R.APP. 44.1; Reinhart, 906 S.W.2d at 473; Island Recreational Dev., 710 S.W.2d at 555. I would conclude that the court of appeals therefore erred in reversing the trial court's judgment on the basis that the omitted instruction was harmful error.

The Coxes' second complaint is that the submission of the jury charge in a disjunctive instruction and as a broad-form question violated their constitutional rights to due process and due course of law. Using the analytical framework I have set out above, I would first determine whether the alleged error affects a significant public interest, articulated in our statutes, constitution, or caselaw. The Coxes assert that submission of a broad-form question violates due process because it permits the termination of parental rights without first ensuring that ten jurors agree on each statutory termination ground. If the charge violates due process for the reasons that the Coxes state, that violation would adversely impact the public interest in ensuring that the statutory grounds required for termination are found by clear and convincing evidence. See TEX. FAM.CODE § 161.001. Furthermore, for the same reasons discussed as to the first charge complaint, this second charge complaint relates directly to the public interest in correct judgments and affects the public generally. Finally, broad-form jury charges are used uniformly in cases like this one, and therefore resolving the issue that this complaint raises would impact many parental-rights-termination cases. Accordingly, I would conclude that our fundamental-error doctrine permits us to review this complaint.

I would hold that the submission of the broad-form question did not violate the Coxes' due process rights, and therefore was not error. In *Texas Department of Human Services v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990), we identified the controlling

**Page 298**

question in a parental-rights-termination case as whether the parent-child relationship between the parent and the children should be terminated. In the Coxes' case, the charge specifically instructed the jury that at least ten jurors must agree on all answers supporting the verdict. See TEX.R. CIV. P. 292. We presume that the jury understood and followed its instructions. See *Gillette Motor Transp. Co. v. Whitfield,* 145 Tex. 571, 200 S.W.2d 624, 626 (1947).

The Coxes argue that our holding in *Crown Life Insurance Co. v. Casteel,* 22 S.W.3d 378 (Tex.2000), alters our analysis in E.B. In Casteel, we held that "[w]hen a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding." Id. at 389. Here, the Coxes do not assert that either of the disjunctive grounds for termination were invalid theories as applied to them. See id. And the Coxes raise no new arguments in this case to give us cause to revisit our decision in E.B. Accordingly, the court of appeals correctly held that the trial court did not abuse its discretion in submitting the broad-form jury charge.

For the reasons expressed above, I respectfully dissent to the Court's opinion and judgment in this cause. The Court belabors the consequences of failing to preserve error, instead of deciding whether we can review that unpreserved error. The Court then inexplicably reviews an unpreserved complaint that it decides is harmless. Not only does the Court reach issues not presented by the parties and that are unnecessary to the resolution of the case, it retreats from our error-preservation standards, thereby adding further uncertainty to the already conflicting decisions from the courts of appeals. The only general proposition I can draw from the Court's opinion is that courts of appeals should review error when they can determine from the record that the error is ultimately harmless. But my greatest concern is that the Court abandons its responsibility to ensure that parents and children receive fair, consistent, and expeditious appellate review in these most difficult cases. Accordingly, I respectfully dissent.

Justice SCHNEIDER, dissenting.

Under the Texas and United States Constitutions, the parent-child relationship is considered a fundamental liberty interest deserving due process protection. Indeed, the relationship is so important that no amount of antisocial behavior directed toward a child or in defiance of a court's order, standing alone, provides enough justification for the State of Texas to terminate the parent-child relationship. Our law requires that, in addition to finding one or more of the legislative-specified laundry list of antisocial conduct by a parent, the fact finder must also find that terminating the parent-child relationship is in the "best interest" of the child.

Today, the Court holds that the "best interest" element can be deemed to support the judgment if, without objection, that element is erroneously omitted from or obfuscated in a jury charge. 96 S.W.3d at 259-260. And, the Court not only deems a best interest finding in this case, but also, to deem the finding, the Court applies a questionable legally sufficient clear and convincing evidence test never requested by the parties or articulated by this Court. Then, the Court holds that the parents' failure to follow the Family Service Plan [1] is conclusively established, so

---

**Page 299**

that the net effect is the case is reversed and judgment is rendered without a remand to the court of appeals for the requested factual sufficiency review of the termination grounds. 96 S.W.3d at 260.

I respectfully dissent. The question squarely before the Court is whether procedural due process considerations require an appellate court to review unpreserved jury-charge errors in a parental-rights termination case. I would address that issue directly. And, in doing so, I would hold that Texas and the United States constitutional procedural due process considerations do not mandate appellate review of unpreserved jury-charge error. The Texas Legislature has devised, and our courts have applied, a fair and just procedural framework at the trial and appellate levels for handling parental-termination cases. Consequently, I would hold the parents waived their right to appellate review of the alleged jury-charge errors, because the parents failed to object in the trial court about the errors they raise here.

Finally, although I agree the court of appeals' decision should be reversed, I do not agree that this Court, under our Texas Constitution, can obviate the court of appeals' role. See TEX. CONST. art. V, § 6; TEX. GOV'T CODE § 22.225(a). This Court cannot conclusively determine a factual question, namely, whether the parents complied with the Family Service Plan. Thus, even if I agree the Court's "deemed finding" procedural route is appropriate in this case, I believe the Court should remand this case to the court of appeals for a factual sufficiency review on the termination grounds the parents challenge.

### I. BACKGROUND

Depending upon one's view, the jury charge either (a) omitted a best interest instruction as to one of the parents and one of the grounds for the other parent; or (b) at the very least, positioned the best interest instruction in such a manner that it was unclear to the jury that the instruction applied to all the termination grounds alleged against both parents. In any event, neither party objected to the charge on the basis that it failed to include an instruction that termination under any ground alleged must also be in the child's best interest. The jury returned a verdict terminating parental rights for all three children, and the trial court rendered judgment based on the verdict.

On appeal, the parents argued for the first time that the broad-form submission and disjunctive questions in the charge violated their due process rights. The parents also complained for the first time that the charge failed to instruct the jury that, to terminate under any ground alleged, the jury must also find that termination is in the best interest of the children.

The court of appeals held that, in parental-termination cases, applying Rule 33.1 of the Rules of Appellate Procedure to preclude an appellate court from reviewing an unpreserved complaint about "core issues" in the jury charge does not afford the parent due process. 57 S.W.3d 66, 72. See also TEX.R.APP. P. 33.1(a) (As a prerequisite for appellate review, the record must show the complaint was made to the trial court by a timely request, objection, or motion in compliance with Texas's civil and appellate rules.). The court of appeals then reviewed the alleged errors and held the broad-form jury charge was proper. 57 S.W.3d at 73-74. After determining

the charge omitting a best interest instruction for all the termination grounds alleged was harmful error, the court of appeals reversed the trial court's judgment and remanded the case for a new trial. 57 S.W.3d at 74-75.

## II. ANALYSIS

The parents contend that their constitutional argument about the best interest instruction in the jury charge involves their substantive--not procedural--due process rights. According to the parents, the Family Code's procedural guarantees, such as the requirement that termination be in the best interest of the children, are meaningless unless appellate review is afforded to ensure the lower court correctly applied these procedures.

In *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), the U.S. Supreme Court explained the meaning of procedural and substantive due process.

We have emphasized time and again that "the touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974), whether the fault lies in a denial of fundamental procedural fairness, see, e.g., *Fuentes v. Shevin,* 407 U.S. 67, 82, 92 S.Ct. 1983, 1995, 32 L.Ed.2d 556 (1972) (the procedural due process guarantee protects against "arbitrary takings"), or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective, see, e.g., Daniels v. Williams, 474 U.S. [327,] at 331, 106 S.Ct. [662] at 664 [(1986)] (the substantive due process guarantee protects against government power arbitrarily and oppressively exercised).

Lewis, 523 U.S. at 845-46, 118 S.Ct. 1708 (citations to Supreme Court Journal omitted and full cite to Daniels provided).

Here, the nature of the parents' due process argument demonstrates that they are in fact making a procedural due process claim. The parents repeatedly rely on the U.S. Supreme Court's analysis for determining whether parents' due process rights have been met in termination cases. See *Lassiter v. Dep't of Soc. Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). And the parents consistently claim that the procedure--that is, receiving no appellate review of alleged jury-charge errors because of the failure to preserve error--violated their due process rights. See Daniels, 474 U.S. at 340-41, 106 S.Ct. 662 (Stevens, J., concurring) (explaining that petitioners asserted procedural and not substantive due process violations, because they alleged the state procedures for redressing deprivations of prisoners' property were constitutionally inadequate). However, the parents do not contend that the action by which the State terminates parental rights is arbitrary or oppressive. See Daniels, 474 U.S. at 331, 106 S.Ct. 677 (substantive due process bars certain government actions regardless of the fairness of the procedures used to implement them and prevents the government from using its power for oppression). Indeed, the court of appeals treated the parents' complaint about the refusal to review unpreserved jury-charge error as a procedural due process issue. 57 S.W.3d at 72. And, the court of appeals applied the U.S. Supreme Court's procedural due process analysis to conclude that "[t]o terminate parental rights--a Fourteenth Amendment liberty interest--when there is a fundamentally erroneous charge on a 'core issue,' only because the complaint was not preserved in the trial court, does not adhere to Fourteenth Amendment procedural due process." Id. (emphasis added).

Accordingly, the court of appeals correctly concluded that procedural, not substantive, due process is at issue here. However, for several reasons, the court of appeals' rationale for concluding that such due process requires review of the parents' unpreserved jury-charge errors is flawed. As discussed in detail below, the court of appeals misplaces its reliance on Texas case law, misapplies our strict scrutiny directive from *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985), and conducts an erroneous due process analysis to conclude our error preservation rules deny the parents due process in this case.

## A. WHETHER DUE PROCESS REQUIRES APPELLATE REVIEW OF UNPRESERVED JURY-CHARGE ERRORS

**1. Reliance on Texas Case Law**

In holding that our error preservation rules do not preclude the court from reviewing the parents' jury-charge complaints raised for the first time on appeal, the court of appeals relied on two cases. 57 S.W.3d at 71-72 (discussing *In re A.P., I.P.,* 42 S.W.3d 248 (Tex.App.-Waco 2001, no pet.) and *In re S.R.M.,* 601 S.W.2d 766 (Tex.Civ.App.-Amarillo 1980, no writ)). But these cases do not support the court of appeals' conclusion.

In S.R.M., the evidence conclusively showed the mother's parental rights should not be terminated for the ground alleged. *In re S.R.M.,* 601 S.W.2d at 768-69. However, the trial court rendered a judgment terminating the mother's parental rights based on grounds not pleaded. Id. at 769. The mother argued the court of appeals should reverse the trial court's judgment, because it relied on unpleaded grounds to terminate her parental rights. Id. The paternal grandparents seeking termination argued the mother impliedly consented to a trial on unpleaded grounds, because she did not specially except or object to the introduction of evidence related to the unpleaded grounds. Id. Because the Family Code mandates that the petition set forth the statutory grounds for termination to afford the parents due process, and because the record showed the mother had no notice that the trial court would consider terminating on unpleaded statutory grounds, the court of appeals reversed the trial court's judgment. Id. at 770.

Here, unlike the circumstances in S.R.M. in which the mother had no notice of the trial court's action, the parents knew about the jury charge and had an opportunity to object. See Id. In fact, though the parents' attorney did not object to the omission or placement of the best interest instruction, he did object to the definition of the clear and convincing evidentiary standard in the charge. And, because the trial court considered objections to the charge before the parents rested, their attorney specifically requested that everyone agree the objection would not be considered waived if he did not urge it again before closing arguments. Their counsel said, "I just don't want at some future time someone to write that I waived that objection." Thus, the parents had notice and an opportunity to object to the charge and acknowledged the consequences if they failed to do so.

In A.P., the court of appeals was asked to review unpreserved factual and legal sufficiency complaints about the grounds for termination and whether termination was in the best interest of the child. 42 S.W.3d at 254-55. The court of appeals cited S.R.M. as precedent for considering unpreserved error and held that terminating parental rights without appellate review of an unpreserved sufficiency complaint is a due process violation. 42 S.W.3d at 255. Then, the court of appeals referred to criminal cases, which have held

**Page 302**

that a defendant does not have to preserve for appellate review a complaint that the evidence is factually or legally sufficient. 42 S.W.3d at 255-56 (citing *Chesnut v. State,* 959 S.W.2d 308, 311 (Tex.App.-El Paso 1997, no pet.); *Davila v. State,* 930 S.W.2d 641, 649 n. 7 (Tex.App.-El Paso 1996, writ ref'd)). Because criminal cases and termination cases both require heightened burdens of proof--"beyond a reasonable doubt" in criminal cases and "clear and convincing" in termination cases--the A.P. court concluded it a "logical extension" to review unpreserved sufficiency issues in termination cases. 42 S.W.3d at 256.

But the A.P. court wholly failed to conduct a due process analysis, as the U.S. Supreme Court requires in parental-termination cases, to determine if the procedure for preserving sufficiency challenges violates parents' due process rights. See Lassiter, 452 U.S. at 27-28, 101 S.Ct. 2153. Instead, the court summarily cited S.R.M., without recognizing its significantly distinguishable facts, to support its conclusion that it could review the unpreserved error. Moreover, the A.P. court improperly relied on criminal cases that only opine about how defendants may raise sufficiency points and, in any event, operate under different procedural rules and jurisprudence. Accordingly, A.P., which should be overruled based on its erroneous analysis and holding, does not support the court of appeals' conclusion here that due process requires appellate courts to consider unpreserved jury-charge errors.

**2. Strict Scrutiny**

The court of appeals further explained that this Court's directive that " 'termination proceedings should be strictly scrutinized' " justified its reviewing the unpreserved jury-charge errors. 57 S.W.3d at 72 (quoting *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985)). However, the strict scrutiny language in Holick only speaks to the important

nature of the interests involved in parental-termination cases and does not support a conclusion that reviewing courts must consider unpreserved jury-charge errors.

In Holick, this Court determined how to construe a particular ground for termination in the Family Code. Holick, 685 S.W.2d at 19-20. Before answering the question, the Court discussed the fundamental constitutional rights involved in parental-termination proceedings. 685 S.W.2d at 20. After recognizing these rights, and the fact that a clear and convincing evidentiary standard applies in these cases, the Court explained that this is why "termination proceedings should be strictly scrutinized...." Id.

Since Holick, courts of appeals have cited the strict scrutiny language when generally discussing the standard of review principles that apply in termination cases. See, e.g., In re A.V., 849 S.W.2d 393, 400 (Tex.App.-Fort Worth 1993, no writ). Further, courts of appeals have relied on the language to support the application of a heightened factual sufficiency review standard. See In re C.H., 89 S.W.3d 17, 25 (Tex.2002) (discussing various courts of appeals decisions attempting to define the factual sufficiency review standard when clear and convincing evidence is required). However, other than the decisions in A.P. and here, no courts of appeals have relied on Holick's strict scrutiny directive to justify review of unpreserved error.

In sum, there is no indication the Court ever intended Holick's strict scrutiny language to support appellate review of unpreserved jury-charge errors. In fact, this Court recently rejected relying on Holick's strict scrutiny language as a basis for reversing a parental-termination judgment based on a parent's due process claim.

---

**Page 303**

See In re K.R., 63 S.W.3d 796, 800, n. 20 (Tex.2001). In K.R., the Court considered a parent's argument that procedural due process precludes a reviewing court from applying a harmless error analysis to his claim that his being handcuffed throughout the trial improperly prejudiced the jury. Id. at 798. The Court held that, while it agreed "that judgments terminating the parent-child relationship must be carefully scrutinized because of the importance of that relationship, [it could not] conclude that the Fourteenth Amendment requires reversal of the judgment in this case without regard to harm." Id. at 800. The Court explained that, even in criminal cases, the U.S. Supreme Court has rejected the notion that any constitutional error requires automatic reversal. Id. To the contrary, if "trial errors" such as "errors in the charge and in evidentiary rulings" occur, courts may not reverse the judgment unless the error caused harm. Id.

Accordingly, Holick's strict scrutiny language does not dictate procedure. The language simply evidences this Court's recognition of the important interests involved in parental-termination proceedings. See Holick, 685 S.W.2d at 20.

### 3. United States Supreme Court Due Process Analysis

The court of appeals additionally determined that appellate review of the parents' unpreserved jury-charge errors "comports with the requirements in Lassiter." 57 S.W.3d at 72. However, if all the pertinent factors are properly considered and weighed, the Lassiter due process test does not support the court of appeals' conclusion.

In Lassiter, the U.S. Supreme Court held that due process does not require states to provide indigent parents counsel in all termination cases. Lassiter, 452 U.S. at 33-34, 101 S.Ct. 2153. Before answering the due process question, the U.S. Supreme Court explained the nebulous nature of this concept:

"[D]ue process" has never been, and perhaps can never be, precisely defined.... Rather, the phrase [due process] expresses the requirement of "fundamental fairness," a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which must discover what "fundamental fairness" consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.

Lassiter, 452 U.S. at 24-25, 101 S.Ct. 2153.

The U.S. Supreme Court then held that the nature of the process due in parental-termination proceedings depends upon a balancing of three factors: (1) the private interests at stake; (2) the government's interests; and (3) the risk that the procedures used will lead to an erroneous deprivation. Lassiter, 452 U.S. at 27, 101 S.Ct. 2153 (relying on *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)); see also see also *Santosky v. Kramer,* 455 U.S. 745, 754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Once these Eldridge factors are weighed against each other, the court must next "set their net weight in the scales against the presumption" that the procedure applied did not violate due process. Id.

Here, the analysis begins with the presumption that our rules governing preservation of jury-charge error comport with due process. Lassiter, 452 U.S. at 27, 101 S.Ct. 2153. But this must be balanced against the net weight of the three Eldridge factors to determine if the presumption is overcome. Santosky, 455 U.S. at 754, 102 S.Ct. 1388; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153; Eldridge, 424 U.S. at 335, 96 S.Ct. 893.

**Page 304**

With respect to the first Eldridge factor--the private interests at stake--this Court has long recognized that the "natural right existing between parents and their children is of constitutional dimensions." Holick, 685 S.W.2d at 20; see also *In re G.M.,* 596 S.W.2d 846, 846 (Tex.1980). A parent's right to the parent-child relationship is " 'essential,' 'a basic civil right of man,' and 'far more precious than property rights.' " Holick, 685 S.W.2d at 20 (quoting *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). Similarly, the U.S. Supreme Court has noted, "A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is ... a commanding one." Lassiter, 452 U.S. at 27, 101 S.Ct. 2153.

However, the child's interests are also necessarily involved and must be considered in this analysis. The Family Code's entire statutory scheme for protecting children's welfare focuses on the child's best interest. See, e.g., TEX. FAM.CODE §§ 51.11(b); 153.001; 153.002; 161.001(2); 161.101. And, like their parents, children have an interest in an accurate resolution and just decision in termination cases. But children also have a strong interest in a final decision on termination so that adoption to a stable home or return to the parents is not unduly prolonged. In fact, it is this State's express policy to provide a safe, stable, and nonviolent environment for the child. TEX. FAM.CODE § 153.001(a)(2). And, if error is properly preserved, the Legislature has upheld this interest by requiring prompt appellate decisions: "An appeal in a suit in which termination of the parent-child relationship is in issue shall be given precedence over other civil cases and shall be accelerated by the appellate courts." TEX. FAM.CODE § 109.002(a). Similarly, Texas's preservation of error rules promote the child's interest in a final decision and thus placement in a safe and stable home, because they preclude appellate courts from unduly prolonging a decision by appellate review of issues not properly raised in the trial court.

Indeed, the U.S. Supreme Court has recognized that prolonged termination proceedings can have psychological effects on a child of such a magnitude that time is of the essence:

It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or foster parents. There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current "home," under the care of his parents or foster parents, especially when such uncertainty is prolonged.

*Lehman v. Lycoming County Children's Services Agency,* 458 U.S. 502, 513-14, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); see also Lassiter, 452 U.S. at 32, 101 S.Ct. 2153 ("[C]hild-custody litigation must be concluded as rapidly as is consistent with fairness...."). Accordingly, under the first Eldridge factor, the private interests reflect a desire for an accurate and just decision, but one that does not unduly prolong a final decision about the child's permanent home.

The second factor under Eldridge is the State's interests. See Santosky, 455 U.S. at 754, 102 S.Ct. 1388; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153; Eldridge, 424 U.S. at 335, 96 S.Ct. 893. Undoubtedly, the State shares the parents' and child's interests in an accurate and just decision. See Lassiter, 452 U.S. at 27, 101 S.Ct. 2153. However, the child's best interest is always the State's primary concern in termination proceedings. See TEX. FAM.CODE §§ 161.001(2); 161.101. Thus, the State additionally shares the child's interest in not

unduly prolonging a final decision about the child's future. See Lehman, 458 U.S. at 513, 102 S.Ct. 3231 ("The State's interest in finality is unusually strong in child-custody disputes."); see also TEX. FAM.CODE §§ 109.002(a) (giving appeals in parental-termination cases precedence over other civil cases); 161.202 (court shall grant motion for a preferential setting for a final termination hearing on the merits if termination would make the child eligible for adoption).

Additionally, the State has an interest in courts consistently and uniformly applying our preservation of error rules. This interest does not merely reflect a fiscal policy. Without uniform application of our error preservation rules, termination proceedings would be conducted and reviewed in an arbitrary manner. "At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost." Eldridge, 424 U.S. at 348, 96 S.Ct. 893. Here, the cost of disregarding our error preservation rules risks not only unduly prolonging termination proceedings but also losing any predictability for the State, counsel for parents, and guardians for children about how courts will conduct and review these proceedings. Consequently, under the second factor, the State's interests encompass all the private interests, but weigh in favor of conducting termination proceedings under our error preservation rules so that the proceedings are not unduly prolonged or unpredictable.

Finally, the third Eldridge factor to consider is the risk that our rules for preserving error about the jury charge will lead to an erroneous deprivation. See Santosky, 455 U.S. at 754, 102 S.Ct. 1388; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153; Eldridge, 424 U.S. at 335, 96 S.Ct. 893. Texas Rules of Civil Procedure 272-274 establish the procedures for parties to participate in the formulation of the jury charge. TEX.R. CIV. P. 272-274. Rule 272 requires a party to object to the charge, either orally or in writing, before the court reads the charge to the jury. TEX.R. CIV. P. 272. A party objecting to the charge must point out distinctly the objectionable matter and the grounds for the objection. TEX.R. CIV. P. 274. In addition to objecting to the charge, either party may request the trial court to submit certain questions, definitions, and instructions in the charge. TEX.R. CIV. P. 273. If a party fails to timely abide by the rules concerning the jury charge, the party waives any complaint on appeal. TEX.R. CIV. P. 273-74; TEX.R.APP. P. 33.1(a).

This Court has relaxed the jury-charge preservation rules in an effort to determine cases on the merits rather than on slight technical defects. See State Dep't. of Highways & Pub. Transp. v. Payne, 838 S.W.2d 235, 241 (Tex.1992). In Payne, the Court held that, although the State requested an improperly worded jury-charge instruction, it was sufficient to preserve error. Id. at 241. The Court explained that "[t]here should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling. The more specific requirements of the rules should be applied, while they remain, to serve rather than defeat this principle." Id.

Accordingly, parties have various opportunities to formulate the jury charge and preserve error about the charge before the trial court reads it to the jury. TEX.R. CIV. P. 273-74. And, after Payne, a party need only timely and plainly make the trial court aware of a complaint to preserve such error. Payne, 838 S.W.2d at 241.

Consequently, Texas's rules for preserving jury-charge error raise little risk of erroneous deprivations.

To summarize the Eldridge factors, then: (1) the parents' interest is extremely important, but must be balanced with the child's important interests for not only an accurate and just decision but also finality and placement in a stable home; (2) the State shares both the parents' and child's interests in an accurate and just decision, but the State's interest in not unduly prolonging finality and in uniformity and predictability in applying our preservation of error rules is stronger; and (3) the risk of an erroneous deprivation under our rules about preserving error in the jury charge is low, because parties have notice and an opportunity to be heard about issues submitted and omitted from the charge, and error is preserved so long as the party timely and plainly made the trial court aware of the party's complaint. Weighing these factors' net weight against the presumption that our error preservation rules comport with

due process, it cannot be said that the parents' were not afforded due process here so that appellate review of their unpreserved jury-charge errors is warranted.

In fact, the record supports the conclusion that the parents' due process rights were not violated. The parents had an opportunity to be heard and object to the charge. Eldridge, 424 U.S. at 333, 96 S.Ct. 893 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' ") (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). As previously discussed, the parents' counsel objected to a portion of the charge not challenged on appeal. And, in making this objection, their counsel expressly acknowledged the risk involved in failing to object in a timely manner. For these reasons, under Lassiter analysis, the court of appeals erroneously relied upon due process considerations to review the parents' unpreserved jury-charge errors.

An additional factor further supports the conclusion that due process does not require appellate review of the unpreserved jury-charge errors. Texas's Legislature has established the procedures for terminating parental rights. See TEX. FAM.CODE §§ 161.001-161.211. In doing so, the Legislature has been heedful of the important interests-- parents' and children's--at stake. For example, the Family Code expressly requires that a court terminate the parent-child relationship only if the grounds for termination, including whether termination is in the best interest of the child, are proven with "clear and convincing evidence." TEX. FAM.CODE § 161.001. This, of course, is a higher evidentiary standard than in ordinary civil case. See *In re G.M.,* 596 S.W.2d at 847. Moreover, though the U.S. Supreme Court has held that states need not do so in every case, the Family Code requires courts to provide counsel for indigent parents in termination proceedings. TEX. FAM.CODE § 107.013(a)(1); see Lassiter, 452 U.S. at 33-34, 101 S.Ct. 2153.

Neither the Family Code passed by our Legislature nor the procedural and appellate rules promulgated and applied by our courts deny parents fair notice and the right to be heard in parental-termination cases. The U.S. Supreme Court has recognized that, "[i]n assessing what process is due ... substantial weight must be given to the good-faith judgments" of our law makers "that the procedures they have provided assure fair consideration of entitlement claims of individuals." Eldridge, 424 U.S. at 349, 96 S.Ct. 893. Here, our Legislature has carefully constructed a statutory scheme governing how courts

---

**Page 307**

shall conduct termination proceedings. In that scheme, though the Legislature has expressly provided certain procedures that differ from other civil cases, see TEX. FAM.CODE §§ 107.013(a)(1), 161.001, it has chosen not to preclude application of our procedural and appellate rules in parental-termination cases. Therefore, substantial weight should be given to the Legislature's good-faith judgment when deciding these cases. See Eldridge, 424 U.S. at 349, 96 S.Ct. 893.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

As the Court recognizes, the parents complain that their counsel's failure to object to the charge and other alleged mistakes rendered his assistance ineffective. Assuming the parents may raise this contention, and assuming they may do so for the first time on appeal, the Court correctly concludes that the assistance in this case was not ineffective. In fact, even assuming the parents can overcome the strong presumption that their counsel's performance was reasonable, there is no reasonable probability that, but for their counsel's unprofessional errors, the result of this termination proceeding would have been different. See *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Garcia v. State,* 57 S.W.3d 436, 440 (Tex.Crim.App.2001).

As discussed at length in the Court's opinion, the jury heard abundant evidence that supports a conclusion that termination is in the children's best interest. Further, given the all evidence the jury considered from numerous sources and witnesses, the counsel's alleged mistakes do not raise even "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Thus, the assistance of the parents' counsel in this case was not ineffective.

## C. THE COURT'S WRITINGS

The Court engages in procedural gymnastics to avoid answering the constitutional question in this case. While Rule 279 may indeed resolve the specific alleged problem with the jury charge in this case, the Court refuses to answer the threshold procedural due process question and does not analyze the due process issue under the U.S. Supreme Court's guidelines for ascertaining the process due in termination proceedings. See Santosky, 455 U.S. at 754, 102 S.Ct. 1388; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153. Because the Court does not answer the threshold constitutional question, the Court's writing leaves little guidance for practitioners and lower courts for how to determine if our error preservation rules violate due process when applied to other types of unpreserved errors. Undoubtedly, the Court must eventually resolve this issue, as there will not be a Rule 279 "band-aid" for every unpreserved trial error in parental-termination cases.

JUSTICE HANKINSON'S fundamental error analysis is no more compelling. The fundamental-error analysis disregards that the parents' due process claim here relates to our procedures about preserving error for appeal. And, the U.S. Supreme Court has dictated how courts must determine what process is due a parent. Santosky, 455 U.S. at 754, 102 S.Ct. 1388; Lassiter, 452 U.S. at 27, 101 S.Ct. 2153. However, rather than conduct this analysis, the dissent contends that our common law doctrine of fundamental error applies. But this disregards the true nature--and danger--of Texas's fundamental error jurisprudence.

Historically, courts have applied fundamental error in civil cases under very limited circumstances. Typically, as the dissent recognizes, the concept of fundamental error is expressed in our jurisprudence

**Page 308.**

holding that subject-matter jurisdiction may be raised at any time. See, e.g., *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 445 (Tex.1993). However, the other types of civil cases applying fundamental error--the cases involving "public-interest-based" issues--are rare. Again, as the dissent recognizes, this Court has often declined to apply fundamental-error review, recently doing so in a case in which a child's welfare and constitutional issues were raised. See, e.g., Texas Dep't of Protective & Regulatory Servs. v. Sherry, 46 S.W.3d 857, 861 (Tex.2001).

Perhaps the Court has not applied fundamental-error review in many cases, because the concept is nebulous and imprecise. This Court has held that fundamental error exists if the error "directly and adversely affects the interest of the public generally, as that interest is declared in the statutes or Constitution of this state." *Ramsey v. Dunlop,* 146 Tex. 196, 205 S.W.2d 979, 983 (1947). But under this test, an argument may be made under almost any statute that public policy favors reviewing the unpreserved issue.

Moreover, under the dissent's analysis, if courts can review unpreserved jury-charge errors based on the Family Code expressing a public policy that the child's best interest is of primary concern, then courts can review any unpreserved error in parental-termination cases. In other words, a logical extension of the dissent's applying fundamental-error review here is that appellate courts must review any unpreserved error in a parental-termination case, because any error could affect the public's overarching concern with the child's best interest. Thus, fundamental-error review results in a slippery slope that, for all the reasons under the Eldridge factors adopted in Lassiter and discussed above, would cause more harm than good in termination cases.

### III. CONCLUSION

The question the Court is asked to answer today is whether due process requires an appellate court to review unpreserved errors in the jury charge. The answer is "no." I cannot join the Court's opinion, because it declines to answer this question and instead relies on a procedural rule that gives no guidance for future cases. Moreover, the parents raised other issues the court of appeals did not consider, including a challenge to the factual sufficiency of the evidence. Accordingly, the court of appeals' judgment should be reversed and remanded to that court for further proceedings.

---------

Notes:

[1] 57 S.W.3d 66.

[2] See TEX. FAM.CODE § 262.104.

[3] See TEX. FAM.CODE § 262.105.

[4] See TEX. FAM.CODE § 262.201.

[5] 57 S.W.3d at 72.

[6] Id. at 73.

[7] Id.

[8] Id. at 73-74.

[9] 57 S.W.3d at 75-76 (Gray, J., dissenting).

[10] Texas Rule of Civil Procedure 279, embodying these concepts, was promulgated in 1941. It essentially tracked the holding in Wichita Falls & Oklahoma Railway Co. v. Pepper, 134 Tex. 360, 135 S.W.2d 79 (1940).

[11] Rule 279 provides:

Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived. When a ground of recovery or defense consists of more than one element, if one or more of such elements necessary to sustain such ground of recovery or defense, and necessarily referable thereto, are submitted to and found by the jury, and one or more of such elements are omitted from the charge, without request or objection, and there is factually sufficient evidence to support a finding thereon, the trial court, at the request of either party, may after notice and hearing and at any time before the judgment is rendered, make and file written findings on such omitted element or elements in support of the judgment. If no such written findings are made, such omitted element or elements shall be deemed found by the court in such manner as to support the judgment. A claim that the evidence was legally or factually insufficient to warrant the submission of any question may be made for the first time after verdict, regardless of whether the submission of such question was requested by the complainant.

TEX.R. CIV. P. 279.

[12] See id.

[13] Id.

[14] See Ramos v. Frito-Lay, Inc., 784 S.W.2d 667, 668 (Tex.1990) (holding that "[i]f the omitted element ... is supported by some evidence, we must deem it found against Frito-Lay under Rule 279") (citing Payne v. Snyder, 661 S.W.2d 134, 142 (Tex.App.-Amarillo 1983, writ ref'd n.r.e.) and Freedom Homes of Texas, Inc. v. Dickinson, 598 S.W.2d 714, 717 (Tex.Civ.App.-Corpus Christi 1980, writ ref'd n.r.e.)).

[15] Santosky v. Kramer, 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); In re G.M., 596 S.W.2d 846, 847 (Tex.1980).

[16] See, e.g., State v. Addington, 588 S.W.2d 569, 570 (Tex.1979) (following Addington v. Texas, 441 U.S. 418, 431-32, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)) (defining the standard in a case in which involuntary commitment of an individual to a state mental hospital was sought); Bentley v. Bunton, 94 S.W.3d 561, 597 (Tex.2002) (defining "clear and convincing evidence" in a defamation case); Huckabee v. Time Warner Entm't Co., 19 S.W.3d 413, 422 (Tex.2000) (same).

[17] See Act of June 14, 1983, 68th Leg., R.S., ch. 298, § 2, 1983 Tex. Gen. Laws 1554, 1555 (former TEX. FAM.CODE § 11.15) recodified by Act of April 20, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex. Gen. Laws 113, 212 (current version at TEX. FAM.CODE §§ 161.001(1), (2)).

[18] TEX. FAM.CODE § 101.007; *In re C.H.,* 89 S.W.3d 17, 25 (Tex.2002) (discussing this Court's and the Legislature's use of the same definition of "clear and convincing evidence"); see also Bentley v. Bunton, 94 S.W.3d at 597 (defining "clear and convincing evidence" in a defamation case) (citing Huckabee v. Time Warner Entertainment Co., 19 S.W.3d at 422); State v. Addington, 588 S.W.2d at 570 (defining the standard in a case in which involuntary commitment of an individual to a state mental hospital was sought).

[19] See In re C.H., 89 S.W.3d at 25 n. 1; see also Bentley v. Bunton, 94 S.W.3d at 577.

[20] In re C.H., 89 S.W.3d at 25.

[21] Id.

[22] Id. at 26.

[23] Id. at 25.

[24] Id. (citations omitted).

[25] Formosa Plastics Corp. U.S.A. v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex.1998) (citing Continental Coffee Products Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex.1996) and Browning-Ferris, Inc. v. Reyna, 865 S.W.2d 925, 928 (Tex.1993)).

[26] 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

[27] 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960).

[28] Jackson, 443 U.S. at 320, 99 S.Ct. 2781 (quoting Jacobellis v. Ohio, 378 U.S. 184, 202, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Warren, C.J., dissenting)).

[29] Id.

[30] Id.

[31] Id. at 320 n. 14 (citations omitted).

[32] See generally Stewart v. Coalter, 48 F.3d 610, 613-14 (1st Cir.1995).

[33] This standard is similar, but not identical, to the formulation used by federal courts in criminal cases to determine whether the defendant is entitled to a directed verdict of acquittal under the reasonable doubt standard of proof. See generally Curley v. United States, 160 F.2d 229, 232-33 (D.C.Cir.1947); United States v. Taylor, 464 F.2d 240, 243 (2nd Cir.1972); see also 2A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 467 (3rd ed.2000).

[34] See Southwest Key Program, Inc. v. Gil-Perez, 81 S.W.3d 269, 270 (Tex.2002) (rendering judgment against the plaintiff in a negligence case when there was legally insufficient evidence of proximate cause); Vista Chevrolet, Inc. v. Lewis, 709 S.W.2d 176, 176-77 (Tex.1986) (holding that rendition is proper when a no evidence point is sustained); see also In re D.T., 34 S.W.3d 625, 642 (Tex.App.-Fort Worth 2000, pet. denied) (partially rendering judgment for the parents in a termination case because the evidence was legally insufficient to support findings on two statutory grounds for termination).

[35] *In re C.H.,* 89 S.W.3d 17, 25 (Tex.2002).

[36] Id.

[37] The parameters of legal and factual sufficiency that we have set forth for parental termination cases differ to some degree from those adopted by the Texas Court of Criminal Appeals for criminal cases. See, e.g., Vasquez v. State, 67 S.W.3d 229, 236 (Tex.Crim.App.2002).

[38] 89 S.W.3d 17 (Tex.2002).

[39] See W.B. v. Tex. Dep't of Protective & Regulatory Servs., 82 S.W.3d 739, 741 (Tex.App.-Corpus Christi 2002, no pet.); In re J.M.M., 80 S.W.3d 232, 240 (Tex.App.-Fort Worth 2002, pet. denied); In re A.L.S., 74 S.W.3d 173, 178 (Tex.App.-El Paso 2002, no pet.); In re R.G., 61 S.W.3d 661, 667 (Tex.App.-Waco 2001, no pet.); In re I.V., 61 S.W.3d 789, 794 (Tex.App.-Corpus Christi 2001, no pet.); In re L.S.R., 60 S.W.3d 376, 378 (Tex.App.-Fort Worth 2001, pet. denied); In re A.V., 57 S.W.3d 51, 61-62 (Tex.App.-Waco 2001, pet. granted); In re J.O.C., 47 S.W.3d 108, 113 (Tex.App.-Waco 2001, no pet.); In re A.P., 42 S.W.3d 248, 256 (Tex.App.-Waco 2001, no pet.); In re V.R.W., 41 S.W.3d 183, 190 (Tex.App.-Houston [14th Dist.] 2001, no pet.); In re J.M.T., 39 S.W.3d 234, 238 (Tex.App.-Waco 1999, no pet.); Leal v. Tex. Dep't of Protective & Regulatory Servs., 25 S.W.3d 315, 321 (Tex.App.-Austin 2000, no pet.) (stating that a heightened standard applies, but actually applying "more than a scintilla" standard); In re P.R., 994 S.W.2d 411, 415 (Tex.App.-Fort Worth 1999, pet. dism'd w.o.j.); In re J.N.R., 982 S.W.2d 137, 142 (Tex.App.-Houston [1st Dist.] 1998, no pet.); In re W.A.B., 979 S.W.2d 804, 806 (Tex.App.-Houston [14th Dist.] 1998, pet. denied); Hann v. Tex. Dep't of Protective & Regulatory Servs., 969 S.W.2d 77, 82 (Tex.App.-El Paso 1998, pet. denied); In re D.L.N., 958 S.W.2d 934, 936 (Tex.App.-Waco 1997, pet. denied); In re B.R., 950 S.W.2d 113, 119 (Tex.App.-El Paso 1997, no writ); Lucas v. Tex. Dep't of Protective & Regulatory Servs., 949 S.W.2d 500, 502 (Tex.App.-Waco 1997, writ denied); Edwards v. Tex. Dep't of Protective & Regulatory Servs., 946 S.W.2d 130, 137 (Tex.App.-El Paso 1997, no writ); Spurlock v. Tex. Dep't of Protective & Regulatory Servs., 904 S.W.2d 152, 155-56 (Tex.App.-Austin 1995, writ denied); In re J.F., 888 S.W.2d 140, 141 (Tex.App.-Tyler 1994, no writ); In re A.D.E., 880 S.W.2d 241, 245 (Tex.App.-Corpus Christi 1994, no writ); D.O. v. Tex. Dep't of Human Servs., 851 S.W.2d 351, 353 (Tex.App.-Austin 1993, no writ); In re L.R.M., 763 S.W.2d 64, 67 (Tex.App.-Fort Worth 1989, no writ).

[40] In re C.D.B., 94 S.W.3d 306, 308-09 (Tex.App.-Corpus Christi 2002, no pet. h.); In re W.C., 56 S.W.3d 863, 867-68 (Tex.App.-Houston [14th Dist.] 2001, no pet.); Rodriguez v. Tex. Dep't of Human Servs., 737 S.W.2d 25, 26-27 (Tex.App.-El Paso 1987, no writ); Subia v. Tex. Dep't of Human Servs., 750 S.W.2d 827, 831 (Tex.App.-El Paso 1988, no writ); Neiswander v. Bailey, 645 S.W.2d 835, 836 (Tex.App.-Dallas 1982, no writ).

[41] 89 S.W.3d at 25.

[42] Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 685-86, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); Bose Corp. v. Consumers Union, 466 U.S. 485, 515-16, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

[43] Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 436, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001).

[44] 491 U.S. at 685-86, 109 S.Ct. 2678.

[45] 466 U.S. at 515-16, 104 S.Ct. 1949.

[46] 768 S.W.2d 273 (Tex.1989).

[47] 764 S.W.2d 220, 223 (Tex.1988).

[48] Garza, 768 S.W.2d at 275-76.

[49] Brown, 764 S.W.2d at 223.

[50] Garza, 768 S.W.2d at 276.

[51] U.S. CONST. amend. XIV, § 1.

[52] TEX. CONST. art. I, § 19.

[53] 455 U.S. 745, 753-54, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

[54] Id. at 754, 102 S.Ct. 1388 (quoting Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

[55] Id.

[56] Id. at 758-59, 102 S.Ct. 1388.

[57] Id. at 759, 102 S.Ct. 1388.

[58] Id.

[59] Id. at 754, 102 S.Ct. 1388.

[60] *In re C.H.,* 89 S.W.3d 17, 25 (Tex.2002).

[61] 455 U.S. at 754, 102 S.Ct. 1388.

[62] See 96 S.W.3d at 307 (SCHNEIDER, J., dissenting).

[63] See id. at 291 (HANKINSON, J., dissenting).

[64] See id. at 298 (HANKINSON, J., dissenting).

[65] See Ramos v. Frito-Lay, Inc., 784 S.W.2d 667, 668 (Tex.1990) (holding that "[i]f the omitted element ... is supported by some evidence, we must deem it found against Frito-Lay under Rule 279") (citing Payne v. Snyder, 661 S.W.2d 134, 142 (Tex.App.-Amarillo 1983, writ ref'd n.r.e.) and Freedom Homes of Texas, Inc. v. Dickinson, 598 S.W.2d 714, 717 (Tex.Civ.App.-Corpus Christi 1980, writ ref'd n.r.e.)).

[66] TEX.R. CIV. P. 279.

[67] Id.

[68] TEX.R. CIV. P. 299; see also Wisdom v. Smith, 146 Tex. 420, 209 S.W.2d 164, 166-67 (1948); Page v. Cent. Bank & Trust Co., 548 S.W.2d 802, 804 (Tex.Civ.App.-Eastland 1977, no writ); Gulf States Theatres of Tex. v. Hayes, 534 S.W.2d 406, 407 (Tex.Civ.App.-Beaumont 1976, writ ref'd n.r.e.); Go Int'l, Inc. v. Big-Tex Crude Oil Co., 531 S.W.2d 208, 210 (Tex.Civ.App.-Eastland 1975, no writ); Ives v. Watson, 521 S.W.2d 930, 934 (Tex.Civ.App.-Beaumont 1975, writ ref'd n.r.e.).

[69] From 1941 until 1988, Rule 279 provided that if "there is evidence to support a finding," omitted findings would be "deemed as found by the court in such manner as to support the judgment." When that rule was amended in 1988, there was no indication in the record of the rules proceedings that revised Rule 279 was to meant to change the prerequisite of "evidence," which was maintained in Rule 299, to "factually sufficient" evidence with respect to deemed findings. But see Kilgarlin, Practicing Law in the "New Age": The 1988 Amendments to the Texas Rules of Civil Procedure, 19 TEX. TECH. L.REV. 881, 916 (1988).

[70] See TEX.R.APP. P. 33.1; see also TEX.R. CIV. P. 279.

[71] We express no opinion with regard to the holdings on this issue in the courts of appeals. See In re M.S., 73 S.W.3d 537, 542 (Tex.App.-Beaumont 2002, pet. granted) (holding that a sufficiency challenge must be preserved in the trial court in a parental termination case to be reviewed on appeal); In re G.C., 66 S.W.3d 517, 527 (Tex.App.-Fort Worth 2002, no pet. h.) (same); In re I.V., 61 S.W.3d 789, 794 (Tex.App.-Corpus Christi 2001, no pet.) (same); In re J.M.S., 43 S.W.3d 60, 62 (Tex.App.-Houston [1st Dist.] 2001, no pet.) (same); In re C.E.M., 64 S.W.3d 425, 428 (Tex.App.-Houston [1st Dist.] 2000, no pet.) (same); In re A.P., 42 S.W.3d 248, 256 (Tex.App.-Waco 2001, no pet.) (holding that a factual sufficiency complaint in a parental termination case may be reviewed even though it was not preserved in the trial court); In re A.V., 57 S.W.3d 51, 56 (Tex.App.-Waco 2001, pet. granted) (same).

[72] The jury was instructed only that "[t]he same ten or more of you must agree upon all of the answers made and to the entire verdict." As can be seen from the charge, quoted in Section II, supra, the only questions to be answered were whether the parent-child relationships should be terminated.

[73] TEX.R.APP. P. 44.1(a).

[74] The first order, a status hearing order, was signed on December 23, 1997. The next three orders, all permanency hearing orders, were signed on April 28, 1998, August 18, 1998, and December 15, 1998.

[75] The first order (signed in December 1997) did not order the mother to pay any child support, but ordered the father to pay $100. The remaining three orders directed each parent to pay $100.

[76] The parents had undergone individual psychological testing in 1997, before the children were removed, pursuant to the initial Child Safety Evaluation and Plan that CPS had implemented in April 1997. The psychiatric evaluations ordered after removal were to be new, additional evaluations that were distinct from the previous psychological testing.

[77] In re A.R.R., 61 S.W.3d 691, 695 (Tex.App.-Fort Worth 2001, pet. denied) (Sixth Amendment); In re B.B., 971 S.W.2d 160, 172 (Tex.App.-Beaumont 1998, pet. denied) (holding that the Sixth Amendment right does not extend to parental termination cases, although the parent contended the right to effective counsel stemmed from TEX. FAM.CODE § 107.013); Arteaga v. Tex. Dep't of Protective & Regulatory Servs., 924 S.W.2d 756, 762 (Tex.App.-Austin 1996, writ denied) (Sixth Amendment); In re J.F., 888 S.W.2d 140, 143 (Tex.App.-Tyler 1994, no writ) (Sixth Amendment); Krasniqi v. Dallas County Child Protective Servs. Unit of Tex. Dep't of Human Servs., 809 S.W.2d 927, 931 (Tex.App.-Dallas 1991, writ denied) (Due process and equal protection under the Fourteenth Amendment); Posner v. Dallas County Child Welfare Unit of the Tex. Dep't of Human Servs., 784 S.W.2d 585, 588 (Tex.App.-Eastland 1990, writ denied) (holding that "the constitutional right to effective assistance of counsel" does not extend to parental termination proceedings without identifying any specific constitutional provision); Howell v. Dallas County Child Welfare Unit, 710 S.W.2d 729, 734-35 (Tex.App.-Dallas 1986, writ ref'd n.r.e.).

[78] In re J.M.S., 43 S.W.3d 60, 62-63 (Tex.App.-Houston [1st Dist.] 2001, no pet.).

[79] TEX. FAM.CODE § 107.103.

[80] In re B.L.D., 56 S.W.3d 203, 211-12 (Tex.App.-Waco 2001, pet. granted).

[81] In re Oghenekevebe, 123 N.C.App. 434, 473 S.E.2d 393, 396 (Ct.App.1996) (basing right on a statute); In re A.R.S., 480 N.W.2d 888, 891 (Iowa 1992) (holding that the test for ineffective assistance of counsel in termination cases is generally the same as in criminal proceedings); In re Adoption of T.M.F., 392 Pa.Super. 598, 573 A.2d 1035, 1041 (1990) (holding that "[t]he constitutional rights in a termination proceeding ... are derived from the due process clause of the fourteenth amendment of the United States Constitution and not the sixth amendment"); In re Simon, 171 Mich.App. 443, 431 N.W.2d 71, 74 (Ct.App.1988) (basing right on a statute).

[82] 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

[83] Id. at 686, 104 S.Ct. 2052.

[84] Id. at 687, 104 S.Ct. 2052.

[85] Id. at 688, 104 S.Ct. 2052.

[86] Id. at 689, 104 S.Ct. 2052 (alteration in original).

[87] Id.

[88] Id.

[89] Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

[90] Id. at 690, 104 S.Ct. 2052.

[91] Id.

[92] Id. at 691, 104 S.Ct. 2052.

[93] Id. at 693, 104 S.Ct. 2052.

[94] Id.

[95] Id.

[96] Id. at 694, 104 S.Ct. 2052.

[97] Id.

[98] Id. at 696, 104 S.Ct. 2052.

[99] Id.

[100] See TEX.R. CIV. P. 279.

[101] Strickland, 466 U.S. at 699, 104 S.Ct. 2052 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

[102] See United States v. Olano, 507 U.S. 725, 731-32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (holding that under Federal Rule of Appellate Procedure 52(b), "plain error" in a jury charge may be considered by an appellate court although it was not brought to the attention of the trial court); Pondexter v. State, 942 S.W.2d 577, 588 (Tex.Crim.App.1996); Green v. State, 934 S.W.2d 92, 108 (Tex.Crim.App.1996); Ransom v. State, 920 S.W.2d 288, 303 (Tex.Crim.App.1994); Jackson v. State, 898 S.W.2d 896, 899 (Tex.Crim.App.1995).

[103] See *State v. Santana,* 444 S.W.2d 614, 615 (Tex.1969) (holding that a jury charge submitting preponderance of the evidence as the burden of proof was error that could be raised for the first time on appeal), vacated on other grounds, 397 U.S. 596, 90 S.Ct. 1350, 25 L.Ed.2d 594 (1970); R.A.M. v. State, 599 S.W.2d 841, 844-45 (Tex.Civ.App.-San Antonio 1980, no writ).

[104] 802 S.W.2d 647 (Tex.1990).

[105] Strickland, 466 U.S. at 690, 104 S.Ct. 2052.

[106] 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

[1] See, e.g., Hill v. Sherwood, 488 So.2d 1357, 1359 (Ala.1986) (court may consider unpreserved error in closing argument only when so grossly improper and highly prejudicial so as to be beyond corrective action by trial court); Holiday Inns of Am., Inc. v. Peck, 520 P.2d 87, 90 (Alaska 1974) (court will consider " 'plain error' that is likely to result in a miscarriage of justice"); Hale v. Morgan, 22 Cal.3d 388, 149 Cal.Rptr. 375, 584 P.2d 512, 516 (1978) (consideration of points not raised below permitted for important matters of public policy in which pure question of law is presented); Scheer v. Cromwell, 158 Colo. 427, 407 P.2d 344, 345 (1965) (in rare cases, court will notice manifest error); Collins v. Colonial Penn Ins. Co., 257 Conn. 718, 778 A.2d 899, 906 n. 14 (2001) (court will consider plain error when it is in the interest of the public welfare or justice between the parties); Wolhar v. General Motors Corp., 734 A.2d 161, 161, 1999 WL 485435 (Del.1999) (plain error is that which jeopardizes the fairness and integrity of the trial process); Newell v. District of Columbia, 741 A.2d 28, 34 (D.C.1999) (reversal for plain error when apparent from the face of the record that a miscarriage of justice has occurred); Murphy v. International Robotic Sys., 766 So.2d 1010, 1027 (Fla.2000) (court can consider unobjected-to, improper closing argument only when raised in a motion for new trial although rules require objection at trial); Foskey v. Foskey, 257 Ga. 736, 363 S.E.2d 547, 548 (1988) (listing types of cases in which court will reverse judgment based on unpreserved jury-charge error); Trucking Co. v. Board of Water Supply, 97 Hawai'i 450, 40 P.3d 73, 81 (2002) (appellate court has discretion to notice plain error in civil cases when justice requires); Hecla Mining Co. v. Star-Morning Mining Co., 122 Idaho 778, 839 P.2d 1192, 1197 (1992) (recognizing plain or fundamental error); Gillespie v. Chrysler Motors Corp., 135 Ill.2d 363, 142 Ill.Dec. 777, 553 N.E.2d 291, 297 (1990) (plain error considered when litigant cannot receive a fair trial and judicial process would deteriorate); Manns v. Skolnik, 666 N.E.2d 1236, 1241 (Ind.Ct.App.1996) (court will consider error that is substantial blatant violation of principles rendering the trial unfair); Berg v. Zummo, 786 So.2d 708, 716 n. 5 (La.2001) (court will consider "plain and fundamental error" in jury instructions); Reno v. Townsend, 704 A.2d 309, 311 (Me.1997) (obvious error affects fairness of proceedings); Squibb v. R.M. Bradley & Co., 40 Mass.App.Ct. 914, 661 N.E.2d 1352, 1353 (1996) (plain error is that which results in manifest injustice); Napier v. Jacobs, 429 Mich. 222, 414 N.W.2d 862, 871 (1987) (plain error is that which results in manifest miscarriage of justice); Alpha Gulf Coast, Inc. v. Jackson, 801 So.2d 709, 727 (Miss.2001) (to reverse for plain error, court must find error and harm); Stanziale v. Musick, 370 S.W.2d 261, 269 (Mo.1963) (court will reverse for manifest injustice or miscarriage of justice); State ex. rel State Comp. Mut. Ins. Fund v.

Berg, 279 Mont. 161, 927 P.2d 975, 982 (1996) (plain-error doctrine permits review of error that results in substantial injustice); Barks v. Cosgriff Co., 247 Neb. 660, 529 N.W.2d 749, 754 (1995) (court will reach the merits of plain error in jury charge); Sunrise Manor Town Protective Ass'n v. City of N. Las Vegas, 91 Nev. 713, 541 P.2d 1102, 1104 (1975) (plain error is so substantial as to result in injustice); Fertile ex. rel. Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 779 A.2d 1078, 1085 (2001) (the standard for plain error is whether error had clear capacity for producing unjust result); Chavez v. Board of County Comm'rs., 130 N.M. 753, 31 P.3d 1027, 1039 (Ct.App.2001) (fundamental error applies, for example, when there is no jurisdiction or issue is a matter of public interest affecting large number of people); Elezaj v. P.J. Carlin Constr. Co., 89 N.Y.2d 992, 657 N.Y.S.2d 399, 679 N.E.2d 638, 638 (1997) (only intermediate appellate court has discretion to review unpreserved error); Rau v. Kirschenman, 208 N.W.2d 1, 9 (N.D.1973)(recognizing exception to preservation rules for fundamental error that is highly prejudicial) (on petition for rehearing); Goldfuss v. Davidson, 79 Ohio St.3d 116, 679 N.E.2d 1099, 1103 (1997) (reversing plain error when, if uncorrected, it would undermine public confidence in judiciary); Sullivan v. Forty-Second West Corp., 961 P.2d 801, 803 (Okla.1998) (fundamental error has a substantial effect on rights of one or more of the parties); Hotelling v. Walther, 174 Or. 381, 148 P.2d 933, 934 (1944) (plain error is error apparent on the record); Wuest ex. rel. Carver v. McKennan Hosp., 619 N.W.2d 682, 691 (S.D.2000) (errors must be obvious and substantial); Salt Lake City v. Ohms, 881 P.2d 844, 847 (Utah 1994) (court can review unpreserved error when exceptional circumstances exist); In re Maher, 132 Vt. 560, 326 A.2d 142, 144 (1974) (court will review errors so grave and serious as to strike to the heart of constitutional rights); Conner v. Universal Utils., 105 Wash.2d 168, 712 P.2d 849, 851 (1986) (court may review unpreserved issue regarding denial of procedural due process on appeal); Sheetz, Inc. v. Bowles Rice McDavid Graff & Love, PLLC, 209 W.Va. 318, 547 S.E.2d 256, 273 (2001) (error must be plain, affect substantial rights, and seriously affect fairness of judicial proceedings); Hatch v. State Farm Fire & Cas. Co., 930 P.2d 382, 391 (Wyo.1997) (court must be able to discern error from record that affects substantial rights).

[1] The Family Service Plan is the trial court's order specifying the actions the parents had to take for the Department to return the children to their custody. See TEX. FAM.CODE § 161.001(1)( o).

Page 437

**911 S.W.2d 437 (Tex.App. —Texarkana 1995)**

**In the Interest of J.J. and K.J., Children.**

**No. 06-95-00051-CV.**

**Court of Appeals of Texas, Sixth District, Texarkana**

**October 5, 1995**

Submitted Aug. 28, 1995.

Rehearing Overruled Oct. 31, 1995.

Page 438

Ebb B. Mobley, Longview, for Appellants J.J. & P.J.

Virginia Schnarr, Longview, for the children J.J. & K.J.

David Brabham, Gregg County District Attorney, Longview, for The State of Texas.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

OPINION

BLEIL, Justice.

J.J. and P.J. appeal from a judgment terminating their parental rights to their two children, a boy and a girl, aged five and four, respectively, at the time of trial. Each challenges the sufficiency of the evidence to support the trial court's findings. Because we

Page 439

conclude that the evidence is sufficient to support the findings, we affirm the judgment.

On October 26, 1992, the paternal grandmother of the two children contacted the Children's Protective Services (CPS) division of the Texas Department of Regulatory and Protective Services to report that the children were being abused and were not receiving proper food or supervision. Following an initial investigation by CPS, P.J. signed a service plan with the agency in February 1993, agreeing to take various actions to improve the care given to her children. One of the provisions of this agreement was that she was not to allow J.J., who at the time was participating in a drug rehabilitation program, to resume living with her and the children due to his history of drug abuse and physical abuse of P.J. The Johnsons divorced on February 16, 1993. CPS removed the children from parental custody and placed them in foster care on April 13, 1993, after discovering that the Johnsons had resumed living with each other. In April 1993, CPS filed a petition to terminate the parent-child relationship between appellants and their children. At the conclusion of the nonjury trial, the court ordered that appellants' parental rights be terminated. Rights which inhere in the parent-child relationship are of constitutional dimension. *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re G.M.,* 596 S.W.2d 846, 846 (Tex.1980). Because the involuntary termination of parental rights is complete, final, and irrevocable, trial court proceedings that result in such a termination must be strictly scrutinized. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985). The evidence supporting a termination order must be clear and convincing; this standard is both constitutionally as well as statutorily mandated. Act of May 26, 1995, 74th Leg., R.S., ch. 751, § 65, 1995 Tex.Sess.Law Serv. 3888, 3911 (Vernon) (to be codified at TEX.FAM.CODE ANN. § 161.001, as an amendment to Act of April 6, 1995, 74th

Leg., R.S., ch. 20, § 1, 1995 Tex.Sess.Law Serv. 113, 212 (Vernon) (recodification and reorganization of Family Code)); *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re G.M.,* 596 S.W.2d at 847; *Slatton v. Brazoria County Protective Servs. Unit,* 804 S.W.2d 550, 555 (Tex.App.--Texarkana 1991, no writ). In order to qualify as clear and convincing, the evidence must be of such a measure or degree of proof as will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 Tex.Sess.Law Serv. 113, 122 (Vernon) (to be codified at TEX.FAM.CODE ANN. § 101.007); *In re G.M.,* 596 S.W.2d at 847; *In re McElheney,* 705 S.W.2d 161, 164 (Tex.App.--Texarkana 1985, no writ).

Section 161.001 of the Family Code establishes the requirements for involuntary termination of a person's parental rights. First, the trial court must find that the parent has committed one of the acts enumerated in subsection (1). Second, pursuant to subsection (2), the court must find that termination of the parent-child relationship is in the best interest of the child. *Richardson v. Green,* 677 S.W.2d 497, 499 (Tex.1984).

The trial court made the following three findings, based on the statutory requirements of Section 161.001: (1) that each appellant knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical and emotional well-being of the children; (2) that each appellant knowingly engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical and emotional well-being of the children; and (3) that termination of the parent-child relationship between each appellant and the children was in the best interest of the children.

In considering a challenge to the sufficiency of the evidence, we are required to examine all of the evidence in the record and to set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). The clear and convincing standard of proof required at the trial court level to terminate parental rights does not alter this fundamental standard of appellate review. Faram v. Gervitz-Faram, 895

Page 440

S.W.2d 839, 842 (Tex.App.--Fort Worth 1995, no writ); *D.O. v. Texas Dep't of Human Servs.,* 851 S.W.2d 351, 353 (Tex.App.--Austin 1993, no writ); see also *State v. Turner,* 556 S.W.2d 563, 565 (Tex.1977); *Meadows v. Green,* 524 S.W.2d 509, 510 (Tex.1975) (clear and convincing standard of appellate review disapproved); contra *Harris v. Herbers,* 838 S.W.2d 938, 941 (Tex.App.--Houston [1st Dist.] 1992, no writ); *Wetzel v. Wetzel,* 715 S.W.2d 387, 389 (Tex.App.--Dallas 1986, no writ) (appropriate standard of review is whether the trier of fact could reasonably find that the fact was highly probable). [1] Because the trial court's order terminated the parental rights of both parents, and because both parents appeal that order, we examine the sufficiency of the evidence separately for each appellant.

J.J. testified that he used crack cocaine in the home while the children were present. He testified that he physically abused P.J. and that this might have occurred while the children were present. P.J. testified that J.J. did physically abuse her while the children were present. J.J. also testified that, while living with the children, he used food stamps to obtain crack cocaine. J.J.

further testified that, as of the date of the trial, he had been in jail numerous times during the preceding year and a half on various charges, including possession of crack cocaine and theft, and that he was currently in jail for violation of his probation.

Based on these facts, the trial court could reasonably have concluded that it was highly probable that J.J. engaged in conduct warranting the termination of his parental rights. Although there was little evidence that J.J. committed any direct physical or emotional abuse of the children, the trial court could nevertheless have found that his conduct endangered his children's well-being. In order for parental conduct to constitute endangerment of a child's well-being, it is not necessary that the conduct be directed at the child or that the child actually suffer injury; rather, it is sufficient that the child's well-being be jeopardized or exposed to loss or injury. *Texas Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987). Further, the specific danger to the child's well-being need not be established as an independent proposition, but may instead be inferred from parental misconduct. Id. Also, evidence of a parent's imprisonment may contribute to a finding that the parent engaged in a course of conduct which endangered a child's physical or emotional well-being. Id. at 534; Harris, 838 S.W.2d at 942.

In light of J.J.'s admissions of spousal abuse and drug abuse while in his children's presence and his repeated instances of imprisonment, we are unable to say that the trial court erred in finding that he knowingly engaged in conduct which endangered the physical and emotional well-being of the children. In addition, the trial court could have reasonably concluded that, by persistently engaging in such conduct, he knowingly placed his children in conditions or surroundings which endangered their physical or emotional well-being.

Page 441

Furthermore, the trial court did not err in finding that there was clear and convincing evidence that terminating J.J.'s parental rights was in the children's best interest. J.J. testified that since the time the children were placed in foster care he had continued to use crack cocaine, and he stated that he could not guarantee that he would not continue to do so in the future. He admitted to a history of physical abuse of P.J. P.J. testified that this abuse continued after the children were placed in foster care and after the divorce. Although J.J. was scheduled to be released from jail three days after the trial was held, he was to remain on probation for seven years, and his past conduct indicated that he had difficulty complying with the terms of probation. J.J. also testified that he himself did not believe the children should be returned to him upon his release from jail. The trial court therefore did not err in finding the statutory requirements for termination of parental rights satisfied as to appellant J.J.

P.J. testified that she used crack cocaine with her husband while the children were present, and she admitted that the environment created by this drug abuse was not good for the children. In addition, P.J. testified that she was an alcoholic and that she had been unable to comply with the requirement of her CPS service plan that she stay sober. She testified that, as of the date of trial, she had been sober for twenty-three days. Furthermore, P.J. testified that there had been occasions when she had left the children completely unattended. Finally, she specifically violated another requirement of her CPS service plan by allowing J.J. to resume living with her and the children in April 1993, despite his history of drug abuse and physical abuse of her. Given these

facts, all of which P.J. herself admitted, we are unable to say that the trial court erred in finding clear and convincing evidence that she engaged in conduct that endangered the children's well-being and that she also placed them in circumstances or surroundings that so endangered them.

P.J. further testified that since the children were taken from her and placed in protective custody she has lived with J.J. periodically, has continued to use crack cocaine, has been unable to remain sober, and has had no consistent employment. In addition, during this period, she worked as a prostitute for J.J. on more than one occasion. P.J. stated that she believed it would be best for the children to be placed somewhere other than her home. In light of this evidence, we additionally hold that the trial court did not err in finding, by clear and convincing evidence, that termination of P.J.'s parental rights was in the children's best interest.

We affirm the trial court's judgment.

---------

Notes:

[1] In rejecting an intermediate standard of appellate review, we adhere to an unambiguous directive of the Texas Supreme Court. See *Meadows v. Green,* 524 S.W.2d 509, 510 (Tex.1975). We note, however, that this rule was formulated at a time when that court explicitly disapproved of an intermediate standard of proof at the trial level as well. See State v. Turner, 556 S.W.2d 563, 565 (Tex.1977). In the intervening years, the court has sanctioned the use of the clear and convincing standard of proof at the trial level in certain types of cases, including the termination of parental rights. In re G.M., 596 S.W.2d 846, 847 (Tex.1980); see also State v. Addington, 588 S.W.2d 569, 570 (Tex.1979) (clear and convincing evidence required in civil commitment proceedings). The courts of appeals have disagreed over whether this new standard of proof for trial courts requires the application of a corresponding, intermediate standard of appellate review. Compare Neal v. Texas Dep't of Human Servs., 814 S.W.2d 216, 222 (Tex.App.--San Antonio 1991, writ denied); Williams v. Department of Human Servs., 788 S.W.2d 922, 926 (Tex.App.--Houston [1st Dist.] 1990, no writ); and Neiswander v. Bailey, 645 S.W.2d 835, 835-36 (Tex.App.--Dallas 1982, no writ) (applying new, intermediate standard of review) with In re A.D.E., 880 S.W.2d 241, 245 (Tex.App.--Corpus Christi 1994, no writ); Oadra v. Stegall, 871 S.W.2d 882, 892 (Tex.App.--Houston [14th Dist.] 1994, no writ); and Slatton v. Brazoria County Protective Servs. Unit, 804 S.W.2d 550, 556 (Tex.App.--Texarkana 1991, no writ) (rejecting alternative standard). In light of this uncertainty, we believe it might be appropriate for the supreme court to revisit this issue.

---------

145 S.W.3d 790 (Tex.App.—Texarkana 2004), 06-04-00020, In re L.C.

Page 790

**145 S.W.3d 790 (Tex.App.—Texarkana 2004)**

**In the Interest of L.C., L.C., et al., Children.**

**No. 06-04-00020-CV.**

**Court of Appeals of Texas, Sixth District, Texarkana.**

**September 16, 2004.**

Submitted June 18, 2004

Page 791

[Copyrighted Material Omitted]

Page 792

[Copyrighted Material Omitted]

Page 793

William T. Hughey, Law Office of William T. Hughey, Kevin McCarter, Marshall, for appellant.

Joe Black, Dist. Atty., Jennifer Truelove, Asst. Dist. Atty., Marshall, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

**OPINION**

MORRISS, Chief Justice.

After many complaint investigations by the Texas Department of Family and Protective Services over a number of years, the long nightmare [1] involving Kimberly Choyce James and her children has resulted in the harsh reality of losing, in the trial court, her parental rights to her children. James' parental rights to her five remaining [2] children--B.J. and J.J., children James shared with her husband, Darren James, and a daughter L.C., a son L.C., and S.C., James' children from earlier relationships [3]--were terminated after a jury trial. James now challenges the jury charge and the legal and factual sufficiency of the evidence to support the jury's findings. We affirm, after considering James' five points of error, because we hold the form of jury submission was proper and the evidence was sufficient. Our analysis is structured in this way:

1. The form of jury submission was proper.

2. The evidence was sufficient to show that at least one predicate act had been committed and that termination was in the children's best interest.

a. The evidence was legally and factually sufficient to show at least one predicate act.

i. Predicate Act A--Knowingly Putting Children in Endangering Conditions--was supported by legally and factually sufficient evidence.

ii. Predicate Act B--Knowingly Exposing Children to Endangering Conduct--was supported by legally and factually sufficient evidence.

iii. Predicate Act C--Child-Endangering Controlled Substance Use--was supported by legally and factually sufficient evidence.

b. The evidence was legally sufficient to show that termination was in the children's best interest.

*1. Form of Jury Submission was Proper (addressing James' second point of error)*

The State's petition for termination alleged three statutory grounds or predicate acts as authorized by Section 161.001(1) (D), (E), and (P) of the Texas

Family Code. *See* TEX. FAM.CODE ANN. § 161.001(1) (D), (E), and (P) (Vernon 2002). The jury charge did not require the jury to make a specific finding on each statutory ground, instead charging the jury that termination was authorized if at least one of three predicate acts occurred: For the parent-child relationship in this case to be terminated, it must be proven by clear and convincing evidence that at least one of the following events has occurred:

"KIMBERLY JAMES has knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; OR

"KIMBERLY JAMES has engaged in conduct or knowingly placed the child with a person who engaged in conduct which endangers the physical or emotional well-being of the child; OR

"KIMBERLY JAMES has used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and (1) failed to complete a court-ordered substance abuse treatment program; or (2) after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance.

*QUESTION No. 1*

Should the parent-child relationship between KIMBERLY JAMES and the children be terminated? Answer "Yes" or "No" as to each child:

James contends the trial court erred in denying her request that the jury be asked to decide separately which of the three alleged statutory grounds had occurred. She contends this method should have been used instead of the disjunctive charge and broad questions format that was used.

We review alleged error in submission of a jury question under an abuse of discretion standard. *See Tex. Dep't of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990). A trial court's discretion in submitting a question to the jury is abused if the submission is arbitrary, unreasonable, and without reference to any guiding rules or principles. *See Goode v. Shoukfeh,* 943 S.W.2d 441, 446 (Tex.1997).

In all jury cases, the court shall, whenever feasible, submit the cause on broad-form questions. TEX.R. CIV. P. 277; *see In re B.L.D.,* 113 S.W.3d 340, 348 (Tex.2003). The Texas Supreme Court has determined that Rule 277 applies in proceedings to terminate parental rights, thus resolving this issue contrary to James' position. *See E.B.,* 802 S.W.2d at 649. In upholding submission of questions to the jury in broad form very similar to those submitted in the instant case, the Texas Supreme Court explained how E.B.'s argument focused on the wrong question: The controlling question in this case was whether the parent-child relationship between the mother and each of her two children should be terminated, not what specific ground or grounds under § 15.02 [4] the jury relied on to answer affirmatively the questions posed. All ten jurors agree that the mother had endangered the child by doing one or the other of the things listed in § 15.02. *Id.* The Texas Supreme Court has impliedly affirmed its holding in *E.B. See In re B.L.D.,* 113 S.W.3d at 354-55 (concluding the charge "follows our precedent in *E.B.*, tracks the statutory language of the Family Code, and comports with Texas Rules of Civil Procedure 277 and 292").

Despite *E.B.*'s holding, several other biological parents have advanced this "ten jurors"

argument. The issue has repeatedly been resolved against them. *See In re J.M.M.,* 80 S.W.3d 232, 249 (Tex.App.-Fort Worth 2002, pet. denied) ("We cannot agree ... that broad-form jury charge submissions are per se violative of due process in termination cases."); *In re K.S.,* 76 S.W.3d 36, 49 (Tex.App.-Amarillo 2002, no pet.) ("We are bound to follow *E.B.* unless the Texas Supreme Court overrules or vitiates it."); *In re M.C.M.,* 57 S.W.3d 27, 31 n. 2 (Tex.App.-Houston [1st Dist.] 2001, pet. denied) (" *E.B.* has not been overruled, and this Court must follow it.").

We, too, are bound by *E.B.* It permits submission of a disjunctive question regarding a parent's predicate act or omission under Section 161.001(1). Here, we have such submission and conclude the trial court did not abuse its discretion in overruling James' objection to the jury charge. We overrule James' second point of error, related to the jury charge.

*2. Evidence was Sufficient to Show At Least One Predicate Act and that Termination was in Children's Best Interest*

A court may order involuntary termination of parental rights only if the court finds that (1) a parent has committed a predicate act or omission harmful to the child, and (2) termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001 (Vernon 2002). Any complaint that the evidence is legally or factually insufficient to support the findings necessary for termination is analyzed by a heightened standard of appellate review. *See In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002); *In re C.H.,* 89 S.W.3d 17, 25 (Tex.2002).

In reviewing the legal sufficiency of the evidence, we view all the evidence in a light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. TEX. FAM.CODE ANN. § 101.007 (Vernon 2002); *In re J.F.C.,* 96 S.W.3d at 266; *In re C.H.,* 89 S.W.3d at 25. If, in light of the entire record, the disputed evidence that a reasonable trier of fact could not have credited in favor of the finding is so significant that a trier of fact could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *In re J.F.C.,* 96 S.W.3d at 266.

*a. Evidence was Legally and Factually Sufficient to Show at Least One Predicate Act*

After review of the record, we find legally and factually sufficient evidence to support *each* of the three alleged predicate acts, though support for any one of the three would be sufficient to support the necessary finding of a predicate act.

*i. Predicate Act A--Knowingly Putting Children in Endangering Conditions--was Supported by Legally and Factually Sufficient Evidence (addressing James' third point of error)*

James contends the evidence is insufficient to establish by clear and convincing evidence that she "knowingly placed or knowingly allowed children to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM.CODE ANN. § 161.001(1) (D). Under this section, we must examine the time before the children's removal to determine whether the environment itself posed a danger to the child's physical or emotional well-being. *Ybarra v. Tex. Dep't of Human Servs.,* 869 S.W.2d 574, 577 (Tex.App.-Corpus Christi 1993, no writ); *In re S.H.A.,* 728 S.W.2d 73, 84 (Tex.App.-Dallas 1987, writ ref'd n.r.e.).

Page 796

"Endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment; it means to expose to loss or injury, to jeopardize. *Tex. Dep't of*

*Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987); *In re A.B.,* 125 S.W.3d 769, 776-77 (Tex.App.-Texarkana 2003, pet. denied). Thus, surroundings can endanger the well-being of a child without the child suffering actual physical injury. *In re A.B.,* 125 S.W.3d at 777. Subsection (D) of Section 161.001(1) permits termination of parental rights based on a single act or omission by the parent. *Id.* at 775.

Without question, sexual abuse is conduct that endangers a child's physical or emotional well-being. *See id.; In re R.G.,* 61 S.W.3d 661, 667 (Tex.App.-Waco 2001, no pet.); *In re King,* 15 S.W.3d 272, 276 (Tex.App.-Texarkana 2000, pet. denied). Parental knowledge that an actual offense has occurred is not necessary; it is sufficient that the parent was aware of the potential for danger and disregarded that risk. *In re A.B.,* 125 S.W.3d at 775; *In re R.G.,* 61 S.W.3d at 667-68; *In re Tidwell,* 35 S.W.3d 115, 118 (Tex.App.-Texarkana 2000, no pet.). The aggravated sexual assault of a child in the home is conduct we may infer will endanger the physical and emotional well-being of other children in the home who may discover the abuse or may be abused themselves. *In re R.W.,* 129 S.W.3d 732, 742 (Tex.App.-Fort Worth 2004, pet. denied); *In re King,* 15 S.W.3d at 276. Thus, Darren's reputed sexual abuse of L.C. created surroundings which not only endangered L.C., but also endangered the other four children in the household.

The record reveals ample evidence that James, at a minimum, knew of the potential for danger of sexual abuse by Darren and failed to adequately protect the children from that risk. One of the children, L.C., testified that from the time she was six years of age Darren sexually abused her by having sexual intercourse with her, and that at some point in time L.C. told James. James explained that in response she started watching Darren around the children and staying up late. She would put all the children in one room and try to stay at home more often. Such measures, while inadequate to sufficiently protect the children, demonstrate that James was aware of a risk of endangerment. James also testified that, during the two weeks since she heard about the sexual abuse, she had made one attempt to report the matter to the police. The police station was closed at the time, however, and no other attempt was made. Such a step, again inadequate to protect the children, does indicate James was aware of a potential for danger and allowed the children to remain in this environment despite the risk. In fact, for some unexplained reason, James rejected her grandmother's offer to let L.C. stay at her house in order to get away from Darren.

The record also reveals endangering conditions other than those relating to sexual abuse. James admits Darren was probably physical with the children when she was not around. Despite the likelihood, she left the children in Darren's care. Further, James admitted she abused alcohol for many years, from approximately 1992 to 2002. She also admitted she had been abusing cocaine for approximately one year before the children's removal. Her long history of drug and alcohol abuse lends itself to an unstable home environment and weighs in favor of termination of her parental rights. *See In re A.B.,* 125 S.W.3d at 777.

Based on the foregoing evidence, we conclude the evidence was sufficiently clear and convincing to support the trial

Page 797

court's finding on this point. Looking at the evidence in a light most favorable to the finding of the trial court, we conclude a reasonable trier of fact could have formed a firm conviction that James

knowingly placed or allowed her children to remain in conditions or surroundings that endangered their physical or emotional well-being. Also, the disputed evidence on the matter is not so significant that the jury could not have formed a firm conviction or belief that its finding was true. We overrule James' third point of error. [5]

*ii. Predicate Act B--Knowingly Exposing Children to Endangering Conduct--was Supported by Legally and Factually Sufficient Evidence (addressing James' fourth point of error)*

James' fourth point of error asserts that the evidence is factually and legally insufficient to support a finding she "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *See* TEX. FAM.CODE ANN. § 161.001(1) (E). Here, our inquiry, unlike that under Section 161.001(1) (D), focuses on conduct of either the parent or a person with whom the parent has placed the children. *See In re A.B.,* 125 S.W.3d at 777. The evidence must show a "course of conduct," while subsection (D) permits termination based on a single act or omission. *Id.* We use the same definition of "endanger" as we do in our inquiry under subsection (D). That is, we look for more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment; we look for a course of conduct which exposes the children to loss or injury or which jeopardizes the children. *See Boyd,* 727 S.W.2d at 533. Here, we look not only at evidence regarding the parent's active conduct, but also evidence showing the parent's omissions or failures to act. *In re A.B.,* 125 S.W.3d at 777.

Placement with an abusive parent or relative is endangerment under subsection (1) (D) or (1) (E) of Section 161.001. *In re J.M.M.,* 80 S.W.3d at 242 (citing *In re J.M.C.A.,* 31 S.W.3d 692, 698 (Tex.App.-Houston [1st Dist.] 2000, no pet.); *In re W.S.,* 899 S.W.2d 772, 778 (Tex.App.-Fort Worth 1995, no writ)). If the parent whose rights are at issue did not have notice that the other parent was abusive or had violent tendencies, however, placing the child with that parent will not be endangerment. *See In re D.J.,* 100 S.W.3d 658, 669 (Tex.App.-Dallas 2003, pet. denied). Here, the record supports the conclusion that James had notice of Darren's sexual abuse.

James testified she had heard the sexual abuse allegations before authorities learned of L.C.'s allegation and removed the children from the home. The record indicates that all five children were living in the household during the time after James learned of the sexual abuse and before their removal from the home. James' failure to protect the children adequately, even after having been told about the sexual abuse, represents a course of conduct which endangered the well-being of the children. Without the protection of

Page 798

their mother, the children may suffer continued abuse and may feel less inclined to report any abuse.

There is evidence of sexual abuse by Darren. L.C., twelve years old at the time of trial, testified Darren had abused her since she was six years old. Without question, these years of sexual abuse certainly represent a course of conduct that endangered the well-being of the children. *See In re King,* 15 S.W.3d at 276.

James failed to guard the children and left them with a man whom she had been told was sexually abusive. Her action in leaving the children in Darren's care, her failure to take sufficient

action to protect them, and Darren's actions provided the jury with legally and factually sufficient proof to support the finding by clear and convincing evidence that James engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children. We overrule James' fourth point of error.

*iii. Predicate Act C--Child-Endangering Controlled Substance Use--was Supported by Legally and Factually Sufficient Evidence (addressing James' fifth point of error)*

James also challenges the sufficiency of the evidence to show she used a controlled substance "in a manner that endangered the well-being of the children." *See* TEX. FAM.CODE ANN. § 161.001(1) (P). She contends that, although she admitted having used marihuana and cocaine, she did not use either substance in a manner that endangered the children.

We believe James' view that her substance abuse did not endanger her children is misplaced. Having to go into drug rehabilitation forced James to leave the children with her cousin, Cassandra Harris. The record shows that the State removed the children from Harris' care and placed them in temporary placement when S.C., at age two, suffered a broken femur. While we note that James was attempting to go through rehabilitation, we also point out it was her drug use that caused her to have to leave the children in order to attend the program. Because she had to attend the rehabilitation program, she had to leave the children in unsafe surroundings.

As previously discussed, James did make at least two attempts at mandatory rehabilitation. The Department included such services in its family services plan designed for the family. James continued to use drugs even after completion of the rehabilitation program, knowing that doing so could lead to termination of her parental rights. In fact, she admits having used cocaine for at least a year before the removal of the children. The children, especially the younger two, J.J. and B.J., experienced a great deal of trauma when the children were removed from their home and their mother. This disruption and trauma in the children's lives is directly caused, at least in part, by James' drug use.

The jury is free to use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence. *United States v. Heath,* 970 F.2d 1397, 1402 (5th Cir. 1992). It was authorized, then, to determine that a mother with a long history of drug and alcohol abuse, who therefore had several encounters with the Department and who admitted abusing cocaine for at least one year, used a controlled substance in a manner that endangered the well-being of her children. Viewing the evidence in a light most favorable to the

Page 799

jury's finding, we conclude a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. Additionally, the disputed evidence that a reasonable jury could not have credited in favor of the finding is not so significant to prevent it from forming a firm belief or conviction, making the evidence factually sufficient.

*b. Evidence was Legally Sufficient to Show that Termination was in Children's Best Interest (addressing James' first point of error)*

Under Section 161.001, in addition to finding at least one predicate act, the trier of fact must find that termination is in the best interest of the child. See TEX. FAM.CODE. ANN. § 161.001(2).

There is a strong presumption that the best interest of the child is served by keeping custody in the natural parent. *See In re D.M.,* 58 S.W.3d 801, 814 (Tex.App.-Fort Worth 2001, no pet.).

When determining the best interest of the child, a court should consider the following factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the parental ability of the individuals seeking custody; (4) the programs available to assist these individuals to promote the best interest of the child; (5) the plans for the child by these individuals or by the agency seeking custody; (6) the stability of the home or proposed placement; (7) the acts or omissions of the parents which may indicate that the existing parent-child relationship is not a proper one; and (8) any excuse for the acts or omissions of the parent. *See Holley v. Adams,* 544 S.W.2d 367, 371-72 (Tex.1976). However, best interest does not require proof of any unique set of factors, nor does it limit proof to any specific factor. *In re H.R.,* 87 S.W.3d 691, 700 (Tex.App.-San Antonio 2002, no pet.).

Evidence of the children's desires is extremely limited. L.C. testified she and her siblings wanted to go home with their mother. She described a loving, happy relationship between the children and James. There is no other evidence of the desires of the children.

The emotional and physical needs of the children suggest that termination is in their best interest. James learned of L.C.'s claims of sexual abuse before L.C.'s report to the abuse hotline. In response to L.C.'s claims, James testified she stayed awake more when L.C. was in the home. James failed to meet the emotional and physical needs of L.C. who, having experienced years of sexual abuse by her stepfather, would naturally need her mother's comfort and support. L.C. stated she did not know whether her mother believed her. She testified that, when she first told her mother about the abuse, her mother would "give her a whooping." Later, James' actions and statements when the children were removed indicate James still may not have believed L.C. James testified that, at the time, she did not know what to believe. Based on her previous reactions to L.C.'s outcry, it would appear James is ill-equipped to respond to any future emotional needs resulting from the sexual abuse.

Further, there is evidence in the record of medical neglect of the children when James failed to take S.C. to the doctor when he had been running a fever for weeks. There is also evidence of James failing to provide the children with adequate clothing to protect them from the cold weather.

Evidence concerning James' parenting ability and her failure to use available programs suggests that termination is in the children's best interest. The record reveals at least eleven incidents or investigations involving the Department between

Page 800

December 1996 until the removal of all the children in September 2003. Admittedly, a mere complaint or investigation, alone, proves nothing. By James' own admission, however, she abused alcohol regularly from 1992 to 2002. She also admitted using marihuana and cocaine at least throughout the year before the removal of the children. James tested positive for cocaine in November 2003, shortly after removal of the children. James also admits she relinquished her parental rights to A.J., a son born in 1996, who suffered from fetal alcohol syndrome. From the record, it does not appear James has developed any long-term parenting skills or has benefited from the many services and programs the Department has provided her over the years.

Further, James offered the jury many excuses for her acts and omissions. She blames the Department and claims that most of her involvement with the Department was instigated by telephone calls from someone who was "out to get her." The blame-shifting and conspiracy theories illustrate James' failure to take responsibility for her actions and inactions. Ultimately, this attitude would likely inhibit any improvements or growth within the family.

James is correct in stating there is no evidence of the children's foster home environment. However, this factor is not dispositive. Thus, an absence of evidence supporting this particular factor will not be fatal to the jury's finding that termination is in the children's best interest. *See In re H.R.,* 87 S.W.3d at 700.

Based on James' actions, her inactions, her history of drug abuse, and her failure to take responsibility for and remedy past problems, we conclude the evidence was legally sufficient to support the jury's determination that termination was in the best interest of the children. Even though James testified she completed certain services under the Department's plans and participated in positive activities with the children, we conclude the evidence was factually sufficient to support the trial court's finding that termination was in the best interest of the children. We overrule her contention to the contrary.

*Conclusion*

Having found no error in the jury charge and having found legally and factually sufficient evidence in the record to support the jury's findings as to termination, we overrule all James' points of error and affirm the trial court's termination of her parental rights.

APPENDIX

**Factual and Procedural Background**

Kimberly Choyce James and Darren James had been married three years and had previously lived together since 1995 in Waskom, Texas. James and Darren had three children together: A.J., B.J., and J.J. James has three other children from earlier relationships: a daughter L.C., a son L.C., and S.C. In 1997, James relinquished her parental rights in A.J. who was born sixteen weeks prematurely with fetal alcohol syndrome and, as a result, had special needs James could not meet. At the time of the hearing on the State's petition for termination, the children whose interests were at stake were as follows: daughter L.C., age 12; son L.C., age 10; son S.C., age 9; son J.J., age 5; and daughter B.J., age 4.

James' involvement with the Department began December 24, 1996, when hospital staff reported physical and medical neglect of A.J., who was still hospitalized since his birth in May 1996. The hospital reported that James had very little contact with A.J. and that she was reluctant to participate in the training offered to help

Page 801

her meet A.J.'s special needs. The Department worked with James, getting her the proper assistance so A.J. could be released to her.

On March 4, 1997, the Department again received allegations of physical and medical neglect of A.J. He had lost one pound and had failed to thrive while in James' care. A.J. was hospitalized again, and the Department reopened the case and provided family preservation services for the family, including weekly services in order to help James meet the needs of her

family.

On July 28, 1997, only ten days after A.J. had been released to James a second time, the Department received another call concerning his health. A.J.'s condition had deteriorated, and he was again hospitalized. A.J. was removed from James' care. She would later voluntarily relinquish her parental rights to A.J. James was admitted into a drug and alcohol abuse treatment program. During this time, the five other children were placed in the care of James' cousin, Cassandra Harris, at James' request.

On September 2, 1997, while James was still in rehabilitation and while the children were in the care of Harris, the Department received a report of neglectful supervision in connection with two-year-old S.C.'s broken leg. The Department removed the children from Harris' care and temporarily placed them outside the home. The Department offered James psychological and counseling services. She participated in a post-treatment drug program and parenting classes. Her five remaining children were returned to her care March 5, 1998.

Approximately three months later, in June 1998, the Department received a report alleging physical abuse of S.C. by James. The report alleged that a drunken James lifted S.C. by his arm and shook him vigorously. The Department could not gather enough information to confirm the allegations of abuse. Thus, the case was "ruled out with factors controlled." [6]

On April 13, 2000, a report of neglectful supervision of the four younger children came into the Department. Allegations were made concerning James' drug use in the home. James' drug screen tested negative, and the case was closed.

On May 23, 2001, the Department received a report alleging James had hit S.C. in the mouth, causing a swollen lip. S.C. later recanted the story that his mother hit him and told varying stories concerning the injury. He finally stated he could not remember how he received the injury. During the investigation, the Department discovered S.C. had been ill with a fever for over a month. The Department put in place a safety plan in which James was required to obtain medical attention for S.C. and report to the Department. The case was then closed.

On December 31, 2001, the Department received another report of physical abuse of S.C. by James. S.C. had another lip injury, this time a split lip, reportedly a result of James' discipline. The report also alleged S.C. had mimicked preparation for intravenous drug use. During the investigation, Department staff became concerned that S.C. was not properly dressed for the winter weather. S.C. denied all the allegations. The Department implemented a safety plan regarding proper cold weather clothing and appropriate

Page 802

discipline. James explained that the injury was due to chapped lips.

The Department received another report February 19, 2002, regarding James' drug use. The Department investigated a case of neglectful supervision of J.J. and B.J. Allegations made accused James of smoking marihuana in front of her two youngest children. James' drug screen came back negative for marihuana use, and the Department closed the case.

On March 25, 2002, the Department received more allegations of physical abuse of one of her children. The caller reported that James was heard yelling for someone to bring her a belt. Shortly thereafter, a child was heard screaming for about fifteen minutes. There were also more

allegations that James used drugs in front of her children. The children denied the allegations that they were physically abused. The Department requested another drug test. Since the February 19, 2002, case was still pending at this time, the Department closed this case by combining it with the February case.

Finally, on September 16, 2003, the most recent involvement with the Department began when a family friend called daughter L.C.'s school and informed school officials of the allegations of sexual abuse by Darren. School officials called the police, who then called the Department. L.C. gave a written statement to police describing years of sexual abuse by her stepfather. Mandy Bryan, an investigator with the Department, went to the junior high school, where she spoke with the chief of police and obtained additional information from L.C. L.C. stated she did not feel safe returning to her house. Based on L.C.'s statement, Bryan went to the house to conduct an interview of the parents and determine whether the children should be removed during the investigation.

After Bryan arrived and explained her purpose for being there, Darren just smiled and shook his head. James became very upset and claimed she did not know about the allegations. Bryan asked James to suggest a safe place for the children during the investigation of the abuse allegations, and James responded she knew of no one whom she trusted. James then stated that the Department should just take the children, that they would just take them anyway. She stated she just did not care anymore.

According to Bryan, while the children were packing some of their things, James stated "[L.C.] started all of this mess and she would get hers." James denied ever having made such a statement. Since James could not provide the Department with a suitable home in which the children could be placed temporarily, the Department began a full removal of the children, including a petition for termination of the parent-child relationship. The children were placed in foster care.

The day after L.C.'s outcry and the removal of the five children from the home, the Department filed its Petition for Protection of a Child, for Conservatorship, and for Termination in a Suit Affecting the Parent-Child Relationship. On January 14, 2004, the trial court heard the Department's petition. The Department presented evidence supporting L.C.'s allegation of sexual abuse, evidence of the prior cases concerning James, evidence of James' drug and alcohol abuse, and evidence that L.C. had told her mother of the sexual abuse before her outcry. James presented evidence of her attempts to protect the children, evidence of the pleasant things the family does together, evidence of her recovery from drug and alcohol abuse, and evidence that Darren will have no more contact with the children. The jury found that James had committed an act necessary

Page 803

for termination and that termination of the parent-child relationship was in the best interest of the children.

---------

Notes:

[1] For an extensive factual and procedural background, please see the Appendix at the end of

this opinion.

[2] James had previously relinquished her parental rights to A.J., a child she shared with her husband, Darren. A.J. had been born with fetal alcohol syndrome and had needs James could not meet.

[3] The Court is advised that Darren's parental rights have been terminated by a default judgment taken after service of process, and that one father, Irvy Allen, executed a waiver of interest, after which his parental rights were terminated by a default judgment. The parental rights of the other two fathers, Christopher Rodgers and Walter Davis, are pending with no service known at this time.

[4] Section 15.02 of the Texas Family Code is now Section 161.001.

[5] We recognize that an affirmative finding by clear and convincing evidence satisfying any one of the subsections of Section 161.001(1) is sufficient to terminate parental rights. *See In re S.F.,* 32 S.W.3d 318, 320 (Tex.App.-San Antonio 2000, no pet.). We could, therefore, affirm the trial court's decision based on our conclusion that James knowingly allowed the children to remain in endangering conditions or surroundings, without addressing any of her other contentions regarding the predicate act or omission under Section 161.001(1). *Id.* We will address these issues for fairness and certainty. *See In re A.B.,* 125 S.W.3d 769, 776 (Tex.App.-Texarkana 2003, pet. denied).

[6] Department staff member Deidra Phillips explained that a notation "ruled out with factors controlled" means "there were some significant things ... that needed to be changed ... in order to provide safety or reduced risk and keep the family intact."

---------

101 S.W.3d 771 (Tex.App.—Texarkana 2003), 06-02-00083, In re N.R.

Page 771

**101 S.W.3d 771 (Tex.App.—Texarkana 2003)**

**In the Interest of N. R., a Child.**

**No. 06-02-00083-CV.**

**Court of Appeals of Texas, Sixth District, Texarkana.**

**March 21, 2003.**

Submitted March 20, 2003.

Page 772

[Copyrighted Material Omitted]

Page 773

Rick McPherson, law Office of Rick McPherson, Carthage, for appellant.

Lana Shadwick, Houston, for appellee.

Page 774

Before MORRISS, C.J., ROSS and CARTER, JJ.

OPINION

CARTER, Justice.

## I. Nature of the Case

Robert Rogers appeals an order terminating the parent-child relationship between him and his daughter, N.R. In five points of error, he contends the evidence was both factually and legally insufficient to support the termination.

## II. Factual and Procedural Background

The Department of Protective and Regulatory Services first began its investigation into the well-being of N.R. in July 2000. At that time, N.R. was five years old and living with Rogers. Rogers had been N. R.'s managing conservator since she was three or four years old. Stephanie Hodge, N. R.'s mother, was incarcerated during the course of the Department's investigation. The Department sought and received from Hodge a voluntary relinquishment of her parental rights to N. R.

Thereafter, the Department filed an action to terminate Rogers' parental rights to N.R. under the procedures provided in TEX. FAM.CODE ANN. §§ 161.001-.211 (Vernon 2002). The trial court terminated Rogers' parental rights to N.R. on the grounds alleged in the Department's petition. This appeal followed.

## III. Discussion

### A. Burden of Proof

The burden of proof in parental termination cases is clear and convincing evidence. TEX. FAM.CODE ANN. § 161.001; *In re J.F.C.,* 96 S.W.3d 256, 263 (Tex., 2002). "Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *In re C.H.,* 89 S.W.3d 17, 25-26 (Tex.2002).

### B. Standards of Review

### 1. Legal Sufficiency

When reviewing a point of "no evidence" or legal sufficiency in the context of a parental rights termination, we look at all the evidence in the light most favorable to the finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *See J.F.C.,* at 266. If, after conducting our review of the record, we determine no reasonable fact-finder could form a firm belief or conviction the matter that must be proven is true, then we conclude the evidence is legally insufficient. *See id.*

## 2. Factual Sufficiency

When reviewing a factual sufficiency challenge to a parental rights termination, we consider the evidence the fact-finder could reasonably have found to be clear and convincing. *See id.; C.H.,* 89 S.W.3d at 25-26. In applying this standard to a trial court's findings, we ask whether there was sufficient evidence presented to produce in the mind of a rational fact-finder a "firm belief or conviction as to the truth of the allegations sought to be established." *See* TEX. FAM.CODE ANN. § 101.007 (Vernon 2002); *see also J.F.C.,* at 264. If the answer to this question is yes, then we must overrule the factual sufficiency point.

We recognize that the natural right existing between parents and their children is one of constitutional dimension. *See In re J.W.T.,* 872 S.W.2d 189, 194-95 (Tex.1994). A parent's right to "the companionship, care, custody, and management"

Page 775

of his or her children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer,* 455 U.S. 745, 758-59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (quoting *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). Therefore, we strictly scrutinize both the termination proceedings and the involuntary termination statutes in favor of the parent. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985).

## C. Analysis

To terminate parental rights in Texas, the evidence must establish: (1) a statutory ground for termination; and (2) the termination is in the child's best interest. TEX. FAM.CODE ANN. § 161.001(1). On appeal, Rogers focuses on the statute's first prong, contending the evidence supporting a statutory ground for termination is both legally and factually insufficient. Rogers does not contend termination of his parental rights is not in N. R.'s best interest.

In its petition, the Department alleged five separate grounds under TEX. FAM.CODE ANN. § 161.001.[1] The trial court found there was clear and convincing evidence supporting each of the Department's alleged grounds. Only one statutory ground is required to terminate parental rights under Section 161.001. *See, e.g., In re S.F.,* 32 S.W.3d 318, 320 (Tex.App.-San Antonio 2000, no pet.) (concluding "only one finding alleged under section 161.001(1) is necessary to a judgment of termination"). Therefore, we will affirm the trial court's order if there is both factually and legally sufficient evidence on any statutory ground on which the trial court relied in terminating Rogers' parental rights. *See id.*

## 1. TEX. FAM.CODE ANN. § 161.001(1)(D), (E)

In his first two points of error, Rogers challenges the factual sufficiency of the evidence supporting a finding under TEX. FAM.CODE ANN. § 161.001(1)(D), (E). Specifically, he contends the evidence is factually insufficient to show: (1) he knowingly placed or knowingly allowed N.R. to

remain in conditions or surroundings that endangered her physical or emotional well-being; or (2) he engaged in conduct or knowingly placed N.R. with persons who engaged in conduct which endangered N. R.'s physical or emotional well-being. Because of the close evidentiary relationship of these two grounds, we will review them together.

"Endangerment" is an element of both subsections (D) and (E). In an involuntary termination proceeding, "endanger" means conduct that is more than a threat of metaphysical injury or the possible ill effects of a less than ideal family environment. *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987). However, the child does not need to suffer actual physical injury to constitute endangerment. *Id.* "Rather, 'endanger' means to expose to loss or injury; to jeopardize." *Id.; see also In re M.C.,* 917 S.W.2d 268, 269 (Tex.1996) (per curiam). Endangerment can occur through both the acts and omissions of the parent. *Phillips v. Tex. Dep't of Protective & Regulatory Servs.,* 25 S.W.3d 348, 354 (Tex.App.-Austin 2000, no pet.). Neglect can be just as dangerous to a child's well-being as direct abuse. *M.C.,* 917 S.W.2d at 270.

TEX. FAM.CODE ANN. § 161.001(1)(D) applies only to the acceptability of a child's living conditions or surroundings; it does not apply to the conduct

Page 776

of the parent toward the child. *In re S.H.A.,* 728 S.W.2d 73, 84 (Tex.App.-Dallas 1987, writ ref'd n.r.e.). Under subsection (D), it must be the environment itself that causes the child's physical or emotional well-being to be endangered, not the parent's conduct. *Id.* at 84-85. Thus, subsection (D) can only be utilized as a ground for termination if the child is placed in conditions or surroundings that are themselves dangerous to his or her physical or emotional well-being; parental conduct alone is insufficient under this subsection. *See In re T.L.H.,* 630 S.W.2d 441, 446 (Tex.App.-Corpus Christi 1982, writ dism'd w.o.j.) (interpreting predecessor statute with identical language). The environment must pose a real threat of injury or harm to the child, *Williams v. Texas Department of Human Services,* 788 S.W.2d 922, 926 (Tex.App.-Houston [1st Dist.]1990, no writ), *overruled on other grounds, In re J.N.R,* 982 S.W.2d 137, 143 (Tex.App.-Houston [1st Dist.] 1998, no pet.), and there must be proof of a direct causal connection between the environment, in which the child is placed or allowed to remain and the resulting danger to the child's physical or emotional well-being to warrant termination under subsection (D). *Ybarra v. Tex. Dep't of Human Servs.,* 869 S.W.2d 574, 577-78 (Tex.App.-Corpus Christi 1993, no writ); *S.H.A.,* 728 S.W.2d at 85. However, it is not necessary for the parent to have certain knowledge that an actual injury is occurring; it is enough that the parent was aware of the potential for danger to the child in such environment and disregarded that risk. *In re Tidwell,* 35 S.W.3d 115, 119-20 (Tex.App.-Texarkana 2000, no pet.).

By contrast, when reviewing a finding under TEX. FAM.CODE ANN. § 161.001(1)(E), the focus is exclusively on the parent's conduct, not the child's environmental surroundings. *In re P.S.,* 766 S.W.2d 833, 835 (Tex.App.-Houston [1st Dist.] 1989, no writ). Subsection (E) does not require there be danger of physical harm; proof of conduct that endangers a child's emotional well-being alone is sufficient. TEX. FAM.CODE ANN. § 161.001(1)(E); *S.H.A.,* 728 S.W.2d at 85. The cause of the danger to the child's physical or emotional well-being, however, must be the parent's conduct by way of actions, inactions, or omissions. *See id.* But the specific danger to the child's

well-being need not be established as an independent proposition; it may be inferred from parental misconduct. *See Boyd,* 727 S.W.2d at 533. In addition, it is not necessary that the conduct was directed at the child at issue or that the child actually suffered injury. *Id.* "Endanger" in this context means "to expose to loss or injury; to jeopardize." *Id.* Thus, there is no requirement of any "actual and concrete" threat of injury to the child's physical or emotional well-being. *Id.*; *Dir. of Dallas County Child Protective Servs. Unit of Tex. Dep't of Human Servs. v. Bowling*, 833 S.W.2d 730, 733 (Tex.App.-Dallas 1992, no writ). In short, subsection (E) is satisfied simply by proof that a parental course of conduct endangered a child's physical or emotional well-being. *Boyd,* 727 S.W.2d at 534; *In re R.D.,* 955 S.W.2d 364, 368 (Tex.App.-San Antonio 1997, pet. denied); *Bowling,* 833 S.W.2d at 733.

## a. The Evidence

The following evidence was presented at trial relevant to both subsections (D) and (E) of the Texas Family Code.

Several witnesses testified of Rogers' propensity for extensive physical abuse to both N.R. and others. Barbara Walker, a Child Protective Services (CPS) caseworker assigned to investigate N. R.'s case, testified CPS had received fourteen separate reports on the family; four classified as "reason to believe" physical abuse.

Page 777

Walker testified there would be a substantial risk to N. R.'s physical safety if she went back to Rogers' home. Walker testified that part of CPS's concern for N. R.'s safety was based on case files involving another child, D.H. These case files showed Rogers had his parental rights terminated to D.H. for extensive physical abuse.

In addition to Walker's testimony, Mark May, Rogers' former roommate, testified. According to May, he witnessed Rogers strike N. R., causing her to fall from a freezer and fracture her arm. May testified that, before Rogers struck N. R., Rogers had been "shooting up" in the bathroom and was under the influence of oxycontins. In addition, May testified that, while N.R. lived with Rogers and in N. R.'s presence, May purchased drugs from Rogers "every day."

Julia Ingram, Rogers' biological daughter, also testified at trial about extensive physical abuse inflicted by Rogers to her and others. Specifically, Ingram testified Rogers physically abused her brother Randall by hitting him with sticks, beating his head against a tree, and whipping him with a telephone cord. She further testified Rogers on one occasion beat her with a belt buckle, drawing blood. On several other occasions, she witnessed Rogers beat her mother and other siblings. Ingram also testified Rogers has an uncontrollable temper, especially when he is drinking or under the influence of drugs. According to Ingram, while she lived with Rogers, he drank almost every day.

Hodge also testified Rogers is violent, especially when he drinks or takes drugs. During her testimony, she recounted a time when she witnessed Rogers whip D.H. with his belt for three hours, causing bruising.

Finally, two experts testified regarding N. R.'s physiological well-being. Each concluded N. R.'s behavior was consistent with a child coming from an abusive environment.

In addition to this testimony, the record contains an extensive criminal history on Rogers.

Rogers has been arrested twenty times and charged with several different offenses: one charge each for kidnapping, sexual abuse, threat, dangerous drugs, public order crimes, and a weapons offense; ten times for assault; three times for driving while intoxicated; and several other various offenses. The record summary shows convictions for assault (two), weapons offense, DWI, and reckless conduct.

Based on the above, we conclude the evidence before the fact-finder was both legally and factually sufficient. Specifically, under subsection (D), a fact-finder could readily have reached the necessary firm conviction or belief that N.R. was placed and allowed to remain in an environment that endangered both her physical and emotional well-being. Likewise, under subsection (E), a fact-finder could readily have reached the necessary firm conviction or belief that Rogers' conduct, including selling drugs and excessive physical abuse to N.R. and others, endangered N. R.'s physical and emotional well-being. We also conclude a fact-finder could readily have reached the necessary firm conviction or belief that the extreme step of termination of Rogers' parental rights was in N. R.'s best interest.

## 2. Other Insufficiency Points Raised by Rogers

Having found the evidence both legally and factually sufficient to support the judgment based on TEX. FAM.CODE ANN. § 161.001(1)(D) and (E), we do not need to consider whether the evidence was sufficient to support the judgment based on

Page 778

TEX. FAM.CODE ANN. § 161.001(1)(C), (F), and (Q).

We affirm the judgment of the trial court.

---------

Notes:

[1] In its petition, the Department alleged Rogers violated TEX. FAM.CODE ANN. § 161.001(1)(C), (D), (E), (F), and (Q) (Vernon 2002).

---------

243 S.W.3d 232 (Tex.App.—Houston (14th Dist.) 2007)

In the Interest of S.R.L. and L.L.

No. 14-06-00659-CV.

Court of Appeals of Texas, Fourteenth District, Houston.

November 8, 2007

On Appeal from the 387th District Court Fort Bend County, Texas Trial Court Cause No. 05-CV-143480

243 S.W.3d 233

Stephen A. Doggett, Robert Leon Thomas, Richmond, for appellants.

Carey Graham, Ken Bryant, Tami Kay Terry, Richmond, David Perwin, Rosenberg, Duke Elton Hooten, Austin, Nancy Gene Pofahl, Houston, for appellees.

Panel consists of Justices Yates, Fowler, and Guzman.

OPINION

Leslie B. Yates, Justice

Appellant Luciano Lopez appeals from the trial court's order terminating his parental rights to his children S.R.L. and L.L. In five issues, he challenges the legal and factual sufficiency of the evidence supporting the termination findings, claims the trial court failed to render judgment within the statutory time frame, and asserts that his counsel provided ineffective assistance. Because we determine the evidence is legally and factually insufficient to support a finding that terminating appellant's parental rights is in the best interest of the children, we reverse and remand.

S.R.L. and L.L., ages five and three at the time of the termination hearing, are appellant's children with a woman named Jessica Lopez, to whom appellant was not married but coincidentally shared a surname. The Texas Department of Family and Protective Services (DFPS) became involved with Jessica in 2005 after receiving a report regarding one of Jessica's children with another man. The two children at issue in this case eventually went to live with relatives (one with a paternal aunt and the other with a maternal aunt), and Jessica voluntarily relinquished her parental rights.

During this time, appellant was incarcerated for assault. This was not his first trouble with the law. Over the previous ten years, appellant had been incarcerated frequently after being convicted of a series of misdemeanor crimes, including theft, drug possession, and several assaults, including assaults on Jessica and Jessica's mother but not his children. In 2003, appellant was again convicted of assault and, with enhancements, sentenced to ten years in prison. DFPS sought to terminate appellant's parental rights, arguing among other things that

he knowingly engaged in criminal conduct resulting in incarceration and the inability to care for his children for not less than two years from the date of filing of the petition, as set

243 S.W.3d 234

forth in subsection Q of section 161.001 of the Family Code. Tex. Fam. Code Ann. ' 161.001(1)(Q) (Vernon Supp. 2006).

At the termination hearing in June 2006, appellant presented evidence that he had changed his life and wanted an opportunity to parent his children. He testified that he took anger management classes in prison and that these classes had made a difference in his life. He learned to change his method of conflict resolution, as evidenced by the fact that he has not been involved in any fights in prison. DFPS provided appellant a service plan, and he completed all portions that he could while in prison. Appellant explained the steps he has taken to prepare for a productive life outside of prison. To make himself employable, he took over 750 hours of electrical training, receiving several commendations from his instructor, and he tutored other prisoners. Appellant married during his incarceration, and appellant stated that he planned on living with his wife in her house after his release. Appellant's mother testified that appellant is a changed man and that she and her husband would fully support appellant and his children after his release until he can get back on his feet. Appellant has also maintained contact with his children and has written letters to his two older children (not the subject of this suit) explaining the mistakes he has made in his life and urging them to avoid the path he took.

Appellant apparently impressed both the children's guardian ad litem and the trial court judge. Even though the guardian recommended terminating appellant's parental rights solely based on appellant's history, he stated that he believed appellant "should have some involvement with [the children]." Upon further questioning, the guardian again confirmed that he believed that appellant's parental rights should be terminated to give the children a stable home but hoped that appellant could still visit the children, even though he realized such a scenario was probably legally impossible. The trial judge also seemed conflicted. He stated repeatedly that he felt he did not "have any choice" but to terminate appellant's parental rights under subsection Q because "he's been in jail so much," but he wanted to allow appellant to have access to his children. For example, the judge stated:

I don't see that I have got any choice. Is there any provision under the law—and I don't know of any, but is there any provision under the law that would allow me to terminate his parental rights and yet allow him to continue [to have] access to these children. I don't know of that.

After terminating appellant's parental rights under subsection Q, the judge called appellant's mother into the courtroom and explained to her as follows:

$ He had just terminated appellant's parental rights because he had been in jail so much.

$ He had heard no evidence that appellant had "done anything bad" to these children.

$ He would not order appellant to stay away from his older children in appellant's mother's possession, but that she should carefully monitor all visits.

$ He "hope[d] there is some way that [appellant] can have some kind of contact with these children" but "he can't award it to him" because "[t]here's no legal basis for it."

A trial court can terminate a parent's rights to his children only after finding both a statutory ground for termination and that termination is in the children's best interest. Tex. Fam. Code Ann. ' 161.001; In re S.M.L., 171 S.W.3d 472, 476 (Tex. App.—Houston [14th Dist.] 2005, no pet.). At the termination

243 S.W.3d 235

hearing, the trial judge found only a statutory ground for termination, subsection Q, but did not find that termination was in the children's best interest, although he later included such a finding in his written order.[1] Appellant argues on appeal that the evidence is legally and factually insufficient to support termination of his parental rights.

Parental rights can be terminated involuntarily only by a showing of clear and convincing evidence. Tex. Fam. Code Ann. ' 161.001; In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. ' 101.007 (Vernon 2002); In re J.F.C., 96 S.W.3d at 264. When reviewing factual findings required to be made by clear and convincing evidence, we apply a standard of review that reflects this burden of proof. In evaluating the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. In re J.F.C., 96 S.W.3d at 266. In a factual sufficiency review, we must also determine whether a factfinder could reasonably form a firm belief or conviction about the truth of the allegations by reviewing the entire record. Id.

Appellant argues the evidence is legally and factually insufficient to establish either subsection Q as a statutory ground for termination or that termination is in the children's best interest. We agree that the evidence is insufficient to show that the trial judge formed a firm belief or conviction that termination is in the children's best interest.[2] Termination of the parent/child relationship is a complete severance and divests for all time the parent's rights to the child. See In re J.R., 171 S.W.3d 558, 567 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Because it is such a drastic remedy, termination proceedings should be strictly scrutinized. Id. It is apparent from the trial judge's own statements that he did not form a firm conviction or belief that appellant should be deprived of all rights to his children. Indeed, he stated several times that he wanted appellant to have a part in his children's lives but felt he had no choice but to terminate appellant's parental rights under subsection Q. But he did have a choice. The factfinder must find both a statutory violation and that termination is in the children's best

interest. The trial judge may have believed DFPS conclusively established a statutory ground for termination under subsection Q, but the best interest determination is a separate inquiry. See In re S.M.L., 171 S.W.3d at 476. Because the trial judge did not actually form a firm conviction or belief that severing appellant's relationship with his children

243 S.W.3d 236

was in their best interest, we conclude the evidence is legally insufficient.

We also conclude the evidence is factually insufficient to support a best interest finding. That a parent is imprisoned does not automatically establish that termination of parental rights is in the child's best interest. See In re C.T.E., 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) ("Termination of parental rights should not become an additional punishment for imprisonment for any crime."). Though appellant has a violent and unstable past, he presented substantial and uncontradicted evidence that he has turned his life around. He took anger management classes, which helped him change his attitude about conflicts and keep him out of fights in prison. He complied with all portions of the service plan possible in prison. Appellant developed job skills and has a home and family support structure in place to help him upon release. Given this evidence of changes in appellant's life and the judge's finding that appellant has never "done anything bad" to these children, we conclude the evidence is factually insufficient for the trial court to have formed a firm conviction or belief that terminating appellant's parental rights is in the children's best interest. See In re W.C., 98 S.W.3d 753, 766 (Tex. App.—Fort Worth 2003, no pet.) (finding factually insufficient evidence to support best interest finding where mother, despite past bad conduct, had "made significant progress, improvements, and changes in her life," had a good support system in place, and had done everything possible to have her children returned); In re C.T.E., 95 S.W.3d at 467-69 (holding evidence to support best interest finding factually insufficient when, among other things, incarcerated father had prepared to be reunited with his family by taking parenting courses, anger management classes, and job training); In re K.C.M., 4 S.W.3d 392, 399 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (reversing best interest finding for factual insufficiency based on the way mother turned her life around while incarcerated).

We sustain appellant's first three issues. We reverse the trial court's judgment, render judgment that terminating appellant's parental rights to S.R.L. and L.L. is not in the children's best interest, and remand for further proceedings consistent with this opinion.

---------

Notes:

[1] In his fourth issue, appellant argues that the trial court should have dismissed the suit because it did not make this best interest finding during the oral rendition and thus the court did not render final judgment within the statutory deadline, which fell in between the time of the oral rendition and the written order. See Tex. Fam. Code Ann. ' 263.401(a) (Vernon Supp.

2006) (providing a one-year deadline for final order or dismissal in certain suits affecting the parent/child relationship). In his fifth issue, appellant argues his trial counsel was ineffective in many respects, including by failing to move for dismissal before the statutory deadline. Because we find the evidence legally and factually insufficient to sustain the termination order, we need not reach these issues.

[2] We note that the Attorney General concedes these issues in its appellate brief.

---------

# In re D.T., 34 S.W.3d 625 (Tex.App. —Fort Worth 2000)

**Page 625**

34 S.W.3d 625 (Tex.App. —Fort Worth 2000)
In the Interest of D.T., A Child.
No. 2-99-101-CV.
Court of Appeals of Texas, Second District, Fort Worth
November 16, 2000

Rehearing Overruled Jan. 25, 2001.

---

**Page 626**

[Copyrighted Material Omitted]

---

**Page 627**

Mike Berger, Fort Worth, for appellant.

Tim Curry, Crim. Dist. Atty., Charles M. Mallin, Chief Appellate Division, Helena F. Faulkner, Asst. Dist. Atty., Fort Worth, for appellee.

DAY and GARDNER, JJ.; JOHN HILL, J. (Retired, Sitting by Assignment).

**OPINION ON REHEARING**

ANNE GARDNER, Justice.

The State, on behalf of Texas Department of Protective and Regulatory Services (TDPRS), has filed a combined motion for rehearing and motion for rehearing en banc asserting complaints regarding our original decision. We withdraw our opinion and judgment issued June 8, 2000, and substitute the following

---

**Page 628**

in their place. We overrule the motion for rehearing.

**INTRODUCTION**

Appellant L.J.T., a twenty-eight year old mother, [1] appeals from the trial court's judgment terminating her parental rights to her son, D.T. She raises two points, contending there is legally or factually insufficient evidence to support the judgment of termination. We reverse and render in part and reverse and remand in part.

**BACKGROUND**

Appellant became pregnant with D.T. in 1996, while living in Montana with D.T.'s father, D.B. [2] She left Montana on November 12, 1996, because D.B. had struck her with a bicycle rack the night before and because she wanted to avoid serving a jail term for a bad check charge. She moved to Oklahoma and had no further contact with D.B.

Appellant lived in Oklahoma from November 1996 until September 1997. D.T. was born in Oklahoma City on August 12, 1997. Subsequently, Appellant moved to Texas, got a job, and arranged for a babysitter to care for D.T. On February 10, 1998, Appellant was arrested by the Hurst Police Department on warrants for bad checks written in Texas and Montana. After she was arrested, she made arrangements for the babysitter to continue caring for D.T. for several more days. D.T. was then six months old.

Because she had no family locally, Appellant requested that TDPRS contact the child's paternal grandparents for possible placement. [3] D.T. was placed in emergency foster care on February 12, 1998.

Jennifer Cook of TDPRS was assigned the case on February 12, 1998. She went to the Hurst jail and met with Appellant for approximately thirty to forty-five minutes. Cook notified Appellant of the emergency placement of D.T. and told her about proceedings being initiated by TDPRS to terminate the parent-child relationship between Appellant and D.T.

Cook saw D.T. on the date she was assigned, and the child appeared to be healthy and well-nourished. At that time, she had no reason to believe that D.T. was abused or neglected. In Cook's words, D.T. "was clean, he looked very healthy. He was real healthy, happy, smiling." Cook felt the reason an emergency removal was necessary was because Appellant could not make bond and there were no available relatives with whom to place D.T. Had Appellant been able to make bond, Cook said Appellant would have been in a position to make arrangements on her own to take care of her son.

On March 5, 1998, Cook called Appellant and spoke with her about relinquishing her parental rights. Appellant told Cook that she thought she would be in jail for over twelve months. Cook explained that in every case in which she "feels" a jail term may exceed twelve months, she is instructed to look at relinquishment from "day one." Nevertheless, Cook testified that there was a two-track approach to the case, in which the caseworkers were pursuing both reunification and termination. The case was transferred sometime in March 1998 to Noelle Preston, a caseworker at TDPRS, for the making of a service plan.

On March 12, 1998, Preston developed a family service plan with a long-range goal of family reunification and mailed it to Appellant. The service plan required Appellant

---

to attend parenting classes and counseling, obtain psychological testing, and participate in parole stipulations when applicable.

On March 20, 1998, Appellant wrote Preston and advised her that she had tried to telephone Preston; she asked how D.T. was doing. On six more occasions between June and December 1998, Appellant wrote Preston, asking how D.T. was doing, asking for pictures of him, and requesting visits with D.T. while she was incarcerated. In an October 6 letter, she advised Preston that she did not want D.T. placed for adoption, that she wanted her son, and that she wanted his paternal grandparents to take care of him while she was incarcerated. Appellant advised Preston that she had completed parenting classes and was currently in counseling. It is undisputed that visits between Appellant and her son were denied, based solely on TDPRS "policy": Appellant had been transferred out of the region where her son had been placed and such visits are deemed not to be in the child's best interest.

On June 3, 1998, Preston sent Appellant a letter stating in relevant part:

I have not heard from you for quite some time now. I need for you to call me ... or send me a letter by June 9, 1998, so we can discuss your service plan. I am reviewing your last plan, dated 3/12/98, since there will be a review court hearing scheduled in July and your plan must be updated for the hearing. You will receive notice of the hearing in a few weeks.
If I do not hear from you by June 9th I will complete your service plan without your participation and mail you a copy. However, your participation is crucial, therefore, we really need to talk.
I am changing the permanency goal from "family reunification" to "adoption." We can talk more about that when you call or write.

Preston confirmed that TDPRS would not have taken the child but for the fact that Appellant was incarcerated. Preston also admitted that Appellant did everything she could while in jail to comply with the service plan. Appellant was scheduled to be released in August 1999, but Preston testified that she believed Appellant's parental rights should be terminated because she had engaged in criminal conduct that resulted in her separation from D.T. by her imprisonment, thereby endangering D.T.'s well-being.

The termination hearing was held on January 21, 1999. Judgment was rendered terminating Appellant's parental rights, as well as those of D.B. and Appellant's former husband as putative father. The trial court signed a corrected decree on April 23, 1999, and filed findings of fact and conclusions of law.

## TERMINATION OF PARENTAL RIGHTS

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX.FAM.CODE ANN. § 161.001(1), (2) (Vernon Supp.2000); *Richardson v. Green,* 677 S.W.2d 497, 499 (Tex.1984). Proof of one does not relieve the petitioner from establishing the other. *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex.1976). It must be emphasized that the child's best interest is not the sole goal of involuntary termination proceedings. The supreme court has made clear that termination "may not be based solely upon what the trial court determines to be the best interest of the child." Id. (emphasis added).

Parents' rights to "the companionship, care, custody and management" of their children are protected to the degree that they are of "federal constitutional dimensions." *Santosky v. Kramer,* 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982) (holding that the parent-child relationship is "far more precious than any property right"). In a termination case,

the State seeks not merely to limit those rights but to end them finally and irrevocably--to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX.FAM.CODE ANN. § 161.206(b) (Vernon 1996); *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985).

It is because termination of parental rights is such a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by a heightened burden of proof of "clear and convincing evidence." *In re G.M.,* 596 S.W.2d 846, 847 (Tex.1980); See also TEX.FAM.CODE ANN. § 161.206(a). This burden is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX.FAM.CODE ANN. § 101.007 (Vernon 1996); *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 31 (Tex.1994). This is an intermediate standard that falls between the preponderance burden of ordinary civil proceedings and the reasonable doubt burden of criminal proceedings. *State v. Addington,* 588 S.W.2d 569, 570 (Tex.1979).

The clear and convincing standard of proof creates a higher burden to fulfill because of the severity and permanency of the termination of the parent and child relationship. *In re J.N.R.,* 982 S.W.2d 137, 141 (Tex.App.--Houston [1st Dist.] 1998, no pet.). This court is duty bound to strictly scrutinize termination proceedings and must strictly construe involuntary termination statutes in favor of the parent. Holick, 685 S.W.2d at 20-21; *In re A.V.,* 849 S.W.2d 393, 400 (Tex.App.--Fort Worth 1993, no writ).

## STANDARD OF REVIEW

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex.1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994).

When presented with legal and factual sufficiency challenges, the reviewing court first reviews the legal sufficiency of the evidence. *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981) (per curiam). In determining a "no-evidence" point, we are to consider all of the evidence in the light most favorable to the party in whose favor the judgment has been rendered, and to indulge every reasonable inference from the evidence in that party's favor. Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex.1998) (op. on reh'g); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997), cert. denied, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

An assertion that the evidence is "factually insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406 (Tex.), cert. denied, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

We have previously held that the higher burden of proof in termination cases does not alter the appellate standard of review for factual sufficiency of the evidence. *In re W.S.,* 899 S.W.2d 772, 776 (Tex.App.--Fort Worth, 1995, no writ); *Faram v. Gervitz-Faram,* 895 S.W.2d 839, 843 (Tex.App.--Fort Worth, 1995, no writ). A number of our sister courts have likewise continued to apply the traditional

---

**Page 631**

standard of review for factual sufficiency where the burden in the trial court is clear and convincing evidence. [4] We note that other courts have espoused what they describe as an intermediate standard of appellate review of factual sufficiency of the evidence in such cases. [5]

In In re L.R.M., this court recognized that, just as the clear and convincing standard of proof in the trial court is an "intermediate" standard of proof falling between the preponderance of evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings, the standard of review for clear and convincing evidence is an "intermediate" standard necessary to protect the fundamental constitutional rights of the parent in termination proceedings. 763 S.W.2d 64, 67 (Tex.App.--Fort Worth 1989, no writ). However, we further observed that, in applying the intermediate standard of review, "[o]ther principles of law relating to sufficiency of evidence are still applicable even when the intermediate standard is used." Id.

Those other principles include the well-settled rule that, in reviewing the factual sufficiency of evidence, we must consider and weigh all of the evidence just as the trial court did, including that favorable to the appellant as well as that favorable to the verdict or findings of the court. Ortiz, 917 S.W.2d at 772 (holding court of appeals must "weigh all of the evidence in the record"); *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986) (noting that court of appeals must examine entire record and review all of the evidence); *In re King's Estate,* 150 Tex. at 664-65, 244 S.W.2d at 661 (pointing out that fact jurisdiction under article V, section 6 of the Texas Constitution requires exercise of our "peculiar" powers to consider and weigh all of the evidence).

The reviewing court does not "indulge inferences or confine its view to evidence favoring one side of the case. Rather, it looks at all of the evidence and then makes a predominately intuitive judgement." William Powers & Jack Ratliff, Another Look at "No Evidence" and "Insufficient Evidence" 69 TEX.L.REV. 515, 525 (1991). The courts of appeals "must, up to a point, follow the same mental processes as a jury does." St. John Garwood, The Question of Insufficient Evidence on Appeal, 30 TEX.L.REV. 803, 811 (1952).

We recognize that we are not a fact finder and that we cannot substitute our judgment for that of the jury merely because the evidence would support a different result. Maritime Overseas, 971 S.W.2d at 406. We can only "unfind" facts. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex.1986) (quoting Garwood, 30 TEX.L.REV. at 813-14). Further, we may set aside a verdict or finding only if the evidence is so weak or the verdict or findings are so contrary to the overwhelming weight of the evidence as to be manifestly unjust. Ortiz, 917 S.W.2d at 772; Pool, 715 S.W.2d at 634.

Applying these principles in reviewing factual sufficiency of the evidence

where a "clear and convincing" burden of proof is required, the standard of review actually does not change, regardless of the terminology used to describe it. [6] Rather, the higher burden of proof merely changes the weight of the evidence necessary to support a finding or verdict. Review of factual sufficiency of the evidence under a clear and convincing standard requires us to determine whether the evidence is sufficient to make the existence of the fact highly probable, not whether the evidence supporting the finding is sufficient to make the existence of the fact more probable than not, as in ordinary civil cases. That is, we must consider whether the evidence is sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. *In re B.R.,* 950 S.W.2d 113, 119 (Tex.App.--El Paso 1997, no writ); Faram, 895 S.W.2d at 843. Accordingly, to prevail on an assertion that the evidence supporting termination of parental rights is factually insufficient, the appellant must show that the evidence is so weak or the evidence to the contrary is so overwhelming that the trier of fact could not have reasonably concluded that there was a high probability that the conduct or endangerment of the child occurred or that termination was in the best interest of the child.

## TRIAL COURT'S FINDINGS

The trial court found, specifically, that Appellant had arrest warrants in five states based on her criminal conduct prior to the birth of D.T.; that Appellant knew her criminal conduct was wrong and could result in her incarceration and inability to parent her child; that Appellant again engaged in criminal conduct after D.T.'s birth and was incarcerated; and that Appellant's conduct and subsequent incarceration endangered the physical and emotional well-being of D.T.

The trial court made the following findings based on the statutory requirements of section 161.001: Appellant knowingly placed D.T. and allowed him to remain in conditions and surroundings that endangered his physical and emotional well-being; Appellant engaged in conduct and knowingly placed D.T. with persons who engaged in conduct that endangered his physical and emotional well-being; Appellant constructively abandoned D.T., who had been in the temporary managing conservatorship of TDPRS for not less than six months, and (a) TDPRS made reasonable efforts to return D.T. to Appellant, (b) Appellant did not regularly visit or maintain significant contact with D.T., and (c) Appellant has demonstrated an inability to provide D.T. with a safe environment; and termination of Appellant's parental rights is in D.T.'s best interest. [7]

## LEGAL SUFFICIENCY OF THE EVIDENCE

### I. Environment

We first address whether the evidence is legally sufficient to support the finding that Appellant knowingly placed and knowingly allowed D.T. to remain in conditions or surroundings that endangered his physical or emotional well-being. TEX.FAM.CODE ANN. § 161.001(1)(D). Under section 161.001(1)(D), the environment of the child must be examined to determine if that is a source of endangerment to the child. Id.; *In re B.S.T.,* 977 S.W.2d at 484. There is no evidence regarding D.T.'s home environment prior to Appellant's arrest. There is no indication that

the babysitter's residence was a dangerous environment.

In In re W.S., we held that involuntary termination under former section 15.02(a)(1)(D) of the Texas Family Code [8] may be established by conduct of the parent as well as by physical conditions in the home. 899 S.W.2d at 776. The State now urges that, under our holding in that case, the conduct and incarceration of Appellant somehow suffices to establish a basis for termination under section 161.001(D). W.S. involved a child continually subjected to sexual abuse by the stepfather in the home, with no effort by the mother to stop the abuse even though she was aware of its occurrence. On that evidence, we held that an endangering "environment" may be produced by conduct of the parent in the home. Id.

This case bears no likeness to W.S. When Appellant was arrested, she asked that TDPRS be contacted to ensure that D.T. was cared for while she was in jail. There was no indication at the time D.T. was placed in foster care that he had been abused or neglected; he appeared clean, happy, and healthy. [9] Cook admitted that, if Appellant had made bond, she would have been able to continue caring for her son. We determine that there is no evidence that Appellant knowingly placed or allowed the child to remain in conditions that endangered his physical or emotional well-being.

## II. Constructive Abandonment

We next address whether the evidence was legally sufficient to support the finding that Appellant constructively abandoned D.T. TEX.FAM.CODE ANN. § 161.001(1)(N). The elements of constructive abandonment are: (1) the child has been in the permanent or temporary managing conservatorship of TDPRS for not less than six months; (2) the department has made reasonable efforts to return the child to the parent; (3) the parent has not regularly visited or maintained significant contact with the child; and (4) the parent has demonstrated an inability to provide the child with a safe environment. Id. If there is no evidence of one or more of these elements, then the finding of constructive abandonment fails.

The first element is not disputed, and the second is inapplicable because Appellant was incarcerated. Therefore, we will focus on the third and fourth elements. There is no evidence to establish the third element of constructive abandonment. To the contrary, Appellant made numerous written requests asking for visitation while she was in jail. Appellant testified that Preston told her that she was going to visit her in Polk County, but when Appellant asked her to bring D.T., Preston stated that the judge would not allow it. Preston confirmed that visitations were denied based on the policy of TDPRS. The record does not support the trial court's finding that Appellant did not attempt to visit regularly or maintain significant contact with the child.

Turning to the last element, nothing in the record other than her incarceration indicates that Appellant has demonstrated an inability to provide D.T. with a safe environment. It has long been settled that imprisonment, standing alone, does not constitute "abandonment" of a child for purposes of termination of parental rights. *In re S.D.H.,* 591 S.W.2d 637, 638 (Tex.Civ.App.--Eastland 1979, no writ) (holding imprisonment does not constitute "abandonment," nor is it conduct "endangering" a child); H.W.J. v. State Dep't of Public Welfare, 543 S.W.2d 9, 11 (Tex.Civ.App.--Texarkana 1976, no writ)

---

**Page 634**

(same); *Hutson v. Haggard,* 475 S.W.2d 330, 333 (Tex.Civ.App.--Beaumont 1971, no writ) (holding imprisonment is not "abandonment"). Texas Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987) (holding imprisonment alone is not conduct "endangering a child").

Considering the evidence in light of the proper standard for "no-evidence" review, and mindful that incarceration alone is not sufficient to constitute abandonment of a child, we hold there is no evidence to support two of the required elements of constructive abandonment.

## III. Course of Conduct

We next address the legal sufficiency of the evidence to support the trial court's finding that Appellant engaged in conduct or knowingly placed D.T. with persons who engaged in conduct that endangered his physical or emotional well-being. TEX.FAM.CODE ANN. § 161.001(1)(E). Section 161.001(1)(E) requires us to look at the parent's conduct alone, including actions or omissions or failures to act. Id.; *In re B.S.T.,* 977 S.W.2d at 484.

"Endanger" under section 161.001(1)(E) means to expose to loss or injury, to jeopardize. Boyd, 727 S.W.2d at 533. The term means more than a threat of "metaphysical injury," but it is not necessary that the conduct be directed at the child or that the child actually suffer injury. Id. Nevertheless, there must be evidence of endangerment to the child's physical or emotional well-being as the direct result of the parent's conduct. *In re R.D.,* 955 S.W.2d 364, 366 (Tex.App.--San Antonio 1997, pet. denied); Dupree v. Texas Dep't of Protective & Regulatory Servs., 907 S.W.2d 81, 83-84 (Tex.App.--Dallas 1995, no writ).

Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious "course of conduct" by the parent is required. *In re K.M.M.,* 993 S.W.2d 225, 228 (Tex.App.--Eastland 1999, no pet.); *In re J.N.R.,* 982 S.W.2d at 142. There is evidence that Appellant had prior convictions and outstanding arrest warrants based on criminal conduct of writing bad checks before D.T.'s birth. Appellant had previously lived in various states outside of Texas. Appellant admitted that, while living in Utah several years before moving to Texas, she had received probation for two bad check cases, one felony and one misdemeanor. Appellant also acknowledged that she jumped bond when she fled from Montana in 1996 prior to D.T.'s birth, partly to avoid serving time in jail. Child protective services became involved, and the two children she had at that time were placed with her mother. [10] Appellant testified she had outstanding warrants from the state of Montana as the result of the revocation of her bond and as a result of the bad check charge pending there.

The evidence to support the trial court's specific finding that Appellant had arrest warrants in five different states consisted of testimony from caseworker Preston that Appellant had told her she had "holds" on her from two other states, Idaho and Oklahoma, in addition to the Montana charges and the convictions in Utah. Appellant testified at the hearing that she was given that information by "Polk County," but some of those "cases" were several years old and she had no information that those states were looking for her or had "holds" on her. She was to

---

be released in August 1999 from her current sentence unless one of those states took her on her release date. Caseworker Cook testified only that TDPRS had been "given information regarding her criminal history and [was] concern[ed] that [Appellant] had several warrants out in several different states and her jail term might go beyond the twelfth month." Preston testified Appellant's course of criminal conduct resulted in her imprisonment, thereby endangering D.T.'s physical and emotional well-being by causing Appellant to be separated from him. The argument of TDPRS, apparently accepted by the trial court, is that Appellant knew she was engaging in conduct that could result in her imprisonment and separation from D.T. and, accordingly, by actively writing bad checks, she engaged in a voluntary, deliberate, and conscious course of conduct that endangered D.T. We reject this argument, as it would effectively nullify the longstanding rule against terminating the parental relationship based solely on imprisonment. Boyd, 727 S.W.2d at 533.

In Boyd, the evidence showed that the father had been convicted of two burglaries, was imprisoned when the child was born, lived with the mother and child for six months, and was in prison again at the time of the hearing. Id. at 533. The Supreme Court of Texas held "endanger" means more than a threat of metaphysical injury or the possibility of ill effects, and endangerment does not require that the misconduct of the parent be directed at the child or that the child actually suffer injury. Id. Rather, the court concluded, "endanger" means "to expose to loss or injury," and "imprisonment is certainly a factor to be considered ... on the issue of endangerment." Id.

The court acknowledged that Texas cases have held that mere imprisonment, standing alone, will not constitute engaging in conduct that endangers the emotional or physical well-being of the child, but noted that the courts have "parted company" on the effect of the parents' imprisonment. Id. The court then held, without elaboration, "[i]f the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding under Section 15.02(1)(E) is supportable." Id. at 534 (quoting *Wray v. Lenderman,* 640 S.W.2d 68, 71 (Tex.App.--Tyler 1982)).

In the court of appeals in Boyd, the Department of Human Services had made the identical argument asserted in our case: "endangerment" as contemplated by the statute may be inferred from imprisonment, alone, when such imprisonment is the result of a voluntary, deliberate and conscious course of conduct by the prisoner. *Boyd v. Texas Dep't of Human Servs.,* 715 S.W.2d 711, 717 (Tex.App.--Austin 1986), rev'd, 727 S.W.2d 531 (Tex.1987). The Austin court of appeals expressly rejected that argument, describing it as "fundamentally without meaning." Id. That court pointed out:

By definition, almost all crimes for which imprisonment may be assessed require a culpable mental state that is voluntary, deliberate and conscious.... [I]nstead of "qualifying" the primary rule, that imprisonment and criminal conduct are not, in and of themselves, grounds for the termination of parental rights, the rule for which the Department contends would devour or render meaningless such primary rule....

Id. at 716.

In reversing, the supreme court disapproved the court of appeals' holding that endangerment may not be inferred from conduct of a parent and must be proved by independent evidence. The supreme court also said that imprisonment is a "factor" to consider with other evidence. The supreme court did not say that endangerment may be inferred from any and all criminal conduct just because that conduct results in imprisonment.

Notably, in reversing the court of appeals' decision in Boyd, the supreme court

---

did not mention the court of appeals' rejection of the Department's argument. [11] We do not read the supreme court's decision in Boyd as requiring us to accept TDPRS's argument that, merely because a parent voluntarily, willfully, and consciously engages in conduct that she knows may result in imprisonment, such conduct and resulting imprisonment are sufficient to support termination of her parental rights. We believe more is required to meet the stringent conditions that are necessary to terminate parental rights.

While an easily administered test such as that proposed by TDPRS may serve the State's interest in conserving time and administrative resources, such a test creates a danger that termination of parental rights could become an additional punishment automatically imposed along with imprisonment for almost any crime. Steven Fleischer, Termination of Parental Rights: An Additional Sentence for Incarcerated Parents, 29 SETON HALL L.REV. 312, 313-16, 339-40 (1998).

On the other hand, the supreme court has not articulated how and to what extent imprisonment should be considered as a "factor" in termination cases. Since Boyd, one court has suggested that imprisonment is a factor in termination only if it is the result of or coupled with a course of conduct that, itself, causes endangerment to the physical or emotional well-being of the child. Dupree, 907 S.W.2d at 84. Another court has stated that if imprisonment is based upon "a certain type of voluntary, deliberate and conscious course of conduct," only then may imprisonment be considered conduct that "endangers" the child under section 161.001(1)(D) or (E). In re K.M.M., 993 S.W.2d at 228.

In the cases we have found involving termination of parental rights of imprisoned parents, endangerment to a child could easily have been inferred from the underlying conduct of the parent. E.g., In re M.D.S., 1 S.W.3d 190, 198-99 (Tex.App.--Amarillo 1999, no pet.) (affirming termination of parental rights of father serving sentence for burglary based on negotiated plea with dismissal of indictment for aggravated sexual assault of another child and history of multiple sexual encounters with children); In re K.M.M., 993 S.W.2d at 228 (finding evidence of "endangerment" sufficient where father was incarcerated before child's birth for sexual assault of fifteen-month old child, had three previous juvenile adjudications for aggravated sexual assault of children, and was still incarcerated at time of trial); Spangler, 962 S.W.2d at 260 (upholding termination of parental rights of father who was serving sentence for "retaliation" against TDPRS worker, who was frequently in jail, and abused mother in presence of children); In re J.J., 911 S.W.2d at 440 (affirming termination of parental rights of father who was frequently jailed, used crack cocaine, and abused wife in presence of children); Trevino v. Texas Dep't of Protective & Regulatory Servs., 893 S.W.2d 243, 247-48 (Tex.App.--Austin 1995, no writ) (affirming termination of parental rights of father who frequently used drugs and was imprisoned for causing death of another child); In re A.K.S., 736 S.W.2d 145, 146 (Tex.App.--Beaumont 1987, no writ) (affirming termination of parental rights of father serving sentence for rape, who also compulsively exhibited genitals to women). Termination based on conduct resulting in imprisonment has also been upheld in one case involving a series of arrests and imprisonments along with additional criminal conduct by the parent with knowledge that his rights to the child were in jeopardy. In re J.N.R., 982 S.W.2d at 144.

There is no evidence here that Appellant's misconduct in writing bad checks was of a type from which endangerment could be inferred. Nevertheless, evidence

---

of conduct before a child is born, as well as evidence as to how a parent has treated another child or spouse is relevant regarding whether a course of conduct under section 161.001(1)(E) has been established. *E.g., In re D.L.N.,* 958 S.W.2d 934, 939 (Tex.App.--Waco 1997, pet. denied); see also Dupree, 907 S.W.2d at 84; Trevino, 893 S.W.2d at 248. We hold that the evidence of Appellant's past course of misconduct, including the evidence that she left her other two children in foster care in Montana when she jumped bail, together with her subsequent offense in Texas and incarceration, viewed in a light most favorable to the judgment, is some evidence of a course of conduct of endangerment under section 161.001(1)(E).

**FACTUAL SUFFICIENCY OF THE EVIDENCE**

To determine whether the evidence is factually insufficient, we consider and detail all the evidence relevant to the trial court's finding under section 161.001(1)(E). See Pool, 715 S.W.2d at 635. Specifically, the issue is whether all of the evidence, including the evidence of Appellant's imprisonment, is factually sufficient to establish that she endangered D.T. physically or emotionally.

**I. Evidence Supporting the Finding**

In reviewing the legal sufficiency of the evidence, we have previously reviewed and detailed the evidence supporting the finding of endangerment as the result of Appellant's course of conduct. Briefly summarizing: Appellant (1) fled the State of Montana while pregnant to avoid imprisonment for writing a hot check, leaving her other children who were later placed with her mother; (2) wrote one or more bad checks in Texas after D.T. was born, resulting in her imprisonment for approximately eighteen months; and (3) engaged in similar criminal conduct in other states prior to D.T.'s birth.

Neither Cook nor Preston verified with the Texas Department of Corrections Appellant's scheduled release date or her criminal status with the other states. Preston amended the service plan based on a telephone conversation she had in June 1998 with authorities in Livingston in which she was told that Appellant would be in jail two years and would then be bench warranted to other states. On cross-examination, Preston conceded that information was incorrect.

Appellant testified that she knew her conduct was wrong and that she could possibly go to jail but that she did not know her ability to parent D.T. could be affected. In In re J.N.R., a biological father learned of his child while in prison, made monthly inquiries regarding the child until his release despite the filing of the termination suit, and thereafter became an active parent in the child's life with regularly scheduled visits and participation in a family service plan. 982 S.W.2d at 139. The plan required him to secure a job and a place to stay, which he did, and also required him to stay out of jail and participate in his parole tasks, which he did not do. Within a few months, his participation in parenting classes became very inconsistent. He also failed to show up for drug tests, and within a period of one month, he was arrested on three separate occasions for disorderly conduct, passing counterfeit bills, and resisting arrest. At the time of the termination hearing, he was in jail awaiting trial on still another charge of passing counterfeit bills. Affirming a judgment terminating his parental rights, the court of appeals relied upon evidence that the father had continued to engage in the criminal activity that resulted in his incarceration even after knowing his parental rights were in jeopardy. Id. at 143. In contrast to the record in In re J.N.R., there is no evidence here that Appellant knew her conduct would result in long-term imprisonment that would affect her ability to parent D.T. or that would have the effect of endangering D.T.'s physical or emotional well-being. What remains is the evidence that Appellant fled Montana, leaving her other children

---

who were placed in foster care. However, the record is silent as to any factual details regarding whether she, herself, initiated the placement for their protection or whether she simply abandoned them when she fled.

**II. Evidence Contrary to Finding**

Along with evidence supporting the trial court's finding of endangerment, we review the evidence contrary to its finding. Pool, 715 S.W.2d at 635. In caseworker Cook's words, when she saw D.T. on the date she was assigned to the case, he "was clean, he looked very healthy. He was real healthy, happy, smiling." There was no indication that

D.T. had been abused or neglected. Indeed, the documentation by Preston after D.T.'s emergency placement reflects not only that D.T. was "on target developmentally for his age" and appeared to be "a healthy child" but also that Appellant was able to meet D.T.'s "basic material needs prior to incarceration."

Cook's testimony that an emergency removal was only necessary because Appellant could not make bond is particularly significant. Preston agreed with this opinion by testifying that TDPRS would not have taken the child except for the fact that Appellant was incarcerated. It was undisputed that Appellant would be eligible for release within nine months of the time of the hearing in January 1999. The only testimony regarding the State of Montana charges was Appellant's testimony that she was told she would be credited for the time served in Texas and it was her understanding she would not have to do additional time.

Absent specific guidance from the supreme court on the troublesome issue of termination of an imprisoned parent's rights, we believe that, in considering all of the evidence, we should look not only at incarceration as a "factor" but also at the expected length of the sentence and whether the underlying conduct is of a type, in and of itself, from which endangerment of the child may be inferred. In this regard, the current statutory scheme for involuntary termination of parental rights in Texas is instructive. As amended in 1997, the family code now includes imprisonment for two years or more as a separate ground for termination (along with a finding of best interest). TEX.FAM.CODE ANN. § 161.001(1)(Q) (providing for termination based on knowing commission of criminal offense resulting in confinement for two years or more from date petition for termination is filed). TDPRS did not plead that section as a basis for termination in this case, nor would it have been applicable, based on the evidence of Appellant's release date.

Because the Legislature specified a minimum period of imprisonment of two years from the date of filing the petition, it is reasonable to assume that the Legislature intended that imprisonment for less than that length of time would be insufficient, standing alone, to support involuntary termination. Because the State does not dispute that Appellant's length of confinement in Texas was for less than that amount of time, and it is speculative as to what confinement, if any, she might ever serve under pending charges from other states, we believe it is consistent with the statutory scheme to hold that TDPRS was required to show either a course of underlying conduct leading to her imprisonment, or in addition to the imprisonment, a course of conduct that was, itself, of an endangering nature to the child.

That our decision is consistent with the Texas statutory scheme regarding the effect of criminal conduct and imprisonment is further supported by the detailed list of crimes under section 161.001(1)(L), which are deemed to constitute a sufficient basis for termination, each of which is of an endangering nature and each of which must also be found to have caused the "death or serious injury" of a child. TEX.FAM.CODE ANN. § 161.001(1)(L). Writing bad checks is not included in the list.

---

**Page 639**

The manner in which the issue has been handled by statute and by courts in other states is also instructive. E.g., ARIZ.REV.STAT.ANN § 8-533 (West 1989 & Supp.1997) (permitting termination for conviction of felony of such nature to prove "unfitness"); IND.CODE ANN. § 31-35-5-4 (West Supp.1997) (allowing termination if conviction is for certain type of crime, including murder and rape); *In re L.A.S.,* 134 N.J. 127, 631 A.2d 928, 935-36 (1993) (holding nature of underlying crime and length of sentence are relevant factors, among others, in termination case involving incarcerated parent); *In re Christina P.,* 175 Cal.App.3d 115, 220 Cal.Rptr. 525, 535 (1985) (holding certain crimes may sufficiently show "depravity" of parent to warrant termination); see generally Parent's Involuntary Confinement, Or Failure To Care For Child As Result Thereof, As Evincing Neglect, Unfitness, Or The Like In Dependency Or Divestiture Proceeding, 79 A.L.R.3d 417, 417 (1977) (focusing on the consequential inability to care for one's children due to confinement).

It is undisputed that this is Appellant's first jail sentence, and it is for a relatively short time, running concurrently with the time she would receive for the Montana charges. The evidence amounts only to "possibilities" as to Appellant's future incarceration on other unspecified charges in other states. The underlying criminal conduct of writing hot checks, in and of itself, is not a type of conduct from which physical or emotional endangerment of a child may be inferred, nor is there any evidence of unrelated conduct of Appellant specifically toward D.T. that might be so characterized.

To the contrary, all the evidence indicates that D.T. was well-cared for by Appellant prior to her arrest, that he was bonding with Appellant, that he slept with her at night and was with her most of the time except when she was at work, and that he was generally a healthy, happy baby. It is also undisputed that Appellant has fulfilled each of the tasks assigned to her by the family service plan to the best of her ability and that her inability to visit with D.T. is solely due to the TDPRS policy.

The concurring justice asserts that this type of evidence is relevant only on the issue of best interest of the child. We have found no comparable case in which parental rights have been terminated in the context of an imprisoned parent. However, in other cases, judgments terminating parental rights based on endangerment have been reversed on similar evidence, without reaching the issue of best interest. In Clay v. Texas Department of Human Resources, the mother contacted the Department for help because she was being abused by her husband and the children were not safe in his presence. 748 S.W.2d 598, 599-600 (Tex.App.--Waco 1988, no writ). The children were placed in the temporary custody of TDHR at the mother's request. The mother paid all child support and attended almost all counseling sessions as ordered and visited with the children as allowed, but she had twenty-five different jobs and a number of different addresses during the three years after TDHR was granted temporary custody. In reversing the judgment terminating her parental rights, the reviewing court found there was no evidence the mother engaged in conduct that endangered the children. Id. at 600. The court noted that the mother posed no danger to her children and that she was "guilty of nothing more than suffering from some of life's misfortunes. She did not work at one place nor live at one place long enough to satisfy the TDHR." Id.

In Doria v. Texas Department of Human Resources, the evidence was that the mother left the children alone in a house with no running water, electricity, or heat and that a boyfriend abused her and possibly abused one child. 747 S.W.2d 953, 958-59 (Tex.App.--Corpus Christi 1988, no writ). The mother was unable to comply with the family service plan by attending

---

all counseling and parenting classes, obtaining adequate housing or visiting the children regularly. A TDHR worker was of the opinion that the children removed from the mother's home should not be returned because they no longer related to the mother and it was "not fair" to them. Id. at 957.

In reversing on the basis of factual insufficiency of the evidence of endangerment, the court of appeals noted that the house had been repaired, that the mother had attended a large number of the required classes and visits considering her low intelligence and poverty, that an abusive boyfriend was no longer allowed in the house, that the great weight of the evidence showed the mother was striving to conform to the service plan, and that she loved her children and was sincerely concerned about getting them back. Id. at 958-59; see also Ybarra v. Texas Dep't of Human Servs., 869 S.W.2d 574, 578 (Tex.App.--Corpus Christi 1993, no writ) (finding factual insufficiency of evidence to support termination based on mother's failure to comply with DHS directions and goals).

Although the parents were not incarcerated in those cases, we believe that the relationship of the parent and child, as well as efforts to improve or enhance parenting skills, are relevant in determining whether a parent's conduct results in "endangerment" of the child under section 161.001(1)(E), even where the parent is incarcerated. TEX.FAM.CODE ANN. § 161.001(1)(E); see also Steven Fleischer, 29 SETON HALL L.REV. at 314-15.

Like the mother in Clay, Appellant contacted TDPRS to ensure D.T.'s safety. Like the mothers in both Clay and Doria, she complied as fully as possible with the goals and objectives required by TDPRS in order to facilitate reunification with her son. TDPRS conceded Appellant complied in all possible respects with the service plan, wrote letters to Preston inquiring about D.T., and requested photographs and visits. Appellant acknowledged her criminal past was wrong. She has taken actions to correct her behavior, loves her son, and has taken advantage of classes and counseling sessions at the T.D.C. in compliance with the service plan to ensure that she lives a clean lifestyle. Despite repeated efforts by Appellant to contact Cook and Preston by telephone and in writing, TDPRS abandoned its reunification goal because Appellant was still incarcerated, placement with D.T.'s grandparents was not possible, and only eight months remained for the court to render a final order of termination or to dismiss the suit. [12] TEX.FAM.CODE ANN. § 263.401(a).

Regarding the evidence that Appellant left her other two children in Montana when she jumped bond, Appellant testified that she could not support her two other children financially and that she left Montana in part to escape D.T.'s abusive father. After Appellant left D.T.'s abusive father, D.T. was born, and she got a job in Texas and found a babysitter for him. When she was arrested in Texas, she made arrangements for the babysitter to continue caring for D.T. and then contacted TDPRS and asked it, herself, to assist in temporary placement.

On this record, we find that there is more than a scintilla of evidence of endangerment, but that the evidence is factually insufficient to establish by clear and convincing evidence that Appellant pursued a course of conduct that endangered the physical or emotional well-being of D.T.

## BEST INTEREST OF THE CHILD

Appellant's brief also attacks the legal and factual sufficiency of evidence to support the trial court's finding that termination is in the best interest of D.T. Judicial inquiry as to the best interest of the child is deferred pending determination

---

**Page 641**

that the petitioner has sufficiently established one or more of the acts or omissions enumerated in subdivision (1) of the statute. *In re S.D.H.,* 591 S.W.2d at 638.

There is a strong presumption that the best interest of a child is served by keeping custody in the natural parent. *In re K.C.M.,* 4 S.W.3d 392, 393-95 (Tex.App.--Houston [1st Dist.] 1999, pet. denied); *Ziegler v. Tarrant County Child Welfare Unit,* 680 S.W.2d 674, 676 (Tex.App.--Fort Worth 1984, writ ref'd n.r.e.). The fact-finder must consider a number of factors in determining the best interest of the child, including the desires of the child, the present and future physical and emotional needs of the child, the present and future emotional and physical danger to the child, the parental abilities of the person seeking custody, programs available to assist those persons in promoting the best interest of the child, plans for the child by those individuals or by the agency seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. Holley, 544 S.W.2d at 371-72.

D.T. is only eighteen months old and obviously unable to communicate his wishes. As to his emotional and physical needs, the evidence affirmatively established that those needs were adequately met by Appellant in the past, as shown by the evidence that D.T. was developmentally and intellectually on-target, has no special needs, and was happy and healthy when placed in custody of the TDPRS. Caseworker Preston acknowledged D.T.'s past home environment could be considered safe. There is no evidence whatsoever as to any actual emotional or physical danger to D.T. in the past. It is undisputed that D.T. is not currently endangered and his emotional and physical needs are being met in foster care. No evidence, direct or indirect, was offered by TDPRS regarding D.T.'s future emotional or physical needs or endangerment to him in the future. Caseworker Preston testified that, in her opinion, it is in the best interest of D.T. for the parent-child relationship with Appellant to be terminated because of Appellant's current separation from him while she is incarcerated and because "[s]he hasn't shown she can provide a safe, stable home for him." Aside from the fact that her statement would improperly reverse the burden of proof, Preston was not looking toward the future when Appellant would be released. She admitted, "We're not even looking to August. We're dealing with right now."

There was no evidence that Appellant currently lacked parenting ability. It was undisputed that Appellant had taken advantage of and had completed the psychological testing and counseling offered to her. There was no evidence of availability of child care assistance or counseling in the future to assist her with D.T., nor was any evidence offered as to financial entitlement programs available. As to plans for the future, Appellant testified that her mother has asked her to come back to Alabama after her release date. Appellant wants to finish school, and her mother said she will help her. TDPRS's plans for D.T. were not stated. Although Preston testified that the current foster parents would be willing to adopt, there was no testimony from the foster parents.

There was no evidence of abuse, neglect, or any other indication of an inappropriate parent-child relationship between Appellant and D.T. As to "excuse," Appellant candidly offered none, but testified she realized her conduct

was wrong and has taken advantage of everything offered by the Texas Department of Corrections to make sure she does not go back.

The evidence of Appellant's past course of conduct of writing bad checks apparently spans several years. This evidence, when considered with her conduct of jumping bond and leaving her other children in Montana, meets only one of the factors enumerated in Holley: evidence of her acts and omissions. While the evidence of

---

**Page 642**

this factor overlaps the proof required to establish the statutory ground of endangerment by her conduct, this evidence is nevertheless some evidence, more than a scintilla, to support termination.

Viewing the evidence in the light most favorable to the judgment, there is legally sufficient evidence that the best interest of D.T. would be served by termination of Appellant's parental rights. However, based upon a review of the totality of the evidence as detailed above in light of the Holley factors, including evidence contrary to the trial court's findings, we hold that the evidence is so weak as to be factually insufficient to establish by clear and convincing evidence that the best interest of D.T. will be served by terminating Appellant's parental rights.

## CONCLUSION

Having determined the evidence is legally insufficient to support the findings under section 161.001(1)(D) and (N), we sustain Appellant's first point as to those findings. When we sustain a "no-evidence" point, it is our duty to render judgment for the appellant because that is the judgment the trial court should have rendered. TEX.R.APP.P. 43.3; *Vista Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176, 176 (Tex.1986) (quoting National Life & Accident Ins. Co. v. Blagg, 438 S.W.2d 905, 909 (Tex.1969)). Therefore, we reverse the trial court's judgment under section 161.001(1)(D) and (N) and render judgment for Appellant on these grounds.

Having determined the evidence is factually insufficient to support the findings under section 161.001(1)(E) and (2), we are of the opinion that the judgment terminating Appellant's parental rights is manifestly unjust. We sustain Appellant's points as to the applicable findings. We reverse the trial court's judgment on the grounds of section 161.001(1)(E) and (2) and remand that portion of the cause for a new trial. B.J. Valve & Fitting Co. v. Elliott Valve Repair Co., 679 S.W.2d 1, 1 (Tex.1984).

JOHN HILL, J. (Retired), filed a concurring opinion.

JOHN HILL, Justice, concurring (Retired).

I concur in the result only because, while I agree with the majority that the evidence is factually insufficient to support the trial court's finding that termination of Appellant's parental rights is in the best interest of the child, I disagree with the majority's conclusion that the evidence is factually insufficient to support the trial court's finding that Appellant engaged in conduct that endangered the physical and emotional well-being of the child.

The majority agrees that the evidence is legally sufficient to support the finding that Appellant engaged in conduct that endangered the physical and emotional well-being of D.T., but finds that the evidence is factually insufficient to support the finding. As I understand the evidence, Appellant, prior to the birth of D.T., fled the State of Montana in order to avoid prosecution for bad checks and to escape an abusive husband. In doing so, she left behind two children who ultimately ended up in the care of her mother. When asked by a child investigator for the Texas Department of Protective and Regulatory Services (TDPRS) why she had not contacted the children, she testified that it was because they were better off in foster care. She testified that there is an outstanding warrant out for her arrest in Montana as a result of bail revocation. She also acknowledged that there is a pending charge in that state for bad checks.

Appellant was arrested in February 1998, shortly after D.T.'s birth in August 1997. In January 1999, at the time of the trial of this termination proceeding, Appellant was in state jail following her conviction for a state jail felony in Texas. She was expecting to be released in August 1999. She acknowledged having been convicted

of a felony involving bad checks in Utah. She said that some of her out-of-state cases might be four or five years old. Appellant testified that she had been told that there might be arrest warrants out for her in five different states. She indicated that those arrest warrants were based upon her conduct, that she knew there would be a possibility of her going to jail, that if she went to jail she would not be able to parent her child, and that she engaged in a continuing course of conduct of writing bad checks or engaging in an activity that might get her arrested.

In holding the evidence is factually insufficient to support the trial court's finding that Appellant engaged in conduct endangering the physical and emotional well-being of D.T., the majority relies upon testimony indicating that D.T. was in good health and had not been abused, that Appellant was taking good care of D.T. before her arrest and was doing the best she could while incarcerated to indicate her interest in D.T., that the only reason for emergency removal of D.T. when Appellant was initially arrested was because she could not make bail, that the Appellant contacted the TDPRS after she was arrested to ensure D.T.'s safety, that she complied as fully as possible with the goals and objectives required of her by the Department, and that her conviction was not for a crime from which, in and of itself, physical or emotional harm to the child might be inferred.

The majority relies in part upon a law review article from the SETON HALL LAW REVIEW, authored by Steven Fleischer. In that article, Fleischer states that, while the psychological effects of parental incarceration on children vary greatly from child to child, parental incarceration can have a pronounced negative effect on a child and may temporarily or permanently affect the child's development and future relationships. Steven Fleischer, Termination of Parental Rights: An Additional Sentence for Incarcerated Parents, 29 SETON HALL L.REV. 312, 321 (1998). It is undisputed that Appellant engaged in a pattern of criminal conduct over a lengthy period of time that ultimately resulted in imprisonment for over a year and a half. It appears that there is a reasonable possibility of more incarceration to come. Therefore, it is my opinion that the evidence is undisputed that Appellant engaged in conduct that endangered the physical and emotional well-being of her child.

The remaining issue is whether termination of the parent-child relationship is in D.T.'s best interest. I believe all the evidence the majority relies upon in holding that the evidence is factually insufficient to support the trial court's finding on the endangerment issue is relevant to the best interest issue. However, the evidence does not contradict the undisputed testimony that shows Appellant engaged in conduct that endangered the physical and emotional well-being of D.T. Evidence that D.T. did not actually suffer injury is not inconsistent with the finding. *Texas Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987). Evidence that Appellant is a loving mother who cares about her child is not inconsistent with the finding because loving mothers can, and Appellant did, engage in conduct that endangers the child. The potential harm to D.T. comes from her course of conduct and the resulting imprisonment. While the nature of a course of conduct, in and of itself, may sometimes support termination, the fact that the conduct, in and of itself, does not pose such a danger does not keep the conduct from posing a danger when coupled with the imprisonment that results from such conduct. Because the evidence relied upon by the majority does not contradict the undisputed evidence the majority found to be legally sufficient to support the trial court's finding on the endangerment issue, I believe the majority is in error in holding the evidence factually insufficient to support the finding on endangerment.

---------

Notes:

[1] Appellant is sometimes referred to in the record by her married name, L.J.P.

[2] D.B., the biological father of D.T., is sometimes referred to in the reporter's record as D.V. In the clerk's record, he is identified as D.B.

[3] A home study was later performed on the paternal grandparents, and as a result, placement with them was denied.

[4] E.g., In re J.N.R., 982 S.W.2d 137, 142-43 (Tex.App.--Houston [1st Dist.] 1998, no pet.); In re B.S.T., 977 S.W.2d 481, 484, n. 4 (Tex.App.--Houston [14th Dist.] 1998, no pet.); In re J.J. & K.J., 911 S.W.2d 437, 439-40 (Tex.App.--Texarkana 1995, writ denied); Spurlock v. Texas Dep't of Protective & Regulatory Servs., 904 S.W.2d 152, 155-56 (Tex.App.-Austin 1995, writ denied); In re A.D.E., 880 S.W.2d 241, 245 (Tex.App.--Corpus Christi 1994, no writ); D.O. v. TDHS, 851 S.W.2d 351, 353 (Tex.App.--Austin 1993, no writ).

[5] E.g., In re B.R., 950 S.W.2d 113, 117-18 (Tex.App.--El Paso 1997, no pet.); Spangler v. Texas Dep't of Protective & Regulatory Servs., 962 S.W.2d 253, 257 (Tex.App.--Waco 1998, no pet.); In re H.C., 942 S.W.2d 661, 663-64 (Tex.App.--San Antonio, 1997, no pet.); In re L.S., 748 S.W.2d 571, 572-73 (Tex.App.--Amarillo 1988, no writ); Neiswander v. Bailey, 645 S.W.2d 835, 835-36 (Tex.App.--Dallas 1982, no writ); see generally Bill Vance, The Clear and Convincing Evidence Standard in Texas: A Critique, 48 BAYLOR L.REV. 391 (1996) (discussing why an additional standard of review should be developed for appellate review of findings of fact made under the clear and convincing evidence standard).

[6] Clear and convincing proof has not been required by the supreme court except where that heightened degree of proof has been mandated by constitutional or statutory requirements. Huckabee v. Time Warner Entm't Co., 19 S.W.3d 413, 423 (Tex.2000). Clear and convincing evidence is required both by due process and by statute in involuntary termination cases. In re G.M., 596 S.W.2d at 847; TEX.FAM.CODE ANN. § 161.206(a).

[7] In effect, the trial court found that Appellant committed acts prohibited under section 161.001(1)(D), (E), and (N) and that termination was in D.T.'s best interest. TEX.FAM.CODE ANN. § 161.001(1)(D), (E), (N), (2).

[8] Act of May 27, 1993, 73rd Leg., R.S., ch. 597, § 1, 1993 Tex.Gen.Laws 2254, 2254 (repealed 1995) (current version at TEX.FAM.CODE ANN. § 161.001(1)(D)).

[9] The fact that D.T. was placed in foster care when Appellant was arrested is not, standing alone, evidence of endangerment. G.M. v. Texas Dep't of Human Res., 717 S.W.2d 185, 188 (Tex.App.--Austin 1986, no writ) (holding that leaving child in care of licensed foster parents did not "endanger" child's emotional or physical well-being).

[10] When Appellant was sixteen, she gave birth to a daughter and placed her for adoption. Later, Appellant married and had other children, one of whom, a twin with a heart defect, died at the age of three months from sudden infant death syndrome while Appellant was at work. Appellant was suspicious of his death because her former husband with whom she was then living had shaken the baby before and had blamed their pet cat for bruises she had once found on the baby. Although the State mentions this evidence, it does not rely on it as evidence of a conscious course of conduct that endangered D.T.

[11] The supreme court did not adopt the sentence in Wray that stated if the imprisonment "displays a voluntary, deliberate and conscious course of conduct, it qualifies as conduct which endangers the emotional well-being of the child." Wray, 640 S.W.2d at 71.

[12] If an extension of the trial court's jurisdiction under section 263.401(b) had been requested and granted, the final hearing could have been held nearer to the time of Appellant's scheduled release. TEX.FAM.CODE ANN. § 263.401(b)(Vernon Supp.2000).

---------

# In re E.S.S., 131 S.W.3d 632 (Tex.App.—Fort Worth 2004)

**Page 632**

131 S.W.3d 632 (Tex.App.—Fort Worth 2004)
In the Interest of E.S.S.
No. 2-03-074-CV.
Court of Appeals of Texas, Second District, Fort Worth.
March 11, 2004.

**Page 633**

[Copyrighted Material Omitted]

**Page 634**

Beth Poulos, Arlington, TX, for Appellant.

Robert Hoover, Fort Worth, TX, Duke Hooten, Special Prosecuting Attorney, Austin, TX, Michael Broome, P.C. and Michael W. Broome, Hurst, TX, for Appellee.

Charla Moore, P.C. and Charla F. Moore, Arlington, TX, Attorney Ad Litem.

PANEL B: DAUPHINOT, HOLMAN, and McCOY, JJ.

## OPINION

DIXON W. HOLMAN, Justice.

Appellant Gary Wayne Stanfield seeks reversal of the trial court's agreed order terminating his parental rights and granting adoption to Gary Wayne Smith. We reverse and remand.

### FACTUAL AND PROCEDURAL BACKGROUND

Appellant and Appellee, parents of E.S.S., were divorced in 1995. In 1996, Appellee married Gary Wayne Smith and E.S.S. has lived with them since that time. Appellant is currently serving a life sentence in the Texas Department of Criminal Justice--Institutional Division (TDCJ-ID)

**Page 635**

for murder. In August 2000, Appellee and Mr. Smith filed a petition for the involuntary termination of Appellant's parental rights in conjunction with a request by Mr. Smith to adopt E.S.S.

On July 30, 2002, the trial court held a trial on the petition for termination of Appellant's parental rights. Prior to the trial's commencement, the parties announced that they had reached an agreement. According to the terms of the agreement, Appellant would voluntarily relinquish his parental rights to E.S.S. in exchange for having his mother and brother named possessory conservators with visitation rights. After Appellee's attorney dictated the settlement agreement and details of the visitation rights on the record, Appellant testified that he was relinquishing his rights to E.S.S. as follows:

THE COURT: Okay. Mr. Stanfield, I want you to understand exactly what we're doing today. I think you know the purpose of this hearing is to determine whether or not your parental rights of this child should be terminated forever.

Now, it's my understanding that you're currently serving a life sentence in the [TDCJ-ID] for murder; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: You understand that even though you're under those circumstances at this time that you still have a right to have a trial in this matter, do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Do you concur and agree that your parental rights to this child should be terminated forever?

THE DEFENDANT: Yes, sir.

THE COURT: All right. And are you doing that freely and voluntarily?

THE DEFENDANT: Yes, sir.

The trial court approved the agreement and ordered termination of Appellant's parental rights. Appellant thereafter did not sign an affidavit for voluntary relinquishment of parental rights.

On February 6, 2003, Appellee filed a motion for entry of an agreed order terminating Appellant's parental rights and granting adoption. Appellee's motion included a proposed agreed order, which not only included the terms of the agreement as stated on the record, but also an order granting adoption and the following findings:

The Court finds by clear and convincing evidence that GARY WAYNE STANFIELD has--

a. engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child; and

b. knowingly engaged in criminal conduct that has resulted in his conviction of an offense and confinement or imprisonment and inability to care for the child for not less than two years from the date the petition was filed.

The Court also finds by clear and convincing evidence that termination of the parent-child relationship between GARY WAYNE STANFIELD and the child the subject of this suit is in the best interest of the child.

In response, Appellant did not sign the proposed agreed order and instead wrote a letter to the trial court seeking to revoke his consent to the agreement.

On February 28, 2003, a hearing was held on Appellee's motion for entry of the agreed order. Appellant claims that he again attempted to revoke his agreement to relinquish his parental rights and repudiate his agreement to the termination. At the conclusion of the hearing, the trial

---

**Page 636**

court overruled Appellant's attempted revocation and signed the proposed agreed order. In five issues, Appellant argues that the trial court erred in signing the agreed order.

**STANDARD OF REVIEW**

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer,* 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982). In a termination case, the State seeks not just to limit parental rights but to end them permanently--to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM. CODE ANN.§ 161.206(b) (Vernon Supp.2004); *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick,* 685 S.W.2d at 20-21; *In re D.T.,* 34 S.W.3d 625, 630 (Tex.App.-Fort Worth 2000, pet. denied) (op. on reh'g).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (Vernon 2002); *Richardson v. Green,* 677 S.W.2d 497, 499 (Tex.1984); *Swate v. Swate,* 72 S.W.3d 763, 766 (Tex.App.-Waco 2002, pet. denied). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by "clear and convincing evidence." TEX. FAM. CODE ANN. §§ 161.001, 161.206(a); *In re G.M.,* 596 S.W.2d 846, 847 (Tex.1980). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *G.M.,* 596 S.W.2d at 847; *D.T.,* 34 S.W.3d at 630. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007.

The higher burden of proof in termination cases alters the appellate standard of legal sufficiency review. *In re J.F.C.,* 96 S.W.3d 256, 265 (Tex.2002). The traditional no-evidence standard does not adequately protect the parent's constitutional interests. *Id.* In reviewing the evidence for legal sufficiency in parental termination cases, we must determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction" that the grounds for termination were proven. *Id.* at 265-66. We must review all the evidence in the light most favorable to the finding and judgment. *Id.* at 266. This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it does not support the finding. *Id.* If we determine that no reasonable factfinder could form a firm belief or conviction that the grounds for termination were proven, then the evidence

---

**Page 637**

is legally insufficient, and we must render judgment for the parent. *Id.*

The higher burden of proof in termination cases also alters the appellate standard of factual sufficiency review. *In re C.H.,* 89 S.W.3d 17, 25 (Tex.2002). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction" that the grounds for termination were proven. *Id.* Our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated one of the conduct provisions of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child. *Id.* at 28. "When reversing on insufficiency grounds, the reviewing court must detail the evidence relevant to the issue of parental termination and clearly state why the evidence is insufficient to support a termination finding by clear and convincing evidence." *Id.* at 18.

Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future;

(3) the emotional and physical danger to the child now and in the future;

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.

*Holley v. Adams,* 544 S.W.2d 367, 371-72 (Tex.1976). These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.,* 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the children. *Id.* On the other hand, the presence of scant evidence relevant to each *Holley* factor will not support such a finding. *Id.*

## DISCUSSION

In Appellant's first issue, he argues that the trial court erred in rendering judgment on the grounds of Appellant's relinquishment without a properly executed affidavit of relinquishment tendered to the court and offered as evidence.[1] The family code provides that the relinquishment of parental rights can be grounds for the termination of the parent-child relationship when the parent has "executed before or after the suit is filed an unrevoked or irrevocable affidavit of relinquishment

---

**Page 638**

of parental rights as provided by this chapter." TEX. FAM.CODE ANN. § 161.001(1)(K). Under section 161.103(a) of the family code, a valid affidavit of voluntary relinquishment must be 1) signed, 2) witnessed by two credible persons, and 3) verified before a person authorized to take oaths. *Id.* § 161.103(a) (Vernon Supp.2004). Appellant points out that there is no statutory provision that an oral relinquishment will suffice to comply with the strict requirements of section 161.103. Further, we find no common law authority allowing acceptance of an oral relinquishment in lieu of a signed affidavit.

Even if an oral statement on the record in open court would sufficiently meet the requirements set forth in 161.103(a), Appellant's oral statements at trial do not encompass the laundry list of information that must be included in an affidavit of voluntary relinquishment as set forth in 161.103(b). Subsection (b) lists several requirements that are not encompassed in Appellant's oral relinquishment. The reporter's record for the trial on the termination of Appellant's parental rights does not contain the following required information:

(1) the address and age of the parent whose parental rights are being relinquished;
(2) the age, and birth date of the child;
(3) the names and addresses of the guardians of the person and estate of the child, if any;
(4) a statement that the affiant is or is not presently obligated by court order to make payments for the support of the child;

(5) a full description and statement of value of all property owned or possessed by the child;

(6) an allegation that termination of the parent-child relationship is in the best interest of the child;

(7)(A) the name and address of the other parent;

(8) a statement that the parent has been informed of parental rights and duties;

(9) a statement that the relinquishment is revocable, that the relinquishment is irrevocable, or that the relinquishment is irrevocable for a stated period of time;

(10) if the relinquishment is revocable, a statement in boldfaced type concerning the right of the parent signing the affidavit to revoke the relinquishment only if the revocation is made before the 11th day after the date the affidavit is executed;

(11) if the relinquishment is revocable, the name and address of a person to whom the revocation is to be delivered.

*See id.* § 161.103. We sustain Appellant's first issue.

In Appellant's second and third issues, he asserts that the trial court erred in granting termination based solely on evidence of the parties' agreement and without evidence or a finding that termination was in the best interest of E.S.S. We construe Appellant's argument to be that the evidence is factually and legally insufficient to support the termination of his parental rights.

The trial court's order includes findings that Appellant's conduct fell within two of the enumerated grounds for involuntary termination under section 161.001 of the family code. First, the court found that Appellant engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child. *See id.* § 161.001(1)(E). Section 161.001(1)(E) requires us to look at the parent's conduct alone, including actions or omissions or failures to act. *See id.; D.T.,* 34 S.W.3d at 634; *In re R.F.,* 115 S.W.3d 804, 810 (Tex.App.-Dallas 2003, no pet.).

---

**Page 639**

"Endanger" under section 161.001(1)(E) means to expose to loss or injury, to jeopardize. *Boyd,* 727 S.W.2d at 533; *D.T.,* 34 S.W.3d at 634. The term means more than a threat of "metaphysical injury," but it is not necessary that the conduct be directed at the child or that the child actually suffer injury. *Boyd,* 727 S.W.2d at 533. Nevertheless, there must be evidence of endangerment to the child's physical or emotional well-being as the direct result of the parent's conduct. *In re J.B.W.,* 99 S.W.3d 218, 226 (Tex.App.-Fort Worth 2003, pet. denied); *In re R.D.,* 955 S.W.2d 364, 367 (Tex.App.-San Antonio 1997, pet. denied). Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious "course of conduct" by the parent is required. *J.B.W.,* 99 S.W.3d at 226; *D.T.,* 34 S.W.3d at 634.

Here, the evidence in support of a finding that Appellant engaged in a course of conduct that endangers the physical or emotional well-being of E.S.S. is a single statement regarding Appellant's prison sentence for murder. Texas cases have considered the involuntary termination of the rights of an imprisoned parent, and have held that mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child. *See Boyd,* 727 S.W.2d at 533-34 (holding imprisonment alone is not conduct endangering a child); *In re C.L.C,* 119 S.W.3d 382, 397 (Tex.App.-Tyler 2003, no pet.); *In re S.D.H.,* 591 S.W.2d 637, 638 (Tex.Civ.App.-Eastland 1979, no writ) (holding imprisonment alone is not conduct endangering a child). Therefore the only evidence before us, Appellant's admission that he is serving a life sentence in prison, cannot support a termination on endangerment grounds under section 161.001(1)(E).

The court's second finding in favor of terminating Appellant's parental rights is based on section 161.001(1)(Q), which requires proof that Appellant:

(Q) knowingly engaged in criminal conduct that has resulted in the parent's:

(i) conviction of an offense; and

(ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition.

TEX. FAM.CODE ANN. § 161.001(1)(Q). Although Appellant admitted that he is currently serving a prison term that will exceed two years, there is no evidence that Appellant is unable to care for E.S.S. Proof that Appellant is unable to care for E.S.S. is an additional requirement not met by showing incarceration alone. *In re B.M.R.,* 84 S.W.3d 814, 818 (Tex.App.-Houston [1st. Dist.] 2002, no pet.); *see In re Caballero,* 53 S.W.3d 391, 395 (Tex.App.-Amarillo 2001, pet. denied). Otherwise, the termination of parental rights could become an additional punishment automatically imposed along with imprisonment for almost any crime. *In re D.R.L.M.,* 84 S.W.3d 281, 294 (Tex.App.-Fort Worth, pet. denied); *D.T.,* 34 S.W.3d at 636; *see also Holick,* 685 S.W.2d at 20-21 (stating we are required to strictly construe the involuntary termination statutes in favor of the parent).

In *In re Caballero,* the Amarillo Court of Appeals construed section 161.001(1)(Q) as requiring a three-step process. 53 S.W.3d at 396. First, the party seeking termination must establish that the parent's knowing criminal conduct resulted in incarceration for more than two years. *Id.* Second, the parent must produce some evidence as to how he would provide or arrange to provide care for the child during that period. *Id.* Finally, the party seeking termination would then have the

---

**Page 640**

burden of persuasion that the arrangement would not satisfy the parent's duty to the child. *Id.*

We conclude that Appellant's statement at trial regarding his prison term is sufficient to establish Appellee's initial burden to prove that Appellant is incarcerated for more than two years. Likewise, Appellant met his burden of production regarding how he would arrange for the care of E.S.S. in that the agreement reached by the parties included naming Appellant's mother and brother possessory conservators with visitation rights. Appellee consequently had the burden of persuasion to establish that this arrangement would not meet Appellant's duty to E.S.S. Because no evidence was presented by Appellee regarding Appellant's plan to care for E.S.S., Appellee has not met her burden of persuasion. *See id.* Consequently, the evidence is insufficient to establish that Appellant's conduct falls within the grounds for involuntary termination enumerated in subsection Q. We also conclude that the scant evidence before us cannot support a finding of best interest. Of the nine previously mentioned *Holley* factors that may be used in determining the best interest of the child, the record before us sheds light on only one factor--whether the acts or omissions of the parent indicate that the existing parent-child relationship is not a proper one. *See Holley,* 544 S.W.2d at 371-72. A single statement on the record regarding Appellant's prison term without weighing any other factors is not sufficient to support a best interest finding by clear and convincing evidence. *See C.H.,* 89 S.W.3d at 27. We sustain Appellant's second and third issues.

In Appellant's fourth issue, he asserts that the trial court erred in entering judgment because Appellant revoked his oral agreement to relinquish his parental rights prior to the entry of the order. Appellant's fifth and final issue takes the position that the trial court did not have authority to enter an agreed order based on grounds which were different from the parties' Rule 11 agreement.[2] Because we conclude that the agreement is unenforceable, we do not address whether the Appellant properly revoked his agreement or whether the agreed order is in compliance with the parties' Rule 11 agreement.

While people are generally free to contract, contracts which violate public policy as captured in statutory mandate are unenforceable. *Williams v. Patton,* 821 S.W.2d 141, 147-48 (Tex.1991) (orig. proceeding) (Doggett, J., concurring). Furthermore, a Rule 11 agreement is nothing more than a contract that satisfies the terms of Rule 11 of the Texas Rules of Civil Procedure. *In re T.M.,* 33 S.W.3d 341, 347 (Tex.App.-Amarillo 2000, no pet.). It too is regulated by laws pertaining to contracts in general and is therefore unenforceable if it violates public policy. *See Padilla v. LaFrance,* 907 S.W.2d 454, 460-61 (Tex.1995); *Alcantar v. Okla. Nat'l Bank,* 47 S.W.3d 815, 819 (Tex.App.-Fort Worth 2001, no pet.); *T.M.,* 33 S.W.3d at 347. The family code expressly states that:

The public policy of this state is to:

(1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child;

(2) provide a safe, stable, and nonviolent environment for the child; and

(3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage.

---

**Page 641**

TEX. FAM.CODE ANN. § 153.001(a) (Vernon 2002).

Here, the Rule 11 agreement does not comply with the required findings for termination under the family code. The relevant evidence on the record consists only of Appellant's statement that he is in prison for murder and his statement that he would relinquish his parental rights in exchange for naming his mother and brother possessory conservators. This alone does not establish by clear and convincing evidence that termination is in the best interest of E.S.S. or that any of the statutory grounds for termination in the family code were met. Given the clear public policy encompassed within sections 153.001 and 161.001 of the family code, we conclude that the agreement in this case is unenforceable. *See T.M.,* 33 S.W.3d at 347. We sustain Appellant's fifth issue.

**CONCLUSION**

From the record, it is apparent that the trial court did not proceed with a trial on the merits of Appellee's petition for involuntary termination of Appellant's parental rights in reliance on the settlement agreement reached between the parties. Because we find the agreement unenforceable, we reverse the judgment of the trial court and remand for a new trial on the merits. *See* TEX.R.APP. P. 43.3(b).

---------

Notes:

[1] Although the trial court's judgment at trial was clearly based on Appellant's oral relinquishment of his parental rights, we note that the resulting agreed order does not include a finding that Appellant relinquished his parental rights nor does it indicate that the decision was based on Appellant's oral relinquishment.

[2] *See* TEX.R. CIV. P. 11.

---------

In re J.T.G., 121 S.W.3d 117 (Tex.App.—Fort Worth 2003)

In re J.T.G., 121 S.W.3d 117 (Tex.App.—Fort Worth 2003)Court of Appeals of Texas, Second District, Fort WorthOctober 16, 2003121 S.W.3d 117

No negative treatment in subsequent cases

121 S.W.3d 117

121 S.W.3d 117 (Tex.App.—Fort Worth 2003)

In the interest of J.T.G., H.N.M., M.D.M., B.M.L., Children.

No. 2-03-039-CV.

Court of Appeals of Texas, Second District, Fort Worth

October 16, 2003.

121 S.W.3d 118

[Copyrighted Material Omitted]

121 S.W.3d 119

[Copyrighted Material Omitted]

121 S.W.3d 120

[Copyrighted Material Omitted]

121 S.W.3d 121

Cindy Stormer, Gainesville, for Appellant (P.G.).

Christopher M. Fostel, Decatur, for Appellant (S.L.).

C. Ed Davis, TDPRS General Counsel, Phoebe Knauer, Deputy Gen. Counsel, Cathy Morris, Chief Atty. for Field Operations, Sarah R. Guidry, Supervising Atty. for Field Operations, Special Litigation Unit, Duke Hooten, Appellate Atty., Office of Gen. Counsel Special Litigation Unit, Austin, for Appellee.

PANEL F: CAYCE, C.J.; GARDNER and WALKER, JJ.

OPINION

SUE WALKER, Justice.

I. INTRODUCTION

P.G. appeals the trial court's judgment terminating her parental rights to four of her children. In four points, P.G. complains that the evidence is legally and factually insufficient to support any of the four statutory grounds for termination pleaded by the Texas Department of Protective and Regulatory Services ("TDPRS"). She also contends that the trial court erred by refusing to submit her requested jury instructions and questions and by denying her request for a disinterested expert witness.

S.L. is the father of P.G.'s youngest child, B.M.L. Based on the jury's verdict, the trial court rendered a judgment terminating S.L.'s parental rights to B.M.L. In three points, S.L. contends that the evidence is legally insufficient to support any of the four statutory grounds for termination pleaded by TDPRS. He also contends that the trial court erred by denying him a sufficient number of peremptory challenges and by admitting evidence of his prior bad acts. We will affirm.

II. FACTUAL AND PROCEDURAL BACKGROUND

P.G. is the mother of J.T.G., born in April 1995, H.N.M., born in October 1997, M.D.M., born in July 1999, and B.M.L., born in July 2001 (the "children"). The alleged father of J.T.G. was only briefly involved with P.G. and never had any contact with P.G. or J.T.G. during P.G.'s pregnancy or after J.T.G.'s birth. Eleven months after J.T.G. was born, P.G. became involved with the father of H.N.M. and M.D.M. In 1998, the couple was common-law married. In 1999, P.G. ended her four-year relationship with the father of H.N.M. and M.D.M. [1] and began a relationship with S.L. immediately thereafter. After two weeks, P.G. and S.L. moved in together. As previously mentioned, S.L. is

the father of B.M.L.[2] and was still living with P.G. at the time of trial. P.G. and S.L. are the parents of another child who was not a subject of this suit.

TDPRS first became involved with P.G. and her children in October 1997 following the birth of H.N.M. TDPRS received a referral after H.N.M. was born with hydrocephalus--a build-up of fluid on the brain and agenesis of the corpus callosum. Concerns existed due to the child's fragile medical condition, her special needs, and allegations of physical abuse stemming from P.G.'s drug use during her pregnancy. P.G. admitted at the time of the investigation and at trial that she used various drugs during her pregnancy with H.N.M. However, TDPRS found no evidence of drug use by P.G. or H.N.M.'s father during the time of the investigation. Both parents were involved in an early childhood intervention program, and H.N.M. was attending all scheduled medical appointments. Following its investigation, TDPRS decided not to remove the children from P.G.'s care.

In July 2001, TDPRS again became involved with P.G. and with S.L. after P.G. attempted to commit suicide by overdosing on prescription and nonprescription drugs. P.G. was approximately thirty-three weeks pregnant with B.M.L., and B.M.L. was born the day after P.G.'s suicide attempt. A drug screen conducted on P.G. revealed positive results for benzodiazepines, amphetamines, and opiates. An investigation by TDPRS revealed that the suicide attempt stemmed from an argument between P.G. and S.L., which resulted in S.L. leaving P.G. for a brief period of time. As a result of P.G.'s suicide attempt, prior drug abuse of both P.G. and S.L., and "high risk" to the children, TDPRS decided to open a case for the provision of in-home safety services focusing on family preservation. TDPRS implemented a safety plan that required S.L. and P.G.'s sister to supervise all contact between P.G. and her children. P.G. was also required to complete a mental health evaluation and receive counseling. Sue McAfee ("McAfee"), a family preservation caseworker with TDPRS, specifically instructed P.G. and S.L. to abstain from any drug or alcohol use. Prior to the completion of a family preservation plan, TDPRS received calls concerning alleged drinking and drug use by P.G. and S.L., as well as an alleged fight between the couple at a relative's home. However, when questioned by McAfee, the couple denied the allegations.

In August 2001, only twelve days after the family preservation case was opened, an incident of family violence occurred between P.G. and S.L. During an altercation regarding B.M.L., P.G. stabbed S.L. in the leg with a knife. At some point during the incident, B.M.L.'s head was bumped on a door frame. All four children were present in the home at the time of the incident. As a result of continued family violence and past drug abuse, all four children were immediately removed from P.G. and S.L.'s care on or about August 6, 2001. In order for P.G. and S.L. to regain custody of their children, TDPRS created a series of four family service plans. As part of their service plans, P.G. and S.L. were to obtain chemical dependency assessments and psychological evaluations, to submit to and test negative in random drug

screens, and to attend parenting classes and counseling sessions for anger management, drug addiction, and domestic violence. Both parents complied with the service plans by completing parenting classes and obtaining

121 S.W.3d 123

chemical dependency assessments. However, during the first and second service plans, neither P.G. nor S.L. obtained a psychological evaluation or attended counseling sessions for anger management, drug addiction, and domestic violence. Both P.G. and S.L. likewise failed to complete counseling sessions for anger management, drug addiction, and domestic violence as required by the third service plan. Over the course of the four service plans, P.G. tested positive for drug use, and both P.G. and S.L. failed to submit to drug testing on repeated occasions. P.G. and S.L. completed inpatient treatment for drug abuse, yet refused to participate in a required outpatient relapse prevention program. The couple also never obtained stable living arrangements.

Both parents sporadically attended visitation with the four children and typically never called when they were going to miss scheduled visits. P.G. missed nineteen of sixty-one scheduled visits with her children, including eight of the last ten. S.L. missed seventeen of sixty-one scheduled visits with the children, including seven of the last ten. Initially, as a result of P.G. and S.L.'s failure to attend visits, J.T.G. appeared sad and disappointed, and H.N.M. appeared angry and often displayed her anger. Yet over time, both children appeared indifferent when P.G. and S.L. would miss visitation.

On November 27, 2002, TDPRS filed a second amended petition to terminate P.G.'s parental rights to all four children, and S.L.'s parental rights to B.M.L. According to TDPRS, the decision to terminate P.G. and S.L.'s parental rights was based upon noncompliance with TDPRS's service plans, concerns about P.G. and S.L.'s continued drug and alcohol abuse, and TDPRS's belief that P.G. and S.L. were unable to properly care for the children and provide a safe and stable environment for them. On January 24, 2003, after several days of testimony at trial, a jury determined that P.G. and S.L.'s parental rights should be terminated, and the trial court entered a termination order on February 18, 2003. This appeal followed.

III. BURDEN OF PROOF IN TERMINATION PROCEEDINGS

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982); accord Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985). The United States Supreme Court, in discussing the constitutional stature of parental rights, states, "[T]he interest of parents in the care, custody, and control of their children--is perhaps the oldest

of the fundamental liberty interests recognized by this Court." Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000). Nonetheless, while parental rights are of constitutional magnitude, they are not absolute. In re C.H., 89 S.W.3d 17, 26 (Tex.2002). Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right. Id.

In proceedings to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, TDPRS must establish one or more of the acts or omissions enumerated under subsection (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001 (Vernon 2002); Swate v. Swate, 72 S.W.3d 763, 766 (Tex.App.-Waco 2002, pet. denied). Both elements must be established; termination may not be based

121 S.W.3d 124

solely on the best interest of the child as determined by the trier of fact. Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987). Because of the elevated status of parental rights, the quantum of proof required in a termination proceeding is elevated from the preponderance of the evidence to clear and convincing evidence. Santosky, 455 U.S. at 746, 102 S.Ct. at 1391; see also TEX. FAM.CODE ANN. § 161.001.

Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007; In re J.F.C., 96 S.W.3d 256, 264 (Tex.2002); C.H., 89 S.W.3d at 25. This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard in criminal proceedings. State v. Addington, 588 S.W.2d 569, 570 (Tex.1979); In re D.T., 34 S.W.3d 625, 630 (Tex.App.-Fort Worth 2001, pet. denied) (op. on reh'g). While the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. Addington, 588 S.W.2d at 570. Termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent. Holick, 685 S.W.2d at 20-21; In re A.V., 849 S.W.2d 393, 400 (Tex.App.-Fort Worth 1993, no writ).

IV. P.G.'S APPEAL

A. Legal and Factual Sufficiency of the Evidence

In her first two points, P.G. contends that the evidence is legally and factually insufficient to support the jury's findings that she (1) knowingly placed or knowingly allowed the children to remain in

conditions or surroundings that endangered their emotional or physical well-being; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their emotional and physical well-being; (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the children's return; and (4) used a controlled substance in a manner that endangered the health and safety of the children, and failed to complete a court-ordered substance abuse treatment program, or after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance. See TEX. FAM.CODE ANN. § 161.001(1)(D), (E), (O), (P).

### 1. STANDARD OF REVIEW

The Texas Supreme Court recently clarified the appellate standards of review to be applied to legal and factual sufficiency of the evidence challenges in light of the clear and convincing evidence burden of proof in termination proceedings. J.F.C., 96 S.W.3d at 264-68 (discussing legal sufficiency review); C.H., 89 S.W.3d at 25 (discussing factual sufficiency review). Because termination findings must be based upon clear and convincing evidence, not simply a preponderance of the evidence, the supreme court has held that the traditional legal and factual standards of review are inadequate. J.F.C., 96 S.W.3d at 265; C.H., 89 S.W.3d at 25. Instead, both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof. J.F.C., 96 S.W.3d at 265-66; C.H., 89 S.W.3d at 25. With respect to a legal sufficiency point, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable

121 S.W.3d 125

trier of fact could have formed a firm belief or conviction that its finding was true." J.F.C., 96 S.W.3d at 266. In determining a factual sufficiency point, we must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing and then determine whether, based on the entire record, a fact finder could reasonably form a firm conviction or belief that the parent violated one of the provisions of section 161.001 and that the termination of his or her parental rights would be in the child's best interest. TEX. FAM.CODE ANN. § 161.001; C.H., 89 S.W.3d at 25.

### 2. Evidence Regarding Endangering Environment and Course of Conduct

We first review the evidence supporting the trial court's findings that P.G. knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that she engaged in conduct or knowingly placed the children with persons

who engaged in conduct that endangered the children's physical or emotional well-being. See TEX. FAM.CODE ANN. § 161.001(1)(D), (E).

Endangerment means to expose to loss or injury, to jeopardize. Boyd, 727 S.W.2d at 533; see also In re M.C., 917 S.W.2d 268, 269 (Tex.1996). Under subsection (D), it is necessary to examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. D.T., 34 S.W.3d at 632. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. In re W.S., 899 S.W.2d 772, 776 (Tex.App.-Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. See id. at 776-77; Ziegler v. Tarrant County Child Welfare Unit, 680 S.W.2d 674, 678 (Tex.App.-Fort Worth 1984, writ ref'd n.r.e.). Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being. See In re S.D., 980 S.W.2d 758, 763 (Tex.App.-San Antonio 1998, pet. denied).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. In re R.D., 955 S.W.2d 364, 368 (Tex.App.-San Antonio 1997, pet. denied); Dupree v. Tex. Dep't of Protective & Regulatory Servs., 907 S.W.2d 81, 83-84 (Tex.App.-Dallas 1995, no writ). Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. TEX. FAM.CODE ANN. § 161.001(1)(E); D.T., 34 S.W.3d at 634; In re K.M.M., 993 S.W.2d 225, 228 (Tex.App.-Eastland 1999, no pet.).

However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. Boyd, 727 S.W.2d at 533. To determine whether termination is necessary, courts look to parental conduct both before and after the child's birth. In re D.M., 58 S.W.3d 801, 812 (Tex.App.-Fort Worth 2001, no pet.). A mother's use of drugs during pregnancy may amount to conduct that endangers the physical and emotional well-being of the child. In re K.M.B., 91 S.W.3d 18, 25 (Tex.App.-Fort Worth 2002, no pet.). Drug addiction and its effect on a parent's life and ability to parent may establish an endangering course of conduct

121 S.W.3d 126

as well. Dupree, 907 S.W.2d at 84. A parent's attempt to commit suicide may also contribute to a finding that the parent engaged in a course of conduct that endangered a child's physical or emotional well-being. See In re A.M.C., 2 S.W.3d 707, 716 (Tex.App.-Waco 1999, no pet.).

Because the evidence concerning these two statutory grounds for termination is interrelated, we consolidate our examination of it. S.D., 980 S.W.2d at 762; In re B.R., 822 S.W.2d 103, 106 (Tex.App.-Tyler 1991, writ denied) (recognizing the link between a parent's conduct and a child's conditions and surroundings). The record contains the following evidence of subsection (D) environmental endangerment and subsection (E) course of conduct endangerment of the physical or emotional well-being of the children.

The record shows a pattern of continued violence and abuse involving P.G. P.G. testified that the father of H.N.M. and M.D.M. often abused her mentally, physically, and emotionally. She admitted that she had to call the police to intervene in some of the fights and that she had sought refuge from the abuse at a women's shelter on at least one occasion.

Evidence was also adduced pertaining to domestic violence between P.G. and S.L. At trial, P.G. characterized the altercations between herself and S.L. as "regular struggling," yet after the stabbing incident, she told McAfee that she and S.L. had physically fought and that she had been hit and knocked down by S.L. Both P.G. and S.L. admitted that at some time during the course of the stabbing altercation, B.M.L.'s head was bumped on a door frame.

The record also reflects a violent altercation between P.G. and her neighbor, Chris Will ("Will"). Russell Driver ("Driver"), a Gainesville police officer, testified that one night, shortly after the children were removed by TDPRS, he responded to a call concerning a stabbing incident involving P.G. and Will. Driver testified that at the scene P.G. had admitted stabbing Will with the knife, but alleged that Will had first assaulted her. At trial, P.G. testified that she did not recall getting into an altercation with Will. Although he had been drinking at the time of the altercation, Will testified that to the best of his recollection, P.G. had stabbed him. He further testified that he told officers he believed that the altercation occurred because he and P.G. had a "relation," and he had told S.L. about it earlier that day.

The evidence demonstrates that P.G. continuously abused drugs, even during her pregnancies. At trial, P.G. testified that she had experimented over the years with cocaine, methamphetamines, marijuana, and acid. She also admitted to drug use during her pregnancy with H.N.M., although she maintained that such drug use ceased when she realized she was pregnant. She indicated that the father of H.N.M. had introduced her to drugs and that he had used several illegal drugs during her pregnancy. Ann Barts ("Barts"), an investigative caseworker for TDPRS, testified that P.G. had told her on a prior occasion that she felt guilty that H.N.M. was born hydrocephalic due to P.G.'s cocaine use during her pregnancy. However, P.G. maintained at trial that H.N.M.'s medical problems were not related to her drug use during pregnancy.

After her failed suicide attempt and the birth of B.M.L., P.G. tested positive for several types of drugs, including amphetamines. At trial, P.G. admitted that she had attempted to commit suicide during her pregnancy with B.M.L. When asked what drugs she had taken in her attempt to overdose, she stated, "Everything I could get my hands on." The evidence demonstrates that S.L. was also abusing

121 S.W.3d 127

marijuana, crank, and alcohol on a regular basis prior to removal of the children. P.G.'s drug abuse continued even after the children were removed. The record indicates numerous occasions on which P.G. tested positive for drugs or failed to take a requested drug screen as required by TDPRS's service plans. Additionally, even during the pregnancy of her fifth child, [3] P.G. tested positive for methamphetamines.

The record suggests that P.G. often lacked emotional stability. P.G. admitted at trial that she suffered from depression and had been diagnosed as mildly bipolar. While pregnant with B.M.L., P.G. attempted to take her own life by overdosing on drugs. According to Barts, after her suicide attempt, P.G. indicated that "she was planning on taking herself and her baby out of this world." She also told Barts that she had thought about suicide all of her life. On at least one occasion, P.G. threatened suicide again after her children were removed from her care.

P.G. contends that none of the incidents of bad conduct occurred in the children's presence or in a manner that could have negatively affected the children. However, the record reflects that the children were present during some incidents of violence and abuse. At trial, P.G. acknowledged that J.T.G. had witnessed several instances of emotional abuse by H.N.M. and M.D.M.'s father. Additionally, J.T.G. told his therapist, Shelly Butler ("Butler"), that he had witnessed domestic violence between P.G. and S.L. Butler testified that J.T.G. was heavily affected by the violence he witnessed at home, and, as a result, seemed resentful towards his mother. Patricia Doughty, Court Appointed Special Advocate ("CASA") and guardian ad litem for the children, also testified that the children had witnessed violent episodes between P.G. and her significant others in the home. The evidence also indicates that P.G.'s drug use during pregnancy could have negatively affected the children. According to P.G.'s obstetrician, Dr. Thomas Currier, the use of amphetamines during pregnancy can cause long-term side effects such as learning defects, failure to thrive, and damage to the neural system.

P.G. also contends that poverty is not sufficient to support the termination of her parental rights. We agree that poverty is not sufficient to establish an endangering environment. Doyle v. Tex. Dept. of Protective & Regulatory Servs., 16 S.W.3d 390, 398 (Tex.App.-El Paso 2000, pet. denied). In this case, however, P.G.'s poverty is not a seminal aspect of the jury's endangerment findings. Other evidence, outlined above, supports these findings. Therefore, P.G.'s argument based on poverty fails.

We have carefully reviewed the entire record. Looking at all the evidence in the light most favorable to the jury's finding, giving due consideration to evidence that the fact finder could reasonably have found to be clear and convincing, we hold that a reasonable trier of fact could have formed a firm belief or conviction that P.G. knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and that she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being.

P.G. challenges the legal and factual sufficiency of all four of the statutory grounds

121 S.W.3d 128

for termination pleaded by TDPRS. However, when multiple grounds for termination are sought and the trial court submits the issue using a broad-form question, we must uphold the jury's findings if any of the grounds for termination support the jury's finding; only one finding under section 161.001(1) is necessary to support a judgment of termination. TEX. FAM.CODE ANN. § 161.001(1); D.M., 58 S.W.3d at 813; In re S.F., 32 S.W.3d 318, 320 (Tex.App.-San Antonio 2000, no pet.); see also Tex. Dep't of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex.1990) (op. on reh'g). Accordingly, because we conclude there is both legally and factually sufficient evidence to support the jury's findings under family code section 161.001, subsections D and E, we need not address P.G.'s remaining points with respect to the jury's findings under section 161.001, subsections 0 and P. TEX. FAM.CODE ANN. § 161.001(1)(D), (E), (O), (P); see TEX.R.APP. P. 47.1. We overrule P.G.'s first and second points.

B. Jury Charge

In her third point, P.G. complains that the trial court erred by refusing to submit her requested jury instructions and questions. At trial, the court submitted a jury instruction that set forth the statutory grounds alleged against P.G. in the disjunctive, followed by a broad-form jury question regarding whether the parent-child relationship between P.G. and each child should be terminated. P.G. made a timely objection to the jury charge and requested a supplemental instruction and question. P.G.'s requested charge included an instruction regarding the constitutional magnitude of parental rights and a question that required the jury to find that P.G. was unfit as a parent [4] before considering the best interest of the children. The trial court overruled her objection and denied her requested jury charge.

1. Standard of Review

The standard of review for a jury charge is abuse of discretion. E.B., 802 S.W.2d at 649. To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable. See Carpenter v. Cimarron Hydrocarbons Corp., 98 S.W.3d 682, 687 (Tex.2002); Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex.1985), cert. denied, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. Downer, 701 S.W.2d at 241-42.

Pursuant to the Texas Rules of Civil Procedure, a trial court is required to submit "such instructions and definitions as shall be proper to enable the jury to

121 S.W.3d 129

render a verdict." TEX.R. CIV. P. 277. Trial courts are afforded considerable discretion in deciding what instructions are necessary and proper in submitting issues to the jury. State Farm Lloyds v. Nicolau, 951 S.W.2d 444, 451 (Tex.1997). For an instruction to be proper, it must (1) assist the jury, (2) accurately state the law, and (3) find support in the pleadings and the evidence. Tex. Workers' Comp. Ins. Fund v. Mandlbauer, 34 S.W.3d 909, 912 (Tex.2000); see TEX.R. CIV. P. 289. Error in a jury charge is reversible only if it probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case on appeal. In re D.I.B., 988 S.W.2d 753, 756 & n. 10 (Tex.1999); Tex. Dep't of Human Servs. v. White, 817 S.W.2d 62, 63 (Tex.1991); see TEX.R.APP. P. 44.1(a)

2. Error Analysis

Relying on Troxel v. Granville, P.G. contends that in a parental termination case a jury must consider the rights of the parents before any other consideration. 530 U.S. at 65, 120 S.Ct. at 2060. She maintains that a jury charge that places the interest of the child over the fundamental rights of the parent is erroneous.

The charge in this case, however, did not subject the interests of the parent to the interests of the children or vice versa. The charge simply asked whether the pleaded termination grounds were established by clear and convincing evidence and whether termination was in the best interest of the children. It is well settled law that a jury charge that tracks the statutory language and then asks the controlling question does not amount to an abuse of discretion. E.B., 802 S.W.2d at 649. In parental termination cases, the controlling question is whether the relationship between the parent and each child should be terminated. Id. The charge as submitted to the jury at trial tracked the statutory language, asked the controlling question, and assisted the jury in reaching its verdict. Moreover, a trier

of fact is "not required to find that the parent is 'unfit' in order to find that termination is in the best interest of the child." In re S.H.A., 728 S.W.2d 73, 91 (Tex.App.-Dallas 1987, writ ref'd n.r.e.). Consequently, we hold that the trial court did not abuse its discretion by refusing to submit P.G.'s requested jury charge. We cannot say that the trial court acted without any regard to guiding principles in deciding what issues were necessary and proper for submission to the jury. We overrule P.G.'s third point.

C. Denial of Request for a Disinterested Expert Witness

In her fourth point, P.G. contends that the trial court committed reversible error by denying her request for a disinterested expert witness. On May 1, 2002, the trial court set the final adversary hearing regarding termination of P.G.'s parental rights for January 13, 2003, and appointed a guardian ad litem for P.G. On January 9, 2003, P.G. filed an "Ex Parte Motion to Provide Funds for Forensic Expert," which was denied by the trial court. P.G. did not file a motion for continuance, nor did she announce to the trial court that she was not ready to proceed because of the lack of a forensic expert to assist in her defense.

She asserts that the trial court's refusal to provide funds to enable her to hire a forensic expert to assist in her defense constitutes a violation of due process. P.G. maintains that the services of a forensic expert were necessary for meaningful cross-examination of TDPRS's expert witness, to verify the results of the TDPRS's drug screens, and to explain that the results of her drug screens were positive due to prescription medication. She asserts

121 S.W.3d 130

that parental termination cases are like criminal cases due to the constitutional magnitude of the rights at issue, and therefore, she contends that due process required the trial court to provide funds for expert assistance.

P.G. refers this court to holdings from three cases in support of her contention that an indigent defendant is entitled to an expert in order to prepare and present a defense. See Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); Terrell v. State, 521 S.W.2d 618 (Tex.Crim.App.1975); Detmering v. State, 481 S.W.2d 863 (Tex.Crim.App.1972). However, all three cases address issues of appointment of experts in the criminal context. See Ake, 470 U.S. at 83, 105 S.Ct. at 1096; Terrell, 521 S.W.2d at 619; Detmering, 481 S.W.2d at 864. P.G. does not refer to any cases to support her contention that due process requires trial courts to provide expert assistance in parental termination cases, and we have located none. Accordingly, we decline to extend the holdings in Ake, Terrell, and Detmering to parental termination cases.

Moreover, we are unpersuaded that the trial court erred by denying P.G.'s request for expert assistance. P.G.'s request was made only one-and-a-half working days before trial, and upon denial of expert assistance, P.G. did not request a continuance to remedy any prejudice she might have suffered. P.G. asserts that she needed expert assistance to explain the medications she had been prescribed, why her drug screens showed positive for certain drugs, and how the positive results were derivative of the prescriptions she was taking. The record reflects that over the course of the service plans, P.G. tested positive for cocaine, opiates, benzodiazepine, and methamphetamines. Dr. Currier, P.G.'s obstetrician and a witness for TDPRS, testified that benzodiazepine was a category of drugs, which included Xanax, a depression medication he had prescribed for P.G. He also testified that Lortab, a pain medication that he had prescribed for her on one occasion, would cause a positive result for opiates. He noted that "speed" would cause a positive result for amphetamines and indicated that he did not know any doctor who would prescribe amphetamines. At trial, P.G. testified about several forms of medication that she had taken over the course of TDPRS's involvement and indicated why each medication was prescribed. In reviewing the record, it appears that the evidence that P.G. contends she was deprived of adducing was in fact admitted through the testimony of P.G. and her obstetrician. We overrule P.G.'s fourth point.

## V. S.L.'S APPEAL

### A. Legal Sufficiency of the Evidence

In his first point, S.L. contends that the evidence is legally insufficient to support the jury's findings that he (1) knowingly placed or knowingly allowed B.M.L. to remain in conditions or surroundings that endangered her emotional or physical well-being; (2) engaged in conduct or knowingly placed B.M.L. with persons who engaged in conduct that endangered her emotional and physical well-being; (3) failed to comply with the provisions of a court order that specifically established the actions necessary for B.M.L.'s return; and (4) used a controlled substance in a manner that endangered the health and safety of B.M.L., and failed to complete a court-ordered substance abuse treatment program, or after completion of a court-ordered substance abuse treatment program, continued to abuse a

121 S.W.3d 131

controlled substance. See TEX. FAM.CODE ANN. § 161.001(1)(D), (E), (O), (P).

As with P.G., the evidence supporting the jury's finding of subsection (D) endangerment is intertwined and overlaps with the evidence supporting the jury's subsection (E) endangerment finding.

Thus, we consolidate our review of the evidence supporting these findings and incorporate evidence discussed above in P.G.'s sufficiency review.

As previously detailed, the record indicates a history of domestic violence involving S.L., including the incident where B.M.L.'s head was bumped on the door frame. During the incident, S.L. admitted to becoming angry, grabbing P.G. by the wrists, and struggling for control of the knife. Additionally, Jane Zygiel, a chemical dependency counselor for S.L. and P.G., testified that P.G. told her that she had suffered a history of physical abuse from S.L.

The record also indicates an extensive history of drug and alcohol addiction and abuse by S.L. At trial, S.L. admitted that he was a drug addict and an alcoholic. On the night of the stabbing altercation, S.L. admitted to drinking prior to the incident. A licensed psychologist, Dr. Chris Haberstroh, testified that S.L. told him that he was abusing marijuana, crank, and alcohol on a regular basis prior to removal of the children. He testified that S.L. admitted that he continued to drink heavily and abuse drugs, even after TDPRS became involved in the case. S.L. also failed to take several drug screens even though they were required for reunification with B.M.L. The jury could have reasonably inferred that S.L.'s failure to complete the scheduled drug screens indicated he was avoiding testing because he was using drugs. See D.M., 58 S.W.3d at 813.

The evidence also demonstrated that S.L. had a history of criminal conduct. In 1998, S.L. was arrested and placed on deferred adjudication for marijuana possession in Victoria, Texas. After violating the terms of his probation, S.L. was convicted of the offense and sentenced to 180 days in jail. After moving to Gainesville, Texas, S.L. was arrested and convicted for driving with a suspended license. His probation was later revoked on the driving with a suspended license charge, and he was sentenced to three days in jail. While P.G. was pregnant with B.M.L., S.L. was arrested and convicted of a second possession of marijuana charge. He was later convicted a second time for driving with a suspended license. As a result, his probation was revoked and he was sentenced to thirty days in jail with credit given for fifteen days of jail time served before the revocation hearing.

Viewing the evidence in the light most favorable to the jury's finding, we hold that a reasonable trier of fact could have formed a firm belief or conviction that S.L. knowingly placed or knowingly allowed B.M.L. to remain in conditions or surroundings that endangered her physical or emotional well-being and that he engaged in conduct or knowingly placed B.M.L. with persons who engaged in conduct that endangered her physical or emotional well-being. As discussed above, we need not address S.L.'s remaining points with respect to the jury's finding's under section 161.001, subsections O or P. TEX. FAM.CODE ANN. § 161.001(1)(O), (P); see TEX.R.APP. P. 47.1. We overrule S.L.'s first point.

B. Peremptory Challenges

In his second point, S.L. contends that the trial court erred by denying him a sufficient number of peremptory challenges. He asserts that the three fathers of P.G.'s children who were involved in the suit were antagonistic to each other because each father was a separate party

121 S.W.3d 132

who made a separate presentation in voir dire. Thus, he contends each father was entitled to six peremptory challenges instead of six challenges total.

Whether antagonism exists between parties is a question of law for the trial court. Garcia v. Cent. Power & Light Co., 704 S.W.2d 734, 736 (Tex.1986). We review all questions of law de novo. See Garner v. Long, 49 S.W.3d 920, 922 (Tex.App.-Fort Worth 2001, pet. denied). As a general rule, each party to a civil case in district court is entitled to six peremptory challenges. TEX.R. CIV. P. 233. In multiparty litigation, the trial judge has a duty to determine "whether any of the litigants aligned on the same side of the docket are antagonistic with respect to any issue to be submitted to the jury, before the exercise of peremptory challenges." Id. In determining whether antagonism exists, the trial court must consider the pleadings, information disclosed by pretrial discovery, information and representations made during voir dire, and any information brought to the attention of the trial court before the parties exercise their peremptory strikes. See Garcia, 704 S.W.2d at 737. Antagonism must exist regarding an issue of fact between the parties on the same side of the docket, rather than because of differing conflicts with the other side of the docket. Patterson Dental Co. v. Dunn, 592 S.W.2d 914, 918 (Tex.1979). If the trial court errs in the allocation of peremptory challenges, reversal is required if the complaining party demonstrates either that the trial was materially unfair or that the trial was hotly contested and the evidence sharply conflicting. See id. at 920-21.

In reviewing the record, we find no conflict between the three fathers as to any issue of fact that was submitted to the jury. The jury was only asked to determine whether based on the evidence the parental rights of each father should be terminated with respect to that father's child or children. Each father was only antagonistic with respect to TDPRS. Accordingly, we hold that the trial court did not err in denying each father six peremptory challenges because no antagonism existed between the fathers. Accord Am. Cyanamid Co. v. Frankson, 732 S.W.2d 648, 652 (Tex.App.-Corpus Christi 1987, writ ref'd n.r.e.). We overrule S.L.'s second point.

C. Introduction of Extraneous Acts and Character Evidence

In his third point, S.L. complains that the trial court erred by admitting evidence of his prior bad acts. Over S.L.'s objection, the trial court allowed into evidence a document placing S.L. on deferred adjudication for possession of marijuana, a judgment convicting S.L. of a second possession of marijuana charge, an order revoking S.L.'s probation based upon a conviction for driving while his license was suspended, and a judgment convicting S.L. a second time for driving with a suspended license. [5] S.L. contends that the aforementioned evidence was inadmissible based on rule 404(b) of the Texas Rules of Evidence. TEX.R. EVID. 404(b). He also contends that the evidence was inadmissible for impeachment purposes under rule 609(a) because he never denied that any of the offenses occurred. TEX.R. EVID. 609(a). He maintains that the evidence was introduced solely to prejudice the jury.

1. Standard of Review

121 S.W.3d 133

A trial court's rulings in admitting or excluding evidence are reviewable under an abuse of discretion standard. Nat'l Liab. & Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527 (Tex.2000). An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling. Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex.1998).

2. Parental Conduct

Termination of parental rights based upon subsection (D) and/or (E) focuses on the conduct of the parent. See Avery v. State, 963 S.W.2d 550, 553 (Tex.App.-Houston [1st Dist.] 1997, no writ). Evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child is relevant to the issue of whether a parent engaged in a course of conduct that endangered the child's well-being. See S.F., 32 S.W.3d at 322.

The evidence regarding S.L.'s prior criminal behavior, convictions, and imprisonment was not offered to prove conduct in conformity or to impeach his credibility as a witness. See TEX.R. EVID. 404(b), 609(a). Instead, it was relevant and probative to whether he engaged in a course of conduct that endangered B.M.L. Accordingly, we hold that the trial court did not abuse its discretion by admitting the evidence. We overrule S.L.'s third point.

VI. CONCLUSION

Having overruled each of P.G.'s points and each of S.L.'s points, we affirm the trial court's judgment.

---------

Notes:

[1] The trial court terminated the parental rights of the alleged father of J.T.G. and the father of H.N.M. and M.D.M. However, neither is a party to this appeal.

[2] The father of H.N.M. and M.D.M. was the presumed father of B.M.L. due to his common-law marriage with P.G. However, he voluntarily relinquished his rights to B.M.L. Subsequently, S.L. acknowledged his paternity as to B.M.L.

[3] The fifth child was removed from P.G.'s care after his birth and is not a subject of this suit.

[4] P.G.'s requested charge is as follows:

It is cardinal that the custody, care, and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the State can neither supply nor hinder. The State's interest in protecting the children does not outweigh a fit parent's interest in the care, custody, and control of their children. The State should not impose its judgment over the judgment of a parent who is found to be fit. So long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children. [citations omitted]

Before you may terminated [sic] the rights of any parent, you must find that each and every parent before you today is in all things an unfit parent.

[Question:] We find that [parent] is an unfit parent as to the child [child's name]?

[5] S.L. also complains that the trial court erred in admitting a document into evidence that adjudicated his guilt for the first possession of marijuana charge. However, at trial, the judge ruled this document

inadmissible based on an objection that it was repetitious. Therefore, we will not address S.L.'s complaint concerning this document.

---------

**4 S.W.3d 392 (Tex.App. —Houston [1 Dist.] 1999)**
**In the Interest of K.C.M., a Child.**
**No. 01-98-00133-CV.**
**Court of Appeals of Texas, First District, Houston**
**October 7, 1999**

Rehearing Overruled Nov. 4, 1999.

William B. Connolly, Houston, Attorney ad litem.

Barbara W. Ramirez, Houston, for Appellant.

Lisa S. Rice, Patricia Lee Flenniken, Casey Todd Wallace, Houston, for Appellee.

Panel consists of Justices MIRABAL, HEDGES, and SMITH. [*]

**O P I N I O N**

MIRABAL, Justice.

This is a termination of parental rights case.

The mother, Kimberly Lyne Martin, appeals the judgment terminating her parental rights to her son, K.C.M., arguing that the termination statute is unconstitutionally vague, and that the evidence is insufficient to support the termination. The attorney ad litem for the child, who was appointed to represent the best interests of the child, also disputes the sufficiency of the evidence and argues for reversal of the judgment. [1] We reverse and remand.

**Case Background**

K.C.M., a male, was born on December 30, 1994. On August 6, 1996, when K.C.M. was 19 months old, the Texas Department of Protective and Regulatory Services (TDPRS), took possession of K.C.M.

The next day, August 7, 1996, TDPRS filed a "suit for the protection of a child in an emergency and original petition in suit to affect parent-child relationship," stating

there was an immediate danger to K.C.M.'s health or safety and seeking temporary custody. The trial court issued an initial emergency order approving the removal of K.C.M. from his parents and appointing TDPRS as his sole temporary managing conservator pending a hearing. Following a hearing held August 19, 1996, the trial court appointed TDPRS as temporary managing conservator.

In February 1997, TDPRS presented a family service plan that sought family reunification, not termination of parental rights. Two weeks later, on March 3, 1997, TDPRS filed a first amended petition, seeking for the first time to terminate the parent-child relationships between K.C.M. and his mother and father. On September 18, 1997, the Associate Judge conducted a one-day bench trial to hear the termination suit. At the close of trial, the Associate Judge announced his ruling from the bench that both parent-child relationships were to be terminated, and that TDPRS was to be appointed sole managing conservator. On October 6, 1997, the trial court signed a Decree for Termination, which adopted the Associate Judge's recommendation. The mother, Kimberly Lyne Martin, appeals. [2]

**Constitutionality of the Family Code**

In her first point of error, Martin asserts the relevant statute, section 161.001 of the Family Code, is unconstitutionally vague and ambiguous. Martin raises this complaint for the first time on appeal. Accordingly, Martin waived this point by not presenting it to the trial court. TEX.R.APP. P. 33.1; *Dreyer v. Greene,* 871 S.W.2d 697, 698 (Tex.1993).

We overrule point of error one.

**Sufficiency of the Evidence**

In points of error two and three, Martin asserts the evidence was legally and factually insufficient to support the trial court's findings.

To terminate parental rights, the trial court must make two findings. First, the parent must have committed one of the acts prohibited under section 161.001(1) of the Texas Family Code. TEX. FAM.CODE ANN. § 161.001(1) (Vernon Supp.1999); [3] *Richardson v. Green,* 677 S.W.2d 497, 499 (Tex.1984). Second, termination of parental rights must be in the child's best interest. TEX. FAM.CODE ANN. § 161.001(2); Richardson, 677 S.W.2d at 499. The trial court made the findings that Martin committed the act prohibited under section 161.001(1)(E), and that termination was in the child's best interest; the Decree for Termination states:

The Court finds by clear and convincing evidence that termination of the parent-child relationship between Kimberly Lyne Martin aka Kim Cressa, and the child, [K.C.M.], is in the best interest of the child and further that the mother: engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.

"Endanger" means to expose the child to loss or injury or to jeopardize. *In re M.C.,* 917 S.W.2d 268, 269 (Tex.1996) (per curiam). "Best interest of the child" is to be determined from consideration of the following factors:

1. The child's desires;

2. The child's physical and emotional needs, now and in the future;

3. The emotional and physical danger to the child, now and in the future;

---

4. The parental ability of the individuals seeking custody;

5. The programs available to assist these individuals in promoting the child's best interest;

6. The plans for the child by the individual or agency seeking custody;

7. The stability of the home or proposed placement;

8. The parent's act or omissions that may indicate the existing parent child relationship is not a proper one; and

9. Any excuse for the parent's acts or omissions.

*Holley v. Adams,* 544 S.W.2d 367, 371-72 (Tex.1976). There is a strong presumption that the best interest of the child is served by keeping custody in the natural parent. *Allred v. Harris County Child Welfare Unit,* 615 S.W.2d

803, 806 (Tex.Civ.App.--Houston [1st Dist.] 1980, writ ref'd n.r.e.). It is the TDPRS's burden to rebut this presumption. See *In re R.E.W.,* 545 S.W.2d 573, 581 (Tex.Civ.App.--Houston [1st Dist.] 1976, writ ref'd n.r.e.).

The termination of parental rights involves fundamental constitutional rights. *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212-13, 31 L.Ed.2d 551 (1972); *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985). Evidence supporting the findings to terminate parental rights must be clear and convincing, not just preponderate. TEX. FAM.CODE ANN. § 161.001; In the Interest of G.M., 596 S.W.2d 846, 847 (Tex.1980); *Harris v. Herbers,* 838 S.W.2d 938, 941 (Tex.App.--Houston [1st Dist.] 1992, no writ). The clear and convincing standard of proof is intentionally placed on the party seeking the termination of the parental rights, so as to create a higher burden to fulfill, because of the severity and permanence of the termination of the parent-child relationship. Spurlock v. Texas Dep't of Protective & Regulatory Servs., 904 S.W.2d 152, 155 (Tex.App.--Austin 1995, writ denied); Harris, 838 S.W.2d at 941. This standard requires more proof than the preponderance of the evidence standard in civil cases, but less than the reasonable doubt standard in criminal cases. G.M., 596 S.W.2d at 847; In the Interest of J.N.R., 982 S.W.2d 137, 141 (Tex.App.--Houston [1st Dist.] 1998, no pet.); Harris, 838 S.W.2d at 941. The clear and convincing standard is the degree of proof that will produce in the mind of the trier of fact a "firm belief or conviction" as to the truth of the allegations sought to be proved. G.M., 596 S.W.2d at 847; J.N.R, 982 S.W.2d at 141; Harris, 838 S.W.2d at 941.

On appeal, in evaluating the sufficiency of the evidence supporting a trial court's decision to terminate parental rights, the standard of review is not affected by the heightened burden of proof required in the trial court. J.N.R., 982 S.W.2d at 141; see also *Edwards v. Texas Dep't of Protective and Regulatory Servs.,* 946 S.W.2d 130, 137 (Tex.App.--El Paso 1997, no writ). In conducting a legal sufficiency review, we consider only the evidence and inferences tending to support the fact finding, and we disregard all contrary evidence and inferences. See *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996); Edwards, 946 S.W.2d at 137; In the Interest of H.C., 942 S.W.2d 661, 664 (Tex.App.--San Antonio 1997, no writ). If any evidence of probative force exists to support the finding, we will uphold the decision. Edwards, 946 S.W.2d at 137. In conducting a factual sufficiency review, we view all of the evidence; we will sustain a factual sufficiency challenge only if, after viewing all the evidence, we conclude the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996) (per curiam); *Hollander v. Capon,* 853 S.W.2d 723, 726 (Tex.App.--Houston [1st Dist.] 1993, writ denied).

### The Evidence

Kimberly Martin, the mother, testified she started smoking marihuana when she

---

**Page 396**

was 13 years old. Both of her parents were drug addicts.

Martin admitted she smoked marihuana at the end of her pregnancy with K.C.M. When Martin came home from the hospital after K.C.M.'s birth, TDPRS contacted her. On January 2, 1995, when K.C.M. was three days old, Martin signed a "Child Safety Evaluation Plan" prepared by TDPRS. The Plan provided that Martin agreed to random drug testing by TDPRS, and that K.C.M.'s paternal grandmother, Joanne Arnold, would monitor the situation. Martin was living with Arnold. Martin admitted that she went through some drug screenings, and she tested positive for marihuana. According to Martin, TDPRS soon stopped monitoring the family because K.C.M. was healthy.

When K.C.M. was one-year-old, TDPRS was back in contact with the family pursuant to a complaint. On January 23, 1996, Martin signed a new "Child Safety Evaluation Plan" that provided she and K.C.M.'s father would submit to a drug assessment at "New Spirit" on January 30, 1996; that until then, they would refrain from using any drugs; and that they would not leave K.C.M. unsupervised at any time.

Martin admitted that, in 1996, she was using crack cocaine on a daily basis, and even on an hourly basis. She testified that she never used crack cocaine in front of K.C.M.; when she ingested crack in Arnold's house, K.C.M. would always be in another room. Martin financed her drug habit through prostitution.

During that period of time, the paternal grandmother, Ms. Arnold, and the father were caring for K.C.M. Ms. Arnold kicked Martin out of the house because of her prostituting and drug abuse; Ms. Arnold continued to care for K.C.M. Martin felt she was leaving K.C.M. in an "okay" situation when she left him with Ms. Arnold, because TDPRS had designated Ms. Arnold as the "safety person" over K.C.M.

Martin did not attend more than four sessions of the "New Spirit" drug therapy because, "I was too into drugs. It was too hard to let go.... I was too addicted." Later in 1996, Martin was enhancing her cocaine use with marihuana.

On August 26, 1996, Martin was arrested for possession of less than one gram of crack cocaine, and she was placed on deferred adjudication probation. This was the first time she had ever been arrested. On November 26, 1996, Martin was again arrested, this time for possession of a crack pipe. She was adjudicated guilty of the original offense and sentenced to one-year confinement in a state jail. At the time of the September 18, 1997 trial in the present case, Martin had only 75 more days to serve in jail; her release date was set for December 3, 1997.

While in jail, Martin wrote letters "all the time" to Ms. Blake, the TDPRS caseworker, inquiring about K.C.M. Martin was on a waiting list to get into a therapeutic drug program at the jail. She attended an Alcoholics Anonymous (AA) substance abuse program, and completed a parenting program offered at the jail. Respondent's exhibit number one is a "Certificate of Participation" dated August 26, 1997, certifying that Martin had completed the course "Systematic Training for Effective Parenting (STEP)." Additionally, Martin took courses in women's health, life skills, and career skills. Respondent's exhibits numbers two and three are certificates of completion for the "Life Skills" and "Career Exploration" courses. Further, Martin had taken GED courses, and at time of trial was waiting for the results from her GED exam.

At the time of trial, Martin held a "low risk" inmate position at the state jail; she had been assigned the job of floor cleaning. Martin testified she had been sober for ten months. She planned to continue attending AA meetings and Narcotics Anonymous (NA) meetings, and planned to enter any type of drug therapy program that was recommended by TDPRS. Martin testified that she loved her son, and

---

**Page 397**

that he was the most important thing to her in her life.

Robert Johnson, the father, testified that he and Martin used drugs and they were around K.C.M. when they were high. He too denied using drugs in the same room as K.C.M. He confirmed that Martin had smoked marihuana toward the end of her pregnancy. [4]

Michelle Blake, the primary TDPRS caseworker, testified that she was assigned to the case on September 16, 1996, approximately one month after K.C.M. had been taken into protective custody. Her job was to develop a family service plan and to refer the family for services. During October 1996, Martin called Blake several times to inquire about her son. Blake scheduled a meeting with Martin to prepare a family service plan on October 21, 1996, but Blake had to cancel the meeting and reschedule for October 28. Martin called and had to cancel the October 28 meeting, and she did not show up at Blake's office the next day. Blake and Martin spoke by phone on November 15, 1996 and Blake told Martin that "we needed to get together and do a service plan and that we would be recommending a drug treatment program for her." A few days later, Martin was arrested. From December 1996 on, while Martin was in jail, she wrote to Blake several times inquiring about her son and requesting pictures. In several letters, Martin wrote that she wanted to get into drug rehab.

Blake testified that TDPRS recommended that Martin's parental rights be terminated "so that this child can be free for adoption." She asked that TDPRS be named as managing conservator.

If TDPRS deferred the termination suit, and established a plan with Martin after she got out of prison in 75 days, and assuming Martin successfully completed the requirements (completing a drug abuse program, taking parenting courses, remaining drug free, obtaining a legal job, and maintaining a stable home), it would be at least another year before K.C.M. could be returned to Martin's custody. By the same token, an adoption could also take six

months to a year to be accomplished. K.C.M.'s current foster mother was presently adopting another child, and she had not expressed an intention to adopt K.C.M.

Blake also explained that TDPRS had considered placing K.C.M. with relatives, but had determined there were no viable options. The agency conducted studies of three available homes. Of the three home studies, two were disapproved (Kenneth and Joanne Matthews, a paternal aunt and uncle; and Fredonia Welch, K.C.M.'s great-grandmother). The third study was approved (Donna Lee, a maternal great-aunt), but she changed her mind and did not want K.C.M. placed with her.

On February 14, 1997, Blake proposed a family service plan for the family. Blake knew the entire history of K.C.M's mother and father at that time, and it was TDPRS's plan as of February 1997, to seek family reunification; TDPRS was not seeking termination of the parent-child relationships at that time, but rather was planning on a permanency plan for the family. On February 13, 1997, Martin was in jail, and had been there since the preceding November. Blake testified:

Q. [By mother's attorney]: You also wrote a family service plan for the mother [in] February of 1997; is that correct?

A. [By Blake]: Yes, that is correct.

Q. And in that plan the agency made on February 13, 1997, they stated a specific plan; goals that you want to improve yourself as an appropriate parent; is that correct?

A. Yes.

---

**Page 398**

Q. And on the next page where there was family tasks, the tasks for Kimberly Martin in February of '97, was to contact the agency once she is released from TDC and participate in a family service plan for family reunification?

A. Right.

…

Q. [By child's attorney ad litem]: Okay. How about the Mom? What has she done since February 14th since your service plan is saying reunite with family? What has she done that would endanger this child?

A. [By Blake]. She has done nothing to endanger him. Right, but be in jail.

…

Q. Okay. You would agree with me would you not that you saw some of the stuff that Kimberly is going through [in jail], parenting education and some other stuff. Isn't that pretty similar in description as to what the agency would offer her and had offered her?

A. Well, we would offer a parenting education course that's 10 weeks long. We would recommend inpatient drug treatment for her and we would want her to be able to show that she can provide a stable home and environment for [K.C.M.] and financial ability to provide.

Q. Did you hear that she was willing to do whatever was necessary including go to drug treatment and be a stable parent as part of what you described as your plan for her?

A. Yes, I heard that.

Fredonia Welch, Martin's grandmother, testified that she wanted to take care of K.C.M., but TDPRS denied her home study because she is already taking care of three other grandchildren. Welch would be willing to help Martin after she is released from jail. Welch thinks Martin will be fine as long as she avoids drugs. Welch has limited financial resources. Welch also discussed problems she had with another adult relative who stayed with her at one time, but felt she had learned how to better handle disruptive situations.

Sharon Wheeler, K.C.M.'s foster mother, testified that K.C.M. is a beautiful, blonde-haired, blue-eyed child, who is angelic looking. When he first arrived at her home, he rarely spoke and did not look like a very happy child. Based on these traits, Wheeler initially thought K.C.M. had developmental problems. However, after a few months, he suddenly snapped out of it. He now has a colorful personality. She is concerned that he currently gets so upset when she disciplines him. She would consider adopting K.C.M., but has not discussed it because she knows he is not available for adoption until the parents' rights are terminated.

**Legal Sufficiency of Evidence**

Considering only the evidence and inferences tending to support the trial court's fact findings, and disregarding all contrary evidence and inferences, we conclude the evidence is legally sufficient to support the findings that Martin engaged in conduct that endangered the physical or emotional well-being of K.C.M. The evidence regarding Martin's drug addiction and the affect it had on her life and her ability to parent, considered alone, constituted legally sufficient evidence to support a finding by clear and convincing evidence that Martin's conduct endangered the child and that termination of the parent-child relationship was in the best interest of the child.

We overrule points of error two and three to the extent they attack the legal sufficiency of the evidence.

**Factual Sufficiency of Evidence**

Reviewing all of the evidence, including evidence that is contrary to the trial court's findings, we consider the following,

---

**Page 399.**

uncontroverted evidence to be particularly compelling:

1. Martin had been drug-free and sober for 10 straight months preceding the trial;

2. While in the state jail in Dayton, Texas, Martin engaged in the following activities:

a. She wrote letters on a consistent basis to the TDPRS case worker, inquiring about K.C.M., requesting pictures, and requesting assistance to get into a drug rehabilitation program;

b. She attended an AA program;

c. She completed parenting classes;

d. She completed a "Life Skills" course;

e. She completed a "Career Exploration" course;

f. She took a women's health course;

g. She completed GED courses and was waiting for the results from her GED exam;

h. She had become a jail trustee, a "low risk" inmate position;

i. She had gotten on a waiting list for a therapeutic drug program at the jail.

3. As of February 1997, when Martin was already in the state jail, the TDPRS was recommending family reunification upon Martin's release from jail, not termination of parental rights. From February 1997 through the date of trial in September 1997, Martin remained in state jail engaging in self-improvement activities. From February 1997 through the date of trial, Martin did nothing to endanger K.C.M., but be in jail.

4. Martin would be released from jail 75 days after the trial.

5. The amount of time necessary to complete an adoption for K.C.M. could take about one year, comparable to the amount of time probably necessary for Martin to successfully complete the TDPRS's requirements for K.C.M. to be returned to Martin's custody.

6. Before K.C.M. could be returned to Martin by TDPRS, she would be expected to attend a parenting course and a drug treatment program, and she would have to show she could provide a stable home and environment for K.C.M. and that she had the financial ability to provide for K.C.M.

The attorney ad litem who was appointed to represent the best interests of the child, along with Martin's attorney, fervently argue that in Martin's case, "jail turned her life around." The evidence supports their argument.

Mindful that there is a strong presumption that the best interest of the child is served by keeping custody in the natural parent, we have weighed the totality of the evidence against the factors set out in Holley, 544 S.W.2d at 371-72. We conclude that the trial court's finding, that the "clear and convincing evidence" showed that termination was in the best interest of the child, is against the great weight and preponderance of the evidence and is clearly unjust. In light of the uncontroverted evidence of the progress Martin had made while in jail, a "firm belief or conviction" that the best interest of K.C.M. required termination of Martin's parental rights could not be fairly reached.

Accordingly, we sustain point of error three to the extent it attacks the factual sufficiency of the evidence to support the "best interest" finding.

We reverse the judgment terminating the mother's parental rights, and we remand that portion of the case to the trial court.

---------

Notes:

[*] The Honorable Jackson B. Smith, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

[1] The attorney ad litem filed a brief, which we received as an amicus brief under TEX.R.APP. P. 11.

[2] The father is not a party to this appeal.

[3] Although the current version of section 161.001 of the Family Code applies only to suits filed on or after September 1, 1997, the relevant provisions were not changed by the amendments. See Act of April 6, 1995, 74th Leg., R.S., ch. 20, § 1, 1995 TEX. Gen. Laws 113, 212-13 (amended 1997) (current version at TEX. FAM.CODE ANN. § 161.001 (Vernon Supp.1999)).

[4] Johnson also testified about his relationship with K.C.M., his job, and his improved drug status at the time of the trial. However, none of that testimony is relevant for Martin, who is the only parent appealing the termination.

**325 S.W.3d 700 (Tex.App.-Houston [1 Dist.] 2010)**

**Carrie JORDAN, Appellant,**

**v.**

**Jerry and Pamela DOSSEY, Appellees.**

**No. 01-09-00618-CV.**

**Court of Appeals of Texas, First District, Houston.**

**May 13, 2010**

Page 701

[Copyrighted Material Omitted]

Page 702

[Copyrighted Material Omitted]

Page 703

[Copyrighted Material Omitted]

Page 704

[Copyrighted Material Omitted]

Page 705

[Copyrighted Material Omitted]

Page 706

Jeffrey L. Oldham, Bracewell & Giuliani LLP, Houston, TX, for Appellant.

Ellen A. Yarrell, Houston, TX, Sallee S. Smyth, Richmond, TX, for Appellees.

Panel consists of Chief Justice RADACK, and Justices ALCALA and HIGLEY.

**OPINION**

ELSA ALCALA, Justice.

In this termination of parental rights case, the biological mother claims her child was kidnapped by the biological father, but the current caretakers of the child call that claim " revisionist history." Agreeing that the assertions by the biological mother lack credibility, the trial court rendered judgment terminating the parental rights of appellant, Carrie Jordan, the biological mother of R.A. The trial court also appointed the current caretakers of the child, appellees, Jerry and Pamela Dossey, as sole managing conservators of R.A. In this accelerated appeal, Jordan contends in her first issue that the evidence is legally and factually insufficient (1) to support termination under three statutory grounds found in section 161.001(1) of the Texas Family Code, and (2) to support a finding that termination of her parental rights is in the best interest of R.A. *See* TEX. FAM.CODE ANN. § 161.001(1), (2) (Vernon Supp.2009). If we sustain the first issue, Jordan's second issue requests that we remand the case for the trial court to reassess its determination of conservatorship. Because our review of the record shows the evidence is legally and factually sufficient to support termination of Jordan's parental rights, we affirm.

**Background**

Jordan is the biological mother and James E. Akin is the biological father of R.A., who was born on November 5, 2006. Jordan had custody of R.A. for the first three weeks of his life, but not

since then. Akin had custody of R.A. from the time R.A. was three weeks until one year of age. R.A. has been cared for by the Dosseys for over two years since he turned one year of age. The evidence presented at trial discussed (A) the events before R.A. was born, (B) the first ten months of R.A.'s life from the time he lived with Jordan to the time he lived with Akin, (C) the tenth through twelfth months of R.A.'s life when Akin met Jerry Dossey and gave R.A. to him and his wife, and (D) the events transpiring during the second and third years of R.A.'s life.

## A. The Events Before R.A. Was Born

Medical records show that by age 15, Jordan had been sexually abused, diagnosed with " major depression," suffered from " psychiatric/substance abuse," and had " 10 to 15 suicide attempts" by " drink[ing a] cleaning product, cutting and self-mutilation." At trial, Jordan denied that she had tried to kill herself that many times, claiming she only tried to kill herself twice, once as a teenager and once as an adult. At age 19, she was diagnosed with a seizure disorder.

In January 2006, while enrolled in college, Jordan was sexually assaulted in her apartment. She dropped out of school and moved into a shelter in Oklahoma City, Oklahoma. After a few weeks at the shelter, Jordan met Akin, became pregnant with R.A., and she quickly left the shelter to live with Akin.

During the first five months of her pregnancy with R.A., Jordan lived with Akin in a transient lifestyle in " crack houses" and around criminals. Jordan acknowledged that she could barely care for herself during this period of time. She observed that Akin was usually unemployed, unable to keep a job, and unable to support her. Within several months of meeting Akin, Jordan learned he was a convicted sexual offender, although she claimed at trial she did not know about that until much later. Jordan also learned he was a violent person. Jordan stated that he struck her on at least 10 occasions while she was pregnant and that she knew this endangered R.A. when he was a fetus. Medical records document that Jordan said that when she was pregnant, Akin pushed her, kicked her, and punched her in the face. While she was pregnant with R.A., police officers had to frequently respond to what Jordan described as " domestic" calls.

During the last four months of her pregnancy, Jordan lived in a shelter called the Rose Home, which was run by Rhonda Davis. The Rose Home is a home for pregnant women with mental illnesses. There, she received prenatal care, parenting classes, and enrolled in a program that assists newborns. When she initially moved into the Rose Home, according to Jordan, Akin visited her often and was renovating a home for them to move into, but according to Davis, Akin infrequently visited and appeared uninterested in Jordan.

While eight months pregnant, Jordan attempted suicide with a broken mirror, requiring her hospitalization in September 2006 at St. Michael's Hospital. At trial, Jordan denied that this was a suicide attempt, explaining that she had only suicidal ideations caused by Akin's sudden failure to take her to the home he said he had renovated for them and by her inability to contact him.

Four of the last six weeks of Jordan's pregnancy were spent at Midwest Regional Hospital. According to Jordan's trial testimony, Akin visited her there once, and he told her that he had not appeared earlier because he had been arrested for fighting and extradited to another state. After this single visit by Akin in the final three months of Jordan's pregnancy, Akin failed to appear at the

hospital when R.A. was born on November 5, 2006.

**B. The First Ten Months of R.A.'s Life**

After giving birth to R.A., Jordan returned to the Rose Home where she resided with R.A. Within two or three days of R.A.'s birth, Davis took Jordan to the house where Akin was living on 7th Street. Jordan showed R.A. to Akin, but Akin was not interested in them. According to Davis, Akin refused to speak to Jordan as Jordan was " begging" him for attention.

There is conflicting testimony regarding Akin's presence at the Rose Home and the

Page 708

circumstances surrounding Akin's removal of R.A. from the Rose Home. The day after Jordan visited Akin, he may have come to the Rose Home on November 12, 2006. Jordan's trial testimony stated that he did, but her deposition testimony was that he did not, and Davis's testimony was that he did not. Similarly, depending on which version of the events is believed, Akin may have come to the Rose Home on the day before Thanksgiving, which was November 24, 2006, and left with R.A., either with or without Jordan's consent. Jordan testified at trial that Akin " kidnapped" R.A. when he kept him without permission following what was supposed to be a short trip to the grocery store to pick up items for Thanksgiving dinner. In contrast, Jordan's description to Special Agent Mike Phill was that R.A. was taken by Akin when Akin left her a note or called her stating he was keeping R.A. Other evidence, however, shows that Jordan gave R.A. to Akin for him to take care of because Jordan hoped that his bonding with the child would help them reunite as a family. Davis testified that when she saw that R.A. was not with Jordan at the Rose Home, she offered to retrieve R.A. from Akin, but Jordan told her everything was okay because Akin was good with children. Davis's impression of the situation was that Jordan wanted Akin to have R.A. Davis's impression was consistent with Akin's statements made in a letter to Jordan written much later after these events. Akin said he never wanted possession of R.A. and was " stuck" with R.A. due to Jordan's disappearance.

From November 24, 2006, when Jordan claims R.A. went to live with Akin, to three weeks later on December 16, when she was asked to leave the Rose Home, Jordan resided at the Rose Home without R.A. Depending on which version of the events is believed, either she was uninterested in taking R.A. from Akin or she was frantically searching for them. Davis described Jordan as not wanting Davis's assistance when Davis offered to take her to get R.A. from Akin, explaining that Jordan appeared to want Akin to have R.A. In contrast, Jordan's trial testimony conveys that she notified police officers, Legal Aid, and private attorneys. Aside from her trial testimony, however, no other evidence shows Jordan contacted anyone to seek custody of R.A. during this period of time while she was living at the Rose Home.

On December 16, Jordan was asked to leave the Rose Home because Davis thought Jordan was a " danger to herself ... or others" after she made threatening gestures with a knife. Jordan acknowledged that she was asked to leave the Rose Home, but she minimized the reason, stating all she did was slam the dishwasher door.

When she left the Rose Home on December 16, Jordan immediately walked 24 blocks to the 7th Street address where Akin was living with R.A., and had a seizure while arguing with Akin. According to Jordan's trial testimony, Akin walked out of the house holding R.A., walked back into

the house, handed R.A. to someone inside the house, and walked out of the house empty handed, refusing to give her R.A. Jordan later told medical personnel who were treating her that she saw R.A. had crusted blood under his nose and bruises. Following the seizure, Jordan was taken by ambulance to University of Oklahoma (OU) Medical Center, where she was quickly committed involuntarily when she tried to commit suicide by hanging herself there. She was in the OU hospital from December 16 to 21 of 2006, then either in a shelter or homeless from December 22 to 28 in 2006, and then hospitalized again from December 28, 2006 to January 17, 2007 at Midwest Regional Medical Center (Midwest) for "

major depressive disorder, recurrent, severe with suicidal thinking psychotic features [,]" psychosis, borderline personality disorder, as well as other conditions.

During this month, from December 16, 2006, to January 17, 2007 when Jordan was hospitalized for her suicide attempt and suicidal ideations, depending on which version of the events is believed, either Akin held R.A. with Jordan's consent or Akin continued to possess R.A. without Jordan's permission. Jordan's statements contained within the medical records for this period of time vary from day to day concerning whether she was claiming then that R.A. was kidnapped, or claiming that R.A. was with his father under her consent. For example, Jordan testified that she tried to get assistance from the police who refused to help her, but medical records show Jordan was " considering" calling the police. Jordan also testified she contacted Legal Aid and private attorneys, but the medical records are silent concerning any efforts by her to contact Legal Aid and private attorneys.

Based on some of Jordan's statements about Akin's possession of R.A. to the medical personnel who were treating her when she was admitted into the OU Medical Center on December 16, the personnel contacted the Oklahoma Department of Human Services (DHS). The medical records show DHS quickly investigated the situation by going to Akin's house and speaking to Akin. The medical records document that DHS determined R.A. was not at risk, and closed the investigation on January 10, 2007. After the case was closed on January 10, other than Jordan's trial testimony, the record shows no evidence of contacts between Jordan and DHS or any other child welfare agency.

There is also conflicting testimony regarding whether or not Jordan knew how to reach Akin from January 10 through September 2007. Either Jordan did not know how to reach Akin after January 10 through September 2007, or she knew where he was living and she was in communication with him. Jordan testified at trial that Akin called her in July 2007 to ask that she mail R.A.'s social security card, which she states she did because he threatened her. Akin, however, in a letter written much later, denied having any contact with Jordan who he said disappeared after she gave him R.A.

After her release from the hospital on January 17, 2007, Jordan resided at the Hope Services Center Standers Estate for about nine months until September. The center provided ongoing programs for people released from the hospital on a mental health commitment. Depending on which version of the events is believed, either Jordan continued to look for Akin and R.A. for the first nine months of 2007 and could not find them, or she knew where they were and

consented to the situation. At trial, Jordan described a nonconsensual situation where she searched for them, but that version is different from the version she told to Detective Feskanich. In a statement to Detective Feskanich, Jordan said that " when she was down at the Hope Center, she knew that the child was still living at the residence." When the Detective asked her why she did not make contact with Akin at that time, Jordan " never" gave him a " definite answer" why she could not go there except that she had " curfew."

Starting in the latter half of June 2007, after R.A. had been gone over six months, the record shows documentation of minimal efforts by Jordan to gain custody of R.A. On June 20, 2007, Jordan asked Legal Aid for help, but it declined representation, offering instead to draft all legal documents that would be required for Jordan to petition the court for custody of R.A.

Page 710

Jordan decided not to represent herself and did not pursue the legal action at that time. Although she also claimed at trial that in the " mid to late" summer of 2007 she contacted the Logan County authorities regarding Akin's status as a sex offender, no documents verify this claim.

In September 2007, Jordan moved out of the Hope Center and into her own apartment after she received a lump sum disability payment totaling between $6,000 and $7,000 from Social Security. She acknowledged that she did not use the money to hire an attorney to pursue legal action against Akin, but instead used the funds to move into an apartment, pay off debts, and buy furniture.

## C. The Tenth through Twelfth Months of R.A.'s Life

When R.A. was ten months old, Akin began work on September 26, 2007 for a company owned by Jerry Dossey. One day between October 11 and 23 of 2007, Akin asked Jerry for a ride to work. When Jerry arrived to pick up Akin, Akin was standing on a corner in front of a house holding several bags and R.A. According to Jerry, Akin " stated that his girlfriend had called the Department of Human Services on him for abuse of his child and that they had came and cleared him and looked at the child and released him." Jerry drove Akin to another house where Akin left his belongings. Jerry described R.A. as dirty and " nonresponsive" with no emotion at that time.

When Jerry and Akin returned from a job on the road on October 29, 2007, Akin told Jerry that he did not have anywhere to go, and Jerry paid for Akin to stay in a motel for six nights until the next job on November 4. While Jerry was driving Akin to the motel, Jerry asked whether Akin wanted to pick up R.A. Akin said that R.A. was at the babysitter's house and that he did not want to see R.A. After explaining that he had seen Jerry with his adopted daughter, Akin asked him if he would like to adopt R.A. Akin told Jerry he had no family who could take R.A. and that R.A.'s mother had committed suicide after R.A. was born. Jerry said he would have to discuss it with his wife. After a meeting between the Dosseys and Akin, the Dosseys agreed to care for R.A. and obtained a signed power of attorney from Akin on November 20, 2007.

R.A. was living in a deplorable situation when the Dosseys rescued him soon after obtaining the signed power of attorney. Akin had left R.A. with a person he called a " babysitter." The babysitter lived in a " crack house" that was " covered in alcohol bottles," " very dirty," and " smelled like feces." Jerry loaned Akin $150 to pay the babysitter, who demanded the money in exchange for R.A. R.A. was filthy, covered in human feces, and his penis had fused to his scrotum

causing his skin to peel off there. R.A. had an " explosive" fear of taking a bath. R.A. did not cry or show emotion. When R.A. ate, he ate as much as he could and then stored food in his mouth, which is a condition that occurs when a child is irregularly fed. A medical examination of R.A. revealed he had scabies.

## D. Events Transpiring the Second and Third Years of R.A.'s Life

On December 20, 2007, after the Dosseys began caring for R.A., Akin stopped working for Jerry. Although they could not locate Akin for information, the Dosseys attempted to get a birth certificate for R.A. and a death certificate for R.A.'s mother by trying to obtain information from the babysitter where R.A. had been recovered, as well as Akin's ex-girlfriend Jessica. Information given by Jessica led Jerry to the Rose Home, where he learned Jordan had been before she moved to the

Page 711

Hope Center. Due to confidentiality, however, Jerry could not obtain more information about Jordan or R.A. Jerry spoke to a neighbor, Officer Phillip Stewart who worked for the Harrah, Oklahoma police department. Jerry gave Officer Stewart the names of Jordan and R.A. to see if Stewart could find any information about them but Stewart reported that he could not find Jordan in his records.

Around January 2008, as they were planning their move from Oklahoma to Texas for a different employment opportunity for Jerry, the Dosseys contacted an attorney in Texas to determine how to proceed to adopt R.A., in light of the abandonment of the child by Akin and the suicide of R.A.'s mother. The attorney advised them to wait six months before filing the case. The Dossey family moved to Sugar Land, Texas in April 2008.

Around the time the Dosseys took custody of R.A. in late 2007, Jordan contacted various police agencies in search of R.A., which led her to Special Agent Mike Phill with the Minnesota police department in March 2008. Soon after that, Jordan received a telephone call in March 2008 that revealed information that led to her learning that the Dosseys had possession of R.A. More specifically, in March 2008, Jerry Dossey's mother contacted Jordan's parents, but did not identify herself. She asked if Jordan was still alive and various questions regarding Jordan and her relationship with Akin. The number was registered to Bill Sibley, Jerry's father. Jordan's parents told Jordan about the call and gave her the number. Jordan called Jerry's mother, but could not find out any information. Jordan then contacted Special Agent Phill, who contacted various police agencies.

In August 2008, Akin was found at a shelter in New York City and charged for failing to register as a sex offender. When questioned by New York police detectives regarding the location of R.A., Akin refused to answer questions and referred them to his attorney. The detectives, however, did discover there was a connection between the Dosseys and Akin, and contacted Special Agent Phill. Special Agent Phill learned the Dosseys had moved to Sugar Land, Texas. Special Agent Phill then requested that Detective Feskanich meet with Jordan so that Oklahoma could open a Missing and Exploited Children case because R.A. had never been reported as missing in Oklahoma.

Detective Feskanich testified that his first involvement in this case concerning R.A. was in

September 2008, when Jordan made a report of a missing child to the Oklahoma City Police Department. Feskanich searched to see if a prior missing child report for R.A. had been filed and found none. He explained that if someone had claimed a child was in danger, he believed a police report would have been generated. Detective Feskanich contacted the Dosseys and told them to take R.A. to the Sugar Land police department where R.A. could be checked and verified as safe and healthy. The Sugar Land police allowed R.A. to remain with the Dosseys after verifying he was safe. Detective Feskanich learned that the Dosseys had hired an attorney to facilitate an adoption and that they intended to keep R.A. Detective Feskanich and Special Agent Phill reported that they were satisfied that R.A. was in a " clean, loving home" and the Detective instructed Jordan that she needed to file a case in a court in Texas to have a judge determine custody.

According to Jerry, he and his wife first found out on September 4, 2008 that Jordan was alive. Prior to that time, he had no suspicion that she was alive. Jerry testified that he did not have any knowledge of any contact that occurred between

Page 712

his mother and Jordan's mother, explaining he was upset about learning about the contact during discovery in this lawsuit, and maintaining that he did not know Jordan was alive until he learned about it in September 2008.

Around the time R.A. turned two years of age in November 2008, Jordan obtained pro bono counsel and sued to establish sole conservatorship of R.A. The Dosseys responded to Jordan's suit by filing a petition seeking sole conservatorship, termination of Jordan's and Akin's parental rights, and the right to adopt R.A.

The trial court held a bench trial that lasted six days. It heard testimony from the Dosseys, Detective Feskanich, Special Agent Phill, Davis, Jordan, an amicus attorney, and Janie Cravens, a licensed social worker who testified that it would be in the child's best interest to remain with caretakers with whom the child has bonded. The trial court terminated Akin's parental rights by entering a default judgment. The trial court also terminated Jordan's parental rights after finding that termination of the parent-child relationship was in the best interest of R.A., and that she committed three grounds under section 161.001(1) by leaving R.A. alone or in the possession of another without providing adequate support and remaining away for a period of at least six months (section C); knowingly placing or allowing R.A. to remain in conditions or surroundings that endanger his physical or emotional well-being (section D); and engaging in conduct or knowingly placing R.A. with persons who engaged in conduct that endangers his physical or emotional well-being (section E).[1] The court then appointed the Dosseys as managing conservators. Jordan filed a motion for new trial and a motion for a judgment notwithstanding the verdict. The court denied both motions and signed findings of fact and conclusions of law. Jordan appealed the trial court's determinations but Akin did not.

**Standard of Review**

A parent's rights to the " companionship, care, custody, and management" of his or her children are constitutional interests " far more precious than any property right." *Santosky v. Kramer,* 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982); *see In re M.S.,* 115

S.W.3d 534, 547 (Tex.2003). A termination decree is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985). Termination proceedings should be strictly scrutinized, and the involuntary termination statutes should be strictly construed in favor of the parent. *Id.* However, " the rights of natural parents are not absolute" and " the rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.,* 113 S.W.3d 355, 361 (Tex.2003). Recognizing that a parent may forfeit his or her parental rights by their acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id.*

Proceedings to terminate parental rights under the Family Code require proof by clear and convincing evidence. TEX. FAM.CODE ANN. § 161.001 (Vernon Supp.2009); *In re J.O.A.,* 283 S.W.3d 336, 344 (Tex.2009). Clear and convincing evidence is " proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re J.O.A.,* 283 S.W.3d at 344. When the legal sufficiency

Page 713

of the evidence is challenged, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id.* To give appropriate deference to the factfinder's conclusions, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* This does not mean that a court must disregard all evidence that does not support the finding. *Id.* Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. *Id.* at 344-45.

When the factual sufficiency of the evidence is challenged, only then is disputed or conflicting evidence under review. *Id.* at 345. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

**Credibility of Witnesses**

Because the credibility of witnesses is a matter pertinent to each of the grounds for termination, we begin by addressing the trial court's findings that the trial testimony by Jordan lacked credibility and the trial testimony by the other witnesses who testified either at trial or by deposition was credible.

The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *See City of Keller v. Wilson,* 168 S.W.3d 802, 819 (Tex.2005). When there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts. *See id.* at 820. In

every circumstance in which a reasonable trier of fact could resolve conflicting evidence either way, the reviewing court must presume it did so in favor of the prevailing party, and disregard the conflicting evidence in its legal sufficiency review. *See id.* at 821. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then the trier of fact must be allowed to do so. *See id.* at 822. So long as the evidence falls within this zone of reasonable disagreement, we may not substitute our judgment for that of the trier-of-fact. *See id.*

In its finding of fact number eight, the trial court stated, " The testimony by Carrie Jordan as presented at trial was inconsistent and not credible." The record shows Jordan's trial testimony is often inconsistent with the testimony of other witnesses, documents in evidence, and her own former statements. In the following section we examine for credibility her assertions that pertain to each of the grounds for termination found by the trial court. Jordan claims (A) her mental condition escalated when her relationship with Akin suddenly changed when Akin failed to arrive in September 2007 to take her to the house he had renovated for her, (B) she never consented for R.A. to be initially placed with Akin, and (C) even if she did initially consent for R.A. to be placed with Akin, she did not consent for

Page 714

R.A. to remain with Akin beyond that initial period of time. The trial court found these contentions lacking in credibility, and we conclude in section (D) that the record supports the trial court's credibility determination.

**A. Change in Mental Condition Due to Change in Relationship**

According to Jordan's trial testimony, she started having suicidal ideations when Akin suddenly failed to appear in September 2007 after telling her that he had renovated a house for them to move into together as a family. For several reasons, the record does not support that theory.

First, at trial, Jordan paints a picture of surprise at Akin's failure to appear when he said he would, suggesting that their relationship was fine before that. It is undisputed, however, that Jordan started living in the Rose Home, a shelter for pregnant women with mental illnesses, because Akin was unemployed and unable to support them. During the period of time Jordan lived with Akin while she was pregnant, they did not have a permanent residence. At times, they lived in " crack houses." At other times, they moved from house to house because Akin would get into an altercation with someone where they were staying and they would then be required to leave the residence. In describing Akin, Jordan said he " always liked to live in neighborhoods where there were severe drug problems and prostitution." A handwritten note by Jordan stated, " While I was pregnant, James did not work, or if he did, he didn't hold a job very long." She acknowledged that while she was with Akin when she was pregnant she did not receive proper nutrition due to their instability. The undisputed evidence shows Jordan was aware of Akin's financial and personal instability.

Second, Jordan's trial testimony suggests that after she moved into the Rose Home, Akin was interested in pursuing a relationship with her and her baby and visited her often, so that she was surprised by his failure to pick her up to take her to their renovated home. But according to Davis, Akin did not visit often and appeared uninterested in Jordan. Deferring to the trial court's

credibility determinations, the record shows Akin did not want to have a relationship with Jordan.

Third, medical records show Jordan has a long history of suicide attempts, having attempted suicide at least 10 to 15 times before she became pregnant with R.A. At trial, Jordan denied having attempted to commit suicide that many times, but the trial court found that testimony lacking in credibility. Deferring to the trial court's credibility determinations, Jordan had frequent suicide attempts throughout her life.

Fourth, although she acknowledges she knew Akin had certain faults, she denied at trial that she knew he was a convicted sex offender during the period of time when she was pregnant, and claims instead that she learned this information about Akin much later. Jordan presents this picture to explain her surprise at things she found out later about Akin. The record does not support this version. Aside from her trial testimony, the record shows that Special Agent Phill wrote in a 2008 report that Jordan told him, " [she] first became aware [that] Akin was a registered sex offender after a verbal domestic argument on May 2, 2006...." At trial, Special Agent Phill further testified by deposition that Jordan told him " that the first time she found out that he was a registered sex offender was after they had a domestic altercation." The trial court could reasonably have determined that Jordan knew Akin was a convicted sex offender at the

Page 715

time of the domestic altercation when she was pregnant with R.A.

Although at trial Jordan presents a picture of a person shocked by the sudden disappearance of a person who she then called a " husband," the trial court could reasonably have rejected that testimony as lacking in credibility. The trial court could have reasonably determined from the evidence it found credible that Jordan was not surprised by Akin's failure to renovate a house for them because he had no financial means to renovate a house, he was too personally unstable to commit to that type of task, and he was not interested in pursuing a relationship with her. Furthermore, Jordan knew that Akin was not reliable because he was often kicked out of houses where he would try to stay, he was often arrested, and he was a convicted sex offender. The trial court could reasonably have rejected Jordan's explanation about the attempted suicide in September 2007 when she was eight-months pregnant with R.A. as lacking in credibility.

**B. Initial Placement of R.A. with Akin**

Jordan contends that she did not knowingly place R.A. with Akin because Akin initially took R.A. from her without her consent. In this section, we focus on a three-week period of time when R.A. initially began living with Akin from about November 24, 2006, when Jordan states Akin took R.A. just before Thanksgiving, to December 16, when Jordan was ousted from the Rose Home.

The sole evidence that Akin's initial possession of R.A. was without Jordan's consent comes from Jordan's trial testimony that the trial court determined lacked credibility. Excluding her trial testimony from consideration, and deferring to the trial court's determination about the credibility of the evidence, the record shows that Jordan voluntarily relinquished R.A. to Akin, who did not want a relationship with them. From the time of R.A.'s birth, Akin was not interested in him. Akin did not go to the hospital when R.A. was born, and when Davis took Jordan to see Akin within a few days of R.A.'s birth, Jordan was " begging" him for attention. Akin did not come to see Jordan at the Rose Home at any point after R.A.'s birth.

The trial court expressly found in its findings of fact number six that Jordan " did not" ask Akin " to return the child to her at that time," referring to December 2006. The trial court also found that Jordan told Davis that R.A. was " ' okay' with his father." The record shows Davis suggested to Jordan that she should take R.A. back from Akin; however, Jordan " assured [her] that it was okay, that [Akin]-no matter how he was with her, he was very good with children." Davis testified that although her memory of the conversation was not completely clear, she knew " for a fact that [she] encouraged [Jordan] to bring the baby back and [Jordan] was reluctant to do so." Davis further stated, " [Jordan] seemed to want [Akin] to have the baby." Davis said it appeared to her that Jordan wanted Akin to have R.A. so that they could reunite as a family. Davis's recollection about Akin's lack of interest in R.A. is supported by Akin's version of the events. The letter from Akin to Jordan mentions that Akin did not want to have custody of R.A. but was " stuck" with him when Jordan refused to care for R.A. and disappeared.

Jordan contends her actions to regain custody of R.A. after R.A. began to live with Akin show that she did not consent to the situation. Jordan claims that soon after R.A. began living with Akin, in the period of time from late November to December 16, 2006, she contacted police officers, Legal Aid, and private attorneys, and

Page 716

tried to raise funds to hire an attorney. Other than Jordan's trial testimony, no evidence shows she contacted the police, Legal Aid, or attorneys, or tried to raise funds to hire an attorney. More specifically, Officer Feskanich testified that he could not find any report concerning R.A., which he would expect would have been generated if someone had complained that a child was in danger. Legal Aid responded to Jordan's June 2007 request for assistance, which is the only evidence in the record concerning any contact between them and Jordan. Concerning Jordan's trial testimony that she tried to contact private attorneys and tried to raise funds to hire an attorney, no evidence shows this, other than her trial testimony. Furthermore, Davis testified that Jordan was not interested in going to retrieve R.A. and it appeared to Davis that Jordan consented to Akin's possession of R.A.

Although she refers to her statements in medical records calling the case a kidnapping, other statements in those same medical records contradict that position. Jordan's reaction to Akin's initial possession of R.A. was described by Jordan herself, as recorded in a medical record dated December 28, 2006, which states,

She has delivered her young son in November of this year and there has been *some difficulties with her ability to keep the child.* She had been staying at the Rose Home with the infant, but states that she got angry there and was asked to leave the Rose Home. *As such, she was unable to keep her young son, so her husband currently has the child and is living with a family that she is unable to live with as they do not want her there.* She states, " They think I am crazy."

(Emphasis added.) Deferring to the trial court's credibility determinations, the record shows Jordan voluntarily placed R.A. with Akin in late November to December 16, 2006.

## C. Allowing R.A. to Remain with Akin

In this section, we address the period of time from December 16, 2006 to September 2007.

## 1. Jordan Spent Approximately 25 Days Seeking Assistance from DHS from December 21,

**2006 to January 10, 2007**

The medical records document that Jordan was in communication with DHS workers from December 21, 2006 to January 10, 2007. On December 21, 2006, the medical records show that Jordan was " concerned about child's welfare and in touch with multiple people regarding her child." The record also states that Jordan " had a child welfare employee come visit her." Medical records dated January 10, 2007 state,

[DHS] investigator says that the father does live with roommates, has no job, but the house and circumstances meet appropriate environmental standards for the child. At this time, the investigator says that she is finished with both parties and patient does not need to keep contacting her. She has an open case, but no further action will be taken.

The medical records show that the DHS worker said that Akin stated he did not want to be with Jordan because he could not handle her " destructive behavior."

Jordan suggests that her contact with DHS shows she did not allow R.A. to remain with Akin, but the record fails to support that assertion. Instead, the records show Jordan was focused on obtaining DHS's assistance to find her a place to live with Akin and R.A. The medical records for this period of time show that Jordan was attempting to have DHS intervene

Page 717

to help find a place for Jordan, Akin, and R.A. to live together as a family. The medical records show Jordan " want[s] the case worke[r] to help us find a place where we can all be together, a place for families. I don't want my baby or us on the street, especially one week before the holidays." Another medical record states, " She also wanted to talk to social worker so that a placement can be found for her husband and her...." The medical reports also document that Jordan was " vague, unclear about why [Jordan] cannot be with husband and child." Furthermore, the medical records for January 5, 2007 state,

Patient wanting to talk with her husband to check on their baby and to see if he will pick up her and the baby's belongings at the shelter where she was staying. Reports he told her he had brought her a new wedding ring. Reports she really does not know what he is thinking but hopes he is sincere in working towards them being a family together.

When DHS became involved, its concern was to determine whether Akin had a suitable environment for R.A. Nothing in the record indicates that Jordan told DHS that she had seen blood and bruises on R.A., that Akin had been physically abusive towards her when she was pregnant with R.A., or that Akin was a convicted sex offender. Having no information about Akin's history and requests focused on having them find a place for Jordan to live with Akin and R.A., DHS decided to take " no further action" after its snapshot view of Akin's residence and circumstances.

At most, Jordan has shown that she was in contact with DHS for a 25-day period of time and that DHS found that R.A.'s living situation was suitable during that short period they were involved. The trial court could reasonably have determined that this contact with DHS was inconsequential in this case because Jordan did not give DHS the pertinent information about Akin's background and its assessment was based on a snapshot view of R.A.'s circumstances.

Additionally, after January 10, 2007, when Jordan learned DHS would take no further action, Jordan made no effort to have DHS further investigate Akin. Jordan acknowledged at trial that she

believed the DHS worker's assessment was erroneous, and that she believed Akin had R.A. in a " bad environment." Jordan testified at trial that although the DHS worker reported that R.A. was not in danger with Akin, Jordan disagreed with that conclusion. Although she did not believe " it was a good investigation," Jordan took no further steps to pursue another DHS investigation and never contacted DHS again after January 10, 2007. This was unreasonable because Jordan knew that, at best, DHS got a snapshot view of R.A.'s environment, which would likely change within a short period of time, given that Akin was a transient, usually unemployed, usually ejected from the places he lived, violent, a convicted sex offender, unreliable, uninterested in having a relationship with R.A., and could not provide proper nutrition to those in his care. The trial court could reasonably have determined that Jordan knew the DHS investigation was inadequate because she did not give the worker pertinent information for her to make an accurate assessment and Akin's transient lifestyle would produce a different environment for R.A. within a short period of time.

**2. After DHS Ended Its Investigation, Jordan Knowingly Allowed R.A. to Remain with Akin from January 10 to September 2007**

Jordan contends that after DHS ended its investigation on January 10, Akin continued
Page 718
to have R.A. without her consent from January 10 to September 2007. She points to medical records that include her references to Akin's possession as a " kidnapping" and claims that she made efforts to regain custody of R.A. during that period of time.

In the trial court's seventh finding, the court found:
Prior to March 2008, there was no evidence offered by [Jordan] that she earnestly attempted to locate or retrieve the child after relinquishing him to [Akin] in November 2006 despite being advised to do so and despite offers of help to do so from Oklahoma Legal Aid.

The record supports the trial court's finding that Jordan did not earnestly attempt to locate or retrieve R.A., but it does not support the date of March 2008 and instead it supports the earlier date of September 2007 when Jordan began calling various police agencies. We have already discussed the period of time from approximately November 24, 2006, when R.A. began living with Akin, to January 10, 2007, when DHS was involved in the case. We, therefore, focus on the period of time when R.A. remained with Akin from January 10, 2007, when DHS ended its investigation, to September 2007, when Jordan contacted several police agencies inquiring about R.A. In examining the period of time from January 10 to September 2007, we examine Jordan's (a) medical records, (b) assertions that she contacted police (c) reasons for not pursuing a civil lawsuit, and (d) assertion that she did not know where Akin was.

**a. Medical Records**

Although Jordan asserts the medical records support her position that Akin had R.A. without her consent for the period of time before September 2007, her statements in the medical records are inconsistent. Jordan's statements documented in the medical records range from one extreme, in which she claims Akin kidnapped R.A., to the opposite extreme, in which she states that Akin is nice, that he is taking care of R.A. while she is unable, and that she wants case workers to help find a place for Akin, Jordan, and R.A. to live together as a family. For example, in the same

emergency report where Jordan uses the word " kidnapped," she quickly explains that Akin " threatened to go to court and get custody" and that he would get a protective order, which are both actions that appear to be inconsistent with a kidnapping.

After DHS ended its investigation of Akin, the medical records suggest Jordan consented to Akin having possession of R.A. OU medical records dated January 14, 2007 state, " She did write a letter to her husband asking that he bring her 3 mo[nth] old son to see her. Also told him she did not like where her husband is living.... She describes her mood as ' great ... I've never felt this good in my life.' " The medical records contain inconsistent statements concerning whether Akin's possession of R.A. was with or without Jordan's consent. We, therefore, must defer to the trial court's determination that Jordan knowingly and voluntarily let R.A. remain with Akin.

**b. Contact With Police**

The medical records show that on January 9, 2007 Jordan said she was " contemplating" calling the police. The record next states, " When asked for what reasons is she justified in calling the police, she didn't say and changed the subject. [The writer of the note] offered to help in any way." Nothing in the medical records show Jordan made contact with police when she was hospitalized.

Page 719

Jordan contends that in " mid to late" summer of 2007 she contacted Logan County authorities, who informed her Akin was a noncompliant sex offender who had failed to register in Minnesota, and then she contacted the Oklahoma police, who sent Officer Robert Townsend to meet her at the Standers Estate. Other than her trial testimony, no evidence shows she contacted these authorities at this point in time. Special Agent Phill testified that when he first came into contact with her in March 2008, he spoke to Oklahoma City police officers who did remember talking to her, but he did not specify when that contact between Jordan and those officers occurred. According to Detective Feskanich, the first report to the Oklahoma police was in January 2008. Feskanich testified that he believed that if Jordan had tried to contact the police before January 2008, the police would have generated a report because a report would be made if a child were in danger. Other than Jordan's claims at trial that she contacted the police who refused to assist her, no other evidence in the record supports her position that she contacted any police agency prior to September 2007. Based on its credibility assessment of the evidence, the trial court could reasonably have determined Jordan did not seek police assistance until September 2007.

**c. Reasons for Not Pursuing Civil Lawsuit**

Jordan asserts she sought to retain an attorney but could not afford one during that period of time. The only evidence to support that claim is Jordan's trial testimony. Nothing in the medical records mentions Jordan trying to hire an attorney. Moreover, evidence that Jordan received a lump sum disability payment late in the summer of 2007 and spent the money on things such as furniture is strong impeachment of Jordan's claim that her lack of an attorney was due to a financial inability.

Jordan contends she tried to obtain R.A. by seeking the assistance of Legal Aid during the first seven months of R.A.'s life. In June 2007, Legal Aid sent a letter declining representation.

This document is the sole evidence about Jordan's contact to Legal Aid, aside from her testimony at trial. However, for two reasons, the trial court could reasonably have determined that Jordan's actions in June 2007 were not earnest attempts by her to locate or retrieve R.A. First, Jordan refused the assistance from Legal Aid. Legal Aid offered to draft all documents that would be required for Jordan to petition the court for custody of R.A. Jordan testified that she did not sign the contract for these services because she did not think she should represent herself. Although self-representation is usually unwise, Jordan was offered some limited legal assistance by Legal Aid to assure that the paperwork would be adequate. Jordan opted to do nothing rather than accept some help to regain custody of R.A.

Second, shortly after Legal Aid had offered to draft the paperwork for Jordan, she received almost $7,000 in a lump sum disability payment that she decided to use for material things other than pursuing legal action. In light of Jordan's decision not to pursue legal action when she had the funds to do so, the trial court could reasonably have determined based on its credibility assessment of the evidence that the reason Jordan did not pursue the lawsuit in the summer of 2007 was because she did not desire to obtain custody of R.A. at that time, and not because she was denied complete representation by Legal Aid.

d. Ability to Locate Akin

Jordan contends she did not knowingly allow R.A. to remain with Akin because

Page 720

she did not know where Akin was after DHS closed its case in January 2007. The record does not support that contention.

The medical records show that Jordan knew where Akin was living in January 2007. Jordan gave DHS Akin's address, where they found him around January 10. On January 14, according to medical records, Jordan said she wrote a letter to Akin asking him to bring R.A. to see her and telling him that she did not like where he was living. These same medical records show that on January 17 Jordan stated that Akin resided " in a home off of 7th and McKinley in Oklahoma City and fears that this home is conducive to illicit drug activity."

The record shows Jordan knew how to find Akin in the first seven months of 2007. Jordan testified at trial that she communicated with Akin in July 2007 when he asked her to mail him R.A.'s social security card, which she says she did. Detective Feskanich's testimony is consistent with that evidence. He said that when he interviewed Jordan in January 2008, she told him that when she was living at the Hope Center, she knew where Akin and R.A. had been living in Oklahoma City. Jordan told Detective Feskanich that the reason she did not go and make " contact" with Akin and R.A. was because she " had curfew." The trial court could reasonably have determined that Jordan's claim that she did not know where Akin was after January 2007 lacked credibility.

Through its assessment of the credibility of the evidence, the trial court could reasonably have determined Jordan voluntarily and knowingly allowed R.A. to remain with Akin by deciding not to earnestly attempt to retrieve R.A. from January 10 to September 2007.

D. Record Supports Trial Court's Credibility Determination

In light of Jordan's many inconsistencies in the various versions of the events, the trial

court's finding that Jordan's trial testimony lacked credibility is supported by the record, and we must defer to that determination. *See id.* Although the trial court disbelieved Jordan, it found the other witnesses credible. The witnesses were Jerry and Pam Dossey; Cravens, the expert; Davis, the manager of the Rose Home; Detective Feskanich; and Special Agent Phill. From our review of the record, the trial court's finding that these witnesses were credible is within the zone of reasonable disagreement, and therefore we defer to the trial court's determination. *See id.* In reviewing each of the grounds for termination of Jordan's parental rights found by the trial court, we do so under the prism of its findings of credibility of the witnesses.

**Statutory Grounds for Termination**

In proceedings to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the party wishing to terminate rights must establish two things. First, the party must prove that one or more acts or omissions enumerated in one or more of the subsections of section 161.001(1) occurred. *See* TEX. FAM.CODE ANN. § 161.001(1); *In re J.L.,* 163 S.W.3d 79, 84 (Tex.2005); *Liu v. Dep't of Family and Protective Servs.,* 273 S.W.3d 785, 790 (Tex.App.-Houston [1st Dist.] 2008, no pet.). Second, the party must prove that termination of the parent-child relationship is in the best interest of the child. *See* TEX. FAM.CODE ANN. § 161.001(2); *In re J.L.,* 163 S.W.3d at 84; *Liu,* 273 S.W.3d at 790. In termination proceedings, the fact finder must find that both elements are established by clear and convincing evidence. *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987). Termination may not be based solely on

Page 721

the best interest of the child. *Id.; Liu,* 273 S.W.3d at 790.

**Grounds for Termination Under Section 161.001(1)**

Jordan challenges the legal and factual sufficiency of the evidence to support each of the three grounds found by the trial court under section 161.001(1). *See* TEX. FAM.CODE ANN. § 161.001(1). The trial court determined that Jordan violated sections C, D, and E of section 161.001(1). *See* TEX. FAM.CODE § 161.001(1)(C), (D), & (E). We address each section separately. Although termination may be based on the best interest of the child in addition to one ground under section 161.001(1), we conclude the evidence is legally and factually sufficient for each of the three grounds found by the trial court.

**A. Endangering by Placing or Allowing Conditions (Section D)**

**1. Applicable Law**

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. TEX. FAM.CODE ANN. § 161.001(1)(D) (Vernon Supp.2009). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the " conditions or surroundings" of the child's home under section D. *In re C.L.,* No. 2-09-126-CV, 2009 WL 3078588, at *2 (Tex.App.-Fort Worth Sept. 24, 2009, no pet.) (mem. op., not designated for publication). When termination of parental rights is based on section D, the endangerment analysis focuses on the evidence of the child's physical

environment, although the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being. *In re S.M.L.,* 171 S.W.3d 472, 477 (Tex.App.-Houston [14th Dist.] 2005, no pet.). Section D permits termination if the petitioner proves parental conduct caused a child to be placed or remain in an endangering environment. *In re R.D.,* 955 S.W.2d 364, 367 (Tex.App.-San Antonio 1997, pet. denied).

It is not necessary that the parent's conduct be directed towards the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of but disregards. *In re S.M.L.,* 171 S.W.3d at 477. Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *Id.* (citing *In re Tidwell,* 35 S.W.3d 115, 119-20 (Tex.App.-Texarkana 2000, no pet.) (" [I]t is not necessary for [the mother] to have had certain knowledge that one of the [sexual molestation] offenses actually occurred; it is sufficient that she was aware of the potential for danger to the children and disregarded that risk by ... leaving the children in that environment." )). In considering whether to terminate parental rights, the court may look at parental conduct both before and after the birth of the child. *Avery v. State,* 963 S.W.2d 550, 553 (Tex.App.-Houston [1st Dist.] 1997, no pet.). Section D permits termination based upon only a single act or omission. *In re R.D.,* 955 S.W.2d at 367.

## 2. Analysis

Deferring to the trial court's credibility determinations, Jordan caused several circumstances that physically and emotionally endangered R.A. by placing him and allowing him to remain in the sole care of Akin. First, she knew that Akin

Page 722

was violent, abusive, had endangered R.A. as a fetus when Akin physically abused her, and was often incarcerated for violent conduct. *See In re J.M.M.,* 80 S.W.3d 232, 241-42 (Tex.App.-Fort Worth 2002, pet. denied) (holding evidence legally and factually sufficient under sections D and E to terminate mother's parental rights based in part on evidence that mother placed children with physically abusive father).

Second, Jordan knew Akin was a convicted sex offender, who usually lived near criminals and drug addicts, and who lived a transient lifestyle. *See id.* (holding evidence legally and factually sufficient under sections D and E to terminate mother's parental rights based in part on evidence that mother placed children with father, who lived transient lifestyle with children); *Hann v. Tex. Dep't of Protective & Regulatory Servs.,* 969 S.W.2d 77, 82-83 (Tex.App.-El Paso 1998, pet. denied) (holding evidence legally and factually sufficient under sections D and E to terminate mother's parental rights based in part on evidence that mother endangered child's physical and emotional well-being by leaving child alone overnight with known cocaine abusers).

Third, Jordan knew Akin was not interested in having a relationship with R.A., would not provide adequate nutrition for R.A., and had no means to financially support R.A. due to Akin's perpetual unemployment. *See In re T.T.,* 39 S.W.3d 355, 362 (Tex.App.-Houston [1st Dist.] 2001, no pet.) (holding evidence supported terminating mother's parental rights under section D based in part on evidence that mother could not adequately protect or provide financially for children).

There is sufficient evidence that shows Jordan was aware of the potential for the

environment to endanger R.A. *See In re S.M.L.,* 171 S.W.3d at 477. Although section D does not require proof of actual harm, the evidence here shows R.A. was actually harmed by living in the circumstances provided by Akin after Jordan voluntarily relinquished custody of R.A. to Akin. The trial court found that when Jerry took R.A. to live with him, R.A. was found alone in a residence, in deplorable conditions, with no clothing or personal belongings, covered in feces, with his penis fused to his scrotum, covered in scabies, with developmental delays, a Vitamin D deficiency, no ability to crawl or walk, suffering from night terrors, afraid of the bath tub and water, demonstrating sexually explicit behaviors, and unable to speak. Although she may not have known that R.A. would get these particular injuries from the circumstances of placing R.A. with Akin, Jordan knew that these types of injuries or much worse were the probable result of the circumstances of leaving a baby in the custody of Akin. *See id.*

The single act of placing R.A. with Akin under any of these circumstances permits termination under section D. *See In re R.D.,* 955 S.W.2d at 367. Here, however, the evidence shows that Jordan not only placed R.A. in these circumstances, but she voluntarily and knowingly allowed R.A. to remain in the circumstances without making any earnest effort to remove him from them.

### 3. Conclusion

Viewing all the evidence in the light most favorable to the judgment, we hold a fact-finder could reasonably have formed a firm belief or conviction that Jordan knowingly placed and knowingly allowed R.A. to remain in conditions and surroundings that endangered his physical and emotional well-being. *See* TEX. FAM.CODE ANN. § 161.001(1)(D). The evidence is thus legally sufficient to support the trial court's termination findings under section 161.001(1)(D) of the Family Code. *See id.;*

Page 723

*In re J.T.,* No. 13-08-00652-CV, 2009 WL 2077184, at *13 (Tex.App.-Corpus Christi July 16, 2009, no pet.) (mem. op., not designated for publication) (holding evidence that mother allowed child to remain in home in which there was violent conduct, as evidenced by father's physical abuse of mother during her pregnancy, was legally sufficient to support termination) (citing *In re H.C.,* 942 S.W.2d 661, 665 (Tex.App.-San Antonio 1997, no writ)) (holding evidence legally sufficient under sections (D) and (E)).

Viewing the evidence as a whole, we hold a rational trier of fact could have reasonably formed a firm belief or conviction that Jordan knowingly placed and knowingly allowed R.A. to remain in conditions and surroundings that endangered his physical and emotional well-being. Thus, the evidence is factually sufficient to support the trial court's finding on the section 161.001(1)(D) ground. *See* TEX. FAM.CODE ANN. § 161.001(1)(D); *In re J.T.,* 2009 WL 2077184 at *13 (holding evidence that mother allowed child to remain in home in which there was violent conduct, as evidenced by father's physical abuse of mother during her pregnancy, was factually sufficient to support termination).

### B. Endangering by Engaging in Conduct (Section E)

### 1. Applicable Law

The trial court must find by clear and convincing evidence that the parent engaged in

conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. TEX. FAM.CODE ANN. § 161.001(1)(E) (Vernon Supp.2009). The relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being. *In re R.D.,* 955 S.W.2d at 368. Termination under section E must be based on more than a single act or omission; what is required is a voluntary, deliberate, and conscious course of conduct. *In re J.J.S.,* 272 S.W.3d 74, 78 (Tex.App.-Waco 2008, pet. struck). The conduct does not have to occur in the presence of the child. *See Dir. of Dallas County Child Protective Servs. v. Bowling,* 833 S.W.2d 730, 733 (Tex.App.-Dallas 1992, no writ). To determine whether termination is necessary, courts look to parental conduct both before and after the child's birth. *In re J.T.G.,* 121 S.W.3d 117, 125 (Tex.App.-Fort Worth 2003, no pet.).

" To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *Robinson v. Tex. Dep't of Protective & Regulatory Servs.,* 89 S.W.3d 679, 686 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (citing *Boyd,* 727 S.W.2d at 533). The term means " more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Id.* (quoting *Boyd,* 727 S.W.2d at 533). However, danger to a child need not be established as an independent proposition and may be inferred from parental misconduct even if the conduct is not directed at the child and the child suffers no actual injury. *See id.; Vasquez v. Tex. Dep't of Protective & Regulatory Servs.,* 190 S.W.3d 189, 195 (Tex.App.-Houston [1st Dist.] 2005, pet. denied).

Conduct that subjects a child to life of uncertainty and instability endangers the child's physical and emotional well-being. *In re S.D.,* 980 S.W.2d 758, 763 (Tex.App.-San Antonio 1998, pet. denied). A parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child.

Page 724

*In re J.I.T.P.,* 99 S.W.3d 841, 845 (Tex.App.-Houston [14th Dist.] 2003, no pet.); *see also In re C.M.B.,* 204 S.W.3d 886, 895 (Tex.App.-Dallas 2006, pet. denied). A parent's mental instability and attempt to commit suicide may contribute to a finding that the parent engaged in a course of conduct that endangered a child's physical or emotional well-being. *In re J.T.G.,* 121 S.W.3d at 126; *see In re A.M.C.,* 2 S.W.3d 707, 716 (Tex.App.-Waco 1999, no pet.) (upholding jury's determination of endangerment where evidence showed mother's suicidal thoughts, suicide attempts, and neglect); *see also In re C.D.,* 664 S.W.2d 851, 853 (Tex.App.-Fort Worth 1984, no writ) (mental conditions and suicide attempts of parent were factors in considering whether parent engaged in conduct that endangered emotional well-being of child).

Abusive and violent criminal conduct by a parent can produce an environment that endangers the well-being of a child. *In re B.R.,* 822 S.W.2d 103, 106 (Tex.App.-Tyler 1991, writ denied). Evidence as to how a parent has treated another child or spouse is relevant regarding whether a course of conduct under section E has been established. *In re D.T.,* 34 S.W.3d 625, 636-37 (Tex.App.-Fort Worth 2000, pet. denied). Evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future.

*Schaban-Maurer v. Maurer-Schaban,* 238 S.W.3d 815, 824 (Tex.App.-Fort Worth 2007, no pet.); *see In re M.G.M.,* 163 S.W.3d 191, 202 (Tex.App.-Beaumont 2005, no pet.).

## 2. Analysis

The trial court made findings pertaining to section 161.001(1)(E) in support of its determinations that (a) Jordan knowingly placed and allowed R.A. to remain with Akin, who engaged in conduct that endangered R.A.'s physical or emotional well-being, and (b) Jordan herself engaged in conduct that endangered R.A.'s physical or emotional well-being. *See* TEX. FAM.CODE ANN. § 161.001(1)(E).

### a. Placing and Allowing R.A. to Remain with Akin

For the same reasons detailed in our analysis of section D, we conclude the evidence supports the trial court's determination that Jordan's voluntary and knowing placement of R.A. with Akin and her voluntary and knowing decision to allow R.A. to remain with Akin by opting not to use earnest efforts until after September 2007 to regain custody of R.A., endangered the physical and emotional well-being of R.A. *See In re S.P.,* 168 S.W.3d 197, 204-05 (Tex.App.-Dallas 2005, no pet.) (holding evidence supported termination of mother's parental rights where, among other factors, mother knowingly allowed abusive and sexually deviant father to have access to children); *In re J.M.M.,* 80 S.W.3d at 241-42; *Hann,* 969 S.W.2d at 82-83.

### b. Jordan's Direct Contact with R.A.

In this section, therefore, we address Jordan's direct conduct that endangered R.A. Deferring to the trial court's credibility determinations, the record supports the trial court's findings that Jordan engaged in conduct which endangered the physical or emotional well-being of R.A. for several reasons. First she endangered him when he was a fetus. *See id.* at 203 (endangering conduct may include parent's actions before child's birth); *In re S.M.L.D.,* 150 S.W.3d 754, 757-58 (Tex.App.-Amarillo 2004, no pet.); *Avery v. State,* 963 S.W.2d at 553. Although she obtained prenatal care in the latter half of her pregnancy, Jordan did not receive proper nutrition for most of her pregnancy due to her decision to leave the shelter to be with Akin. *Compare*

Page 725

*Mann v. Dep't of Family & Protective Servs.,* No. 01-08-01004-CV, 2009 WL 2961396, at *11 (Tex.App.-Houston [1st Dist.] Sept. 17, 2009, no pet.) (mem. op., not designated for publication) (considering under section E that mother took prenatal vitamins as evidence that undermined argument that she engaged in course of conduct that endangered child). In addition to failing to properly care for R.A. for the entire time he was a fetus, Jordan also tried to end his existence by attempting suicide when he was an eight-month fetus. This deliberate conduct endangered R.A. physically before he was born. *See In re A.M.C.,* 2 S.W.3d at 716 (finding endangerment from mother's suicidal ideations, attempts and neglect). Jordan also physically endangered R.A. before he was born by remaining with Akin, who was repeatedly physically abusing her to the point that she knew he was endangering R.A. as a fetus. *See In re J.T.,* 2009 WL 2077184 at *12 (holding evidence legally and factually sufficient to terminate mother's parental rights under section E for endangering physical well-being of child based in part on evidence that mother remained with physically abusive person while she was pregnant); *see also In re J.I.T.P.,* 99 S.W.3d at 845 (holding trial court could have properly considered the domestic violence and physical altercation

during mother's pregnancy as evidence of endangerment).

Second, Jordan has lived an unstable, transient lifestyle that indicates a pattern of engaging in conduct that would endanger R.A. emotionally and physically. *See Bowling,* 833 S.W.2d at 733 (conduct does not have to occur in presence of child and can be considered even if child living elsewhere at time of events). Between December 2006 and September 2007, she was kicked out of the Rose Home shelter for violent conduct, she then attempted suicide, and then resided at various points in time in a hospital, in a shelter, or was homeless. Although none of her conduct at that time was directed at harming R.A., endangering conduct is not limited to actions directed toward the child. *See In re J.I.T.P.,* 99 S.W.3d at 844 (endangering acts need not be directed at or actually cause injury to child). The trial court could reasonably determine that Jordan's propensity for violence against herself and others, want of self control, and transient lifestyle would endanger R.A. by giving him a life of instability and uncertainty. *See id.* at 845 (holding trial court could have considered mother's desire to hurt herself and her history of noncompliance with her medication schedule as factors endangering child); *In re N.S.G.,* 235 S.W.3d at 358, 367 (Tex.App.-Texarkana 2007, no pet.) (noting that if evidence shows course of conduct which has effect of endangering physical or emotional well-being of child, finding under section E is supportable); *see also In re J.J.S.,* 272 S.W.3d at 78 (requiring course of conduct under section E).

Jordan points to evidence that she had not attempted suicide for over a year, has not been hospitalized for over two years, and that her mental illness is in remission. Other than her trial testimony that the court found lacking in credibility, Jordan provided no evidence that her mental illness is in remission. The record shows Jordan was last hospitalized in January 2007; however, medical records from February through November 2008 repeatedly diagnose Jordan as still having " [m]ajor depressive disorder, recurrent, severe with psy[chotic] features, seizure disorder." Additionally, the record shows, and the court made findings, that Jordan was first diagnosed with major depression and personality disorder at the age of 15. Between 1996 and 2003, she was in and out of several mental health care facilities. She

Page 726

has tried to commit suicide 10 to 15 times and has been hospitalized 20 times. She has been either homeless, in a shelter, in housing associated with a shelter, or in a hospital for most of R.A.'s life. Jordan is currently diagnosed with bi-polar disorder, major depression, chronic post-traumatic stress syndrome, and borderline personality disorder. At the time of trial, Jordan was not attending all of her mental health appointments, and she was not taking her medications as prescribed.

Although there are recent developments that show improvements in Jordan's condition, the trial court could reasonably determine any evidence of improvement was short lived and outweighed by the extent of her mental history over the course of most of her life, the number of suicide attempts, the number hospitalizations, her minimization of her present mental condition, and her present failure to strictly comply with her medication and therapy. *See In re J.I.T.P.,* 99 S.W.3d at 845 (considering in termination proceeding under section E that mother had recurrent depression, borderline personality disorder, post-traumatic stress syndrome, partial complex seizures, thoughts of suicide, and was not compliant with medications); *In re C.D.,* 664 S.W.2d at

853 (considering mother's schizophrenia and resulting suicidal thoughts, hospitalizations, and violence); *In re J.O.A.,* 283 S.W.3d 336, 346 (Tex.2009) (deferring to trial court to weigh evidence of significant recent improvements, especially of short duration, against probative value of irresponsible choices). Based on Jordan's past and present conduct, the trial court could reasonably infer that if R.A. lived with her in the future, her instability would physically and emotionally endanger him by giving him a life of uncertainty. *See Schaban-Maurer,* 238 S.W.3d at 824; *In re M.G.M.,* 163 S.W.3d at 202.

### 3. Conclusion

Viewing all the evidence in the light most favorable to the judgment, we hold a fact-finder could reasonably have formed a firm belief or conviction that Jordan knowingly placed and allowed R.A. to remain with persons who engaged in conduct that endangered the physical and emotional well-being of R.A., and Jordan engaged in conduct that endangered the physical and emotional well-being of R.A. *See* TEX. FAM.CODE ANN. § 161.001(1)(E). The evidence is thus legally sufficient to support the trial court's termination findings under section E. *See In re J.I.T.P.,* 99 S.W.3d at 845.

Viewing the evidence as a whole, we hold a rational trier of fact could have reasonably formed a firm belief or conviction that (1) Jordan knowingly placed and allowed R.A. to remain with persons who engaged in conduct that endangered the physical and emotional well-being of R.A., and (2) Jordan engaged in conduct that endangered the physical and emotional well-being of R.A. *See* TEX. FAM.CODE ANN. § 161.001(1)(E). Thus, the evidence is factually sufficient to support the trial court's termination findings under section E. *See In re J.I.T.P.,* 99 S.W.3d at 845.

### C. Failing to Support for Six Months (Section C)

### 1. Applicable Law

The court may terminate the parent-child relationship if the court finds by clear and convincing evidence that the parent has left the child alone or in the possession of another without providing adequate support for the child and remained away for a period of at least six months. *See* TEX. FAM.CODE ANN. § 161.001(1)(C) (Vernon Supp.2009). This ground is commonly characterized as the abandonment of a child by a parent. *See*

Page 727

*In re J.R.,* No. 08-08-00058-CV, 2010 WL 375676, at *3 (Tex.App.-El Paso Feb. 3, 2010, no pet.); *In re T.B.D.,* 223 S.W.3d 515, 518 (Tex.App.-Amarillo 2006, no pet.). The six-month period is a period of at least six consecutive months. *See In re T.B.D.,* 223 S.W.3d at 518.

### 2. Analysis

The trial court made findings of fact pertinent to section 161.001(1)(C) that Jordan gave three week old R.A. to Akin; that she took " no steps to seek his return through civil court proceedings until around October 2008" ; that she provided no support, goods, or money for the child after November 24, 2006; that she did not make adequate arrangements for the support of the child when she relinquished possession of the child to Akin in November 2006; and that she relinquished the child to Akin who had no job, no residence, and no visible means to support himself or the child. Deferring to the trial court's credibility determinations, the record supports these findings. These findings and the record establish that Jordan voluntarily placed R.A. in the

possession of Akin, she did not provide any support to R.A., and she voluntarily remained away for a period of at least six months from November 24, 2006 to September 2007.

It is undisputed that Jordan has never provided any support of any kind to R.A. since he was three weeks of age. We have already detailed above the evidence that shows Jordan voluntarily placed R.A. with Akin on approximately November 24, 2006 and voluntarily left him with Akin until she tried to seek assistance from the police after September 2007. We have also noted she knew where Akin was until September 2007. The evidence, therefore, shows that although she knew where R.A. was, she did not support R.A. in any way for at least nine months.

Even if we exclude the period of time when DHS investigated the situation, DHS closed its case on January 10, 2007. Beginning January 10, Jordan did not support R.A. in any way from then through at least six months to July 10, 2007. We note that the record shows that on June 20, 2007, Legal Aid sent a letter to Jordan declining full representation, but offering to draft documents. As we have observed above, the trial court could reasonably have determined that was not an earnest effort by Jordan to regain custody of R.A. Excluding the time of the DHS investigation, Jordan failed to provide any support to R.A. for six months from January 10 to July 10, 2007.

Jordan relies upon *Holick v. Smith* to assert she does not herself need to provide support. 685 S.W.2d 18 (Tex.1985). In *Holick,* the mother of two children had difficulties caring for the children and eventually left the children with her niece to be cared for by the niece until the mother improved her living conditions. *Id.* at 19. After she left the children with the niece, she moved to another city and obtained employment. *Id.* She did not send money to help support the children, but the niece did not expect her to do so. *Id.* The mother did not visit or write the children for over six months, although she did call and talk to them once during that period, and expressed an intent to return for the children. *Id.* at 19, 20. The niece eventually sought termination of the mother's rights, and the trial court terminated the mother's rights under section C. *Id.* On appeal to the Texas Supreme Court, she contended that she was not required to actually support the children, but only make arrangements for their adequate support. *Id.* at 21. The Supreme Court agreed. It held the mother was required to " make arrangements for the adequate support" rather than personally support

Page 728

the children, and concluded that the mother had met this standard. *Id.*

In this case, Jordan did not make " arrangements for the adequate support" of R.A. Excluding the testimony of Jordan, the evidence shows that she initially relinquished R.A. to Akin, an abusive man and convicted sex offender who lived a transient lifestyle. After DHS closed its case on January 10, 2007, Jordan did not try to regain possession of R.A., did not again contact DHS, and did not ensure that Akin was adequately supporting R.A. even though she knew the location of Akin and R.A. Additionally, unlike in *Holick,* there was no understanding between Akin and Jordan that Jordan would not be sending support because Akin could provide adequate support on his own. As Akin said in his own letters, Jordan " stuck" R.A. with him, she " never once helped [him] when [he] had [R.A.]," he " tried for almost 6 month[s]" to locate Jordan but she " vanished off the face of the earth," and he needed her " more than ever at that time and so did

[R.A.] [b]ut [p]oof [she] vanished." The evidence clearly shows that Jordan did not make arrangements for the adequate support of R.A. *Cf. In re R.N.G.,* No. 11-02-00084-CV, 2002 WL 32344622, at *2 (Tex.App.-Eastland Dec. 12, 2002, no pet.) (mem. op., not designated for publication) (holding evidence insufficient to terminate mother's parental rights under section C because mother made arrangements for adequate support of children, evidence showed mother left children with father who maintained steady employment and adequately supported children, mother knew that father would provide adequate support, and mother left children pursuant to agreed divorce decree).

Jordan also relies upon *In re T.B.D.* to argue her rights should not be terminated. 223 S.W.3d 515. In *T.B.D.,* the father had attempted to contact the child from prison through correspondence. *Id.* at 519. The court found that although the father was incarcerated, there was insufficient proof of the " remaining away" requirement of section C, especially in light of the fact that the father attempted to contact the child. *Id.* The facts in this case are not analogous to those in *T.B.D.* As demonstrated above, apart from Jordan's testimony, the evidence shows that Jordan knew where R.A. and Akin were for the six-month period of time from January to June 2007, yet she did not go to see them. Her only explanation that she gave Detective Feskanich for not visiting them was that she had a curfew. Although an inmate's sole means to communicate with a young child is by letter, that type of communication is wholly inadequate when the person lives in the same city and is physically capable of maintaining personal contact with the child.

### 3. Conclusion

Viewing all the evidence in the light most favorable to the judgment, we hold a fact-finder could reasonably have formed a firm belief or conviction that Jordan failed to provide any support to R.A. for a continuous six month period of time. *See* TEX. FAM.CODE ANN. § 161.001(1)(C). The evidence is thus legally sufficient to support the trial court's termination findings under section 161.001(1)(C) of the family code. *See id.*

Viewing the evidence as a whole, we hold a rational trier of fact could have reasonably formed a firm belief or conviction that Jordan failed to provide any support for R.A. for a continuous six month period of time. *See* TEX. FAM.CODE ANN. § 161.001(1)(C). Thus, the evidence is factually sufficient to support the trial court's finding on the section 161.001(1)(C) ground. *See id.*

Page 729

### D. Conclusion of Section 161.001(1) Analysis

Although only one ground under section 161.001(1) is required for termination of parental rights under that section, the trial court found three grounds, and we have determined the evidence is legally and factually sufficient to support each independent ground. *See In re J.L.,* 163 S.W.3d at 84 (stating that petitioner must establish only one ground listed under section 161.001(1)).

### Best Interest Finding

Having determined the evidence is sufficient to establish at least one of the grounds in section 161.001(1), we now consider the best interests of R.A.

### A. Applicable Law

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. *See In re M.C.T.,* 250 S.W.3d 161, 170 (Tex.App.-Fort Worth 2008, no pet.) (citing TEX. FAM.CODE ANN. § 263.307(a) (Vernon 2008)). There is also a strong presumption that a child's best interests are served by maintaining the parent-child relationship. *In re L.M.,* 104 S.W.3d 642, 647 (Tex.App.-Houston [1st Dist.] 2003, no pet.). Nevertheless, while parental rights are of constitutional magnitude, they are not absolute. *See In re C.H.,* 89 S.W.3d 17, 26 (Tex.2002). Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right. *Id.*

In *Holley v. Adams,* the Texas Supreme Court provided a nonexclusive list of factors that the trier of fact may use in a termination case to determine the best interest of the child. 544 S.W.2d 367, 371-72 (Tex.1976). These factors include (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* These factors are not exhaustive, and there is no requirement that the petitioner prove all factors as a condition precedent to parental termination. *In re C.H.,* 89 S.W.3d at 27; *Adams v. Tex. Dep't of Family & Protective Servs.,* 236 S.W.3d 271, 280 (Tex.App.-Houston [1st Dist.] 2007, no pet.).

The same evidence of acts or omissions used to establish grounds for termination under section 161.001(1) may be probative in determining the best interests of the child. *In re C.H.,* 89 S.W.3d at 28; *In re L.M.,* 104 S.W.3d at 647. Evidence of just one factor may suffice as support of a finding that termination is in the best interest of the child. *See In re C.H.,* 89 S.W.3d at 27. However, termination of the parent-child relationship is not justified when the evidence shows merely that a parent's failure to provide a more desirable degree of care and support of the child is due solely to misfortune or the lack of intelligence or training, and not to indifference or malice. *Clark v. Dearen,* 715 S.W.2d 364, 367 (Tex.App.-Houston [1st Dist.] 1986, no writ).

## B. Analysis

We address the nine factors to determine whether the evidence is legally

Page 730

and factually sufficient to show that termination of Jordan's parental rights is in the best interest of R.A.

## 1. Desires of Child

Regarding the first factor, because of R.A.'s youth, R.A.'s desires cannot be determined. This factor, therefore, is inconsequential in this case. *See In re M.T.,* No. 14-02-00973-CV, 2003 WL 22054247, at *2 (Tex.App.-Houston [14th Dist.] Sept. 4, 2003, no pet.) (mem. op., not designated for publication) (noting child of two years old too young to express her desires).

## 2. Emotional and Physical Needs Now and In Future, and

### 3. Emotional and Physical Danger Now and in the Future

The record shows that by the time of the trial, R.A. had not completely recovered from the circumstances he had lived under, but he was doing much better due to the care of the Dosseys. R.A. still stores food in his mouth when he eats, but he now enjoys taking a bath. The Dosseys have nurtured R.A. from his unhealthy condition to that of a healthy young boy developing verbal and motor skills, emotional attachment, and overcoming fears.

If R.A. was detached from the Dosseys, then he would face emotional harm. At trial, Cravens, an expert in child development, testified that after attachment has occurred a child cannot be moved without a measure of harm. She testified that a break in attachment and a move would likely impact R.A.'s ability to trust others and his ability to empathize with others when he is older. Cravens testified that it would be best not to break attachment at R.A.'s age, but if it must be broken to do it slowly and carefully. Despite acknowledging Cravens's testimony, Jordan testified at trial that she wanted to break R.A.'s attachment with the Dosseys and that if awarded custody, she did not want the Dosseys to be a part of R.A.'s life.

Jerry testified that he tried multiple times to meet Jordan but she has refused to meet, as well as indicated an unwillingness to work with them regardless of what the court decides about R.A. Jordan's unwillingness to work with the Dosseys in making any necessary transition makes it probable that R.A. would be harmed by the break in the attachment he has with the Dosseys.

The trial court found that Jordan had placed her own needs above R.A. For example, after Jordan found out the Dosseys had possession of R.A., she did not attempt to contact them to find out how R.A. was doing or to send any support for R.A. or even a birthday card. Since then, however, Jordan has had some supervised visitation with R.A.

The Dosseys would serve well the emotional and physical needs of R.A. The Dosseys have been married for 13 years and have another child with whom R.A. has bonded. The evidence is undisputed that the Dosseys provide a stable home and that they will be able to continue to meet R.A.'s emotional and physical needs. The second and third factors weigh in favor of termination of Jordan's parental rights. *See Dupree v. Texas Dep't of Protective & Regulatory Servs.,* 907 S.W.2d 81, 87 (Tex.App.-Dallas 1995, no writ) (" The need for permanence is the paramount consideration for the child's present and future physical and emotional needs." ); *see also* TEX. FAM.CODE ANN. § 263.307(a).

### 4. Parenting Abilities

Although Jordan had only a limited time with R.A., in that limited time she demonstrated weak parenting abilities. She attempted to commit suicide while pregnant with R.A. After R.A. was born, she allowed Akin to care for R.A. even though he had repeatedly abused her, had housed her in

Page 731

crack houses, was a sex offender, and could not financially provide for food for her. As Jordan noted at trial, she has never taken care of a child full-time. She did take one online parenting class one week before trial, but has not taken other parenting courses since she was pregnant. At trial, Jordan testified that she had some experience taking care of children, but that testimony was inconsistent with her earlier statements produced during discovery.

The record shows Jordan has weak parenting abilities. It is undisputed the Dossey's have been excellent parents to R.A. The fourth factor, therefore, weighs in favor of termination of Jordan's parental rights. *See Castorena v. Tex. Dep't of Protective & Regulatory Servs.,* No. 03-02-00653-CV, 2004 WL 903906, at *11 (Tex.App.-Austin April 29, 2004, no pet.) (noting " [i]t is not in a child's best interest that he be made a guinea pig" upon whom parents should be allowed to practice until they might become more proficient in child care).

## 5. Programs Available to Assist in Care of R.A.

Due to her diagnosis of epileptic seizures, Jordan receives governmental disability income of $674 per month to live on, albeit it would increase if she was awarded custody. Jordan has received food stamps for approximately one year. Jordan testified that she has an ability to take advantage of programs that could promote R.A.'s best interests. Jordan has no family in Oklahoma, and she complained of extensive abuse from her own mother and molestation from a family member, so it is unlikely she would be able to receive family support.

The financial resources that a stable family like the Dossey can provide could help pay for any social or counseling programs that R.A. may need in the future. The fifth factor neither weighs in favor of or against termination of Jordan's parental rights.

## 6. Plans for the Child, and

## 7. Stability of Home

Although Jordan testified she has plans to be a good mother to R.A., the record indicates she does not have the ability to be one. At trial, she admitted that if granted custody, she planned to prevent the Dosseys from seeing R.A., even in light of the expert's testimony that this could damage R.A.'s emotional stability. Furthermore, Jordan acknowledged at trial that her home was not suitable for a two-year-old.

The Dosseys intend to raise R.A. as their own child and adopt him. There is no dispute the Dosseys have provided R.A. with a stable home. Jerry testified that he and his wife, Pam, filed the lawsuit to terminate Jordan's rights because they consider R.A. to be their child who they love as part of their family, and whose best interest is served by living with them. Jerry said he and his wife paid an attorney to pursue the lawsuit because they decided they would do " anything that it takes to save [R.A.'s] life."

The sixth and seventh factors weigh in favor of terminating Jordan's parental rights. *See In re C.A.J.,* 122 S.W.3d 888, 894 (Tex.App.-Fort Worth 2003, no pet.). (" Without stability, income, or a home, [a parent] is unable to provide for the child's emotional and physical needs" and parent's instability " threatens the physical well-being of the child" ).

## 8. Acts or Omissions of Parent that May Indicate Existing Parent-Child Relationship is not Proper One, and

## 9. Any Excuse for Acts or Omissions of Parent

At the time of trial, Jordan testified she was taking four prescription medications

Page 732

for anxiety, depression, seizures, and to help her sleep. She acknowledges she recently has periodically failed to consistently take her seizure medications. She admitted that she had not attended all of her medical appointments. Jordan stopped all psychological therapy in 2008. She

has also hidden the extent of her mental instability to those that have tried to help her in this case, including Special Agent Phill.

Jordan contends, nevertheless, that her depression is under control, that her epilepsy is under control, and that she has not been hospitalized for over two years. Although she testified that recently her mental situation has improved due to its remission, Jordan did not provide any evidence that she is in remission, other than her own testimony. The OU medical records show that Jordan had been hospitalized 20 times, but Jordan's trial testimony denied it was that many. Similarly, the medical records show she had 10 to 15 suicide attempts, but at trial she could " only think of two specific times," once as a teenager and once as an adult. At trial, Jordan continued to make statements suggestive of a suicidal ideation by stating that her life is not worth living without R.A.

The record undisputedly shows the Dosseys take excellent care of R.A. emotionally and physically, and their family has a loving relationship with him. They hope to adopt him into their family. Although the record shows Jordan has had some improvement in her situation, her severe mental illness over the course of most of her life that includes numerous hospitalizations and suicide attempts show that termination is in R.A.'s best interest, particularly in light of her present minimization of the situation, failure to take medications strictly as prescribed, failure to continue to attend all medical appointments, and decision to stop therapy. The eighth and ninth factors weigh in favor of terminating Jordan's parent-child relationship with R.A. *See Castorena,* 2004 WL 903906 at *9 (noting in termination proceedings that " [a]though evidence of past misconduct or neglect alone may not be sufficient to show present unfitness, the fact finder may permissibly infer that an adult's future conduct may well be measured by recent deliberate past conduct as it relates to the same or a similar situation" ).

## C. Conclusion of Analysis

Termination decisions cannot be used to reallocate children " to better and more prosperous parents." *See In re W.C.,* 98 S.W.3d 753, 758 (Tex.App.-Fort Worth 2003, no pet.). That is not the situation presented here. Although evidence shows Jordan has made some recent improvements to her past situation, those improvements cannot absolve her of her long history of irresponsible choices. *See In re J.O.A.,* 283 S.W.3d at 346 (" While the recent improvements made by [appellant] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of ... irresponsible choices." ).

Jordan contends her misfortunes are not grounds to terminate her parental rights. A parent's lack of education, training, or misfortune is considered when reviewing excuses for acts or omissions of a parent; however, these considerations do not negate evidence tending to show that termination is in the child's best interest. *In re S.H.A.,* 728 S.W.2d 73, 89-90 (Tex.App.-Dallas 1987, writ ref'd n.r.e.). In this case, except for one inconsequential and one neutral factor, each of the best interest factors weigh in favor of concluding that termination of Jordan's parental rights is in the best interest of R.A. Although Jordan has led a life filled with various misfortunes, the trial court found the vast majority of her explanations lacking

Page 733

in credibility and the evidence shows that placing R.A. with her would endanger him emotionally in

the future. *See id.*

Jordan's plans to form a life with R.A. have not been met with actions that demonstrate an ability to execute those plans. For example, she has an apartment, but acknowledges it is unfit for a two-year old. Additionally, she takes her required medications, but not exactly as prescribed. She continues to have an interest in suicide as a solution to her problems as demonstrated by her statements that if she did not get custody of R.A. her life would not be worth living. Given her approximately 15 attempts at suicide, this continued reference to a " life not worth living" suggests she still sees suicide as a remedy for her problems. It is not in R.A.'s best interest to place him in an environment where his sole caretaker, who has attempted suicide at least 15 times, sees suicide as a solution to problems.

In light of all the evidence, the trial court could have reasonably formed a firm belief or conviction that termination of Jordan's parental rights was in R.A.'s best interest. Accordingly, we hold the evidence is both legally and factually sufficient to support the trial court's finding that termination of Jordan's parental rights was in the best interest of R.A. *See in re J.T.,* 2009 WL 2077184 at 14 (holding that evidence was sufficient to support trial court's best interest finding where mother allowed child to be in contact with individual who had physically abused her, mother was not capable of caring for child on her own, mother admitted at trial she had not found stable employment, and child was doing well in her current placement).

We overrule Jordan's first issue.

**Conservatorship Rights**

In Jordan's second issue, she contends that if we reverse on the trial court's termination of Jordan's parental rights, we remand for a determination by the trial court of Jordan's conservatorship rights. Because we find that the evidence is legally and factually sufficient to uphold the trial court's termination of Jordan's parental rights, we overrule Jordan's second issue as moot.

**Conclusion**

We affirm the judgment of the trial court.

---------

Notes:

[1] TEX. FAM.CODE ANN. § 161.001(1)(C), (D), & (E) (Vernon Supp.2009).

---------

**727 S.W.2d 531 (Tex. 1987)**

**TEXAS DEPARTMENT OF HUMAN SERVICES et al., Petitioner,**

**v.**

**William S. BOYD, Respondent.**

**No. C-5877.**

**Supreme Court of Texas.**

**April 8, 1987**

Page 532

Richard L. Crozier and Ann S. Taylor, Hearne, Knolle, Lewallen, Livingston & Holcomb, J. Patrick Wiseman, Attorney General's Office, Don Kay, Texas Dept. of Human Services, from Austin, for petitioner.

R. Stephen Tompkins, Legal Aid Society of Central Texas, Austin, for respondent.

ROBERTSON, Justice.

This is an action to terminate the parent-child relationship between the biological father, William Swanson Boyd, and his minor child. Suit was instituted by the Texas Department of Human Resources after the child's natural mother, Barbara Arriola, signed an irrevocable affidavit of relinquishment of her parental rights. Boyd was served with process and entered an appearance in the case and cross-petitioned for legitimation. Prior to trial of this cause but after execution of the affidavit of relinquishment, Barbara Arriola consented to legitimation of the child as to Boyd. The trial court rendered its order legitimating the child, terminating the mother's parental rights based upon her execution of the irrevocable affidavit of relinquishment [1], and terminating the father's parental rights based upon a finding under section 15.02(1)(E), TEX. FAM. CODE ANN. (Vernon's 1986), that Boyd had engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child. [2] The court of appeals reversed the trial court and rendered judgment that the Texas Department of Human Resources take nothing by its suit seeking to terminate Boyd's parental rights. 715 S.W.2d 711. We reverse the judgment of the court of appeals and remand this cause to that court for further consideration.

Boyd and Arriola began living together in approximately February 1981 but were

Page 533

never married. On April 4, 1982, Boyd was arrested and jailed for burglary. Two days later Arriola gave birth to a daughter. Boyd saw the child for the first time eight months later when he was paroled from his burglary conviction on December 23, 1982. After his parole, Boyd lived with Arriola until early June 1983, approximately five months. They then separated. In October 1983, Boyd was again arrested and jailed for burglary and he is currently serving a five-year sentence in the Texas Department of Corrections. During the short period of time that Boyd was out on parole, he intermittently held three different jobs. The evidence is vague, at best, as to the nature and amount of support he provided the child.

Barbara Arriola first contacted the Department of Human Resources in June 1983 concerning

problems she was having caring for the child. No action was taken by the Department at that time. Barbara contacted the Department for the second time in January 1984 and indicated that she wished to place the child for adoption because she could no longer afford to take care of the child. At the time the child was taken into custody by the Department, she was experiencing emotional problems including sleep disorders, dietary and bed-wetting problems, and temper tantrums.

Under section 15.02, TEX. FAM. CODE ANN. (Vernon's 1986), termination of a parent-child relationship may not be based solely upon what the trial court determines to be the best interest of the child. *Holley v. Adams,* 544 S.W.2d 367 (Tex.1976). In *Wiley v. Spratlin,* 543 S.W.2d 349, 351 (Tex.1976), this court wrote:

Subdivision (1) of [section 15.02] lists several acts or omissions, one or more of which must be proved in a termination case.... Subdivision (2) of the same Section requires proof of a second element, that the termination is in the best interest of the child. Both elements must be established and the requirements of Subdivision (1) are not excused because a court may be of the opinion that Subdivision (2) has been proved.

Based upon its interpretation of section 15.02(1)(E), the court of appeals held that there was no evidence, or alternatively that the evidence was less than clear and convincing, that Boyd had endangered the emotional or physical well-being of the child. That section provides for termination of the parent-child relationship if the court finds that the parent has:

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.

The court of appeals stated that the word "endanger" as used in the statute actually meant "danger" and defined "danger" as an "actual and concrete threat of injury to the child's emotional or physical well-being." 715 S.W.2d at 715. The court of appeals further held that the " 'danger' must be established as an independent proposition and is not inferrable alone from parental misconduct." 715 S.W.2d 715. We decline to adopt the interpretation placed on section 15.02(1)(E) by the court of appeals and expressly disapprove both its definition of "danger" and its holding that danger cannot be inferred from parental misconduct. While we agree that "endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Allred v. Harris County Child Welfare Unit,* 615 S.W.2d 803, 806 (Tex.Civ.App.--Houston [1st Dist.] 1980, writ ref'd n.r.e.). Rather, "endanger" means to expose to loss or injury; to jeopardize. Webster's New Twentieth Century Dictionary of the English Language 599 (1976), and imprisonment is certainly a factor to be considered by the trial court on the issue of endangerment.

Texas cases have considered the involuntary termination of the rights of an imprisoned parent, and have held that mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child. See, e.g., *Wray v. Lenderman,*

*Page* 534

640 S.W.2d 68 (Tex.App.--Tyler 1982, writ ref'd n.r.e.); In the Interest of Guillory, 618 S.W.2d 948 (Tex.Civ.App.--Houston [1st Dist.] 1981, no writ); *Crawford v. Crawford,* 569 S.W.2d 505, 507

(Tex.Civ.App.--San Antonio 1978, no writ). It is at this point, however, that the courts of appeals part company on the effect of a parent's imprisonment. We hold that if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding under section 15.02(1)(E) is supportable. Wray at 71.

Since we hold that the court of appeals incorrectly interpreted section 15.02(1)(E), we reverse the judgment of the court of appeals and remand this cause to that court for their determination of whether the State met its burden of proving by clear and convincing evidence that Boyd engaged in conduct which endangered the physical or emotional well-being of the child.

---------

Notes:

[1] The trial court's order terminating the mother's parental rights has not been appealed and that part of the order has become final.

[2] Section 15.02(1)(E) was the only provision of section 15.02 alleged against Boyd by the Department of Human Resources.

---------

455 U.S. 745 (1982), 80-5889, Santosky v. Kramer

**455 U.S. 745 (1982)**

**102 S.Ct. 1388, 71 L.Ed.2d 599**

**Santosky**

**v.**

**Kramer**

**No. 80-5889**

**United States Supreme Court**

**March 24, 1982**

Argued November 10, 1981

CERTIORARI TO THE APPELLATE DIVISION, SUPREME COURT OF

NEW YORK, THIRD JUDICIAL DEPARTMENT

Syllabus

Under New York law, the State may terminate, over parental objection, the rights of parents in their natural child upon a finding that the child is "permanently neglected." The New York Family Court Act (§ 622) requires that only a "fair preponderance of the evidence" support that finding. Neglect proceedings were brought in Family Court to terminate petitioners' rights as natural parents in their three children. Rejecting petitioners' challenge to the constitutionality of § 622's "fair preponderance of the evidence" standard, the Family Court weighed the evidence under that standard and found permanent neglect. After a subsequent dispositional hearing, the Family Court ruled that the best interests of the children required permanent termination of petitioners' custody. The Appellate Division of the New York Supreme Court affirmed, and the New York Court of Appeals dismissed petitioners' appeal to that court.

*Held:*

1. Process is constitutionally due a natural parent at a state-initiated parental rights termination proceeding. Pp. 752-757.

(a) The fundamental liberty interest of natural parents in the care custody, and management of their child is protected by the Fourteenth Amendment, and does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. A parental rights termination proceeding interferes with that fundamental liberty interest. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures. Pp. 752-754.

(b) The nature of the process due in parental rights termination proceedings turns on a balancing of three factors: the private interests affected by the proceedings; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure. *Mathews v. Eldridge*, 424 U.S. 319, 335. In any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the public and

Page 746

private interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants. The minimum standard is a question of federal law which this Court may resolve. Retrospective case-by-case review cannot preserve fundamental fairness when a class of proceedings is governed by a constitutionally defective evidentiary standard. Pp. 754-757.

2. The "fair preponderance of the evidence" standard prescribed by § 622 violates the Due Process Clause of the Fourteenth Amendment. Pp. 758-768.

(a) The balance of private interests affected weighs heavily against use of such a standard in parental rights termination proceedings, since the private interest affected is commanding, and the threatened loss is permanent. Once affirmed on appeal, a New York decision terminating parental rights is *final* and irrevocable. Pp. 758-761.

(b) A preponderance standard does not fairly allocate the risk of an erroneous factfinding between the State and the natural parents. In parental rights termination proceedings, which bear many of the indicia of a criminal trial, numerous factors combine to magnify the risk of erroneous factfinding. Coupled with the preponderance standard, these factors create a significant prospect of erroneous termination of parental rights. A standard of proof that allocates the risk of error nearly equally between an erroneous failure to terminate, which leaves the child in an uneasy *status quo,* and an erroneous termination, which unnecessarily destroys the natural family, does not reflect properly the relative severity of these two outcomes. Pp. 761-766.

(c) A standard of proof more strict than preponderance of the evidence is consistent with the two state interests at stake in parental rights termination proceedings -- a *parens patriae* interest in

preserving and promoting the child's welfare and a fiscal and administrative interest in reducing the cost and burden of such proceedings. Pp. 766-768.

3. Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence. A "clear and convincing evidence" standard adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process. Determination of the precise burden equal to or greater than that standard is a matter of state law properly left to state legislatures and state courts. Pp. 768-770.

75 App.Div.2d 910, 427 N.Y.S.2d 319, vacated and remanded.

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed a

Page 747

dissenting opinion, in which BURGER, C.J., and WHITE and O'CONNOR, JJ., joined, *post,* p. 770.

BLACKMUN, J., lead opinion

JUSTICE BLACKMUN delivered the opinion of the Court.

Under New York law, the State may terminate, over parental objection, the rights of parents in their natural child upon a finding that the child is "permanently neglected." N.Y.Soc.Serv.Law §§ 384-b.4.(d), 384-b.7.(a) (McKinney Supp.1981-1982) (Soc.Serv.Law). The New York Family Court Act § 622 (McKinney 1975 and Supp.1981-1982) (Fam.Ct.Act) requires that only a "fair preponderance of the evidence" support that finding. Thus, in New York, the factual certainty required to extinguish the parent-child relationship is no greater than that necessary to award money damages in an ordinary civil action.

Today we hold that the Due Process Clause of the Fourteenth Amendment demands more than this. Before a State may sever completely and irrevocably the rights of parents in

Page 748

their natural child, due process requires that the State support its allegations by at least clear and convincing evidence.

I

A

New York authorizes its officials to remove a child temporarily from his or her home if the child appears "neglected," within the meaning of Art. 10 of the Family Court Act. *See* §§ 1012(f), 1021-1029. Once removed, a child under the age of 18 customarily is placed "in the care of an authorized agency," Soc.Serv.Law § 384-b.7.(a), usually a state institution or a foster home. At that point, "the state's first obligation is to help the family with services to . . . reunite it. . . ." § 384-b.1.(a)(iii). But if convinced that "positive, nurturing parent-child relationships no longer exist," § 384-b.1.(b), the State may initiate "permanent neglect" proceedings to free the child for adoption.

The State bifurcates its permanent neglect proceeding into "factfinding" and "dispositional" hearings. Fam.Ct.Act §§ 622, 623. At the factfinding stage, the State must prove that the child has been "permanently neglected," as defined by Fam.Ct.Act §§ 614.1.(a)-(d) and Soc.Serv.Law § 384-b.7.(a). *See* Fam.Ct.Act § 622. The Family Court judge then determines at a subsequent dispositional hearing what placement would serve the child's best interests. §§ 623, 631.

At the factfinding hearing, the State must establish, among other things, that, for more than a year after the child entered state custody, the agency "made diligent efforts to encourage and strengthen the parental relationship." Fam.Ct.Act §§ 614.1.(c), 611. The State must further prove that, during that same period, the child's natural parents failed

substantially and continuously or repeatedly to maintain contact with or plan for the future of the child although physically and financially able to do so.

§ 614.1.(d). Should the State support its allegations by "a fair preponderance of the evidence," § 622, the child may be declared permanently neglected.

Page 749

§ 611. That declaration empowers the Family Court judge to terminate permanently the natural parents' rights in the child. §§ 631(c), 634. Termination denies the natural parents physical custody, as well as the rights ever to visit, communicate with, or regain custody of, the child.[1]

New York's permanent neglect statute provides natural parents with certain procedural protections.[2] But New York permits its officials to establish "permanent neglect" with less proof than most States require. Thirty-five States, the District of Columbia, and the Virgin Islands currently specify a higher standard of proof, in parental rights termination proceedings, than a "fair preponderance of the evidence."[3] The only analogous federal statute of [102 S.Ct. 1393] which we are aware

Page 750

permits termination of parental rights solely upon "evidence beyond a reasonable doubt." Indian Child Welfare Act of 1978, Pub.L. 95-608, § 102(f), 92 Stat. 3072, 25 U.S.C. § 1912(f) (1976 ed.,

Supp. IV). The question here is whether

Page 751

New York's "fair preponderance of the evidence" standard is constitutionally sufficient.

B

Petitioners John Santosky II and Annie Santosky are the natural parents of Tina and John III. In November, 1973, after incidents reflecting parental neglect, respondent Kramer, Commissioner of the Ulster County Department of Social Services, initiated a neglect proceeding under Fam.Ct.Act § 1022 and removed Tina from her natural home. About 10 months later, he removed John III and placed him with foster parents. On the day John was taken, Annie Santosky gave birth to a third child, Jed. When Jed was only three days old, respondent transferred him to a foster home on the ground that immediate removal was necessary to avoid imminent danger to his life or health.

In October, 1978, respondent petitioned the Ulster County Family Court to terminate petitioners' parental rights in the three children.[4] Petitioners challenged the constitutionality of the "fair preponderance of the evidence" standard specified in Fam.Ct.Act § 622. The Family Court Judge rejected this constitutional challenge, App. 29 30, and weighed the evidence under the statutory standard. While acknowledging that the Santoskys had maintained contact with their children, the judge found those visits, "at best, superficial and devoid of any [102 S.Ct. 1394] real emotional content." *Id.* at 21. After

Page 752

deciding that the agency had made "`diligent efforts' to encourage and strengthen the parental relationship," *id.* at 30, he concluded that the Santoskys were incapable, even with public assistance, of planning for the future of their children. *Id.* at 33-37. The judge later held a dispositional hearing and ruled that the best interests of the three children required permanent termination of the Santoskys' custody.[5] *Id.* at 39.

Petitioners appealed, again contesting the constitutionality of § 622's standard of proof.[6] The New York Supreme Court, Appellate Division, affirmed, holding application of the preponderance of the evidence standard "proper and constitutional." *In re John AA,* 75 App.Div.2d 910, 427 N.Y.S.2d 319, 320 (1980). That standard, the court reasoned, "recognizes and seeks to balance rights possessed by the child . . . with those of the natural parents. . . ." *Ibid.*

The New York Court of Appeals then dismissed petitioners' appeal to that court "upon the ground that no substantial constitutional question is directly involved." App. 55. We granted certiorari to consider petitioners' constitutional claim. 450 U.S. 993 (1981).

II

Last Term, in *Lassiter v. Department of Social Services*, 452 U.S. 18 (1981), this Court, by a 5-4 vote, held that the

Page 753

Fourteenth Amendment's Due Process Clause does not require the appointment of counsel for indigent parents in every parental status termination proceeding. The case casts light, however, on the two central questions her -- whether process is constitutionally due a natural parent at a State's parental rights termination proceeding, and, if so, what process is due.

In *Lassiter,* it was

not disputed that state intervention to terminate the relationship between [a parent] and [the] child must be accomplished by procedures meeting the requisites of the Due Process Clause.

*Id.* at 37 (first dissenting opinion); *see id.* at 24-32 (opinion of the Court); *id.* at 59-60 (STEVENS, J., dissenting). *See also Little v. Streater*, 452 U.S. 1, 13 (1981). The absence of dispute reflected this Court's historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment. *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *Smith v. Organization of Foster Families*, 431 U.S. 816, 845 (1977); *Moore v. East Cleveland*, 431 U.S. 494, 499 (1977) (plurality opinion); *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639-640 (1974); *Stanley v. Illinois*, 405 U.S. 645, 651-652 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *Pierce v. Society of Sisters*, 268 U.S. 510, 534-535 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

The fundamental liberty interest of natural parents in the care, custody, and [102 S.Ct. 1395] management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to

Page 754

destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures. [7]

In *Lassiter,* the Court and three dissenters agreed that the nature of the process due in parental rights termination proceedings turns on a balancing of the "three distinct factors" specified in

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976): the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure. *See* 452 U.S. at 27-31; *id.* at 37-48 (first dissenting opinion). *But see id.* at 59-60 (STEVENS, J., dissenting). While the respective *Lassiter* opinions disputed whether those factors should be weighed against a presumption disfavoring appointed counsel for one not threatened with loss of physical liberty, *compare* 452 U.S. at 31-32, *with id.* at 41, and n. 8 (first dissenting opinion), that concern is irrelevant here. Unlike the Court's right-to-counsel rulings, its decisions concerning constitutional burdens of proof have not turned on any presumption favoring any particular standard. To the contrary, the Court has engaged in a straightforward consideration of the factors identified in *Eldridge* to determine whether a particular standard of proof in a particular proceeding satisfies due process.

In *Addington v. Texas*, 441 U.S. 418 (1979), the Court, by a unanimous vote of the participating Justices, declared:

The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to

Page 755

"instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication."

*Id.* at 423, quoting *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring). *Addington* teaches that, in any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants.

Thus, while private parties may be interested intensely in a civil dispute over money damages, application of a "fair preponderance of the evidence" standard indicates both society's "minimal concern with the outcome," and a conclusion that the litigants should "share the risk of error in roughly equal fashion." 441 U.S. at 423. When the State brings a criminal action to deny a defendant liberty or life, however,

the interests of the defendant are of such magnitude that historically, and without any explicit constitutional requirement, they have been protected by standards of proof designed to exclude, as [102 S.Ct. 1396] nearly as possible, the likelihood of an erroneous judgment.

*Ibid.* The stringency of the "beyond a reasonable doubt" standard bespeaks the "weight and gravity" of the private interest affected, *id.* at 427, society's interest in avoiding erroneous convictions, and a judgment that those interests together require that "society impos[e] almost the entire risk of error upon itself." *Id.* at 424. *See also In re Winship,* 397 U.S. at 372 (Harlan, J.,

concurring).

The

minimum requirements [of procedural due process] being a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action.

*Vitek v. Jones*, 445 U.S. 480, 491 (1980). *See also Logan v. Zimmerman Brush Co., ante* at 432. Moreover, the degree of proof required in a particular type of proceeding "is the kind of question which has

Page 756

traditionally been left to the judiciary to resolve."

*Woodby v. INS*, 385 U.S. 276, 284 (1966).[8]

In cases involving individual rights, whether criminal or civil, "[t]he standard of proof [at a minimum] reflects the value society places on individual liberty."

*Addington v. Texas,* 441 U.S. at 425, quoting *Tippett v. Maryland,* 436 F.2d 1153, 1166 (CA4 1971) (opinion concurring in part and dissenting in part), *cert. dism'd sub nom. Murel v. Baltimore City Criminal Court,* 407 U.S. 355 (1972).

This Court has mandated an intermediate standard of proof -- "clear and convincing evidence" -- when the individual interests at stake in a state proceeding are both "particularly important" and "more substantial than mere loss of money." *Addington v. Texas,* 441 U.S. at 424. Notwithstanding "the state's `civil labels and good intentions,'" *id.* at 427, quoting *In re Winship,* 397 U.S. at 365-366, the Court has deemed this level of certainty necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with "a significant deprivation of liberty" or "stigma." 441 U.S. at 425, 426. *See, e.g., Addington v. Texas, supra,* (civil commitment); *Woodby v. INS,* 385 U.S. at 285 (deportation); *Chaunt v. United States*, 364 U.S. 350, 353 (1960) (denaturalization);

Page 757

*Schneiderman v. United States*, 320 U.S. 118, 125, 159 (1943) (denaturalization).

In *Lassiter,* to be sure, the Court held that fundamental fairness may be maintained in parental rights termination proceedings even when some procedures are mandated only on a case-by-case basis, rather than through rules of general application. 452 U.S. at 31-32 (natural parent's right to court-appointed counsel should be determined by the trial court, subject to appellate review). But

this Court never has approved case-by-case determination of the proper *standard of proof* for a given proceeding. Standards of proof, like other

procedural due process rules[,] are shaped by the risk [102 S.Ct. 1397] of error inherent in the truthfinding process as applied to the *generality of cases,* not the rare exceptions.

*Mathews v. Eldridge,* 424 U.S. at 344 (emphasis added). Since the litigants and the factfinder must know at the outset of a given proceeding how the risk of error will be allocated, the standard of proof necessarily must be calibrated in advance. Retrospective case-by-case review cannot preserve fundamental fairness when a class of proceedings is governed by a constitutionally defective evidentiary standard.[9]

Page 758

III

In parental rights termination proceedings, the private interest affected is commanding; the risk of error from using a preponderance standard is substantial; and the countervailing governmental interest favoring that standard is comparatively slight. Evaluation of the three *Eldridge* factors compels the conclusion that use of a "fair preponderance of the evidence" standard in such proceedings is inconsistent with due process.

A

The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be "condemned to suffer grievous loss."

*Goldberg v. Kelly*, 397 U.S. 254, 262-263 (1970), quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring). Whether the loss threatened by a particular type of proceeding is sufficiently grave to warrant more than average certainty on the part of the factfinder turns on both the nature of the private interest threatened and the permanency of the threatened loss.

*Lassiter* declared it "plain beyond the need for multiple citation" that a natural parent's "desire for, and right to, `the companionship, care, custody, and management of his or her children'" is an interest far more precious than any property

Page 759

right. 452 U.S. at 27, quoting *Stanley v. Illinois,* 405 U.S. at 651. When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it.

If the State prevails, it will have worked a unique kind of deprivation. . . . A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one.

452 U.S. at 27.

[102 S.Ct. 1398] In government-initiated proceedings to determine juvenile delinquency, *In re Winship, supra;* civil commitment, *Addington v. Texas, supra;* deportation, *Woodby v. INS, supra;* and denaturalization, *Chaunt v. United States, supra,* and *Schneiderman v. United States, supra,* this Court has identified losses of individual liberty sufficiently serious to warrant imposition of an elevated burden of proof. Yet juvenile delinquency adjudications, civil commitment, deportation, and denaturalization, at least to a degree, are all reversible official actions. Once affirmed on appeal, a New York decision terminating parental rights is *final* and irrevocable. *See* n. 1, *supra.* Few forms of state action are both so severe and so irreversible.

Thus, the first *Eldridge* factor -- the private interest affected -- weighs heavily against use of the preponderance standard at a state-initiated permanent neglect proceeding. We do not deny that the child and his foster parents are also deeply interested in the outcome of that contest. But at the factfinding stage of the New York proceeding, the focus emphatically is not on them.

The factfinding does not purport -- and is not intended -- to balance the child's interest in a normal family home against the parents' interest in raising the child. Nor does it purport to determine whether the natural parents or the foster parents would provide the better home. Rather, the factfinding hearing pits the State directly against the parents. The State alleges that the natural parents are at fault. Fam.Ct.Act § 614.1.(d). The questions disputed and decided are

Page 760

what the State did -- "made diligent efforts," § 614.1.(c) -- and what the natural parents did not do -- "maintain contact with or plan for the future of the child." § 614.1.(d). The State marshals an array of public resources to prove its case and disprove the parents' case. Victory by the State not only makes termination of parental rights possible; it entails a judicial determination that the parents are unfit to raise their own children.[10]

At the factfinding, the State cannot presume that a child and his parents are adversaries. After the State has established parental unfitness at that initial proceeding, the court may assume at the *dispositional* stage that the interests of the child and the natural parents do diverge. *See* Fam.Ct.Act § 631 (judge shall make his order "solely on the basis of the best interests of the child," and thus has no obligation to consider the natural parents' rights in selecting dispositional alternatives). But until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship.[11] Thus,

at the factfinding, the interests of the child and his natural parents coincide to favor use of error-reducing procedures.

[102 S.Ct. 1399] However substantial the foster parents' interests may be, *cf. Smith v. Organization of Foster Families,* 431 U.S. at 845-847, they are not implicated directly in the factfinding stage of a state-initiated permanent neglect proceeding against the natural parents. If authorized, the foster parents may pit their interests directly against those of the natural parents by initiating their own permanent neglect proceeding. Fam.Ct.Act § 1055(d); Soc.Serv.Law §§ 3846.3(b), 392.7.(c). Alternatively, the foster parents can make their case for custody at the dispositional stage of a state-initiated proceeding, where the judge already has decided the issue of permanent neglect and is focusing on the placement that would serve the child's best interests. Fam.Ct.Act §§ 623, 631. For the foster parents, the State's failure to prove permanent neglect may prolong the delay and uncertainty until their foster child is freed for adoption. But for the natural parents, a finding of permanent neglect can cut off forever their rights in their child. Given this disparity of consequence, we have no difficulty finding that the balance of private interests strongly favors heightened procedural protections.

B

Under *Mathews v. Eldridge,* we next must consider both the risk of erroneous deprivation of private interests resulting from use of a "fair preponderance" standard and the likelihood that a higher evidentiary standard would reduce that risk. *See* 424 U.S. at 335. Since the factfinding phase of a permanent neglect proceeding is an adversary contest between the State and the natural parents, the relevant question is whether a preponderance standard fairly allocates the risk of an erroneous factfinding between these two parties.

In New York, the factfinding stage of a state-initiated permanent neglect proceeding bears many of the indicia of a criminal trial. *Cf. Lassiter v. Department of Social Services,* 452 U.S. at 42-44 (first dissenting opinion); *Meltzer v. C. Buck LeCraw & Co.,* 402 U.S. 954, 959 (1971) (Black, J., dissenting from denial of certiorari). *See also* dissenting opinion, *post* at 777-779 (describing procedures employed at factfinding proceeding). The Commissioner of Social Services charges the parents with permanent neglect. They are served by summons. Fam.Ct.Act §§ 614, 616, 617. The factfinding hearing is conducted pursuant to formal rules of evidence. § 624. The State, the parents, and the child are all represented by counsel. §§ 249, 262. The State seeks to establish a series of historical facts about the intensity of its agency's efforts to reunite the family, the infrequency and insubstantiality of the parents' contacts with their child, and the parents' inability or unwillingness to formulate a plan for the child's future. The attorneys submit documentary evidence, and call witnesses who are subject to cross-examination. Based on all the evidence, the

judge then determines whether the State has proved the statutory elements of permanent neglect by a fair preponderance of the evidence. § 622.

At such a proceeding, numerous factors combine to magnify the risk of erroneous factfinding. Permanent neglect proceedings employ imprecise substantive standards that leave determinations unusually open to the subjective values of the judge. *See Smith v. Organization of Foster Families,* 431 U.S. at 835, n. 36. In appraising the nature and quality of a complex series of encounters among the agency, the parents, and the child, the court possesses unusual discretion to underweigh probative facts that might favor the parent.[12]

Page 763

Because parents [102 S.Ct. 1400] subject to termination proceedings are often poor, uneducated, or members of minority groups, *id.* at 833-835, such proceedings are often vulnerable to judgments based on cultural or class bias.

The State's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense. No predetermined limits restrict the sums an agency may spend in prosecuting a given termination proceeding. The State's attorney usually will be expert on the issues contested and the procedures employed at the factfinding hearing, and enjoys full access to all public records concerning the family. The State may call on experts in family relations, psychology, and medicine to bolster its case. Furthermore, the primary witnesses at the hearing will be the agency's own professional caseworkers, whom the State has empowered both to investigate the family situation and to testify against the parents. Indeed, because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination.[13]

Page 764

The disparity between the adversaries' litigation resources is matched by a striking asymmetry in their litigation options. Unlike criminal defendants, natural parents have no "double jeopardy" defense against repeated state termination efforts. If the State initially fails to win termination, as New York did here, *see* n. 4, *supra,* it always can try once again to cut off the parents' rights after gathering more or better evidence. Yet even when the parents have attained the level of fitness required by the State, they have no similar means by which they can forestall future termination efforts.

Coupled with a "fair preponderance of the evidence" standard, these factors create a significant prospect of erroneous termination. A standard of proof that, by its very terms, demands consideration of the quantity, rather than the quality, of the evidence may misdirect the factfinder in the marginal case. *See In re Winship,* 397 U.S. at 371, n. 3 (Harlan, J., concurring). Given the weight of the private interests at stake, the social cost of even occasional error is sizable.

Raising the standard of proof would have both practical and symbolic consequences. *Cf. Addington v. Texas,* 441 U.S. at 426. The Court has long considered the heightened standard of proof used in criminal prosecutions to be "a prime instrument for reducing the risk of convictions resting on factual error." *In re Winship,* 397 U.S. at 363. An elevated standard of proof in a parental rights termination proceeding would alleviate

the possible risk that a factfinder might decide to [deprive] an individual based solely on a few isolated instances of unusual conduct [or] . . . idiosyncratic behavior.

*Addington v. Texas,* 441 U.S. at 427.

Increasing the burden of proof is one way to impress [102 S.Ct. 1401] the factfinder with the importance

Page 765

of the decision, and thereby perhaps to reduce the chances that inappropriate

terminations will be ordered. *Ibid.*

The Appellate Division approved New York's preponderance standard on the ground that it properly "balanced rights possessed by the child . . . with those of the natural parents. . . ." 75 App.Div.2d at 910, 427 N.Y.S.2d at 320. By so saying, the court suggested that a preponderance standard properly allocates the risk of error between the parents and the child.[14] That view is fundamentally mistaken.

The court's theory assumes that termination of the natural parents' rights invariably will benefit the child.[15] Yet we have noted above that the parents and the child share an interest in avoiding erroneous termination. Even accepting the court's assumption, we cannot agree with its conclusion that a preponderance standard fairly distributes the risk of error between parent and child. Use of that standard reflects the judgment that society is nearly neutral between erroneous termination of parental rights and erroneous failure to terminate those rights. *Cf. In re Winship,* 397 U.S. at 371 (Harlan, J., concurring). For the child, the likely consequence of an erroneous failure to terminate is preservation of

Page 766

an uneasy *status quo.*[16] For the natural parents, however, the consequence of an erroneous termination is the unnecessary destruction of their natural family. A standard that allocates the risk of error nearly equally between those two outcomes does not reflect properly their relative severity.

C

Two state interests are at stake in parental rights termination proceedings -- a *parens patriae* interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings. A standard of proof more strict than preponderance of the evidence is consistent with both interests.

"Since the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision" at the *factfinding* proceeding. *Lassiter v. Department of Social Services,* 452 U.S. at 27. As *parens patriae,* the State's goal is to provide the child with a permanent home. *See* Soc.Serv.Law § 384-b.1.(a)(i) (statement of legislative findings and intent). Yet while there is still reason to believe [102 S.Ct. 1402] that positive, nurturing parent-child relationships exist, the *parens patriae* interest favors preservation, not

Page 767

severance, of natural familial bonds.[17] § 384-b.1.(a)(ii). "[T]he State registers no gain towards its declared goals when it separates children from the custody of fit parents." *Stanley v. Illinois,* 405 U.S. at 652.

The State's interest in finding the child an alternative permanent home arises only "when it is *clear* that the natural parent cannot or will not provide a normal family home for the child." Soc.Serv.Law § 384-b.1.(a)(iv) (emphasis added). At the factfinding, that goal is served by procedures that promote an accurate determination of whether the natural parents can and will provide a normal home.

Unlike a constitutional requirement of hearings, *see, e.g., Mathews v. Eldridge,* 424 U.S. at 347, or court-appointed counsel, a stricter standard of proof would reduce factual error without imposing substantial fiscal burdens upon the State. As we have observed, 35 States already have adopted a higher standard by statute or court decision without apparent effect on the speed, form, or cost of their factfinding proceedings. *See* n. 3, *supra.*

Nor would an elevated standard of proof create any real administrative burdens for the State's factfinders. New York Family Court judges already are familiar with a higher evidentiary standard in other parental rights termination proceedings not involving permanent neglect. *See* Soc.Serv.Law §§ 384-b.3.(g), 384-b.4.(c), and 384-b.4.(e) (requiring "clear and convincing proof" before parental rights may be terminated for reasons of mental illness and mental retardation or severe and repeated child abuse). New York also demands at least clear and convincing evidence in proceedings of far less moment than parental rights termination proceedings. *See, e.g.,* N.Y.Veh. & Traf.Law § 227.1 (McKinney Supp.1981) (requiring the State to prove traffic

Page 768

infractions by "clear and convincing evidence") and *In re Rosenthal v. Hartnett,* 36 N.Y.2d 269 326 N.E.2d 811 (1975); *see also Ross v. Food Specialties, Inc.,* 6 N.Y.2d 336, 341, 160 N.E.2d 618, 620 (1959) (requiring "clear, positive and convincing evidence" for contract reformation). We cannot believe that it would burden the State unduly to require that its factfinders have the same factual certainty when terminating the parent-child relationship as they must have to suspend a driver's license.

IV

The logical conclusion of this balancing process is that the "fair preponderance of the evidence" standard prescribed by Fam.Ct.Act § 622 violates the Due Process Clause of the Fourteenth Amendment.[18] The Court noted in *Addington:*

The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state.

441 U.S. at 427. Thus, at a parental rights termination proceeding, a near-equal allocation of risk between the parents and the State is constitutionally intolerable. The next question, then, is whether a "beyond a reasonable doubt" or a "clear and convincing" standard is constitutionally mandated.

In *Addington,* the Court concluded that application of a reasonable doubt standard is inappropriate in civil commitment proceedings for two reasons -- because of our hesitation to apply that unique standard [102 S.Ct. 1403] "too broadly or casually in noncriminal cases," *id.* at 428, and because the psychiatric evidence ordinarily adduced at commitment proceedings is

Page 769

rarely susceptible to proof beyond a reasonable doubt. *Id.* at 429-430, 432-433. To be sure, as has been noted above, in the Indian Child Welfare Act of 1978, Pub.L. 9508, § 102(f), 92 Stat. 3072, 25 U.S.C. § 1912(f) (1976 ed., Supp. IV), Congress requires "evidence beyond a reasonable doubt" for termination of Indian parental rights, reasoning that "the removal of a child from the parents is a penalty as great [as], if not greater, than a criminal penalty. . . ." H.R.Rep. No. 95-1386, p. 22 (1978). Congress did not consider, however, the evidentiary problems that would arise if proof beyond a reasonable doubt were required in all state-initiated parental rights termination hearings.

Like civil commitment hearings, termination proceedings often require the factfinder to evaluate medical and psychiatric testimony, and to decide issues difficult to prove to a level of absolute certainty, such as lack of parental motive, absence of affection between parent and child, and failure of parental foresight and progress. *Cf. Lassiter v. Department of Social Services,* 452 U.S. at 30; *id.* at 44-46 (first dissenting opinion) (describing issues raised in state termination

proceedings). The substantive standards applied vary from State to State. Although Congress found a "beyond a reasonable doubt" standard proper in one type of parental rights termination case, another legislative body might well conclude that a reasonable doubt standard would erect an unreasonable barrier to state efforts to free permanently neglected children for adoption.

A majority of the States have concluded that a "clear and convincing evidence" standard of proof strikes a fair balance between the rights of the natural parents and the State's legitimate concerns. *See* n. 3, *supra.* We hold that such a standard adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process. We further hold that determination of the precise burden equal to or greater than that standard

Page 770

is a matter of state law properly left to state legislatures and state courts. *Cf. Addington v. Texas,* 441 U.S. at 433.

We, of course, express no view on the merits of petitioners' claims.[19] At a hearing conducted under a constitutionally proper standard, they may or may not prevail. Without deciding the outcome under any of the standards we have approved, we vacate the judgment of the Appellate Division and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

REHNQUIST, J., dissenting

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE O'CONNOR join, dissenting.

I believe that few of us would care to live in a society where every aspect of life was regulated by a single source of law, whether that source be this Court or some other organ of our complex body politic. But today's decision certainly moves us in that direction. By parsing the New York scheme and holding one narrow provision unconstitutional, the majority invites further federal court intrusion into every facet of state family law. If ever there were an area in which federal courts should heed the admonition of Justice Holmes that "a page of history is worth a volume of logic," [1] it is in the area of domestic relations. This area has been left to the States from [102 S.Ct. 1404] time immemorial, and not without good reason.

Equally as troubling is the majority's due process analysis. The Fourteenth Amendment guarantees that a State will treat individuals with "fundamental fairness" whenever its actions infringe their protected liberty or property interests. By adoption of the procedures relevant to this case, New

York has created an exhaustive program to assist parents in regaining the custody of their children and to protect parents from the unfair deprivation of their parental rights. And yet the majority's myopic scrutiny of the standard of proof blinds it to the very considerations and procedures which make the New York scheme "fundamentally fair."

I

State intervention in domestic relations has always been an unhappy but necessary feature of life in our organized society. For all of our experience in this area, we have found no fully satisfactory solutions to the painful problem of child abuse and neglect. We have found, however, that leaving the States free to experiment with various remedies has produced novel approaches and promising progress.

Throughout this experience, the Court has scrupulously refrained from interfering with state answers to domestic relations questions.

Both theory and the precedents of this Court teach us solicitude for state interests, particularly in the field of family and family property arrangements.

*United States v. Yazell*, 382 U.S. 341, 352 (1966). This is not to say that the Court should blink at clear constitutional violations in state statutes, but rather that, in this area, of all areas,

substantial weight must be given to the good faith judgments of the individuals [administering a program] . . . that the procedures they have provided assure fair consideration of the . . . claims of individuals.

*Mathews v. Eldridge*, 424 U.S. 319, 349 (1976).

This case presents a classic occasion for such solicitude. As will be seen more fully in the next part, New York has enacted a comprehensive plan to *aid* marginal parents in regaining the custody of their child. The central purpose of the New York plan is to reunite divided families. Adoption of the preponderance of the evidence standard represents New York's good faith effort to balance the interest of parents

against the legitimate interests of the child and the State. These earnest efforts by state officials should be given weight in the Court's application of due process principles.

Great constitutional provisions must be administered with caution. Some play must be allowed for the joints of the machine, and it must be remembered that legislatures are ultimate guardians of

the liberties and welfare of the people in quite as great a degree as the courts.

*Missouri, K. & T. R. Co. v. May,* 194 U.S. 267, 270 (1904).[2]

The majority may believe that it is adopting a relatively unobtrusive means of ensuring that termination proceedings provide "due process of law." In fact, however, [102 S.Ct. 1405] fixing the standard of proof as a matter of federal constitutional law will only lead to further federal court intervention in state schemes. By holding that due process requires proof by clear and convincing evidence, the majority surely cannot mean that any state scheme passes constitutional muster so long as it applies that standard of proof. A state law permitting termination of parental rights upon a showing of neglect by clear and convincing evidence certainly would not be acceptable

Page 773

to the majority if it provided no procedures other than one 30-minute hearing. Similarly, the majority probably would balk at a state scheme that permitted termination of parental rights on a clear and convincing showing merely that such action would be in the best interests of the child. *See Smith v . Organization of Foster Families*, 431 U.S. 816, 862-863 (1977) (Stewart, J., concurring in judgment).

After fixing the standard of proof, therefore, the majority will be forced to evaluate other aspects of termination proceedings with reference to that point. Having in this case abandoned evaluation of the overall effect of a scheme, and with it the possibility of finding that strict substantive standards or special procedures compensate for a lower burden of proof, the majority's approach will inevitably lead to the federalization of family law. Such a trend will only thwart state searches for better solutions in an area where this Court should encourage state experimentation.

It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country. This Court has the power to prevent an experiment.

*New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). It should not do so in the absence of a clear constitutional violation. As will be seen in the next part, no clear constitutional violation has occurred in this case.

II

As the majority opinion notes, petitioners are the parents of five children, three of whom were removed from petitioners' care on or before August 22, 1974. During the next four and one-half years, those three children were in the custody of the State and in the care of foster homes or institutions, and the State was diligently engaged in efforts to prepare petitioners for the children's return. Those efforts were unsuccessful,

however, and, on April 10, 1979, the New York Family Court for Ulster County terminated petitioners' parental rights as to the three children removed in 1974 or earlier. This termination was preceded by a judicial finding that petitioners had failed to plan for the return and future of their children, a statutory category of permanent neglect. Petitioners now contend, and the Court today holds, that they were denied due process of law not because of a general inadequacy of procedural protections, but simply because the finding of permanent neglect was made on the basis of a preponderance of the evidence adduced at the termination hearing.

It is well settled that

[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property.

*Board of Regents v. Roth*, 408 U.S. 564, 569 (1972). In determining whether such liberty or property interests are implicated by a particular government action, "we must look not to the `weight,' but to the *nature,* of the interest at stake." *Id.* at 571 (emphasis in original). I do not disagree with the majority's conclusion that the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment. *See Smith v. Organization of Foster Families, supra,* at 862-863 (Stewart, J., concurring in judgment). "Once it is determined that due [102 S.Ct. 1406] process applies, [however,] the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). It is the majority's answer to this question with which I disagree.

A

Due process of law is a flexible constitutional principle. The requirements which it imposes upon governmental actions vary with the situations to which it applies. As the Court previously has recognized, "not all situations calling for

procedural safeguards call for the same kind of procedure." *Morrissey v. Brewer, supra,* at 481. *See also Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 12 (1979); *Mathews v. Eldridge,* 424 U.S. at 334; *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961). The adequacy of a scheme of procedural protections cannot, therefore, be determined merely by the application of general principles unrelated to the peculiarities of the case at hand.

Given this flexibility, it is obvious that a proper due process inquiry cannot be made by focusing upon one narrow provision of the challenged statutory scheme. Such a focus threatens to overlook factors which may introduce constitutionally adequate protections into a particular government

action. Courts must examine *all* procedural protections offered by the State, and must assess the *cumulative* effect of such safeguards. As we have stated before, courts must consider "the fairness and reliability of the existing . . . procedures" before holding that the Constitution requires more. *Mathews v. Eldridge, supra,* at 343. Only through such a broad inquiry may courts determine whether a challenged governmental action satisfies the due process requirement of "fundamental fairness."[3] In some instances, the Court has even looked to nonprocedural restraints on official action in determining whether the deprivation of a protected interest was effected without due process of law. *E.g.,* Ingraham v.

Page 776

*Wright,* 430 U.S. 651 (1977). In this case, it is just such a broad look at the New York scheme which reveals its fundamental fairness.[4]

The termination of parental rights on the basis of permanent neglect can occur under New York law only by order of the Family Court. N.Y.Soc.Serv.Law (SSL) § 384-b.3.(d) (McKinney Supp.1981-1982). Before a petition for permanent termination can be filed in that court, however, several other events must first occur.

[102 S.Ct. 1407] The Family Court has jurisdiction only over those children who are in the care of an authorized agency. N.Y. Family Court Act (FCA) § 614.1.(b) (McKinney 1975 and Supp.1981-1982). Therefore, the children who are the subject of a termination petition must previously have been removed from their parents' home on a temporary basis. Temporary removal of a child can occur in one of two ways. The parents may consent to the removal, FCA § 1021, or, as occurred in this case, the Family Court can order the removal pursuant to a finding that the child is abused or neglected.[5] FCA §§ 1051, 1052.

Page 777

Court proceedings to order the temporary removal of a child are initiated by a petition alleging abuse or neglect, filed by a state-authorized child protection agency or by a person designated by the court. FCA §§ 1031, 1032. Unless the court finds that exigent circumstances require removal of the child before a petition may be filed and a hearing held, *see* FCA § 1022, the order of temporary removal results from a "dispositional hearing" conducted to determine the appropriate form of alternative care. FCA § 1045. *See also* FCA § 1055. This "dispositional hearing" can be held only after the court, at a separate "factfinding hearing," has found the child to be abused or neglected within the specific statutory definition of those terms. FCA §§ 1012, 1044, 1051.

Parents subjected to temporary removal proceedings are provided extensive procedural protections. A summons and copy of the temporary removal petition must be served upon the parents within two days of issuance by the court, FCA §§ 1035, 1036, and the parents may, at their own request, delay the commencement of the factfinding hearing for three days after service

of the summons. FCA § 1048.[6] The factfinding hearing may not commence without a determination by the court that the parents are present at the hearing and have been served with the petition. FCA § 1041. At the hearing itself, "only competent, material and relevant evidence may be admitted," with some enumerated exceptions

Page 778

for particularly probative evidence. FCA § 1046(b)(ii). In addition, indigent parents are provided with an attorney to represent them at both the factfinding and dispositional hearings, as well as at all other proceedings related to temporary removal of their child. FCA § 262(a)(i).

An order of temporary removal must be reviewed every 18 months by the Family Court. SSL § 392.2. Such review is conducted by hearing before the same judge who ordered the temporary removal, and a notice of the hearing, including a statement of the dispositional alternatives, must be given to the parents at least 20 days before the hearing is held. SSL § 392.4. As in the initial removal action, the parents must be parties to the proceedings, *ibid.,* and are entitled to court-appointed counsel if indigent. FCA § 262(a).

One or more years after a child has been removed temporarily from the parents' home, permanent termination proceedings may be commenced by the filing of a petition in the court which ordered the temporary removal. The petition must be filed by a state agency or by a foster parent authorized by the court, SSL § 384-b.3.(b), and must allege that the child has been [102 S.Ct. 1408] permanently neglected by the parents. SSL § 384-b.3.(d).[7] Notice of the petition and the dispositional proceedings must be served upon the parents at least 20 days before the commencement of the hearing, SSL § 384-b.3.(e), must inform them of the potential consequences of the hearing, *ibid.,* and must inform them

of their right to the assistance of counsel, including [their] right . . . to have counsel assigned by the court [if] they are financially unable to obtain counsel.

*Ibid. See also* FCA § 262.

As in the initial removal proceedings, two hearings are held in consideration of the permanent termination petition.

Page 779

SSL § 384-b.3.(f). At the factfinding hearing, the court must determine, by a fair preponderance of the evidence, whether the child has been permanently neglected. SSL § 384-b.3.(g). "Only competent, material and relevant evidence may be admitted in a factfinding hearing." FCA § 624. The court may find permanent neglect if the child is in the care of an authorized agency or foster home and the parents have

failed for a period of more than one year . . . substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so.

SSL § 384-b.7.(a).[8] In addition, because the State considers its "first obligation" to be the reuniting of the child with its natural parents, SSL § 384-b.1.(iii), the court must also find that the supervising state agency has, without success, made "*diligent* efforts to encourage and strengthen the parental relationship." SSL § 384-b.7.(a) (emphasis added).[9]

Page 780

Following the factfinding hearing, a separate, dispositional hearing is held to determine what course of action would be in "the best interests of the child." FCA § 631. A finding of permanent neglect at the factfinding hearing, although necessary to a termination of parental rights, does not control the court's order at the dispositional hearing. The court may dismiss the petition, suspend judgment on the petition and retain jurisdiction for a period of one year in order to provide further opportunity for a reuniting of the family, or terminate the parents' right to the custody and care of the child. FCA §§ 631-634. The court must base its decision solely upon the record of "material and relevant evidence" introduced at the dispositional [102 S.Ct. 1409] hearing, FCA § 624; *In re "Female" M.,* 70 App.Div.2d 812, 417 N.Y.S.2d 482 (1979), and may not entertain any presumption that the best interests of the child "will be promoted by any particular disposition." FCA § 631.

As petitioners did in this case, parents may appeal any unfavorable decision to the Appellate Division of the New York Supreme Court. Thereafter, review may be sought in the New York Court of Appeals and, ultimately, in this Court if a federal question is properly presented.

As this description of New York's termination procedures demonstrates, the State seeks not only to protect the interests of parents in rearing their own children, but also to assist and encourage parents who have lost custody of their children to reassume their rightful role. Fully understood, the New York system is a comprehensive program to aid parents such as petitioners. Only as a last resort, when "diligent efforts" to reunite the family have failed, does New

Page 781

York authorize the termination of parental rights. The procedures for termination of those relationships which cannot be aided and which threaten permanent injury to the child, administered by a judge who has supervised the case from the first temporary removal through the final termination, cannot be viewed as fundamentally unfair. The facts of this case demonstrate the fairness of the system.

The three children to which this case relates were removed from petitioners' custody in 1973 and

1974, before petitioners' other two children were born. The removals were made pursuant to the procedures detailed above, and in response to what can only be described as shockingly abusive treatment.[10] At the temporary removal hearing held before the Family Court on September 30, 1974, petitioners were represented by counsel, and allowed the Ulster County Department of Social Services (Department) to take custody of the three children.

Temporary removal of the children was continued at an evidentiary hearing held before the Family Court in December, 1975, after which the court issued a written opinion concluding that petitioners were unable to resume their parental responsibilities due to personality disorders. Unsatisfied with the progress petitioners were making, the court also directed

Page 782

the Department to reduce to writing the plan which it had designed to solve the problems at petitioners' home and reunite the family.

A plan for providing petitioners with extensive counseling and training services was submitted to the court and approved in February, 1976. Under the plan, petitioners received training by a mother's aide, a nutritional aide, and a public health nurse, and counseling at a family planning clinic. In addition, the plan provided psychiatric treatment and vocational training for the father, and counseling at a family service center for the mother. Brief for Respondent Kramer 1-7. Between early 1976 and the final termination decision in April, 1979, the State spent more than $15,000 in these efforts to rehabilitate petitioners as parents. App. 34.

Petitioners' response to the State's effort was marginal, at best. They wholly disregarded some of the available services, and participated only sporadically in the others. As a result, and out of [102 S.Ct. 1410] growing concern over the length of the children's stay in foster care, the Department petitioned, in September, 1976, for permanent termination of petitioners' parental rights so that the children could be adopted by other families. Although the Family Court recognized that petitioners' reaction to the State's efforts was generally "nonresponsive, even hostile," the fact that they were "at least superficially cooperative" led it to conclude that there was yet hope of further improvement and an eventual reuniting of the family. Exhibit to Brief for Respondent Kramer 618. Accordingly, the petition for permanent termination was dismissed.

Whatever progress petitioners were making prior to the 1976 termination hearing, they made little or no progress thereafter. In October, 1978, the Department again filed a termination petition alleging that petitioners had completely failed to plan for the children's future despite the considerable efforts rendered in their behalf. This time, the Family Court agreed. The court found that petitioners had

failed in any meaningful way to take advantage of the many social

and rehabilitative services that have not only been made available to them but have been diligently urged upon them.

App. 35. In addition, the court found that the "infrequent" visits "between the parents and their children were, at best, superficial, and devoid of any real emotional content." *Id.* at 21. The court thus found

nothing in the situation which holds out any hope that [petitioners] may ever become financially self sufficient or emotionally mature enough to be independent of the services of social agencies. More than a reasonable amount of time has passed, and still, in the words of the case workers, there has been no discernible forward movement. At some point in time, it must be said, "enough is enough."

*Id.* at 36.

In accordance with the statutory requirements set forth above, the court found that petitioners' failure to plan for the future of their children, who were then seven, five, and four years old and had been out of petitioners' custody for at least four years, rose to the level of permanent neglect. At a subsequent dispositional hearing, the court terminated petitioners' parental rights, thereby freeing the three children for adoption.

As this account demonstrates, the State's extraordinary 4-year effort to reunite petitioners' family was not just unsuccessful, it was altogether rebuffed by parents unwilling to improve their circumstances sufficiently to permit a return of their children. At every step of this protracted process, petitioners were accorded those procedures and protections which traditionally have been required by due process of law. Moreover, from the beginning to the end of this sad story, all judicial determinations were made by one Family Court Judge. After four and one-half years of involvement with petitioners, more than seven complete hearings, and additional periodic supervision of the State's rehabilitative efforts, the judge no doubt was intimately familiar with this case and the prospects for petitioners' rehabilitation.

It is inconceivable to me that these procedures were "fundamentally unfair" to petitioners. Only by its obsessive

focus on the standard of proof and its almost complete disregard of the facts of this case does the majority find otherwise.[11] As the discussion [102 S.Ct. 1411] above indicates, however, such a

focus does not comport with the flexible standard of fundamental fairness embodied in the Due Process Clause of the Fourteenth Amendment.

B

In addition to the basic fairness of the process afforded petitioners, the standard of proof chosen by New York clearly reflects a constitutionally permissible balance of the interests at stake in this case. The standard of proof

represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.

*In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J. concurring); *Addington v. Texas*, 441 U.S. 418, 423 (1979). In this respect, the standard of proof is a crucial component of legal process, the primary function of which is "to minimize the risk of erroneous decisions."[12] *Greenholtz v. Nebraska*

Page 786

*Penal Inmates,* 442 U.S. at 13. *See also Addington v. Texas, supra,* at 425; *Mathews v. Eldridge,* 424 U.S. at 344.

[102 S.Ct. 1412] In determining the propriety of a particular standard of proof in a given case, however, it is not enough simply to say that we are trying to minimize the risk of error. Because errors in factfinding affect more than one interest, we try to minimize error as to those interests which we consider to be most important. As Justice Harlan explained in his well known concurrence to *In re Winship:*

In a lawsuit between two parties, a factual error can make a difference in one of two ways. First, it can result in a judgment in favor of the plaintiff when the true facts warrant a judgment for the defendant. The analogue in a criminal case would be the conviction of an innocent man. On the other hand, an erroneous factual determination can result in a judgment for the defendant when the true facts justify a judgment in plaintiff's favor. The criminal analogue would be the acquittal of a guilty man.

The standard of proof influences the relative frequency of these two types of erroneous outcomes. If, for example, the standard of proof for a criminal trial were a preponderance of the evidence, rather than proof

Page 787

beyond a reasonable doubt, there would be a smaller risk of factual errors that result in freeing guilty persons, but a far greater risk of factual errors that result in convicting the innocent. Because

the standard of proof affects the comparative frequency of these two types of erroneous outcomes, the choice of the standard to be applied in a particular kind of litigation should, in a rational world, reflect an assessment of the comparative social disutility of each.

397 U.S. at 370-371.

When the standard of proof is understood as reflecting such an assessment, an examination of the interests at stake in a particular case becomes essential to determining the propriety of the specified standard of proof. Because proof by a preponderance of the evidence requires that "[t]he litigants . . . share the risk of error in a roughly equal fashion," *Addington v. Texas, supra,* at 423, it rationally should be applied only when the interests at stake are of roughly equal societal importance. The interests at stake in this case demonstrate that New York has selected a constitutionally permissible standard of proof.

On one side is the interest of parents in a continuation of the family unit and the raising of their own children. The importance of this interest cannot easily be overstated. Few consequences of judicial action are so grave as the severance of natural family ties. Even the convict committed to prison and thereby deprived of his physical liberty often retains the love and support of family members.

This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to "the companionship, care, custody, and management of his or her children" is an important interest that "undeniably warrants deference and, absent a powerful countervailing interest, protection." *Stanley v. Illinois*, 405 U.S. 645, 651.

*Lassiter v. Department of Social Services*, 452 U.S. 18, 27 (1981). In creating the scheme at issue in this case, the New York Legislature

Page 788

was expressly aware of this right of parents "to bring up their own children." SSL § 384-b.1.(a)(ii).

On the other side of the termination proceeding are the often countervailing interests of the child. [13] A stable, loving

Page 789

home [102 S.Ct. 1413] life is essential to a child's physical, emotional, and spiritual wellbeing. It requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens. The same can be said of children who, though not physically or emotionally abused, are passed from one foster home to another with no constancy of love, trust, or discipline. If the Family Court makes an incorrect

factual determination resulting in a failure to terminate a parent-child relationship which rightfully should be ended, the child involved must return either to an abusive home[14] or to the often unstable world of foster care.[15] The reality of these

Page 790

risks is magnified by the fact that the only families faced with termination actions are those which have voluntarily surrendered custody of their child to the State, or, as in this case, those from which the child has been removed by judicial action because of threatened irreparable injury through [102 S.Ct. 1414] abuse or neglect. Permanent neglect findings also occur only in families where the child has been in foster care for at least one year.

In addition to the child's interest in a normal home life, "the State has an urgent interest in the welfare of the child." *Lassiter v. Department of Social Services,* 452 U.S. at 27.[16] Few could doubt that the most valuable resource of a self-governing society is its population of children, who will one day become adults and themselves assume the responsibility of self-governance.

A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies.

*Prince v. Massachusetts*, 321 U.S. 158, 168 (1944). Thus, "the whole community" has an interest "that children be both safeguarded from abuses and given opportunities for growth into free and independent well-developed . . . citizens." *Id.* at 165. *See also Ginsberg v. New York*, 390 U.S. 629, 640-641 (1968).

When, in the context of a permanent neglect termination proceeding, the interests of the child and the State in a stable,

Page 791

nurturing home life are balanced against the interests of the parents in the rearing of their child, it cannot be said that either set of interests is so clearly paramount as to require that the risk of error be allocated to one side or the other. Accordingly, a State constitutionally may conclude that the risk of error should be borne in roughly equal fashion by use of the preponderance of the evidence standard of proof. *See Addington v. Texas,* 441 U.S. at 423. This is precisely the balance which has been struck by the New York Legislature:

It is the intent of the legislature in enacting this section to provide procedures not only assuring that the rights of the natural parent are protected, but also, where positive, nurturing parent-child relationships no longer exist, furthering the best interests, needs, and rights of the child by terminating the parental rights and freeing the child for adoption.

SSL § 384-b.1.(b).

III

For the reasons heretofore stated, I believe that the Court today errs in concluding that the New York standard of proof in parental rights termination proceedings violates due process of law. The decision disregards New York's earnest efforts to aid parents in regaining the custody of their children and a host of procedural protections placed around parental rights and interests. The Court finds a constitutional violation only by a tunnel vision application of due process principles that altogether loses sight of the unmistakable fairness of the New York procedure.

Even more worrisome, today's decision cavalierly rejects the considered judgment of the New York Legislature in an area traditionally entrusted to state care. The Court thereby begins, I fear, a trend of federal intervention in state family law matters which surely will stifle creative responses to vexing problems. Accordingly, I dissent.

---------

Notes:

[1] At oral argument, counsel for petitioners asserted that, in New York, natural parents have no means of restoring terminated parental rights. Tr. of Oral Arg. 9. Counsel for respondents, citing Fam.Ct.Act § 1061, answered that parents may petition the Family Court to vacate or set aside an earlier order on narrow grounds, such as newly discovered evidence or fraud. Tr. of Oral Arg. 26. Counsel for respondents conceded, however that this statutory provision has never been invoked to set aside a permanent neglect finding. *Id.* at 27.

[2] Most notably, natural parents have a statutory right to the assistance of counsel and of court-appointed counsel if they are indigent. Fam.Ct.Act § 262.(a)(iii).

[3] Fifteen States, by statute, have required "clear and convincing evidence" or its equivalent. *See* Alaska Stat.Ann. § 47.10.080(c)(3) (1980); Cal.Civ.Code Ann. § 232(a)(7) (West Supp.1982); Ga.Code §§ 24A-2201(c), 24A-3201 (1979); Iowa Code § 600A.8 (1981) ("clear and convincing proof"); Me.Rev.Stat.Ann., Tit. 22, § 4055.1.B.(2) (Supp. 1981-1982); Mich.Comp.Laws § 722.25 (Supp. 1981-1982); Mo.Rev.Stat. § 211.447.2(2) (Supp.1981) ("clear, cogent and convincing evidence"); N.M.Stat.Ann. § 40-7-4.J. (Supp.1981); N.C.Gen.Stat. § 7A-289.30(e) (1981) ("clear, cogent, and convincing evidence"); Ohio Rev.Code Ann. §§ 2151.35, 2151.414(B) (Page Supp. 1982); R.I.Gen.Laws § 15-7-7(d) (Supp. 1980); Tenn.Code Ann. § 37-246(d) (Supp. 1981); Va.Code § 16.1-283.B (Supp. 1981); W.Va.Code § 492(c) (1980) ("clear and convincing proof"); Wis.Stat. § 48.31(1) (Supp. 1981-1982).

Fifteen States, the District of Columbia, and the Virgin Islands, by court decision, have required

"clear and convincing evidence" or its equivalent. *See Dale County Dept. of Pensions & Security v. Robles,* 368 So.2d 39, 42 (Ala.Civ.App.1979); *Harper v. Caskin,* 265 Ark. 558, 560-561, 580 S.W.2d 176, 178 (1979); *In re J.S.R.,* 374 A.2d 860, 864 (D.C.1977); *Torres v. Van Eepoel,* 98 So.2d 735, 737 (Fla.1957); *In re Kerns,* 225 Kan. 746, 753, 594 P.2d 187, 193 (1979); *In re Rosenbloom,* 266 N.W.2d 888, 889 (Minn.1978) ("clear and convincing proof "); *In re J.L.B.,* 182 Mont. 100, 116-117, 594 P.2d 1127, 1136 (1979); *In re Souza,* 204 Neb. 503, 510, 283 N.W.2d 48, 52 (1979); *J. v. M.,* 157 N.J.Super. 478, 489, 385 A.2d 240, 246 (App.Div.1978); *In re J. A.,* 283 N.W.2d 83, 92 (N.D.1979); *In re Darren Todd H.,* 615 P.2d 287, 289 (Okla.1980); *In re William. L.,* 477 Pa. 322, 332, 383 A.2d 1228, 1233, *cert. denied sub nom. Lehman v. Lycoming County Children's Services,* 439 U.S. 880 (1978); *In re G.M.,* 596 S.W.2d 846, 847 (Tex.1980); *In re Pitts,* 535 P.2d 1244, 1248 (Utah 1975); *In re Maria,* 15 V.I. 368, 384 (1978); *In re Sego,* 82 Wash.2d 736, 739, 513 P.2d 831, 833 (1973) ("clear, cogent, and convincing evidence"); *In re X.,* 607 P.2d 911, 919 (Wyo.1980) ("clear and unequivocal").

South Dakota's Supreme Court has required a "clear preponderance" of the evidence in a dependency proceeding. *See In re B.E.,* 287 N.W.2d 91, 96 (1979). Two States, New Hampshire and Louisiana, have barred parental rights terminations unless the key allegations have been proved beyond a reasonable doubt. *See State v. Robert H.,* 118 N.H. 713, 716, 393 A.2d 1387, 1389 (1978); La.Rev.Stat.Ann. § 13:1603.A (West Supp.1982). Two States, Illinois and New York, have required clear and convincing evidence, but only in certain types of parental rights termination proceedings. *See* Ill.Rev.Stat., ch. 37, ¶¶ 705-9(2), (3) (1979), amended by Act of Sept. 11, 1981, 1982 Ill. Laws, P.A. 82-437 (generally requiring a preponderance of the evidence, but requiring clear and convincing evidence to terminate the rights of minor parents and mentally ill or mentally deficient parents); N.Y.Soc.Serv.Law §§ 384-b.3(g), 384-b.4(c), and 384-b.4(e) (Supp.1981-1982) (requiring "clear and convincing proof" before parental rights may be terminated for reasons of mental illness and mental retardation or severe and repeated child abuse).

So far as we are aware, only two federal courts have addressed the issue. Each has held that allegations supporting parental rights termination must be proved by clear and convincing evidence. *Sims v. State Dept. of Public Welfare,* 438 F.Supp. 1179, 1194 (SD Tex.1977), *rev'd on other grounds sub nom. Moore v. Sims*, 442 U.S. 415 (1979); *Alsager v. District Court of Polk County,* 406 F.Supp. 10, 25 (SD Iowa 1975), *aff'd on other grounds,* 545 F.2d 1137 (CA8 1976).

[4] Respondent had made an earlier and unsuccessful termination effort in September, 1976. After a factfinding hearing, the Family Court Judge dismissed respondent's petition for failure to prove an essential element of Fam.Ct.Act § 614.1.(d). *See In re Santosky,* 89 Misc.2d 730, 393 N.Y.S.2d 486 (1977). The New York Supreme Court, Appellate Division, affirmed, finding that "the record as a whole" revealed that petitioners had "substantially planned for the future of the children." *In re John W.,* 63 App.Div.2d 750, 751, 404 N.Y.S.2d 717, 719 (1978).

[5] Since respondent Kramer took custody of Tina, John III, and Jed, the Santoskys have had two other children, James and Jeremy. The State has taken no action to remove these younger

children. At oral argument, counsel for respondents replied affirmatively when asked whether he was asserting that petitioners were "unfit to handle the three older ones, but not unfit to handle the two younger ones." Tr. of Oral Arg. 24.

[6] Petitioners initially had sought review in the New York Court of Appeals. That court *sua sponte* transferred the appeal to the Appellate Division, Third Department, stating that a direct appeal did not lie because "questions other than the constitutional validity of a statutory provision are involved." App. 50.

[7] We therefore reject respondent Kramer's claim that a parental rights termination proceeding does not interfere with a fundamental liberty interest. *See* Brief for Respondent Kramer 11-18; Tr. of Oral Arg. 38. The fact that important liberty interests of the child and its foster parents may also be affected by a permanent neglect proceeding does not justify denying the *natural parents* constitutionally adequate procedures. Nor can the State refuse to provide natural parents adequate procedural safeguards on the ground that the family unit already has broken down; that is the very issue the permanent neglect proceeding is meant to decide.

[8] The dissent charges, *post* at 772, n. 2, that

this Court simply has no role in establishing the standards of proof that States must follow in the various judicial proceedings they afford to their citizens.

As the dissent properly concedes, however, the Court must examine a State's chosen standard to determine whether it satisfies "the constitutional minimum of `fundamental fairness.'" *Ibid. See, e.g., Addington v. Texas*, 441 U.S. 418, 427, 433 (1979) (unanimous decision of participating Justices) (Fourteenth Amendment requires at least clear and convincing evidence in a civil proceeding brought under state law to commit an individual involuntarily for an indefinite period to a state mental hospital); *In re Winship*, 397 U.S. 358, 364 (1970) (Due Process Clause of the Fourteenth Amendment protects the accused in state proceeding against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged).

[9] For this reason, we reject the suggestions of respondents and the dissent that the constitutionality of New York's statutory procedures must be evaluated as a "package." *See* Tr. of Oral Arg. 25, 36, 38. Indeed, we would rewrite our precedents were we to excuse a constitutionally defective standard of proof based on an amorphous assessment of the "cumulative effect" of state procedures. In the criminal context, for example, the Court has never assumed that "strict substantive standards or special procedures compensate for a lower burden of proof. . . ." *Post* at 773. *See In re Winship,* 397 U.S. at 368. Nor has the Court treated appellate review as a curative for an inadequate burden of proof. *See Woodby v. INS*, 385 U.S. 276, 282 (1966) ("judicial review is generally limited to ascertaining whether the evidence relied upon by the trier of fact was of sufficient quality and substantiality to support the rationality of the judgment") .

As the dissent points out, "the standard of proof is a crucial component of legal process, the primary function of which is `to minimize the risk of erroneous decisions.'" *Post* at 785, quoting *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 13 (1979). Notice, summons, right to counsel, rules of evidence, and evidentiary hearings are all procedures to place information before the factfinder. But only the standard of proof "instruct[s] the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions" he draws from that information. *In re Winship,* 397 U.S. at 370 (Harlan, J., concurring). The statutory provision of right to counsel and multiple hearings before termination cannot suffice to protect a natural parent's fundamental liberty interests if the State is willing to tolerate undue uncertainty in the determination of the dispositive facts.

[10] The Family Court Judge in the present case expressly refused to terminate petitioners' parental rights on a "non-statutory, no-fault basis." App. 22-29. Nor is it clear that the State constitutionally could terminate a parent's rights *without* showing parental unfitness. *See Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have little doubt that the Due Process Clause would be offended `[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest,'" quoting *Smith v. Organization of Foster Families*, 431 U.S. 816, 862-863 (1977) (Stewart, J., concurring in judgment)).

[11] For a child, the consequences of termination of his natural parents' rights may well be far-reaching. In Colorado, for example, it has been noted:

The child loses the right of support and maintenance, for which he may thereafter be dependent upon society; the right to inherit; and all other rights inherent in the legal parent-child relationship, not just for [a limited] period . . . , but forever.

*In re K.S.,* 33 Colo. App. 72, 76, 515 P.2d 130, 133 (1973).

Some losses cannot be measured. In this case, for example, Jed Santosky was removed from his natural parents' custody when he was only three days old; the judge's finding of permanent neglect effectively foreclosed the possibility that Jed would ever know his natural parents.

[12] For example, a New York court appraising an agency's "diligent efforts" to provide the parents with social services can excuse efforts not made on the grounds that they would have been "detrimental to the best interests of the child." Fam.Ct.Act § 614.I.(c). In determining whether the parent "substantially and continuously or repeatedly" failed to "maintain contact with . . . the child," § 614.1.(d), the judge can discount actual visits or communications on the grounds that they were insubstantial or "overtly demonstrat[ed] a lack of affectionate and concerned parenthood." Soc.Serv.Law § 384-b.7.(b). When determining whether the parent planned for the child's future, the judge can reject as unrealistic plans based on overly optimistic estimates of physical or

financial ability. § 384-b.7.(c). *See also* dissenting opinion, *post* at 779-780, nn. 8 and 9.

[13] In this case, for example, the parents claim that the State sought court orders denying them the right to visit their children, which would have prevented them from maintaining the contact required by Fam.Ct.Act. § 614.1.(d). *See* Brief for Petitioners 9. The parents further claim that the State cited their rejection of social services they found offensive or superfluous as proof of the agency's "diligent efforts" and their own "failure to plan" for the children's future. *Id.* at 10-11.

We need not accept these statements as true to recognize that the State's unusual ability to structure the evidence increases the risk of an erroneous factfinding. Of course, the disparity between the litigants' resources will be vastly greater in States where there is no statutory right to court-appointed counsel. *See Lassiter v. Department of Social Services*, 452 U.S. 18, 34 (1981) (only 33 States and the District of Columbia provide that right by statute).

[14] The dissent makes a similar claim. *See post* at 786-791.

[15] This is a hazardous assumption, at best. Even when a child's natural home is imperfect, permanent removal from that home will not necessarily improve his welfare. *See, e.g.,* Wald, State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards, 27 Stan.L.Rev. 985, 993 (1975) ("In fact, under current practice, coercive intervention frequently results in placing a child in a more detrimental situation than he would be in without intervention").

Nor does termination of parental rights necessarily ensure adoption. *See* Brief for Community Action for Legal Services, Inc., *et al.* as *Amici Curiae* 22-23. Even when a child eventually finds an adoptive family, he may spend years moving between state institutions and "temporary" foster placements after his ties to his natural parents have been severed. *See Smith v. Organization of Foster Families,* 431 U.S. at 833-838 (describing the "limbo" of the New York foster care system).

[16] When the termination proceeding occurs, the child is not living at his natural home. A child cannot be adjudicated "permanently neglected" until, "for a period of more than one year," he has been in "the care of an authorized agency." Soc.Serv.Law § 384-b.7.(a); Fam.Ct.Act § 614. l.(d). *See also* dissenting opinion, *post* at 789-790.

Under New York law, a judge has ample discretion to ensure that, once removed from his natural parents on grounds of neglect, a child will not return to a hostile environment. In this case, when the State's initial termination effort failed for lack of proof, *see* n. 4, *supra,* the court simply issued orders under Fam.Ct.Act § 1055(b) extending the period of the child's foster home placement. *See* App.19-20. *See also* Fam.Ct.Act § 632(b) (when State's permanent neglect petition is dismissed for insufficient evidence, judge retains jurisdiction to reconsider underlying orders of placement); § 633 (judge may suspend judgment at dispositional hearing for an additional year).

[17] Any *parens patriae* interest in terminating the natural parents' rights arises only at the

dispositional phase, *after* the parents have been found unfit.

[18] The dissent's claim that today's decision "will inevitably lead to the federalization of family law," *post* at 773, is, of course, vastly overstated. As the dissent properly notes, the Court's duty to "refrai[n] from interfering with state answers to domestic relations questions" has never required "that the Court should blink at clear constitutional violations in state statutes." *Post* at 771.

[19] Unlike the dissent, we carefully refrain from accepting as the "facts of this case" findings that are not part of the record, and that have been found only to be more likely true than not.

[1] *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921).

[2] The majority asserts that

the degree of proof required in a particular type of proceeding "is the kind of question which has traditionally been left to the judiciary to resolve." *Woodby v. INS*, 385 U.S. 276, 284 (1966).

*Ante* at 755-756. To the extent that the majority seeks, by this statement, to place upon the federal judiciary the primary responsibility for deciding the appropriate standard of proof in state matters, it arrogates to itself a responsibility wholly at odds with the allocation of authority in our federalist system, and wholly unsupported by the prior decisions of this Court. In *Woodby v. INS*, 385 U.S. 276 (1966), the Court determined the proper standard of proof to be applied under a *federal* statute, and did so only after concluding that "Congress ha[d] not addressed itself to the question of what degree of proof [was] required in deportation proceedings." *Id.* at 284. Beyond an examination for the constitutional minimum of "fundamental fairness" -- which clearly is satisfied by the New York procedures at issue in this case -- this Court simply has no role in establishing the standards of proof that States must follow in the various judicial proceedings they afford to their citizens.

[3] Although, as the majority states, we have held that the minimum requirements of procedural due process are a question of federal law, such a holding does not mean that the procedural protections afforded by a State will be inadequate under the Fourteenth Amendment. It means simply that the adequacy of the state-provided process is to be judged by constitutional standards -- standards which the majority itself equates to "fundamental fairness." *Ante* at 754. I differ, therefore, not with the majority's statement that the requirements of due process present a federal question, but with its apparent assumption that the presence of "fundamental fairness" can be ascertained by an examination which completely disregards the plethora of protective procedures accorded parents by New York law.

[4] The majority refuses to consider New York's procedure as a whole, stating that

[t]he statutory provision of right to counsel and multiple hearings before termination cannot suffice

to protect a natural parent's fundamental liberty interests if the State is willing to tolerate undue uncertainty in the determination of the dispositive facts.

*Ante* at 758, n. 9. Implicit in this statement is the conclusion that the risk of error may be reduced to constitutionally tolerable levels only by raising the standard of proof -- that other procedures can never eliminate "undue uncertainty" so long as the standard of proof remains too low. Aside from begging the question of whether the risks of error tolerated by the State in this case are "undue," *see infra* at 785-791, this conclusion denies the flexibility that we have long recognized in the principle of due process; understates the error-reducing power of procedural protections such as the right to counsel, evidentiary hearings, rules of evidence, and appellate review; and establishes the standard of proof as the *sine qua non* of procedural due process.

[5] An abused child is one who has been subjected to intentional physical injury

which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ.

FCA § 1012(e)(i). Sexual offenses against a child are also covered by this category. A neglected child is one

whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent . . . to exercise a minimum degree of care in supplying the child with adequate food, clothing, shelter or education.

FCA § 1012(f)(i)(A).

[6] The relatively short time between notice and commencement of hearing provided by § 1048 undoubtedly reflects the State's desire to protect the child. These proceedings are designed to permit prompt action by the court when the child is threatened with imminent and serious physical, mental, or emotional harm.

[7] Permanent custody also may be awarded by the Family Court if both parents are deceased, the parents abandoned the child at least six months prior to the termination proceedings, or the parents are unable to provide proper and adequate care by reason of mental illness or mental retardation. SSL § 384-b.4.(c).

[8] As to maintaining contact with the child, New York law provides that

evidence of insubstantial or infrequent contacts by a parent with his or her child shall not, of itself, be sufficient as a matter of law to preclude a determination that such child is a permanently neglected child. A visit or communication by a parent with the child which is of such a character as

to overtly demonstrate a lack of affectionate and concerned parenthood shall not be deemed a substantial contact.

SSL § 384-b.7.(b).

Failure to plan for the future of the child means failure

to take such steps as may be necessary to provide an adequate, stable home and parental care for the child within a period of time which is reasonable under the financial circumstances available to the parent. The plan must be realistic and feasible, and good faith effort shall not, of itself, be determinative. In determining whether a parent has planned for the future of the child, the court may consider the failure of the parent to utilize medical, psychiatric, psychological and other social and rehabilitative services and material resources made available to such parent.

SSL § 384-b.7.(c).

[9] "Diligent efforts" are defined under New York law to

mean reasonable attempts by an authorized agency to assist, develop and encourage a meaningful relationship between the parent and child, including but not limited to:

(1) consultation and cooperation with the parents in developing a plan for appropriate services to the child and his family;

(2) making suitable arrangements for the parents to visit the child;

(3) provision of services and other assistance to the parents so that problems preventing the discharge of the child from care may be resolved or ameliorated; and

(4) informing the parents at appropriate intervals of the child's progress, development and health.

SSL § 384-b.7.(f).

[10] Tina Apel, the oldest of petitioners' five children, was removed from their custody by court order in November, 1973, when she was two years old. Removal proceedings were commenced in response to complaints by neighbors and reports from a local hospital that Tina had suffered injuries in petitioners' home, including a fractured left femur, treated with a homemade splint; bruises on the upper arms, forehead, flank, and spine; and abrasions of the upper leg. The following summer, John Santosky III, petitioners' second oldest child, was also removed from petitioners' custody. John, who was less than one year old at the time, was admitted to the hospital suffering malnutrition, bruises on the eye and forehead, cuts on the foot, blisters on the hand, and multiple pin pricks on the back. Exhibit to Brief for Respondent Kramer 1. Jed Santosky, the third oldest of petitioners' children, was removed from his parents' custody when only three

days old as a result of the abusive treatment of the two older children.

[11] The majority finds, without any reference to the facts of this case, that "numerous factors [in New York termination proceedings] combine to magnify the risk of erroneous factfinding." *Ante* at 762. Among the factors identified by the majority are the "unusual discretion" of the Family Court judge "to underweigh probative facts that might favor the parent"; the often uneducated, minority status of the parents and their consequent "vulnerab[ility] to judgments based on cultural or class bias"; the "State's ability to assemble its case," which "dwarfs the parents' ability to mount a defense" by including an unlimited budget, expert attorneys, and "full access to all public records concerning the family"; and the fact that "natural parents have no `double jeopardy' defense against repeated state" efforts, "with more or better evidence," to terminate parental rights "even when the parents have attained the level of fitness required by the State." *Ante* at 762, 763, 764. In short, the majority characterizes the State as a wealthy and powerful bully bent on taking children away from defenseless parents. *See ante* at 761-764. Such characterization finds no support in the record.

The intent of New York has been stated with eminent clarity: "the [S]tate's *first obligation* is to *help* the family with services to *prevent* its break-up or to reunite it if the child has already left home." SSL § 384-b.1.(a)(iii) (emphasis added). There is simply no basis in fact for believing, as the majority does, that the State does not mean what it says; indeed, the facts of this case demonstrate that New York has gone the extra mile in seeking to effectuate its declared purpose. *See supra* at 781-785. More importantly, there should be no room in the jurisprudence of this Court for decisions based on unsupported, inaccurate assumptions.

A brief examination of the "factors" relied upon by the majority demonstrates its error. The "unusual" discretion of the Family Court judge to consider the "`affectio[n] and concer[n]'" displayed by parents during visits with their children, *ante* at 763, n. 12, is nothing more than discretion to consider reality; there is not one shred of evidence in this case suggesting that the determination of the Family Court was "based on cultural or class bias"; if parents lack the "ability to mount a defense," the State provides them with the full services of an attorney, FCA § 262, and they, like the State, have "full access to all *public* records concerning the family" (emphasis added); and the absence of "double jeopardy" protection simply recognizes the fact that family problems are often ongoing, and may in the future warrant action that currently is unnecessary. In this case, the Family Court dismissed the first termination petition because it desired to give petitioners "the benefit of the doubt," Exhibit to Brief for Respondent Kramer 620, and a second opportunity to raise themselves to "an acceptable minimal level of competency as parents." *Id.* at 624. It was their complete failure to do so that prompted the second, successful termination petition. *See supra* at 781-784 and this page.

[12] It is worth noting that the significance of the standard of proof in New York parental termination proceedings differs from the significance of the standard in other forms of litigation. In the usual adjudicatory setting, the factfinder has had little or no prior exposure to the facts of the

case. His only knowledge of those facts comes from the evidence adduced at trial, and he renders his findings solely upon the basis of that evidence. Thus, normally, the standard of proof is a crucial factor in the final outcome of the case, for it is the scale upon which the factfinder weighs his knowledge and makes his decision.

Although the standard serves the same function in New York parental termination proceedings, additional assurances of accuracy are present in its application. As was adduced at oral argument, the practice in New York is to assign one judge to supervise a case from the initial temporary removal of the child to the final termination of parental rights. Therefore, as discussed above, the factfinder is intimately familiar with the case before the termination proceedings ever begin. Indeed, as in this case, he often will have been closely involved in protracted efforts to rehabilitate the parents. Even if a change in judges occurs, the Family Court retains jurisdiction of the case, and the newly assigned judge may take judicial notice of all prior proceedings. Given this familiarity with the case, and the necessarily lengthy efforts which must precede a termination action in New York, decisions in termination cases are made by judges steeped in the background of the case and peculiarly able to judge the accuracy of evidence placed before them. This does not mean that the standard of proof in these cases can escape due process scrutiny, only that additional assurances of accuracy attend the application of the standard in New York termination proceedings.

[13] The majority dismisses the child's interest in the accuracy of determinations made at the factfinding hearing because "[t]he factfinding does not purport . . . to balance the child's interest in a normal family home against the parents' interest in raising the child," but instead "pits the State directly against the parents." *Ante* at 759. Only "[a]fter the State has established parental unfitness," the majority reasons, may the court "assume . . . that the interests of the child and the natural parents do diverge." *Ante* at 760.

This reasoning misses the mark. The child has an interest in the outcome of the factfinding hearing independent of that of the parent. To be sure, "the child and his parents share a vital interest in preventing *erroneous* termination of their natural relationship." *Ibid.* (emphasis added). But the child's interest in a continuation of the family unit exists only to the extent that such a continuation would not be harmful to him. An error in the factfinding hearing that results in a failure to terminate a parent-child relationship which rightfully should be terminated may well detrimentally affect the child. *See* nn. 14, 15, *infra*.

The preponderance of the evidence standard, which allocates the risk of error more or less evenly, is employed when the social disutility of error *in either direction* is roughly equal -- that is, when an incorrect finding of fault would produce consequences as undesirable as the consequences that would be produced by an incorrect finding of no fault. Only when the disutility of error in one direction discernibly outweighs the disutility of error in the other direction do we choose, by means of the standard of proof, to reduce the likelihood of the more onerous outcome. *See In re Winship*, 397 U.S. 358, 370-372 (1970) (Harlan, J., concurring).

New York's adoption of the preponderance of the evidence standard reflects its conclusion that the undesirable consequence of an erroneous finding of parental unfitness -- the unwarranted termination of the family relationship -- is roughly equal to the undesirable consequence of an erroneous finding of parental fitness -- the risk of permanent injury to the child either by return of the child to an abusive home or by the child's continued lack of a permanent home. *See* nn. 14, 15, *infra.* Such a conclusion is well within the province of state legislatures. It cannot be said that the New York procedures are unconstitutional simply because a majority of the Members of this Court disagree with the New York Legislature's weighing of the interests of the parents and the child in an error-free factfinding hearing.

[14] The record in this case illustrates the problems that may arise when a child is returned to an abusive home. Eighteen months after Tina, petitioners' oldest child, was first removed from petitioners' home, she was returned to the home on a trial basis. Katherine Weiss, a supervisor in the Child Protective Unit of the Ulster County Child Welfare Department, later testified in Family Court that "[t]he attempt to return Tina to her home just totally blew up." Exhibit to Brief for Respondent Kramer 135. When asked to explain what happened, Mrs. Weiss testified that

there were instances on the record in this court of Mr. Santosky's abuse of his wife, alleged abuse of the children, and proven neglect of the children.

*Ibid.* Tina again was removed from the home, this time along with John and Jed.

[15] The New York Legislature recognized the potential harm to children of extended, nonpermanent foster care. It found

that many children who have been placed in foster care experience unnecessarily protracted stays in such care without being adopted or returned to their parents or other custodians. Such unnecessary stays may deprive these children of positive, nurturing family relationships and have deleterious effects on their development into responsible, productive citizens.

SSL § 384-b.1.(b). Subsequent studies have proved this finding correct. One commentator recently wrote of "the lamentable conditions of many foster care placements" under the New York system even today. He noted:

Over fifty percent of the children in foster care have been in this

"temporary" status for more than two years; over thirty percent for more than five years. During this time, many children are placed in a sequence of ill-suited foster homes, denying them the consistent support and nurturing that they so desperately need.

Besharov, State Intervention To Protect Children: New York's Definition of "Child Abuse" and

"Child Neglect," 26 N.Y.L.S.L.Rev. 723, 770-771 (1981) (footnotes omitted). In this case, petitioners' three children have been in foster care for more than four years, one child since he was only three days old. Failure to terminate petitioners' parental rights will only mean a continuation of this unsatisfactory situation.

[16] The majority's conclusion that a state interest in the child's wellbeing arises only after a determination of parental unfitness suffers from the same error as its assertion that the child has no interest, separate from that of its parents, in the accuracy of the factfinding hearing. *See* n. 13, *supra.*

---------

# STANLEY v. ILLINOIS, 405 U.S. 645 (1972)

## 405 U.S. 645

### STANLEY v. ILLINOIS
### CERTIORARI TO THE SUPREME COURT OF ILLINOIS

#### No. 70-5014.

#### Argued October 19, 1971
#### Decided April 3, 1972

Petitioner, an unwed father whose children, on the mother's death, were declared state wards and placed in guardianship, attacked the Illinois statutory scheme as violative of equal protection. Under that scheme the children of unmarried fathers, upon the death of the mother, are declared dependents without any hearing on parental fitness and without proof of neglect, though such hearing and proof are required before the State assumes custody of children of married or divorced parents and unmarried mothers. The Illinois Supreme Court, holding that petitioner could properly be separated from his children upon mere proof that he and the dead mother had not been married and that petitioner's fitness as a father was irrelevant, rejected petitioner's claim. Held:

> 1. Under the Due Process Clause of the Fourteenth Amendment petitioner was entitled to a hearing on his fitness as a parent before his children were taken from him. Pp. 647-658.
> (a) The fact that petitioner can apply for adoption or for custody and control of his children does not bar his attack on the dependency proceeding. Pp. 647-649.
> (b) The State cannot, consistently with due process requirements, merely presume that unmarried fathers in general and petitioner in particular are unsuitable and neglectful parents. Parental unfitness must be established on the basis of individualized proof. See Bell v. Burson, 402 U.S. 535 . Pp. 649-658.
> 2. The denial to unwed fathers of the hearing on fitness accorded to all other parents whose custody of their children is challenged by the State constitutes a denial of equal protection of the laws. P. 658.

45 Ill. 2d 132, 256 N. E. 2d 814, reversed and remanded.

WHITE, J., delivered the opinion of the Court, in which BRENNAN, STEWART, and MARSHALL, JJ., joined, and in Parts I and II of which DOUGLAS, J., joined. BURGER, C. J., filed a dissenting opinion, in which BLACKMUN, J., joined, post, p. 659. POWELL and REHNQUIST, JJ., took no part in the consideration or decision of the case. [405 U.S. 645, 646]

Patrick T. Murphy argued the cause and filed a brief for petitioner.

Morton E. Friedman, Assistant Attorney General of Illinois, argued the cause for respondent. With him on the brief were William J. Scott, Attorney General, and Joel M. Flaum, First Assistant Attorney General.

Jonathan Weiss and E. Judson Jennings filed a brief for the Center on Social Welfare Policy and Law as amicus curiae urging reversal.

Calvin Sawyier and Richard L. Mandel filed a brief for the Child Care Association of Illinois, Inc., as amicus curiae.

MR. JUSTICE WHITE delivered the opinion of the Court.

Joan Stanley lived with Peter Stanley intermittently for 18 years, during which time they had three children. 1 When Joan Stanley died, Peter Stanley lost not only her but also his children. Under Illinois law, the children of unwed fathers become wards of the State upon the death of the mother. Accordingly, upon Joan Stanley's death, in a dependency proceeding instituted by the State of Illinois, Stanley's children 2 were declared wards of the State and placed with court-appointed guardians. Stanley appealed, claiming that he had never been shown to be an unfit parent and that since married fathers and unwed mothers could not be deprived of their children without such a showing, he had been deprived of the equal protection of the laws guaranteed him by the Fourteenth Amendment. The Illinois Supreme Court accepted the fact that Stanley's own unfitness had not been established but rejected the equal protection claim, holding that Stanley could properly be separated from his children upon proof of the single fact that he and the dead mother [405 U.S. 645, 647]   had not been married. Stanley's actual fitness as a father was irrelevant. In re Stanley, 45 Ill. 2d 132, 256 N. E. 2d 814 (1970).

Stanley presses his equal protection claim here. The State continues to respond that unwed fathers are presumed unfit to raise their children and that it is unnecessary to hold individualized hearings to determine whether particular fathers are in fact unfit parents before they are separated from their children. We granted certiorari, 400 U.S. 1020 (1971), to determine whether this method of procedure by presumption could be allowed to stand in light of the fact that Illinois allows married fathers - whether divorced, widowed, or separated - and mothers - even if unwed - the benefit of the presumption that they are fit to raise their children.

# I

At the outset we reject any suggestion that we need not consider the propriety of the dependency proceeding that separated the Stanleys because Stanley might be able to regain custody of his children as a guardian or through adoption proceedings. The suggestion is that if Stanley has been treated differently from other parents, the difference is immaterial and not legally cognizable for the purposes of the Fourteenth Amendment. This Court has not, however, embraced the general proposition that a wrong may be done if it can be undone. Cf. Sniadach v. Family Finance Corp., 395 U.S. 337 (1969). Surely, in the case before us, if there is delay between the doing and the undoing petitioner suffers from the deprivation of his children, and the children suffer from uncertainty and dislocation.

It is clear, moreover, that Stanley does not have the means at hand promptly to erase the adverse consequences of the proceeding in the course of which his children were declared wards of the State. It is first [405 U.S. 645, 648]   urged that Stanley could act to adopt his children. But under Illinois law, Stanley is treated not as a parent but as a stranger to his children, and the dependency proceeding has gone forward on the presumption that he is unfit to exercise parental rights. Insofar as we are informed, Illinois law affords him no priority in adoption proceedings. It would be his burden to establish not only that he would be a suitable parent but also that he would be the most suitable of all who might want custody of the children. Neither can we ignore that in the proceedings from which this action developed, the "probation officer," see App. 17, the assistant state's attorney, see id., at 29-30, and the judge charged with the case, see id., at 16-18, 23, made it apparent that Stanley, unmarried and impecunious as he is, could not now expect to profit from adoption proceedings. 3 The Illinois Supreme Court apparently recognized some or all of these considerations, because it did not suggest that Stanley's case was undercut by his failure to petition for adoption.

Before us, the State focuses on Stanley's failure to petition for "custody and control" - the second route by which, it is urged, he might regain authority for his children. Passing the obvious issue whether it would be futile or burdensome for an unmarried father - without funds and already once presumed unfit - to petition for custody, this suggestion overlooks the fact that legal custody is not parenthood or adoption. A person appointed guardian in an action for custody and control is subject to removal at any time without such [405 U.S. 645, 649]   cause as must be shown in a

neglect proceeding against a parent. Ill. Rev. Stat., c. 37, 705-8. He may not take the children out of the jurisdiction without the court's approval. He may be required to report to the court as to his disposition of the children's affairs. Ill. Rev. Stat., c. 37, 705-8. Obviously then, even if Stanley were a mere step away from "custody and control," to give an unwed father only "custody and control" would still be to leave him seriously prejudiced by reason of his status.

We must therefore examine the question that Illinois would have us avoid: Is a presumption that distinguishes and burdens all unwed fathers constitutionally repugnant? We conclude that, as a matter of due process of law, Stanley was entitled to a hearing on his fitness as a parent before his children were taken from him and that, by denying him a hearing and extending it to all other parents whose custody of their children is challenged, the State denied Stanley the equal protection of the laws guaranteed by the Fourteenth Amendment.

## II

Illinois has two principal methods of removing non-delinquent children from the homes of their parents. In a dependency proceeding it may demonstrate that the children are wards of the State because they have no surviving parent or guardian. Ill. Rev. Stat., c. 37, 702-1, 702-5. In a neglect proceeding it may show that children should be wards of the State because the present parent(s) or guardian does not provide suitable care. Ill. Rev. Stat., c. 37, 702-1, 702-4.

The State's right - indeed, duty - to protect minor children through a judicial determination of their interests in a neglect proceeding is not challenged here. Rather, we are faced with a dependency statute that empowers state officials to circumvent neglect proceedings [405 U.S. 645, 650]   on the theory that an unwed father is not a "parent" whose existing relationship with his children must be considered. 4 "Parents," says the State, "means the father and mother of a legitimate child, or the survivor of them, or the natural mother of an illegitimate child, and includes any adoptive parent," Ill. Rev. Stat., c. 37, 701-14, but the term does not include unwed fathers.

Under Illinois law, therefore, while the children of all parents can be taken from them in neglect proceedings, that is only after notice, hearing, and proof of such unfitness as a parent as amounts to neglect, an unwed father is uniquely subject to the more simplistic dependency proceeding. By use of this proceeding, the State, on showing that the father was not married to the mother, need not prove unfitness in fact, because it is presumed at law. Thus, the unwed father's claim of parental qualification is avoided as "irrelevant."

In considering this procedure under the Due Process Clause, we recognize, as we have in other cases, that due process of law does not require a hearing "in every conceivable case of government impairment of private interest." Cafeteria Workers v. McElroy, 367 U.S. 886, 894 (1961). That case explained that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation" and firmly established that "what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental [405 U.S. 645, 651]   action." Id., at 895; Goldberg v. Kelly, 397 U.S. 254, 263 (1970).

The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection. It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children "come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements." Kovacs v. Cooper, 336 U.S. 77, 95 (1949) (Frankfurter, J., concurring).

The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," Meyer v. Nebraska, 262 U.S. 390, 399 (1923), "basic civil rights of man," Skinner v. Oklahoma, 316 U.S. 535, 541 (1942), and "[r]ights far more precious . . . than property rights," May v. Anderson, 345 U.S. 528, 533 (1953). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." Prince v. Massachusetts, 321 U.S. 158, 166 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, Meyer v. Nebraska, supra, at 399, the Equal Protection Clause of the Fourteenth Amendment, Skinner v. Oklahoma, supra, at 541, and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 496 (1965) (Goldberg, J., concurring).

Nor has the law refused to recognize those family relationships unlegitimized by a marriage ceremony. The Court has declared unconstitutional a state statute denying natural, but illegitimate, children a wrongful-death action for the death of their mother, emphasizing that [405 U.S. 645, 652]   such children cannot be denied the right of other children because familial bonds in such cases were often as warm, enduring, and important as those arising within a more formally organized family unit. Levy v. Louisiana, 391 U.S. 68, 71 -72 (1968). "To say that the test of equal protection should be the `legal' rather than the biological relationship is to avoid the issue. For the Equal Protection Clause necessarily limits the authority of a State to draw such `legal' lines as it chooses." Glona v. American Guarantee Co., 391 U.S. 73, 75 -76 (1968).

These authorities make it clear that, at the least, Stanley's interest in retaining custody of his children is cognizable and substantial.

For its part, the State has made its interest quite plain: Illinois has declared that the aim of the Juvenile Court Act is to protect "the moral, emotional, mental, and physical welfare of the minor and the best interests of the community" and to "strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when his welfare or safety or the protection of the public cannot be adequately safeguarded without removal . . . ." Ill. Rev. Stat., c. 37, 701-2. These are legitimate interests, well within the power of the State to implement. We do not question the assertion that neglectful parents may be separated from their children.

But we are here not asked to evaluate the legitimacy of the state ends, rather, to determine whether the means used to achieve these ends are constitutionally defensible. What is the state interest in separating children from fathers without a hearing designed to determine whether the father is unfit in a particular disputed case? We observe that the State registers no gain towards its declared goals when it separates children from the custody of fit parents. Indeed, if Stanley is a [405 U.S. 645, 653]   fit father, the State spites its own articulated goals when it needlessly separates him from his family.

In Bell v. Burson, 402 U.S. 535 (1971), we found a scheme repugnant to the Due Process Clause because it deprived a driver of his license without reference to the very factor (there fault in driving, here fitness as a parent) that the State itself deemed fundamental to its statutory scheme. Illinois would avoid the self-contradiction that rendered the Georgia license suspension system invalid by arguing that Stanley and all other unmarried fathers can reasonably be presumed to be unqualified to raise their children. 5   [405 U.S. 645, 654]

It may be, as the State insists, that most unmarried fathers are unsuitable and neglectful parents. 6 It may also be that Stanley is such a parent and that his children should be placed in other hands. But all unmarried fathers are not in this category; some are wholly suited to have custody of their children. 7 This much the State [405 U.S. 645, 655]   readily concedes, and nothing in this record indicates that Stanley is or has been a neglectful father who has not cared for his children. Given the opportunity to make his case, Stanley may have been seen to be deserving of custody of

his offspring. Had this been so, the State's statutory policy would have been furthered by leaving custody in him.

Carrington v. Rash, 380 U.S. 89 (1965), dealt with a similar situation. There we recognized that Texas had a powerful interest in restricting its electorate to bona fide residents. It was not disputed that most servicemen stationed in Texas had no intention of remaining in the State; most therefore could be deprived of a vote in state affairs. But we refused to tolerate a blanket exclusion depriving all servicemen of the vote, when some servicemen clearly were bona fide residents and when "more precise tests," id., at 95, were available to distinguish members of this latter group. "By forbidding a soldier ever to controvert the presumption of nonresidence," id., at 96, the State, we said, unjustifiably effected a substantial deprivation. It viewed people one-dimensionally (as servicemen) when a finer perception could readily have been achieved by assessing a serviceman's claim to residency on an individualized basis.

> "We recognize that special problems may be involved in determining whether servicemen have actually acquired a new domicile in a State for franchise purposes. We emphasize that Texas is free to take reasonable and adequate steps, as have other States, to see that all applicants for the vote actually fulfill the requirements of bona fide residence. But [the challenged] provision goes beyond such rules. [405 U.S. 645, 656]  `[T]he presumption here created is . . . definitely conclusive - incapable of being overcome by proof of the most positive character.'" Id., at 96.
> "All servicemen not residents of Texas before induction," we concluded, "come within the provision's sweep. Not one of them can ever vote in Texas, no matter" what their individual qualifications. Ibid. We found such a situation repugnant to the Equal Protection Clause.

Despite Bell and Carrington, it may be argued that unmarried fathers are so seldom fit that Illinois need not undergo the administrative inconvenience of inquiry in any case, including Stanley's. The establishment of prompt efficacious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in constitutional adjudication. But the Constitution recognizes higher values than speed and efficiency. 8 Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones.

Procedure by presumption is always cheaper and easier [405 U.S. 645, 657]  than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand. 9

Bell v. Burson held that the State could not, while purporting to be concerned with fault in suspending a driver's license, deprive a citizen of his license without a hearing that would assess fault. Absent fault, the State's declared interest was so attenuated that administrative convenience was insufficient to excuse a hearing where evidence of fault could be considered. That drivers involved in accidents, as a statistical matter, might be very likely to have been wholly or partially at fault did not foreclose hearing and proof in specific cases before licenses were suspended.

We think the Due Process Clause mandates a similar result here. The State's interest in caring for Stanley's children is de minimis if Stanley is shown to be a fit [405 U.S. 645, 658]  father. It insists on presuming rather than proving Stanley's unfitness solely because it is more convenient to presume than to prove. Under the Due Process Clause that advantage is insufficient to justify refusing a father a hearing when the issue at stake is the dismemberment of his family.

### III

The State of Illinois assumes custody of the children of married parents, divorced parents, and unmarried mothers only after a hearing and proof of neglect. The children of unmarried fathers, however, are declared dependent children without a hearing on parental fitness and without proof of neglect. Stanley's claim in the state courts and here is that failure to afford him a hearing on his parental qualifications while extending it to other parents denied him equal protection of the laws. We have concluded that all Illinois parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody. It follows that denying such a hearing to Stanley and those like him while granting it to other Illinois parents is inescapably contrary to the Equal Protection Clause. 10   [405 U.S. 645, 659]

The judgment of the Supreme Court of Illinois is reversed and the case is remanded to that court for proceedings not inconsistent with this opinion.

　　　It is so ordered.
**MR.** JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS joins in Parts I and II of this opinion.

## Footnotes

[ Footnote 1 ] Uncontradicted testimony of Peter Stanley, App. 22.

[ Footnote 2 ] Only two children are involved in this litigation.

[ Footnote 3 ] The Illinois Supreme Court's opinion is not at all contrary to this conclusion. That court said: "[T]he trial court's comments clearly indicate the court's willingness to consider a future request by the father for custody and guardianship." 45 Ill. 2d 132, 135, 256 N. E. 2d 814, 816. (Italics added.) See also the comment of Stanley's counsel on oral argument: "If Peter Stanley could have adopted his children, we would not be here today." Tr. of Oral Arg. 7.

[ Footnote 4 ] Even while refusing to label him a "legal parent," the State does not deny that Stanley has a special interest in the outcome of these proceedings. It is undisputed that he is the father of these children, that he lived with the two children whose custody is challenged all their lives, and that he has supported them.

[ Footnote 5 ] Illinois says in its brief, at 21-23.

> "[T]he only relevant consideration in determining the propriety of governmental intervention in the raising of children is whether the best interests of the child are served by such intervention.
> "In effect, Illinois has imposed a statutory presumption that the best interests of a particular group of children necessitates some governmental supervision in certain clearly defined situations. The group of children who are illegitimate are distinguishable from legitimate children not so much by their status at birth as by the factual differences in their upbringing. While a legitimate child usually is raised by both parents with the attendant familial relationships and a firm concept of home and identity, the illegitimate child normally knows only one parent - the mother. . . .
> ". . . The petitioner has premised his argument upon particular factual circumstances - a lengthy relationship with the mother . . . a familial relationship with the two children, and a general assumption that this relationship approximates that in which the natural parents are married to each other.
> ". . . Even if this characterization were accurate (the record is insufficient to support it) it would not affect the validity of the statutory definition of parent. . . . The petitioner does not deny that the children are illegitimate. The record reflects their natural mother's death. Given these two factors, grounds exist for the State's intervention to ensure

adequate care and protection for these children. This is true whether or not this particular petitioner assimilates all or none [405 U.S. 645, 654] of the normal characteristics common to the classification of fathers who are not married to the mothers of their children."

See also Illinois' Brief 23 ("The comparison of married and putative fathers involves exclusively factual differences. The most significant of these are the presence or absence of the father from the home on a day-to-day basis and the responsibility imposed upon the relationship"), id., at 24 (to the same effect), id., at 31 (quoted below in n. 6), id., at 24-26 (physiological and other studies are cited in support of the proposition that men are not naturally inclined to childrearing), and Tr. of Oral Arg. 31 ("We submit that both based on history or [sic] culture the very real differences . . . between the married father and the unmarried father, in terms of their interests in children and their legal responsibility for their children, that the statute here fulfills the compelling governmental objective of protecting children . . .").

[ Footnote 6 ] The State speaks of "the general disinterest of putative fathers in their illegitimate children" (Brief 8) and opines that "[i]n most instances, the natural father is a stranger to his children." Brief 31.

[ Footnote 7 ] See In re Mark T., 8 Mich. App. 122, 154 N. W. 2d 27 (1967). There a panel of the Michigan Court of Appeals in unanimously affirming a circuit court's determination that the father of an illegitimate son was best suited to raise the boy, said:

> "The appellants' presentation in this case proceeds on the assumption that placing Mark for adoption is inherently preferable to rearing by his father, that uprooting him from the family which he knew from birth until he was a year and a half old, secretly institutionalizing him and later transferring him to strangers is so incontrovertibly better that no court has the power even to consider the matter. Hardly anyone would even suggest such a proposition if we were talking about a child born in wedlock.
> "We are not aware of any sociological data justifying the assumption that an illegitimate child reared by his natural father is less likely to receive a proper upbringing than one reared by his natural father who was at one time married to his mother, or that the [405 U.S. 645, 655] stigma of illegitimacy is so pervasive it requires adoption by strangers and permanent termination of a subsisting relationship with the child's father." Id., at 146, 154 N. W. 2d, at 39.

[ Footnote 8 ] Cf. Reed v. Reed, 404 U.S. 71, 76 (1971). "Clearly the objective of reducing the workload on probate courts by eliminating one class of contests is not without some legitimacy. . . . [But to] give a mandatory preference to members of either sex over members of the other, merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment." Carrington v. Rash, 380 U.S. 89, 96 (1965), teaches the same lesson. ". . . States may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State. Oyama v. California, 332 U.S. 633 . By forbidding a soldier ever to controvert the presumption of nonresidence, the Texas Constitution imposes an invidious discrimination in violation of the Fourteenth Amendment."

[ Footnote 9 ] We note in passing that the incremental cost of offering unwed fathers an opportunity for individualized hearings on fitness appears to be minimal. If unwed fathers, in the main, do not care about the disposition of their children, they will not appear to demand hearings. If they do care, under the scheme here held invalid, Illinois would admittedly at some later time have to afford them a properly focused hearing in a custody or adoption proceeding.

Extending opportunity for hearing to unwed fathers who desire and claim competence to care for their children creates no constitutional or procedural obstacle to foreclosing those unwed fathers who are not so inclined. The Illinois law governing procedure in juvenile cases, Ill. Rev. Stat., c.

37, 704-1 et seq., provides for personal service, notice by certified mail, or for notice by publication when personal or certified mail service cannot be had or when notice is directed to unknown respondents under the style of "All whom it may Concern." Unwed fathers who do not promptly respond cannot complain if their children are declared wards of the State. Those who do respond retain the burden of proving their fatherhood.

[ Footnote 10 ] Predicating a finding of constitutional invalidity under the Equal Protection Clause of the Fourteenth Amendment on the observation that a State has accorded bedrock procedural rights to some, but not to all similarly situated, is not contradictory to our holding in Picard v. Connor, 404 U.S. 270 (1971). In that case a due process, rather than an equal protection, claim was raised in the state courts. The federal courts were, in our opinion, barred from reversing the state conviction on grounds of contravention of the Equal Protection Clause when that clause had not been referred to for consideration by the state authorities. Here, in contrast, we dispose of the case on the constitutional premise raised below, reaching the result by a method of analysis readily available to the state court.

For the same reason the strictures of Cardinale v. Louisiana, 394 U.S. 437 (1969), and Hill v. California, 401 U.S. 797 (1971), have been fully observed.

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE BLACKMUN concurs, dissenting.

The only constitutional issue raised and decided in the courts of Illinois in this case was whether the Illinois statute that omits unwed fathers from the definition of "parents" violates the Equal Protection Clause. We granted certiorari to consider whether the Illinois Supreme Court properly resolved that equal protection issue when it unanimously upheld the statute against petitioner Stanley's attack.

No due process issue was raised in the state courts; and no due process issue was decided by any state court. As MR. JUSTICE DOUGLAS said for this Court in State Farm Mutual Automobile Ins. Co. v. Duel, 324 U.S. 154, 160 (1945), "Since the [state] Supreme Court did not pass on the question, we may not do so." We had occasion more recently to deal with this aspect of the jurisdictional limits placed upon this Court by 28 U.S.C. 1257 when we decided Hill v. California, 401 U.S. 797 (1971). Having rejected the claim that Chimel v. California, 395 U.S. 752 (1969), should be retroactively applied to invalidate petitioner Hill's conviction on the ground that a search incident to arrest was overly extensive in scope, the Court noted Hill's additional contention that his personal diary, which was one of the items [405 U.S. 645, 660] of evidence seized in that search, should have been excluded on Fifth Amendment grounds as well. MR. JUSTICE WHITE, in his opinion for the Court, concluded that we lacked jurisdiction to consider the Fifth Amendment contention:

> "Counsel for [the petitioner] conceded at oral argument that the Fifth Amendment issue was not raised at trial. Nor was the issue raised, briefed, or argued in the California appellate courts. [Footnote omitted.] The petition for certiorari likewise ignored it. In this posture of the case, the question, although briefed and argued here, is not properly before us." 401 U.S., at 805 .

In the case now before us, it simply does not suffice to say, as the Court in a footnote does say, that "we dispose of the case on the constitutional premise raised below, reaching the result by a method of analysis readily available to the state court." Ante, at 658 n. 10. The Court's method of analysis seems to ignore the strictures of JUSTICES DOUGLAS and WHITE, but the analysis is clear: the Court holds sua sponte that the Due Process Clause requires that Stanley, the unwed biological father, be accorded a hearing as to his fitness as a parent before his children are declared wards of the state court; the Court then reasons that since Illinois recognizes such rights to due process in married fathers, it is required by the Equal Protection Clause to give such protection to unmarried fathers. This "method of analysis" is, of course, no more or less than the use of the Equal Protection Clause as a shorthand condensation of the entire Constitution: a State

may not deny any constitutional right to some of its citizens without violating the Equal Protection Clause through its failure to deny such rights to all of its citizens. The limits on this Court's jurisdiction are not properly expandable by the use of such semantic devices as that. [405 U.S. 645, 661]

Not only does the Court today use dubious reasoning in dealing with limitations upon its jurisdiction, it proceeds as well to strike down the Illinois statute here involved by "answering" arguments that are nowhere to be found in the record or in the State's brief - or indeed in the oral argument. I have been unable, for example, to discover where or when the State has advanced any argument that "it is unnecessary to hold individualized hearings to determine whether particular fathers are in fact unfit parents before they are separated from their children." Ante, at 647. Nor can I discover where the State has "argu[ed] that Stanley and all other unmarried fathers can reasonably be presumed to be unqualified to raise their children." Ante, at 653. Or where anyone has even remotely suggested the "argu[ment] that unmarried fathers are so seldom fit that Illinois need not undergo the administrative inconvenience of inquiry in any case, including Stanley's." Ante, at 656. On the other hand, the arguments actually advanced by the State are largely ignored by the Court. 1  [405 U.S. 645, 662]

All of those persons in Illinois who may have followed the progress of this case will, I expect, experience no little surprise at the Court's opinion handed down today. Stanley will undoubtedly be surprised to find that he has prevailed on an issue never advanced by him. The judges who dealt with this case in the state courts will be surprised to find their decisions overturned on a ground they never considered. And the legislators and other officials of the State of Illinois, as well as those attorneys of the State who are familiar with the statutory provisions here at issue, will be surprised to learn for the first time that the Illinois Juvenile Court Act establishes a presumption that unwed fathers are unfit. I must confess my own inability to find any such presumption in the Illinois Act. Furthermore, from the record of the proceedings in the Juvenile Court of Cook County in this case, I can only conclude that the judge of that court was unaware of any such presumption, for he clearly indicated that Stanley's asserted fatherhood of the children would stand him in good stead, rather than prejudice him, in any adoption or guardianship proceeding. In short, far from any intimations [405 U.S. 645, 663]  of hostility toward unwed fathers, that court gave Stanley "merit points" for his acknowledgment of paternity and his past assumption of at least marginal responsibility for the children. 2

In regard to the only issue that I consider properly before the Court, I agree with the State's argument that the Equal Protection Clause is not violated when Illinois gives full recognition only to those father-child relationships that arise in the context of family units bound together by legal obligations arising from marriage or from adoption proceedings. Quite apart from the religious or quasi-religious connotations that marriage has - and has historically enjoyed - for a large proportion of this Nation's citizens, it is in law an essentially contractual relationship, the parties to which have legally enforceable rights and duties, with respect both to each other and to any children born to them. Stanley and the mother of these children never entered such a relationship. The record is silent as to whether they ever privately exchanged such promises as would have bound them in marriage under the common law. See Cartwright v. McGown, 121 Ill. 388, 398, 12 N. E. 737, 739 (1887). In [405 U.S. 645, 664]  any event, Illinois has not recognized common-law marriages since 1905. Ill. Rev. Stat., c. 89, 4. Stanley did not seek the burdens when he could have freely assumed them.

Where there is a valid contract of marriage, the law of Illinois presumes that the husband is the father of any child born to the wife during the marriage; as the father, he has legally enforceable rights and duties with respect to that child. When a child is born to an unmarried woman, Illinois recognizes the readily identifiable mother, but makes no presumption as to the identity of the biological father. It does, however, provide two ways, one voluntary and one involuntary, in which that father may be identified. First, he may marry the mother and acknowledge the child as his own; this has the legal effect of legitimating the child and gaining for the father full recognition as a parent. Ill. Rev. Stat., c. 3, 12-8. Second, a man may be found to be the biological father of the

child pursuant to a paternity suit initiated by the mother; in this case, the child remains illegitimate, but the adjudicated father is made liable for the support of the child until the latter attains age 18 or is legally adopted by another. Ill. Rev. Stat., c. 106 3/4, 52.

Stanley argued before the Supreme Court of Illinois that the definition of "parents," set out in Ill. Rev. Stat., c. 37, 701-14, as including "the father and mother of a legitimate child, or the survivor of them, or the natural mother of an illegitimate child, [or] . . . any adoptive parent," 3 violates the Equal Protection Clause in that it [405 U.S. 645, 665]   treats unwed mothers and unwed fathers differently. Stanley then enlarged upon his equal protection argument when he brought the case here; he argued before this Court that Illinois is not permitted by the Equal Protection Clause to distinguish between unwed fathers and any of the other biological parents included in the statutory definition of legal "parents."

The Illinois Supreme Court correctly held that the State may constitutionally distinguish between unwed fathers and unwed mothers. Here, Illinois' different treatment of the two is part of that State's statutory scheme for protecting the welfare of illegitimate children. In almost all cases, the unwed mother is readily identifiable, generally from hospital records, and alternatively by physicians or others attending the child's birth. Unwed fathers, as a class, are not traditionally quite so easy to identify and locate. Many of them either deny all responsibility or exhibit no interest in the child or its welfare; and, of course, many unwed fathers are simply not aware of their parenthood.

Furthermore, I believe that a State is fully justified in concluding, on the basis of common human experience, that the biological role of the mother in carrying and nursing an infant creates stronger bonds between her and the child than the bonds resulting from the male's often casual encounter. This view is reinforced by the observable fact that most unwed mothers exhibit a concern for their offspring either permanently or at least until [405 U.S. 645, 666]   they are safely placed for adoption, while unwed fathers rarely burden either the mother or the child with their attentions or loyalties. Centuries of human experience buttress this view of the realities of human conditions and suggest that unwed mothers of illegitimate children are generally more dependable protectors of their children than are unwed fathers. While these, like most generalizations, are not without exceptions, they nevertheless provide a sufficient basis to sustain a statutory classification whose objective is not to penalize unwed parents but to further the welfare of illegitimate children in fulfillment of the State's obligations as parens patriae. 4

Stanley depicts himself as a somewhat unusual unwed father, namely, as one who has always acknowledged and never doubted his fatherhood of these children. He alleges that he loved, cared for, and supported these children from the time of their birth until the death of their mother. He contends that he consequently must be treated the same as a married father of legitimate children. Even assuming the truth of Stanley's allegations, I am unable to construe the Equal Protection Clause as requiring Illinois to tailor its statutory definition of "parents" so meticulously as to include such unusual unwed fathers, while at the same time excluding those unwed, and generally unidentified, biological fathers who in no way share Stanley's professed desires. [405 U.S. 645, 667]

Indeed, the nature of Stanley's own desires is less than absolutely clear from the record in this case. Shortly after the death of the mother, Stanley turned these two children over to the care of a Mr. and Mrs. Ness; he took no action to gain recognition of himself as a father, through adoption, or as a legal custodian, through a guardianship proceeding. Eventually it came to the attention of the State that there was no living adult who had any legally enforceable obligation for the care and support of the children; it was only then that the dependency proceeding here under review took place and that Stanley made himself known to the juvenile court in connection with these two children. 5 Even then, however, Stanley did not ask to be charged with the legal responsibility for the children. He asked only that such legal responsibility be given to no one else. He seemed, in

particular, to be concerned with the loss of the welfare payments he would suffer as a result of the designation of others as guardians of the children.

Not only, then, do I see no ground for holding that Illinois' statutory definition of "parents" on its face violates the Equal Protection Clause; I see no ground for holding that any constitutional right of Stanley has been denied in the application of that statutory definition in the case at bar.

As Mr. Justice Frankfurter once observed, "Invalidating legislation is serious business . . . ." Morey v. Doud, 354 U.S. 457, 474 (1957) (dissenting opinion). The [405 U.S. 645, 668]  Court today pursues that serious business by expanding its legitimate jurisdiction beyond what I read in 28 U.S.C. 1257 as the permissible limits contemplated by Congress. In doing so, it invalidates a provision of critical importance to Illinois carefully drawn statutory system governing family relationships and the welfare of the minor children of the State. And in so invalidating that provision, it ascribes to that statutory system a presumption that is simply not there and embarks on a novel concept of the natural law for unwed fathers that could well have strange boundaries as yet undiscernible.

[ Footnote 1 ] In reaching out to find a due process issue in this case, the Court seems to have misapprehended the entire thrust of the State's argument. When explaining at oral argument why Illinois does not recognize the unwed father, counsel for the State presented two basic justifications for the statutory definition of "parents" here at issue. See Tr. of Oral Arg. 25-26. First, counsel noted that in the case of a married couple to whom a legitimate child is born, the two biological parents have already "signified their willingness to work together" in caring for the child by entering into the marriage contract; it is manifestly reasonable, therefore, that both of them be recognized as legal parents with rights and responsibilities in connection with the child. There has been no legally cognizable signification of such willingness on the part of unwed parents, however, and "the male and female . . . may or may not be willing to work together towards the common end of child rearing." To provide legal recognition to both of them as "parents" would often be "to create two conflicting parties competing for legal control of the child."

The second basic justification urged upon us by counsel for the State was that, in order to provide for the child's welfare, "it is [405 U.S. 645, 662]  necessary to impose upon at least one of the parties legal responsibility for the welfare of [the child], and since necessarily the female is present at the birth of the child and identifiable as the mother," the State has selected the unwed mother, rather than the unwed father, as the biological parent with that legal responsibility.

It was suggested to counsel during an ensuing colloquy with the bench that identification seemed to present no insuperable problem in Stanley's case and that, although Stanley had expressed an interest in participating in the rearing of the children, "Illinois won't let him." Counsel replied that, on the contrary, "Illinois encourages him to do so if he will accept the legal responsibility for those children by a formal proceeding comparable to the marriage ceremony, in which he is evidencing through a judicial proceeding his desire to accept legal responsibility for the children." Stanley, however, "did not ask for custody. He did not ask for legal responsibility. He only objected to someone [else] having legal control over the children." Tr. of Oral Arg. 38, 39-40.

[ Footnote 2 ] The position that Stanley took at the dependency proceeding was not without ambiguity. Shortly after the mother's death, he placed the children in the care of Mr. and Mrs. Ness, who took the children into their home. The record is silent as to whether the Ness household was an approved foster home. Through Stanley's act, then, the Nesses were already the actual custodians of the children. At the dependency proceeding, he resisted only the court's designation of the Nesses as the legal custodians; he did not challenge their suitability for that role, nor did he seek for himself either that role or any other role that would have imposed legal responsibility upon him. Had he prevailed, of course, the status quo would have obtained: the Nesses would have continued to play the role of actual custodians until either they or Stanley

acted to alter the informal arrangement, and there would still have been no living adult with any legally enforceable obligation for the care and support of the infant children.

[ Footnote 3 ] The Court seems at times to ignore this statutory definition of "parents," even though it is precisely that definition itself whose constitutionality has been brought into issue by Stanley. In preparation for finding a purported similarity between this case and Bell v. Burson, 402 U.S. 535 (1971), the Court quotes the legislatively declared aims of the Juvenile Court Act to "strengthen the minor's family ties whenever possible, removing him from the custody of [405 U.S. 645, 665]   his parents only when his welfare or safety or the protection of the public cannot be adequately safeguarded without removal." (Emphasis added.) The Court then goes on to find a "self-contradiction" between that stated aim and the Act's nonrecognition of unwed fathers. Ante, at 653. There is, of course, no such contradiction. The word "parent" in the statement of legislative purpose obviously has the meaning given to it by the definitional provision of the Act.

[ Footnote 4 ] When the marriage between the parents of a legitimate child is dissolved by divorce or separation, the State, of course, normally awards custody of the child to one parent or the other. This is considered necessary for the child's welfare, since the parents are no longer legally bound together. The unmarried parents of an illegitimate child are likewise not legally bound together. Thus, even if Illinois did recognize the parenthood of both the mother and father of an illegitimate child, it would, for consistency with its practice in divorce proceedings, be called upon to award custody to one or the other of them, at least once it had by some means ascertained the identity of the father.

[ Footnote 5 ] As the majority notes, ante, at 646, Joan Stanley gave birth to three children during the 18 years Peter Stanley was living "intermittently" with her. At oral argument, we were told by Stanley's counsel that the oldest of these three children had previously been declared a ward of the court pursuant to a neglect proceeding that was "proven against" Stanley at a time, apparently, when the juvenile court officials were under the erroneous impression that Peter and Joan Stanley had been married. Tr. of Oral Arg. 19. [405 U.S. 645, 669]

196 S.W.3d 236 (Tex.App.—Houston [1st Dist.] 2006)

Sabrina YONKO, Appellant,

v.

DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, Appellee.

No. 01-05-00091-CV.

Court of Appeals of Texas, First District, Houston

April 27, 2006

On Appeal from the 314th District Court Harris County, Texas Trial Court Cause No. 2004-04462J

196 S.W.3d 237

[Copyrighted Material Omitted]

196 S.W.3d 238

William B. Connolly, William B. Connolly & Associates, Houston, for appellant.

Sandra D. Hachem, Sr. Asst. Co. Atty., Houston, for appellee.

Panel consists of Chief Justice Radack and Justices Alcala and Bland.

196 S.W.3d 239

OPINION ON REHEARING

Jane Bland, Justice.

Sabrina Yonko appeals the trial court's judgment terminating her parental rights to her minor son ("V.Y."). Yonko contends the evidence is legally and factually insufficient to support the trial court's findings that (1) she knowingly allowed the child to remain in conditions which endangered the child's physical or emotional well-being; (2) she knowingly placed the child with persons who engaged in conduct which endangered the child's physical or emotional well-being; (3) she was the major cause of the child's failure to be enrolled in school as required by the Education Code; and (4) it is in the child's best interest for Yonko's parental rights to be terminated. In our opinion dated December 22, 2005, we held that the evidence was factually insufficient to support the trial court's finding as to issue four and therefore we reversed and remanded for a new trial. The State has filed a motion for rehearing and motion for rehearing en banc. We withdraw our previous opinion and issue this opinion in its stead.[1] Our disposition remains the same.

Facts

After having been raped at age seventeen, Yonko gave birth to V.Y. in August 1995. In 1996, Yonko began a relationship with Sam Perez ("Perez"), the man whom Yonko later came to consider her husband and V.Y.'s father. Yonko testified that their families did not approve of their relationship and, to put it mildly, did not get along with each other. She testified that in one incident, her father went to jail and Perez's father went to the hospital after the two men had a fight, and in another, Perez's father showed up at her father's house with gang members and guns. As a result, Yonko and Perez traveled wherever they thought they could find work and avoid problems with their families. She further testified that V.Y. never witnessed any of the violence between their families. Yonko estimated that during V.Y.'s childhood, they spent about a year to a year and a half in San Diego, a month to a month and a half in Las Vegas, four months in Phoenix, a couple months in Detroit, a couple months in Houston, two years in Chicago, and a couple months in Hammond, Indiana. Yonko stayed either in motels or with family members, and V.Y. was with Yonko at all times during this period. Yonko never enrolled V.Y. in school. During this period, Yonko worked as an auto body repair technician, and sold potpourri and roses at flea markets. She at all times was gainfully employed.

During one visit to Houston in March 2002, Yonko was arrested and charged with aggravated assault. Yonko testified that Perez was responsible for the assault, which was committed against a third person, but that she pled guilty in an effort to avoid imprisonment. The criminal trial court sentenced Yonko to three years' community supervision. She left Harris County soon thereafter to visit her grandfather, who she claimed was having heart surgery. As a result, the court revoked Yonko's community supervision, and sentenced her to two years' imprisonment. At this time, V.Y. was six years' old. Upon her incarceration, Yonko placed V.Y. in her mother's care. Yonko testified that she believed her brother ("Angelo") and his wife would also help her mother ("Betty") take care of V.Y. Yonko gave Betty $4,400, which she had saved from working, to care for V.Y. and to pay for an attorney.

196 S.W.3d 240

In May 2004, the Department of Family and Protective Services ("DFPS") received a referral of neglectful supervision of V.Y. when he was found taking cookies from an apartment complex leasing office. V.Y. told police he had been staying with his maternal uncle, Angelo, in the complex, and that his mother and father were on vacation in Las Vegas. Apartment personnel told police that the padlocked apartment where V.Y. claimed he had been living had not been occupied by Angelo, and that no one named "Yonko" occupied any apartment in the complex or in the surrounding area. DFPS observed that V.Y.'s clothing was dirty and torn, and that he had dirt caked in his nails, and took him into custody. Although he was eight years old, V.Y. could not write his name, nor could he identify much of the alphabet and some numbers.

A week later, Angelo contacted DFPS and provided inconsistent stories about why V.Y. was in his care. Angelo claimed V.Y. had been staying with Perez in Arizona, and that he went to get V.Y. in October 2003, but the DFPS caseworker testified that she had some concerns about Angelo's honesty. After performing a home study, DFPS determined that V.Y. should not live with Angelo because Angelo had been evicted in the past; V.Y. was seen roaming the streets at

one o'clock in the morning; V.Y. shot someone's window out with a BB gun while in Angelo's care; Angelo could not produce proof of income; Angelo and his wife already had two children with a third on the way; and Angelo's wife told DFPS that V.Y. would not follow her instructions.

Yonko learned that her son was in DFPS's custody from a social worker, and was then served in prison with the lawsuit to terminate her rights. Yonko testified that she was shocked by what happened to V.Y. because Betty, Yonko's mother, loved V.Y. as much as she did, and she did not know the reason for Angelo leaving V.Y. unsupervised. Upon learning about V.Y., Yonko had a "nervous breakdown," meaning she started shaking, would not eat, and had to be put on medication for a period of time. Yonko wrote approximately 200 letters to V.Y. after she learned what had happened. V.Y. wrote her back six or seven times. After being served, Yonko wrote numerous letters to the district and county court clerks requesting an attorney. The trial court appointed counsel for Yonko approximately one month before trial.

In accordance with the family service plan created for her by DFPS, Yonko completed classes in prison on parenting, anger management, and life skills, and participated in counseling. Yonko testified that upon her release from prison, scheduled to occur in less than thirty days after the trial of this case, she would find employment, enroll V.Y. in school, and establish suitable housing. She testified that she had learned the importance of an education, exemplified by her earning her G.E.D. in prison, and that she regretted not enrolling V.Y. in school when he became eligible. Yonko testified that she believed it was a responsible decision to leave V.Y. with Betty because Betty was his grandmother and loved him. Betty herself was not available to testify because, according to the guardian ad litem's testimony, Yonko believed Betty was living in California at the time of the trial.

The DFPS caseworker testified that she believed termination was in V.Y.'s best interest, but admitted that V.Y. had expressed a strong preference to be with his mother. The caseworker opined that V.Y. would be "heartbroken" if his mother's rights were terminated and would need counseling to support him if the court permanently separated him from his mother. The guardian ad litem supported termination

196 S.W.3d 241

based on reading reports, meeting with the foster parents, and meeting V.Y. The guardian ad litem also testified that she met with Yonko for forty-five minutes in jail, and that Yonko was cooperative in providing information. The attorney ad litem opposed termination, stating that it would be in V.Y.'s best interest to remain in contact with Yonko and that she believed V.Y. would suffer permanent damage if not allowed to remain in contact with his mother. The trial court terminated Yonko's rights and appointed DFPS the sole managing conservator.

Standard of Review

The natural right that exists between parents and their children is one of constitutional dimension. See In re J.F.C., 96 S.W.3d 256, 273 (Tex. 2002) (examining constitutional

implications of terminating parental rights). A parent's right to "the companionship, care, custody and management of his or her children" is a constitutional interest "far more precious than any property right." Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982) (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972)). In a case terminating parental rights, therefore, we strictly scrutinize the proceedings and strictly construe the law in favor of the parent. Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985). In proceedings brought under section 161.001 of the Family Code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon 2005); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005); In re L.M., 104 S.W.3d 642, 647 (Tex. App.-Houston [1st Dist.] 2003, no pet.).

In termination of parental rights cases, "due process requires that the State support its allegations by at least clear and convincing evidence" to reduce the risk of erroneous termination. Santosky, 455 U.S. at 747–48, 102 S.Ct. at 1391–92; In re B.L.D., 113 S.W.3d 340, 353–54 (Tex. 2003). To be legally or factually sufficient under the clear and convincing standard, the evidence must be such that a fact-finder reasonably could form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof. In re J.L., 163 S.W.3d at 84; Robinson v. Tex. Dep't of Protective & Regulatory Servs., 89 S.W.3d 679, 688 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

In a legal sufficiency challenge, we review all the evidence in a light most favorable to the court's finding, and assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. In re J.L., 163 S.W.3d at 85. We disregard any evidence that a reasonable fact-finder could have disbelieved, but we do not disregard undisputed facts. Id. In reviewing a challenge to the factual sufficiency of the evidence, we must give due consideration to the evidence that the fact-finder reasonably could have found to be clear and convincing, considering all the evidence in the record, including evidence in support of and contrary to the trial court's findings. In re J.F.C., 96 S.W.3d at 266. In reviewing all the evidence, we also keep in mind that the State has the burden of proof in termination proceedings. See id. at 264.

Legal Sufficiency [2]

The trial court found that clear and convincing evidence existed to terminate

196 S.W.3d 242

Yonko's parental rights under Family Code section 161.001(1)(D), because she knowingly placed the child in conditions which endangered his physical and emotional well-being; under section 161.001(1)(E), because she engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered his physical and emotional well-being; and under section 161.001(1)(J)(i), because she had been the major cause of the failure of the child to be enrolled in school as required by the Education Code. See Tex. Fam. Code Ann. § 161.001. The trial court further found, as required by the statute, that clear and convincing evidence existed that

termination was in the best interest of the child. See id. Yonko challenges the legal sufficiency of each of these findings.

Though the trial court here found that termination was justified under all three of the enumerated factors alleged by DFPS, and that termination was in V.Y.'s best interest, a finding of one enumerated factor coupled with a finding of the child's best interest is sufficient to support termination. See In re A.V., 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest."); see also Latham v. Dep't of Family & Protective Servs., 177 S.W.3d 341, 348 (Tex. App.—Houston [1st Dist.] Apr. 7, 2005, no pet.) ("A court may base a termination of parental rights upon a finding that a parent engaged in conduct described in one of the alleged grounds, plus a finding that termination is in the best interest of the children."). A finding that the termination was not in the child's best interest is enough to justify reversal, even if all of the enumerated factors are proven. See In re A.V., 113 S.W.3d at 362. We hold that the evidence was legally sufficient to support termination under one enumerated factor and the child's best interest, but factually insufficient to support termination based on the child's best interest. Thus, we address the evidence supporting the enumerated factor and best interest.

Failure to Enroll the Child in School

The trial court found termination of Yonko's parental rights justified under section 161.001(1)(J), because Yonko had been the major cause of "the failure of [V.Y.] to be enrolled in school as required by the Education Code." See Tex. Fam. Code Ann. § 161.001(1)(J). The Education Code provides that "a child who is at least six years of age . . . shall attend school." Tex. Educ. Code Ann. § 25.085(b) (Vernon Supp. 2005).

Yonko admits that she never enrolled V.Y. in school or otherwise provided him with a certified home-school education, noting that she was molested while in school, and that she was not settled enough to enroll V.Y. in school. Yonko further contends that she and V.Y. were never Texas residents for any relevant time period under the statute. The State responds that Yonko was in Harris County for approximately two months around the time she was charged with assault in March 2002, and that V.Y. was age six at that time.

The compulsory education statute does not state a residency requirement, and the caselaw indicates that moving frequently does not exempt a parent from the requirement of enrolling a child in school or otherwise providing for his education. Yonko argues that viewing the Education Code as a whole, residency is a requirement of enrollment. See id. § 25.001(b)(1) (requiring schools to admit children between ages five and twenty-one if they reside in school district); id. § 25.001(c)

196 S.W.3d 243

(allowing districts to set minimum proof of residency before admitting children). Yonko ignores, however, the many other situations where the statute requires schools to admit children who are nonresidents. For example, the statute requires admission to school if the child is living with a parent who has joint custody, if the person is homeless regardless of residence, if the person is a foreign exchange student, or if the child is temporarily living with foster parents. Id. § 25.001(b)(2), (5), (6), (f). In Stuart v. Tarrant County Child Welfare Unit, the court of appeals held that the parents' need to move frequently in the flea market circuit so they could support the family did not excuse them from the requirements of the compulsory education statute. 677 S.W.2d 273, 280 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.), overruled on other grounds by In the Interest of W.S., 899 S.W.2d 772 (Tex. App.—Fort Worth 1995, no writ). Viewing the evidence in this case in a light most favorable to the ruling, the trial court reasonably could have formed a firm belief or conviction that Yonko was the major cause of failing to enroll V.Y. in school as required by the Education Code.

Best Interest of the Child

The Texas Supreme Court has provided a non-exclusive list of factors that may be considered in determining whether the termination of a parent's rights is in a child's best interest. Holley v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. Id.

The State need not prove all of the Holley factors as a condition precedent to parental termination. In re C.H., 89 S.W.3d 17, 27 (Tex. 2002). Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child, but the presence of scant evidence relevant to each Holley factor will not support such a finding. Id; In re J.J.O., 131 S.W.3d 618, 630–31 (Tex. App.—Fort Worth 2004, no pet.). There is a strong presumption that the best interest of the child is served by keeping custody in the natural parent. In re B.M.R., 84 S.W.3d 814, 819 (Tex. App.—Houston [1st Dist.] 2002, no pet.). For legal sufficiency purposes, we will consider those factors that support the finding that termination was in the child's best interest. In re C.T.E., 95 S.W.3d 462, 464 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). The evidence raises two Holley factors supporting termination.

1. Parent's Acts or Omissions

The evidence is undisputed that Yonko failed to enroll V.Y. in school or otherwise provide a certified home-school education. The DFPS caseworker testified that when V.Y. came into State custody, he could not recognize many letters and some numbers, and he was unable to read,

write, and do arithmetic. The school he began attending placed V.Y. one grade level behind, and required him to participate in one-on-one pull-out groups for individual attention. Yonko admits that it was not in V.Y.'s best interest for him never to have been placed in school. Viewing the evidence in a light most favorable to the ruling, the trial

196 S.W.3d 244

judge could have formed a firm belief or conviction that Yonko's failure to enroll V.Y. in school or teach him to read or do math weighed in favor of termination of Yonko's rights.

In addition, Yonko's participation in an aggravated assault and subsequent violation of community supervision weigh against Yonko on this issue. Though Yonko testified that she was not responsible for the assault, a reasonable fact-finder could have disbelieved this testimony. Yonko also testified that she violated her community supervision to be with a sick grandfather, but she nonetheless knowingly violated her community supervision by leaving Harris County. This factor weighs in favor of termination.

2. Stability of the Home

The State also contends that termination is in V.Y.'s best interest because he lived in many locales before the age of six. The evidence is undisputed that Yonko moved frequently when V.Y. was in her care. Though Yonko was inconsistent in her estimation of the time they resided in each place, they had spent at least some time in San Diego, Las Vegas, Phoenix, Houston, Chicago, Detroit, and Hammond, Indiana, all by the time V.Y. was seven years' old. As to V.Y.'s current home environment, the DFPS caseworker testified that V.Y. had bonded with his current foster family, the second family with whom DFPS has placed him for care. We hold that legally sufficient evidence supports the trial court's finding of best interest under this factor because in this case Yonko failed to provide for V.Y.'s educational needs, but we decline to hold that moving alone is tantamount to instability in the home if the child's other social, emotional, health, and educational needs are met.

Factual Sufficiency

Next, we balance the factors presented in the legal sufficiency argument against the evidence that militates against finding that termination is justified under the statute. In re C.T.E., 95 S.W.3d at 464. A court of appeals should consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that disputed evidence in favor of its finding. In re J.F.C., 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that weighs against termination is so significant that a fact-finder could not reasonably have formed a firm belief or conviction that termination was justified, then the evidence is factually insufficient to support termination. Id. A court of appeals should detail in its opinion why it has concluded that a reasonable fact-finder could not have credited disputed evidence in favor of termination. Id. at 266–67.

1. Child's Desires

The evidence is undisputed that V.Y. loves his mother and wishes to live with her. Yonko testified that V.Y. "would go crazy" if her rights were terminated because he is expecting to re-unite with her. The DFPS caseworker testified that V.Y. loves his mother and would be "heartbroken" if he never got to see her again. The caseworker further testified that V.Y. would need counseling to recover from the separation. V.Y. expressed his feelings toward his mother in one of the letters he sent her after he was taken into DFPS custody:

Dear Mom, I love you forever I pray every night. Mom send a couple of pictures of you am writing to you soon. I miss you mom. I pray every night even when I eat. I hope I see you again. I hope you like the pictures I gave you. I miss you mom. Love [V.] forever from your son [V.]

The DFPS caseworker also testified that V.Y. told her he loves his mother and

196 S.W.3d 245

misses her, and that a bond exists between him and his mother.

The State points to In re W.S.M., 107 S.W.3d 772 (Tex.App.-Texarkana 2003, no pet.), for the proposition that a child's love for his parents cannot override undisputed evidence that the parents' lifestyle endangers the child's well-being. We agree that the child's desire to remain with a parent is only one factor to consider among many, but love for a parent cannot be ignored as a reflection of the parent's ability to provide for the child's emotional needs. Where the evidence of the parent's failures is not overwhelming, the desires of the child weigh against termination of parental rights.

The facts of this case are easily distinguishable from the facts of W.S.M. There, the evidence showed that the father was physically abusive to the mother; the parents were unable to provide financially for the family; both parents engaged in extensive drug use; at age seven, the child did not know how to clean himself after using the restroom or how to tie his shoes; the mother had neglected a health problem until it was so bad the child needed surgery; the mother suffered from depression; and DFPS had intervened to try to help the family before, but both parents refused to complete the family plan. Id. at 773.

Here, in contrast, the evidence indicates that Perez was never violent toward Yonko or V.Y.; Yonko provided financially for the family, sometimes earning as much as $600 in a day repairing cars; and the only evidence of drug use occurred before Yonko became pregnant with V.Y., many years before the termination proceeding. No evidence exists that Yonko ever failed to provide for V.Y.'s medical needs. Yonko completed all the required classes under the DFPS family supervision plan and earned her G.E.D. Moreover, Yonko placed V.Y. in her mother's care, together with $4,400 to defray expenses for V.Y. and her criminal attorney. While separated from Yonko, V.Y. experienced problems following directions, took cookies from an apartment complex leasing office, and shot a BB gun through a window, but this evidence does

not rise to the level that establishes that Yonko's lifestyle endangered the child as compared to the circumstances in W.S.M. See id.

Here, V.Y. was nine years' old at the time of the trial and capable of expressing his love for, and desire to remain with, his mother. V.Y. expressed this desire through letters to his mother and statements to the DFPS caseworker. His mother returned this affection in nearly 200 letters sent to him while she was incarcerated. Combined with the DFPS caseworker's admission that V.Y. would be so affected by termination as to be heartbroken and would require counseling, this factor of the "child's desires" weighs against a finding that termination was in V.Y.'s best interest.

2. Emotional and Physical Needs of the Child Now and in the Future

The evidence indicates that Yonko provided for the physical and emotional needs of V.Y. before her incarceration. Yonko testified that she provided V.Y. food, clothing, shelter, and love while he was in her care. This evidence is undisputed. V.Y.'s love for his mother and desire to be with her further indicate that she was providing for his emotional needs, and that his emotional well-being in the future is dependent upon maintaining a relationship with his mother. Yonko testified that she has always been employed, and can make anywhere from $100 to $600 a day repairing cars. She has also made money selling potpourri and roses, and was able to save $4,400 which she intended to use to rent an apartment and purchase a more reliable

196 S.W.3d 246

car. DFPS put on no evidence to indicate that Yonko herself had ever failed to provide for the physical or emotional needs of her child. Rather, that evidence relates to the lack of care V.Y. received from relatives after Yonko's incarceration.

Although it is undisputed that Yonko left her son in the care of her mother, together with $4,400 she had saved, the State contends that the trial court was within its discretion to believe that the money was for an attorney rather than V.Y. because Yonko initially testified that she had not provided financial support for V.Y. The State, however, mischaracterizes the testimony on this issue. While Yonko was questioned by the State regarding the arrangements she made for V.Y.'s care while she was in prison, the State asked with whom she had left her son. Yonko responded that her mother, brother, and sister-in-law would all be taking care of him. The State next asked whether she provided her family members with any financial support for the child. Yonko responded that she was in prison and thus could not send them money. The State then asked Yonko whether she had saved any money prior to becoming incarcerated, to which she replied that she had saved $4,400, which she had intended to use to rent an apartment and purchase a better car. The State asked whether she turned that money over to her mother for the care of V.Y. and she responded that she had. The State asked whether the money was used on V.Y.'s behalf. Yonko stated that it was supposed to be. The State then stated that the question was whether Yonko knew that the money was spent on her son's behalf. Yonko responded that she was pretty sure it was. This testimony does not indicate that Yonko initially

denied leaving the money for the care of her son; rather, it indicates that Yonko believed the question was whether she had sent money since becoming incarcerated, to which Yonko honestly replied that she had not. The State's own questions indicate that the State knew Yonko had left money, and was attempting to clarify this issue for the court.

The evidence suggesting that Yonko did not provide for V.Y. comes from the period while Yonko was incarcerated. The DFPS caseworker admitted Yonko could not know that Yonko's mother would not care for her son. The DFPS caseworker also testified that she had doubts about Angelo's story that he picked V.Y. up from Arizona where he was staying with his father. Yonko testified that she was shocked to discover that her family failed to properly care for V.Y. Furthermore, the evidence is undisputed that Yonko sent over 200 letters to V.Y. during the time he was in DFPS care, assuring him that she loved him and they would be together again soon.

Yonko threatened V.Y.'s needs when she violated her community supervision, thus resulting in incarceration. The Texas Supreme Court has held, however, that incarceration alone is not a sufficient basis for termination of parental rights. Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). Yonko was scheduled to be released from prison within thirty days of this trial, and repeatedly expressed her intentions to secure a job and an apartment, and enroll V.Y. in school, thus indicating that she did not intend to repeat her mistakes in the future. Yonko also completed classes in anger management and parenting, and completed her G.E.D. while in prison, further indicating she would be able to provide for V.Y.'s needs. We hold that this factor weighs against termination, given the caseworker's assessment of V.Y.'s emotional need for his mother, and the lack of evidence from the State as to emotional or physical abuse or neglect by the mother.

196 S.W.3d 247

3. Emotional and Physical Danger to the Child Now and in the Future

The only evidence of any potential danger to V.Y. was from Yonko's stepfather. Yonko testified that her stepfather was abusive to her mother, Betty, when she was a child, that V.Y. had seen Yonko's stepfather spill whiskey on Betty, and that Betty was unable to testify at this trial because she fled to California when her husband threatened to kill her. Yonko testified that they lived with her mother for less than a month when V.Y. was a child, and that she left V.Y. with Betty when she went to prison. The State contends that V.Y. was therefore exposed to potential family violence. However, the State does not dispute Yonko's testimony that Betty always either called the police or left when her husband was violent. Nor does the State dispute Yonko's testimony that she told her mother to get a restraining order, and that something would have to be done about the situation with her stepfather before she would bring V.Y. around Betty. Yonko also testified that she changed residences to protect V.Y. from her stepfather and avoid any violent situations. This evidence indicates that Yonko and Betty took steps to avoid potential violence by the stepfather, and to keep V.Y. away from such violence.

In addition, the evidence indicates that emotional harm to V.Y. would result if Yonko's parental rights were terminated. The DFPS caseworker testified V.Y. would need counseling to overcome the separation, and that he would be heartbroken. Yonko testified that V.Y. would go crazy because she had been assuring him in her letters that they would be together again soon. The attorney ad litem appointed to represent V.Y. also opposed termination because of the negative emotional impact she believed it would have on V.Y. Given the lack of evidence of any physical or emotional endangerment to V.Y. while in his mother's care, a reasonable fact-finder could not have formed a firm belief that emotional or physical danger to the child would result from allowing Yonko to retain rights to her son.

4. Parental Abilities of the Individual Seeking Custody

Yonko's failure to enroll V.Y. in school for the one-year period during which he was in her care and required to attend school, and Yonko's frequent moves, cause concern for her parental abilities. Also, Yonko's testimony that she occasionally had others read legal documents for her or write things to be submitted to DFPS indicates that she might have a difficult time helping V.Y. with his school work. Yonko testified that she did not attend school very often as a child. Yonko also testified that she learned the value of education in prison, and that she pursued and completed her G.E.D. In addition to her G.E.D. classes, Yonko took classes on parenting, life skills, anger management, and bible studies. Yonko testified that she intended to put V.Y. in school, and that she wanted him to be a lawyer or a pastor. The DFPS caseworker testified that V.Y.'s only special need was reading, and recognized that within a few months of being in custody, V.Y. was writing letters to his mother. Yonko testified that prior to her incarceration, she provided V.Y. with books, and that if she was to regain custody after being released, she would help V.Y. study and do whatever it took personally to help him get through school. We hold that a reasonable fact-finder could not have formed a firm belief or conviction that Yonko lacked the parental abilities necessary to care properly for V.Y.

5. Programs Available to Assist the Individual

Yonko testified that when she was released from prison, she intended to stay in

196 S.W.3d 248

a halfway house until she could get on her feet. She also testified that Project R.I.O. was willing to give her a job despite her felony conviction. The only evidence offered by DFPS was that counseling would be available to help V.Y. adjust to his foster family. DFPS did not contradict Yonko's testimony that Project R.I.O. would help her find a job, or that she would be able to stay in a halfway house. A reasonable fact-finder could not have formed a firm belief or conviction that that this factor weighs in favor of termination of Yonko's rights, and we therefore conclude that it does not weigh in favor of termination.

6. Any Excuse for the Parent's Acts or Omissions

Yonko testified that the reason she did not place V.Y. in school was that she was molested as a student and did not want him to endure a similar experience. This does not excuse her failure to educate V.Y., but her concern for the child's well-being was a factor in her decision not to place him in school. In addition, Yonko's pursuit of her own G.E.D. and other life-skills classes while in prison, and repeated testimony that she learned the value of education while incarcerated, further indicate that Yonko understands that V.Y. must be enrolled in school.

Yonko's decisions resulting in her incarceration were poor ones, despite her professed justification that she did it to further the needs of her family and her son by attempting to care for a sick relative and avoid leaving her son alone while in prison. However, viewing all the evidence, Yonko has also demonstrated an ability to care for V.Y. and has made an effort to improve her parenting abilities for the future. We therefore hold that this factor does not weigh strongly against or in favor of termination of Yonko's parental rights, and that termination of Yonko's parental rights cannot be upheld in this case merely because the excuses for her acts and omissions are inadequate.

7. Plans for the Child by the Parent and DFPS

Yonko testified that she intended to get a job, find an apartment, and place V.Y. in school. Yonko was scheduled to be released from prison less than thirty days after the trial in this case. She estimated that she might have to stay in a halfway house at first, and that it would probably take her a couple months to get on her feet. The fact that Yonko had been able to save $4,400 prior to her incarceration indicates that she can be financially responsible. She testified that she might ask for financial assistance from Betty, but that she did not intend to stay with her. Yonko testified that she would spend extra time and do additional home schooling if necessary to help V.Y. with his school work. Yonko had complied with all the terms of the family plan that she could possibly comply with while in prison, by taking the required classes, and DFPS presented no evidence to suggest that she would not comply with the rest of the terms when released from prison.

DFPS presented evidence that V.Y.'s present foster family has considered adopting him, but had not made a final decision at the time of trial. The DFPS caseworker testified that she believed V.Y. was adoptable, because DFPS believes all children are adoptable. It is undisputed that V.Y.'s reading and writing had improved and that he had bonded with his foster family. It is also undisputed that V.Y. was already in his second foster home in six months. DFPS presented no evidence that it had taken any steps to provide a permanent home for V.Y. This factor weighs against termination.

196 S.W.3d 249

The Overall Assessment of Best Interest

Reviewing the factors that weigh in favor of and against termination, we hold the evidence is factually insufficient to support termination of Yonko's parental rights under the clear and

convincing evidence standard because (1) the caseworker's opinion supporting termination is substantially undermined by her further assessment of the psychological and emotional damage she concedes would result to the child from termination, with no testimony as to how this damage could be ameliorated other than a reference to counseling; and (2) the State presented scant evidence the trial court could credit as to Yonko's future inability to meet the needs of the child under the Holley factors so as to overcome the caseworker's assessment of the emotional risk to the child. See In re K.C.M., 4 S.W.3d 392, 394–95 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (evidence supporting termination found factually insufficient to establish best interest where mother developed relationship with child prior to incarceration for drugs, wrote numerous letters while incarcerated discussing her plans to reunite with child, did nothing to endanger child after she signed service plan, and had only seventy-five days before release from prison at time of termination trial).[3] The facts in this case parallel the facts in K.C.M. Given the presumption that children should remain with their parents, and given the high evidentiary standard that the statute requires the State to meet, a reasonable factfinder could not have found factually sufficient evidence exists to form a firm belief or conviction that termination in this case is in V.Y.'s best interest.

Conclusion

We hold that the evidence was legally sufficient to support termination of Yonko's rights based on her failure to enroll V.Y. in school and her failure to provide V.Y. with a stable home environment, and that termination was in V.Y.'s best interest. We hold that the evidence was factually insufficient to support termination, however, because in weighing all of the Holley factors, a reasonable fact-finder could not have formed a firm belief or conviction that termination of Yonko's parental rights was in V.Y.'s best interest. Accordingly, we reverse the judgment of the trial court and remand for a new trial.

---------

Notes:

[1] As we have issued a new opinion on rehearing, we deny the State's motion for en banc reconsideration as moot. See Brookshire Bros. v. Smith, 176 S.W.3d 30, 40 n.2 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (supp. op. on reh'g).

[2] When both legal and factual sufficiency issues are raised, we decide the legal sufficiency issue first. Glover v. Tex. Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex. 1981).

[3] We note that this court decided K.C.M. using a standard of review that the Texas Supreme Court has since disapproved. See In re C.H., 89 S.W.3d 17, 25–26 (Tex. 2002). Now, the appropriate appellate standard for reviewing parental termination factual findings is whether the evidence is such that a fact-finder reasonably could have formed a firm belief or conviction about the truth of the State's allegations. Id. at 25. This standard retains the deference an

appellate court should have for the fact-finder's role. Id. at 26. Nevertheless, K.C.M. illustrates evidence that lacks factual sufficiency even under the present standard.

---------

# Tex. Fam. Code § 101.007 Clear And Convincing Evidence 

- Tex. Fam. Code § 101.007 Clear And Convincing Evidence
- 
- 

**Texas Statutes**
**Family Code**
**Title 5. The Parent-Child Relationship And The Suit Affecting The Parent-Child Relationship**
**Subtitle A. General Provisions**
**Chapter 101. Definitions**
*Current through the 2013 Regular and Special Sessions*
**§ 101.007. Clear And Convincing Evidence**


"Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.

# § 161.001. Involuntary Termination Of Parent-Child Relationship.

Archive

**Texas Statutes**

**Family Code**

**Title 5. The Parent-Child Relationship And The Suit Affecting The Parent-Child Relationship**

**Subtitle B. Suits Affecting The Parent-Child Relationship**

**Chapter 161. Termination Of The Parent-Child Relationship**

**Subchapter A. Grounds**

*Current through the 1st Called Session of the 82nd Legislature (2011)*

**§ 161.001. Involuntary Termination Of Parent-Child Relationship**

The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:

(1) that the parent has:

(A) voluntarily left the child alone or in the possession of another not the parent and expressed an intent not to return;

(B) voluntarily left the child alone or in the possession of another not the parent without expressing an intent to return, without providing for the adequate support of the child, and remained away for a period of at least three months;

(C) voluntarily left the child alone or in the possession of another without providing adequate support of the child and remained away for a period of at least six months;

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

(F) failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition;

(G) abandoned the child without identifying the child or furnishing means of identification, and the child's identity cannot be ascertained by the exercise of reasonable diligence;

(H) voluntarily, and with knowledge of the pregnancy, abandoned the mother of the child beginning at a time during her pregnancy with the child and continuing through the birth, failed to provide adequate support or medical care for the mother during the period of abandonment before the birth of the child, and remained apart from the child or failed to support the child since the birth;

(I) contumaciously refused to submit to a reasonable and lawful order of a court under Subchapter D, Chapter 261;

(J) been the major cause of:

(i) the failure of the child to be enrolled in school as required by the Education Code; or

(ii) the child's absence from the child's home without the consent of the parents or guardian for a substantial length of time or without the intent to return;

(K) executed before or after the suit is filed an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided by this chapter;

(L) been convicted or has been placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or serious injury of a child under the following sections of the Penal Code or adjudicated under Title 3 for conduct that caused the death or serious injury of a child and that would constitute a violation of one of the following Penal Code sections:

(i) Section 19.02 (murder);

(ii) Section 19.03 (capital murder);

(iii) Section 19.04 (manslaughter);

(iv) Section 21.11 (indecency with a child);

(v) Section 22.01 (assault);

(vi) Section 22.011 (sexual assault);

(vii) Section 22.02 (aggravated assault);

(viii) Section 22.021 (aggravated sexual assault);

(ix) Section 22.04 (injury to a child, elderly individual, or disabled individual);

(x) Section 22.041 (abandoning or endangering child);

(xi) Section 25.02 (prohibited sexual conduct);

(xii) Section 43.25 (sexual performance by a child);

(xiii) Section 43.26 (possession or promotion of child pornography);

(xiv) Section 21.02 (continuous sexual abuse of young child or children);

(xv) Section 20A.02(a)(7) or (8) (trafficking of persons); and

(xvi) Section 43.05(a)(2) (compelling prostitution);

(M) had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state;

(N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months, and:

(i) the department or authorized agency has made reasonable efforts to return the child to the parent;

(ii) the parent has not regularly visited or maintained significant contact with the child; and

(iii) the parent has demonstrated an inability to provide the child with a safe environment;

(O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child;

(P) used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and:

(i) failed to complete a court-ordered substance abuse treatment program; or

(ii) after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance;

(Q) knowingly engaged in criminal conduct that has resulted in the parent's:

(i) conviction of an offense; and

(ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition;

(R) been the cause of the child being born addicted to alcohol or a controlled substance, other than a controlled substance legally obtained by prescription, as defined by Section 261.001;

(S) voluntarily delivered the child to a designated emergency infant care provider under Section 262.302 without expressing an intent to return for the child; or

(T) been convicted of:

(i) the murder of the other parent of the child under Section **19.02** or **19.03**, Penal Code, or under a law of another state, federal law, the law of a foreign country, or the Uniform Code of Military Justice that contains elements that are substantially similar to the elements of an offense under Section **19.02** or **19.03**, Penal Code;

(ii) criminal attempt under Section **15.01**, Penal Code, or under a law of another state, federal law, the law of a foreign country, or the Uniform Code of Military Justice that contains elements that are substantially similar to the elements of an offense under Section **15.01**, Penal Code, to commit the offense described by Subparagraph (i); or

(iii) criminal solicitation under Section **15.03**, Penal Code, or under a law of another state, federal law, the law of a foreign country, or the Uniform Code of Military Justice that contains elements that are substantially similar to the elements of an offense under Section **15.03**, Penal Code, of the offense described by Subparagraph (i); and

(2) that termination is in the best interest of the child.

**Cite as Tex. Fam. Code§161.001**

**History.** Amended By **Acts 2011, 82nd Leg., R.S., Ch. 1**, **Sec. 4.02**, eff. September 1, 2011.

Amended By **Acts 2009, 81st Leg., R.S., Ch. 86**, **Sec. 1**, eff. September 1, 2009.

Amended By **Acts 2007, 80th Leg., R.S., Ch. 593**, **Sec. 3.30**, eff. September 1, 2007.

Amended By **Acts 2005, 79th Leg., Ch. 508**, **Sec. 2**, eff. September 1, 2005.

Amended By **Acts 2001, 77th Leg., ch. 809**, **Sec. 1**, eff. Sept. 1, 2001.

Amended By **Acts 1999, 76th Leg., ch. 1087**, **Sec. 1**, eff. Sept. 1, 1999

Amended By **Acts 1999, 76th Leg., ch. 1390**, **Sec. 18**, eff. Sept. 1, 1999

Amended By **Acts 1997, 75th Leg., ch. 575**, **Sec. 9**, eff. Sept. 1, 1997

Amended By **Acts 1997, 75th Leg., ch. 1022**, **Sec. 60**, eff. Sept. 1, 1997

Amended by **Acts 1995, 74th Leg., ch. 709**, **Sec. 1**, eff. Sept. 1, 1995

Amended By **Acts 1995, 74th Leg., ch. 751**, **Sec. 65**, eff. Sept. 1, 1995

Added by **Acts 1995, 74th Leg., ch. 20**, **Sec. 1**, eff. April 20, 1995.